UNITED STATES OF DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

KANE MARCEAUX, GREG CORMIER,       CIVIL ACTION NO: 6:12-cv-01532
SCOTT POIENCOT, NORBERT MYERS,
GABE THOMPSON, NOVEY STELLY,
ULETOM P. HEWITT, REGINA BRISCOE
AND ALEETA M. HARDING

VERSUS                             JUDGE RICHARD T. HAIK, SR.

LAFAYETTE CITY-PARISH CONSOLIDATED
GOVERNMENT; LAFAYETTE POLICE
DEPARTMENT THROUGH THE LAFAYETTE
CITY-PARISH CONSOLIDATED
GOVERNMENT; LESTER JOSEPH "JOEY"
DUREL, JR. IN HIS CAPACITY AS PRESIDENT
OF THE LAFAYETTE CITY-PARISH
CONSOLIDATED GOVERNMENT; DEE
EDWARD STANLEY, INDIVIDUALLY AND IN
HIS CAPACITY AS CHIEF ADMINISTRATIVE
OFFICER OF THE LAFAYETTE CITY-PARISH
CONSOLIDATED GOVERNMENT; JAMES P.
"JIM" CRAFT, INDIVIDUALLY AND IN HIS
CAPACITY AS CHIEF OF THE LAFAYETTE
POLICE DEPARTMENT; AND GEORGE
"JACKIE" ALFRED, INDIVIDUALLY AND IN
HIS CAPACITY AS PATROL DIVISION
COMMANDER OF THE LAFAYETTE
POLICE DEPARTMENT                  MAGISTRATE JUDGE PATRICK J. HANNA
**********************************************************************

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT—SCOTT POIENCOT,
## GREG CORMIER, AND GABE THOMPSON

Defendants, LCG/LPD, CAO Stanley, Chief Craft, and Alfred (in their individual capacities), present the Memorandum in Support of the foregoing Motion for Summary Judgment seeking dismissal of Scott Poiencot, Greg Cormier, and Gabe Thompson's claims as a matter of law. Defendants adopt and incorporate the following sections from their Motion for Summary Judgment relative to Kane Marceaux's claims ("the Marceaux Motion"):

i

- *Introduction—Applicable to all Plaintiffs*
- *Law Applicable to Motions for Summary Judgment*
- *The Principle of Qualified Immunity*

## I.    <u>TABLE OF CONTENTS</u>

II.    TABLE OF AUTHORITIES ................................................................. iv

III.    INTERNAL INVESTIGATIONS & DEPARTMENTAL DISCIPLINE ........... 1

IV.    POIENCOT, CORMIER, THOMPSON FACTS ................................. 4

    A. The Leaked Document ..................................................... 4
    B. The Improper Temporary Restraining Order ................................. 5
    C. Results of AD201-007 ..................................................... 7
    D. In the Meantime… ........................................................ 8
    E. Severance ................................................................. 9

V.    DEFENDANTS DID NOT VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS ................................................................. 9

    A. Scott Poiencot ........................................................... 10

        1. No Matter of Public Concern ........................................ 10
        2. Poeincot's transfer was not an Adverse Employment Action ........... 11
        3. Poiencot's petitioning did not motivate transfer or termination ...... 12

    B. Greg Cormier ............................................................ 14

        1. No Matter of Public Concern ........................................ 14
        2. Cormier's transfer was not an Adverse Employment Action ........... 15
        3. Cormier's petitioning did not motivate transfer or termination ....... 15

    C. Gabe Thompson ......................................................... 18

        1. Thompson's transfer was not an Adverse Employment Action ....... 18
        2. LPD's interest in efficiency outweighed Thompson's right to secretly record his superiors ........................................ 19
        3. Thompson's petitioning did not prompt Defendants' decisions. ...... 21

VI.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY .................. 22

VII.    CONCLUSION .............................................................. 23

VIII.   APPENDICES

I. G.O. 101.1
II. G.O. 101.3
III. G.O. 201.2
IV. G.O. 204.5
V. G.O. 301.9 (without attachments)
VI. G.O. 301.10
VII. G.O. 305.1
VIII. P.P.M. 2161-2

IX.   EXHIBITS

A.  May 8, 2012 transcript from Board hearing
B.  *Marceaux v. LCG* (15th Judicial District, Lafayette, Louisiana, Docket No. 2012-2899)
C.  May 29, 2012 TRO suit hearing transcript
D.  Scott Poiencot Deposition
E.  Greg Cormier Deposition
F.  Greg Cormier Discovery Responses
G.  Gabe Thompson Deposition
H.  Affidavit of CAO Stanley
I.  Affidavit of Chief Craft
J.  Affidavit of Major Alfred
K.  Affidavit of Dwayne Prejean
L.  Transcript of Recording, "631 Greenbriar 05-15-12"
M.  Transcript of Recording, "Craft's Response to Greenbriar Rd..wav"

## II.     TABLE OF AUTHORITIES

### *Statutes*

La. R.S. 33:2489 ...................................................................................................... 22
La. R.S. 33:2500 ..........................................................................................  1, 13, 17
La. R.S. 33:2501 .......................................................................................................... 2
La. R.S. 40:2531 ...................................................................................................... 2, 3

### *Jurisprudence*

*Blanchard v. Brinkerhoff*, 53 F.3d 1282 (5th Cir.1995). ....................................... 16

*Gilbert v. Homar*, 520 U.S. 924 (1997). ................................................................... 1

*Harris v. Victoria Indep. School District*, 168 F.3d 216 (5th Cir.1999) ................................ 10

*Hunt v. Rapides Healthcare Systems, L.L.C.,* 277 F.3d 757 (5th Cir.2001). ......................... 19

*Nixon v. City of Houston*, 511 F.3d 494 (5th Cir.2007). ....................................... 4, 20

*Tindle v. Caudell*, 56 F.3d 966, 971 (8th Cir.1995). ................................................. 4

*Rathjen v. Litchfield*, 878 F.2d 836 (5th Cir.1989). ................................................. 10

*Serna v. City of San Antonio*, 244 F.3d 479 (5th Cir.2001). ................................................. 12

### III.   INTERNAL INVESTIGATIONS & DEPARTMENTAL DISCIPLINE

Police officers occupy a position of "great public trust and high public visibility."[1] It is incumbent on the police department to ensure its officers' integrity and reputation in the eyes of the citizens they serve.[2] As set forth in the Marceaux Motion, LPD officers are governed by multiple sets of rules, including LPD General Orders. Violations of the General Orders may result in discipline.[3] In addition, La. R.S. 33:2500 prescribes public employee conduct for maintaining standards of service and authorizes discipline on any employee who violates its provisions. For instance, public employees may be disciplined for unwillingness or failure to perform duties in a satisfactory manner, conduct which prejudices departmental service or is contrary to public interest or policy, insubordination, and any dishonest, disgraceful, or immoral conduct, among others.[4]

Regulation of officer misconduct begins with consideration of all complaints of alleged employee misconduct and investigations of same, if warranted, a task assigned to Internal Affairs ("IA").[5] Complaints against officers are divided into three categories: 1) serious misconduct, including criminal violations, conduct involving moral turpitude, or allegations requiring termination or demotion; 2) minor policy infractions, which are not of a serious nature; and 3) administrative investigations, initiated by the Chief of Police and conducted by IA when the incident is sensitive in nature or of great magnitude.[6] The Chief of Police or his designee may determine that an allegation of misconduct can be investigated at a lower level in which IA does not get involved (a divisional or "shift" level investigation).

---

[1]     *Gilbert v. Homar*, 520 U.S. 924, 932 (1997).
[2]     Appendix VI—G.O. 301.9.
[3]     Appendix I—G.O. 101.1, Observance Regarding Rules of Conduct.
[4]     La. R.S. 33:2500(A).
[5]     Appendix VI—G.O. 301.9.
[6]     Appendix VI—G.O. 301.9, Classification of Complaints.

In its pursuit of justice, IA is equipped with many tools for investigation, including interrogations, interviews, and polygraphs, among others. An employee who refuses or fails to submit to a polygraph or C.V.S.A. "shall" be terminated. Nonetheless, IA's authority is not unbridled. Louisiana protects officers under investigation with a comprehensive statutory scheme referred to as the Police Officer's Bill of Rights, codified at La. R.S. 40:2531 and reiterated in General Order ("G.O.") 204.5. The Police Officer's Bill of Rights sets forth minimum standards by which IA must investigate officers under investigation. Pertinent to this Motion, the LPD must initiate an investigation of an officer within 14 days of a formal written complaint. Once commenced, the investigation must be completed within 60 days, subject to one 60-day extension ("the 60-day rule"). The investigation is considered complete upon either 1) notice to the officer under investigation that the complaint was not sustained or unfounded, or 2) notice of a pre-determination hearing (in the event the complaint is sustained). Following a pre-determination hearing, the department will determine what discipline is necessary.

G.O. 204.5 governs LPD's disciplinary scheme and sets forth the afore-mentioned three categories of offenses, ranging from the most benign to the most reprehensible. Discipline can also be based on whether the officer has committed prior or multiple offenses (LPD's progressive discipline scheme). Levels of discipline range from mere counseling to the ultimate discipline, termination.[7] All forms of discipline, except letters of counseling, are appealable to the Lafayette Municipal Fire and Police Civil Service Board ("the Board").[8] The Board may consider the merits of an officer's appeal of disciplinary action (which must be affirmed if LPD acted in good faith and for cause[9]) or matters concerning compliance with the Police Officer's

---

[7] Appendix IV—G.O. 204.5.
[8] Lafayette Fire & Police Civil Service Rule XXIII, Section 7-8.
[9] La. R.S. 33:2501(C).

Bill of Rights. If any standard mandated by the Rights is not satisfied, any resulting discipline is an absolute nullity.[10]

Although numerous statutes and rules govern an officer's conduct, the following are pertinent to this Motion.

LPD maintains a strict confidentiality policy:

All departmental business is to be considered confidential and no employee shall release any information to any non-law enforcement entity without proper authorization. No employee shall make known to anyone a proposed action of the Department or the details of any police action/operation.[11]

Violations of the confidentiality policy are Category 3 offenses (the most severe). Similarly, LCG PPM 2161-2 prohibits unauthorized removal or use of any official correspondence, record, computer file, e-mail, or report from any LCG building, office, or file.

As discussed in Defendants' Marceaux Motion, LPD has revised G.O. 201.2 to include a prohibition against clandestine recordings of fellow officers (with few exceptions). In addition, LCG/LPD prohibits the following: conduct unbecoming of a City employee in dealing with fellow employees, supervisors, and members of the public;[12] conduct which disrupts the performance of official duties or interferes with reasonable supervision and discipline, conduct in violation of PPM's, General Orders, and laws; reproachful, incredible, or embarrassing conduct to the profession or Department;[13] unauthorized release of information to the news media[14] and unauthorized release of any departmental matter, deemed confidential, to any non-law

---

[10]     La. R.S. 40:2531(C).
[11]     Appendix IV—G.O. 204.5, Category of Offenses.
[12]     Appendix VIII—LCG PPM 2161-2, §2.28.
[13]     Appendix III—G.O. 201.2.
[14]     Appendix IV—G.O. 204.5, ¶3.5.

enforcement entity;[15] and the furnishing of any information or copies of internal investigations to anyone without permission.[16]

The United States Court of Appeal, Fifth Circuit, is mindful of the paramilitary structure of police departments and has recognized that police departments have greater latitude in their decisions regarding discipline and personnel regulations than other government employers.[17]

## IV.   POIENCOT, CORMIER, AND THOMPSON FACTS

### A.   The Leaked Document

It is highly probable that the Court would not be reading these briefs if not for the single act of a third-party attorney on behalf of her client (also a third party to this lawsuit) in April 2012. At that time, former LPD officer, Ed Mclean, represented by attorney, Olita Magee, was appealing his termination to the Board. Prior to hearing the appeal on the merits, the Board was concerned about whether IA complied with the 60-day rule and asked the parties to submit briefs addressing the issue. Attached to Ms. Magee's responding brief as Exhibit "A" was a copy of an LPD Interoffice Communication entitled "SL Notice/Instructions" signed by IA Sergeant Keith Gremillion on which certain information had been whited-out.[18] LPD later learned that the document had been taken from a shift level investigative file.[19]

The 60-day rule issue came before the Board on May 8, 2012. At that time, LPD questioned Ms. Magee as to how she came in possession of the confidential IA document, which had been whited-out and attached to her brief.[20] Ms. Magee refused to disclose the source of the document, and the Board instructed LPD to launch an investigation regarding the source of the

---

[15]     Appendix IV—G.O. 204.5, ¶3.8.
[16]     Appendix VI—G.O. 301.9.
[17]     *Nixon v. City of Houston*, 511 F.3d 494, 498 (5th Cir.2007), citing *Tindle v. Caudell*, 56 F.3d 966, 971 (8th Cir.1995).
[18]     Exhibit K—Affidavit of Dwayne Prejean; Exhibit E—G. Cormier Deposition, "Exhibit D-1," page 210-211; 217-223.
[19]     Exhibit K—Affidavit of Dwayne Prejean.
[20]     Exhibit A—May 8, 2012 transcript of Board hearing, page 20-21.

leaked document.[21] Accordingly, and pursuant to authorization from CAO Dee Stanley and Major Alfred (in Chief Craft's absence), LPD initiated an investigation on **May 11, 2012.**[22] In commencing its investigation, IA first determined from which file the document had been removed.[23] From there, IA compiled a list of all LPD employees (fourteen officers and one civilian) who could have had access to the file in question.[24] Administrative investigation AD2012-007 commenced. Of the fifteen focus employees, four requested suspension of their interviews in order to obtain an attorney: then-Corporal Scott Poiencot, then-Lieutenant Greg Cormier, then-Captain Norbert Myers, and then-Lieutenant Gabe Thompson.[25] IA proceeded to interview the other employees until the foregoing officers obtained a Temporary Restraining Order.[26]

### B.  The Improper Temporary Restraining Order

On **May 22, 2012 at 1:49 p.m.,** Marceaux, Cormier, Poiencot, Myers, and Thompson filed a *Petition for Temporary Restraining Order with Notice and Preliminary Injunction Pursuant to the Policeman's Bill of Rights* in the Fifteenth Judicial District, Parish of Lafayette, State of Louisiana (Docket No. 2012-2899) ("the TRO suit").[27] Plaintiff's counsel (only Mr. Spring at the time) purportedly sent a "courtesy copy" on that date "transmitted by U.S. Post."[28] Otherwise, Plaintiffs provided no notice of their requested TRO.[29] At the time of filing, Mr. Spring asked for service on named defendants, CAO Stanley, Chief Craft, and Major Alfred. The

---

[21]  *Id.*, page 22.
[22]  Exhibit K—Affidavit of Dwayne Prejean.
[23]  *Id.*
[24]  *Id.*
[25]  *Id.*
[26]  *Id.*
[27]  Exhibit B—*Marceaux v. LCG* (15ᵗʰ JDC, Lafayette, Louisiana, Docket No. 2012-2899), Rule Nisi, Plaintiff's Petition for TRO, with Exhibits, and signed Order.
[28]  Exhibit B—*Marceaux v. LCG* (15ᵗʰ JDC, Lafayette, Louisiana, Docket No. 2012-2899), Plaintiff's Petition for TRO, May 22, 2012 correspondence from Plaintiffs' counsel.
[29]  Exhibit H—Affidavit of CAO Stanley; Exhibit I—Affidavit of Chief Craft; Exhibit J—Affidavit of Major Alfred.

Clerk of Court did not issue service until May 23, 2012, commanding Defendants' appearance at the hearing scheduled for May 29, 2012.[30] **LCG and CAO Stanley were not formally served by the Sheriff's office until May 23, 2012; individual Defendants, Chief Craft and Major Alfred were not formally served until May 25, 2012 at 9:10 (presumably a.m.).[31]** The Honorable Judge Herman Clause signed the TRO, prohibiting LPD from pursuing investigation of the leaked Mclean document, on May 23, 2012.[32]

On May 29, 2012, the parties convened before the Honorable Judge Kristian Earles in the Fifteenth Judicial District for a hearing on whether Defendants could be permanently enjoined from conducting an investigation into the leaked Mclean document. At that time, Plaintiffs played an audio recording secretly taped by Gabe Thompson (using Scott Poiencot's pen) during a conversation with Major Alfred on April 19, 2012. During the course of the hearing, Defendants learned that Poiencot had been secretly taping his conversations with fellow officers since 2006.[33] At the conclusion of the hearing, after listening to the entire April 19, 2012 recording which Plaintiffs claimed supported their TRO suit, Judge Earles stated:

> So, at this point you have no additional evidence of any other threats other than what you allege was made on this CD?
>
> *****
>
> And it just may be said for the record that I didn't find anything here that would be considered a threat to anybody in the department.[34]

---

[30]     Exhibit B—*Marceaux v. LCG* (15th JDC, Lafayette, Louisiana, Docket No. 2012-2899), Rule Nisi, Plaintiff's Petition for TRO, with Exhibits, and signed Order.

[31]     Exhibit B—*Marceaux v. LCG* (15th JDC, Lafayette, Louisiana, Docket No. 2012-2899), Sheriff's Returns, *in globo*.

[32]     *Id.*

[33]     Exhibit C—May 29, 2012 TRO suit hearing transcript.

[34]     Exhibit C—May 29, 2012 TRO suit hearing transcript, page 29-30.

Ultimately Judge Earles dissolved the TRO as wrongfully issued, denied Plaintiffs' request for a permanent injunction, and awarded Defendants costs and attorneys' fees.

On June 6, 2012, the TRO Plaintiffs, together with additional Plaintiffs, filed suit in this Court in order to reach "beyond the realm of local politics," as stated by their counsel following the dismissal of their State Court Petition.[35] Throughout these proceedings, Defendants learned that Plaintiffs have routinely secretly recorded their fellow officers and superior officers without consent. Some recordings have been released to the media and others uploaded to Plaintiffs' patently offensive website. The rest is history.

### C.  Results of Investigation AD2012-007

After Judge Earles dissolved the wrongfully issued TRO and dismissed Plaintiffs' Petition for Injunction, LPD re-commenced the wrongfully stalled investigation into the leaked Mclean document. Following initial interviews of the fifteen subject employees, IA narrowed the scope of the investigation to five officers, each of which were required to submit to polygraph examinations.[36] While Thompson was cleared of any wrong doing, Poiencot and Cormier admitted to actions which were in violation of LPD General Orders and PPM's. Specifically, Cormier admitted that he took the document in question, in its original form, from the file of a shift level investigation to which he was assigned.[37] He further admitted that he whited-out certain information from the file, which was maintained in his office, and gave it to Poiencot, who, at the time, was the LPD civil service representative serving on the Board (which, of course, was hearing Mclean's appeal).[38] Pursuant to the investigation, Cormier was required to

---

[35]  Doc. 31.
[36]  Exhibit K—Affidavit of Dwayne Prejean.
[37]  Exhibit E—G. Cormier Deposition, "Exhibit D-3," page 210-211; 219-222.
[38]  *Id*. Poiencot was later removed from the Board by judgment of the Fifteenth Judicial District Court, because he did not meet the statutory requirements for serving on the Board. (*Lafayette City-Parish Consolidated Government v. Poiencot*, Fifteenth Judicial District, Lafayette, Louisiana, Docket No. 2012-3201-E).

take a polygraph exam. He was unable to take an initial polygraph after the examiner determined that Cormier needed doctor's clearance due to a possible heart issue. Thereafter, Cormier submitted to a subsequent polygraph, which he failed.[39]

Poiencot admitted to receiving the leaked document from Cormier.[40] Furthermore, Poiencot refused to consent to the required polygraph.[41]

### D.  In the Meantime…

On or about March 25, 2012, Cormier filed a complaint with the Board requesting an investigation into alleged payroll fraud of a fellow lieutenant. LCG ordered its human resources director, Raymond Domingue, to commence the investigation.[42] Following a thorough investigation, including analysis of the fellow lieutenant's payroll records and various interviews and statements, Mr. Domingue determined that Cormier's complaint was "unfounded," for reasons set forth in detail in a May 29, 2012 disposition letter to Cormier.[43] Interestingly, while Cormier claimed in his complaint that Chief Craft would "seek vengeance against anyone associated with cooperating with this investigation," Chief Craft was actually the person who brought the complaint to CAO Stanley's attention asking that it be immediately investigated.[44]

Despite Plaintiffs' unsuccessful attempts to stop the investigation into the leaked Mclean document, LPD continued daily operations as usual. After all, a police department cannot halt its daily operations simply because some disgruntled employees have sued it. **Prior to May 2012**, Chief Craft and other officials within LPD determined it was time for a change.[45] As such, they implemented sweeping department-wide transfers, moving numerous officers to different

---

[39]     Doc. 74, ¶79.
[40]     Exhibit D—S. Poiencot Deposition, page 136.
[41]     Exhibit D—S. Poiencot Deposition, page 157.
[42]     Exhibit F—G. Cormier Deposition, page 343 – 344, referencing Exhibit F—G. Cormier Discovery Responses, GC – 296-298 (CAO Stanley's disposition letter detailing Cormier's payroll fraud complaint).
[43]     *Id.*
[44]     *Id.*
[45]     Exhibit I—Affidavit of Chief Craft.

divisions, precincts, and shifts, in an effort to make them more well-rounded and otherwise prepare them for future promotions.[46] In all, eleven lieutenants (including Plaintiffs Cormier, Stelly, and Thompson) and eight sergeants were transferred.[47] All officers were notified of these transfers by Internal Memorandum of May 22, 2012, with transfers effective June 10, 2012. Subsequently, on May 25, 2012, three corporals (including Poiencot) and one patrol officer ("P.O.") were transferred.[48] Poiencot, Cormier, and Thompson were transferred as follows:

- Poiencot: relieved of duty in Patrol Division—Precinct 3, Resource Officer; transferred to Patrol Division—Precinct 4, Shift C.

- Cormier: relieved of duty in Patrol Division—Patrol Support; transferred to Patrol Division—Precinct 4, Shift C Shift Lieutenant.

- Thompson: relieved of duty in Patrol Division—Precinct 3, Administrative Assistant; transferred to Patrol Division—Precinct 4, Administrative Assistant.[49]

### E. Severance

As a result of their involvement in the leak of the Mclean document, Poiencot and Cormier were terminated on September 12, 2012.[50] Poiencot's failure to submit to a polygraph examination for the investigation and his participation in the secret recording of fellow officers which were released to the media (in violation of General Orders and PPM's) also contributed to the cause for his termination.[51] Gabe Thompson retired on September 11, 2012.[52]

## V.   DEFENDANTS DID NOT VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS.

---

[46]   Exhibit I—Affidavit of Chief Craft.
[47]   Exhibit I—Affidavit of Chief Craft (Exhibit I-1).
[48]   Exhibit I—Affidavit of Chief Craft (Exhibit I-2).
[49]   Exhibit I—Affidavit of Chief Craft (Exhibits I-1 and I-2).
[50]   Exhibit D—S. Poinecot Deposition, "Exhibit D-6;" page 161; Exhibit E—G. Cormier Deposition, "Exhibit D-3;" page 254.
[51]   Exhibit D—S. Poinecot Deposition, "Exhibit D-7;" page 164 (regarding AD2012-010 relative to secret recordings); "Exhibit D-8;" page 165 (regarding AD2012-012 relative to failure to submit to polygraph).
[52]   Exhibit G—G. Thompson Deposition, page 47.

The Court will recall from the Marceaux Motion that Plaintiffs must first prove that Defendants violated their First Amendment rights. The qualified immunity analysis is moot if Plaintiffs cannot overcome this first hurdle. To show that Defendants violated their First Amendment rights, Plaintiffs must submit affirmative evidence of the following:

1. Plaintiff spoke or petitioned a tribunal on a matter of public concern;
2. Plaintiff suffered an adverse employment action;
3. Plaintiff's interest in speaking or petitioning outweighed the government's interest in promoting efficiency; and
4. Plaintiff's speech motivated the defendant's conduct.[53]

Defendants refer the Court to the Marceaux Motion for law applicable to each element.

### A.  SCOTT POINECOT

Poiencot claims Craft removed him from his "current position" the day the Fifteenth Judicial District restrained Defendants from investigating the leaked Mclean document, because of an exchange Poiencot had with a citizen.[54] Further, he claims that he was made the target of "at least three baseless administrative investigations" which ultimately resulted in his termination.[55]

### 1. *No Matter of Public Concern.*

The only First Amendment activity made the basis of Poiencot's complaints is the TRO suit; however, Poiencot filed the TRO suit to stop the investigation into the leaked confidential IA document, praying as follows:

> That a temporary restraining order issue herein, according to law and without bond or minimal bond, directed to the Defendants restraining, enjoining and prohibiting them from proceeding with the present "investigation" which is an absolute nullity at law.[56]

---

[53]     *Harris v. Victoria Indep. School District*, 168 F.3d 216, 220 (5th Cir.1999); *Rathjen v. Litchfield*, 878 F.2d 836, 842 (5th Cir.1989).

[54]     Doc. 1, ¶224-227.

[55]     Doc. 74, ¶84.

[56]     Doc. 13-10, page 7.

As this concerned only his personal employment condition (namely, an investigation into his involvement in the leak of a confidential document), the TRO suit cannot serve as the basis for his First Amendment retaliation claim.

Poiencot also claims he was retaliated against because of an exchange he had with a citizen who complained to LPD about a harassing lawn maintenance individual. There is no affirmative evidence that the interchange dealt with a matter of public concern raised by Poiencot in his capacity as a citizen. (Poiencot claims he filed a complaint with the Board against Chief Craft relative to this incident; however, he did not produce a copy of same, such that it is impossible to discern the nature of the alleged complaint.) Rather, Poiencot testified that he, in his capacity as an LPD resource officer, met with the citizen regarding a harassing lawn maintenance individual.[57] Poiencot secretly recorded his encounter with the citizen, which confirms that Poiencot and the citizen discussed only the harassing individual at issue and Poiencot's plans to address same.[58] Defendants also encourage the Court to review the secret recording allegedly between former Plaintiff, Norbert Myers, and Chief Craft wherein Chief Craft explains that the citizen advised him (Chief Craft) that Poiencot had a negative attitude and apparently did not like Chief Craft.[59] Because the citizen-complaint issue does not involve a matter of public concern, as spoken by a citizen, it cannot serve the basis of Poiencot's First Amendment retaliation claim.

### 2. *Poiencot's transfer was not Adverse Employment Action.*

As discussed in the Marceaux Motion, a transfer can only qualify as an adverse employment action if it is equivalent to a demotion (*objectively* worse in prestige, interest, or

---

[57] Exhibit D—S. Poiencot Deposition page 186-188.
[58] Exhibit L—Transcript of Recording, "631 Greenbriar 05-15-12."
[59] Exhibit M—Transcript of Recording, "Craft's Response to Greenbriar Rd..Wav"

room for advancement). Again, the plaintiff's subjective beliefs are of no import.[60] Poiencot was transferred from Precinct 3 as resource officer to Precinct 4, Shift C. His ranking as corporal, his salary, and his benefits remained the same.[61] Although Poiencot testified that his working hours became 3:00 p.m. to 3:00 a.m. following the May 2012 transfer, he admitted that three of his four assignments throughout his LPD career were at night.[62] In fact, some officers (even Poiencot's co-Plaintiff *preferred* to work nights.[63]) Moreover, he testified that the north side is not the most desirable assignment, because it is a high crime area; however, he previously served as an agent in LMNTF for approximately three to four years, which could likewise be a dangerous position given interaction with drug users and dealers.[64]

Perhaps most damning is the fact that not even Poiencot's co-Plaintiffs agree that an assignment to Precinct 4 was punitive. Poiencot claimed Precinct 4 was "Hell's Kitchen,"[65] but Plaintiff Hewitt claimed Precinct 1 was "Hell's Kitchen."[66] Furthermore, Nolvey Stelly testified that Precincts 1, 2, and 3 were the areas where no officer wanted to work.[67] Finally, upon being asked the significance of the term, "Hell's Kitchen," Plaintiff, Thompson, responded, "That's a TV show, right?"[68]

### *3. Poiencot's petitioning did not motivate transfer or termination.*

As set forth above, the May 2012 transfer did not constitute an adverse employment action. Nevertheless, for purposes of argument, Defendants maintain that Poiencot's purported First Amendment activities (the TRO suit or the citizen-complaint, neither of which, again,

---

[60]   *Serna v. City of San Antonio*, 244 F.3d 479, 483 (5th Cir.2001).
[61]   Exhibit D—S. Poiencot Deposition page 66.
[62]   Exhibit D—S. Poiencot Deposition page 104.
[63]   See e.g. Exhibit E—G. Cormier Deposition, page 42.
[64]   Lafayette Metro Narcotics Task Force (or "Metro Narcotics"). See Exhibit D—S. Poiencot Deposition page 57-60.
[65]   Exhibit D—S. Poiencot Deposition page 105.
[66]   U. Hewitt Motion for Summary Judgment, Hewitt Deposition, page 59; 76.
[67]   N. Stelly Motion for Summary Judgment, N. Stelly Deposition, page 76.
[68]   Exhibit G—G. Thompson Deposition, page 303, line 6.

constitute matters of public concern) did not motivate Defendants to transfer him. Rather, Poiencot and the other Plaintiffs were transferred pursuant to a departmental-wide reorganization aimed at making the department more effective and efficient by making more well-rounded officers who had served in multiple capacities under various different supervisors.[69] In fact, Poiencot was transferred along with two other corporals and one patrol officer and just days after LPD transferred eleven lieutenants and eight sergeants pursuant to the same policy.[70] There is no evidence that any of the other officers were transferred because they engaged in protected First Amendment activity. For instance two sergeants, who have not sued LPD, were also transferred to Precinct 4, Shifts C and D.[71]

With regard to Poiencot's termination, Poiencot was terminated following three separate acts of misconduct: 1) involvement in the leak of the Mclean document in violation of PPM 2161-2, G.O. 201.2, G.O. 204.5, G.O. 301.9, and La. R.S. 33:2500(A)(3);[72] 2) involvement in the surreptitious recording of Major Alfred in violation of G.O. 201.2, G.O. 204.5, G.O. 301.9, G.O. 305.1, G.O. 600.3, and La. R.S. 33:2500(A)(3);[73] and 3) failure to submit to a polygraph pursuant to an administrative investigation in violation of PPM 2161-2, G.O. 204.5, G.O. 301.9, G.O. 301.10, and La. R.S. 33:2500(A)(3) and (4).[74]

Significantly, Poiencot admitted to the salient facts of each of the foregoing. With regard to the leaked Mclean document, he testified that he received the subject document from Cormier, but did not alert his supervisors or question the fact that a confidential document had been removed from the investigative file of another officer.[75] Poiencot further admitted that

---

[69]   Exhibit I—Affidavit of Chief Craft; Exhibit J—Affidavit of Major Alfred.
[70]   Exhibit I—Affidavit of Chief Craft (Exhibit I-2).
[71]   Exhibit I—Affidavit of Chief Craft (Exhibit I-1).
[72]   Exhibit D—S. Poiencot Deposition, "Exhibit D-6."
[73]   Exhibit D—S. Poiencot Deposition, "Exhibit D-7."
[74]   Exhibit D—S. Poiencot Deposition, "Exhibit D-8."
[75]   Exhibit D—S. Poiencot Deposition, page 136; 147.

Thompson used his (Poiencot's) recording pen to record Major Alfred on April 19, 2012, thereby admitting to his involvement in the clandestine recording of a superior.[76] (LPD's justification for terminating Poiencot based on his practice of surreptitiously recording fellow and superior officers is further discussed below with regard to Thompson.) All things considered, the Court cannot find that Defendants retaliated against Poiencot for his participation in the TRO suit or any other protected First Amendment activity. Indeed, the purpose of the TRO suit was to stop the investigation into the very misconduct which would ultimately serve the basis of Poiencot's termination.

## B.  GREG CORMIER

Cormier claims that he filed a payroll fraud complaint with the Board, which was investigated by LCG Human Resources Department.[77] He further claims he was transferred to the north side of Lafayette and/or the night shift after filing the TRO suit.[78] Finally, Cormier alleges he was terminated following a failed polygraph examination.[79]

### 1.  *No Matter of Public Concern.*

For the same reasons Poiencot's participation in the TRO suit did not constitute a matter of public concern, Cormier's participation seeking to stop an investigation into his own alleged misconduct does not support First Amendment retaliation claims. Defendants concede that Cormier's payroll fraud complaint arguably constituted a matter of public concern; however, as discussed below, Defendants took no retaliatory action because of it.

---

[76]      Exhibit D—S. Poiencot Deposition, page 165; Exhibit G—G. Thompson Deposition, page 122-124.
[77]      Doc. 1, ¶202.
[78]      Doc. 1, ¶231-235.
[79]      Doc. 74, ¶75-81.

### 2. *Cormier's transfer was not an Adverse Employment Action.*

By May 22, 2012 Internal Memorandum, Cormier was transferred from Patrol Support (a unit within the Patrol Division) to Precinct 4, Shift C (also within the Patrol Division).[80] Cormier claims that this transfer was retaliatory, because he was transferred to the "north side" and to a night shift. He did not lose his Lieutenant ranking, salary, or other benefits because of the transfer.[81] Cormier cannot prove that the transfer would objectively be considered a demotion, especially in light of his testimony that he had been transferred numerous times throughout his career, had been assigned to the "north side" of Lafayette in the past, and had often worked nights. In fact, he preferred to work nights![82] For instance, he began his career working Shift D, a rotating night shift on the north side of Lafayette.[83] He also worked on the north side beginning in approximately 1992 to 1993.[84] In December 2010, he was assigned to the Power Squad, which supplemented the patrol shift during peak hours, 3:00 p.m. to 3:00 a.m.[85]

Of course, like Poiencot, Cormier cannot show that Precinct 4 was an objectively worse position where co-Plaintiff Hewitt claimed Precinct 1 was "Hell's Kitchen," and co-Plaintiff Thompson thought "Hell's Kitchen" was a TV show.

### 3. *Cormier's petitioning did not motivate transfer or termination.*

Cormier contends that the May 22, 2012 transfer was retaliatory because it occurred on the same day Plaintiffs filed the TRO suit; however, Plaintiffs cannot present any affirmative evidence that Defendants knew about the TRO lawsuit before the transfers. In fact, Defendants

---

[80]     Exhibit I—Affidavit of Chief Craft (Exhibit I-1).
[81]     Exhibit E—G. Cormier Deposition, page 332-333.
[82]     Exhibit E—G. Cormier Deposition, page 42.
[83]     Exhibit E—G. Cormier Deposition, page 39.
[84]     Exhibit E—G. Cormier Deposition, page 44.
[85]     Exhibit E—G. Cormier Deposition, page 58-60.

did not know about the TRO suit until at least one full day after it was filed.[86] LCG and CAO Stanley were not served with the TRO suit until May 23, 2012 at 4:02 p.m., and Chief Craft and Major Alfred were not served until May 25, 2012.[87] Moreover, although Plaintiffs' counsel indicated that notice was sent on May 22, 2014, Plaintiffs' counsel merely sent an alleged courtesy copy via U.S. Post (called "snail mail" for a reason).[88] Thus, the fact that Cormier was transferred on the same date he filed the TRO suit is mere coincidence. Mere coincidence of timing does not support retaliation claims.[89]

Contrary to Cormier's speculation as to Defendants' intentions vis-à-vis the transfers, Chief Craft and other officials had planned on implementing the transfers some time before Plaintiffs first filed suit.[90] Specifically, Defendants intended to transfer officers to positions which would provide additional experience in different units within the Department, thereby making the officers more well-rounded and better suited for higher positions.[91]

With regard to his termination, Cormier was terminated on September 12, 2012 for his involvement in the leaked Mclean document.[92] Cormier admitted that he took the document in question from an officer's investigative file, whited it out, and gave it to Poiencot.[93] When Poiencot asked Cormier where he obtained the document, Cormier responded, "[I]t doesn't

---

[86]   Exhibit H—Affidavit of CAO Stanley; Exhibit I—Affidavit of Chief Craft; Exhibit J—Affidavit of Major Alfred.

[87]   Exhibit H—Affidavit of CAO Stanley; Exhibit I—Affidavit of Chief Craft; Exhibit J—Affidavit of Major Alfred; Exhibit B—*Marceaux v. LCG* (15th JDC, Lafayette, Louisiana, Docket No. 2012-2899), Sheriff's Returns, *in globo*.

[88]   Exhibit B—*Marceaux v. LCG* (15th JDC, Lafayette, Louisiana, Docket No. 2012-2899), Plaintiff's Petition for TRO, May 22, 2012 correspondence from Plaintiffs' counsel, "Exhibit B [sic]." The correspondence is erroneously labeled as "Exhibit B," but it is actually "Exhibit C."

[89]   *Blanchard v. Brinkerhoff*, 53 F.3d 1282, p. 7 (5th Cir.1995).

[90]   Exhibit H—Affidavit of CAO Stanley; Exhibit I—Affidavit of Chief Craft; Exhibit J—Affidavit of Major Alfred.

[91]   *Id.*

[92]   Exhibit E—G. Cormier Deposition, "Exhibit D-3."

[93]   Exhibit E—G. Cormier Deposition, page 210-211; 220-222.

matter,"[94] or "[D]on't worry about it."[95] At some point thereafter, the document was leaked to Attorney Magee, who attached it to a brief filed with the Board. Further contributing to Cormier's termination was the fact that Cormier did not discuss his concerns about the subject document with his superior officers, file a grievance, or request a discussion before the Board.[96] Instead, he chose to take matters into his own hands and released the document without authorization.[97] Moreover, he failed his polygraph.[98] Based on these facts, LPD determined that Cormier was in violation of PPM 2161-2, §2.7 and §2.28, G.O. 201.2, G.O. 204.5 §3.5 and §3.8, G.O. 301.9, and La. R.S. 33:2500(A)(3).[99]

To the extent Cormier claims his payroll fraud complaint against a fellow lieutenant prompted his transfer (which, again, is not an adverse employment action under these circumstances) or termination, Cormier has not shown any affirmative, admissible evidence that this is true. To the contrary, Cormier's discovery responses show that upon receipt of Cormier's complaint, Chief Craft ordered an immediate investigation into the lieutenant's working hours.[100] Because the Human Resources department was better equipped to determine whether an employee was abusing the payroll system, it conducted the investigation.[101] After a thorough investigation, LCG determined that Cormier's complaint was unfounded.[102] Thus, rather than serving as a basis for Cormier's §1983 claim, Defendants' handling of Cormier's payroll fraud complaint actually proves Defendants' commitment to investigating and remediating misconduct, despite Plaintiffs' unsuccessful attempts to show otherwise.

---

[94]   Exhibit D—S. Poiencot Deposition, page 139, line 15-16
[95]   Exhibit E—G. Cormier Deposition, page 154, line 2.
[96]   Exhibit E—G. Cormier Deposition, "Exhibit D-3."
[97]   Exhibit E—G. Cormier Deposition, "Exhibit D-3."
[98]   Exhibit K—Affidavit of Dwayne Prejean.
[99]   Exhibit E—G. Cormier Deposition, "Exhibit D-3." See also Appendices III, IV, and VI, the G.O.'s at issue.
[100]  Exhibit F—G. Cormier Discovery Responses, GC – 296-298.
[101]  Exhibit F—G. Cormier Discovery Responses, GC – 296-298.
[102]  Exhibit F—G. Cormier Discovery Responses, GC – 296-298.

## C.  GABE THOMPSON

Similar to Cormier, Thompson claims that he was transferred to the north side and/or night shift after filing the TRO suit.[103] Thompson also claims that he was forced into retirement after being the subject of two investigations: the disclosure of a confidential IA document to a third-party and conducting an unauthorized investigation.[104]

### 1.  *Thompson's transfer was not an Adverse Employment Action.*

Like Poiencot and Cormier's May 2012 transfers, Thompson's transfer from Precinct 3 to Precinct 4 did not constitute an adverse employment action. He did not lose rank, salary, or benefits.[105] Moreover, the only material change in his working conditions was the fact that he had to work from 8:00 a.m. to 5:00 p.m., instead of 7:00 a.m. to 4:00 p.m., as he had previously.[106] His duties remained exactly same.[107] Defendants are confident the Fifth Circuit would not classify a transfer resulting in a mere one-hour schedule change as an adverse employment action for purposes of §1983.

Unlike Poiencot and Cormier, Thompson was cleared of wrongdoing with regard to the leaked Mclean document.[108] Nevertheless, he retired on September 11, 2012.[109] Thompson claims that he was forced to retire. In order to determine whether an employee has been constructively discharged, the Court should consider the following factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off

---

[103]     Doc. 1, ¶231-235.
[104]     Doc. 74, ¶87-90.
[105]     Exhibit G—G. Thompson Deposition, page 152.
[106]     Exhibit G—G. Thompson Deposition, page 41-42.
[107]     Exhibit G—G. Thompson Deposition, page 34; 42; 44; 67.
[108]     Exhibit K—Affidavit of Dwayne Prejean.
[109]     Exhibit G—G. Thompson Deposition, page 47.

whether the offer were accepted or not.[110] Thompson was not demoted, did not receive a reduced salary, and there is no affirmative, admissible evidence that he was given an offer of early retirement,[111] leaving only factors (3), (4), and (5) to discuss. He testified that he was transferred from the supervision of Captain Myers, who gave him more responsibility as his assistant, to Captain Montgomery, who gave Thompson fewer responsibilities.[112] Thompson admitted that this difference could have been the respective Captains' decisions as to how they chose to run their precincts.[113] He further admitted that the Captain had a right to run his precinct on a daily basis as he saw fit.[114] He cannot show that Chief Craft knew Captain Montgomery would give Thompson fewer responsibilities, as would be necessary to show that Chief Craft intended the transfer as retaliation. Otherwise, Thompson cannot present any affirmative evidence supporting that he was constructively discharged.

### 2. *LPD's interest in efficiency outweighed Thompson's right to secretly record his superiors.*

To the extent departmental gossip could contribute to Thompson's constructive discharge claim (which Defendants maintain cannot be the case), LPD *could have* terminated Thompson for his involvement in the surreptitious recording of his superior, Major Alfred (the same reasons for which Poiencot was terminated). The Fifth Circuit has acknowledged that a police department's substantial interest in the efficient operations of its services outweighs an officer's interest in commenting on matters of public concern (although significant) where the officer's actions undermine discipline and order among employees and the department's ability to

---

[110]   *Hunt v. Rapides Healthcare Systems, L.L.C.,* 277 F.3d 757, 771-72 (5th Cir.2001).
[111]   Exhibit G—G. Thompson Deposition, page 118. See also page 168, wherein Thompson admits to speculating regarding Major Alfred's intentions, and page 169-170 regarding Thompson's overhearing of a portion of another Captain's telephone conversation with Major Alfred.
[112]   Exhibit G—G. Thompson Deposition, page 67-69.
[113]   Exhibit G—G. Thompson Deposition, page 67.
[114]   Exhibit G—G. Thompson Deposition, page 75.

promote and maintain confidence in it.[115] For instance, in *Nixon v. City of Houston*, the Fifth Circuit held that the Houston Police Department was justified in terminating the plaintiff-officer where the officer criticized the HPD's handling of a high speed pursuit and admitted to knowing disobedience of an HPD policy.[116] The Court agreed that a police department's "interest in maintaining public confidence is so important to its proper functioning because '[the department] often relies upon members of the public to provide critical information, to serve as witnesses, to respect law enforcement authority, and to provide financial support.'"[117] A police department's reasonable belief that speech or publication would negatively impact the relationship between the department and the citizens which it serves and "generally bring 'the mission of the [police department] and the professionalism of its officers into serious disrepute" – certainly legitimate and substantial interest, harm to which would undoubtedly impair the proper performance of [the police department] functions."[118] Similarly, LPD relies on members of the public, whose support and confidence is critical to its proper functioning.[119]

It is undisputed that Thompson secretly recorded a conversation with his supervisor, Major Alfred on April 19, 2012, which recording was later released to the media.[120] The fact that secretly recording one's colleagues and supervisors can result in internal turmoil within the Department is best illustrated by one of Thompson's own accounts. He testified as to one particular episode in which another officer, Mark Francis, became suspicious of Thompson following the April 19, 2012 recording. Thompson claimed he had to explain to Francis that he (Thompson) was not the officer who was recording everyone, despite how it appeared.[121]

---

[115] *Nixon*, 511 F.3d at 499.
[116] *Id.*
[117] *Id.* at 500.
[118] *Id.* at 500 – 501.
[119] Appendix II—G.O. 101.3, Public Support of Police; Appendix IX—G.O. 305.1.
[120] Exhibit G—G. Thompson Deposition, page 127; 137-139.
[121] Exhibit G—G. Thompson Deposition, page 177.

Thompson had to specifically tell Francis that he (Thompson) did not record him (Francis). How can a police department possibly run an efficient operation where officers do not trust each other? How can a supervisor reasonably speak to his subordinate about a confidential or sensitive matter if there is a possibility that the subordinate is recording him and that recording may end up on the news or the internet?

Further supporting that surreptitious recording of fellow officers is contrary to good police department policy is revised General Order 201.2 (initially enacted on June 4, 2012 as Special Order 12.1), which prohibits clandestine recordings.[122] This Order was fashioned after a similar order utilized by the Louisiana State Police. This Court has found that LPD's enactment of the Order was reasonable.[123]

### 3. *Thompson's petitioning did not prompt Defendants' decisions.*

For the reasons set forth above, relative to Poiencot and Cormier's transfers, Defendants did not transfer Thompson, effective June 10, 2012, because of the TRO suit. Rather, Thompson was transferred pursuant to pre-planned department-wide transfers aimed at making officers more well-rounded and better prepared for higher positions.[124] Thompson was one of eleven lieutenants and eight sergeants transferred.

Thompson's only purported evidence that he was getting transferred was an alleged conversation between Major Alfred and Dwayne Prejean overhead by an eavesdropping custodian in her closet, who then relayed this to Thompson.[125] Thompson's name was never mentioned in the overheard conversation, and there is no indication that Alfred or Prejean

---

[122]    Exhibit I—Affidavit of Chief Craft.
[123]    Doc. 48, page 5 (Memorandum Ruling on Defendants' Motion for Protective Order, remanded on other grounds.)
[124]    Exhibit I—Affidavit of Chief Craft.
[125]    Exhibit G—G. Thompson Deposition, page 46.

allegedly stated that Thompson was being transferred because of the lawsuit.[126] Otherwise, Thompson has no admissible evidence that he was getting transferred because of the lawsuit.[127]

## VI.     DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

As set forth above, Poiencot, Cormier, and Thompson cannot meet their *prima facie* burden to show First Amendment retaliation under §1983, such that the Court need not reach the qualified immunity analysis. Nevertheless, for purposes of completion, Plaintiffs' cannot show that Defendants' conduct has been anything but reasonable, for the same reasons that Plaintiffs cannot show Defendants' took any adverse employment action against them because of their allegedly protected First Amendment activities. Defendants did not transfer Poiencot, Cormier, or Thompson because of the TRO suit or any complaint. These officers were transferred, along with twenty other officers pursuant to a department-wide policy intended to make officers more well-rounded and better prepared for future promotions. Moreover, all Plaintiffs testified that they had been transferred on numerous occasions throughout their careers. Transfers are a part of law enforcement. Indeed, police officers serve at the pleasure of LPD and are subject to transfer from any position in the classified service to any other position of the same class.[128] No Plaintiff has shown that his new position was not within the same class as his previous position. Plaintiffs cannot present any affirmative, admissible evidence that these department-wide transfers were anything but reasonable.

Defendants did not fire Poiencot or Cormier because they filed a lawsuit or a complaint. Poiencot and Cormier were terminated, because they admitted to their involvement with a confidential document which was removed from a confidential, private personnel file of another officer, doctored, and eventually leaked to someone outside LCG/LPD. Furthermore, Poiencot

---

[126]     *Id.*
[127]     *Id.*
[128]     La. R.S. 33:2489.

and Cormier routinely recorded fellow and superior officers. Poiencot cannot truthfully deny his involvement with Thompson's secret recording with Major Alfred on April 19, 2012. Poiencot also admitted that he did not consent to be polygraphed pursuant to an investigation, as required by LPD General Orders, an admission which also contributed to his termination. Plaintiffs cannot present any affirmative, admissible evidence that Defendants' act of termination of officers who blatantly, admittedly violated rules was anything but reasonable.

Defendants did not fire Thompson or take any adverse employment action against him because he filed a lawsuit or a complaint. Thompson voluntarily retired and received a check for approximately $65,000 - $66,000 in accrued sick and vacation leave.[129] Thompson cannot present any affirmative, admissible evidence that Defendants were going to terminate him. Even given the opportunity, Defendants would have been entirely reasonable to punish Thompson for his admitted secret recording of his superior officer, Major Alfred, on April 19, 2012. Plaintiffs cannot present any evidence that Defendants' response to their discovery that these police officers were surreptitiously recording their conversations with their brother officers and their supervisors was anything but reasonable.

## VII.   CONCLUSION

The Court will recall Defendants' analogy of secret recording to adultery—not illegal, but inherently deceitful. A continued relationship between the jilted and straying lovers is blighted; the foundation upon which the relationship was built—trust—is compromised, in most cases irreparably. So it is with the secretly-recording employee (straying lover) and his employer (jilted lover). Now, imagine the straying lover not only cheated, but also stole a special token from his oblivious lover, and when asked by his accomplice from whence the token came, the straying lover replies, "Don't worry about it." The straying lover is now a cheater and a thief,

---

[129]        Exhibit G—G. Thompson Deposition, page 66.

bringing shame and reproach to the spited lover who nevertheless takes him back. The only difference between the jilted lover and the LPD in this scenario is that public opinion actually matters. The LPD not only had the right, but was, indeed, obligated, to fire those employees who irreparably compromised trust and disrupted the harmony and reputation of the Department. The LPD is a stronger, more trustworthy organization and better suited to serve Lafayette citizens without employees like Poiencot, Cormier, and Thompson, posturing as martyrs, who in reality lack any justification for their actions. Accordingly, Poiencot, Cormier, and Thompson's claims should be dismissed with prejudice.

RESPECTFULLY SUBMITTED:

**BRINEY FORET CORRY, LLP**

BY: s/ Michael P. Corry_____
       MICHAEL P. CORRY – 20764
       PATRICK J. BRINEY – 03467
       HALLIE P. COREIL – 33784
       413 Travis Street
       Suite 200
       Post Office Box 51367
       Lafayette, Louisiana 70505-1367
       Telephone:  (337) 237-4070
       Facsimile:  (337) 233-8719
ATTORNEY FOR DEFENDANTS, LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT, DEE EDWARD STANLEY, INDIVIDUALLY, JAMES P. "JIM" CRAFT, INDIVIDUALLY, AND GEORGE "JACKIE" ALFRED, INDIVIDUALLY

**<u>CERTIFICATE</u>**

This is to certify that on May 30, 2014, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following:

springlaw@gmail.com                    jca@jcalaw.us

ralexander@deep-south.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participant or pro se defendant:

**None.**

_____s/Michael P. Corry_____
MICHAEL P. CORRY- 20764