**In The Matter Of:**

*Kane Marceaux, et al vs.*

*Lafayette City-Parish Consolidated Government, et al*

*Scott Poiencot*

*April 16, 2014*



LORI HEAPHY
&ASSOCIATES LLC
C E R T I F I E D   C O U R T   R E P O R T E R S

*Min-U-Script® with Word Index*

EXHIBIT

D

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

**Page 1**

```
 1          UNITED STATE DISTRICT COURT.

 2          WESTERN DISTRICT OF LOUISIANA

 3              LAFAYETTE DIVISION

 4  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
    KANE MARCEAUX, GREG
 5  CORMIER, SCOTT POIENCOT,
    NORBERT MYERS, GABE THOMPSON,      CIVIL ACTION NO:
 6  NOVEY STELLY, ULETOM P. HEWITT,    6:12-CV-01532
    REGINA BRISCOE AND ALEETA
 7  M. HARDING                        JUDGE HAIK, SR.
            VERSUS                    MAG. JUDGE HANNA
 8  LAFAYETTE CITY-PARISH CONSOLIDATED
    GOVERNMENT; LAFAYETTE POLICE
 9  DEPARTMENT THROUGH THE LAFAYETTE
    CITY-PARISH CONSOLIDATED GOVERNMENT;
10  LESTER JOSEPH "JOEY" DUREL, JR.
    IN HIS CAPACITY AS PRESIDENT OF
11  THE LAFAYETTE CITY-PARISH
    CONSOLIDATED GOVERNMENT; DEE
12  EDWARD STANLEY, INDIVIDUALLY AND
    IN HIS CAPACITY AS CHIEF ADMINISTRATIVE
13  OFFICER OF THE LAFAYETTE CITY-PARISH
    CONSOLIDATED GOVERNMENT; JAMES P.
14  "JIM" CRAFT, INDIVIDUALLY AND IN
    HIS CAPACITY AS CHIEF OF THE
15  LAFAYETTE POLICE DEPARTMENT, AND
    GEORGE "JACKIE" ALFRED, INDIVIDUALLY
16  AND IN HIS CAPACITY AS PATROL DIVISION
    COMMANDER OF THE LAFAYETTE
17  POLICE DEPARTMENT
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
18

19      The deposition of SCOTT POIENCOT was taken in

20  the above-entitled cause, pursuant to the

21  following stipulations, before Debbie G. Chaney,

22  Certified Court Reporter, at The Law Offices of

23  Briney, Foret & Corry, 413 Travis Street, Suite

24  200, Lafayette, Louisiana, on the 16th day of

25  April, 2014, beginning at 10:59 a.m.
```

---

**Page 2**

```
 1              A P P E A R A N C E S

 2

 3  MR. MICHAEL P. CORRY, ATTORNEY AT LAW
    MS. HALLIE P. COREIL, ATTORNEY AT LAW
 4  BRINEY, FORET & CORRY
    413 Travis Street
 5  Lafayette, Louisiana  70505
        REPRESENTING LAFAYETTE CITY-PARISH
 6      CONSOLIDATED GOVERNMENT, DEE EDWARD STANLEY,
        INDIVIDUALLY, JAMES P. "JIM" CRAFT,
 7      INDIVIDUALLY, AND GORGE "JACKIE" ALFRED,
        INDIVIDUALLY

 8

 9  MR. S. STEPHEN SPRING, ATTORNEY AT LAW
    SPRING & SPRING, LLC
10  733 East Airport Avenue, Suite 104
    Baton Rouge, Louisiana  70806
11      REPRESENTING PLAINTIFFS
        (Waived appearance)
12
    MR. J. CHRISTOPHER ALEXANDER, SR., ATTORNEY AT LAW
13  J. CHRISTOPHER ALEXANDER, SR., ESQ. LLC
    3751 Government Street, Suite A
14  Baton Rouge, Louisiana  70806
        REPRESENTING PLAINTIFFS
15  (Via telephone)

16  ALSO PRESENT:
        MR. NOVEY STELLY
17

18

19

20

21

22

23

24

25
```

---

**Page 3**

## S T I P U L A T I O N S

It is stipulated and agreed by and between counsel for the parties that the deposition of SCOTT POIENCOT, is hereby taken for discovery purposes and all other purposes allowable under the Federal Rules of Civil Procedure.

That the witness reserves the right to read and sign the deposition;

That all formalities of sealing, certifying and filing are waived.

That all objections, except those as to the form of the question and the responsiveness of the answer, are reserved until such time as this deposition or any part thereof may be used or sought to be used in evidence;

That, Debbie G. Chaney, Certified Court Reporter officiated in administering the oath to the above-mentioned witness.

---

**Page 4**

### INDEX

|                                    | Page |
|------------------------------------|------|
| Examination By Mr. Corry           | 5    |
| Examination By Mr. Alexander       | 222  |
| Re-Examination By Mr. Corry        | 232  |

**EXHIBITS**

|      | Description                                                      | Page |
|------|------------------------------------------------------------------|------|
| D-1  | Driver's license                                                 | 8    |
| D-2  | October 29th, 2008, personnel transfer                           | 62   |
| D-3  | May 27th, 2012 e-mail transfer                                   | 64   |
| D-4  | Judgment                                                          | 121  |
| D-5  | Lafayette Police Department Interoffice Communication SL notice/instructions | 136 |
| D-6  | Letter of Termination, September 12, 2012                        | 161  |
| D-7  | Sept. 12, 2012 letter regarding AD 2012-010                     | 164  |
| D-8  | AD 2012-012, regarding polygraph                                 | 165  |
| D-9  | In globo, SP-1-75                                                | 169  |

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

**Page 5**

1     SCOTT POIENCOT,
2  after being first duly sworn, was examined and
3  testified as follows:
4     THE WITNESS:
5        Yes, ma'am.
6        EXAMINATION
7  BY MR. CORRY:
8  Q   Would you start off by giving me your full
9     name and address, please?
10 A   My name is Scott Jeremy Poiencot.  I live at
11    215 Country Club Drive, Lafayette, Louisiana
12    70501.
13 Q   Have you ever given a deposition before?
14 A   Yes, sir.
15 Q   How many times?
16 A   A few.  I can't really say.  Three or four,
17    five, six, seven, eight.
18 Q   Less than ten?
19 A   Yes, sir.
20 Q   All in connection with your work as a police
21    officer?
22 A   Yes, sir.
23 Q   Okay.  As you know, my name is Michael Corry,
24    and I represent the defendants in the federal
25    lawsuit that you, among others, have filed.

**Page 6**

1     And I'm here to take your deposition.
2        Let me finish my question before you
3  respond.  I'll be happy to let you finish
4  your response before I ask the next question.
5  Okay?
6  A   Okay.
7  Q   Please respond out loud with a yes or no
8  answer.  Feel free to explain your answer,
9  but you can't say uh-huh, uh-uh, or nod your
10 head, because the Court Reporter sitting here
11 cannot get that down.
12 A   Okay.
13 Q   At the -- if you answer the question, I'm
14 going to assume you understood it and I'll
15 hold you to your answer.
16 A   Yes, sir.
17 Q   All right.  And if during the deposition,
18 Scott, we go over something -- and do you
19 mind if I call you Scott?
20 A   No.
21 Q   And you can call me Michael.
22    As we go through the deposition, we may
23 be talking about something, and, you know, 30
24 minutes before, you realize that you want to
25 add something, or you thought of something,

**Page 7**

1     or something may be different, or something
2  like that, we can go back --
3  A   Yes, sir.
4  Q   -- okay, if something jogs your memory.
5        At the conclusion of the deposition, you
6  will have the right to read and sign it.  You
7  will have to get with the Court Reporter to
8  do that.  If you want to wait until we're
9  through with the deposition to make that
10 decision, that's fine.
11 A   Yes, sir.
12 Q   Okay.
13    MR. ALEXANDER:
14       Let me add this, too, Mike.  Scott,
15    if during the deposition I object to
16    something, just don't say anything until
17    the objection is resolved one way or the
18    other.
19 A   Yes, sir.
20    MR. ALEXANDER:
21       Thanks.
22 MR. CORRY:
23 Q   All right.  Do you have any type of recording
24    device on?
25 A   No, sir.

**Page 8**

1  Q   All right.  What is your date of birth,
2  Scott?
3  A   It's August 21st, 1973.
4  Q   How old does that make you?
5  A   That makes me 40 years old.
6  Q   Okay.  And your Social, and we'll just put
7  the last four on the record.
8  A   Okay.
9  Q   Give me the whole thing, but we'll just put
10 the last four.
11 A   I'm a little nervous this morning.
12    XXX-XX-8283.
13 Q   All right.  And your driver's license
14 number?
15 A   It's 5684919.  Let me confirm that real
16 quick.
17 Q   Has your license ever been suspended or
18 revoked?
19 A   No, sir.
20    MR. CORRY:
21       And we'll make a copy and attach
22    it, just so we have that for the record.
23 A   Did I say 5684919?
24 MR. CORRY:
25 Q   Yes.  5684919.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

**Page 9**

1 And pull it out and we'll make a copy.
2 Don't leave without it.
3 How long have you resided at 215 Country
4 Club Drive?
5 A Since April of 2010.
6 Q And who resides there with you?
7 A My wife.
8 Q And what is your wife's name?
9 A Nicole.
10 Q What is her maiden name?
11 A Hernandez.
12 Q Is Nicole employed?
13 A Yes, she is.
14 Q Where?
15 A She works for, I guess, Rehabilitative
16 Services for the State of Louisiana.
17 Q What is her profession or occupation?
18 A Social worker.
19 Q Okay. Do you have any children?
20 A No.
21 Q Have you been married to anyone other than
22 Nicole?
23 A Yes.
24 Q When were you and Nicole married?
25 A November of 2003.

---

**Page 10**

1 Q And who were you previously married to?
2 A Crystal Silva.
3 Q When were you married and when did it -- did
4 it end in divorce?
5 A Yes, sir. 1994. And it ended in, I believe
6 in '96.
7 Q All right. Did you have any children with
8 Crystal?
9 A No, sir.
10 Q Any other marriages?
11 A No, sir.
12 Q What was your address prior to 215 Country
13 Club Drive? Or Country -- is it Country Club
14 Drive or Country Drive?
15 A Country Club Drive.
16 Q What was your prior address?
17 A I believe it was 13587 Junius Road, in
18 Abbeville, Louisiana.
19 Q Do you remember the zip?
20 A No, sir, I don't.
21 Q Is that a home?
22 A Yes, sir.
23 Q And how long did you reside on Junius Road?
24 A Probably since 1999.
25 Q '99, until?

---

**Page 11**

1 A Until I moved to the Country Club, 2010.
2 Q Okay. April of 2010?
3 A Yes, sir.
4 Q Where did you reside prior to Junius? If you
5 don't know the address, what town?
6 A Fort Sill, Oklahoma.
7 Q Is that where you grew up?
8 A No, sir.
9 Q How long were you in Oklahoma?
10 A Three years, I think.
11 Q So it would have been '96 to '99?
12 A Yes, sir.
13 Q And what was the reason you were there?
14 A I was assigned to Fort Sill, Oklahoma,
15 through the Army.
16 Q When did you join the Army?
17 A In 1991.
18 Q When were you discharged?
19 A In 1998.
20 Q Army?
21 A Yes, sir.
22 Q Honorable?
23 A Yes, sir.
24 Q Rank?
25 A Special C4.

---

**Page 12**

1 MR. CORRY:
2 Chris, are you popping popcorn?
3 MR. ALEXANDER:
4 No, I'm just trying to take some
5 notes here. Sorry. Is that bothering
6 you?
7 MR. CORRY:
8 No.
9 MR. ALEXANDER:
10 Okay, man. Sorry.
11 MR. CORRY:
12 Q Did you do any combat tours?
13 A No, sir, I did not.
14 Q Prior to Oklahoma, I guess from '91 to '96,
15 where were you?
16 A From '91 to -- it's either '95 or '96, when I
17 got sent to Fort Sill, Oklahoma. And prior
18 to that, I was stationed at Ford Hood, Texas.
19 Q From time you joined until you left Oklahoma?
20 A In 1991, I was sent to Fort Sill, Oklahoma
21 for six months for basic, and AIT, Advanced
22 Individual Training. And after that, they
23 sent me to Fort Hood, in '92. And I stayed
24 there until they sent me back to Fort Sill.
25 Q Did you ever have any disciplinary problems

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 13

1     in the Army?
2  A  Yes, sir.
3  Q  What?
4  A  I sustained two Article 15's.
5  Q  What is an Article 15?
6  A  It's a form of non-judicial punishment.
7  Q  When was the first one?
8  A  I guess 1996, I believe.
9  Q  And what was the nature of the incident?
10  A  It was insubordination.
11  Q  What happened?
12  A  We were out at a field exercise and a staff
13     sergeant threatened to beat me up.  And I
14     confronted his threat with the threat of a
15     fight, and got stung for it.
16  Q  Did they suspend you, or they send you --
17  A  No, sir.
18  Q  -- to the brig?  What did they do?
19  A  They just write up an Article 15, saying that
20     you were found to be insubordinate in this
21     action, that further incidents similar to
22     that could increase in punishment, further
23     enhanced punishment.
24  Q  Was there a process that you went through
25     that -- after the investigation, it was an

Page 14

1     ultimate decision?  Or was it just, it
2     happens, they write you up and that's it?
3  A  Yes, sir.
4  Q  Which one?
5  A  It was the latter.
6  Q  Okay.  And what about the second incident?
7  A  The second incident, I slept late and missed
8     formation, and I got stung with that one.
9  Q  And what year was that?
10  A  '97.
11  Q  And it was insubordination as well, or what?
12  A  No.  Failure to show up at your assignment.
13     I don't know what you call it.  You miss a
14     formation.  It's not awol, because you are
15     there, but --
16  Q  But you're in the barracks?
17  A  Yes.  You're not where you're supposed to be.
18  Q  Any other discipline in the Army?
19  A  No, sir.
20  Q  Are you on any medication today?
21  A  No, sir.
22  Q  Do you have any health conditions?
23  A  Not that I know of at this time.
24  Q  Have you ever been arrested for anything?
25  A  No, sir.

Page 15

1  Q  So you have been -- no convictions?
2  A  No, sir.
3  Q  Ever been treated for alcohol or drug abuse?
4  A  No, sir.
5  Q  Ever been treated for any type of
6     psychological or psychiatric conditions with
7     a psychologist, psychiatrist, social worker?
8  A  Yes, sir.
9  Q  When?
10  A  When I went through my first divorce, I saw a
11     military counselor.  I don't remember his
12     name.  It's been awhile.
13  Q  Were you in the military during that first
14     divorce?
15  A  Yes, sir.
16  Q  Any other times?
17  A  Yes, sir.  I saw Dr. Lyle LeCorgne, 2012
18     until the point where I was fired.
19  Q  Why?
20  A  To deal with the stress of the unwarranted
21     investigations that LCG launched against me.
22  Q  And how often did you see Lyle LeCorgne?
23  A  It was probably twice a month, I think.
24     Either once or twice a month.
25  Q  And you were fired in September of 2012,

Page 16

1     correct?
2  A  Yes, sir.
3  Q  Have you sought any treatment since September
4     of 2012?
5  A  No, sir.  I stopped all the treatment after I
6     lost my insurance and got fired.  I couldn't
7     afford to go.
8  Q  And what was he doing with you, just
9     counseling sessions?
10  A  Yes, sir.
11  Q  Do you know when in 2012, you started?
12  A  Not right offhand.
13  Q  Was it before or after you filed the TRO?
14  A  I believe it was after.
15  Q  So that was what, in April or May?
16     MS. COREIL:
17      May.
18  MR. CORRY:
19  Q  May of 2012, and you were terminated in
20     September of '12.  In four months, you think
21     you went less than ten times?
22  A  It's a possibility, yes, sir.
23  Q  Did he put you on any medication?
24  A  No, sir.  Dr. Swan did prior to that.
25  Q  And when did you see Swan the first time?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

| Page 17 |
| --- |

1 A   The first time I went to Dr. Swan was
2   probably back in 2009.
3 Q   And was that -- for what?
4 A   High blood pressure.
5 Q   Was that at the request of the city, or the
6   police department?
7 A   Yes, sir, at the request of the city.
8 Q   And what was the issue?
9 A   I don't understand.
10 Q   Well, something must have occurred for the
11   city to send you to Dr. Swan for high blood
12   pressure?
13 A   Yes, sir.  I was under investigation by the
14   police department.
15 Q   For what?
16 A   Rude and discourteous behavior.
17 Q   Who filed the complaint?
18 A   I believe it was Angelo Iorio.
19 Q   Was he in your chain?
20 A   Yes, sir.  He was my captain at the time.
21 Q   And what was the outcome of that
22   investigation?
23 A   I received a counseling form.  It was
24   sustained.
25 Q   And what was the date that it was sustained;

| Page 18 |
| --- |

1   do you remember?
2 A   No, sir, I don't.
3 Q   Sometime in 2009?
4 A   Yes, sir.
5 Q   Okay.  And how do we get from rude and
6   discourteous conduct, to high blood pressure
7   and seeing Dr. Swan.  Just kind of bring it
8   -- (Interrupted)
9 A   Because the incident never happened.  Angelo
10   had targeted me because I had filed a
11   criminal complaint against him a year or so
12   before.
13 Q   For what?
14 A   He compromised the identity of narcotics
15   confidential informants, and the security of
16   a narcotics operation.
17 Q   And were you working that operation?
18 A   Yes, sir.
19 Q   Okay.  And I'm still not clear.  I'm not
20   trying to be a smart aleck.
21     I'm not clear how the city said you
22   needed to go see Dr. Swan for high blood
23   pressure.
24 A   That morning that they took me off of duty,
25   they came in and was going to give us our flu

| Page 19 |
| --- |

1   shot.  Before they gave us the flu shot, they
2   took everybody's vitals.  And my blood
3   pressure was significantly elevated, so they
4   told me I had to go see Dr. Swan.
5 Q   All right.
6 A   And that's --
7 Q   And in relation to the criminal complaint
8   that you filed, when did that episode happen?
9 A   The criminal complaint was filed in 2007.
10 Q   Do you know what the outcome was?
11 A   Yes, sir.  It was sustained.
12 Q   Was he charged criminally?
13 A   No, sir, he was not.
14 Q   Did the DA's office get involved?
15 A   It never got that far.
16 Q   Do you know what happened to Iorio?
17 A   No, sir, I don't.
18 Q   All right.  But in 2009, is when you went to
19   see Dr. Swan --
20 A   Yes, sir.
21 Q   -- for the flu shot incident?
22     All right.  How many times did you have
23   to see Swan?
24 A   I saw him once that year, and I might have
25   done a follow-up six months later and was

| Page 20 |
| --- |

1   taken off the -- the medication.  And then, I
2   went back when all the investigations
3   started, in 2012.
4 Q   Okay.  Did he put you back on any medication?
5 A   Yes, sir.  He put me back on high blood
6   pressure and some anti-anxiety medications.
7 Q   What were they?
8 A   Lisinopril for the high blood pressure.
9   Xanax for the anxiety.  And one other for the
10   anxiety, which I don't remember the name of
11   it.
12 Q   Prior to being placed on those medications --
13   well, strike that.
14     2009, high blood pressure medication.
15   Had you ever been on it before that date?
16 A   No, sir.
17 Q   Had you ever been treated or diagnosed for
18   high blood pressure?
19 A   No, sir.
20 Q   All right.  And then, in 2012, when you were
21   placed on the anxiety medication, Xanax, and
22   the one that you can't recall, prior to that
23   date, had you ever been placed on those type
24   of medications --
25 A   No, sir.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 21

1 Q -- at any time in your life?
2 A No, sir.
3 Q How long did you take those medications?
4 A Up until the prescription ran out, shortly
5 after I got fired, then I stopped taking
6 them.
7 Q Okay. Have you been on them since?
8 A No, sir.
9 Q Have you seen anybody for anxiety since?
10 A No, sir.
11 Q So it was one prescription that was -- it was
12 two different prescriptions, two different
13 medications but one prescription. And when
14 it ran out, you stopped taking them?
15 A Yes, sir.
16 Q You never had refills?
17 A No, sir. I did not refill anything.
18 Q Okay. Have you been on any prescription
19 medications in the past two years, since you
20 got fired?
21 A No, sir.
22 Q All right. Who is your family doctor?
23 A I don't have one.
24 Q I'm sorry?
25 A I don't have one.

---

Page 22

1 Q Who do you go to if you have a cold or
2 something?
3 A CVS. The last time I was sick was with the
4 flu, and I went to Lourdes ER because it was
5 after hours. They gave me a dose of Tamiflu.
6 Q When was that?
7 A That was the first week in January.
8 Q Of 2014?
9 A I'm trying to think, because I missed a
10 couple of days of work. I'll call it the
11 first week of January. I know it was early
12 January.
13 Q Of '14?
14 A Yes, sir.
15 Q 2014?
16 A Yes, sir.
17 Q In the past five years, have you had a
18 regular doctor that you would see, other than
19 seeing Dr. Swan the couple of times you
20 mentioned, and Dr. LeCorgne?
21 A Dr. Sullivan, who is a chiropractor, if you
22 want to consider that. I think that's been
23 within the past five years.
24 Q Anybody else?
25 A No, sir.

---

Page 23

1 Q The depos that you told me you gave prior to
2 this one, and I think you said roughly ten,
3 and I'm not trying to hold you to the number.
4 I know in your line of work that you probably
5 gave them. Were they all related to
6 investigation of motor vehicle accidents?
7 A No, sir. I could only recall two right
8 offhand. One was of a traffic crash, the
9 other one was unauthorized use of force, or
10 excessive force lawsuit in federal court.
11 Q And were you the defendant?
12 A Yes, sir.
13 Q So some victim claimed that you used
14 excessive force, and in connection with that
15 claim, a lawsuit was filed and your
16 deposition was taken?
17 A Yes, sir.
18 Q When was that?
19 A 2004 or 2005, I believe.
20 Q And who was the plaintiff?
21 A Oh, I don't remember that.
22 Q Who was the attorney that took your
23 deposition?
24 A I don't remember that, either.
25 Q Who represented you?

---

Page 24

1 A A lady. I couldn't tell you her name at this
2 point.
3 Q All right. What was the outcome?
4 A I think the city got it dismissed. I didn't
5 hear much after the deposition, so I don't
6 know.
7 Q Where was the deposition given?
8 A I believe it was a law office right across
9 the street from the sheriff's office.
10 There's a little house. You got -- if you go
11 across the sheriff's office, you got a brick
12 building that holds, I think the IEO office.
13 And then, there's an Acadian style house
14 right across the street.
15 Q Yes.
16 That's who was your lawyer, or that was
17 the other person's lawyer?
18 A That was the -- I believe the lawyer that the
19 city hired.
20 Q And who was the chief back then?
21 A Ronnie Boudreaux.
22 Q Do you know any of the other defendants that
23 were in the lawsuit with you?
24 A No, sir, I don't.
25 Q What happened?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 25

1 A   I don't know if Tony Peterson, or what's his
2     name, Curtis Oats, was a defendant or a
3     witness, but they were associated because
4     there were investigating the same traffic
5     crash.  There was a significant traffic crash
6     at the intersection of Pinhook and Carmel
7     Drive.  And the driver resisted a little bit
8     and didn't like the way we handled him.  I
9     placed him in an arm bar, took him down to
10    the concrete, placed handcuffs on him, and
11    that was the end of it.
12 Q   And it was just a car wreck?
13 A   Yes, sir.  It was a hit and run.  There was
14    some dope, and I think a firearm was also
15    related in the incident.
16 Q   Okay.  And the guy that you handcuffed, was
17    he eventually associated with the hit --
18    leaving the scene, the dope and the gun?
19 A   I believe so.
20 Q   Okay.  Any other depositions you recall
21    giving?
22 A   No, sir.
23 Q   I think you told me there was two.  The other
24    one was a car wreck?
25 A   The other one was a car crash.

---

Page 26

1 Q   Where you investigated a crash, somebody
2     filed a lawsuit for personal injuries --
3 A   Yes.
4 Q   -- and they took your deposition regarding
5     the investigation you undertook?
6 A   Yes, sir.
7 Q   What year was that, do you remember?
8 A   No, I don't.
9 Q   Before or after the federal case?
10 A   For excessive force?
11 Q   Yes.
12 A   I believe it was after.
13 Q   Have you ever filed a lawsuit other than the
14    TRO that you filed, the federal suit that
15    we're here for today -- and were you involved
16    in any of those mandamus proceedings that
17    Kane Marceaux filed?
18 A   No, sir.
19 Q   Okay.  Other than the TRO, and other than the
20    federal suit that we're here for today, have
21    you ever filed, as a plaintiff, any other
22    lawsuit --
23 A   No, sir.
24 Q   -- either in state or federal court?
25 A   No.

---

Page 27

1     MR. CORRY:
2        Did you hear that?
3     COURT REPORTER:
4        Yes.
5     MR. CORRY:
6        Okay.
7 MR. CORRY:
8 Q   Other than being sued in the federal court
9     case for excessive force, have you ever been
10    a defendant in any other lawsuits, at any
11    time in your life?
12 A   Yes, sir.
13 Q   When?
14 A   A traffic crash in 1998, in Abbeville.
15 Q   You were sued as causing the crash?
16 A   Yes, sir.
17 Q   Were you deposed?
18 A   I can't remember.  I don't think so.  I don't
19    think it ever got --
20 Q   Did you have an attorney retained to
21    represent you?
22 A   I was working for the City of Abbeville, and
23    they hired an attorney.
24 Q   You were a police officer at the time?
25 A   Yes, sir.

---

Page 28

1 Q   And you ran into somebody in your cruiser?
2 A   I was backing out of a parking lot, and the
3     other vehicle came and hit the back rear and
4     kind of skidded across the rear bumper.
5 Q   Okay.  Do you know the outcome of that?
6 A   Yes.  The city paid the other person's claim.
7 Q   Do you remember how much?
8 A   No, sir, I don't.
9 Q   Okay.  Any other claims where you've been a
10    defendant?
11 A   No, sir.
12 Q   Have you ever made claims where you actually
13    didn't have to file a lawsuit, but you made a
14    claim against an insurance company for any
15    reason?
16 A   No, sir.
17 Q   Have you ever filed for unemployment?
18 A   Can we -- let's go back to the other
19    question.
20 Q   Yes.
21 A   You're talking about like in a vehicle crash,
22    have I ever had?
23 Q   Yes.
24 A   Yes, sir.  I dinged the front end of my
25    bumper.  And I called USAA and told them, and

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

**Page 29**

1 made a claim and they --
2 Q  Paid for it?
3 A  Yes, sir.
4 Q  Okay.  Have you ever filed for unemployment?
5 A  No, sir.
6 Q  Have you ever filed for bankruptcy?
7 A  No, sir.
8 Q  What year did you graduate from high school?
9 A  1991.
10 Q  Where?
11 A  Carencro High School.
12 Q  Are you from Lafayette?
13 A  No, sir.  Not originally.
14 Q  Did you attend all four years at Carencro
15     High School?
16 A  No, sir.
17 Q  Where did you attend?
18 A  From my freshman year all the way up until
19     midway senior year, I went to Zachary High
20     School in Zachary, Louisiana.
21 Q  Are you from Zachary?
22 A  No, sir.  Originally from Houma, Louisiana.
23 Q  Briefly, bring me from Houma to Zachary.
24 A  My dad was working for Dowell Schlumberger,
25     from --

---

**Page 30**

1 Q  So y'all moved with his employment?
2 A  Yes.  To Lafayette.  He lost his job.  We
3     moved to Zachary.  He got re-hired with the
4     same company, relocated to Lafayette.  They
5     settled in Carencro.  And unfortunately,
6     that's where I ended up at.
7 Q  Okay.  Do you have any education after
8     Carencro High School?
9 A  No, sir.  No formal education.
10 Q  Do you hold any licenses or certificates,
11     other than your driver's license?
12 A  You're going to have to explain that a little
13     bit.
14 Q  Are you a certified plumber, are you a
15     certified electrician?  Do you have any --
16 A  No, sir.
17 Q  -- specialized licenses or certificates?
18     Real estate license?
19 A  No, sir.
20 Q  All right.  When you graduated from Carencro
21     High in 1991, what did you do?
22 A  I went to the Army.
23 Q  All right.  And that was from '91 to '99, you
24     said?
25 A  '98.

---

**Page 31**

1 Q  '98.
2     All right.  Upon discharge, what did you
3     do?
4 A  I worked for the Abbeville Police Department.
5 Q  Beginning '98?
6 A  Yes, sir.
7 Q  Until?
8 A  2002.
9 Q  And did you have training there?
10 A  Yes, sir.
11 Q  Where?  Explain to me your training.
12 A  I went through the Acadiana Law Enforcement
13     Training Academy.  I did their field training
14     unit and was put on the road as a police
15     officer.
16 Q  All right.  And why did you leave?
17 A  Financially, Lafayette -- career and
18     financially-wise, Lafayette was a better
19     choice.
20 Q  So there was more money to earn at the
21     Lafayette Police Department than the
22     Abbeville Police Department?
23 A  Yes, I made more money in Lafayette.
24 Q  What was your salary when you left Abbeville?
25 A  Oh, I'm not sure.  It couldn't have been more

---

**Page 32**

1 than $25,000, maybe.
2 Q  Okay.  All right.  And then you worked in
3     Lafayette from 2002?
4 A  Yes, sir.
5 Q  Until 2012?
6 A  Yes, sir.
7 Q  September of '12?
8 A  Yes, sir.
9 Q  Did you start immediately, you know, the day
10     after you finished at Abbeville, within a
11     short period of time, did you start at
12     Lafayette?
13 A  Yes, sir.  I think the same month.  I took
14     two weeks off in between Lafayette and
15     Abbeville.
16 Q  All right.  And when you got hired, did you
17     fill out an application?
18 A  With Lafayette?
19 Q  Yes.
20 A  Yes, sir.
21 Q  And did they send you for a physical or a fit
22     for duty?
23 A  Yes, sir.
24 Q  Did everything you put in the application,
25     was it truthful and honest?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 33

1  A  Yes, sir.
2  Q  And at that time, were you provided a copy of
3     the PPM's and general orders?
4  A  I'm not sure.  I don't think so.
5  Q  If there's documentation to suggest that you
6     signed off saying that you received them,
7     would you dispute that?
8  A  No, sir.
9  Q  Okay.  And you know, maybe they didn't give
10    them to you, but they said here's where you
11    can find them, or they're on this computer or
12    whatever.  Do you remember that?
13 A  No, sir.
14 Q  Did you have access of the Lafayette PPM's at
15    some point between 2002 and 2012?
16 A  Yes, sir.
17 Q  All right.  The same with the general orders?
18 A  Yes, sir.
19 Q  And how would you access those?
20 A  Through their internal server.  I guess
21    that's where they have it located at.
22 Q  And that's for both?
23 A  Yes, sir.
24 Q  Are they both contained in the same location
25    of the server?

---

Page 34

1  A  I don't believe so.  I'm not sure.
2  Q  Okay.  I would assume that -- (Interrupted)
3  A  I'm not sure.
4  Q  Yes.
5        I would assume -- and correct me if I'm
6     wrong -- but every Lafayette City-Parish
7     Consolidated employee has access to the
8     PPM's, but only police officers have access
9     to the general orders.  Is that accurate?
10 A  I would assume, yes.
11 Q  Okay.  So I would further assume that to
12    access the general orders, it would be
13    something through the police department?
14 A  Yes, sir.
15 Q  All right.  But you did have access to both?
16 A  Yes.
17 Q  All right.  Did you have to undergo any
18    training with LPD when you started?
19 A  Yes, sir.  I went through their field
20    training unit program.
21 Q  And who was your field training officer?
22 A  I had many.  Mike Rose, Bryan Irving, Paul
23    Truard, John Leblanc, John Miller.
24 Q  How long did you have to do that?
25 A  I believe it was about four -- four months,

---

Page 35

1     maybe.
2  Q  Why did you have so many?
3  A  That's just the way it was structured.  Then,
4     there were six phases of the field training
5     unit.  I only had to go through four because
6     I had the previous experience.
7  Q  Okay.  Were you a civil servant at the
8     Abbeville Police Department?
9  A  Yes, sir.
10 Q  What position did you start in once you
11    finished your field training?
12 A  I was assigned to the nighttime power squad.
13    I think it was in patrol support maybe.
14    MR. ALEXANDER:
15       Scott, you said nighttime power
16    squad?
17 A  Yes, sir.
18    MR. ALEXANDER:
19       Okay.
20 MR. CORRY:
21 Q  Let me back up.
22       While you were with the Abbeville Police
23    Department for the four years you were there,
24    roughly the four years, '98 to '02, did you
25    ever receive any discipline?

---

Page 36

1  A  No, sir.
2  Q  Were you ever written up?
3  A  No, sir.
4  Q  Did you ever have any complaints filed
5     against you by members of the police
6     department or citizens?
7  A  No, sir.
8  Q  Were you ever sued as an Abbeville police
9     officer, other than that car wreck?
10 A  No, sir.
11 Q  What precinct, division, shift is the --
12    well, you said nighttime power squad patrol
13    support.  What division is that, patrol?
14 A  Patrol.
15 Q  And how long were you in that position?
16 A  From 2003, up until the time I went into
17    Metro in 2005, I think.  I went from power to
18    Metro.
19 Q  What is the power squad?
20 A  It's a supplemental shift unit.
21 Q  Explain that to me.
22 A  Your calls get -- the shift gets overwhelmed
23    with calls holding, we're there to pick up
24    all the slack that the shift can't handle.
25 Q  Is there a particular precinct or it's

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 37

1  city-wide?
2  A  No, sir, it's city-wide.  There were no
3  precincts then.
4  Q  It was night shift.  What were the hours?
5  A  From 3:00 p.m. to 3:00 a.m.
6  Q  Were you married at that time?
7  A  No, sir.
8  Q  When did you get married to your current
9  wife?
10  A  2003.
11  I got married a year after I got
12  hired --
13  Q  Okay.
14  A  -- with the Lafayette Police Department.
15  Q  All right.  Did you like working nights?
16  A  Not really.  But I was new, so I'd go where
17  they tell me to go.
18  Q  All right.  And I guess you would agree with
19  me, wouldn't you, Scott, that not everybody
20  can work days?
21  A  Correct.
22  Q  The city has to be protected?
23  A  Correct.
24  Q  You have people that work nights, and you
25  have people that work days?

---

Page 38

1  A  Correct.
2  Q  And you have new people that start that work
3  nights, correct?
4  A  Correct.
5  Q  You have new people that start that work
6  days?
7  A  No.
8  Q  Nobody that starts works days?
9  A  Not -- during that time frame, all the new
10  people got cut loose during the night,
11  whether it was on a shift or the power squad.
12  Q  All right.  And you have senior people that
13  work days, and senior people that work
14  nights?
15  A  Correct.
16  Q  All right.  So this was like an overflow
17  squad?  Is that a fair assessment?
18  A  Yes.
19  Q  What was your chain when you started?
20  A  My chain?
21  Q  Of command.
22  A  We had a sergeant and a lieutenant.
23  Q  Do you remember who they were?
24  A  Sergeant Ron Lott and Lieutenant Sammy
25  Lowe.

---

Page 39

1  Q  Do you remember who your captain was?
2  A  I don't ever recall having a captain.
3  Q  What about a major?  Or lieutenant.  I'm
4  sorry, lieutenant.
5  A  (No response)
6  Q  You told me -- (Interrupted)
7  A  Lieutenant Sammy Lowe and Sergeant Ron
8  Lott.
9  Q  Okay.  And captain and major, you don't
10  recall?
11  A  No.
12  Q  And who was the chief when you started?
13  A  Ronnie Boudreaux.
14  Q  And when did he -- when did Hundley take over
15  for him?
16  A  I'm not sure.  Either 2005 or '06.
17  Q  And when did Craft take over for Hundley?
18  A  Either 2006 or '07.
19  Q  Okay.  Did you stay on nights with the power
20  squad?
21  A  Yes, sir.  That's the only time they worked.
22  Q  Okay.  And it's Monday through Friday, or how
23  did it work?
24  A  It was a rotation with the shift, 12-hour
25  shift.

---

Page 40

1  Q  I'm sorry?
2  A  It was a rotation with the shift.
3  Q  Explain that to me.
4  A  You had a 12-hour shift working 3:00 p.m. to
5  3:00 a.m., with two nighttime shifts.  I
6  forgot how it works.  I think either the B or
7  D rotation rotates nights, and the other side
8  rotates days.
9  Well, we were assigned to either B or D.
10  We had a counterpart that came in.  We'd go
11  in select shifts.  Two, 12-hour tours, off
12  two days, on three, off two.  And we rotated
13  with the shift like that.
14  Q  All right.  Did you have any discipline
15  problems between '03 and '05?
16  A  No, sir.
17  Q  Anybody filed a complaint against you?
18  A  Yes, sir.
19  Q  Who?
20  A  I don't remember who they were, but they
21  filed a complaint on it.
22  Q  Citizens?
23  A  Citizen, yes.
24  Q  How many do you think you had between '03 and
25  '05, filed against you?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

**Page 41**

1  A   I believe that one.
2  Q   And that was the takedown at the traffic
3       accident?
4  A   No.  That one was I -- I think it was Jim
5       Craft's next door neighborhood filed a
6       complaint on me because I insinuated that he
7       was acting like a buffoon.
8  Q   I'm sorry?
9  A   I insinuated he was acting like a buffoon.
10 Q   Who was that?
11 A   I'm not sure of the kid's name.
12 Q   It was a kid?
13 A   Yeah.
14 Q   A minor?
15 A   No.  He was a young adult.
16 Q   And how do you know he was Jim Craft's next
17      door neighbor?
18 A   Because that's what Sammy Lowe told me.
19 Q   And who is Sammy Lowe?
20 A   My lieutenant.
21 Q   And where did this incident take place?
22 A   It took place in the -- the now Hobby Lobby
23      parking lot, at the corner of Acadiana --
24      Ambassador Caffery and Johnston Street.
25 Q   What was going on?

**Page 42**

1  A   At that point in time, the city was having
2       problems with individuals congregating in the
3       parking lots, large groups of individuals.
4       They'd burn out their tires in the parking
5       lot.  And Craft had issued a memorandum to
6       the power squad to make sure that these type
7       of congregations, if we did find them, to
8       disburse them because it was unwarranted.
9          I get dispatched down there.  There was
10      a group of people down there.  I tell them to
11      disburse.  They go start leaving.  There's a
12      pile of trash everywhere.  So I stop
13      everybody that's there, said, look, just
14      clean up your trash and go home.
15         This one individual came up and said,
16      he's not cleaning up the trash.  I said,
17      well, you've got choices in life.  You can
18      clean up the trash and take the issue up with
19      the people that left it there, or I can issue
20      a summons for criminal mischief for being out
21      here and just being silly and stupid and
22      causing a disruption.  He said he'd rather
23      take the summons.  Kind of buffoonish, but
24      you know --
25 Q   Did you give him the summons?

**Page 43**

1  A   Yes, sir, I did.
2  Q   And he filed a complaint against you?
3  A   Yes, sir, he did.
4  Q   What was the outcome of that?
5  A   It was --
6  Q   And was there an investigation?
7  A   Yes, sir.
8  Q   And what was the outcome?
9  A   His complaint was sustained.
10 Q   And so, what was your discipline?
11 A   I didn't receive any discipline.
12 Q   Was it a counseling form, letter of
13      reprimand, or what?
14 A   Are you considering a counseling form a form
15      of discipline?
16 Q   I'm asking you, what happened?
17 A   I told you, there was no discipline issued.
18 Q   Was there a counseling form issued?
19 A   Yes, sir.
20 Q   And what were you -- what was your --
21      (INTERRUPTION IN DEPOSITION)
22      MR. CORRY:
23          Hey, Chris?
24      MR. ALEXANDER:
25          Hey.

**Page 44**

1      MR. CORRY:
2          Mr. Hewitt just arrived.
3      MR. ALEXANDER:
4          What's that?
5      MR. CORRY:
6          I said, Mr. Hewitt has just
7      arrived.
8      MR. ALEXANDER:
9          Okay.  Well, then, I need to -- we
10     need to have a discussion.
11     MR. CORRY:
12         All right.  Let's take a break, and
13     we'll take a five-minute break.
14     MR. ALEXANDER:
15         All right.
16     MR. CORRY:
17         And I'll go to my office and call
18     you.
19     MR. ALEXANDER:
20         Sounds good.
21     MR. CORRY:
22         All right, man.
23     (SHORT BREAK TAKEN IN DEPOSITION
24         AT 11:35 P.M.)
25 MR. CORRY:

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 45

1 Q   Scott, I was asking you about your employment
2     with LPD.  I'm going to fast forward real
3     quick, because I think we can knock this out
4     quicker.
5         When you left LPD, or were terminated in
6     September of 2012, where did you go to work,
7     and when did you go to work?
8 A   The first job I took was with Lofton Security
9     Staffing in mid-November.
10 Q   And what did you do with them, security
11     officer?
12 A   Security guard, yes, sir.
13 Q   What was your rate of pay?
14 A   I believe it was $9 an hour.
15 Q   Were you working 40 hours a week?
16 A   No, sir.
17 Q   How much were you working?
18 A   I believe it was 36.
19 Q   Did you have any other benefits?
20 A   Yes.  I had -- I purchased a medical
21     insurance plan that they sold.
22 Q   What did that cost you?  Was it weekly,
23     monthly, or -- (Interrupted)
24 A   It took a portion of my paycheck.  The
25     amount, I really couldn't tell you exactly.

---

Page 46

1     I didn't work there but for maybe -- maybe a
2     month, maybe.
3 Q   So November of '12, is when you started?
4 A   Yes, sir.
5 Q   One month.
6         Where did you go after that?
7 A   I went to the Iberia Parish Sheriff's Office
8     after that.
9 Q   As an officer?
10 A   Yes, sir.
11 Q   As a deputy?
12 A   Yes, sir.
13 Q   Was that in December of '12?
14 A   Yes, sir.  I got hired mid-December.
15 Q   And did you go through the normal hiring
16     process?
17 A   Yes, sir.
18 Q   Normal -- did you have to do any training?
19 A   No, sir.
20 Q   Put you right on the road?
21 A   Well, there was a training officer to get
22     acquainted with their computer system, their
23     dispatch system, things that are internal to
24     Iberia Parish.  Not every law enforcement
25     agency across the state operates the same

---

Page 47

1     reporting format.  So I had to ride with a
2     deputy for about a month, just to get
3     acquainted with their zones, their shifts,
4     their reporting system, and things of that
5     nature.
6 Q   Backing up a minute.
7         Working for Lofton, did you work days or
8     nights?
9 A   I was assigned to a night shift.
10 Q   And what was the shift?
11 A   6:00 p.m. to 6:00 a.m.
12 Q   All right.  And then, with Iberia, what
13     shift?
14 A   I worked the night shift.
15 Q   What was it?
16 A   5:00 p.m. -- or 5:30 to 5:30.
17 Q   And how long were you with Iberia?
18 A   I worked with Iberia from December until July
19     of last year.
20 Q   July of '13?
21 A   Yes, sir.
22 Q   And what was your salary when you started and
23     when you left?
24 A   I believe it was just above $30,000, maybe.
25 Q   And -- (Interrupted)

---

Page 48

1 A   That's inclusive of the supplemental pay.
2 Q   Plus benefits?
3 A   Yes, sir.
4 Q   Health insurance?
5 A   Yes, sir.
6 Q   Why did you leave Lofton?
7 A   I was starving to death.
8 Q   All right.
9 A   I couldn't pay my bills.
10 Q   All right.
11 A   Financially, it was -- it was a stepping
12     stone to get reacquainted with employment.
13 Q   All right.
14 A   After I got fired, it took a heavy toll on
15     me.
16 Q   Okay.  And then, why did you leave Iberia?
17 A   I went to work for Halliburton Energy
18     Services.
19 Q   And you started there in July of '13?
20 A   Yes, sir.
21 Q   And is that where you're currently employed?
22 A   Yes, sir.
23 Q   What is your current pay?
24 A   I believe it's $14.50 an hour.
25 Q   And do you work 40 hours a week?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 49

1 A   Sometimes.  Sometimes less and sometimes
2     more.  I'm on a 24-hour call.  All the job
3     parameters dictate how much I work.
4 Q   What is your position?
5 A   I'm a tool operator and operator assistant.
6 Q   Tool operator and operator assistant?
7 A   Yes, sir.
8 Q   And who is your supervisor?
9 A   Mr. Kenneth Arabie and Mr. Randy Landry.
10 Q   And where are you assigned?  What Halliburton
11    office?
12 A   Weeks Island Road in New Iberia.
13 Q   Are you making more money with Halliburton
14    than you were making with the Iberia Parish
15    Sheriff's Office?
16 A   Yes, sir.
17 Q   Are you making more money with Halliburton
18    than you were making with the Lafayette
19    Police Department?
20 A   I'm not sure yet.  I haven't worked a full
21    year to do the comparison.
22 Q   What are you averaging in pay per month?
23 A   $1,800.
24 Q   A month?
25 A   Take home, yeah.

Page 50

1 Q   Are you paid monthly, weekly, biweekly?
2 A   We're on a 26 paycheck.  I guess, biweekly.
3 Q   You work offshore?
4 A   Yes, sir, I do.
5 Q   Is that the only place you work?
6 A   Yes, sir.
7 Q   So when you're called, you go offshore and
8     you don't know how long your hitch is going
9     to be?
10 A   Correct.
11 Q   It could be a day, it could be a month?
12 A   It's going to be longer than a day.
13 Q   And they take you out there by boat or
14    helicopter?
15 A   It all depends on the job.  Some jobs you'll
16    take a boat, some jobs you'll fly out.  It
17    all depends.
18 Q   And it's all in the Gulf?
19 A   Yes, sir.
20 Q   Have you been overseas for work?
21 A   No, sir.
22 Q   Is that a possibility?
23 A   Yes, sir.
24 Q   And what do you have to do to get overseas
25    work?

Page 51

1 A   I'm not really sure.  I know they have --
2     Halliburton is a global entity.  I know they
3     have places all around planet earth.
4         But right now, I'm assigned to the Gulf
5     of Mexico, so that's where I concentrate all
6     my efforts at.
7 Q   Okay.  And the purpose of the question was,
8     you said you were on call.  I'm just
9     wondering, could they call you and say, hey,
10    we have a job in Africa, you're on that?
11 A   No, sir.
12 Q   It would be more of a change of office?
13 A   Yes, sir.
14 Q   Do you have benefits?
15 A   Yes, sir.
16 Q   Health insurance?
17 A   Yes, sir.
18 Q   Retirement?
19 A   Yes, sir.
20 Q   Vacation?
21 A   Yes, sir.
22 Q   Sick leave?
23 A   Yes.
24 Q   And you're paid for those?
25 A   I'm not sure about sick leave.  Because, when

Page 52

1     I got the flu, I didn't get paid.  So I would
2     say no at this point.
3 Q   Is there like a --
4 A   I don't know.
5 Q   -- year minimum?
6 A   Yeah.  I don't know if you have to be there a
7     year or not.  I didn't ask.
8 Q   Did you fill out an application?
9 A   Yes, sir.
10 Q   Everything in it was accurate and truthful?
11 A   Yes, sir.
12 Q   Have you had any incidences at Halliburton
13    where you were written up for any reason?
14 A   No, sir.
15 Q   What about at the Iberia Sheriff's Office?
16 A   No, sir.
17 Q   You left on good terms?
18 A   Yes, sir.
19 Q   If you wanted to go back to Iberia, you
20    could?
21 A   Yes, sir.
22 Q   Do you have any intent in returning to the
23    law enforcement?
24 A   No, sir.
25 Q   You took off today -- (Interrupted)

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 53

1 A   I need to strike that or at least amend it,
2    if you'd allow me to.
3 Q   Go ahead.
4 A   I am going to come back when I get my job.
5    I'm going back to the Lafayette Police
6    Department.
7        (INTERRUPTION IN DEPOSITION)
8    MR. CORRY:
9        What is that?
10   MS. COREIL:
11       Looks like the errata sheet.
12   MR. CORRY:
13       You have to give that to Chris.
14   Let me have that.
15       Let's put on the record that Mr.
16   Hewitt dropped off his deposition.  And
17   apparently, there's an errata sheet
18   attached in the front cover and I'm
19   handing it to you.
20 MR. CORRY:
21 Q   How long are you normally called out when
22   you're called out?
23 A   I've only got two jobs since I've been there.
24   I've been in training since July of last
25   year, and will continue on until probably

Page 54

1    midway throughout this year.
2 Q   So it's a year-long training process?
3 A   There's a lot -- it's a detailed job.
4 Q   And you have been called out offshore?
5 A   Yes, sir.
6 Q   Two times, you said?
7 A   Yes, sir.
8 Q   And how long were you hitches when you went
9    off?
10 A   The first one was for 14 days.  I was loaned
11   out to another agency or another organization
12   of Halliburton.  It's not particularly my
13   job, but in order to get out and get some
14   experience, they sent me out there with those
15   guys.  It lasted 14 days.
16       This last job that I was sent on, I had
17   to leave.  They brought me back in because I
18   had to do this.  Otherwise, I would probably
19   still be out there.
20 Q   Okay.  And when was the other time that you
21   got called out during that 14-day hitch?
22 A   No.  It was only two.
23 Q   Do you know when that was?
24 A   The first one was mid-February.  And the
25   second one, I left at the end of March.

Page 55

1 Q   And when did you come back?
2 A   Monday.  Monday night.
3 Q   Okay.  Are you scheduled to go back after
4    today?
5 A   I'm not sure if they're going to send me back
6    out or not.
7 Q   Okay.  And briefly, what do you do?  Do you
8    know yet?  I guess you're not --
9 A   Yeah.  I'm trained to run completion systems
10   for the Gulf of Mexico.  Completions mean
11   that once you drill a well, it has to be
12   completed.  You don't just drill a hole and
13   the oil comes out.  There's certain tools
14   that Halliburton owns that we would place
15   downhole that allows these hydrocarbon zones
16   to be productive without causing any kind of
17   catastrophic incidents.
18 Q   Okay.  So you watch some gauges or -- is it a
19   physical job?
20 A   Yes.
21 Q   All right.  Let's go back to LPD.
22       Anything else about your job at
23   Halliburton that we didn't -- (Interrupted)
24 A   No, sir.
25 Q   And I mean, I know it's a complex job.  But

Page 56

1    for today's purposes, we covered --
2    (Interrupted)
3 A   Okay.
4 Q   You agree?
5 A   Yes, sir.
6 Q   All right.  The last thing we talked about
7    was this kid, or young adult in the parking
8    lot of Hobby Lobby.  He gets a summons.
9    After that, at some point, he files a
10   complaint against you.  It's investigated.
11 A   Yes, sir.
12 Q   Accurate.
13       Do you know if it was a shift level
14   investigation or administrative level?
15 A   I guess it was a shift level, because at that
16   point, I'd never been to Internal Affairs,
17   so --
18 Q   All right.  Did you go to Internal Affairs
19   for that?
20 A   No, as well.
21 Q   All right.  And you received a counseling
22   form?
23 A   Yes, sir.
24 Q   Who gave you that counseling form?
25 A   Lieutenant Sammy Lowe.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 57

1 Q   All right.  Any other complaints filed
2     against you by anyone between '03 and '05,
3     while you were in the power squad?
4 A   No, sir.
5 Q   Did you file any complaints against anyone
6     between '03 and '05?
7 A   No, sir.
8 Q   All right.  And then, '05, you were
9     transferred to Metro Narcotics?
10 A   Yes, sir.
11 Q   What was your position?
12 A   Narcotics agent.
13 Q   And do you remember your chain of command?
14 A   It was Sergeant Kirk Colarelli, to I guess
15     Captain -- we went through a couple of
16     captains back then.  It was -- Jackie Phelps
17     was the first captain.  The second captain
18     was Angelo Iorio.  And the third captain was
19     -- was it Ned Fowler?  Is that his name?
20 Q   There is a Ned Fowler.  I'm not sure --
21 A   A big guy.
22 Q   I'm not sure if that's who you're talking
23     about.
24 A   Big bulky guy, mustache.
25 Q   I think so.

---

Page 58

1 A   Yeah.  That's him.
2 Q   How long were you in Metro?
3 A   From 2005, till, I believe 2009.
4 Q   And what was your -- is that part of the --
5     what division is that in?
6 A   I think it's covered under CID.
7 Q   And what shift?
8 A   I worked from 4:00 p.m. till 2:00 a.m.
9 Q   What days of the week?  Same type of shift
10     work, or was it a straight?
11 A   I think it was straight.
12 Q   Monday through Friday?
13 A   Yeah.  No, we -- that's ten hours.  We worked
14     a ten-hour week.
15 Q   Ten-hour day, 40-hour week?
16 A   Yeah.
17 Q   Okay.  That's ten.
18 A   Okay.
19 Q   4:00 to 2:00 is ten.
20 A   Yes.
21 Q   So -- (Interrupted)
22 A   Tuesday through Friday.  I know we alternated
23     Tuesday through Friday, and Monday through
24     Thursday.
25 Q   What did you do as a narcotics -- you were a

---

Page 59

1     narcotics agent?
2 A   Yes, sir.
3 Q   Did you work with the feds at all?
4 A   No, sir.  Well, strike that.  Maybe two or
5     three of my cases went to the federal
6     government, but it wasn't one of those
7     hand-in-hand investigations.  It was more or
8     the less the amount of narcotics that were
9     recovered qualified for federal prosecution.
10     So they felt it better to prosecute it at the
11     federal jurisdiction than at the state level.
12 Q   Okay.  Did you have any complaints filed
13     against you between '05 and roughly '09,
14     while you were in narcotics, CID?
15 A   I don't believe so.
16 Q   Did you file any complaints against anyone?
17 A   Angelo.
18 Q   Did you file an IA complaint and a criminal
19     complaint, or was it all one and the same?
20 A   I thought it was one and the same.
21 Q   Why did you -- scratch that.
22     Did your shift ever change from the 4:00
23     P to 2:00 A, while you were working in
24     narcotics during those three to four years?
25 A   That was the scheduled requirement that we

---

Page 60

1     had, but we worked all times days and nights.
2     It -- the drug trade dictated our hours.  If
3     it was no business for us to do, we were
4     required to be there from 4:00 p.m. to 2:00
5     a.m.
6     But nine times out of ten, we were
7     early, left late, rolled around the clock.
8     Like I said, it all -- the drug trade
9     dictates how much we worked.
10 Q   And you were paid for your over 40 hours?
11 A   Yes, sir.
12 Q   Why did you leave -- scratch that.
13     What was your rank in your hitch before
14     Metro, patrol officer?
15 A   Yeah.
16 Q   And what was it when you were in narcotics?
17 A   Patrol officer.
18 Q   Patrol officer?
19 A   Yeah.
20 Q   When you were terminated in September of '12,
21     was it patrol officer?
22 A   Yeah.  I was a corporal, I guess.  Patrol
23     officer, yeah.
24 Q   Is there a difference?
25 A   In between?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 61

1 Q   A patrol officer and corporal.
2 A   You're a corporal, but you're still a patrol
3     officer.
4 Q   A corporal is a higher rank than a patrol
5     officer, or is it not?  I'm asking.  I don't
6     know.
7 A   I'd have to look at the civil service
8     arrangements to see if they actually classify
9     patrol officer as the rank.  Whether it's
10    patrol officer level 1, 2, 3, I'm not really
11    sure.
12 Q  Okay.  So did you consider yourself a
13    corporal when you started up to the --
14 A  No.
15 Q  -- point that you --
16       Okay.  So at some point, you became a
17    corporal?
18 A  Yes, sir.
19 Q  And how do you do that?
20 A  I think it's a four-year time, you have to
21    take the corporal's civil service exam.  And
22    if there's a spot allocated for a promotion
23    and you've got seniority, they'll promote you
24    to it.
25 Q  Okay.  And you did that?

Page 62

1 A   Yes, sir.
2 Q   Was it during the time in Metro?
3 A   I believe so, yes, sir.
4 Q   All right.  In '08 or '09, where did you go?
5 A   From Metro, I went back to -- I went to
6     Precinct 3, working days under Angelo Iorio.
7 Q   So you worked under Angelo after you filed a
8     complaint against him?
9 A   Yes, sir, I did.
10 Q  He was your captain?
11 A  Yes, sir, he was.
12 Q  Let me show you what I'll mark as D-1.  It's
13    an October 29th, 2008, personnel transfer.
14    It's you and one other officer's name on
15    there.
16       Is that the transfer out of Metro into
17    Precinct 3 days?
18 A  (Witness examines document.)
19       Yes, sir.
20 Q  Okay.  And so, you were in Metro '05, to --
21    what is the effective date on that one?
22 A  October 29th, 2008.
23 Q  Okay.  Is that your -- does that refresh your
24    recollection?
25 A  Yes, sir.

Page 63

1 Q   All right.  Let me see that.
2       Okay.  So you went to patrol division
3     Precinct 3, Shift A, day shift under Angelo
4     Iorio?
5 A   Yes, sir.
6 Q   And how long did you stay there, Scott?
7 A   Up until the point where Jim Craft created
8     the precinct investigator's position.
9 Q   Do you know when that was?
10 A  I can't recall the actual date.  I'm not
11    sure.
12 Q  So you would have -- do you remember the
13    year?
14 A  Not really, no.
15 Q  What is the precinct investigator?
16 A  I'm not really sure.  That's something that
17    Jim Craft created.  I know I was assigned
18    some investigative duties, primarily inside
19    of Precinct 3.  But I don't think the idea
20    ever kicked off or had any kind of clear
21    determination to continue.  I don't even know
22    if it still goes on today.
23 Q  How long were you in that position?
24 A  Up until they transferred me after I filed
25    the complaint on Jim Craft.

Page 64

1 Q   What year was that?
2 A   2012.
3 Q   Okay.  That was the TRO?
4 A   No.  That was the Duaine Belfour incident.
5 Q   Is the precinct investigator the same thing
6     as a resource officer?
7 A   No, sir.
8 Q   When did you become a resource officer?
9 A   I'm not really sure when the transition was
10    made.
11 Q  Okay.  Let me show you what I'm going to mark
12    as 2.  It looks like it's a May 25th, 2012,
13    e-mail.  And it says, effective May 27th,
14    2012, Scott Poiencot will be relieved of duty
15    patrol division, Precinct 3, resource officer
16    under the supervision of Captain Norbert
17    Myers, transferred to patrol, Precinct 4,
18    Shift C, under the supervision of Captain
19    Cornell Montgomery.  Is that the transfer
20    you're referring to?
21 A  I believe so.
22 Q  Okay.  I'll let you look at that.
23 A  (Witness examines document.)
24       MR. CORRY:
25          Actually, that'll be 3, because 1

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 65

1 was his license, right?
2 COURT REPORTER:
3    Yes. Sorry.
4 MR. CORRY:
5    So 2 will be the October 29th, '08,
6 memo. And 3 will be the one we just
7 referenced.
8 A  Okay.
9 MR. CORRY:
10 Q  Is that the transfer?
11 A  Yes, sir.
12 Q  Is that the last position you held before
13 being terminated?
14 A  Yes, sir, it is.
15 Q  So is it safe to say, Scott, that you
16 basically held four positions, or worked in
17 four different -- is position the right word
18 at the Lafayette Police Department?
19 A  Disposition or position?
20 Q  Position.
21 A  Yes, sir.
22 Q  Patrol?
23 A  Yes, sir.
24 Q  Excuse me. Power squad, for '03 to '05,
25 nights. Then, '05 to '08, Metro. '08 to --

Page 66

1 what's the date of that?
2 A  May 25th.
3 Q  Of '12?
4 A  Yes, sir. 2012.
5 Q  So Precinct 3, days, October 2nd of '08 to
6 2012. And then, that transfer from '12,
7 until your termination?
8 A  Yes, sir.
9 Q  Okay. Did your rate of pay change with any
10 of your four transfers?
11 A  No, sir, it did not.
12 Q  I guess your duties as an officer changed
13 depending on where you were working?
14 A  Yes, sir.
15 Q  Did your benefits change?
16 A  No, sir.
17 Q  How many investigations -- let's back up to
18 between '08 and '12. How many investigations
19 did you do as a precinct investigator?
20 A  I'm not really sure.
21 Q  More than five?
22 A  Yes.
23 Q  More than ten?
24 A  I would say, yeah.
25 Q  And what were you investigating?

Page 67

1 A  Mostly property crimes.
2 Q  Okay. So it was something different than
3 like a shift level or an IA investigation?
4 It was investigations for the citizens of
5 Lafayette?
6 A  Yes.
7 Q  Police work?
8 A  Yes.
9 Q  Okay. And when you say "property crimes",
10 what does that mean?
11 A  Burglary, theft, forgery. Crimes that don't
12 have an actual physical victim involved in
13 it.
14 Q  A human?
15 A  Correct.
16 Q  Is that all you did between '08 and '12?
17 A  I believe so.
18 Q  The resource officer position, when did that
19 -- when did you become a resource officer?
20 A  I'm not really sure. They kind of blended
21 in. And one day, they called me a precinct
22 investigator. The next day, they're calling
23 me a resource officer. But I was still doing
24 the same thing.
25 Q  So in your mind, it was the same thing?

Page 68

1 A  Yeah.
2 Q  Do you know -- (Interrupted)
3 A  Not in my mind the same thing. It was still
4 the same thing.
5 Q  I'm sorry.
6 A  Yeah.
7 Q  So your duties from when they called you a
8 precinct investigator or a resource officer,
9 your duties remained the same?
10 A  I still received cases for assignment to go
11 investigate from Captain Myers.
12 Q  All right. And you've got to answer the
13 question, though.
14 A  Which is what?
15 Q  You gave me an explanation yes. Or is it --
16 let me back up.
17    Your duties as a precinct investigator
18 and your duties as a resource officer were
19 the same?
20 A  Yes.
21 Q  Okay. Do you know why there was a change and
22 it was termed resource officer?
23 A  No.
24 Q  Do you know when the first time you heard the
25 word resource officer?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 69

1  A   We had one -- the first time I heard it was
2       for the school resource officers.  Those guys
3       that are assigned to all the high schools,
4       middle schools and whatnot.  And there was
5       another resource officer that was assigned
6       with me.  And she was primarily there to --
7       if I needed a uniformed officer to go out
8       with me to ensure that we didn't burden the
9       shift.
10 Q   Where was your office located?
11 A   It was on the third floor.  You have the
12      elevator that's closest to the main lobby,
13      then you have the one that's a little bit
14      further down closer to the parking lot.  You
15      take the elevator on the third floor closest
16      to the parking lot, you make an immediate
17      left after you get out of the hallway, and my
18      office is right there.
19 Q   And that's where your office was starting on
20      November 2nd of '08?
21 A   No.  No.
22 Q   Let me finish.
23      As evidenced by D-2, which the October
24      29th, '08, memo, regarding the transfer.
25 A   No.  My offices switched three times.

---

Page 70

1  Q   All right.  When did you end up on the third
2       floor?
3  A   I've always been on the third floor.
4  Q   All right.  And why were your offices
5       changed?
6  A   I have no idea.
7  Q   Okay.
8  A   They just come in and tell me, hey, you're in
9       this office today.  A couple of weeks later,
10      hey, you're in this office.  Then, hey, we're
11      shuffling people and personnel, we need this
12      office, you go to that office.
13 Q   I guess you always share an office with
14      somebody?
15 A   No.  The second office I had was mine.  And
16      then, when they switched me to that last
17      office, I shared an office with -- I guess
18      Bridget Corne was the last one I shared the
19      office with.  Todd Alcorn and Jared Istre.
20 Q   And let me back up just a bit.
21      '05 to '08, when you were in Metro, did
22      you have an office, or you -- (Interrupted)
23 A   Yeah.
24 Q   Where?
25 A   It was in the same building, third floor.  I

---

Page 71

1       believe it's now part of the Compstat rooms.
2  Q   Okay.  And then, in Precinct 3 days, '08 to
3       '12, 2008 to 2012, the three offices you
4       described a moment ago switching, that was
5       while you were on that shift, or in that
6       position?
7  A   As precinct investigator, yes, sir.
8  Q   Okay.  Do you remember your rate of pay when
9       you left?
10 A   No, sir, I don't.
11 Q   Do you remember your hourly rate?
12 A   No, sir, I do not.
13 Q   Do you recall getting raises?
14 A   Getting?
15 Q   Raises.
16 A   Yes, sir.  I think we got like a two percent,
17      maybe a couple of times during the time I was
18      there.
19 Q   What else did you do while you were in
20      Precinct 3, days?
21 A   Handled Precinct 3 business.
22 Q   Well, you told me about property complaints.
23      Anything else?
24 A   Handled day-to-day call volume from time to
25      time, traffic crashes, burglary

---

Page 72

1       investigations, whatever came across the
2       board that I was available to do.
3  Q   Did you ride around in a patrol unit?
4  A   When I got out of Metro, yes, I was assigned
5       to a patrol unit.
6  Q   So from '08 to '12, you were in a -- you had
7       a unit?
8  A   No, sir.  Sometime in between '08 and the
9       creation of the precinct investigation,
10      that's when I was on active patrol.
11      Once I got into the precinct
12      investigator position, they put me in an
13      unmarked car and gave me the office.
14 Q   I guess in an unmarked car, you're not going
15      out and investigating car accidents, are you?
16      Or are you?
17 A   I did.
18 Q   Just because they were short-handed, or --
19      (Interrupted)
20 A   Unfortunately, there were a couple of them
21      that I was there, and I witnessed it.  So who
22      better to work a traffic crash than the
23      person that actually saw it.
24 Q   Would that be part of your duties to be
25      called out and go investigate it, or was it

---

**Page 73**

1     just -- (Interrupted)
2 A   As a precinct investigator, no.
3 Q   All right.  And who was your captain in
4     Precinct 3?
5 A   First, it was Angelo Iorio.  Angelo retired
6     and Captain Norbert Myers took over.
7 Q   How long did you work with Angelo?
8 A   (No response.)
9 Q   Looks like you were there about four years --
10 A   Yeah.
11 Q   -- or three and a half years, maybe?
12 A   I'm not really sure how long I worked for
13     Angelo.
14 Q   And Captain Norbert Myers, that's the Norbert
15     Myers that was a plaintiff in this lawsuit
16     who was dismissed?
17 A   Yes.
18 Q   Okay.  Who was your lieutenant and sergeant?
19 A   The first one was -- oh, man, what's his
20     name?  I don't remember the first one's name.
21     I can see his face.  Randy Miller.  I believe
22     Randy Miller was the first one.
23     Then, we got Chris Wadlington.  Then, we
24     got Mike Rose and Judith Estorge.  Those are
25     all four sergeants that I worked for while I

**Page 74**

1     was in patrol.
2     Lieutenants, we had lieutenant Ron
3     Czajkowski, Lieutenant Stelly, and that was
4     it.  When I went to precinct investigations,
5     there was Lieutenant Gabe Thompson and
6     Captain Myers that was in the chain.
7 Q   All right.  So Gabe was in your --
8     Lieutenant Gabe Thompson was in your chain.
9     Captain Norbert Myers was in your chain.
10 A   Yes.
11 Q   What about Lieutenant Greg Cormier?
12 A   No.
13 Q   Did he work on the third floor near you?
14 A   Yes.
15 Q   All right.  The entire time you were on the
16     third floor?
17 A   No.
18 Q   When did that start?
19 A   I'm not sure when he got -- when he was
20     transferred out of CID and put into patrol
21     support.  But I know when I first started, he
22     was on the second floor in CID.  And then,
23     they went through another reorganization, and
24     he ended up on the third floor.
25 Q   Were there ever any times when Lieutenant

**Page 75**

1     Cormier was on the third floor and you were
2     on the third floor, that y'all met about
3     non-police business?
4 A   Yes.
5 Q   How many times?
6 A   I'm not sure.
7 Q   And what was the nature of the meetings?
8 A   Whether it be firearms, tractors.  That's all
9     I could really recall about non-police
10     matters that I spoke to him about.
11 Q   You don't recall anything else?
12 A   No, sir.
13 Q   When did you start using your recorder?
14 A   In 2006.
15 Q   And was there a particular event that you
16     thought you needed to start recording?
17 A   Yes, sir.
18 Q   What?
19 A   Unfortunately, while I was working in Metro,
20     I was the agent on-call and was assigned to
21     handle the drug case of Chance Marchiafava.
22 Q   I'm sorry?
23 A   Chance Marchiafava.  Don't ask me to spell
24     his last name, because I can't.
25 Q   That's an individual?

**Page 76**

1 A   Yes.  It's Jim Craft's son.
2 Q   Chance?
3 A   Marchiafava, I believe is how he pronounces
4     his last name.
5 Q   Okay.
6 A   He was in a traffic crash.  During the
7     investigation, the officers found a gram of
8     powder cocaine on him.  So instead of booking
9     him in jail, I got assigned to go out there
10     and see if there was anything I could do.
11 Q   By who?
12 A   My supervisor at that time, I think, was Kirk
13     Colarelli.  And I was on-call.  Every agent
14     goes through an on-call status while you're
15     there.
16     Unfortunately, his crash occurred during
17     the seven days that I was on-call.  So when
18     patrol called saying, we think we got
19     something for Metro to look at, they called
20     the number.  I think the supervisor gets it
21     and they say, hey, who's up?  And I'm up.
22     You go out there and handle this.  Go meet
23     the patrol out there at that location.
24     Get out there, get the dope, get Chance,
25     we bring him back to the Metro house.  Sign

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

**Page 77**

him up as an informant, and let things die
down.  There's no need to do anything at that
point.

A couple of days later -- I think the
very next day, somebody told on him.  The
next thing you know, Chuck Huebner's at the
office trying to wonder -- trying to snoop
whether or not Jim Craft's son had been
arrested for possession of cocaine.

So we kind of laid still and not do
anything, just let all this crap burn over.

During that time, Captain Babin called
me in his office and wanted to know what was
the -- to get an update on Chance's case.  So
I explained to him that he agreed to be an
informant, we're letting the heat die down,
because, you know, I'm not going to take a
chance of him being discovered as a informant
and ruining his ability to do what everybody
else that we arrest have the same
opportunity.

Q  So when you arrest somebody like that,
everybody gets an opportunity to be an
informant?

A  They could either be an informant or go to

**Page 78**

jail.

Q  Okay.  So that's not an uncommon practice?

A  No.

Q  There was no special treatment for Chance at
that point?

A  Not at that point.

Q  Okay.

A  Once Babin -- I gave Babin his update.  This
is the part where I decided, you know, maybe
you need to start protecting yourself,
because things aren't going well.

Babin told me just to go ahead and let
the case die a slow death.  He said, let's
not move on this.  Let's not -- is there any
kind of way out of this aside from making him
work as an informant and putting him in jail?
And I said, no, those were the two options
that were given by the district attorney's
office.  If you know some other process,
which there was, which is, you can go to the
district attorney and ask him to dismiss the
charges if that's what you want to do.
That's entirely up to the administration, not
me.

Q  All right.

**Page 79**

A  And he said, no, that he would prefer me to
just let it go.

Q  All right.

A  And at that point, I just -- that's not the
way we do business.  So I decided to start
recording conversations at that point.

Q  All right.  And whatever happened with that?

A  Chance came through.  He -- he did his job.
And we forwarded the case to the DA's office
and he dismissed it.

Q  Okay.  Because he acted as an informant?

A  Yes.

Q  And were there arrests made as a result of
that?

A  I believe so.

Q  Okay.  All right.  So that's when you decided
you should start recording?

A  Yes.

Q  Were there ever any times, Scott, while you
worked for the Lafayette Police Department
that you recorded someone and told them you
were recording them?

A  Yes.

Q  Who and when?

A  I believe it was Larry Theriot.  It was

**Page 80**

during the downtown detail.  And Larry was
talking to me about something, and he asked
me if I was recording, and I said, yeah.  And
he said, oh, you're messing with me.  And I
took out my recording, and said, hey, I'm
recording you, Buddy.  It's not you I'm
recording, I turn it on when I get out of my
unit, and I turn it off when I get back.

Q  Okay.  Other than him, was there ever any
time that you recorded and you told somebody,
I'm recording you?

A  I'm not sure.

Q  I mean, you pretty much -- (Interrupted)

A  Larry was the only one that I remember,
because he confronted me on it, and I had to
prove it to him.

Q  Okay.  You produced a lot of recordings --

A  Yes.

Q  -- in connection with this lawsuit.  And a
lot of them, there's a designation, I think
by maybe your attorney's office, that says,
consensual recording.

A  Yes.

Q  But you never told the persons -- person or
persons that were being recorded that you

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 81

1  were recording them.  Accurate?
2 A  They were all consensual.
3 Q  I don't want to get into a debate with you on
4  what the word consensual means.  I just want
5  you to answer the question.
6     On any of the recordings that you
7  produced, did you ever tell the people,
8  person or persons that were captured on the
9  recording device that you were recording
10  them?
11 A  Well, the first part of your statement gives
12  the perception that they weren't consensual.
13  Then, you asked the question.  If we can
14  separate the two.
15 Q  I'm asking the questions, Scott.
16 A  Okay.
17 Q  You've got to answer them.
18 A  Ask your question.
19 Q  The same question I just asked you.
20 A  Which was what?
21 Q  On any of the recordings that you have
22  produced in discovery, and there's a bunch of
23  them, did you ever tell the person or persons
24  who were captured on the recording that they
25  were being recorded?

Page 82

1 A  Yes.  Some knew and some didn't.
2 Q  Okay.  Did you tell them that?
3 A  No.
4 Q  Did you advise any of them of their police
5  officer bill of rights, if they were a police
6  officer?
7 A  No.
8 Q  Did you Mirandize anybody that you recorded
9  at any time?
10 A  No.
11 Q  Are there any recordings that you have from
12  2006, up until today -- well, let me limit it
13  to the time you were terminated.  2006,
14  that's when you started --
15 A  Yes, sir.
16 Q  -- correct?
17     Up through the time you were terminated
18  that you have not produced?
19 A  Yes, sir.  There's one.
20 Q  All right.  And what is it?
21 A  That's when I was called Jim Craft's office
22  to discuss Angelo Iorio's complaint, his
23  criminal activity.  And I had a stored --
24  crap happens.  I had a disc.
25     I know that in 2009, I met with Glenn

Page 83

1  Armentor to seek help for this, because I
2  didn't think it was fair that -- or even
3  legal to just ignore the fact that Angelo
4  committed these crimes and no --
5 Q  Well, I don't want you to tell me -- there's
6  an attorney-client privilege, and I don't
7  want you to tell me anything --
8     MR. CORRY:
9     Chris, are you there?
10     MR. ALEXANDER:
11     Yes.
12     MR. CORRY:
13     I just want to make sure he's not
14  violating any attorney-client privilege
15  with Glenn.
16     MR. ALEXANDER:
17     Yes.  And Scott -- I think Scott's
18  aware of that.
19     Don't get into, Scott, any of the
20  specific discussions that you had with
21  Glenn, because that is attorney-client
22  and that has not been waived.  Any
23  information that you can provide to Mike
24  that does not constitute specific
25  conversations or information relayed

Page 84

1  between you and Mr. Armentor is fine.
2  But do not get into discussions between
3  you and Mr. Armentor.
4 A  Okay.  Can I just go a little bit further so
5  maybe y'all can understand?
6     MR. CORRY:
7 Q  Sure.  You can go as far as you want, I just
8  want you to understand.
9 A  Okay.  It was during an FOP meeting.  Glenn
10  was invited to discuss or talk about the --
11  what's that crap called?  The legal defense
12  plan.  And there was numerous other
13  complaints that he was addressing as far as
14  just general conversation.  I don't -- there
15  was no retainer, there was no agreement to
16  represent anybody.
17 Q  Armentor didn't?
18 A  No, sir.
19 Q  Okay.
20 A  So that's --
21 Q  Then he wasn't your attorney, it doesn't
22  sound like.
23 A  No.
24 Q  All right.
25 A  But I had asked him for the help, but he

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 85

1  denied the help because of his association
2  with the city.
3  Q  All right.  Look in your -- let me see.
4  A  Do you want to go back to -- did I answer
5  your first question?
6  Q  Well, I'm going to let you look at something,
7  and I think you will.
8  MR. ALEXANDER:
9  Yes.  Let me ask you this, Scott:
10  It was your understanding, then, there
11  was no attorney-client agreement, to
12  your knowledge, between you and Mr.
13  Armentor?
14  A  No, not at that time there was no agreement.
15  There was me and probably 20, 30 other people
16  in just a round robin banter conversation.
17  MR. ALEXANDER:
18  And there were other people present
19  besides you and Glenn?
20  A  Yes, sir.
21  MR. ALEXANDER:
22  Okay.
23  MR. CORRY:
24  Where are the 18 that he's relying
25  on?  Where is it in the --

---

Page 86

1  MS. COREIL:
2  It's the very last thing, SP-73
3  through 75.
4  MR. CORRY:
5  Q  This is what I'm looking for.  And what I'm
6  showing you, Scott, I know you were here for
7  some of the depositions, at least parts of
8  them.  We have taken all the discovery that
9  you've provided through your attorney to us.
10  And we've got, it's 1 through 75, and we've
11  put it in a binder for your ease of
12  reference.
13  And I'm going to ask you to turn to
14  SP-75, which is the last page.  If you want
15  to look at it to refresh your -- look at the
16  three pages so you can kind of refresh what
17  that is.
18  A  (Witness examines document.)
19  Okay.
20  Q  That's the catalog of the tape recordings
21  that you're going to use and that you have
22  produced in discovery for this lawsuit?
23  A  Yes, sir.
24  Q  I know there's a whole lot of recordings, and
25  it looks like you've picked out 18.

---

Page 87

1  A  Yes, sir.
2  Q  All right.  And they're contained in pages
3  SP-73, 74 and 75.
4  A  Yes, sir.
5  Q  All right.  Is the recording that you're
6  referring to 13?
7  A  No.  I know it's not.  No.
8  Q  Okay.  So there's another recording regarding
9  Angelo Iorio in Jim -- Chief Craft's office
10  that you lost, it got -- (Interrupted)
11  A  I don't have.
12  Q  You don't have.  You don't know where --
13  (Interrupted)
14  A  The only copy I know that exists is with
15  Glenn Armentor.
16  Q  All right.  So the one at 13, on SP-75, is
17  something different?
18  A  Correct.
19  Q  When was that meeting where Armentor was
20  present?
21  A  Either late 2008, early 2009.  It was at an
22  FOP meeting.  So I'm sure that the FOP may
23  have a concrete -- if they keep accurate
24  archives of their meetings, they should have
25  one.

---

Page 88

1  Q  "FOP" is the Fraternal Order of Police
2  meetings?
3  A  Yes, sir.
4  Q  And where does that take place?
5  A  That took place at the Police Union's
6  building that was off of the Thruway,
7  Northeast Evangeline Thruway.  They no longer
8  have that building.  They sold that one and
9  bought a new one on Cameron Street.
10  Q  Okay.  Do you know if Armentor still has that
11  recording?
12  A  No, sir.
13  Q  You don't know one way or the other?
14  A  No, sir.  I -- I told him to call me if he
15  would be interested in helping me.  He never
16  called.  So we never spoke of the issue
17  again.
18  Q  Okay.  Did you file any complaints with
19  anybody about that?
20  A  About what, Angelo?
21  Q  Yes.  What was on that -- other than what you
22  told me earlier about Angelo.
23  A  No.
24  Q  Okay.
25  A  After I found out that the police department

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 89

1  wasn't going to handle Angelo's criminal
2  activity, I just thought it best that, you
3  know -- you're not getting any help from
4  anybody, so why poke that snake.
5 Q  Have you ever filed a grievance?
6 A  Yes.
7 Q  When?
8 A  I think I filed one when I was in the power
9  squad.
10 Q  How many do you think you filed?
11 A  Grievances? Just one, I believe. Yeah, just
12  one, I think.
13 Q  While you were in power squad?
14 A  Yeah.
15 Q  For what?
16 A  At the time, we were being assigned to all
17  the -- the entire power squad, contrary to
18  what the game plan was. We would be assigned
19  to all the special functions that were being
20  tasked out; i.e., Greek week, Crawfish
21  Festival, all the festivals that required
22  extra staffing. And every time it came up to
23  staff these things, they would wait until the
24  last moment and say, okay, it was done by
25  seniority, but the entire power squad was

Page 90

1  selected, even though the seniority list
2  didn't concur with what was going on.
3      So I challenged the thought process.
4  Look, if this is going to be the power
5  squad's assignment, just tell us that. Don't
6  tell us that you staffed all of us based on
7  seniority, because there were three or four
8  guys that had quite a bit of seniority over
9  other people in the agency that should have
10  been drawn from first, if that was the case.
11 Q  And what was the outcome of the grievance?
12 A  They just threw it in the garbage.
13 Q  Who is "they"?
14 A  The agency, all the way up to the chief. The
15  chief at that time I think was Randy Hundley.
16 Q  Have you ever had a grievance filed against
17  you?
18 A  No, sir, not that I'm aware of.
19 Q  All the recordings that you made, did you
20  make them on more than one recording device?
21 A  Yes, sir. I started off with just a generic
22  Olympus digital recorder.
23 Q  Where is it?
24 A  Oh, I have no clue.
25 Q  All right. And when did you move from that

Page 91

1  to what?
2 A  When Captain Myers suggested I go with a pen.
3 Q  Why?
4 A  Because it was more covert, it was easier to
5  use.
6 Q  Did he provide it to you?
7 A  No, sir. He provided me with a website, and
8  I bought it myself.
9 Q  Do you recall when that was? If you started
10  in '06, when did you go to the pen?
11 A  Late 2011, maybe.
12 Q  All right. And what kind of device was it,
13  make and model?
14 A  Oh, I don't remember. Memo pen.
15 Q  All right.
16 A  Make and model, I don't know.
17 Q  And where is it now?
18 A  Oh, man, it's gone.
19 Q  All right. And how would you obtain the
20  recordings -- start with the first one. How
21  do you retain it? Did it have a chip in it,
22  or a disc in it?
23 A  (No response)
24 Q  How did you obtain the information off of
25  it?

Page 92

1 A  There was a USB cord that you plug into a
2  laptop.
3 Q  All right. And you would download them?
4 A  Or a desktop, yes.
5 Q  Did you download all of the recordings?
6 A  No, not all of them.
7 Q  What did you do with them?
8 A  Some I downloaded, some Captain Myers
9  downloaded, and others were just disposed of.
10 Q  At whose discretion?
11 A  Mine.
12 Q  And what was the basis?
13 A  Just didn't -- there was no relevance to
14  anything that was going on.
15 Q  All right. The same thing with the pen, how
16  would you gather or get the information off
17  the pen?
18 A  In the same method.
19 Q  Okay. And did you download them all?
20 A  No.
21 Q  Who did, if you didn't?
22 A  Some were downloaded by me, some Greg, some
23  Gabe, some Norbert.
24 Q  When you say "Greg"?
25 A  Greg.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 93

1 Q  Cormier?
2 A  Cormier, yeah.
3 Q  And then, "Gabe", Gabe Thompson?
4 A  Yes, sir.
5 Q  Who else?
6 A  Norbert.
7 Q  Myers?
8 A  Yes.
9 Q  Who else?
10 A  That's it.
11 Q  Okay.  So you know for a fact that recordings
12    you made, those individuals just identified
13    that downloaded the recordings from your pen?
14 A  Yeah.
15 Q  What did they do with them?
16 A  I don't know.  You'd have to ask them.
17 Q  And where did they download them?
18 A  I don't know.  You'd have to ask them.
19 Q  Okay.  Do you know where those recordings are
20    today?
21 A  I can't vouch for everybody else's download
22    abilities, or any other officer that might
23    have recorded individuals in the Lafayette
24    Police Department.  I gave you everything I
25    had, minus that one.

---

Page 94

1 Q  All right.  But you don't -- and you can't
2    confirm that we've received every recording
3    that was made on your pen, because Greg
4    Cormier, Gabe Thompson and Norbert Myers
5    downloaded some of those recordings, and you
6    don't know --
7 A  I'm almost certain --
8 Q  -- their whereabouts --
9 A  Well, correct.  I can't confirm whether or
10    not they listed it as any kind of evidentiary
11    value through their specifics of this case.
12    I'm almost certain that they did.
13 Q  Why?
14 A  Why else would they do it?  Unless they did
15    it for their own personal -- I don't know.
16 Q  Do you know if any recordings that were made
17    on your pen were deleted by any of them?
18 A  No, I'm not sure.
19 Q  Do you know if any of the recordings made on
20    your pen, or your Olympus recorder before
21    were sent to the news media?
22 A  The Olympus, I don't think so.  I think the
23    Memo pen, maybe.
24 Q  All right.  And which recordings?
25 A  I'd have to go back and review.  I'm not sure

---

Page 95

1    if it was Gabe's pen, or Greg's pen, because
2    they all got pens pretty much around the same
3    time, a little bit shortly after I got mine.
4 Q  Was that a discussion y'all had up on the
5    third floor?
6 A  About what?
7 Q  The pens.
8 A  Yeah, I guess so.
9 Q  All right.  And what time frame was that?
10    The end of 2011 --
11 A  I guess.
12 Q  -- when you got yours?
13 A  Yes, sir.
14 Q  Did the three of you get yours about the same
15    time?
16 A  I guess so.  I'm not sure of the time frame
17    as to who got whose first.  I know Norbert
18    got his, I got mine.  The other two got
19    theirs.
20 Q  I'm not trying to say you got yours on
21    Monday, and they got theirs on Wednesday.
22    Okay.
23 Q  It was all within the same time frame,
24    though.
25 A  The same year.

---

Page 96

1 Q  Did everybody show each other their pen?
2 A  Yeah.
3 Q  Did Novey ever get one?
4 A  No.  Not that I know of.
5 Q  Were they all the same kind?
6 A  I guess.
7 Q  I mean, did y'all order all the same pens,
8    off the same website?
9 A  I know Gabe had one that had video capability
10    at one point in time.  I'm not sure.  I just,
11    I know what I had.
12 Q  All right.  What did you download them to?
13 A  A little portable storage device.
14 Q  Hard drive?
15 A  Yes.
16 Q  And where is that?
17 A  Steve's office.
18 Q  Okay.  Is that the same one that you
19    referenced in the hearing at the TRO, with
20    Judge Earles --
21 A  I believe so.
22 Q  -- when I was questioning you?
23 A  I believe so.
24 Q  Is that the only hard drive that you
25    downloaded recordings to?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

**Page 97**

1　A　No.  I made a couple of other copies since
2　　　then.
3　Q　All right.  And where are those?
4　A　Steve's office.
5　Q　Are there any recordings that you've made
6　　　since '06, that have not been provided to
7　　　your attorney's office?
8　A　Just that one that I said right before.
9　Q　Just that one.  Okay.
10　　　And I was flipping through those
11　　documents and not paying attention exactly.
12　　　You recorded it on your pen?
13　A　Some, yes; some, no.
14　Q　No, no, no.
15　　　The one that you can't find.
16　A　No.  That was done on the Olympus.
17　Q　All right.  And what happened?
18　A　To?
19　Q　The recording.
20　A　I gave it to Glenn.
21　Q　You didn't keep a copy?
22　A　No.  I searched high and low
23　　to give it to y'all, because I think it's
24　　important that y'all have it.  I believe it's
25　　important that the website have it, but I

---

**Page 98**

1　　　don't have it.
2　Q　And you don't know why?
3　A　No.  It was --
4　Q　Do you have an explanation?
5　A　It was done before I moved.  I do know that.
6　Q　When you were in Abbeville?
7　A　Yes.
8　Q　Did you download recordings on a device other
9　　　than that hard drive you described?
10　A　No, sir.
11　Q　Did you ever download them on your laptop?
12　A　No, sir.
13　Q　Did you have a computer at home?
14　A　Yes, sir, I did.
15　Q　Did you download them to that?
16　A　No, sir.
17　Q　All right.  And I was asking you, were any of
18　　the recordings you made provided to the news
19　　media, newspaper, television, radio, or put
20　　on the website?
21　A　Without reviewing what was played on the
22　　media.  If you have a copy of the things that
23　　were put on the media, I could pick it up.
24　Q　I'm just asking what you remember.
25　A　I don't.

---

**Page 99**

1　Q　Do you think some of your recordings were?
2　A　Yes, sir.
3　Q　And which ones do you think?
4　A　I think the only significant one was --
5　Q　Why don't you look at 73, 74 and 75.  If it's
6　　in there, tell me.  That'll help you.
7　A　(Witness examines documents.)
8　　　I think number 1 was.
9　Q　And it was provided to who?
10　A　I don't know.  I know -- I know that Stephen
11　　had copies of it.  From Kane's testimony, I
12　　know he had copies of it.
13　Q　And Scott, it's not -- I'm not trying to be
14　　flip with you or cute.
15　　　You said, I know it was, but you didn't
16　　-- you didn't give me any more information.
17　　You know it was what?  That's what I'm
18　　asking.  Number 1, what was -- what did you
19　　do with number 1.
20　A　It was put on the same device that I put all
21　　the rest of them on and gave them to Steve.
22　Q　Okay.  But the question was, news media --
23　A　Okay.
24　Q　-- television, radio, newspaper, or that
25　　website that was up.

---

**Page 100**

1　A　Okay.
2　Q　Was that placed on there?
3　A　Yes.  I heard that on the news.
4　Q　Okay.  What channel, do you recall?
5　A　I don't recall that.
6　Q　Do you know how number 1 ended up at the
7　　news?
8　A　Kane gave it to them.
9　Q　Do you recall when -- or I didn't ask you.
10　　　Did you give these recordings to anyone
11　　-- did you give any of your recordings to
12　　anyone other than your attorneys?
13　A　After all of this started, and after they
14　　went to the website, yeah, I made copies,
15　　Kane had a copy, I believe Greg and Gabe
16　　both.  I circulated it to both of them so
17　　they would be in different places.
18　Q　And you think Kane is the one that turned it
19　　over to the news?
20　A　That's what he testified to in federal court.
21　Q　I'm just asking what you know.  I have
22　　transcripts.  I can -- (Interrupted)
23　A　Okay.
24　Q　I just want to know what you know.
25　A　And the question is?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 101

1  Q   Do you know how number 1 ended up with the
2      news media?
3  A   No.
4  Q   Based on Kane's testimony, you think it was
5      Kane?
6  A   I take Kane at his word.  If he said he did
7      it, I'm not going to argue with him.
8  Q   Did you do it?
9  A   No.
10 Q   Did you provide any recordings, either you
11     made or anyone else made, to the news media?
12 A   No.
13 Q   And that would be the TV, the radio,
14     newspaper?
15 A   TV, radio, website.  I didn't turn over any
16     of them.
17 Q   Okay.  What was the reason you gave them to
18     all of those people?
19 A   So that we'd have -- always have access to
20     it.
21 Q   Okay.  Do you know how many copies you made?
22 A   No, not really.
23 Q   Do you know who has copies other than your
24     attorneys, Kane Marceaux, Gabe Thompson or
25     Greg Cormier?

Page 102

1  A   No.  Everything that you have should have
2      been uploaded on the website.
3  Q   All right.  Any other recordings that were
4      published to the news media, other than
5      number 1, looking at 73, 74 or 75?
6  A   (Witness examines documents.)
7          I think maybe number 12.
8  Q   Which one was that?
9  A   Consensual audio recording of Jim Craft,
10     4/13/12.
11 Q   And where was that?
12 A   That was from the chief's office.
13 Q   Where was it published?
14 A   I think it was on the -- on the news,
15     television news.
16 Q   And that's the same with number 1, TV news?
17 A   Yeah.
18 Q   Do you know the dates that they were
19     published?
20 A   No.
21 Q   Before or after the TRO?
22 A   I don't know.
23 Q   How did number 12 end up at the news?
24 A   I don't know.
25 Q   Any not contained within your list of

Page 103

1      recordings from 73 to 75 of SP, that were
2      published?
3  A   Not that I recall.
4  Q   All right.  Scott, let's kind of go back.
5          When you were transferred effective May
6      27th of 2012 -- when you were transferred on
7      May 27th of 2012, from patrol division,
8      Precinct 3, resource officer to Precinct 4,
9      Shift C, Cornell Montgomery, tell me the
10     difference.
11 A   (No response)
12 Q   Where is precinct 3?  That was at --
13     (Interrupted)
14 A   Precinct 3 is the south side of Lafayette.
15 Q   All right.  And that was while you were
16     working at 900 East University?
17 A   Yes.
18 Q   On the third floor?
19 A   Yes.
20 Q   And when you were transferred to patrol
21     division, Precinct 4, where was that?
22 A   North side of Lafayette, Precinct 4, which
23     is --
24 Q   Shift C?
25 A   Which is 6:00 p.m. to 6:00 a.m., and I

Page 104

1      believe it's everything on the east and north
2      side of the Evangeline Thruway, on up to the
3      city limits with Carencro.
4  Q   Where you grew up?
5  A   No.  I didn't grow up there.  I spent six
6      months -- I spent January through early June
7      there.
8  Q   In looking at your four positions that you
9      held, were three of them nights and one days?
10 A   Yes.
11 Q   And had you worked with Captain Cornell
12     Montgomery prior to this transfer in May of
13     2012?
14 A   No.  I don't believe I ever have.
15 Q   Who was your sergeant?
16 A   For --
17 Q   The last -- (Interrupted)
18 A   -- Precinct 4?
19 Q   Yes.
20 A   Lieutenant Jim Richard.
21 Q   And who was your lieutenant?
22 A   Greg Cormier was, yes.
23 Q   He was your lieutenant on Precinct 4?
24 A   Yes.
25 Q   And what were your responsibilities?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 105

1 A   Nighttime patrol operations in Precinct 4.
2 Q   So were you assigned to an office, or you
3     spent all of your time in your patrol unit?
4 A   All my time in a patrol unit.
5 Q   Did your rate of pay change?
6 A   No.
7 Q   Have you ever heard the term, hell's kitchen?
8 A   Yeah.
9 Q   When did that come about?
10 A   That's banter amongst officers working on the
11     north side of Lafayette.
12 Q   Was that after this lawsuit was filed?
13 A   No.  It's always been there.  North side of
14     Lafayette is not the most desirable place to
15     work.
16 Q   Somebody's got to work it, though, right?
17 A   Unfortunately, so.
18 Q   And why is that?  Why doesn't anybody want to
19     work on the north side?
20 A   Because it has the highest criminal activity,
21     it's more violent.  Nobody really wants to
22     place themselves in a violent situation,
23     knowing that the chances are they're going to
24     be in a violent encounter before the night's
25     end is pretty good when you're working the

---

Page 106

1     north side.
2 Q   You've got to speak up a little bit.  I'm
3     having trouble.
4     MR. CORRY:
5         Chris, can you hear us?
6     MR. ALEXANDER:
7         Yes.
8 MR. CORRY:
9 Q   And Scott, this isn't supposed to be a
10     marathon, and we want to finish today.
11 A   Okay.
12 Q   But if you want to take a break at any time,
13     we can.
14 A   Okay.  No, we're good.
15 Q   Okay.
16     MR. ALEXANDER:
17         Mike, can we go off the record for
18     just a second?
19     MR. CORRY:
20         Yes.
21     (DISCUSSION HELD OFF THE RECORD)
22 MR. CORRY:
23 Q   Did you work there continuously until the
24     time you were terminated?
25 A   Yes, sir.

---

Page 107

1 Q   Have you filed an IA complaint against
2     anyone?
3 A   Yes.
4 Q   Who?
5 A   Total?
6 Q   Yes.
7 A   Angelo and the chief.
8 Q   No others?
9 A   No, sir.
10 Q   And have you ever had an IA complaint filed
11     against you?
12 A   Yes.
13 Q   The McClean document that we'll to get to?
14 A   The McClean document, the one that Angelo
15     initiated came through -- through Internal
16     Affairs, I believe.  I think that was it.
17 Q   Let's talk about your civil service board --
18 A   Okay.
19 Q   -- representation.
20         When were you elected?
21 A   August of 2011.
22 Q   And who did you run against?
23 A   Paul Truard.
24 Q   And do you remember the vote?
25 A   No.  It was close.  Really close.

---

Page 108

1 Q   Were you provided that information?
2 A   I'm sure they came out and told me, but I
3     don't recall what it was.  I know he was up
4     at one point, then I came over the top by
5     maybe one or two votes.  It wasn't by much.
6 Q   And when did you decide to run?
7 A   I'd say probably about one or two years
8     before that.
9 Q   Why?
10 A   Because Reginald Thomas wasn't doing a good
11     job for the officers within the agency.  He
12     was spreading false information and you,
13     know, they could have been verified just by
14     reading the rules.
15         And I said, you know what, I just don't
16     like the way the things are happening here.
17 Q   Is it the role, though, of the board member
18     to decide the cases that are presented to
19     them by the city and the officer?  And I
20     mean, you're basically the judge, right?
21 A   It's one of the roles, yes.
22 Q   Okay.  So the fact that you didn't think
23     Reggie was doing right for the officers, I
24     mean, it's got to be for the officers and the
25     city?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 109

1  A   Yes.
2  Q   I mean, you're the unbiased determinator,
3      right?
4  A   Absolutely.
5  Q   Okay.  So you were elected on August 11th.
6      Did you do any research as to the
7      qualifications to become a board member?
8  A   Yes.
9  Q   What did you do?
10 A   I read the requirements, what was needed in
11     order to run, including the residential
12     requirements.  There is a requirement that
13     you live inside the city.  But for the member
14     elected through each department, that is
15     usually waived.
16 Q   By who?
17 A   By the consolidated government.
18 Q   Okay.  Can you give me any example where it's
19     been waived?
20 A   Right offhand, no.
21 Q   And how did you get the information that it's
22     your understanding that it's always waived?
23 A   Well, at that point, my chief opponent, Paul,
24     he lived outside of the parish, so I didn't
25     see anything wrong.

Page 110

1  Q   So both of you that ran didn't meet the
2      requirements of the statute?
3  A   No, sir.
4  Q   Is that correct?
5  A   No, sir.  Nobody opposed -- the consolidated
6      government knew where I lived, they had no
7      opposition to it.
8  Q   Okay.  You've got to answer the question.
9      You and Paul ran, neither one of you met
10     the requirements of the statute?
11 A   I met the requirements.
12 Q   Okay.
13 A   I lived inside the city.
14 Q   Right.
15     But you didn't meet the residency
16     requirements of living within the city for
17     five years?
18 A   No.
19 Q   Not by the revised statute --
20 A   No.
21 Q   -- is that correct?
22 A   Correct.
23 Q   When did you first learn that that was a
24     requirement, before you ran?
25 A   Yes, sir.

Page 111

1  Q   Did you have any discussions with anybody
2      about your residency?
3  A   No.
4  Q   Did you make anybody aware that, hey --
5      (Interrupted)
6  A   I talked to -- I talked to Captain Myers
7      about it.  And there was a point in time,
8      where I wasn't going to run until I saw that
9      Paul Truard, who also lived outside of the
10     parish.  What's good for the goose is good
11     for the gander.  I thought if it was fair
12     that if he ran, I'd be able to run, too.
13 Q   What did Myers tell you?
14 A   Not much.  We just talked about it.  I said,
15     well, man, I don't know what we're going to
16     do at this point.  And I said, I don't know.
17     I think I'm just going to go ahead and
18     withdraw.  Then, when we found out that Paul
19     was running, and nobody seemed to have a
20     problem with that, I went ahead and continued
21     on.
22     And at no point in time did the city
23     ever -- I try to deceive the city in not
24     knowing where I lived or how long I'd lived
25     there.  I think everybody in the police

Page 112

1      department knew that I had been living at --
2      on Country Club for less than maybe a year or
3      so.
4  Q   Okay.  My notes say that you got elected on
5      June 22nd of 2011.  Is there any reason to
6      dispute that?
7  A   No.  I think that was the actual election
8      date.  I didn't take over until August.
9  Q   Okay.  And that's what my notes say, that in
10     August of 2011, you took the office -- the
11     oath of office for a three-year term --
12 A   Yes, sir.
13 Q   All right.  Were there ever any occasions
14     that you discussed any cases with officers or
15     firefighters prior to them coming before the
16     board for their hearing, either discussed it
17     with them or with their attorneys?
18 A   I think Ed's case was discussed amongst the
19     board members outside of the board meeting a
20     couple of times.
21 Q   Okay.  But -- I appreciate that.  And I'm
22     going to get to that.
23     But the question was:  Did you discuss
24     with any officer or firefighter directly, any
25     cases coming before the board before they

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

**Page 113**

1 came before the board?
2 A Not that I'm aware of. I don't recall any
3 conversation about any kind of specific case
4 that was coming before the board.
5 Q Do you have any recordings of any
6 conversations?
7 A Not that I'm aware of.
8 Q Did you discuss any cases coming before the
9 board with any attorneys representing either
10 a firefighter or a police officer before it
11 came before the board?
12 A Yes. I received a couple of phone calls from
13 Glenn Armentor.
14 Q About which case?
15 A About Zeryk's case.
16 Q Before it came?
17 A Yes.
18 Q And what were the nature of those
19 discussions?
20 A He wanted to know how the process was to get
21 the board -- get his case before the board,
22 and if there was anything I could do to
23 expedite the situation.
24 Q And what did you tell him?
25 A I said I'd try to expedite the situation

---

**Page 114**

1 because I thought it was important that his
2 come first.
3 Q Why?
4 A If you go back to August, chief came -- the
5 chief came before the board and explained
6 that he was in a preemptive posture to fire
7 Zeryk Guillory, and explained why he was
8 going to fire Zeryk Guillory. And the
9 chairman of the board, along with the other
10 board members told him that based on the
11 information that he provided, that he
12 shouldn't do it because it's going to get
13 overturned. This is not going to be upheld
14 by the board. They told him that.
15    So knowing that he fired Zeryk and the
16 board was in a position to get Zeryk's job
17 back was no reason to make the man linger or
18 punish him any further, based on the
19 information that the board had at the time.
20 I'm in no position to schedule these events.
21 Q What is the process to schedule them?
22 A I'm not sure there is one, to be honest with
23 you. I've asked that numerous times, why do
24 these cases linger on for years on end
25 without any kind of concrete resolution?

---

**Page 115**

1    Well, it says 30 pays. Apparently, to the
2 civil service board, 30 days is accepting the
3 appeal notice. And then, at that point, it's
4 at the leisure of the attorneys as to when
5 they can come forward and get it done.
6 Q I mean, that has to be considered; does it
7 not?
8 A It does.
9 Q Okay.
10 A But I don't think years on end is an
11 appropriate time frame to get these done.
12 Q All right.
13 A At the time I got elected, we were looking at
14 probably 12, 13 cases, some two or three
15 years old.
16 Q All right. Did you have any other
17 discussions with Glenn Armentor about Zeryk
18 Guillory's case?
19 A No, sir, not that I can recall.
20 Q Was there anything that was discussed that
21 you have not disclosed?
22 A No, sir.
23 Q Do you have any recordings of your
24 conversations with Glenn Armentor about Zeryk
25 Guillory?

---

**Page 116**

1 A No, sir.
2 Q Why didn't you record it?
3 A I didn't feel comfortable recording Glenn. I
4 think I may have one or two that's listed.
5 I'm not sure.
6 Q But you have no recordings of you and Glenn
7 Armentor?
8 A That's right.
9 Q And he called you or you called him?
10 A He called me.
11 Q And it was on two occasions?
12 A Yes, sir.
13 Q Where were you?
14 A On -- doing my job.
15 Q On the third floor?
16 A No. I was out on the road. I remember he
17 called me when I was on the road at one point
18 in time.
19 Q Did he call you on your cell, or on your --
20 (Interrupted)
21 A He called me on my cell.
22 Q Was it your office cell or -- (Interrupted)
23 A No, sir. It was a personal cell phone.
24 Q Did you use your personal cell phone for
25 police business?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 117

1 A  Yes, I did.
2 Q  What is that number, or what was that number?
3 A  I'm not really sure what the number was.  It
4    was a prepaid cellar phone.
5 Q  Why did you have a prepaid?
6 A  Because I didn't want to use my personal
7    phone.
8 Q  Okay.  So the -- you never used your personal
9    phone for police business?
10 A  I guess you could consider the prepaid a
11    personal phone, because I personally
12    purchased it.
13 Q  Well, it sounds like you had more than one
14    personal cell phone.
15 A  Yes.  I had my cell phone that I used for my
16    wife and I's purposes.  Then, I had the
17    prepaid to conduct whatever police business I
18    needed to conduct with it.
19 Q  And did you have a police issued cell phone?
20 A  No, sir.
21 Q  And you don't remember the prepaid phone
22    number?
23 A  No, sir, I don't.
24 Q  Do you know who the provider was?
25 A  No, sir, I don't.  You could pick one up at

---

Page 118

1    Wal-Mart and buy some minutes for it.
2 Q  Do you know anything about Zeryk Guillory's
3    case, other than what was presented at the
4    hearing?
5 A  No, sir.
6 Q  Were you part of any of the discussions by
7    any members of Lafayette City-Parish
8    Consolidated Government and/or the Lafayette
9    Police Department about Zeryk Guillory's
10    case?
11 A  No, sir.
12 Q  So you really have no idea why decisions were
13    made, or -- why they were made, or how they
14    were made, other how what you heard at that
15    hearing?
16 A  Correct.
17 Q  And you would agree that as the chief of
18    police, Chief Craft runs the entire Lafayette
19    Police Department?
20 A  He does.
21 Q  He is the appointing authority?
22 A  Yes, he is.
23 Q  And decisions are made and meetings are held
24    that did not involve you?
25 A  Correct.

---

Page 119

1 Q  Okay.  So there's a lot of things that occur
2    that you're not privy to that occur within
3    the Lafayette Police Department?
4 A  True.
5 Q  All right.  And that same goes with Mr.
6    Stelly, Greg Cormier, Gabe Thompson, Kane
7    Marceaux?
8 A  Correct.
9 Q  And Mr. Hewitt, correct?
10 A  Correct.
11 Q  Why didn't you recuse yourself when the city
12    asked you to recuse yourself after filing the
13    TRO?
14 A  Because they were two separate issues.
15 Q  You thought you could be fair?
16 A  Yes.
17 Q  Did you, at that time, tell anyone that you
18    were serving on the board in violation of the
19    revised statute regarding the residency
20    requirement?
21 A  No.
22 Q  Did you ever voice that violation to anyone
23    prior to me filing a motion for summary
24    judgment to remove you?
25 A  I didn't think it was a violation.

---

Page 120

1 Q  Okay.  So the answer to that question is no?
2 A  Which is what?
3 Q  You've got to answer the question --
4 A  That I was --
5 Q  -- then you can explain it.
6     Did you ever advise anyone that you were
7    in violation of the residency requirement of
8    the revised statute to sit on the board?
9 A  No.  Because I didn't believe I was sitting
10    in violation of the law.
11 Q  Okay.
12 A  It wasn't made known until you filed, number
13    one, first, I be removed because of gross
14    misconduct.  Then, when you found out that
15    wasn't working, you pulled a rabbit out of
16    hat, and now I'm in violation of the
17    residential restrictions because the city
18    didn't like the fact that I didn't live
19    inside the city for the minimum requirement
20    time.
21 Q  And are you aware that Judge Clause agreed
22    with that position and granted the summary
23    judgment?
24 A  Yes.
25 Q  In fact, at the hearing on October 22nd,

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 121

1  2012, said that you should be removed
2  immediately?
3  A  Yes.
4  Q  Were you provided a copy of that judgment?
5  A  No, I was not.
6  Q  Well, let me show you a copy of it, and we'll
7  mark it as number 4.
8  A  Okay.
9  Q  Have you seen that document before?
10 A  (Witness examines document.)
11     No, sir, I have not.
12 Q  When did you -- when were you removed from
13 the board?
14 A  I guess after I was fired, I no longer had
15 any participation with the board.
16 Q  When was the last time you served prior to
17 your termination in a hearing?
18 A  I guess the Tuesday right before I was fired,
19 I believe.  Yes, it was 9/11.  I was fired on
20 9/12.
21 Q  So your termination was 9/12.  And on 9/11 of
22 2012, you sat on the board?
23 A  Yes.
24 Q  And what matters came before the board that
25 day?

---

Page 122

1  A  I believe that was the -- man, what was it?
2  I'm not really sure what was the nature of
3  it.  I don't think anything of any kind of
4  great consequence or importance came before
5  the board.  I don't know.
6  Q  There wasn't a hearing?
7  A  No.  Well, a hearing as in hearing of
8  disciplinary matters --
9  Q  Yes.
10 A  -- or just a regular meeting?
11 Q  Like A hearing regarding a firefighter,
12 or police officer disciplinary?
13 A  I think that might have been the firefighter
14 that was fired.  That's right.  There was a
15 hearing.
16 Q  Which one was that?
17 A  I don't remember the guy's name.  He had been
18 fired, he came back.  We were hearing maybe a
19 five or ten-day suspension.  And then, he had
20 another hearing for a termination.
21 Q  Okay.  Did you vote in that matter?
22 A  Yes, I did.
23 Q  Did you vote for the firefighter or against?
24 A  I voted to amend his disciplinary action.
25 Q  At any -- scratch that.

---

Page 123

1     While you sat on the board, how many
2  different police matters came before you,
3  disciplinary matters that had to be heard?
4  A  There were two right when I took over.
5  Q  Who were they?
6  A  Greg Randell and Terry Head.  And then, there
7  was Zeryk.  And those are the only three
8  hearings I had involving police officers.
9  Q  And what about firefighters?
10 A  I believe just that one, the guy that got --
11 that last one.
12 Q  Did you ever vote for the appointing
13 authority on any of those three --
14 A  No.
15 Q  -- police officers?
16     Pardon?
17 A  No.
18 Q  What about for the firefighter?
19 A  No.
20 Q  Did you vote for the appointing authority?
21 A  The firefighter?  Yes and no.  His decision
22 was upheld, it was just modified.
23 Q  All right.  That was the firefighter?
24 A  Yes, sir.
25 Q  Were there any votes that you participated

---

Page 124

1  in, at any time sitting on the board, where
2  you voted for the appointing authority?
3  A  I believe so.
4  Q  When and what?
5  A  For the Bert Bejsovec.  The Bert Bejsovec
6  investigation, when he was stealing
7  Consolidated money through payroll fraud.
8  Q  Did that matter come up before the board as a
9  disciplinary matter?
10 A  No.  It came up to whether -- it came up as a
11 vote as to whether or not the board was going
12 to investigate it, or side with the CAO and
13 allow them to investigate it.  And I voted to
14 allow the CAO to investigate it.
15 Q  All right.  And so, you were satisfied with
16 that investigation?
17 A  No.
18 Q  Okay.
19 A  I say no, but I don't have all the
20 particulars of the investigation.  It was
21 wrapped up in two weeks.  Y'all investigated
22 me for six months and still didn't come up
23 with a reason why I was fired.
24 Q  Do you have any information about the payroll
25 fraud issue?  Were you part of the

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 125

1  investigation?
2  A  No, I was not part of the investigation.
3  Q  Did you have anything other than what was
4     presented to the board?
5  A  No.
6  Q  Did you discuss with anybody, anybody,
7     anything about that investigation?
8  A  Yes.
9  Q  Who?
10  A  Greg.
11  Q  What did you discuss with him?  Greg Cormier?
12  A  Yes.
13  Q  What did you discuss with him?
14  A  Greg came to me and asked me if he could file
15     with the Civil Service Board, and would they
16     accept it?
17  Q  And what did you tell him?
18  A  I told him, yes, you could file with the
19     Civil Service Board this afternoon.  I'm just
20     one man.  I can't tell you yes or no.  You
21     could file it.  I'm not going to tell you not
22     to.  I'm disappointed that you didn't -- if
23     you're going to do this, you didn't do it
24     with Dwayne Arceneaux, who's also stealing
25     downtown funds.  But that's your -- according

Page 126

1  to law, if you want to bring it, bring it.
2  Q  Okay.  How many discussions did you have with
3     him?
4  A  About what, Bert?
5  Q  About that.
6  A  I don't know.  Maybe that one and another one
7     where he said that the chief might have been
8     mad because we were laughing in Greg's
9     office, and they thought we were laughing at
10     Bert.
11  Q  Did you record any of those?
12  A  With Greg?  No.
13  Q  Did you have any discussions with any board
14     members about matters before the board,
15     before they came up for hearing?
16  A  Yes.
17  Q  Who?
18  A  Jason had called me and said that the city
19     had screwed up in the Ed McClean case, which
20     started all of this mess.  Jason had called
21     me and said that if you review the case, it
22     would appear as though the city violated the
23     60-day rule.
24  Q  Okay.  And is there a recording to that
25     effect?

Page 127

1  A  I believe that's in there.
2  Q  Why don't you direct us to that one?
3  A  (Witness examines documents.)
4        There's two, a consensual audio
5     recording with Jason Boudreaux on 3/7.
6  Q  I'm sorry.  I didn't hear you.
7        It's on -- what page is it on, first.
8  A  I'm sorry.  SP-74.
9  Q  Okay.  SP-74.
10  A  Number 5 and number 6.
11  Q  And which ones are those?
12  A  Those are recordings with Jason Boudreaux.
13  Q  And that's the Jason Boudreaux who is the
14     chairman of the Lafayette Fire and Police
15     Municipal Civil Service Board?
16  A  Yes, sir.
17  Q  And he called you to discuss the Ed McClean
18     matter?
19  A  Yes.
20  Q  Did you ask him to call you?
21  A  No.
22  Q  Was that his custom or practice to call you
23     prior to matters coming up before the board?
24  A  He had discussed maybe -- I'm not sure if Ed
25     McClean was the only one.  It's the only one

Page 128

1  that sticks out in my mind, because of all
2  the chaos that surrounded it.  He would stay
3  after meetings and discuss things with me
4  after meetings in preparation for these
5  cases.  That's the only one that sticks out
6  in my mind.
7  Q  Are those the only two recordings that you
8     have of conversations with Jason Boudreaux
9     about matters coming before the board prior
10     to them actually being presented to the
11     board?
12  A  Yes, sir.
13  Q  I'm sorry?
14  A  Yes, sir, I believe so.
15  Q  Do you know anything about the open meetings
16     law?
17  A  Yes, sir, I do.
18  Q  What do you know about them?
19  A  That you can't hold a forum without notifying
20     the media and everybody present to conduct
21     business with the -- civil service business.
22  Q  Did you and Chairman Boudreaux on the two
23     occasions that he contacted you, it looks
24     like March 7th of 2012, and January 18th,
25     2012, did y'all follow the open meetings law?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 129

1 A  I'd have to look at it really close to
2     determine. And I'm not going to admit that
3     we violated the law on that aspect.
4 Q  Well, did you notify anyone from the city
5     that y'all were discussing the case before it
6     came before them?
7 A  It's my understanding of the law you have to
8     have a forum at least to violate it. And it
9     was just the two of us. He called me and
10    said, hey, look, they violated that, look at
11    this.
12 Q  All right. You've got to go back and answer
13    the question. I understand your explanation.
14    Did you notify anybody with the city
15    that you and Jason were discussing the Ed
16    McClean matter before it came before them?
17 A  No.
18 Q  Did you notify anybody with Mr. McClean's
19    office?
20 A  No.
21 Q  Have you listened to those recordings lately?
22 A  No, not recently.
23 Q  When was the last time you listened to any of
24    these recordings?
25 A  Oh, it's been awhile. I was fired and I just

---

Page 130

1     put all of this behind me and drove forward.
2         Just bits and pieces. It's been awhile.
3     To say I sat down and listened to them
4     recently, I can't tell you.
5     MS. COREIL:
6         What are you looking for?
7     MR. CORRY:
8         My binder.
9     MS. COREIL:
10        We have a bunch of them here.
11 MR. CORRY:
12 Q  Do you know the outcome of the Ed McClean
13    matter?
14 A  No, sir, I don't.
15 Q  Did you sit on the board?
16 A  No.
17 Q  Do you know the board upheld the termination,
18    and that it was appealed to the 15th JDC, and
19    the district court upheld the termination?
20 A  No, I didn't know that.
21 Q  Did you know that they found that there was
22    no violation of the 60-day rule?
23 A  There wasn't a violation of the 60-day rule.
24 Q  Did you know that is what the board
25    determined and the court determined?

---

Page 131

1 A  That was determined prior to even going to
2     the -- to having a hearing. The violation
3     didn't occur.
4 Q  Okay. Were you part of that?
5 A  And I agreed.
6         Whether or not the violation occurred?
7 Q  Yes.
8 A  Upon receiving this case, I saw no violation.
9     This case was probably one of the most
10    efficient ones I've ever seen, in either
11    criminal or administrative. Kelly Gibson did
12    a good job on that.
13 Q  Do you remember Jason Boudreaux saying in the
14    recording on March 7th of 2012, something
15    along the lines of: Now, you didn't hear
16    this from me. We really shouldn't be
17    discussing all of that. I'm not trying to
18    slue you. I'm just telling you what I'm
19    finding.
20        Do you remember him saying something
21    like that?
22 A  No, sir.
23 Q  The recording will speak for itself?
24 A  Which recording?
25 Q  That recording.

---

Page 132

1 A  I don't know. Where is that recording coming
2     from?
3 Q  Number 5. March 7th of 2012, the recording
4     you made --
5 A  Okay.
6 Q  -- and produced.
7         The recording would speak for itself,
8     right?
9 A  Which recording are you -- you're referring
10    to --
11 Q  I'm referring to number 5.
12 A  That --
13 Q  5 on SP-74.
14 A  Yes. Are you saying that the recording will
15    be validated for -- in its original format
16    with no -- from what I gave you?
17 Q  Well, I guess what I'm asking you is, how are
18    these recordings going to be authenticated?
19 A  You listen to them and ask the person if
20    that's them on the other line.
21 Q  Okay.
22 A  Jason Boudreaux, Scott Poiencot, is that you?
23    Yes, no.
24 Q  All right.
25 A  And you can --

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 133

1 Q  And how do we know what's been produced to us
2   has not been altered or doctored in any way?
3 A  You're going to have to take me at my word,
4   Mike.  I didn't alter or doctor any of these.
5 Q  Okay.  I'm not trying to be silly.  I'm just
6   trying to make sure I cover all --
7     MR. ALEXANDER:
8       And let me just make this point.  I
9     mean, obviously, if you have suspicion
10    that anything has been altered or
11    doctored, I mean, there are ways to
12    determine that.
13    MR. CORRY:
14      Okay.
15    MR. ALEXANDER:
16      But Mr. Poiencot, just so I
17    understand correctly, your testimony is
18    that you haven't altered or edited any
19    recording that you produced, correct?
20 A  No, sir, I haven't altered anything.
21 MR. CORRY:
22 Q  And other than just identifying the voice as
23   best we can, is there any other way to
24   identify the participants that are captured,
25   or the voices -- the identity of the voices

---

Page 134

1   that are captured on the recordings?
2 A  Through deposition, and that's it.
3 Q  Okay.  Did you have any discussions with any
4   other board members about cases coming before
5   the board before they came before the board?
6 A  Richard spoke to us, the same thing, in the
7   McClean matter.
8 Q  And when did you speak to him?
9 A  We spoke out -- it was a conversation right
10   before the meeting, that both he and I voiced
11   our concerns with it, and with the case
12   itself, or Jason's consideration of the case,
13   that they violated the 60-day rule.  We tried
14   to point out that it didn't happen, the
15   60-day violation didn't occur.
16 Q  Anybody else present?
17 A  No, I don't think so.
18 Q  Was that recorded?
19 A  No.
20    MR. CORRY:
21      Let's take a five-minute break.
22      (SHORT BREAK TAKEN AT 1:13 P.M.)
23 MR. CORRY:
24 Q  Scott, let me make sure.  I may have missed
25   something.

---

Page 135

1     When I asked you about the IA complaints
2   that you filed, you told me about the one
3   with Angelo Iorio we talked about.  What was
4   the one with Craft?  When was it and what was
5   it?
6 A  It was shortly before my transfer.  He sent
7   out the transfer the Friday.  I filed it the
8   Thursday.  And I was in reference to my
9   encounter with Duaine Belfour.
10 Q  All right.  And we're going to get to that
11   because you have some documents in your
12   discovery responses.
13     Any other discussions you had with any
14   board members, or officers, firefighters, or
15   their attorneys, about other matters coming
16   before the board?
17 A  Not that I could recall.
18 Q  All right.  Let's talk about the McClean
19   document.
20 A  Okay.
21    MR. CORRY:
22      Debbie, we're going to attach these
23    that we referenced so far.
24 MR. CORRY:
25 Q  And I'm going to hand you what I've

---

Page 136

1   identified as Number 5, Scott.  And it is the
2   Lafayette Police Department Interoffice
3   Communication SL notice/instructions, issued
4   by Sergeant Gremillion.  And it's got Exhibit
5   A at the bottom.  It's what came out in the
6   McClean appeal.
7     When's the first time you ever saw that
8   document in that form?
9 A  I saw a redacted version of this.  Greg
10   Cormier gave it to me probably after -- it
11   was one of the hearings in which the 30-day
12   discussion was being bantered about, and
13   whether or not it would apply to this case.
14   Greg brought it to me.
15 Q  All right.  Was the information contained on
16   the document in its original form provided to
17   you?
18 A  As in a non-redacted form?
19 Q  Yes.
20 A  No, sir.  I didn't get a copy of the
21   non-redacted form.
22 Q  Did you ever work in IA?
23 A  No, sir, I did not.
24 Q  Did you ever work on any shift level or IA
25   investigations?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 137

1  A   No, sir, I have not.
2  Q   Prior to being involved in the investigations
3      against you, were you ever a witness on any
4      IA investigations or shift level
5      investigations?
6  A   When I filed the criminal complaint against
7      Angelo, yes.
8  Q   Other than Iorio.
9  A   The shift level investigations I guess I
10     previously mentioned.
11 Q   Which one was that?
12 A   When Angelo retaliated against me by filing
13     that other -- and --
14 Q   Anything other than Angelo Iorio?
15 A   No, not that I could recall.  I don't think
16     I've ever been a part of any kind of
17     investigation.
18 Q   All right.  Where were you when Greg Cormier
19     brought this document to you?
20 A   In my office.
21 Q   And in relation to April 5th of 2012, when
22     did he bring that to you?
23 A   I guess it would have been the March meeting.
24     Shortly after the March meeting, because I
25     believe that's when Jason ordered the -- or

---

Page 138

1      asked that y'all both prepare briefs on the
2      60-day rule.
3  Q   So sometime in March of 2012, and before
4      April 5th, 2012, Greg brought this document
5      to you?
6  A   It was either the March or the February.  I
7      can't recall.  I'd have to look at the
8      February and March docket.
9  Q   And that would be 2012?
10 A   Yes, sir.
11 Q   And who was present when he brought it to
12     you?
13 A   I think just he and I.
14 Q   Was the document that he handed you, I think
15     you told us he whited out information.  Was
16     the document that he showed you, did it have
17     the original Wite-Out on it?
18 A   No, sir.  I think it looked just like that.
19 Q   You think it was a -- he had made a copy of
20     the whited out version, and given you a copy
21     that looks just like Number 5?
22 A   I don't know how -- what he did in order
23     to -- it looked just like Number 5, if that's
24     what you're asking me.
25 Q   All right.

---

Page 139

1  A   That plain and simplistic.
2  Q   All right.  Was that conversation with Greg
3      recorded?
4  A   No, sir.
5  Q   Did you report the fact -- or scratch that.
6          Did Greg tell you or advise you where he
7      got the document?
8  A   No, sir.
9  Q   Did you know that he had taken it out of a
10     prior investigation that he had worked?
11 A   No, sir.
12 Q   Did you ask him where he got it?
13 A   Yes.
14 Q   And what did he say?
15 A   He shook it off and said don't -- it doesn't
16     matter.  It just -- it exists.
17         And I said, well, is it part of the
18     SOP's?  He said, yes.  So I set it aside and
19     went view the Lafayette Police Department
20     Internal Affairs SOP.
21         Shortly after that, I walked into
22     Internal Affairs and told them, look, y'all
23     need to get rid of that because it's causing
24     a controversy within the -- if it's
25     unnecessary to print something like this

---

Page 140

1      because that statement, all it does is create
2      double talk from the city's side when they
3      were arguing over whether or not the 60-day
4      rule was violated.
5  Q   Did you bring the document that I've
6      identified as Number 5 to IA?
7  A   No.  I just went in there and said, look,
8      y'all have the shift level investigation
9      instruction sheet that's causing a lot of
10     banter.  Y'all need to go ahead and get that
11     out of the way.
12 Q   Who did you go discuss it with?
13 A   I told Keith Gremillion and Dwayne Prejean,
14     in Dwayne's office.
15 Q   Did you record that?
16 A   No.
17 Q   What did Keith Gremillion said?
18 A   He said, we'll look into it, but it's not
19     part of the case.  I said, I know it's not
20     part of the case, but you've got people
21     fighting tooth and nail on this, don't give
22     them any reason to fight.  This doesn't
23     change the law.
24 Q   Did you discuss -- what did Dwayne Prejean
25     tell you?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 141

1 A   Nothing.
2 Q   Did you tell them that Greg Cormier had taken
3     or had given you a document with Keith's
4     signature on it?
5 A   No.
6 Q   Why not?
7 A   It wasn't important.  I didn't put any
8     validity into that document.
9 Q   All right.  What did you do with this
10    document, the document that he brought to
11    you?
12 A   I gave it to Ted Vincent, former Internal
13    Affairs lieutenant, now captain.
14 Q   Greg gave you a copy, or he gave you the one
15    he had?
16 A   He gave me a copy.  I presume it's a copy,
17    because it looked just like that one.
18 Q   Do you know if, when he gave you the
19    document, did he also retain possession of
20    one?
21 A   I'm not sure if he did or not.
22 Q   Don't know.
23        All right.  When did you discuss this
24    with Ted Vincent?
25 A   I'm sure --

Page 142

1 Q   Or when did you bring it to him?
2 A   Ted came to my office and --
3 Q   There's a recording?
4 A   Yeah.  I think it's the 322 recording.
5 Q   What number is that?
6 A   Number 4.
7 Q   On page what?
8 A   Page SP-74.  It's either number 4 or number
9     2.  There were two separate times Ted came
10    and I spoke to him.
11 Q   Did he come into your office or you went into
12    his?
13 A   No, he came to me.
14 Q   Was it on police business, or he just came to
15    visit, or what was -- (Interrupted)
16 A   He came to see if there was anything he could
17    do to help me in my understanding of the
18    officer bill of rights and the 60-day rule.
19    And I explained to him that, you know, face
20    value, I understand the 60-day rule, what it
21    means.  But by their own admission, and their
22    own shift level instructions that it seems
23    like they're not following their own
24    instructions.  You know, you conducted your
25    investigation well within the 60 days.  You

Page 143

1     waited beyond the 60 days to fire him.  Does
2     that make a difference?  I'm not sure.  I
3     don't believe it does.  But it doesn't.  And
4     I discussed this form with him, and he wanted
5     to know where I got it from.  And I said,
6     well, here you go, here it is, Greg gave it
7     to me.
8         Strike that.  I didn't tell him that
9     Greg gave it to me.  I'm trying to figure out
10    how this sheet came into existence.  I think
11    I just pointed to him and said that I found
12    it in the SOP's, and that I can print him a
13    copy if he needed.  Otherwise, I got one
14    hanging around here, and I gave it to him.
15 Q   Was it the one that had Gremillion's
16    signature on it?
17 A   The exact same one.
18 Q   The same one that we've marked and identified
19    as Number 5?
20 A   When I say the exact same one, Greg gave it
21    to me, it's right here.  Ted comes in.  The
22    exact same one Greg gave me, I gave to Ted.
23 Q   Did you leave it with Ted?
24 A   Yeah.  I didn't need it.
25 Q   Did you ever see that document after you left

Page 144

1     it with Ted?
2 A   Not until it appeared in Olita Magee's brief.
3 Q   Do you know who gave it to Olita Magee?
4 A   I was told Todd Green did.
5 Q   By who?
6 A   Greg.
7 Q   Did Todd Green give it to Olita at Greg's
8     request?
9 A   I'm not sure.  I wasn't part of any of that
10    mess.
11 Q   What did Greg tell you he told Todd Green, or
12    what was the discussion between them?
13 A   (No response)
14 Q   How did Todd Green's name come up?
15 A   We were sitting around bantering about, you
16    know, who else had access to this crap.  I
17    didn't do it.  Gabe didn't do it.  We presume
18    you did it.  Who else had copies of it?  He
19    said, well, he gave a copy to Todd, Todd
20    Green, because he and Olita Magee were
21    personal friends.
22 Q   Did you relay that information to anyone
23    within the police department?
24 A   No.  I found that out Saturday before I got
25    fired.  At that time, y'all had already made

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 145

1  y'all minds up to fire me.
2  Q  So you didn't tell anybody that?
3  A  No, I did not.  I told Gabe the Monday before
4  we got fired, so he'd have a better
5  understanding as to how he wanted to proceed.
6  Q  Where was this meeting that y'all had when
7  you said y'all were bantering about, you,
8  Greg and Gabe?
9  A  I think we might have been in New Orleans.
10  Q  For what?
11  A  I think his CVSA or polygraph.
12  Q  Was there anybody else present for that
13  discussion other than you, Greg, Gabe?
14  A  Gabe wasn't there.  Gabe wasn't part of that.
15  Gabe didn't go with us to New Orleans.
16     No.  Kane -- Kane had gone with us to
17  New Orleans, but I don't think he was in the
18  immediate vicinity when we started discussing
19  it.
20  Q  So it was just you and Greg?
21  A  Yeah.
22  Q  Was there a recording?
23  A  No.
24  Q  The one -- the document that you found in the
25  SOP's didn't have Keith Gremillion's

Page 146

1  signature on it, did it?
2  A  The form in the SOP?
3  Q  Yes.
4  A  No.
5  Q  It was a blank form?
6  A  It was a blank form, yes, sir.
7  Q  Back up where it says from, Sergeant
8  Gremillion, Office of Internal Affairs, that
9  was blank as well, correct?
10  A  Correct.  There was no data in it whatsoever.
11  Q  So as a police officer, you knew that this
12  document had been taken out of a file
13  somewhere --
14  A  Not necessarily.
15  Q  -- and whited out?
16  A  No.
17  Q  Why not?
18  A  Because I get crap files like that every day.
19  I have an evaluation that has redacted marks
20  on it.  It even has the supervisor, Dwayne
21  Arceneaux on it.  It's not uncommon for the
22  Lafayette Police Department to disseminate
23  information or files that are not authentic.
24     I've never worked for Dwayne Arceneaux,
25  but yet I've got an evaluation that says I do

Page 147

1  with some redactions on it.
2  Q  All right.
3  A  So it's not uncommon.
4  Q  When was the first time you saw that document
5  after you left it with Ted Vincent?
6  A  The internal -- at the civil service
7  meeting --
8  Q  Okay.
9  A  -- when you pointed it out.
10  Q  When Olita Magee attached it to her brief?
11  A  No.  When you pointed it out that it existed
12  in Olita Magee's brief.
13  Q  Okay.  And at that point, did you report that
14  document, that you had seen it before to
15  anybody?
16  A  No.
17  Q  You didn't report it to IA, or your chain, or
18  the chief, that, look, I've seen this
19  document, this is the one that Greg Cormier
20  gave me --
21  A  No.
22  Q  -- and that I gave to Ted Vincent?
23  A  No.  Because I -- the following day -- the
24  following week, we're all served with
25  investigative -- Internal Affairs

Page 148

1  investigative notices.
2  Q  All right.  At the time that you were served
3  with that notice, did you tell anybody that
4  you had seen that document before?
5  A  During the investigation?
6  Q  No.  During the time you were notified with
7  the investigation.  When you were served with
8  the notice, did you tell anybody, hey, Greg
9  Cormier brought me this and I gave it to Ted
10  Vincent?
11  A  I don't think so.
12  Q  Why not?
13  A  I think the first time I told anybody about
14  it was to -- to what's his name -- to Dwayne
15  Prejean, that I had seen it and Greg had
16  given it to me.
17  Q  And that was during your statement?
18  A  That was during the investigation itself.
19  Dwayne asked me where I got it, and I told
20  him Greg Cormier gave it to me.  And he asked
21  me if I gave it to Olita Magee, and I said,
22  no.  I gave it to Ted Vincent.
23  Q  Are there any other recordings with you or
24  anybody else involving that document?
25  A  No, I don't think so.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 149

1 Q   Why was the TRO filed?
2 A   Based on the conversation that Gabe had with
3     Jackie.  You know, he's talking about
4     retaliating against all of us.  I don't need
5     that.  I wasn't part of any of this mess.
6         I was the civil service representative
7     up until the time that things just spiraled
8     out of control because of that document.
9 Q   The TRO wasn't filed to stop that
10    investigation?
11 A   No.  It was to prevent Jackie from
12    retaliating against us, whether it be
13    physical, whether it be some shootings as he
14    described it.  I don't know Jackie Alfred.  I
15    can't trust him.  Hell, he attacked me in the
16    lobby of the Lafayette Police Department the
17    day we got fired.
18 Q   You were present in court the day the
19    recording was played to Judge Earles, right?
20 A   Yes.
21 Q   And you heard him say, that's all you got?
22 A   Yes.
23 Q   And you heard Gabe Thompson laugh 22 times,
24    I think?
25 A   I'm not Gabe.

---

Page 150

1 Q   Okay.  I mean, the public heard it, and the
2     TRO was dismissed, right?
3 A   You won, Mike.
4 Q   That's what happened?
5 A   Yeah.
6 Q   So it's your testimony today that the TRO was
7     not filed to stop the investigation?
8 A   No.
9 Q   Who made the -- or when did you make the
10    decision to be a part of the TRO?
11    When we retained Steve --
12 Q   I don't want to know what you talked about
13    with Stephen.
14 A   Okay.  Then, that's the same time.
15 Q   I'm asking when you decided to make, to be a
16    party to the TRO.
17 A   Just when we retained Steve.
18 Q   Okay.
19 A   It was a conversation between Stephen and
20    myself.
21 Q   All right.  Did you have any discussions with
22    any of the other plaintiffs in the TRO about,
23    hey, we need to file it, this is why we need
24    to file it?  Any discussions at all about at
25    the TRO?

---

Page 151

1 A   It was discussed between, I think Greg, Gabe
2     and Kane, and myself.  But I don't recall the
3     nature of, this is why we're going to file
4     it, this or that.  I just didn't want people
5     to attack me based on what somebody else had
6     done.
7 Q   And you signed as the surety on the TRO?
8 A   I'm not sure.  What does that mean?
9 Q   Where you have to -- the bond has to be put
10    up in order to file a TRO.
11 A   I'm not sure if I did or not.
12 Q   Okay.  Whatever is filed of record --
13 A   Yes, sir.
14 Q   -- is -- (Interrupted)
15 A   It's at the court.
16 Q   And if your signature is on something, then
17    it speaks for itself?
18 A   Yes, sir.
19 Q   Okay.  So that Jackie Alfred recording is the
20    only reason you filed the TRO?
21 A   Yes, sir.
22 Q   Why did you file the federal lawsuit?
23 A   Because of what I felt was going on was
24    wrong.
25 Q   And what was that?

---

Page 152

1 A   I was being attacked because of this
2     document.  I had nothing to do with this
3     document.
4 Q   Okay.  So why did you file the federal
5     lawsuit?
6 A   Because they were retaliating against me
7     because you were losing in civil service.
8 Q   Well, what did we lose in civil service?
9 A   You lost Greg Randell's case.
10 Q   What does Greg Randell's case have to do with
11    this McClean document?
12 A   It kind of flows in the pattern of everything
13    else that -- the retaliation that officers
14    receive from the administration when they
15    decide to say, you know what, somebody in
16    administration is doing wrong.
17        Greg Randell was persecuted because he
18    filed a complaint against Glen Dartez.
19 Q   All right.  Well -- (Interrupted)
20 A   The racism plays into the factor of this.
21 Q   All right.  Well, you're going to have --
22    we're talking about McClean and the federal
23    lawsuit right now.
24 A   Okay.
25 Q   And this document that we've marked as

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 153

1    Exhibit 5 had nothing to do with --
2  A  Greg Randell.
3  Q  -- Greg Randell --
4  A  Okay.
5  Q  -- and it had going to do with Dartez, did
6     it?
7  A  Okay.
8  Q  Correct?
9  A  Correct.
10 Q  Okay.  It had to do with Greg Cormier taking
11    it out of a personnel file, which he's told
12    us he's done --
13 A  Okay.
14 Q  -- whited it out, and gave it to you --
15 A  Yes, sir.
16 Q  -- as the member of the police department,
17    and as a civil service board member, and you
18    didn't report that to anybody?
19 A  No.
20    I'd like to elaborate on that.
21 Q  Go ahead.
22 A  Gabe -- Greg didn't come to me and say, look,
23    Scott, I pulled this out of a file, an
24    Internal Affairs file, whited out all the
25    pertinents and given it to you.  He gave me

Page 154

1     it, I look at it, I asked him where he gets
2     it, don't worry about it.  Is this a
3     legitimate document that's still in use
4     today?  Is it?  Yes, it is.
5        Then, we go to SOP's.  Greg has brought
6     me bad information before, especially on
7     rules and laws that pertain to civil service.
8     So everything that he might tell me is the
9     law, I go verify through the sources that is
10    that.
11       I had no idea that Greg took this out of
12    Dwayne -- or out of one Dwayne Prejean's
13    Internal Affairs investigation.
14 Q  Did it make you suspicious at all when you
15    asked Cormier, where did he get it, and he
16    says, don't worry about it?
17 A  No, because he does that often.
18 Q  You didn't think you had a duty to report
19    that to anybody, your chain, or IA, or --
20    (Interrupted)
21 A  To report what, that there's a redacted form
22    that states policy?
23 Q  Yes.
24 A  No.  I don't report any policies that I
25    review.  What was there to report?

Page 155

1  Q  Do you know if you ever violated the open
2     meetings laws?
3  A  Yes, and in the short time that we did.
4  Q  Who?
5  A  The entire board.
6  Q  Okay.  And when did that occur?
7  A  That happened in the August meeting when
8     Jason told the chief that he wasn't -- it
9     wasn't lawful for them to fire Zeryk
10    Guillory.
11 Q  Did y'all report that to the state office of
12    examiners?
13 A  I'm not sure if Jason did or not.
14 Q  Any other times?
15 A  I'm not really sure.
16 Q  Do you remember having a discussion with Ted
17    Vincent, that if you suspect wrongdoing on
18    behalf of an officer, you stop right there,
19    tell them to take a polygraph, and if they
20    fail it, you fire them?
21 A  Yeah.
22 Q  You stand behind that?
23 A  No.
24 Q  Why not?
25 A  Because it's not truly accurate.

Page 156

1     After reviewing several civil service
2     cases, it -- I found that you can't rely
3     wholeheartedly on the civil service or on a
4     polygraph for basis of termination.
5  Q  Were you required to take a polygraph in
6     connection with this McClean document?
7  A  No, sir, I was not.
8  Q  You didn't have a polygraph scheduled?
9  A  They scheduled it, but there was no direct
10    order given to me to take a polygraph.
11 Q  How did you end up with the polygraph
12    officer, or whoever it was --
13 A  What do you mean, how did I?
14 Q  -- if you didn't receive an order.
15 A  Dwayne Prejean said that they sent an e-mail
16    out with a list of dates of polygraph
17    examinations.
18 Q  Okay.  And you got that?
19 A  Yeah.
20 Q  And who did that come from?
21 A  Dwayne Prejean.
22 Q  Okay.  And did you show up to give the
23    polygraph?
24 A  Yes.
25 Q  And why didn't you give it?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 157

1  A   I was going to give it, but the polygraph
2      examiner decided he didn't want to give it to
3      me.
4  Q   Why?
5  A   He said it was too much of a liability.
6  Q   Did you refuse to give it?
7  A   No.  I refused to give him -- to make this
8      polygraph examination consensual.
9  Q   Okay.
10 A   If you're going to force it on me, force it
11     on me.  But for me to say, okay, Mike, I'm
12     going to allow you to stick me in the head
13     with a spike, well, no, I'm not going to tell
14     you that.
15 Q   Okay.  So you refused to give it?  You didn't
16     voluntarily --
17 A   No.
18 Q   -- agree -- let me scratch that and rephrase
19     my question.
20     You didn't voluntarily agree to give the
21     polygraph that Dwayne Prejean told you you
22     needed to give?
23 A   I'm not -- there was -- the word voluntarily
24     never came up.  He asked me if I'd give
25     consent, I said no.

Page 158

1  Q   Okay.  So you got to the -- where was this?
2  A   At the police department.
3  Q   Where?
4  A   On the third floor in Internal Affairs.
5  Q   All right.  So you're in Internal Affairs,
6      and there was a person there to give the
7      polygraph?
8  A   Correct.
9  Q   And who was that person?
10 A   Somebody only known as Woody.
11 Q   All right.
12 A   That's the only person that's -- that's the
13     only way he would identify himself to me.
14 Q   All right.  And he asked if you would consent
15     to giving the polygraph?
16 A   Yeah.  He ran through a few questions and
17     explained in order for me to do this, it
18     needed to be consensual.  And I told him it
19     wasn't consensual.
20 Q   Okay.  And at that point, he said he wasn't
21     giving it?
22 A   He said, I'm sorry, I'm not going to give it
23     to you.  I went back out.  I consulted my
24     attorneys because he kept me segregated from
25     them.  And they said, no, go back in there

Page 159

1      and take it.
2  Q   Did you?
3  A   Yeah.  I went back and told them, look, let's
4      get it done.
5  Q   All right.  And what happened?
6  A   He said, no, I'm not giving it to you.
7  Q   All right.  And who was there, Spring and
8      Alexander?
9  A   Both Chris and Stephen were there,
10     Gremillion, Prejean and the polygraph guy.
11 Q   All right.  And what was the date of that, do
12     you know?
13 A   I'm not sure of the date.
14 Q   Did you ever discuss matters with Frederica?
15 A   Yeah.  Frederica and I BS quite a bit in our
16     office.
17 Q   Are there any recordings of Frederica?
18 A   I don't think so.  You can't rely on what
19     Frederica says.
20 Q   Why?
21 A   Because most of it's not true.
22 Q   Did you tell ever her, or anybody else that
23     you would have your job back within a few
24     months?
25 A   No, because I knew it'd take longer than

Page 160

1      that.  I'm going to get it back, it's just
2      going to take awhile.
3  Q   I'm going to move on.  I think we've covered
4      it, but I want to make sure I'm clear.
5      Was there any discussion between you and
6      Greg as to the contents that were on this
7      document that were whited out?
8  A   No, sir.  The only conversation Greg and I
9      have had about the conversation -- about this
10     document was the instructions as to how the
11     investigation is going to proceed.  And that
12     it applied to Ed's case; yes, no, I don't
13     believe so.
14 Q   Did you ever record any citizens on traffic
15     stops?
16 A   Yes.
17 Q   Did you tell them you were recording them?
18 A   No.
19 Q   Did you Mirandize them?
20 A   No.
21 Q   Did you ever record -- (Interrupted)
22 A   Let me -- it all depends.  If they were being
23     -- I was going to go -- on traffic stops just
24     issuing citations, no.  If there was going to
25     be a prolonged investigation aside from the

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 161

1  issuance of a citation, a search of a
2  vehicle, obtaining contraband throughout,
3  yeah.
4  Q   Did you, while you were in patrol, ever
5  investigate any accidents or incidences where
6  your dash camera was on, and then you turned
7  it off to not capture --
8  A   The incident itself?
9  Q   -- what was going on?
10  Anything?
11  A   Well, no.  I've never conducted any kind of
12  incidents where I had any kind of encounter
13  where I -- I don't believe I've ever did
14  anything of such.  I've always handled my
15  business correctly, I believe.
16  Q   Have you ever turned off a dash camera at any
17  time?
18  A   Yes.  If it was recording it, I was finished
19  with the investigation, I'd turn it off to go
20  BS with other officers.
21  Q   All right.  During an investigation, did you
22  ever turn it off?
23  A   No, sir.
24  Q   Okay.  Let me mark this as Number 6, Scott,
25  and get you to identify it.  It's a four-page

Page 162

1  document dated September 12, 2012.  And the
2  last page is your acknowledgment receipt,
3  where it said it was sent to your attorney.
4  Have you seen your letter of termination
5  before today?
6  A   It was e-mailed to me through Stephen's
7  office.
8  Q   Okay.  So you have seen that?
9  A   Yes.
10  Q   You have a copy?
11  You would agree that the document that
12  was given to Olita Magee was not done with
13  the appropriate permission or authorization
14  of the Lafayette Police Department?
15  A   I'm not sure.  Did Greg obtain, or did Todd
16  obtain permission?  I don't know.  That's
17  something that you would have to ask Todd.
18  Q   Do you know if any information contained in
19  Shift Level 2011-028 was published in the
20  federal lawsuit, signed and verified by you?
21  A   What is Shift Level 2011?  Refresh my
22  memory.
23  Q   I'm asking the questions.  Do you know?
24  A   I don't recall.
25  Q   You did verify the lawsuit?

Page 163

1  A   Yes.
2  Q   So all of the allegations in the lawsuit, you
3  verified and stand behind?
4  A   All the allegations that I made, yes, sir.
5  Q   Okay.  Did you have any input on the creation
6  of the website?
7  A   No, sir, I did not.
8  Q   Did anybody ask for your authority to create
9  it?
10  A   Yes, sir, they did.
11  Q   And did you give it?
12  A   No, I did not.
13  Q   What did you say?  We shouldn't do this?
14  A   I just said I'm not going to authorize the
15  website.
16  Q   Did you file a grievance against Greg about
17  that document?
18  A   No.
19  Q   Those recordings that you had with Captain
20  Ted Vincent, did you ever tell him you were
21  recording him?
22  A   No.
23  Q   Did you ever read him his bill of rights?
24  A   I wasn't conducting an administrative
25  investigation.  So no, I wouldn't have.

Page 164

1  Q   Was there a request of you to produce a copy
2  of the recordings with Ted Vincent?
3  A   Yes.  I received a direct order from the
4  chief to turn them over.
5  Q   Did you do that?
6  A   Yes.
7  Q   To who?
8  A   I'm not really sure how the transfer of the
9  document got done.  I made -- I told -- I
10  gave the direct order to Stephen.  And I had
11  Stephen ensure that the document got to him.
12  Q   Do you know what PPM 2161-2 is?
13  A   No, sir, not right offhand.
14  Q   Okay.  General Order 201.2?
15  A   Not right offhand.
16  Q   You would need to see the actual PPM's or
17  general orders to refresh your memory?
18  A   Yes, sir.
19  Q   Okay.  I'm going to mark what we'll identify
20  as number 7.  It's also a September 12th,
21  2012, letter to you regarding AD 2012-010.
22  And the first one was AD 2012-007.
23  Regarding the -- I'll get you to look at
24  it.  Have you seen that before?
25  A   (Witness examines document.)

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 165

1    Yes, sir.  This one was e-mailed to me
2  from Stephen.
3  Q   And that involves the recording of Major
4  Alfred, I think back in March of 2012.
5  A   That's what it says, yes, sir.
6  Q   And that was the recording that became the
7  subject of the TRO hearing?
8  A   Yes, sir.
9  Q   And you were aware that Gabe Thompson used
10  your pen to record the conversation?
11  A   Yes, sir.
12  Q   You gave him the authority to use it?
13  A   He come and asked for it, yeah.
14  Q   All right.  And then, the last one I'll mark
15  as Number 8.  It's the same date letter,
16  regarding AD 2012-012, regarding the
17  polygraph.  Have you seen this document?
18  A   (Witness examines document.)
19    Yes, sir.  It was e-mailed to me as
20  well.
21  Q   Okay.
22  A   Through Stephen's office.
23  Q   And you discussed with us your version of the
24  polygraph incident that occurred in Internal
25  Affairs.

Page 166

1  A   Which can be corroborated through the
2  Internal Affairs audio/video surveillance
3  system that they have throughout the entire
4  corridor.
5  Q   Okay.  All right.  Have you ever filed an
6  EEOC complaint?
7  A   No, sir, I have not.
8  Q   Workers' comp claim?
9  A   I don't think so.  Now, I have broken my hand
10  on duty, and I had my teeth chipped on duty.
11  Now --
12  Q   At LPD?
13  A   Yes, sir.  While I was working for the
14  Lafayette Police Department.
15    I didn't -- I guess I was put on
16  workmen's comp for my hand because I was out
17  for an extended -- for the six-week time
18  period.  If that's what you mean --
19  Q   Yes.
20  A   -- by filing workmen's comp, I did.
21  Q   So if you were injured on the job with LPD
22  and you had to miss work, you think you may
23  have been paid workers' comp?
24  A   Yes, sir.
25  Q   But as far as filing an actual workers' comp

Page 167

1  dispute in workers' comp court?
2  A   No, sir, I've never done that.
3  Q   What about disability?
4  A   No, sir, I've never done that.
5  Q   Other than running for civil service rep,
6  have you ever run for any political office?
7  A   No, sir.
8  Q   Pardon?
9  A   No, sir.
10  Q   Other than your original fit for duty
11  evaluation, have you had any -- had to
12  participate in any others?
13  A   No, sir, I have not.
14  Q   Have you ever filed any complaints with the
15  civil service board?
16  A   Yes, sir.  The one against Chief Craft.
17  Q   Belfour incident?
18  A   Yes, sir.
19  Q   Who's the last person you recorded?
20  A   I'm not sure.  I guess it might have been
21  Olita Magee.
22  Q   Okay.  We'll get to that.
23    After the special general order came
24  out, or the special order came out about no
25  more clandestine recordings, did you record

Page 168

1  anyone?
2  A   No, sir.
3  Q   Scott, the binder in front of you is your
4  discovery responses.
5  A   Do you want me to turn to the front page, or
6  do you want to --
7  Q   Yes.  Turn to the front page and just flip
8  through it and make sure that that's
9  everything.  That's everything that has been
10  provided to us.  It goes 1 through 74, I
11  think.
12    And if you look at the front, it tells
13  you how it's broken down as to --
14  (Interrupted)
15  A   Okay.
16  Q   I think there were three different
17  productions.
18  A   (Witness examines documents.)
19    MR. CORRY:
20    Chris, I'm just having him go
21  through the documents so he can verify
22  that that's everything.
23    MR. ALEXANDER:
24    Okay.
25    (DISCUSSION HELD OFF THE RECORD)

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 169

1 MR. CORRY:
2 Q   Is that everything?
3 A   Okay.
4 Q   Chris, we're on.
5       And what I'm going to do, Scott, is
6 attach a copy and we'll mark it as 9, in
7 globo.  And it's 1 through 74 -- SP-1 through
8 75, which a copy of what you have there.
9 A   Yes, sir.
10 Q   All right.  Turn to SP-15.
11 A   (Witness complies.)
12 Q   Who generated that document?  It looks like
13 it's a --
14 A   The --
15 Q   -- four, five -- let's see.  It goes from
16 SP-15 to SP-21.
17 A   Okay.  This is a, I guess, transcript from
18 the audio recording that Stephen's office
19 made.
20 Q   Okay.  Did you review it?
21 A   Yeah.  Partially, yes, sir.
22 Q   Does it appear to be accurate?
23 A   From the bits I've read, yes, sir.
24 Q   Okay.  And it's the recording from Ted --
25 Captain Ted Vincent, 3/15/12 tape recording.

Page 170

1       I guess it would be the same one that's
2 referenced back in your list of recordings at
3 SP-74, number 2?
4 A   Yes, sir.
5 Q   And what is the reason -- why is that
6 recording significant to your lawsuit?
7 A   It shows that through Ted Vincent's
8 conversation that, one, that Internal Affairs
9 is pretty much being a corrupted organization
10 with illegal wire taping and the systematic
11 targeting of individuals within the
12 organization that they don't like.
13       After this conversation, this should
14 have been given to every officer in the
15 agency so they can understand that coming
16 from a former Internal Affairs administrator,
17 that what we have now is a corrupted
18 organization.
19 Q   And it's the comments that are contained
20 within that recording that you claim supports
21 your position?
22 A   Yes, sir.
23 Q   Anything else that that's significant for?
24 A   I believe that's also -- that that is the
25 conversation that I believe I gave him the

Page 171

1 copy of the Ed McClean document, as well.
2 Q   Okay.  Where is that noted?
3 A   (Witness examines document.)
4       I don't know.  I didn't see it in there.
5 Q   All right.  Let's move to SP-22.
6       Or anything else significant about SP-15
7 through 21, that recording?
8 A   No, sir.
9 Q   All right.  SP-22, what is that?
10 A   That is the first investigative notice that I
11 received.
12 Q   All right.  And that involves AD 2012-007?
13 A   Yes, sir.
14 Q   And you would agree that if that document had
15 been taken out and doctored, out of a private
16 personnel internal file, whited out by Greg
17 Cormier and given to you, you had an
18 obligation to report that to somebody,
19 correct?
20 A   No, sir.
21 Q   You don't?
22 A   No, sir.  Not if somebody is giving me a
23 redacted form that had no particular use for
24 me.  And then, after it became -- or
25 Q   All right.  And then, after it became -- or

Page 172

1 after you realized that it was used in
2 support of the McClean position in civil
3 service, where you saw that I pointed it out
4 and it was attached to Olita Magee's brief,
5 Mr. McClean's attorney, you did nothing
6 further there, either, did you?
7 A   Yes, sir.  I reported it to Internal Affairs,
8 as they requested.
9 Q   Oh, did you?
10 A   Yeah.
11 Q   When?
12 A   They scheduled an investigation and an
13 interview, and I gave them all the
14 information I had in reference to the
15 document.
16 Q   Prior to being the subject of the
17 investigation, did you send it over to
18 anybody?
19 A   No, sir, I did not.
20 Q   Okay.  You signed off on SP-22?
21 A   Yes, sir.
22 Q   SP-23, what is that?
23 A   (Witness examines document.)
24       It's another notice from Dwayne Prejean.
25 Q   Regarding the polygraph?  It said you would

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 173

1   be required to give a statement and a
2   polygraph.
3 A   Yes.  It says, that you are required to
4   corporate fully with the investigation which
5   shall include giving statements and the
6   polygraph.
7 Q   All right.  Let me back you up to -- and
8   what's the date of that document?
9 A   That is May 14th.
10 Q   All right.  Let me back you up to SP-17.  I'm
11   sorry, SP-16, and the top of 17, which is the
12   statement of March 15th, 2012, about two
13   months before you received the notice of
14   investigation.
15 A   Yes, sir.
16 Q   At that time, you said, look, if you feel
17   that the employee is being less than
18   truthful, use the polygraph?
19 A   Yes.
20 Q   Okay.  Let's go to SP-24.  What is that?
21 A   (Witness examines document.)
22     That's another e-mail from Dwayne.
23 Q   And what's it regarding?
24 A   Officer bill of rights, 30-day request
25   notice.

Page 174

1 Q   All right.  Did you tell him you were going
2   to have counsel?
3 A   Yes.
4 Q   All right.  You were given your bill of
5   rights and signed off on them?
6 A   No, I don't think I signed off on them.
7 Q   Were you given your bill of rights?
8 A   He sent some stuff via e-mail.
9 Q   You got it?
10 A   Some of it was incorrect, so I can't tell you
11   which one was correct and what wasn't
12   correct.
13 Q   All right.  SP-25?
14 A   (Witness examines document.)
15     From Joey.
16 Q   What is that?
17 A   Need to speak with you in reference to an
18   Internal Affairs investigation.  Please see
19   myself or Lieutenant Prejean.
20 Q   All right.  That was on May 11th?
21 A   Yes, sir.
22 Q   Did you speak with them?
23 A   Yeah.  I got with Joey.
24 Q   Is that when they gave you the administrative
25   investigation notice?

Page 175

1 A   Before Gabe recording Jackie Alfred, I
2   believe so.
3 Q   All right.  SP-26?
4 A   And I'm not sure if this one was for Jackie
5   Alfred or for the Ed McClean case.  I'm not
6   sure.
7     May 11th was prior to -- they hit us all
8   pretty quick.
9 Q   All right.  SP-26?
10 A   Okay.
11 Q   What is that?
12 A   (Witness examines document.)
13     From Dwayne Prejean, an e-mail.  And he
14   is admitting that he didn't use the proper
15   Louisiana revised statute.
16 Q   He says he made a typographical error?
17 A   I think it's more or less just a mistake on
18   his part.
19 Q   Have you ever made a mistake?
20 A   I have.  But I haven't --
21 Q   Have you ever made a typographical error?
22 A   -- made a mistake that cost somebody their
23   job, though.
24 Q   Did that document SP-26, cost you your job?
25 A   No.  His animosities with Greg Cormier cost

Page 176

1   me my job.
2 Q   27, SP-27, what is that, Scott?
3 A   It's the request for an appeal.
4 Q   All right.  And that's dated September 15th
5   of 2012?
6 A   I think it's the 18th.
7 Q   It's the 18th?  It's hard to read.
8 A   I'm looking at the stamp.
9 Q   Okay.
10 A   The Frederica stamp.
11 Q   And then, SP-28?
12 A   Yes.
13 Q   I guess SP-27 is the appeal of AD 2012-007 --
14 A   Yes.
15 Q   -- determination for the McClean?
16 A   007, and the one for the next investigation,
17   and the one for the final investigation.
18 Q   Okay.  27, 28?
19 A   Yes.  Because I received three separate
20   termination letters.  And I didn't know how
21   to proceed with that, so I made sure there
22   was an appeal on record for each individual
23   one.
24 Q   All right.  SP-30?
25 A   (Witness examines document.)

Page 177

1          Yes.
2   Q   That's just an internal memorandum?
3   A   No.  That was something that was sent to
4       Stephen.
5   Q   Okay.
6   A   I'm not sure why it was included into this.
7       This was something that was personal in
8       between us two.  Just a list of items to
9       request for the preparation of the civil
10      service appeal.
11  Q   All right.  I don't know why it was, either.
12          31, what is SP-31?
13  A   (Witness examines document.)
14          I think it's from Jackie Alfred.
15      Effectively immediately, precinct resource
16      officers are to work Monday through Friday,
17      eight hours a day.
18  Q   What was your schedule before that memo?
19  A   I worked four, ten-hour days.
20  Q   And who did you get that approved through?
21  A   Norbert -- Captain Myers did it.
22  Q   All right.  And then, there was a change on
23      May 11th, to work Monday through Friday,
24      eight hours a day?
25  A   Correct.  After the chief found out I was

Page 178

1       working ten-hour days.  And this was all in
2       the culmination of the Bert Bejsovec stealing
3       money incident.  That's how they decided that
4       the eight-hour work day was more beneficial
5       to the organization, even though Internal
6       Affairs works ten-hour days, Metro works
7       ten-hour days, some CID members work ten-hour
8       days.
9   Q   Did your pay change?
10  A   No.
11  Q   Did your duties change?
12  A   No.
13  Q   SP-32?
14  A   (Witness examines document.)
15          That is the e-mail shortly after.
16  Q   About the work hours?
17  A   Yes.
18  Q   Okay.  I think 33 is the same thing, a
19      continuation.  Is that accurate?
20  A   (Witness examines document.)
21          What's that, a continuation?
22  Q   32 is a continuation?
23  A   Yes, sir.
24  Q   All right.  34, 35.  And then, 36 is the list
25      of -- 36, 37, 38 and 39 are the original list

Page 179

1       of recordings that were produced.
2   A   Yes, sir.
3   Q   Did you generate those notations next to each
4       recording on those four pages?
5   A   Some of them, I recognize.  Some of them, I
6       don't.
7   Q   Do you know who put those there?
8   A   No, sir.
9   Q   Is it fair to say that the only recordings
10      that you're now relying on are the ones
11      contained in 73, 74 and 75?
12  A   Yes, sir.
13  Q   All right.
14  A   You asked for all of of them.  I'm going to
15      give you all of them, but not all of them are
16      relevant.
17  Q   Okay.  All right.  Let's look at SP-41.  Are
18      you there?
19  A   Yes, sir.
20  Q   A, were you part of that investigation that's
21      noted, AD 2007-003?
22  A   Yes, sir.
23  Q   Conducted in 2007, involving the criminal
24      activity of Angelo Iorio.
25  A   Yes, sir, I was.

Page 180

1   Q   Did you conduct the investigation?
2   A   No, sir.  I was the complainant and a witness
3       to it.
4   Q   Did you provide a statement?
5   A   Yes, I did.
6   Q   Did you attend the predetermination hearing?
7   A   No, sir.  That's not something I would be
8       allowed to do.
9   Q   Do you know the outcome of that
10      investigation?
11  A   I believe rumor has it that Angelo was
12      suspended for three days for criminal
13      activity.
14  Q   Okay.  And I understand that's -- you
15      clarified that by saying it's a rumor.
16          Do you have any firsthand knowledge the
17      outcome of that investigation?
18  A   I have a partial letter saying that my
19      complaint was sustained and thanking me for
20      bringing the information forward.
21  Q   Okay.  What did you do with that letter?
22  A   It should have been submitted to you.
23  Q   All right.  Maybe it's in here, maybe we'll
24      get to it.
25          Do you know of any witnesses to -- other

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 181

1 than you and Iorio, as it relates to section
2 A of SP-41?
3 A You have -- I don't know if Blair Dore, what
4 his rank is, but he was a witness as well.
5 John Babin should have been a witness. Kirk
6 Colarelli. And I'm not sure who else from
7 the sheriff's office, because it was a
8 combined agency effort.
9 Q Did you take any of that information to
10 anyone other than IA?
11 A No.
12 Q Okay.
13 A Glenn Armentor, when I requested help from
14 him.
15 Q All right. Anybody else?
16 A No.
17 Q Did you report that to any news organization?
18 A No, I have not. Not yet.
19 Q Section B, shift level investigation,
20 2009-036. What does that have to do? It
21 looks like an issue date of July 10th, 2009.
22 What is the incident?
23 A That was the incident that Angelo launched
24 against me in retaliation for launching one
25 on him.

Page 182

1 Q And what was the nature of the complaint?
2 A A bank teller reported that I was rude and
3 discourteous to her.
4 Q And what was the outcome of that
5 investigation?
6 A They sustained the investigation.
7 Q And did you receive notice of that?
8 A Yes.
9 Q In the form of what?
10 A A counseling form.
11 Q Okay. Where was the bank?
12 A It was the Capital One Bank on East Kaliste
13 Saloom Road. After you pass Pinhook, it's
14 the one on the right-hand side.
15 Q Have you ever been rude to anybody?
16 A Yes.
17 Q Did you appeal that?
18 A No. I couldn't.
19 Q All right.
20 A I say I couldn't. It's part of the reason
21 why I decided that wanted to run for civil
22 service, is because when I approached
23 Reginald Thomas with it, there's nothing you
24 can do about it, nothing at all, which is
25 contrary to what the rules of the board are.

Page 183

1 You can appeal anything that's perceived as
2 disciplinary action to the board. It's up to
3 the board to decide whether or not they're
4 going to hear it.
5 Q Do you have any authority for that?
6 A To appeal my action to the board?
7 Q Yes.
8 A Yeah.
9 Q What?
10 A You could -- you could request that the board
11 hear it, conduct an investigation and a
12 finding of the facts to see if they're true
13 and accurate.
14 Q Where does the authority come from that says
15 you cannot appeal a counseling form?
16 A From Reginald Thomas.
17 Q Nobody else, no other authority?
18 A The chief of police.
19 Q What about state civil service?
20 A No. There's no -- there's nothing that says
21 you can't appeal -- the guidelines are, and I
22 should have brought the workbook with me that
23 I got from the state department, from the
24 state examiner's office. It's clear and it's
25 in black and white. Any action that the

Page 184

1 employee perceives as disciplinary action is
2 appealable to the civil service board.
3 Q Did you call the state examiner's office
4 ever?
5 A Yes, I called them a lot.
6 Q Did you ever record any conversations with
7 them?
8 A Yes, I did.
9 Q Why?
10 A Because I wanted to make sure that the facts
11 were straight, that if ever there was a --
12 all the recordings weren't made to target any
13 individual individuals. It was to make sure
14 that when this all blows up, when they say
15 that Scott said this, and Scott said that,
16 that I have an accurate assessment of what
17 Scott said.
18 Q All right. Did -- when you spoke with the
19 state examiner's office, did you ever speak
20 to an attorney, or did you just get the staff
21 people?
22 A Yeah. I spoke to the staff people that I was
23 required to speak to.
24 Q Were they attorneys?
25 A No. They were employers, regular employers

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 185

1   of the state examiner's office.
2 Q   All right.  Let's look at number C, Internal
3   Affairs investigation report.  Okay.  That's
4   the termination.   The next one is the --
5 A   Yes, sir.
6 Q   I guess that's the --
7 A   All three.
8 Q   -- Alfred and -- (Interrupted)
9 A   C, D and E.
10 Q   Yes.  Okay.
11   And then, F.  And that wasn't clear for
12   the record.  But C, D and E on SP-41 are in
13   relation to the three termination letters
14   that we identified as 6, 7 and 8.
15 A   Yes, sir.
16 Q   All right.  F, Internal Affairs investigative
17   report against Police Chief Jim Craft.  What
18   was the nature of that?
19 A   That was when Jim Craft lied to Norbert about
20   my actions with Duaine Belfour.  I filed a
21   complaint against him because I thought it
22   was rude and discourteous towards me.  If he
23   felt that I did something wrong, and he was
24   that adamant that I had done something wrong,
25   then an investigation should have been

---

Page 186

1   launched.
2 Q   Was there one?
3 A   No.
4 Q   Okay.  What was the outcome of the
5   investigation you filed, or the complaint you
6   filed against him?
7 A   I got a letter back from Ray Domingue that
8   said it was unfounded.
9 Q   Okay.  And do you know how the investigation
10   was conducted?
11 A   I have no idea what they did.
12 Q   Did they discuss it with you?
13 A   No.
14 Q   Did you file written documents?
15 A   Yes, I did.
16 Q   What did you file?
17 A   I filed a statement of fact as to what
18   transpired between myself and Duaine Belfour.
19 Q   And what happened?
20 A   And the comments of Jim Craft to Norbert
21   Myers.
22 Q   What happened with Belfour?
23 A   Nothing.  I went to his house.  I was asked
24   to go out there to check on some lawn service
25   guy that was harassing the neighbors.  He

---

Page 187

1   told me what he had to do, or what his
2   complaint was of the lawn service guy.  And I
3   explained to him what I could do for him, and
4   what I'd like to try to do for him.
5 Q   All right.  And what did Chief Craft say you
6   did?
7 A   He said I went in there and bad mouthed him,
8   called him all kinds of names.
9 Q   Do you know where he got that information?
10 A   No, sir, I don't.
11 Q   Do you know if he had any conversations
12   directly with Belfour?
13 A   No, I do not.
14 Q   Was there a recording between you and
15   Belfour?
16 A   Yes, there is.
17 Q   Was there any communication between you and
18   Belfour that was not recorded?
19 A   No, there is not.
20 Q   And which recording is it?  14?
21 A   Yes, sir.  Consensual audio recording with
22   Duaine Belfour.
23 Q   Number 14 on SP-75?
24 A   Yes, sir.
25 Q   Do you know of any witnesses?

---

Page 188

1 A   No, sir.
2 Q   It was just you and Belfour?
3 A   I arrived there, and his wife was leaving.  I
4   met his wife.  And that's it.
5 Q   Okay.  So you don't have any idea of anything
6   -- any communication Belfour relayed to Chief
7   Craft about your encounter?
8 A   No.  But if he made any kind of encounter,
9   wouldn't he be obligated to launch an
10   investigation if my behavior was contrary --
11 Q   I think it's up to the appointing authority.
12   Who has the authority to launch an
13   investigation?
14 A   The chief does.
15 Q   Okay.
16 A   But isn't it written in the general orders
17   that he shall initiate an investigation when
18   there is misconduct warranted or observed?
19 Q   Did you ever have the authority to launch an
20   investigation?
21 A   Yes.
22 Q   You did?
23 A   Yes.
24 Q   And what authority is that?
25 A   I think by providing a witness statement,

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 189

1    that's launching the investigation.
2 Q  All right.  Did you have any authority to
3    conduct an investigation?
4 A  Criminal investigations, yes.
5 Q  What about --
6 A  Administrative --
7 Q  -- administrative?
8 A  -- no.
9 Q  Did Greg Cormier?
10 A  I think so.
11 Q  What about Gabe Thompson?
12 A  I think so.
13 Q  What about Novey Stelly?
14 A  I'm sure.
15 Q  They all had the authority to conduct
16    administrative investigations?
17 A  I think I've seen all of them conduct
18    administrative investigations.
19 Q  But it has to be at the request of the chief,
20    right?
21 A  Yes.
22 Q  That's what I'm asking.
23 A  Okay.
24 Q  They don't have the authority to launch their
25    own investigations?

Page 190

1 A  Correct.  The chief holds the authority to
2    launch and dismiss investigations at will,
3    which is part of the problem with this
4    organization.
5 Q  You don't like the way it's run?
6 A  No, I don't.
7 Q  Okay.
8 A  I've seen better days.
9 Q  All right.  Let's look at Number -- G, I
10    think we've talked about, right, Olita
11    Magee?
12 A  Yes.
13 Q  H, I, J. J, I guess is the same thing as --
14 A  It's the same thing as the Belfour incident.
15 Q  -- F?
16 A  Yes, the Belfour incident.
17 Q  And X is the Belfour incident?
18 A  Yes, sir.
19 Q  All right.  Let's look at page 43.  Why do
20    you have me listed as the witness?
21 A  Because you're the one that requested the
22    investigation.
23 Q  Why do you have -- any other reason?
24 A  Every time I see anything associated with Ed
25    McClean, you were the -- the spark that

---

Page 191

1    started it.
2 Q  Well -- (Interrupted)
3 A  You came before the board and you said, we
4    demand -- I demand an investigation.  You're
5    the witness.  Shouldn't I have the
6    opportunity to question you about why you
7    decided that you wanted me to be part of an
8    investigation that you requested?
9 Q  I'm counsel of record, aren't I?
10    MR. ALEXANDER:
11        I'm going to just say the -- I
12    didn't -- I want to hear the -- was the
13    answer to the question is, you should
14    have a right to question him, correct?
15 A  Yes.
16    MR. ALEXANDER:
17        Yes.  Okay.
18 MR. CORRY:
19 Q  I am counsel of record, correct?
20 A  You also made the request.
21 Q  Okay.  When was that request made?
22 A  That was made in the May civil service
23    hearing.
24 Q  May what?
25 A  I'm not sure of the exact date.  It's

Page 192

1    whatever date it was that we had the May
2    civil service hearing, in regards to the
3    Olita Magee briefs.
4 Q  All right.  Any other reason?
5 A  Yes.
6 Q  What?
7 A  That you had direct knowledge that I didn't
8    have anything to do with this through Olita
9    Magee to you.  But yet, you still wanted this
10    investigation towards me done.
11 Q  Okay.  Anything else?
12 A  No.
13 Q  All right.  Olita Magee?
14 A  She's the sole proprietor of this whole mess.
15    She got the letter, she knows I didn't give
16    it to her.  She's made it --
17 Q  Is the only reason you were fired --
18    MR. ALEXANDER:
19        Let me allow --
20 MR. CORRY:
21 Q  Go ahead.  I didn't mean to cut him off.  Go
22    ahead, Scott.
23    MR. ALEXANDER:
24        Let him completely answer the
25    questions.  Thanks.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 193

1  MR. CORRY:
2  Q   Go ahead.
3  A   She's made numerous statements to Dwayne
4      Prejean during the length of this
5      investigation that I had nothing to do with
6      this.
7  Q   Do you have firsthand knowledge of that?
8  A   Yes.  The audio recording that I provided.
9  Q   And which one is that?
10 A   Consensual audio recording, Olita Magee with
11     Scott.
12 Q   What number is that?
13 A   SP-75, Number 18.  And in the conversation,
14     she directly says that she told Dwayne
15     Prejean that I didn't have anything to do
16     with this.
17 Q   All right.  Anything else about Olita Magee?
18 A   Not this I can recall at this time.
19 Q   Allyson Prejean?
20 A   She's the one that submitted or authored the
21     audio website letter into the record, and
22     which further shows the connection of the
23     Stanley/Craft organization, that they'll use
24     outside resources in order to disparage
25     individuals that come against them.

Page 194

1  Q   Paul Marx?  Or anything else about Allyson?
2  A   That's it about Allyson.
3  Q   Paul Marx?
4  A   He's the one that said he authored the
5      investigation -- the letter that impugned our
6      record on behalf of the consolidated
7      government.  He's part of the Stanley/Craft
8      organization.
9  Q   All right.  Richard Chappuis?
10 A   Richard is a witness that stated that he
11     believed that y'all lied during the special
12     hearing when Dwayne came and said that Greg
13     had heart issues.  He also said that Dee
14     could have handled this better, which shows a
15     biasness as to his ability to hear cases
16     before the civil service board.
17 Q   And when he says "y'all lied", who are you
18     referring to?
19 A   No, he didn't say y'all lied.  They lied in
20     reference to Dwayne Prejean and --
21 Q   Right.
22         You said y'all.  Who is the definition
23     of "y'all"?
24 A   Dwayne Prejean and U.J. Prevost.
25 Q   All right.  Anything else about Chappuis?

Page 195

1  A   No.
2  Q   Norbert Myers?
3  A   Norbert was there from fit to finish in all
4      the targeting and the animosities that came
5      to us, just solely from me being in civil
6      service.
7  Q   And he was also a plaintiff?
8  A   Yes.
9  Q   And his claims got dismissed?
10 A   As for now, yes.
11 Q   All right.  And Greg Cormier, anything more
12     than what he's already testified to?
13 A   Correct.
14 Q   There is?
15 A   No.
16 Q   All right.  Austin Prevost?
17 A   Austin was part of the -- the first
18     investigation as well.
19 Q   All right.  Anything else?
20 A   No.
21 Q   When you say "the first investigation", the
22     termination for the McClean document?
23 A   Yes.  Yes.
24 Q   Dee Stanley?
25 A   We need to find out if it was either -- the

Page 196

1      investigation was either started by you or by
2      Dee.
3  Q   All right.  Anything else?
4  A   He had sole control to take care of this and
5      he didn't.  He's part of the Stanley/Craft
6      organization.  He allows Craft to run shot
7      over black officers, and those that are less
8      desired by the administration.
9  Q   Do you know what the authority is to launch
10     an investigation and who has that authority?
11 A   Yeah.  According to your comments earlier,
12     it's the chief of police.
13 Q   Well, I'm asking you.  Do you know?
14 A   I'm going by your word, the chief of police.
15 Q   Okay.  Anybody else?
16 A   No.  It's clearly stated.  I believe it's
17     clearly stated that the chief of police or
18     his designee.
19 Q   Okay.  Amy Leblanc?
20 A   Amy Leblanc was the witness to the -- let's
21     go back to -- she is a witness in the --
22 Q   Give me a page number.
23 A   It'll be SP-41.  The bank incident.
24 Q   Okay.  And what year was that?
25 A   2009.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

| Page 197 |
| --- |

1  Q   All right.  Is that part of the lawsuit?
2  A   It shows the direct retaliation.
3  Q   That's a yes or no answer.
4  A   Yes.
5  Q   You can explain it.
6  A   Yes, sir, it is part of the lawsuit.
7  Q   All right.  Gabe Thompson, anything more than
8      what he's testified to?
9  A   No, sir.
10 Q   Forrest Blanton?
11 A   He was part of the investigation.
12 Q   Of which one?
13 A   The Ed McClean document.
14 Q   All right.  Jim Craft, I think you've covered
15     him, right?
16 A   Yes.
17 Q   Glen Dartez.
18 A   Glen was part of the Stanley/Craft
19     organization that specifically targeted black
20     officers.
21 Q   Did he ever specifically target you?
22 A   Yes.  He was part of assigning me back to
23     Angelo Iorio, after I filed a criminal
24     complaint on him.
25 Q   Keith Gremillion, that's in his role in IA?

| Page 198 |
| --- |

1  A   Yes, sir.
2  Q   Now, Jeremy Dupuis you've got listed.  And
3      we've already had several hearings before
4      several different judges about him.  So what
5      is it you want to cover with him?
6  A   If it wouldn't be for him, I wouldn't have
7      that document.  And y'all are saying that
8      this is Jeremy's document.  How are we
9      supposed to verify that?
10 Q   Well, actually, if it wasn't for Greg
11     Cormier, you wouldn't have had that document.
12 A   Well --
13 Q   Is that accurate?
14 A   No, that's not accurate.  That's why we --
15 Q   Well, how did you get it if Greg didn't give
16     it to you?
17 A   It was created because of Jeremy Dupuis.  You
18     cited Jeremy Dupuis numerous times in this
19     case.
20 Q   Anything else?
21 A   No.
22 Q   Jackie Alfred?
23 A   He's the one that authorized the Ed McClean
24     case.
25 Q   Blair Dore?

| Page 199 |
| --- |

1  A   Was witness to Angelo Iorio.
2  Q   Todd Green?
3  A   He's the one that gave the Ed McClean
4      document to him.
5  Q   Did you ever report that to anybody?
6  A   I found out the day I got fired -- the
7      weekend I got fired, so the answer is no.
8  Q   Okay.  Nancy Hebert?
9  A   I don't know why she's in there.
10 Q   Who is that?
11 A   That's Jackie Alfred's secretary.  She could
12     probably attest to the fraudulent time
13     keeping of Jackie Alfred.
14 Q   Ray Domingue?
15 A   He's the one that conducted the -- authored
16     the Duaine Belfour complaint.
17 Q   Okay.  Frank Bejsovec?
18 A   He was part of the Ed McClean investigation.
19 Q   All right.  Olita Magee we talked about.
20     Duaine Belfour we've talked about.  Dwayne
21     Prejean we've talked about.
22 A   Yes.
23 Q   Correct?
24 A   Yes.
25 Q   Zeno, Rick Zeno?

| Page 200 |
| --- |

1  A   He was there.  I don't know why Rick is in
2      there.
3  A   He shouldn't be in there?
4  A   Not for me.
5  Q   So Rick shouldn't be there, and Nancy
6      shouldn't be there.
7  A   Nancy.
8  Q   And Detective Todd Green is in there twice.
9  A   Nancy should be in there only because she --
10     the basis of the complaint is about the
11     corruption that exists within the Lafayette
12     Police Department.  She can attest to the
13     fraudulent bookkeeping and times that Jackie
14     Alfred was keeping.
15 Q   Did you ever make a complaint about that?
16 A   Oh, no.  I would have gotten fired earlier.
17 Q   Okay.  Detective Todd Green is the same Todd
18     Green that's noted above?
19 A   Yes.
20 Q   Prevost, U.J. Prevost?
21 A   Took part in the investigation.
22 Q   Which one?
23 A   All three.
24 Q   Paul Marx we talked about.
25 A   Yes.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 201

1 Q   Randy Vincent, what did he do?
2 A   He was a witness to the investigation, as
3     well.
4 Q   All of them?
5 A   Ed McClean.
6 Q   Okay.  Woody Overton?
7 A   He is the alleged polygraph examiner.
8 Q   Do you know if he is a certified polygraph
9     examiner?
10 A   I've never met the man before.  All I know is
11    he has -- you know, he identified himself as
12    state police, criminal investigator, and his
13    name is Woody.
14 Q   Guy Lebreton?
15 A   He is part of the Dwayne -- part of the
16    Stanley/Craft organization.  The fact that he
17    supports what Jim Craft does, malicious
18    targeting of individual officers.
19 Q   Is he a good board member?
20 A   I'd say not.
21 Q   Okay.  Why?
22 A   He made open comments that those that filed a
23    lawsuit showed a lack of integrity in doing
24    so.  That shows a clear biasness against the
25    individuals that participated in the lawsuit.

---

Page 202

1     Then turns around and votes on matters that
2     are directly related to the lawsuit, those
3     in the lawsuit.
4 Q   How is that different than you suing the
5     chief of police, and then wanting to sit on
6     his cases before the civil service board?
7 A   That's between the chief and myself.  That
8     has nothing to do with the officers that are
9     filing these complaints.
10 Q   All right.  Is Guy Lebreton fair?
11 A   No.
12 Q   Dorion Brabham?
13 A   Dorion was the one that -- Dorion -- there's
14    a recording of Dorion trying to change the
15    way promotions are run, specifically.
16 Q   Who is that?
17 A   He is the union president, the police
18    association's union president, who is trying
19    to change the civil service promotions.  So
20    it specifically targets overweight and less
21    healthier officers to pass over during
22    promotional process.
23 Q   I mean, don't you need to be physically fit
24    to be a police officer?
25 A   Sure.

---

Page 203

1 Q   I mean, if I'm getting -- you know, somebody
2     is trying to murder me, and there's a big,
3     fat guy that can't defend me, don't you think
4     that's an issue?
5 A   I would say that's a noble concept, but when
6     the purpose of this thing -- the purpose of
7     the revision is solely so he could get
8     promoted over the fat officers.
9 Q   All right.  How does that affect the
10    allegations you made in your lawsuit?
11 A   It shows that the corruption is there.  It's
12    not --
13 Q   Are you a member of the union?
14 A   No.  I'm not a member of the union or the FOP
15    at this point in time.
16 Q   No.  Back when you were a police officer?
17 A   No.  I was a member of the FOP.
18 Q   You were?
19 A   Yeah.  They're two separate organizations.
20 Q   Okay.  Anything else about Dorion Brabham?
21 A   No.
22 Q   Ron Czajkowski?
23 A   Part of the investigation, Ed McClean.
24 Q   Okay.  Marceaux, anything more than what he's
25    submitted?

---

Page 204

1 A   No.
2 Q   Ted Vincent, we've gone through him?
3 A   Yes.
4 Q   Ned Fowler?
5 A   Part of the investigation, Ed McClean.
6 Q   Mark Francis?
7 A   Disseminator of all the lies to the public.
8 Q   Dwayne Arceneaux?
9 A   He is a witness to the falsifications of the
10    UCR report, codes to the federal government.
11 Q   Jason Boudreaux, we've talked about him?
12 A   Yes.
13 Q   Phil Fontenot?
14 A   Part of the Ed McClean investigation.
15 Q   Cornell Montgomery?
16 A   Only that he tried to transfer me again after
17    the retaliation of transferring me again
18    shortly after I got transferred from the
19    first time the chief targeted me.
20 Q   Anybody else?  I mean, anything else about
21    Cornell Montgomery?
22 A   Other than he's a rapist, no.
23 Q   Pat Patum?
24 A   He took part in the investigations, I think
25    the second two.

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 205

1 Q  Sean Terro?
2 A  Conducted the second -- the third
3    investigation.
4 Q  Do you know the outcome of the allegations
5    that were made in your lawsuit with regards
6    to the motions to strike and motions to
7    dismiss in federal court?
8 A  It's been awhile since I sat down with it,
9    Mike.
10 Q  Lots of it were stricken, correct?
11 A  Yes.
12 Q  Do you know if any sanctions were awarded by
13    the Court?
14 A  I'm not sure.
15 Q  But you say Mark Francis does what?  What did
16    you tell me Mark Francis does?
17 A  Disseminates false information to the public
18    on behalf of the Stanley/Craft organization.
19     MR. CORRY:
20       Do you have those pleadings?
21     MS. COREIL:
22       For him or the -- this one.
23 MR. CORRY:
24 Q  I think it's a typo on Interrogatory Number
25    2, on SP-43.  Paragraphs 137 through 146 of

---

Page 206

1    the original complaint, I don't think deal
2    with you.  Maybe it does.
3       What was the conversation you had with
4    Mark Francis?  Do you see on page --
5    (Interrupted)
6 A  Which one?  The one that we're looking at
7    right here?
8 Q  No.  I'm sorry.
9       It's -- this -- what I'm handing to you
10    is copies of the original complaint that you
11    filed --
12 A  Okay.
13 Q  -- and the amended complaint.  We're going to
14    talk about the original complaint first.
15 A  Okay.
16 Q  Look at page 21, number 137.
17    (Witness complies.)
18       Okay.
19 Q  What was that conversation that you had on
20    February 16th with Mark Francis, Greg Cormier
21    and Gabe Thompson?
22 A  I believe that is when Mark was telling us
23    about the shady goings on within the
24    Lafayette Police Department.  IA Glen Dartez
25    not being prosecuted after he let that woman

---

Page 207

1    die on Wilcox Street.
2 Q  Did you have any direct involvement in that
3    incident?
4 A  No, sir.
5 Q  It was all told to you by Francis?
6 A  Yes.
7 Q  It was Francis' version?
8 A  It was Francis' version, which he got from
9    the chief of police, which the chief wanted
10    him to report some things that weren't
11    necessarily true.
12 Q  All right.  Look at paragraphs 224 through
13    226 on page 29, Scott.
14 A  224 to 226?
15 Q  Yes.  On page 29.  Are you there?  What is
16    that about?
17 A  (Witness examines documents.)
18 Q  That's the Belfour incident?
19 A  Yes, sir.
20 Q  Okay.  Did you violate any general orders or
21    PPM's in connection with the AD 2012-007, 010
22    or 012?
23 A  All three of them?
24 Q  Yes, sir.
25 A  No, sir.

---

Page 208

1 Q  Within any of them, you didn't do anything
2    wrong?
3 A  No, sir.  I don't believe I did.
4 Q  I'm just making sure.  I think we've covered
5    all of this.  I don't want to just keep --
6       All right.  Turn to 53.  Go back to your
7    binder.  Give me these.  We're done with
8    these.
9 A  (Witness complies.)
10 Q  That was the predetermination hearing notice
11    for 007?
12 A  Yes, sir.
13 Q  And it's your testimony you didn't violate
14    any of those --
15 A  Correct.
16 Q  -- listed?
17 A  There's some I don't even know what they are.
18    Division Level investigation E, G, J,
19    confidentiality policy, A.
20 Q  All right.  55 and 56, and 57, that's for the
21    investigation dash 010?
22 A  Yes.
23 Q  Did you violate any of those?
24 A  Once again, I'm going to say no.  But most of
25    them, I don't even know what they are.

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 209

1  Public statements release, news release,
2  number 1. There's no explanation.
3    Professional conduct and
4  responsibilities, A, G, E and J, no. I don't
5  know what that means.
6    Responsibility C, 2. Attention to duty
7  B, C, F. Cooperation with fellow employees
8  and agencies, A. There's a lot of
9  information that was left out that I can't
10 attest to because I don't know what they are.
11 Q  All right. Did you give any statements at
12   the predetermination hearing?
13 A  No, I did not.
14 Q  All right. Look at 58, that's for 010. 58
15   and 59.
16 A  (Witness examines documents.)
17   Okay.
18 Q  Is that accurate?
19 A  Yes, sir.
20 Q  All right. 60, what is this, SP-60?
21 A  This is the Duaine Belfour complaint. This
22   is what caused me to have to go out and --
23   this is the initial complaint from Duaine
24   that requested my help, or the help of the
25   Lafayette Police Department.

Page 210

1  Q  Is this the kind of things you investigated
2    as a resource officer?
3  A  Yes, sir. Among others.
4  Q  Okay. And apparently some lawn guy was,
5    according to Mr. Belfour, harassing him or --
6  A  Yes.
7  Q  -- causing some issues for him?
8  A  Yes. Yes.
9  Q  Where did you go? Where did Belfour live?
10 A  I went to his address.
11 Q  Do you know what it is?
12 A  In Greenbriar. Not right offhand, no.
13 Q  Okay. What is 61?
14 A  I believe this was a letter issued out to all
15   police departments officers condemning what
16   we did, even though he hadn't done any kind
17   of investigation to find out whether or not
18   anything was -- it was just him slapping us
19   in the face, which further shows his
20   retaliation towards those that speak out.
21 Q  Okay. 62, what is that?
22 A  That is from my polygraph examination given
23   by James Robertson.
24 Q  What date did you do that?
25 A  It says, 7/17/12. I don't know if that's the

Page 211

1  date he compiled this paper, or that's the
2  actual date that I took the test. That's
3  July? That's probably the date that I took
4  the test.
5  Q  Is he a certified polygraphist?
6  A  Yes, sir. I think he sits on the board that
7    governs the rules for polygraph examiners.
8  Q  And it's not signed.
9  A  Okay. Stephen has the original.
10 Q  Okay. 63?
11 A  If we could go back to SP-62.
12 Q  Okay.
13 A  This was sent to expedite -- to aid in the
14   investigation that we were under instead of
15   waiting for snail mail to get there. As soon
16   as he was able to compile it, he e-mailed it
17   to Stephen, and e-mailed it in.
18 Q  All right. 63?
19 A  It's a request for the audio recordings and
20   transcripts from my interviews.
21 Q  Did you get those?
22 A  No, sir, I have not.
23 Q  Has your attorney?
24 A  No, sir, he has not. They provided it to him
25   for investigation, 2012-007 and 012. They

Page 212

1  were blind copied of this.
2  Q  Okay. And you followed up with Lieutenant
3    Gremillion?
4  A  Yes, sir. That's --
5  Q  64, he says when he gave them to you, they
6    had the information on there?
7  A  Correct. And we returned them with no data
8    on them. And he returned two more discs with
9    no data on them.
10 Q  Okay. So he gave you discs twice with no
11   data, is what you're saying?
12 A  Correct.
13 Q  All right. 65?
14 A  This was -- this is what drug -- I don't know
15   where this came from in the Lafayette Police
16   Department, whether they gave it to the wrong
17   office because I don't think I was intended
18   to see this. But it goes to show that there
19   were sources outside of the Lafayette Police
20   Department related to officers that were
21   trying to get information to Channel 10 to
22   dispute what we were trying to say.
23 Q  Where do you get that from?
24 A  I wonder if Channel 10 is going to run this?
25   Apparently somebody --

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 213

1 Q   Did they send that to Channel 10?
2 A   Well, why would they wonder if Channel 10 is
3     going to run it if they didn't send it?
4 Q   Okay.
5 A   And that's the actual letter from the IDO's
6     website.
7 Q   That's 66?
8 A   Yes, sir.  And 67, and 68, and 69.
9 Q   Did you comply with number 70?
10 A   Yes, sir.
11 Q   Was that recording altered in any way?
12 A   No, sir.
13 Q   71, what is that?
14 A   When I got the notice, it was late.  And it's
15    arriving to me, which gave me like two days
16    to provide the information before they would
17    decide to terminate me.  So I e-mailed Dwayne
18    to see if there was an e-mail address that we
19    could use to e-mail the audio file to him,
20    that way he could have access to it before
21    Steve could send him a hard copy, or whatever
22    Steve sent him.
23 Q   Have you ever told Richard Chappuis and Jason
24    Boudreaux that you recorded them?
25 A   No.

---

Page 214

1 Q   Have you ever provided them a copy of the
2     recording?
3 A   No.
4 Q   Have they asked for it?
5 A   No.
6 Q   72, what is that?  The same thing?
7 A   Yes.  That's after I had sent the request, he
8     replied -- he gave me the e-mail address to
9     do so.  And then, later that afternoon
10    decided not to send it, that I'd have to
11    deliver it to him in the form of disc, flash,
12    a pen drive.
13 Q   Okay.  73, let's go through those recordings.
14    I think we talked about -- (Interrupted)
15 A   Mark Francis.
16 Q   That's the one out in the parking lot?
17 A   Yes, sir.
18 Q   2, we talked about that.
19        3, we talked about.  4?
20 A   4 is when Ted Vincent came into my office and
21    condemned Jim Craft for what he was doing,
22    along with Dwayne Prejean for acting in an
23    unethical manner, and that they were
24    violating laws.  And that he was tired and
25    didn't want to deal with it anymore.

---

Page 215

1 Q   Did you report that to anybody?
2 A   No.
3 Q   Number 5, we've talked about.  Number 6,
4     we've talked about.
5        Number 7, what is that?
6 A   Number 7, that is the recording where Dwayne
7     Arceneaux came in and reported that they were
8     falsifying or changing the UCR codes to make
9     the Compstat report better.
10 Q   All right.  Did you report that to anybody?
11 A   No.
12 Q   Number 7.  Number 8?
13 A   I believe that's the one where he reported
14    that the chief and, once again, Bert
15    Bejsovec, and select members of the Craft
16    crew went over budget and stole money from
17    the Mardi Gras funds.  That was a Saturday
18    that was rained out where there was no
19    festivities planned, or no work to be done,
20    but yet, they billed for a 12-hour or 14-hour
21    day.
22 Q   Did you report that to anybody?
23 A   No.
24 Q   Number 9?
25 A   That was a meeting with Dee Stanley and the

---

Page 216

1     municipal side representatives, as well as
2     police and fire, in reference to changing the
3     law with regard to sick leave payout, or the
4     accumulation of sick leave.
5        During that conversation, there are two
6     things that I think are very relevant that
7     shows very serious culture corruption with
8     the consolidated government.
9        One is that Dee Stanley reports that
10    some individuals in the consolidated
11    government are earning sick leave payable
12    upon retirement at a rate that they can't
13    humanly do, which shows that there is fraud
14    and abuse within the government that he
15    refuses to look at.
16       And two, that Red Flex is a 1.5 million
17    dollar cash cow.  It's not related to the
18    safety of the public, but that if the public
19    wanted to vote away Red Flex, that he would
20    have to find some other kind of way to get
21    the 1.5 million dollars in assets that Red
22    Flex pays.  Which, during that time
23    definitely contradicts all the public safety
24    aspects that they were reporting to the
25    consolidated government and the state

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

---

Page 217

1  government to decide whether or not they were
2  going to continue the Red Flex program.
3  Q  Did you report that to anybody?
4  A  Who do you report it to?  Who?
5  Q  I'm just asking you, did you report it to
6  anybody?
7  A  We reported it now, who's helping us?
8  Q  Did you tell any of these individuals all
9  through number 10, that you were recording
10  them?
11  A  No.
12  Q  Why does it say consensual recording, then?
13  A  Because it was consensual.  Louisiana is a
14  one party consent law.  I consented to their
15  recordings, so they're legal and I made them.
16  Q  All right.  Number 11, that's the Belfour
17  incident?
18  A  Yes.  I didn't make that one.  That was
19  Norbert.  That's a conversation that Craft
20  had with Norbert about me, and told Norbert
21  to get rid of me out of that position
22  immediately.
23  Q  Did he follow that order?
24  A  I was transferred two days later.
25  Q  Okay.  Number 12?

---

Page 218

1  A  That's when he called me -- Craft called me
2  in his office to discuss the Bert Bejsovec
3  investigation.
4  Q  Okay.  What does that show?
5  A  Well, on one hand, it shows that he admits
6  that I'm a decent and ethical civil service
7  representative.  And then, he turns around
8  and disparages me and attacks me because I'm
9  biased and all of this other BS later on
10  after the lawsuits were filed.
11  Q  Okay.  Anything else?
12  A  No.
13  Q  13.  We've talked about that one, right?
14  A  Yes.  That's when Angelo violated the law and
15  Jim Craft slapped him on the wrist with a
16  suspension.
17  Q  And we don't have that recording?
18  A  You don't have it?
19       MR. CORRY:
20          We don't have that one, do we?
21       MS. COREIL:
22          No.  It says this file will be
23       provided.
24  A  Okay.  I'll make sure that Stephen gets it to
25  you.

---

Page 219

1  MR. CORRY:
2  Q  All right.  And that occurred back in '07?
3  A  Yes, sir.
4  Q  14, we talked about that?
5  A  Yes.
6  Q  15?
7  A  Yes.  And that's where Dorion describes why
8  -- the true meaning of why they want to
9  change the rules for the promotion.
10  Q  16?
11  A  It's supposed to be Richard Chappuis, not
12  Richard Chargois.  That's when Richard said
13  that Dee Stanley handled this whole matter
14  inappropriately.
15  Q  That's just his opinion, right?  He's not the
16  CAO, is he?
17  A  No, he's not.
18  Q  17.  Did Craft file a complaint against
19  you --
20  A  No.
21  Q  -- for that Belfour incident?
22  A  No, he just transferred me.
23  Q  18, we've talked about.
24       Anything else about your allegations
25  that we haven't covered that are important?

---

Page 220

1  A  No, sir.
2  Q  Pardon?
3  A  No, sir.
4  Q  Is there one recording that is the smoking
5  gun that wins the case for you?  Hewitt had
6  one and pointed it out for us.  I'm just
7  wondering if you've got one.
8  A  I don't believe in smoking guns.  O.J.
9  Simpson was dead to rights, he got off.  So
10  to say that there's one allegation that's
11  more important than the other, no, I can't
12  say that.  I think they're all important in
13  itself.
14  Q  Okay.
15       MS. COREIL:
16          Do you have any recordings of Keith
17       Gremillion?
18       MR. ALEXANDER:
19          What's the question?
20       MR. CORRY:
21          Does he have any recordings of
22       Keith Gremillion?
23       MS. COREIL:
24          Just because Number 17, it says,
25       it's going to be provided on flash drive

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 221

1  and I don't know where that is.  Maybe
2  it's on one we have and just hasn't been
3  pointed out.
4  A  Yes.  I think that was when I actually went
5  and filed the investigation with Keith.
6  That's who I filed it with.  I don't know why
7  they don't have it.  I'll get with Stephen to
8  make sure y'all get it.  That's all of us --
9  that's me going to Keith's office and saying,
10  I'd like to file a complaint.  Against who?
11  The chief.  Okay.  Here's the format and
12  paperwork, and collected all the data in
13  order to get that done.
14      MR. CORRY:
15          And Chris, we're just going to
16      reserve our right if we have to come
17      back and explore any of that.
18      MR. ALEXANDER:
19          I understand.
20      MS. COREIL:
21          Is that the only one with
22      Gremillion?
23  A  I believe so.
24      MR. CORRY:
25          Let me just have one minute.  Take

Page 222

1  one minute, Chris, just sit tight.
2      MR. ALEXANDER:
3          Okay.
4      (SHORT BREAK TAKEN AT 2:52 P.M.)
5      MR. CORRY:
6          Chris, I don't have any follow-up
7      or any other questions.
8          EXAMINATION
9  BY MR. ALEXANDER:
10  Q  Okay.  I've just have one or two.
11      Scott, can you hear me?
12  A  Yes, sir.
13  Q  Okay.  Scott, let me ask you a question.  In
14  your recollection, what was the first action
15  that you took as a member of the Lafayette
16  Police Department, that you feel resulted in
17  the first act of retaliation against you?
18  A  It was in the handling of Jim's son's drug
19  case that I started getting assigned cases in
20  a higher manner.  They started dog piling
21  work on top of me.
22      Just to give an example.  During my
23  tenure with the Lafayette Metro Narcotics, I
24  was assigned to over 300 cases, where the
25  agent that shared the same office handled

Page 223

1  five.
2      Shortly after that, the Angelo incident.
3  I told on Angelo.  The next thing I know, I'm
4  working for Angelo and under investigation.
5      So I think between those two things
6  right there put me on Jim Craft's hit list,
7  because I didn't --
8  Q  Okay.  So you filed a complaint against
9  Angelo?
10  A  Yes, sir.
11  Q  And after that, you were assigned under him?
12  A  Yes, sir.  Shortly after that -- I say
13  shortly, it was about a year later, I was
14  transferred by Glen Dartez under Angelo's
15  command.
16  Q  What -- was he aware of the fact that you had
17  filed a complaint against him?
18  A  Yes, sir.  He was one of the few people that
19  I reported it to.  When I reported the Angelo
20  criminal acts, the first time, it was to Ted
21  Vincent, who was the supervisor of Internal
22  Affairs, nothing happened.  I reported it to
23  Glen Dartez, nothing happened.  And then, I
24  was called to the chief's office because he
25  had heard rumor that something happened.

Page 224

1      So when I explained it to the chief, he
2  said that if the allegations made against
3  Angelo were true and accurate, that there
4  would be a criminal investigation and he
5  would be arrested.  And he asked if I truly
6  wanted to go through with the investigation,
7  and I told him yes.
8      The investigation started, and I was --
9  I wasn't notified of the outcome, until
10  probably a year and a half later when Randy
11  Vincent brought me the disposition of the
12  case, which was, thank you for reporting it,
13  your claim has been sustained.  But by that
14  time, I had already been working for Angelo.
15  Q  Okay.  Is it unusual for a department member
16  who files a complaint, to wait 18 months to
17  find out the disposition?
18  A  Not that I'm aware of.  Usually -- the only
19  complaints I was familiar with were the ones
20  that were filed against me, and we found out
21  pretty quick.
22  Q  Right.
23      So I mean, in your experience --
24  (Interrupted)
25  A  Well, that notice, Chris, I think this may

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 225

1 better answer your question. That notice was
2 never intend to be given to me.
3    When Glen Dartez left the agency, Glen
4 Dartez had it in a file in his desk with a
5 bunch of other documents that were destined
6 to be shredded. When Randy found it, he gave
7 it to me because he had to go clean out Glen
8 Dartez' desk. So the letter, the notice had
9 already been sent through the departmental
10 mail system, but somehow it ended up with
11 Glen Dartez who was just sitting on it.
12    It was never intended to be given to me.
13 They were going to destroy it like they do
14 everything else.
15 Q  When you say "they were going to destroy it",
16 Scott, "like they do everything else", would
17 you elaborate on that?
18 A  Well, it was sitting in a pile of paperwork
19 that was destined to go be destroyed.
20 Without that notice being sent, there would
21 never be any kind of track, or anything back
22 to Craft, you know, with Craft knowing that,
23 hey, these allegations of a criminal nature
24 did occur, they've been proven that they
25 occurred, but yet, he handled an

Page 226

1 administrative action.
2    I think we need to notify the federal
3 prosecutor for this district to let them know
4 that they need to let Paul Green out of jail
5 because he did the same thing and is sitting
6 in prison for 20 years. But Angelo Iorio,
7 the chief's friend, apparently nothing
8 happens.
9    And after that point, I wouldn't go to
10 Internal Affairs for anything. I knew my
11 time was done when they launched their
12 investigation against me for the Ed McClean
13 document. So it was just a matter of time
14 before they fired me, so I felt no fear of
15 going file the complaint against Jim Craft
16 for the Duaine Belfour incident.
17 Q  Okay. Based upon your experience as an
18 officer of the Lafayette Police Department,
19 do you have confidence in the integrity of
20 the Internal Affairs department?
21 A  No. You file a complaint against the chief,
22 they assign U.J. Prevost, a corporal, to
23 investigate the chief of police. U.J.'s
24 position in Internal Affairs is at the
25 leisure of the chief of police. So how can

Page 227

1 you conduct an unbiased, fair investigation
2 against the person who is responsible for
3 your job?
4 Q  Right.
5    Where would you go within the Lafayette
6 Police Department if you had a serious
7 complaint, or a serious issue, and you wanted
8 to ensure that it was handled with integrity
9 and handled properly and fairly? Where would
10 you go?
11 A  Chris, I don't know. You'd go to an outside
12 attorney to try to get help because you see
13 the way things happened for me. You file a
14 complaint against Angelo, you work for
15 Angelo.
16 Q  Do you have any -- Mr. Corry has brought up
17 in a number of depositions the fact that the
18 civil service board has sustained this
19 complaint, or throughout this complaint and
20 did all of this. Do you have confidence in
21 the ability of the civil service board to
22 handle complaints and issues in a fair
23 manner, and in a timely manner?
24 A  No. I think it's been proven that they're
25 not going to handle anything in a timely

Page 228

1 manner. I've seen people sitting on appeals
2 for years on end.
3    And as far as any kind of oversight of
4 the administration, no. They refuse to hear
5 anything short of suspensions and
6 terminations.
7 Q  Okay. So if you had a complaint that you
8 appealed to the civil service board, would
9 you have confidence that it would be handled
10 properly and that you'd get a fair hearing
11 there?
12 A  Not with the makeup of Jason Boudreaux and
13 Guy Lebreton sitting on it.
14 Q  Let me take a quick look here.
15    Do you feel, Scott, that there is -- you
16 talked about the Iorio complaint, the first
17 act that you took that resulted in
18 retaliation.
19    Do you feel that there is a clear line
20 of sort of demarcation between the Scott
21 Poiencot prior to beginning to record, and
22 beginning to file complaints about what you
23 saw as wrongdoing, versus the Scott after you
24 began to do that and the way you were
25 treated?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 229

1 A   Absolutely.
2       Before Angelo, Jim Craft didn't even
3   know I existed inside the Lafayette Police
4   Department.  After that, that black cloud
5   stayed over me 24 hours a day, seven days a
6   week.  I was passed up from the training unit
7   because of it, for somebody with a lot less
8   experience and less qualifications as me.
9       Every time something turned around that
10  might benefit me in my career, Craft was
11  there to try to stop it.  If it wouldn't have
12  been for Norbert, I'd have been on the
13  patrol.  Norbert fought for me to become a
14  precinct investigator against the wishes of
15  Jim Craft.  He just-- he'd much rather me
16  just go away.  He knew that if I did see
17  something, I probably would report it.  But
18  at that particular point in time, who do you
19  report to?
20 Q   Right.
21      Now, let me ask you this, because Mr.
22  Corry asked you also about, as he has the
23  other people who were deposed, other clients.
24  Aren't there things in the Lafayette Police
25  Department, decisions that are made on a

Page 230

1   higher level than what you're aware of, or
2   have all the information of.  Do you remember
3   when he asked you that?
4 A   Yes, sir.
5 Q   Now, let me ask you a similar question.  You
6   know that's the case.  Is it -- I think it's
7   reasonable for you to expect to be treated
8   fairly on things that directly pertain to
9   you, and to be given adequate information and
10  just to be treated fairly.
11 A   Do I expect the administration to treat me
12  fairly even though they may be --
13 Q   Would you hope that in any police department,
14  even though there are decisions that are made
15  that are, you know, above your level, that
16  when it comes to issues that directly affect
17  you and your career, that you would have all
18  the information that you need to know and be
19  treated fairly?
20 A   Yes.
21 Q   Do you feel like you have been treated
22  fairly?
23 A   No.
24 Q   A few minutes ago, you had asked -- Mr. Corry
25  asked you why you were -- named him as a

Page 231

1   witness -- a possible witness in the case.
2       And I think you were responding, and you
3   answered regarding the TRO, and the
4   initiation of the complaint against you with
5   regard to the TRO.  Could you clarify that,
6   because I really didn't understand that?
7 A   Well, he's the one that initially came up and
8   gave -- and requested the investigation.  And
9   through the TRO, and that time that came
10  before it, there's been several cases where
11  he reported two different time frames as to
12  when this investigation actually started.
13  How are we going to find out when this
14  actually started if we can't ask him
15  officially when he decided to start his
16  investigation?
17      Because I feel as though the
18  consolidated government started investigating
19  me back in October of 2011, after I became a
20  civil service representative.
21      Mark Francis told Gabe that they were
22  investigating me, and that I needed to go
23  ahead and start rendering verdicts that
24  should be somewhat favorable to the man, and
25  can't butt heads with him all the time in

Page 232

1   order to maintain my position.  That started
2   as early as October.
3       So is he aware that this happened and
4   they started investigating in October?
5   Nobody really knows.
6 Q   Okay.  What kind of performance reviews,
7   prior to the time that you filed the
8   complaint against Iorio, which apparently set
9   in motion all of this, what kind of
10  performance reviews had you received from the
11  Lafayette Police Department?
12 A   I've always gotten somewhat above average
13  marks during performance evaluations.
14 Q   Okay.  So no major problems?
15 A   I've never been a major problem within the
16  Lafayette Police Department until I became a
17  civil service representative, according to
18  the LCG.
19 Q   Okay.
20      MR. ALEXANDER:
21          That's all I have.  Thank you.
22          RE-EXAMINATION
23 BY MR. CORRY:
24 Q   I've got a couple of follow-ups.
25      Were you involved in the cleaning up of

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Scott Poiencot
April 16, 2014

Page 233

1    Iorio's desk?

2  A  No.

3  Q  Randy Vincent did that?

4  A  No.

5  Q  Who did it?

6  A  I don't know who cleaned out Angelo Iorio's
7    desk.

8  Q  Okay.  Were you not treated fair in the
9    investigation that you were terminated on?

10 A  No.

11 Q  Why not?

12 A  Because I didn't do it.

13    How can you treat somebody fair and fire
14    them for something they didn't do?  I gave
15    you all the information I had in relation to
16    Ed McClean.  The final weekend, two days
17    before I go up for a predetermination hearing
18    to condemn me for all of these allegations
19    that they've made, A, B, C, D, E, F, G, X, Y
20    and Z, I was already fired.  Lafayette Police
21    Department spent a total of maybe 30 or 45
22    minutes conducting an interview with me to
23    find out what I knew.  I don't know how Ed
24    McClean's document got in the position that
25    it was in.  I don't know.

Page 234

1  Q  Well, you do know how it got -- (Interrupted)

2  A  I do now.

3  Q  No.

4    Well, you know how it got -- you know
5    how Greg Cormier got it.

6  A  According to you.  I can trust you, Mike?

7  Q  You know Greg Cormier came to you with a
8    document out of a personnel file.

9  A  I know he came to me with a file that's been
10    generated numerous times in the same fashion.

11 Q  Okay.

12    MR. CORRY:

13    What do you want to do about the
14    reading and signing, Chris?

15    MR. ALEXANDER:

16    We're going to read and sign.

17    MR. CORRY:

18    All right.  That's all I've got.

19    MR. ALEXANDER:

20    Thank you for your time today.

21    Scott, call me in a bit.

22    (DEPOSITION CONCLUDED AT 3:05 P.M.)

23

24

25

Page 235

1         CERTIFICATE.

2

3         This certification is valid only for a
4    transcript accompanied by my original signature
     and original required seal on this page.

5

6         I, Debbie G. Chaney, Certified Court
     Reporter, in and for the State of Louisiana, as
7    the officer before whom this testimony was taken,
     do hereby certify that SCOTT POIENCOT, after
8    having been duly sworn by me upon authority of
     R.S. 37:2554, did testify as hereinbefore set
9    forth in the foregoing two hundred thirty-four
     (234) pages; that this testimony was reported by
10   me in the stenotype reporting method, was prepared
     and transcribed by me or under my personal
11   supervision, and is a true and correct transcript
     to the best of my ability and understanding; that
12   the transcript has been prepared in compliance
     with transcript format guidelines required by
13   statute or by rules of the board, as described on
     the website of the board; that I have acted in
14   compliance with the prohibition on contractual
     relationships, as defined by Louisiana Code of
15   Civil Procedure Article 1434 and in rules and
     advisory opinions of the board; that I am not
16   related to counsel or the parties herein, nor am I
     otherwise interested in the outcome of this
     matter.

17

18   This the 13th day of May, 2014, at LAFAYETTE,
19   LOUISIANA.

20

21

22        DEBBIE GIDDINGS CHANEY, CCR
          LOUISIANA CERTIFICATION NO. 90023

23

24

25



_____ POLICE DEPARTMENT _____

TEL: (337) 291-8600
900 E. UNIVERSITY AVE.
P. O. BOX 4308
LAFAYETTE, LOUISIANA 70502

September 12, 2012

Corporal Scott Poiencot (3120-1795)
Lafayette Police Department
900 E. University Ave
Lafayette, LA  70503

Corporal Poiencot:

An Internal Affairs investigation (AD2012–007) was completed regarding an allegation of employee misconduct in reference to official, confidential, interoffice communication originating in the Internal Affairs Unit being copied and/or removed from the Lafayette Police Department (LPD) and given to a local attorney without appropriate permission or authorization.  Additionally, during the course of this investigation, confidential information contained in Shift-Level investigation (SL 2011-028) was published in a federal lawsuit signed and verified by you.  Furthermore, a public website created for and/or on behalf of you was launched on the Internet.

A pre-disciplinary hearing was held on September 7, 2012 wherein you declined to provide a statement. Your attorney, Stephen Spring entered a statement on your behalf in which he denied all allegations.

The Internal Affairs investigation report indicated that you admitted that you were in possession of the subject document which had been taken from a Shift Level investigation (SL2011-028). All identifying information contained in said document had been redacted except for the LPD Internal Affairs Sergeant's signature. You admitted that you received the document from Lieutenant Greg Cormier. The altered document or a copy thereof was provided to a local attorney who represented a LPD officer in a Municipal Fire and Police Civil Service appeal hearing. Subsequently, the attorney used the document as an exhibit in a legal brief which was presented before the Municipal Fire and Police Civil Service Board. Although you asserted that you were provided with the document because of contradictions perceived regarding the policies and procedures followed in the past, at no time did you attempt to discuss your concerns about the subject document with your superior officers, nor did you file a formal grievance or request the Municipal Fire and Police Civil Service Board to engage in a formal public discussion regarding the matter.

You engaged in several conversations with Captain Ted Vincent which you clandestinely recorded, as the investigators learned from the television station KATC. The conversation included among other things, a discussion about the subject document. You were served with a direct order on July 3, 2012 to produce a copy of the recording by July 7, 2012. You failed to comply with the order. However, on July 13, 2012, your attorney, Stephen Spring produced a compact disc which contained two conversations between yourself and Captain Vincent. You also refused to cooperate with the directive to complete a polygraph examination. Additionally, you failed to report the misconduct of Lt. Cormier who copied and released the subject document. You were obligated by departmental policy to report Lt. Cormier's misconduct.



EXHIBIT

6

PENGAD 800-631-6989

I have sustained the complaint of employee misconduct. Your recent actions were deemed to constitute violation of the following:

## LAFAYETTE CONSOLIDATED GOVERNMENT POLICY AND PROCEDURES

### PPM: 2161-2:  Conditions of Employment

**2.      Prohibitions**

2.7       "Unauthorized removal or use of any official correspondence, record, computer file, e-mail or report from any LCG building, office or file."

## LAFAYETTE POLICE DEPARTMENT GENERAL ORDERS:

### G.O. 201.2 PROFESSIONAL CONDUCT AND RESPONSIBILITIES

**Professional Conduct**

J.        "Employees shall not perform any actions which disrupt the performance of official duties or which tend to interfere with reasonable supervision and discipline."

**Responsibilities**

C.        "Employees shall abide by all Federal, State, and Local Ordinances, as well as, LCG PPM's, Department Written Directives, General Orders, Standard Operating Procedures, and rules of the Civil Service Board."

**Attention to Duty**

C.        "Employees, whether on or off duty, shall follow the ordinary and reasonable rules of good conduct and behavior. They shall not commit any act in an official or private capacity that would bring reproach, discredit, or embarrassment to their profession, the Department, or which could constitute conduct unbecoming by an employee. Employees shall follow established procedures in carrying out their duties, and shall at all times use sound judgment."

**Reporting to Supervisor**

A.        "Every employee shall seek to protect the integrity of the Department."

### G. O. 204.5 DEPARTMENTAL DISCIPLINE

**Category 3 Offenses**

3:8       **Confidentiality**

          "All departmental business is to be considered confidential and no employee shall release any information to any non-law enforcement entity without proper authorization. No employee shall make known to anyone a proposed action of the Department or the details of any police action/operation."

### G. O. 301.9 INTERNAL INVESTIGATION, RESPONSIBILITY OF DEPARTMENT PERSONNEL TO COOPERATE

**Confidentiality Policy**

A.        "The Internal Affairs Section shall be responsible for recording, registering, supervising, and controlling all records, reports, documents, information and items that are part of an Internal Affairs investigation. Information or copies of internal investigations shall not be furnished to anyone without permission from the

Cpl. Scott Poiencot                                                                                     page 3                          9-12-2012

Chief of Police.  Internal investigations will be kept in the secure confines of the Internal Affairs Section with only employees of the Section having access to the files unless otherwise directed by the Chief of Police. (CALEA – 52.1.2)"

B.    **Responsibilities of Employees**

1.    "Employees having knowledge of misconduct shall immediately report such information to the appropriate entity in accordance with this General Order. Employees having knowledge of misconduct will be held accountable if they fail to report the matter and/or take appropriate action."

2.    "During an administrative investigation, employees shall truthfully answer all questions asked by investigators. Failure to comply shall result in disciplinary action."

3.    "Employees under investigation shall submit to the following conditions if deemed necessary and relevant to the investigation. Whenever an employee is ordered to submit to any of the following conditions, the information gained cannot be used against the employee in any subsequent criminal proceedings, but may be used against the employee in and administrative or disciplinary action up to and including termination: (CALEA – 52.2.6 a, b, c, d, and e)

   d. Submit to a polygraph and/or C.V.S.A. examination. The results of a polygraph or C.V.S.A. examination shall not be the sole determining factor in administrative investigations."

I also reference the **Louisiana Municipal Fire and Police Civil Service Rules: LA. R. S. 33:2500: Corrective and Disciplinary Action for Maintaining Standards of Service:**

A.    "The tenure of persons who have been regularly and permanently inducted into positions of the classified service shall be during good behavior. However, the appointing authority may remove any employee from the service, or take such disciplinary action as the circumstances warrant in the manner provided below for any one of the following reasons"

   3. "The commission or omission of any act to the prejudice of the departmental service or contrary to public interest or policy."

As an employee of the Lafayette Police Department, your actions reflect upon the reputation and image of the organization and our community, at all times whether on or off duty. You must understand that as public servants we are hired to provide and/or perform services in an efficient and professional manner for the citizens, which we serve. Your recent actions have caused embarrassment and projected a negative image upon the reputation and integrity of the Lafayette Police Department and our Officers. This level of performance is unacceptable, as it is counterproductive to the mission of the Lafayette Police Department which is an integral part of the Lafayette Consolidated Government.

I would be remiss in my duties, as the Police Chief, to uphold the accountability and integrity of the Lafayette Police Department and our Officers, if I did not administer disciplinary action. Due to the seriousness of your recent actions, I find it in the best interest of the Lafayette Police Department and the Lafayette Consolidated Government to terminate your employment. This letter is your *official notification* that **your employment with the Lafayette Police Department is terminated effective September 12, 2012.** As you are aware, the Municipal Fire and Police Civil Service Rules provide you a right to appeal this action. If you wish to appeal, you must submit a written request to the Fire and Police Civil Service office within fifteen (15) days.

**Jim Craft**
**Police Chief**

C: City-Parish President, L. J. Durel, Jr.
   Chief Administrative Officer, Dee Stanley
   Chairman, Municipal Fire and Police Civil Service Board
   State Examiner, Municipal Fire and Police Civil Service Board
   Secretary, Municipal Fire and Police Civil Service Board
   Human Resources

Personnel Office Review
as to form and procedure
(PZ)                        09/12/12
                            Date

## *ACKNOWLEDGMENT RECEIPT OF DISCIPLINARY ACTION*

I acknowledge receipt of a letter of termination which includes details of the infraction(s) which resulted in this action. I also acknowledge I am aware the Fire-Police Civil Service requirements stipulate a request for an Appeal of this disciplinary action must be filed with the Fire-Police Civil Service Office within fifteen (15) days.


_SENT TO ATTORNEY  7/12/12_
Employee Signature               Date
Print Name:


Supervisor:


_[signature]  9·12·2012_
Signature               Date
Print Name:



LAFAYETTE
CONSOLIDATED
GOVERNMENT

_____ POLICE DEPARTMENT_____

TEL: (337) 291-8600
900 E. UNIVERSITY AVE.
P. O. BOX 4308
LAFAYETTE, LOUISIANA 70502

September 12, 2012

Corporal Scott Poiencot (3120-1795)
Lafayette Police Department
900 E. University Ave
Lafayette, LA  70503

Corporal Poiencot:

An Internal Affairs investigation (AD2012–010) was completed regarding an allegation of employee misconduct in reference to an unauthorized investigation whereby Lt. Gabe Thompson gathered information from Major George Alfred by recording a conversation with him without his knowledge. At no time was Major Alfred advised of his Miranda or Police Officer Bill of Rights; nor did he receive a Notice of Investigation. The recorder Lt. Thompson used was owned by you and he submitted the recorder back to you after he concluded the conversation with Major Alfred. The recording was used in an attempt to obtain a Temporary Restraining Order. The recording was also released to the media without Major Alfred's or the Lafayette Police Department's knowledge and/or authorization.

A pre-disciplinary hearing was held on September 7, 2012 wherein you declined to provide a statement. Your attorney, Stephen Spring entered a statement on your behalf in which he denied all allegations.

The investigation report noted that you did not report the recording to Internal Affairs. Rather, you admitted that you gave your hard drive and disc to your Attorney Stephen Spring, and it was a possibility that you gave it to other people. You also failed to report the actions of Lt. Thompson to his Superiors.

I have sustained the complaint of employee misconduct. Your recent actions were deemed to constitute violation of the following:

**LAFAYETTE CONSOLIDATED GOVERNMENT POLICY AND PROCEDURES**

## PPM: 2161-2:  Conditions of Employment

1.      **Requirements**

1.20     "To cooperate and assist in any work-related administrative investigation and to answer any related questions completely and truthfully."

2.      **Prohibitions**

2.17     "Conducting personal business during duty hours."

EXHIBIT

7

PENGAD 800-631-6989

2.19    "Sleeping, loitering, loafing, visiting, wasting time or inattention to work while on duty."

2.28    "Conduct deemed unbecoming of an employee of the LCG in dealing with fellow employees, supervisors and superiors, and/or members of the public."

### PPM 1200-2 – Public Statements / News Releases

#### Procedure

1. "Any employee who is requested or required to make a public presentation about a matter pertaining to LCG business shall first discuss the content and form of the presentation with the Departmental Director."

### LAFAYETTE POLICE DEPARTMENT GENERAL ORDERS:

### G.O. 201.2 PROFESSIONAL CONDUCT AND RESPONSIBILITIES

#### Professional Conduct

A.  "Employees shall practice professionalism, loyalty, cooperation, assistance, and courtesy toward other employees and the public."

I.  "Employees shall not criticize or ridicule the Department or its policies, LCG officials, or other employees by speech, writing, email, MDT transmissions, police radio, or other expressions. This includes, but is not limited to, expressions which are defamatory, obscene, unlawful, undermines the effectiveness of the Department, interferes with the maintenance of discipline, or is made with reckless disregard for the truth and/or malice."

J.  "Employees shall not perform any actions which disrupt the performance of official duties or which tend to interfere with reasonable supervision and discipline."

#### Responsibilities

C.  "Employees shall abide by all Federal, State, and Local Ordinances, as well as, LCG PPM's, Department Written Directives, General Orders, Standard Operating Procedures, and rules of the Civil Service Board."

#### Attention to Duty

B.  "All employees, within the scope of their responsibilities, shall abide by LCG Policies and Procedures, in addition to all Lafayette Police Department Written Directives. Employees shall report any violation to their immediate supervisors without delay. When possible, they will actively prevent such violations or interrupt/intervene as necessary to ensure professional and proficient operations."

C.  "Employees, whether on or off duty, shall follow the ordinary and reasonable rules of good conduct and behavior. They shall not commit any act in an official or private capacity that would bring reproach, discredit, or embarrassment to their profession, the Department, or which could constitute conduct unbecoming by an employee. Employees shall follow established procedures in carrying out their duties, and shall at all times use sound judgment."

F.  "Employees shall not knowingly make false or untrue statements – written or verbally."

#### Cooperation with Fellow Employees and Agencies

A.  "Employees shall treat other employees of the Department with respect. They shall be courteous, civil and respectful of their superior officers, other employees, and shall not use threatening, intimidating, or insulting language."

Cpl. Scott Poiencot

page 3                    9-12-2012

## Reporting to Supervisors

A. "Every employee shall seek to protect the integrity of the Department."

B. "Employees shall immediately report to their supervisor(s) knowledge of any unusual activity, situations, or issues which involve the duty of the Department to uphold the law, keep the peace or protect lives and property."

## G. O. 204.5 DEPARTMENTAL DISCIPLINE

### 1.11 Conduct Unbecoming an Officer

"Employees whether on or off duty shall follow the ordinary and reasonable rules of good conduct and behavior. They shall not commit any act in an official or private capacity that would bring reproach, discredit, or embarrassment to their profession, the Department, or which could constitute conduct unbecoming by an employee. Employees shall follow established procedures in carrying out their duties, and shall at all times use sound judgment."

### 3.0 Category 3 Offenses

Disciplinary code, or Written Directives which could threaten the integrity of the Department, pose a danger or threat to the public or members of the Department, and/or have criminal consequences. The Internal Affairs Unit shall investigate all violations inclusive of this section. Although not every offense classified as Category 3 Offense is listed, discretionary use of additional offenses may be subject to this specific category."

### 3.6 Independent Investigations

3.6.1   "Employees shall immediately report to their supervisor knowledge of any unusual activity, situations, or problems which involve the duty of the Department to uphold the law, keep the peace, or protect lives and property."

### 3.8   Confidentiality

"All departmental business is to be considered confidential and no employee shall release any information to any non-law enforcement entity without proper authorization. No employee shall make known to anyone a proposed action of the Department or the details of any police action/operation."

### 3.23   Truthfulness

"Employees shall not knowingly make false or untrue statements."

## G. O. 301.9 INTERNAL INVESTIGATION, RESPONSIBILITY OF DEPARTMENT PERSONNEL TO COOPERATE

### Receiving Complaints

A. "The Lafayette Police Department shall investigate all written and/or verbal allegations of employee misconduct, whether from an internal or external source and may conduct an investigation into the complaints received. The Chief of Police shall be notified when any complaint is made involving departmental employees."

C. Internal Complaints

1. "Internal complaints shall be those allegations made by an employee directed at specific misconduct on the part of another employee."

2. "An employee of the Department who had knowledge of any act or information of any misconduct on the part of

Cpl. Scott Poiencot

another employee shall immediately bring it to the attention of their supervisor. If the act or violation involves the reporting employee's supervisor, the information shall be related to the next level in their chain of command."

3. "If for any reason the employee feels it necessary, the employees shall be permitted to file a complaint or request the inquiry directly to the Internal Affairs Section without going through their chain of command. The reporting of information regarding possible employee misconduct directly to the Internal Affairs Section shall not constitute a violation of the chain of command regulations."

## Procedure for Filing Complaints Against Employees

A. "When a complaint is filed against an employee of the Department, the complaint shall proceed through the chain of command, (with the exception of C. Internal Complaints, part 3 above). The Allegation of Misconduct Form will be utilized to record the basic information relative to any allegation of misconduct.

3. "The Allegation of Employee Misconduct Form shall be completed whether the allegation is received in person, by telephone, at some other location, or by any other means."

## B. Completion of the Form

3. "The supervisor completing the Allegation of Employee Misconduct Form shall advise the reporting party that an investigation shall be conducted as determined by the Chief of Police or his designee. The reporting party shall be notified in writing upon the completion of the investigation and the adjudication of the results, by the Chief of Police or his designee."

## Classification of Complaints

B. "The Chief of Police or his designee shall determine if employee misconduct allegations are to be handled by the Internal Affairs Section or at some lower level."

D. "Supervisory and/or command employees who are advised of misconduct involving any criminal offense (felony or misdemeanor) or administrative infractions that could result in an employee receiving disciplinary action shall immediately notify the appropriate Division Commander or the Internal Affairs Section. The Chief of Police shall be notified."

## Internal Investigation Policy

A. "The Chief of Police or respective Division Commander (in emergency/exceptional situations) may direct the Internal Affairs Section or other departmental employee, the responsibility of investigating complaints made against employees. The investigator shall make a thorough, complete, and objective investigation of the allegations of misconduct."

D. "The Internal Affairs Section shall be responsible for recording, registering, supervising, and controlling the investigations of complaints against employees and in ferreting out evidence of corruption within the Department."

## Divisional Level Investigations

E. "Upon being assigned to investigate a complaint, the Shift Captain or Section Head will then conduct an in-person conference with the employee(s) named in the complaint. The employee is entitled to receive written notice of the investigation. The employee shall be read his/her Police Officer's Bill of Rights; it shall be reviewed and signed by the employee and two witnesses."

G. "In the event that the employee chooses to elect to appear with legal representation, the interview shall take place on a scheduled prescribed date and time of appearance."

J. "The Facts and circumstances involved in an allegation of employee misconduct shall be considered confidential and shall not be discussed with anyone other than the respective Division Commander. Any other conversations with regard to an allegation shall be confined to those discussions necessary to interview witnesses or accused officers. Violations of the confidentiality requirement shall result in disciplinary action."

## Rights and Responsibilities of Employees

B.        Responsibility of Employees

1. "Employees having knowledge of misconduct shall immediately report such information to the appropriate entity in accordance with this General Order. Employees having knowledge of misconduct will be held accountable if they fail to report the matter and/or take appropriate action."

2. "During an administrative investigation, employees shall truthfully answer all questions asked by investigators. Failure to comply shall result in disciplinary action."

## Confidentiality Policy

A. "The Internal Affairs Section shall be responsible for recording, registering, supervising, and controlling all records, reports, documents, information and items that are part of an Internal Affairs investigation. Information or copies of internal investigations shall not be furnished to anyone without permission from the Chief of Police. Internal investigations will be kept in the secure confines of the Internal Affairs Section with only employees of the Section having access to files unless otherwise directed by the Chief of Police."

## G.O. 305.1 Public Information & Media Relations

## Public Information Office

A. "All request for information from the news media, as well as from the public, shall be channeled through the Public Information Office. This office will be responsible for daily dissemination of information to the news media."

B. "Except as specified in this Order, no one shall be authorized to release information to the news media."

## Personnel Authorized to Release Information

A. "Chief of Police – The Chief of Police may release information to the news media at any time and shall approve any news releases prepared by the Public Affairs Unit. In the absence of the Chief of Police, his designee shall approve the news release and any other information deemed necessary. The Public Affairs Unit shall be notified of any information released by the Chief of Police to the news media."

B. "Public Affairs Unit – Officers assigned to the Public Affairs Unit should prepare news releases when appropriate and provide all other information to the news media. Formal news releases shall be recorded on equipment maintained in the Public Affairs Unit and available via telephone to all members of the news media. Upon release of any information, measures shall be taken to ensure equal access of information to all interested members of the news media. An officer assigned to this Unit shall be on twenty-four (24) hour call."

## Guidelines for the Release of Information

## B. The following information shall not be released to the media:

1. "The existence of contents of any statement, admission of guilt, or confession."

2. "Any personal opinion, unsubstantiated fact or rumor concerning any evidence, suspect, crime, event or situation."

Cpl. Scott Poiencot

page 6                    9-12-2012

**Confidential Investigations**

A. "Media requests for information pertaining to Internal Affairs Investigation shall be directed to the Chief of Police."

**G.O. 600.3 Security of Police Investigation Reports**

**Procedures**

A. "Employees shall not give/issue copies of police investigatory reports to any attorney, his representative, or private individual. No employee shall convey either verbally, by method of email, by method of electronic document, or in writing any information contained in any police investigatory report(s). This procedure shall not prohibit the release of reports or information that is authorized by law."

B. "Information requested by the media concerning any investigation or incident shall only be provided to the requesting party by authorized Departmental employees. Release of information to the media shall also conform to the regulation and policies as set forth in General Order 305.1."

I also reference the **Louisiana Municipal Fire and Police Civil Service Rules: LA. R. S. 33:2500: Corrective and Disciplinary Action for Maintaining Standards of Service:**

A. The tenure of persons who have been regularly and permanently inducted into positions of the classified service shall be during good behavior. However, the appointing authority may remove any employee from the service, or take such disciplinary action as the circumstances warrant in the manner provided below for any one of the following reasons"

    3. "The commission or omission of any act to the prejudice of the departmental service or contrary to public interest or policy."

As an employee of the Lafayette Police Department, your actions reflect upon the reputation and image of the organization and our community, at all times whether on or off duty. You must understand that as public servants we are hired to provide and/or perform services in an efficient and professional manner for the citizens, whom we serve. Your recent behavior demonstrated a lack of respect for your superior officers and the Lafayette Police Department. Your actions have shown deliberate and willful failure to comply with and abide by the Lafayette Police Department General Orders. You have not exhibited the professionalism expected of an officer with the Lafayette Police Department. Your actions have diminished the level of your trustworthiness and integrity. This level of performance is unacceptable, as it is counterproductive to the mission of the Lafayette Police Department and the Lafayette Consolidated Government.

I would be remiss in my duties, as the Police Chief, to uphold the accountability and integrity of the Lafayette Police Department and our Officers, if I did not administer disciplinary action. Due to the seriousness of your recent actions, I find it in the best interest of the Lafayette Police Department and the Lafayette Consolidated Government to terminate your employment. This letter is your *official notification* that **your employment with the Lafayette Police Department is terminated effective September 12, 2012**. As you are aware, the Municipal Fire and Police Civil Service Rules provide you a right to appeal this action. If you wish to appeal, you must submit a written request to the Fire and Police Civil Service office within fifteen (15) days.

Jim Craft
Police Chief

C: City-Parish President, L. J. Durel, Jr.
   Chief Administrative Officer, Dee Stanley
   Chairman, Municipal Fire and Police Civil Service Board
   State Examiner, Municipal Fire and Police Civil Service Board
   Secretary, Municipal Fire and Police Civil Service Board
   Human Resources

Personnel Office Review
as to form and procedure

PR

09/12/12
Date

## *ACKNOWLEDGMENT RECEIPT OF DISCIPLINARY ACTION*

I acknowledge receipt of a letter of termination which includes details of the infraction(s) which resulted in this action. I also acknowledge I am aware the Fire-Police Civil Service requirements stipulate a request for an Appeal of this disciplinary action must be filed with the Fire-Police Civil Service Office within fifteen (15) days.


*SENT TO ATTORNEY   9/12/12*
_____
Employee Signature          Date
Print Name:


Supervisor:


*George J. Alfred   9/12/2012*
_____
Signature                   Date
Print Name:  George J. Alfred



_____ POLICE DEPARTMENT_____

TEL: (337) 291-8600
900 E. UNIVERSITY AVE.
P. O. BOX 4308
LAFAYETTE, LOUISIANA 70502

September 12, 2012

Corporal Scott Poiencot (3120-1795)
Lafayette Police Department
900 E. University Ave
Lafayette, LA 70503

Corporal Poiencot:

An Internal Affairs investigation (AD2012–012) was completed regarding an allegation of employee misconduct in reference to insubordination as a result of your failure to comply with the directive to complete a polygraph examination as a part of an Internal Affairs investigation, reference (AD2012-007). You were scheduled to complete the polygraph examination on July 12, 2012. Several hours after being notified of the date of your scheduled polygraph examination, you notified your supervisor that you would be out of work with an 'undetermined medical issue'. Upon your return to duty on July 13, 2012, you were ordered to appear in the Internal Affairs office for the purpose of a polygraph examination. Although you did meet with the Polygraph Examiner, you advised him that you refused to grant him permission to conduct the polygraph examination, and exited the room.

A pre-disciplinary hearing was held on September 7, 2012 wherein you declined to provide a statement. Your attorney, Stephen Spring entered a statement on your behalf in which he denied all allegations.

I have sustained the complaint of employee misconduct. Your recent actions were deemed to constitute violation of the following:

## LAFAYETTE CONSOLIDATED GOVERNMENT POLICY AND PROCEDURES

### PPM: 2161-2:  Conditions of Employment

**1.**    **Requirements**

1.18    "To follow instructions of your supervisor and perform tasks as directed. If you consider an order improper or unjust, perform the task and request permission to bring the matter to your supervisor's superior, unless the task would clearly jeopardize your health and safety, or violate policy. In such a case, talk it over with your supervisor immediately. If the task is clearly unsafe or overly dangerous, you have the right to demand that your supervisor contact the Safety Officer for an on-site consultation. Failure to obey instructions is a serious offense; therefore, you may be asked to state your reasons in writing."

**EXHIBIT**
**8**

1.20    "To cooperate and assist in any work-related administrative investigation and to answer any related questions completely and truthfully."

## 2.    Prohibitions

2.9    "Insubordination resulting from refusing or failing to comply with a lawful directive given by a supervisor or superior. Depending upon the facts and circumstances of the insubordination, the actions of the employee may be deemed to be so extreme, outrageous, and unacceptable so as to constitute 'gross insubordination' and a major offense as defined under Section 3.2 of this PPM."

2.24    "Failure to comply with applicable Civil Service rules and LCG policies and procedures."

## 3.    Classification of Offenses

3.2    **Major offenses** are those willful or deliberate violations that exceed those considered correctable by progressive, corrective disciplinary action and which may result in immediate discharge without consideration of employment history or past performance. Major offenses include the following:

   d. Gross insubordination, consisting of a repeated refusal or failure to comply with a lawful directive given by a supervisor or superior after having been warned of the potential consequences of such actions (Section 1.18, 2.4,and 2.9 of this PPM)."

## LAFAYETTE POLICE DEPARTMENT GENERAL ORDERS:

## G.O. 201.2 PROFESSIONAL CONDUCT AND RESPONSIBILITIES

## Responsibilities

C.    "Employees shall abide by all Federal, State, and Local Ordinances, as well as, LCG PPM's, Department Written Directives, General Orders, Standard Operating Procedures, and rules of the Civil Service Board."

## G. O. 204.5 DEPARTMENTAL DISCIPLINE

## Category 3 Offenses

3:17    "Employees of the Department are required to obey any Standing Order or General Order, abide by all policies and procedures and promptly carry out any order relayed from a supervisor by an employee of the same or lesser rank, whether issued verbally, in writing, or be telecommunications (2-way radio, phone, fax, digital communications). Employees shall obey lawful order(s) of a superior. Upon receipt of a conflicting order, the employee receiving the order shall tell the supervisor issuing the second order of this fact. If then directed, the employee shall obey the second order. Upon receipt of a perceived unjust or improper order, the receiving employee shall obey the order to the best of his ability within the limits of the law, and then report the order through the proper chain of command. No employee shall obey an order that is contrary to Federal, State, or City Law."

3.18    "Employee shall promptly obey all lawful orders and directions given by supervisors. The failure or deliberate refusal of employees to obey such orders shall be deemed insubordination and is prohibited. Flaunting the authority of a superior officer by displaying obvious disrespect or by disputing his orders shall likewise be deemed insubordination."

## G. O. 301.9 INTERNAL INVESTIGATION, RESPONSIBILITY OF DEPARTMENT PERSONNEL TO COOPERATE

### Internal Investigation Policy

H. "Every employee of the Department shall cooperate in all internal investigations. When directed by a competent authority to make a statement or furnish material relevant to a departmental investigation, employees shall comply. Employees shall submit to a polygraph and/or C.V.S.A. examination when ordered to do so by the Chief of Police. Any employee who fails to cooperate or interferes with an internal investigation shall be subject to disciplinary action. Failure to submit to a polygraph or C.V.S.A. shall result in termination."

### Rights and Responsibilities of Employees

B.      Responsibilities of Employees

3.      "Employees under investigation shall submit to the following conditions if deemed necessary and relevant to the investigation. Whenever an employee is ordered to submit to any of the following conditions, the information gained cannot be used against the employee in any subsequent criminal proceedings, but may be used against the employee in and administrative or disciplinary action up to and including termination: (CALEA – 52.2.6 a, b, c, d, and e)

      d. Submit to a polygraph and/or C.V.S.A. examination. The results of a polygraph or C.V.S.A. examination shall not be the sole determining factor in administrative investigations."

### G.O. 301.10 Polygraph Examinations/Computerized Voice Stress Analysis (C.V.S.A.)

### Uses of Polygraph and C.V.S.A.

C. "Administrative investigations: Utilization of the polygraph or C.V.S.A. for administrative investigations will be determined by the Chief of Police. Employees shall submit to said examinations as per General Order 301.9. (CALEA - 52.2.6e)"

I also reference the **Louisiana Municipal Fire and Police Civil Service Rules: LA. R. S. 33:2500: Corrective and Disciplinary Action for Maintaining Standards of Service:**

A.      "The tenure of persons who have been regularly and permanently inducted into positions of the classified service shall be during good behavior. However, the appointing authority may remove any employee from the service, or take such disciplinary action as the circumstances warrant in the manner provided below for any one of the following reasons"

   3. "The commission or omission of any act to the prejudice of the departmental service or contrary to public interest or policy."

   4. "Insubordination."

As an employee of the Lafayette Police Department, your actions reflect upon the reputation and image of the organization and our community, at all times whether on or off duty. You must understand that as public servants we are hired to provide and/or perform services in an efficient and professional manner for the citizens, which we serve. Your recent behavior demonstrated a lack of respect for your superior officers and the Lafayette Police Department; as illustrated by your deliberate, willful and repeated failure to comply with and abide by the Lafayette Police Department General Orders. You have not exhibited the professionalism expected of an officer with the Lafayette Police Department. Your actions have diminished the level of your trustworthiness and integrity. This level of performance is unacceptable, as it is counterproductive to the mission of the Lafayette Police Department and the Lafayette Consolidated Government.

Cpl. Scott Poiencot

page 4                    9-12-2012

I would be remiss in my duties, as the Police Chief, to uphold the accountability and integrity of the Lafayette Police Department and our Officers, if I did not administer disciplinary action. Due to the seriousness of your recent actions, I find it in the best interest of the Lafayette Police Department and the Lafayette Consolidated Government to terminate your employment. This letter is your *official notification* that **your employment with the Lafayette Police Department is terminated effective September 12, 2012**. As you are aware, the Municipal Fire and Police Civil Service Rules provide you a right to appeal this action. If you wish to appeal, you must submit a written request to the Fire and Police Civil Service office within fifteen (15) days.


**Jim Craft**
**Police Chief**

C: City-Parish President, L. J. Durel, Jr.
   Chief Administrative Officer, Dee Stanley
   Chairman, Municipal Fire and Police Civil Service Board
   State Examiner, Municipal Fire and Police Civil Service Board
   Secretary, Municipal Fire and Police Civil Service Board
   Human Resources

Personnel Office Review
as to form and procedure
PZ                    09/12/12
Initials              Date

## *ACKNOWLEDGMENT RECEIPT OF DISCIPLINARY ACTION*

I acknowledge receipt of a letter of termination which includes details of the infractions which resulted in this action. I also acknowledge I am aware the Fire-Police Civil Service requirements stipulate a request for an Appeal of this disciplinary action must be filed with the Fire-Police Civil Service Office within fifteen (15) days.

*SENT TO ATTORNEY*          *7/12/12*
_____    _____
Employee Signature                         Date
Print Name:


Supervisor:


_____    _____
Signature                                          Date
Print Name: