# In The Matter Of:

*Kane Marceaux, et al vs.*

*Lafayette City-Parish Consolidated Government, et al*

---

*Greg Cormier*

*March 31, 2014*

---



LORI HEAPHY
&ASSOCIATES LLC
CERTIFIED COURT REPORTERS



EXHIBIT
E

*Min-U-Script® with Word Index*

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 1**

1       UNITED STATE DISTRICT COURT

2       WESTERN DISTRICT OF LOUISIANA

3       LAFAYETTE DIVISION

4    * * * * * * * * * * * * * * * *
     KANE MARCEAUX, GREG
5    CORMIER, SCOTT POIENCOT,
     NORBERT MYERS, GABE THOMPSON,        CIVIL ACTION NO:
6    NOVEY STELLY, ULETOM P. HEWITT,      6:12-CV-01532
     REGINA BRISCOE AND ALEETA
7    M. HARDING                           JUDGE HAIK, SR.
         VERSUS                           MAG. JUDGE HANNA
8    LAFAYETTE CITY-PARISH CONSOLIDATED
     GOVERNMENT; LAFAYETTE POLICE
9    DEPARTMENT THROUGH THE LAFAYETTE
     CITY-PARISH CONSOLIDATED GOVERNMENT;
10   LESTER JOSEPH "JOEY" DUREL, JR.
     IN HIS CAPACITY AS PRESIDENT OF
11   THE LAFAYETTE CITY-PARISH
     CONSOLIDATED GOVERNMENT; DEE
12   EDWARD STANLEY, INDIVIDUALLY AND
     IN HIS CAPACITY AS CHIEF ADMINISTRATIVE
13   OFFICER OF THE LAFAYETTE CITY-PARISH
     CONSOLIDATED GOVERNMENT; JAMES P.
14   "JIM" CRAFT, INDIVIDUALLY AND IN
     HIS CAPACITY AS CHIEF OF THE
15   LAFAYETTE POLICE DEPARTMENT, AND
     GEORGE "JACKIE" ALFRED, INDIVIDUALLY
16   AND IN HIS CAPACITY AS PATROL DIVISION
     COMMANDER OF THE LAFAYETTE
17   POLICE DEPARTMENT
     * * * * * * * * * * * * * * * *

18       The deposition of GREG CORMIER was taken in

19   the above-entitled cause, pursuant to the

20   following stipulations, before Debbie G. Chaney,

21   Certified Court Reporter, at The Law Offices of

22   Briney, Foret & Corry, 413 Travis Street, Suite

23   200, Lafayette, Louisiana, on the 31st day of

24   March, and 1st day of April, 2014, beginning at

25   10:28 a.m.

---

**Page 2**

1       A P P E A R A N C E S

2

3    MR. MICHAEL P. CORRY, ATTORNEY AT LAW
     MS. HALLIE P. CORELL, ATTORNEY AT LAW
4    BRINEY, FORET & CORRY
     413 Travis Street
5    Lafayette, Louisiana  70505
         REPRESENTING LAFAYETTE CITY-PARISH
6        CONSOLIDATED GOVERNMENT, DEE EDWARD STANLEY,
         INDIVIDUALLY, JAMES P. "JIM" CRAFT,
7        INDIVIDUALLY, AND GORGE "JACKIE" ALFRED,
         INDIVIDUALLY

8

9    MR. S. STEPHEN SPRING, ATTORNEY AT LAW
     SPRING & SPRING, LLC
10   733 East Airport Avenue, Suite 104
     Baton Rouge, Louisiana  70806
11       REPRESENTING PLAINTIFFS

12

     MR. J. CHRISTOPHER ALEXANDER, SR., ATTORNEY AT LAW
13   J. CHRISTOPHER ALEXANDER, SR., ESQ. LLC
     3751 Government Street, Suite A
14   Baton Rouge, Louisiana  70806
         REPRESENTING PLAINTIFFS
15   (Waived Appearance)

16

     ALSO PRESENT:

17

18   (3/31/14)  Mr. Gabe Thompson, Mr. Uletom Hewitt,
                Mr. Novey Stelly

19   (4/1/14)  Mr. Novey Stelly, Mr. Uletom Hewitt

20

21

22

23

24

25

---

**Page 3**

1    S T I P U L A T I O N S

2

3    It is stipulated and agreed by and between

4    counsel for the parties that the deposition of

5    GREG CORMIER, is hereby taken for discovery

6    purposes and all other purposes allowable under

7    the Federal Rules of Civil Procedure.

8

9    That the witness reserves the right to read and

10   sign the deposition;

11

12   That all formalities of sealing, certifying

13   and filing are waived.

14

15   That all objections, except those as to the

16   form of the question and the responsiveness of

17   the answer, are reserved until such time as this

18   deposition or any part thereof may be used or

19   sought to be used in evidence;

20

21   That, Debbie G. Chaney, Certified Court

22   Reporter officiated in administering the oath to

23   the above-mentioned witness.

24

25

---

**Page 4**

1        INDEX

2

3                                        Page
     Examination By Mr. Corry (3/31/14)     5

4    Examination By Mr. Corry (4/1/14)     217

5

6

7        EXHIBITS

8        Description

9    D-1    Letter of discipline           210

10   D-2    Administrative leave AS-2012-007  252

11   D-3    Termination notification       254

12   D-4    Transfer                       256

13

14

15

16

17

18

19

20

21

22

23

24

25

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 5

1      GREG CORMIER,
2  after being first duly sworn, was examined and
3  testified as follows:
4      THE WITNESS:
5      I do.
6      EXAMINATION (3/31/14)
7  BY MR. CORRY:
8  Q  Mr. Cormier, can you start off by giving us
9     your full name and address for the record,
10    please?
11 A  Gregory John Cormier, 553 Miller Road,
12    Opelousas, Louisiana 70570.
13 Q  You said Miller, M-i-l-l-e-r?
14 A  That's correct.
15 Q  Okay.  As you know, I'm Michael Corry.  I'm
16    here to take your deposition in connection
17    with the federal lawsuit that you and some
18    other officers have filed.
19    I'm sure you've been deposed previously.
20 A  Yes.
21 Q  How many times do you think you've been
22    deposed in your career?
23 A  I can't give you a figure.  Two or three,
24    maybe.
25 Q  Okay.  Just let me finish the question.  I

Page 6

1  think you were here -- if you need some
2  paper, I can get you a pad of paper.
3      You were here for some of the other
4  depositions.  Just let me just finish the
5  question.  I will allow you to respond before
6  I ask the next question.
7      Please respond out loud.  Make sure you
8  say yes or no, feel free to explain your
9  answer.  But we can't say uh-huh, uh-uh, or
10 nod our head, because the Court Reporter
11 sitting here is taking everything down and
12 she can't do that.
13     When we finish the deposition, you will
14 have the right to read and sign the
15 deposition.  If you choose to exercise that
16 right, you will have to get with the Court
17 Reporter, and she will make arrangements to
18 provide it to you to read and sign it.
19     MR. SPRING:
20     He wants to read and sign it.
21     MR. CORRY:
22     Okay.
23 MR. CORRY:
24 Q  If at any time you need to take a break, tell
25 me and we'll will be happy to take a break

Page 7

1  for you.
2      Like I did with the other officers, I'm
3  going to take you through some background,
4  some employment, education.  And then, we'll
5  go specifically to the documents.
6      MR. CORRY:
7      And before we started, for purposes
8  of the record, there was an initial set
9  of discovery that consisted of pages 1
10 through 139, that we Bates stamped, GC-1
11 through 139.
12     Then, there was a supplemental set
13 of documents that was produced to us at
14 one of the depositions, a binder was
15 left for us, and it goes 140 through
16 577.
17     And then, Friday, there was
18 supplemental responses that were
19 forwarded to us via e-mail, and we've
20 marked that GC-560 through GC-577.
21     Before we started, Mr. Cormier went
22 through the binder that I had produced
23 or put together for him to use during
24 this deposition, which consisted of all
25 three sets of his discovery responses.

Page 8

1      And near the area of GC-237, it's
2  his belief that his four-page, December
3  8th, 2010, transfer was somehow not
4  included in the binder, and a one-page,
5  April 29th, 2011.  So we will address
6  those documents.  I'll ask him questions
7  about them, and we can just attach them
8  at the end.
9      There were also a couple of sets of
10 additional documents that Mr. Cormier
11 felt were not in the binder.  And we'll
12 go through those and identify them.  And
13 we can attach those, or deal with them
14 at the appropriate time.
15 MR. CORRY:
16 Q  How long have you lived at the Miller
17    address, Mr. Cormier?
18 A  12 years.
19    THE WITNESS:
20    Before we go any further, what's
21 your name, ma'am?
22 MR. CORRY:
23 Hallie.
24 MS. COREIL:
25 Hallie Coreil.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 9

1 THE WITNESS:
2    Ms. Coreil.
3 A  And I know you, Mr. Corry.  I have a little
4    housecleaning before we go any further.
5       On February 17th, when Kane Marceaux
6    started his initial deposition, the 18th and
7    the 19th, there were officers with the
8    Lafayette Police Department that were armed
9    and outside of your door.  Can you tell me,
10   number one, why they were there, and who made
11   that decision for them to be there, and is
12   that normal protocol?
13 MR. CORRY:
14 Q  Well, first of all, this is a deposition and
15   I'm asking the questions.
16 A  I --
17 Q  So -- (Interrupted)
18 A  I need you to answer that.  Because, number
19   one, it was insulting and intimidating, for
20   number one.  And are they there now?
21 Q  There's nobody sitting in the lobby there.
22 A  There's a marked -- unmarked Dodge Charger
23   that's out there right now.
24 Q  You're sworn to answer my questions today.
25 A  I'm --

Page 10

1 Q  If you don't want to do that, tell me you
2    don't want to do it.
3 A  I'm quite aware of that, Mr. Corry --
4 Q  I'm not under oath, and I'm not answering
5    questions.
6       MR. CORRY:
7          So what do you want to do, Steve?
8       MR. SPRING:
9          What Michael is telling you is
10         correct.
11 A  All right.  Let's proceed.
12 MR. CORRY:
13 Q  How long have you lived at the Miller Road
14   address?
15 A  Approximately 12 years.
16 Q  Okay.  And who resides there with you?
17 A  My wife, Colette Cormier.
18 Q  Anyone else?
19 A  Son, Ian Cormier.
20 Q  How old is Ian?
21 A  17.
22 Q  And does your wife work outside the home?
23 A  Yes.
24 Q  Where?
25 A  AT&T.

Page 11

1 Q  Okay.  Anybody else reside there with you?
2 A  Yes.  A daughter.
3 Q  I'm sorry?
4 A  A daughter.
5 Q  What's her name and age?
6 A  Ciesley Cormier, ten.
7 Q  Okay.  Anybody else?
8 A  That's it.
9 Q  What is your date of birth?
10 A  10/5/66.
11 Q  How old does that make you?
12 A  47.
13 Q  And your driver's license number?
14 A  5239511.
15 Q  Has your license ever been suspended or
16   revoked for any reason?
17 A  No.
18 Q  And your Social?  And we'll just put the last
19   four digits on the record.
20 A  XXX-XX-2087.
21 Q  Okay.  Where did you reside prior to
22   Opelousas?
23 A  200 High Meadows Boulevard.
24 Q  Lafayette?
25 A  Apartment 235, Lafayette.

Page 12

1 Q  And how long were you there?
2 A  I can't give you an exact number.  I was
3    there twice.
4 Q  Are you originally from Lafayette Parish?
5 A  No.
6 Q  Where are you originally from?
7 A  St. Martin Parish.
8 Q  And how long have you been in Lafayette
9    Parish?
10 A  1986, I would say.
11 Q  Was that in conjunction with finishing high
12   school, I guess?
13 A  What?
14 Q  When you moved to Lafayette from St.
15   Martinville?
16 A  Yes.
17 Q  What year did you graduate from high school?
18 A  1984.
19 Q  St. Martinville High?
20 A  Yes.
21 Q  Are you on any prescription medication today?
22 A  Yes.
23 Q  What?
24 A  Exforge.
25 Q  I'm sorry?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 13

1  A   Exforge, E-x-f-o-r-g-e.
2  Q   And what is that for?
3  A   Blood pressure.
4  Q   Is that affecting your ability to hear and
5      understand and answer my questions?
6  A   No.
7  Q   Who prescribes that for you?
8  A   Dr. Alemany.
9  Q   Are you on any other medication?
10 A   No.
11 Q   How long have you been on this medication?
12 A   2013, sometime.
13 Q   Is that when you were diagnosed with high
14     blood pressure?
15 A   By who?
16 Q   Dr. Alemany.
17 A   Okay.  Yes.
18 Q   Have you ever taken prescription blood
19     pressure medication prior to the Exforge
20     prescribed by Dr. Alemany --
21 A   No.
22 Q   -- at any time in your life?
23 A   No.
24 Q   Has any health care provider diagnosed you
25     with any type of blood pressure issue, high

Page 14

1      blood pressure, anything in your life, prior
2      to Dr. Alemany?
3  A   You're talking about me personally, that I
4      saw, or --
5  Q   Yes, sir.
6  A   -- outside the realm of that?
7  Q   No.  Somebody that you saw.
8  A   No.
9  Q   Where is Dr. Alemany?
10 A   He has two offices.  His first name is a
11     Fernando.
12     One in Lafayette, and one in Opelousas.
13 Q   Do you see him at the Opelousas or Lafayette
14     address?
15 A   Opelousas.
16 Q   And how do you spell his last name?
17 A   Your guess is as good as mine.
18 Q   He is Spanish?
19 A   I don't know his ethnicity, Mr. Corry.
20 Q   And what type of doctor is he?
21 A   I guess general practitioner, I think.
22 Q   And what was the reason you went to see Dr.
23     Alemany?
24 A   Annual physical.
25 Q   Who was your family doctor prior to Dr.

Page 15

1      Alemany?
2  A   Patrick Moore.
3  Q   And where is he located?
4  A   Lafayette.
5  Q   Is he with a particular group?
6  A   Moore Health Group.
7  Q   Where is that located?
8  A   In Lafayette, off of Moss Street.  I can't
9      give you exact numericals.
10 Q   How long have you seen Dr. Alemany?
11 A   Since last year.
12 Q   2013?
13 A   Yes.
14 Q   Is there any particular reason you switched
15     from Moore to Dr. Alemany?
16 A   Out of convenience.
17 Q   How long had you seen Moore?
18 A   Since the latter part of 2012.
19 Q   And what did you go see Moore for?
20 A   Annual checkup.
21 Q   Is there a particular time of year you go for
22     your annual checkup?
23 A   The latter part of the year.
24 Q   How many times have you seen Moore?
25 A   I can't give you an exact amount, Mr. Corry.

Page 16

1      Probably once or twice a year, maybe.
2  Q   Okay.  You saw him -- and correct me if I'm
3      wrong.  I thought you told me the first time
4      you had been him was the latter part of 2012.
5  A   Uh-huh (yes).
6  Q   That's correct?
7  A   Yes.
8  Q   Okay.  And you've seen him once or twice
9      since then?
10 A   Yes.
11 Q   For what?
12 A   Follow up.
13 Q   Okay.  Was there a reason he told you that
14     you needed to come back?
15 A   Monitor my pressure, make sure it was at an
16     appropriate level.
17 Q   Monitor your what?
18 A   Blood pressure.
19 Q   Blood pressure.
20     Was there an issue that he was
21     addressing?
22 A   No.
23 Q   Do you have any other health conditions other
24     than high blood pressure?
25 A   No.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 17

1 Q  Who did you see prior to Dr. Moore as your
2    family doctor, or general practitioner?
3 A  No one in particular, other than Dr. Swan.
4    Periodically, I would see him.
5 Q  And who is Dr. Swan?
6 A  I guess he's a general practitioner here in
7    Lafayette.
8 Q  Was the reason you saw Dr. Swan in connection
9    with your employment with the Lafayette
10   Police Department, or was it separate, on
11   your own?
12 A  Employment with the Lafayette Police
13   Department.
14 Q  Were you required to get an annual physical
15   with Swan?
16 A  No.
17 Q  When did you start getting annual physicals?
18 A  I guess after 2012, when the issue of a
19   racing heart beat came up.
20 Q  And what issue is that you're referring to?
21 A  I guess when I was diagnosed with a racing
22   heart beat by Chief Jim Craft, Joey Provost
23   and Dwayne Prejean.
24 Q  Do you remember the date of that?
25 A  I guess it would be the date of my -- the

---

Page 18

1    initial polygraph that I was scheduled to go
2    in.  Let me refer to my notes to get an exact
3    date.
4 Q  And it might be -- well, it will be -- I
5    mean, you're welcome to look at your notes.
6       MR. CORRY:
7          Steve, but for the record, I've got
8       these Bates stamped.
9 MR. CORRY:
10 Q  So I need you to find it in here so we can
11   identify it for the record.  Because we're
12   not going to be able to identify it just out
13   of your book.
14      Like I said, this should be in the same
15   order as your binder.
16 A  Should.  That's the key word.
17   8/14/12.
18      MR. SPRING:
19         What's the page number on that?
20      THE WITNESS:
21         Page number is GC-391.
22      MR. SPRING:
23         Thank you.
24 MR. CORRY:
25 Q  And what is that you're referring to?

---

Page 19

1 A  I'm referring to the polygraph examination
2    unit consent to be polygraphed.
3 Q  Is that a one-page document or two?
4 A  It's one page.
5 Q  One page.  Okay.  GC-391.  All right.
6       So at that point, you -- you can leave
7    it open, because we're going to be referring
8    to it a bunch.
9       At that point, you felt it necessary to
10   seek the services of a health care provider,
11   a health care professional?
12 A  No, not really.  The reason I went there was,
13   you know, pretty much dispute what they were
14   claiming.
15 Q  And that's Dr. Swan that you went to?
16 A  Initially, yes.
17 Q  And what did you complain to Dr. Swan was
18   your issue, if anything?
19 A  It wasn't a complaint.  I just went there for
20   an overall physical in order for him to
21   pretty much diagnose if I had a racing heart
22   beat or not.
23 Q  Okay.  And what did he diagnose?
24 A  That I was perfectly fine.
25 Q  All right.  And I don't know if I asked

---

Page 20

1    before we started.  Is anybody recording this
2    deposition?
3       MR. SPRING:
4          No.
5 MR. CORRY:
6 Q  When, in relation to the August 14th, '12
7    date did you see Swan?
8 A  I saw Swan after, if I'm not mistaken.
9    (Witness examines his document.)
10 Q  And I don't need an accurate.  I mean, it
11   doesn't have to be exact.
12 A  Okay.  Because --
13 Q  We're going to go through all the documents,
14   and if we come to it and you want to make a
15   reference to it, we can.
16 A  Okay.
17 Q  But in order to try to keep it moving along.
18   And I know it's not an exact date.
19      Was it within a day or two, was it
20   within a couple of days, a couple of weeks,
21   or what is your recollection?
22 A  I would say probably a week or two.
23 Q  Okay.
24 A  Let me elaborate on that.  The reason I was
25   placed on administrative leave for that

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 21

1  racing heart beat.  And thereafter, I sought
2  the assistance of Dr. Swan.  As a matter of
3  fact, it was August 27th, 2012.
4  Q  Okay.  And what are you referring to that
5  refreshes your memory?
6  A  I'm referring to --
7  Q  GC?
8  A  -- GC-398.
9  Q  And what is that?
10  A  That is a Lafayette Consolidated Government
11  Doctor's Certificate/Medical Status Report.
12  Q  All right.  When you were placed on
13  administrative leave, it was paid
14  administrative leave?
15  A  Yes.
16  Q  And you were, in fact, paid?
17  A  Yes.
18  Q  All right.  So that's the first time -- do
19  you mind if I call you Greg, or would you
20  prefer I call you Mr. Cormier?
21  A  It doesn't matter, Mr. Corry.
22  Q  And you can call me Michael, that's fine.
23  Prior to seeing Dr. Swan and the
24  reference to the racing heart beat, you had
25  never seen any health care provider for

---

Page 22

1  racing heart beat, high blood pressure,
2  anything to do with your heart?
3  A  No.
4  Q  Who did you see as a family doctor before
5  Dr. Swan?
6  A  Actually, none.  It was mostly Dr. Swan.
7  Q  If you had an ailment, you'd develop a cold,
8  or a cough, or the flu, or something, while
9  you were employed with LPD, let's say you
10  woke up one night, you weren't scheduled to
11  be at work, and you felt bad, would you
12  always go through someone with LPD, or would
13  you just go out to your own doctor?  How did
14  that work for you?
15  A  Apart from injuries on duty, I don't recall
16  ever having that instance that you're
17  referring to.  That's an area -- Mr. Corry, I
18  was there for 22-1/2 years, I only missed two
19  days of work.
20  Q  Okay.  So you could seek medical treatment
21  with anyone you wanted to, and your health
22  insurance with the city would pay for it?  It
23  didn't have to be at Dr. Swan or someone
24  related to the city; is that accurate, if you
25  needed to see the doctor?

---

Page 23

1  A  Somewhat, yes.
2  Q  How is it not?
3  A  Because the city doesn't just pay for it like
4  that.  There's a process that you go through.
5  And depending on the injury, and --
6  Q  And I'm not talking about an on-the-job
7  injury, I'm talking about -- (Interrupted)
8  A  I'm talking about off duty.
9  Q  What?
10  A  I'm talking about off duty.
11  Q  Okay.  You had benefits with the city, right?
12  A  That's correct.
13  Q  Okay.  I assume you have never been arrested
14  for anything.
15  A  No.
16  Q  Never been treated for alcohol or drug
17  abuse?
18  A  No.
19  Q  Ever been treated for any type of
20  psychological or psychiatric condition?
21  A  No.
22  Q  Have you ever served in the military?
23  A  Yes.
24  Q  What years, and what branch?
25  A  December 26th, 1984, until April 16th, if I'm

---

Page 24

1  not mistaken, 1991.
2  Q  And what branch were you in?
3  A  United States Marine Corps.
4  Q  And honorable discharge?
5  A  Yes.
6  Q  What was your rank?
7  A  Sergeant.
8  Q  Were you -- did you ever suffer any type of
9  injuries in the military?
10  A  Other than a sprained ankle, no.
11  Q  And where were you stationed through your
12  career?  Why don't you take me from when you
13  started out to where you completed?
14  A  December 26th, 1984, I was stationed at
15  MCRTD, Marine Corps Recruit Training Depot,
16  Camp Pendleton -- I mean, I'm sorry -- in San
17  Diego, California.  I completed basic
18  training March 15th, 1985.
19  From there, I went to Camp Lejeune,
20  North Carolina, Infantry Training School.
21  From there, I left from there, went to
22  nuclear biological chemical warfare school,
23  Fort McClellan, Alabama.
24  From there, I went to advanced nuclear
25  biological chemical warfare school in Cherry

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 25

1 Point, North Carolina.
2 Do you actually want me to continue
3 going through all of that?
4 Q Well, just -- did you ever serve in any
5 combat?
6 A Yes.
7 Q Where?
8 A Operation Desert Storm, Desert Shield.
9 Q That was Desert Storm I?
10 A Yes.
11 Q And where were you stationed when you were
12 discharged?
13 A TOW Platoon, 23rd Marines, Broussard,
14 Louisiana.
15 Q You were in the reserve for a period of time?
16 A Yes.
17 Q How long?
18 A Probably 1986 until 1991.
19 Q Do you have any type of marine corps
20 retirement? Did you qualify for that?
21 A I don't know. I never sought looking into
22 that yet.
23 Q So '84 to '91. '91 included the reserves?
24 A Yes.
25 Q The five years of reserve. Is that accurate?

Page 26

1 A Pretty much, correct.
2 Q You said you had given a deposition two or
3 three times, you think, prior to this one.
4 Was that in conjunction with your employment
5 with the Lafayette Police Department?
6 A Yes.
7 Q And what was the nature of those depositions?
8 A One was a -- I guess you can say a wrongful
9 death suit, and the other two were traffic
10 crashes.
11 Q Do you know when the wrongful death suit was,
12 roughly?
13 A 2000 -- I'd say anywhere from 2007 to maybe
14 2009, at the most.
15 Q And someone died? What was the nature of
16 that suit?
17 A A gentleman's family members sued the police
18 department. I was the supervisor on the
19 street and narcotics team, and we encountered
20 that same subject. He took off running,
21 ingested a plastic -- some marijuana that was
22 wrapped in some plastic, and I guess he
23 aspirated on it.
24 Q And it killed him?
25 A Yes.

Page 27

1 Q So you, along with your other --
2 A Employees.
3 Q -- officers under you were sued?
4 A Correct.
5 Q Do you remember the name of that suit, the
6 caption, or who the officer -- excuse me, who
7 the decedent was?
8 A I want to say it's Daniel Harmon, but I might
9 be mistaken. Or Damion Harmon.
10 Q And what was the outcome of that?
11 A I don't know.
12 Q Is it still pending?
13 A I don't know. We gave a deposition at city
14 hall, and that was the extent of it.
15 Q Who took your deposition?
16 A I don't even remember the attorney's name,
17 Mr. Corry, to be honest with you.
18 Q I guess it was the attorney representing the
19 family of Mr. Harmon, if that's his name?
20 A Pretty much, yeah.
21 Q Who was the city attorney?
22 A (Witness shakes head negatively.)
23 Q Don't remember? Okay.
24 And then, the other two were traffic
25 crashes? They were traffic crashes you were

Page 28

1 involved in, or traffic crashes that you
2 investigated?
3 A Investigated.
4 Q And I guess those were way back in your
5 career?
6 A Yes.
7 Q Other than this lawsuit and the TRO lawsuit
8 that was filed in the Fifteenth Judicial
9 District, and I don't recall specifically off
10 the top of my head if you were parties to any
11 of the mandamus proceedings. Were you? I
12 think it was just Mr. Marceaux.
13 A It was Mr. Marceaux and Mr. Hewitt, that's --
14 that's it.
15 Q Okay. Other than the TRO and the federal
16 lawsuit that we're here for today, have you
17 ever been active as a plaintiff in a lawsuit?
18 A No.
19 Q So those two are the only two lawsuits that
20 you've been -- that have been filed on your
21 behalf?
22 A Correct.
23 Q And I'm talking about either through your
24 employment with Lafayette Police Department,
25 or any other place you may have worked, or

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 29**

1 anything personal. Those are the only two
2 lawsuits?
3 A  Correct.
4 Q  All right. Have you ever been sued as a
5   defendant, other than the wrongful death
6   lawsuit back in somewhere around '07 or '09,
7   involving someone we think was named Harmon?
8 A  When you say "sue", what are you referring
9   to? As far as any --
10 Q  Where you have been named as a defendant.
11 A  Yes.
12 Q  Okay. Tell me about those.
13 A  I guess you would say when you filed
14   paperwork for us violating the protective
15   order. Would that be considered that?
16 Q  No. Not -- you're a party to the federal
17   lawsuit.
18 A  Okay.
19 Q  Where you are a separate -- (Interrupted)
20 A  I'm sorry. I'm sorry, I cut you off. Go
21   ahead.
22 Q  Where you have been named actually as a
23   defendant.
24 A  No.
25 Q  Have you ever made any claims against anyone

---

**Page 30**

1 where maybe a lawsuit was not necessary,
2 claims against an insurance company, or
3 something like that?
4 A  Yes.
5 Q  Tell me about that.
6 A  I can't give you the exact date. I was still
7   in patrol. I was leaving city court. At the
8   intersection -- I can't remember the street
9   offhand. But Don's Seafood is right at that
10   intersection, downtown. And an elderly
11   gentleman ran the red light and broadsided
12   me.
13 Q  And you were injured?
14 A  Yes.
15 Q  And you made a claim against an insurance
16   company, but you didn't have to file a
17   lawsuit?
18 A  I made a claim as far as repairing my
19   vehicle, but that was the extent of it.
20 Q  Were you in your police vehicle, or your
21   personal vehicle?
22 A  Personal.
23 Q  Did you have to obtain an attorney?
24 A  Initially, yes.
25 Q  I'm sorry?

---

**Page 31**

1 A  Initially, yes.
2 Q  Did you make a claim for personal injuries?
3 A  No.
4 Q  Roughly, what year was that?
5 A  '94, '95, maybe.
6 Q  Any other claims that you have had to make?
7 A  No.
8 Q  Have you ever filed for any type of
9   disability, either through a federal or state
10   agency, or a private insurer?
11 A  No.
12 Q  Have you ever filed for unemployment?
13 A  No.
14 Q  Have you ever filed for bankruptcy?
15 A  No.
16 Q  How long have you and Ms. Colette been
17   married?
18 A  It'll be 23 years this October 5th.
19 Q  Have you been married to anyone other than
20   Ms. Colette?
21 A  Not that I'm aware of.
22 Q  Do you have any other children other than Ian
23   and Ciesley?
24 A  No, sir.
25 Q  How long has Ms. Colette been employed at

---

**Page 32**

1 AT&T?
2 A  12, 13 years, I want to say.
3 Q  Okay. You told me you graduated from St.
4   Martinville High School in '86?
5 A  '84.
6 Q  '84.
7     Tell me about your education after that
8   point. Have you had any education?
9 A  Yes.
10 Q  Other than perhaps the military, from '84 to
11   '91?
12 A  Yes.
13 Q  What?
14 A  A Bachelor's Degree.
15 Q  BA or BS?
16 A  BS.
17 Q  In?
18 A  Criminal justice.
19 Q  What year?
20 A  1989.
21 Q  And where did you obtain that?
22 A  University of Southwestern Louisiana.
23 Q  Any other education?
24 A  No.
25 Q  When did you get into law enforcement?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 33

1  A   June 25th, 1990.
2  Q   And where did you start out working?
3  A   Lafayette City Police.
4  Q   When did you start UL, when you got out of,
5      or Southwestern -- when you got out of the
6      military?
7  A   In between.
8  Q   While you were on the reserve, you were
9      going?
10 A   Yes.
11 Q   Were you employed -- did you ever hold any
12     jobs other than, you know, college type of
13     job, prior to going to work for the LPD on
14     June 25th, 1990?
15 A   Yes.
16 Q   What?
17 A   Lafayette Community Correctional Center.
18 Q   An employee of the sheriff?
19 A   No.  I think it was -- at that time, it was
20     through the Louisiana Department of
21     Corrections.
22 Q   It was the Lafayette Community what?
23 A   Correctional Center.
24 Q   Is that what we know as the jail now?
25 A   No, sir.

Page 34

1  Q   Where was that located?
2  A   That was the halfway house.  It was -- I
3      think the address was 120 Chestnut Street,
4      South Chestnut Street.
5  Q   Okay.  And how long were you employed there?
6  A   Maybe six months to a year, I would say.
7  Q   It was a full-time job?
8  A   Yes.
9  Q   And what was your position?
10 A   Resident supervisor.
11 Q   I guess it was for individuals who perhaps
12     had criminal issues and/or drug or alcohol
13     related issues, would stay there until they
14     could acclimate back into society?  Is that
15     -- (Interrupted)
16 A   Correct.  It was a halfway house.
17 Q   Okay.  Any other employment prior to LPD?
18 A   University Post Office.
19 Q   What did you do there?
20 A   Mail sorter.
21 Q   While you were in school?
22 A   Yes.
23 Q   What year were you at the correctional
24     center?
25 A   1989, up until my employment with the

Page 35

1      Lafayette Police Department, which would be
2      '90.
3  Q   What about at the post office?
4  A   I would guess -- I would venture to say '87
5      till about '89.
6  Q   You stopped working there when you went to
7      work for the correctional center?
8  A   That's correct.
9  Q   Okay.  Any other employment?
10 A   No.
11 Q   Do you hold any certificates or licenses,
12     other than your driver's license, high school
13     diploma and college diploma?
14 A   Currently?
15 Q   Yes.
16 A   No.
17 Q   Have you ever held any?
18 A   Yes.
19 Q   What?
20 A   Some that -- I can't disclose that, that's
21     military.
22 Q   All right.  Would you refer to that as while
23     you were employed -- while you were in the
24     military, you had certain -- what would you
25     refer to it in the military?  Not as a

Page 36

1      certificate or license.  Like clearance to do
2      certain things.  Is that what you're
3      referring to, something like that?
4  A   Military occupational specialist is what it
5      was called.
6  Q   Okay.  You started the Lafayette Police
7      Department on June 25th of '90.  Were you
8      sent for training at that time?
9  A   Yes.
10 Q   Where?
11 A   Acadiana Law Enforcement Training Academy.
12 Q   How long was that course?
13 A   Eight weeks.
14 Q   Who was the chief when you were hired?
15 A   Gary Copes.
16 Q   And did you complete the eight-week training?
17 A   Yes.
18 Q   Where were you assigned?
19 A   What do you mean?
20 Q   Tell me what -- after you finished your
21     eight-week training, where did you go from
22     there?
23 A   FTO, field training officer program.
24 Q   And how long did you -- were you with the FTO?
25 A   Three months.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 37

1  Q   Were you with the same FTO?
2  A   No, sir.
3  Q   Who were you with?
4  A   I started off with Dale Hewitt, Bruce Simien.
5  Q   I'm sorry?
6  A   Bruce Simien, and McCullen Gallien.
7  Q   That's who they refer to as Mac Gallien?
8  A   Yes.
9  Q   Are those three officers still with the
10     LPD?
11 A   No.  I'm not finished.
12 Q   Oh, I'm sorry.  Go ahead.
13 A   Upon my return from Desert Storm, Desert
14     Shield, Norbert Myers.
15 Q   So during your FTO, you were called upon to
16     serve in the military?
17 A   Actually, I was -- I had completed the FTO
18     program and was activated.
19 Q   Okay.  And I guess when you came back, they
20     wanted to refresh you with an FTO, so you
21     went with Myers?
22 A   Yes.  It was a one-month reacclimation
23     process.
24 Q   How long did you have to go serve in Desert
25     Storm?

Page 38

1  A   November 28th, 1990, April 16th, 1991.
2  Q   You were in Kuwait?
3  A   No.  Not all the time.
4  Q   Where else were you?
5  A   (No response)
6  Q   You can't tell me?
7  A   No, sir.
8  Q   What would happen if you did?
9  A   You would lose your law license, the federal
10     judge would have some issues.
11 Q   Okay.  So you came back on April 16th of '91.
12     When did you return to the LPD?
13 A   It was in the summer.  I can recall that.  I
14     would say June, something like that.
15 Q   And was the two-month off something you chose
16     to take sometime off, or was that something
17     that the LPD provided to you?  Or how did
18     that work?
19 A   They basically reached out to me and told me
20     whenever I'm ready to come back --
21 Q   Okay.
22 A   -- I can come back, be it one week after my
23     return, or three months, or four months.
24 Q   Okay.  And you just wanted to take some time
25     off?

Page 39

1  A   That's correct.
2  Q   Okay.  And then, did you work continuously,
3      from June of '91, up through the point of
4      your termination for the LPD?
5  A   Correct.
6  Q   Did you ever get called out at any other time
7      by the military?
8  A   No.
9  Q   Okay.  Where were you first assigned when you
10     finished your one month with Norbert Myers?
11 A   I was assigned to Shift D, 400 shift.
12 Q   What does that mean in laymen's terms?
13 A   Shift D, night shift.  But it was a rotating
14     shift.
15 Q   So you worked -- (Interrupted)
16 A   You worked pretty much two weeks days, and
17     then two weeks nights.
18 Q   And Shift D was where, that's the location of
19     the city?
20 A   That's -- it was the north side, now it's
21     called Upper Lafayette.
22 Q   And who was your -- I guess when you start,
23     what is your position?  What do they refer to
24     you as?
25 A   Patrol officer.

Page 40

1  Q   And how long did you work as a patrol officer
2      on Shift D, 400 shift?
3  A   Maybe two years.
4  Q   And who was your sergeant?
5  A   Sergeant Eugene Woods.
6  Q   Do you remember your lieutenant, captain,
7      major?
8  A   I don't know.  I don't remember the
9      lieutenant.  The captain was Francis Mouton,
10     and the major was Major Ralph Peters.
11 Q   I think I asked you, and then, I cut you off.
12     I don't think you answered.
13     The FTO officers that you rode with, are
14     they still employed with the Lafayette Police
15     Department?  Hewitt, Simien, Gallien and
16     Myers.  I know Myers is not.
17 A   No, none of them.
18 Q   None of them are?
19 A   No.
20 Q   All right.  Where did you go after you worked
21     two years in patrol for Shift D, 400 shift?
22 A   I went to Shift C.
23 Q   What part of the city is that?
24 A   The alphabet doesn't designate what part.  I
25     was working central.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 41

1  Q   Which shift?
2  A   Shift C.
3  Q   So days and nights?
4  A   Uh-huh (yes).
5  Q   It was the same?
6  A   The same.
7  Q   When did that change, the rotating shift, do
8  you remember?
9  A   What do you mean?  Change from --
10 Q   Where you worked two weeks nights to two
11 weeks days?
12 A   From -- if my memory serves me correct, the
13 rotation would switch every pay period cycle.
14 Q   Y'all were paid twice a month?
15 A   Correct.
16 Q   But at some point, the LPD did away with the
17 rotating shifts, correct?
18 A   Yes.
19 Q   When was that?
20 A   I can't give you an exact date on that.
21 Q   Was it within the past five years?
22 A   Longer than that.
23 Q   Longer than that?
24 A   Yes.
25 Q   Before Craft was the chief?

Page 42

1  A   Yes.
2  Q   Do you remember who the chief was that did
3  away with the rotating shifts?
4  A   If I'm not mistaken, I think it was Chief
5  Crenshaw.
6  Q   And do you recall the reason?
7  A   I think he had did a sample poll, and the
8  overwhelming majority preferred working a set
9  shift, as far as days or nights.  And I guess
10 there was an echo or process, and they split
11 them working days and nights.  And thus,
12 forward from there, everybody worked either
13 set days or set nights.
14 Q   Okay.  What did you prefer?
15 A   Nights.
16 Q   So when some officers take issue with being
17 transferred to a night shift, for Greg
18 Cormier, that was actually something you
19 preferred.  And I guess you weren't alone.  I
20 guess there were a number of officers that
21 preferred working nights.
22 A   Not really.  You asked me that question, what
23 do I prefer.  But I can work days or nights.
24      But when you're referring to that,
25 transferring to night shift was a punishment

Page 43

1  when they would transfer you.
2  Q   When it started, though, with Chief Crenshaw,
3  I guess half of the officers had to decide on
4  nights, and half had to decide on days,
5  correct?
6  A   Correct.
7  Q   Do you have as many officers working nights
8  as you do days?
9  A   I can't tell you the manpower.  Floor chart
10 right now, Mr. Corry, I wouldn't be able to
11 answer that question.
12 Q   Okay.  Back when Crenshaw made the change,
13 though, do you recall roughly, was it equal,
14 or I guess at night -- correct me if I'm
15 wrong -- but it seems like at night, most
16 people are sleeping, and you probably don't
17 have as many officers on the road as you do
18 during the day.  Or is that incorrect?
19 A   I don't want to put myself on the limb and
20 guess at something that's going to be
21 incorrect.
22 Q   All right.  So how long did you work Shift C
23 central.  Was that days of -- that was
24 rotating.
25      What years did you work there?

Page 44

1  A   I would say maybe -- it was probably the end
2  of '92 until '93, maybe.  And then, I went --
3  Q   You were in patrol?
4  A   Yes.
5  Q   Then, you went where?
6  A   Then I stayed on the same Shift C.  But then,
7  I moved to the north side.
8  Q   So you were transferred to the north side?
9  From Shift C central, '92 to roughly '93.
10 Then, you were transferred from Shift C to
11 north side.
12 A   I don't consider it a transfer.  You're still
13 on the same shift.
14 Q   Okay.  So same shift is not a transfer?
15 A   No.
16 Q   All right.  Were you working still the
17 rotation --
18 A   Correct.
19 Q   -- days and nights?
20      And how long were you on that shift, or
21 north side?
22 A   Until June 15th, 1995.
23      And I need to make a correction.  I'm
24 just thinking about it.
25      When you was referring to employment,

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

**Page 45**

1 there was a separation. June 15th, 1995.
2 Q Was that military related?
3 A No.
4 Q What was it?
5 A Louisiana State Police.
6 Q And how long were you separated?
7 A Two weeks.
8 Q Kane made it one day, I think.
9    So just to kind of cut to the chase and
10 move forward. Apparently, at some point
11 in '95, you decided to make a career change,
12 applied to the state police, were hired.
13 Started on June 15th or thereabouts, of '95,
14 and decided after two weeks, that that wasn't
15 for you and you wanted to go back to the PD.
16 Is that fair?
17 A It wasn't a matter of it wasn't for me. It
18 was financially, it wasn't feasible at the
19 time.
20 Q You made less money with the state police?
21 A Yeah. It was less money, but the insurance,
22 the health care package wasn't --
23 Q Did the fact that you decide -- that you
24 decided to leave LPD and go to the state
25 police, did it have anything to do with your

**Page 46**

1 employment with the LPD, such as you had
2 problems with the supervisor, or you got in
3 trouble, or somebody was causing you trouble,
4 or was it just simply, I want to make a
5 career move to the LPD?
6 A It was only a career opportunity.
7 Q All right. And the same thing, the same
8 question coming back from state police back.
9 Anything other than the financial issues you
10 discussed with me?
11 A Repeat that question.
12 Q When you decided to make the change back from
13 state police back to LPD, was it anything
14 other than the health care package and
15 financial issue you mentioned to me?
16 A Are you asking, is that the only reason why I
17 returned back?
18 Q Yes.
19 A Yes.
20 Q Okay. When you returned, when did you
21 return? Do you remember the date you started
22 back?
23 A I can't give you exact date. It was that
24 same year. Maybe two weeks. I returned,
25 maybe that following week.

**Page 47**

1 Q Okay.
2 A I came back.
3 Q Okay. So you were only gone two or three,
4 four weeks, maybe?
5 A Yes.
6 Q All right. And did you go right back in
7 where you were, or did you have to start the
8 process over?
9 A No, I went back.
10 Q And did you lose any seniority?
11 A No, sir.
12 Q And who was the chief at that time?
13 A '95? I think it was still Crenshaw.
14 Q How did you manage to not lose any seniority?
15 A That's a question, Mr. Corry, if I can answer
16 that, I can win the lottery. No one never
17 gave me --
18 Q I'm sorry?
19 A -- a straight answer on that.
20 Q Do you think you got favorable treatment?
21 A I don't know.
22 Q Who was your chain when you left and when you
23 came back?
24 A I'm trying to remember. I think my sergeant
25 was Donald Caesar. I know Major Ralph Peters

**Page 48**

1 was still the major in patrol. I can't
2 remember who was the lieutenant, as well as
3 the captain.
4 Q Did you ever -- I'm sorry.
5 A I can't remember who was the captain or the
6 lieutenant.
7 Q And then, when you returned, it was the same?
8 A No. I'm saying I can't remember if it was
9 the same.
10 Q But it was the same major?
11 A Yes.
12 Q Okay. Did you ever work directly within
13 Chief Craft's chain before he became chief?
14 A Yes.
15 Q When?
16 A June 1996.
17 Q Until?
18 A I can't give you exact date. I guess Chief
19 Craft would be prone to answer that.
20    I know he -- he was the captain in the
21 Criminal Investigation Division at that time,
22 and he got promoted to major and left. So I
23 don't know. I can't give you an exact date
24 of when he was promoted and left that
25 section.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 49

1 Q   Who was the chief at that time, still
2     Crenshaw?
3 A   Yes.
4 Q   When did Crenshaw retire?
5 A   I don't know.
6 Q   After Crenshaw, it was the former FBI guy,
7     not FBI, the U.S. Marshal guy?
8 A   Ronnie Boudreaux.
9 Q   Was he after Crenshaw?
10 A   Yes, sir.
11 Q   And then, from Boudreaux, it went to Hundley,
12     from Hundley to Craft; is that correct?
13 A   That's correct.
14 Q   Okay.  Did you have any issues when you
15     worked under Chief Craft in CID where he was
16     the captain?
17 A   What do you mean, "issues"?
18 Q   Did you have any personality conflicts with
19     him?
20 A   He got upset with me one time over a lottery
21     for Greek week where he was drafting people.
22     And initially, it was stipulated by Chief
23     Craft in a meeting with all the employees
24     with the Criminal Investigation Division,
25     that employees didn't want to work Greek

Page 50

1     week.  And they decided to draft people
2     because they couldn't get enough volunteers.
3     But he stipulated that the initial draft, if
4     your name was picked, you're not getting out
5     of it.  And his exact words were, unless you
6     get killed, or you're serious injured, where
7     you can't move, you're going to work it.
8     And --
9 Q   What did you call it, week week?
10 A   Greek week.
11 Q   Greek week.
12 A   And somehow, the initial draft letter came
13     out with the list of officers that were
14     drafted to work.  And then, he had a
15     secondary list came out, where he did a
16     redraft, and certain officers were taken off
17     the list, who, I guess were his cronies, that
18     worked Dillard's.  For instance, Phil
19     Fontenot, Vaughn Burris, and people like
20     that.  And --
21 Q   Were you drafted on the list?
22 A   No.
23 Q   Okay.  What year was this?
24 A   I can't give you exact year.  It was in the
25     hay day of Greek week.

Page 51

1 Q   Is that the thing that I think some
2     fraternities, or something associated with
3     UL --
4 A   Yes.
5 Q   -- have a big party in the park?
6 A   Yes.
7 Q   And they come from all over?
8 A   Yes.
9 Q   I think all over the country, right?
10 A   That's correct.
11 Q   Okay.  Yes, they trash our parking lot every
12     year.
13     Okay.  Let me go back to your -- and
14     we're probably close.
15     You came back after your separation from
16     the state police, went back into Shift C,
17     north side.  Is that accurate?
18 A   Correct.
19 Q   Okay.  And then, where did you go from there?
20 A   The Criminal Investigation Division.
21 Q   Okay.  That's referred to as CID?
22 A   Correct.
23 Q   And is there a particular shift that you were
24     on?
25 A   There's no shift.

Page 52

1 Q   No shift for CID.
2     Is that a position you had to apply for?
3 A   Yes.
4 Q   Is it based on merit?
5 A   Yes.
6 Q   Okay.  And what was your rank at that time?
7 A   Corporal.
8 Q   When did you make corporal?
9 A   I would have to refer to my personal action
10     form in here probably.
11 Q   Roughly, how long did it take you from the
12     time you were hired?
13 A   Four years.
14 Q   All right.  What was your chain in CID?
15 A   Sergeant Dave Morris, Lieutenant Albert
16     Fowler, Captain James P. Craft and Major
17     Ralph Peters.
18 Q   And when you started CID, do you remember
19     roughly the year, or the date?
20 A   June of '96 -- I'm sorry.  January of 1996.
21 Q   Okay.  And I think you told me Craft became
22     the captain in June of '96.
23 A   No.
24 Q   I didn't -- he got promoted in June of '96?
25 A   No.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 53

1 Q  I've got 6/96 written down for something.
2 A  You've got 6/96, because I told you that's --
3     the question was posed to me, when did you
4     start working for Chief Craft?
5 Q  Okay.  That's when he came in as the captain?
6 A  No.  I mistakenly told you June of '96, but
7     it's actually January of '96, when I actually
8     started working for him.
9 Q  Okay.  And then, when he got promoted, he's
10    no longer your captain.  How long were you in
11    CID?
12 A  As an investigator?
13 Q  That was your first position?
14 A  Correct.
15 Q  Yes.
16 A  Roughly, nine and a half years.
17 Q  So '05, something like that?
18 A  Correct.
19 Q  And what did you do -- what do you do as a
20    CID investigator?  What did you do?
21 A  I was in the juvenile division.  I
22    investigated all crimes of property, as well
23    as persons.  Crimes committed by juveniles,
24    as well as crimes committed against
25    juveniles.

Page 54

1 Q  Okay.  And why did you leave that position in
2    '05?
3 A  I was promoted to sergeant.
4 Q  Do you remember the date?
5 A  I'd have to refer to my personal action form
6    from the civil service, when I was promoted.
7 Q  Sometime in '05, though?
8 A  Roughly, yes.
9 Q  Okay.  And where were you -- what was your
10    new position?
11 A  I was a field supervisor for the action unit.
12 Q  That's still within CID?
13 A  No, sir.
14 Q  What is that in?
15 A  That's in patrol.  It falls under the
16    umbrella of patrol support.
17 Q  What do you do as a field supervisor in the
18    action unit?
19 A  Your duties there are similar to a field
20    supervisor in the patrol division, with the
21    exception that the action unit, mostly they
22    concentrate on street level narcotics,
23    basically street level dealers that's pretty
24    much on the corners, stuff like that.
25 Q  And how long were you in that position, from

Page 55

1    '05 -- roughly '05 to what?
2 A  Probably the end of '06.
3 Q  And where did you go from there?
4 A  Criminal Investigation Division.
5 Q  Back to CID?
6 A  Correct.
7 Q  Why?
8 A  I was told I had to go back.
9 Q  Okay.  So you were transferred back?
10 A  Yes.
11 Q  Okay.  Is a transfer from CID -- I guess when
12    you get promoted, it's not a transfer, it's a
13    promotion, right?
14 A  If you get transferred out of that particular
15    section, yes.
16 Q  Okay.
17 A  Unless you're so lucky that that slot that
18    you're getting promoted to is in the same
19    section.
20 Q  In order to get promoted, it's my
21    understanding, you've got to have the years
22    of service, time.  And then, you've also got
23    to take the various tests that are provided
24    by civil service, and satisfactorily complete
25    those tests in order to get promoted.  Is

Page 56

1    that accurate?
2 A  No.
3 Q  How do you get promoted?
4 A  You also have to have college credits as
5    well, to achieve the rank of sergeant and
6    lieutenant, major.  And if you desire to be a
7    chief, you have to have the degree.  But I
8    think they -- I don't know the status of it
9    right now.  I think they had changed that
10    requirement in the wake of Hundley becoming
11    chief, or applying for chief.
12 Q  Okay.
13 A  So --
14 Q  So you had to have a college degree or
15    college credits?
16 A  You have to have college credits in order to
17    be promoted to sergeant.
18 Q  All right.  And do you remember how many you
19    had to have?
20 A  I don't want to put myself out on a limb and
21    guess.
22 Q  Okay.  All right.  So you go back to CID, the
23    end of '06, or the beginning of '07,
24    something like that?
25 A  Correct.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 57

1  Q   And how long did you stay there?
2  A   December 8th, 2010.
3  Q   What was your position, sergeant of CID?
4  A   Yes.
5  Q   Do you remember your chain?
6  A   It was Lieutenant Mac Gallien, Captain Randy
7      Vincent, and Major Glen Dartez.
8  Q   Okay.  Where did you go December 8th of '10?
9  A   I was transferred to the patrol division,
10     power squad sergeant.
11 Q   Patrol division?
12 A   Power squad.
13 Q   From December 8th of '10, until when?
14 A   I would have to look at the transfer letter.
15 Q   I'm not holding you to the dates.  I'm just
16     trying to get a rough idea.
17 A   Maybe six months afterwards.
18 Q   What were your duties as a power squad
19     sergeant?
20 A   I didn't have any duties.
21 Q   What does that mean?
22 A   It was just on paper.  I was transferred in
23     the wake of the Glen Dartez incident.  So
24     they put me there to punish me, because the
25     power squad has, I guess you would say

Page 58

1      working hours that are pretty much
2      non-conducive to most patrol officers.
3  Q   What is the power squad?
4  A   It's a shift that pretty much supplements the
5      patrol shift.  They work normally the peak
6      hours in patrol, in order to alleviate some
7      of the call volume from patrol.  The hours
8      are from 3:00 p.m. to 3:00 a.m.
9  Q   And you stayed there six months?
10 A   No, sir.
11 Q   Okay.  I thought you told me you started on
12     December 8th of 2010, and you were the
13     sergeant in the power squad for roughly six
14     months.
15 A   Yes, sir.  On paper, I was the power squad
16     sergeant.
17 Q   I'm sorry?
18 A   On paper, I was the power squad sergeant.
19 Q   All right.  Did you get transferred out of
20     there?
21 A   I don't know.  I can't answer that.  That
22     would that question would be better suited to
23     Chief Craft and the powers that be that made
24     that decision.  Because I was actually
25     transferred to that, like I said, in the wake

Page 59

1      of the Glen Dartez, because they had believed
2      that I was responsible for getting him
3      terminated, or whatever you want to call it,
4      or forcing him to resign.  They put me -- to
5      punish me, they put me working evenings.  And
6      power squad, the bulk of the call volume that
7      they work is on the north side.
8          That being said, I had -- December 8th
9      was the date that I was supposed to be
10     transferred, but I had accumulated a lot of
11     adjusted time, almost in the month -- of
12     about a month and a half.  So they wanted me
13     to burn out the adjusted time prior to me
14     actually assuming that position in the power
15     squad.
16         My first day there, I was told that -- I
17     was called in and said that my attire wasn't
18     the correct attire to wear, and I needed to
19     come in plain clothes.  He sent me home.  And
20     the following morning, I was assigned to work
21     cold cases.  And they supplied me with two
22     people to assist me, Calvin Parker and
23     Christina Breaux.
24 Q   And maybe I misunderstood, or you
25     misunderstood me.

Page 60

1  A   Uh-huh (yes).
2  Q   You mentioned something about six months as
3      the sergeant in patrol on the power squad.
4  A   Yes.
5  Q   What were you referring to?
6  A   You asked me how long I was there as a
7      sergeant in the power squad.
8  Q   For six months?
9  A   And my response was six months.
10 Q   Okay.  The adjusted time, is that time off?
11 A   Yes, sir.  Time you earn working hours
12     outside your normal working hours.
13 Q   All right.  So you had accumulated roughly a
14     month to a month and a half?
15 A   Pretty much.
16 Q   And so, you took that time off before
17     assuming the role, or the position of
18     sergeant in power squad?  Did I understand
19     that right?
20 A   Well, actually, there was -- when I was
21     officially called in and advised that I was
22     being transferred, I brought up the issue of
23     some adjusted time that was accumulated, and
24     how they were going to address it.
25         And that's what they elected to do, to

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

| Page 61 | Page 62 |
|---|---|

**Page 61**

1   allow me to use up all the adjusted time
2   prior to assuming the position of a power
3   squad supervisor.
4   Q   So the month to the month and a half that you
5   took off was prior to December 8th of 2010?
6   A   No, sir.
7   Q   It was after?
8   A   Yes.
9   Q   So basically on December 9th, you took off a
10   month to a month and a half, whatever the
11   adjusted time shows?
12   A   That's correct.
13   Q   It was continuous?
14   A   Yes.
15   Q   You were paid for it?
16   A   Yes.
17   Q   Okay.  Is there any particular reason that
18   you brought that issue up when you were put
19   in power squad?  Why all of a sudden was the
20   adjusted time was an issue in your mind?
21   A   Because in the Criminal Investigation
22   Division, it was common knowledge all over it
23   was illegal according to state law, you can
24   only -- you have to use your adjusted time
25   within a 28-day cycle.  They would just

**Page 62**

1   ignore it and let it roll over because of
2   manpower issue.  And they would let you take
3   adjusted time -- let's say, for instance, I
4   had, hypothetically speaking, 80 hours of
5   adjusted time.  As opposed to letting you
6   take it all in one block, they would say,
7   okay, Greg, you can take adjusted time
8   Friday, and then, Monday, or whatever, until
9   you absorb all of that 80 hours.
10       The problem was I could never take it
11   because of the manpower issue.
12   Q   All right.  And this is all -- was all of
13   this adjusted time accumulated in CID?
14   A   Yes, pretty much.
15   Q   Okay.  And the reason that you get so much
16   adjusted time is because you have to work
17   such long hours in CID?
18   A   Sometimes you work over the normal extended
19   hours.  I mean, the duty hours, and you can
20   either elect to take adjusted time or pay.
21   Q   What were your hours between June of '07, to
22   December 8th of '10, in CID?
23   A   8:00 to 4:00.
24   Q   And then, what did you actually work?
25   Generally, what did you actually work?

| Page 63 | Page 64 |
|---|---|

**Page 63**

1   A   8:00 to 4:00, sometimes I'd work later than
2   that.
3   Q   Okay.  So how did you accumulate so much
4   adjusted time if you were -- and I assume
5   that's Monday through Friday, 8:00 to 4:00?
6   A   Yes.
7   Q   How did you accumulate so much adjusted time
8   working in CID, if you were working 8:00 to
9   4:00?
10   A   On-call status.  Sometimes continuation of
11   your normal work schedule.  Even though
12   sometimes I would -- there would be
13   individuals or officers that had other
14   supervisors, they would call me as opposed to
15   their supervisor, because they relied on me
16   to make the sound and rational decision on a
17   sensitive matter.  So they requested I work
18   with them.
19   Q   Okay.  And then, you would do that?
20   A   Of course.
21   Q   Okay.  And the business about rolling over
22   the adjusted time, you were the beneficiary
23   of that, correct?
24   A   Me?  No.
25   Q   Well, you used a month and a half, or a

**Page 64**

1   month?
2   A   I used a month and a half because it was
3   something that I earned.
4   Q   Right.
5   A   Uh-huh (yes).
6   Q   But you were able to take advantage of the
7   adjusted time policy?
8   A   No.  They preferred giving me adjusted time
9   as opposed to paying me.
10   Q   Okay.  But when you were off, you didn't have
11   to work for that month to month and a half
12   and you were paid, correct?
13   A   Yes, sir.  But I was paid because it's
14   something that I earned.
15   Q   All right.  How long, or how often would you
16   be on on-call status when you were the
17   sergeant in CID?
18   A   You're asking me to pull teeth, Mr. Corry.  I
19   can't give you an exact, like -- let's see.
20   Maybe -- let's see.  There's three sergeants
21   in CID, adult side, one sergeant in
22   juveniles, and as well a lieutenant.  So how
23   many supervisors?  That's five.  So every
24   fifth week you would be on-call.
25   Q   And how long would your on-call status last?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 65

1  A   You're on-call basically for one week.
2  Q   Monday through Friday?
3  A   Yes, sir.  No.  Monday through Monday.
4  Q   And you could be called out at any time in
5      the day?  You may get off at 4:00, and they'd
6      call you at 10:00 or midnight, or 3:00 a.m.
7      Was it something that you just handled by
8      phone or computer, or was it something that
9      you would have to actually go out to address?
10     I guess it depended.
11 A   You cannot handle an issue by computer.  You
12     can either handle it via the phone, or
13     actually going out in person.
14 Q   Okay.  Did you have to go out more times than
15     being able to handle it by the phone, or --
16     (Interrupted)
17 A   I -- there's different variables in that, Mr.
18     Corry.  You may have one week where you're
19     going to get called out for some things that
20     normally you wouldn't.  But it's basically a
21     flip of the coin.  Sometime -- you know, if
22     somebody complains to the chief, something
23     that's normal protocol, you wouldn't get
24     called out, he would make you go out for it.
25     So I can't really answer that.

Page 66

1  Q   It just depends.
2  A   Yeah.
3  Q   Okay.  And I guess when you're on the on-call
4      status, you would also be required to work on
5      the weekend, perhaps?
6  A   You're on-call and you're subject to be
7      called out, or you are subject to receive a
8      phone call, which is related to your duties
9      as that supervisor over the weekend.  Yes.
10 Q   Okay.  You didn't actually have to report to
11     your office on the weekend, though, only if
12     you got called out?
13 A   Only if it's something that warrants you
14     coming out to investigate.
15 Q   Okay.  When you were in CID, where was your
16     office, on University?
17 A   The white house?
18 A   No.  The big building on -- where Chief
19     Craft's office is.
20 A   Yes.  The white house.
21 Q   What do you call it?
22 A   The white house.
23 Q   Why do you call it "the white house"?
24 A   I don't call it that.  That's what white
25     officers call it.

Page 67

1  Q   Okay.  All right.  So you get transferred to
2      the power squad, you take your month, month
3      and a half off.  You come back for one day.
4      And then, they put you working cold cases
5      with two assistants?
6  A   Correct.
7  Q   And how long did you work the cold cases?
8  A   (No response.)
9  Q   So we're talking somewhere in the beginning
10     of 2011, February, roughly?
11 A   Up until -- I would have to refer to the
12     official promotion and transfer.  But I would
13     venture to say in April, somewhere around
14     there, maybe.
15     Would you like --
16 Q   We'll get to it.
17 A   All right.
18 Q   So sometime after April '11, roughly?
19 A   Yeah.  It's in April, I would think.
20 Q   And you were promoted to what?
21 A   Lieutenant.
22 Q   Where were you assigned at that point?
23 A   Patrol support.
24 Q   And who was your chain?
25 A   Captain Dwayne Arceneaux, Major George Jackie

Page 68

1      Alfred, and Police Chief Jim Craft.
2  Q   And in patrol support, what did you -- what
3      was your position?
4  A   Lieutenant.
5  Q   All right.  And what were your duties?
6  A   Do you want the official duties?
7  Q   Yes.  Well, no.  I mean, we'll get to that.
8  A   That's official.
9  Q   What did you do on a daily basis?
10 A   I was actually assigned -- do you want to
11     know what I did on a daily basis?  Because
12     there's two lieutenants in patrol support,
13     but actually there was only one, because
14     every time there was an issue that would
15     arise with Bert Bejsovec's subordinates, I
16     addressed it because he was never around.
17     But that's here or there.  Anyway --
18 Q   Let me ask you this question.
19 A   Go ahead.
20 Q   Bert Bejsovec was a lieutenant, as you were,
21     in patrol support?
22 A   Yes.
23 Q   Okay.  And the reason you have two is when
24     one is not working, one's off, and then -- is
25     that it?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 69

1 A  No, sir.
2 Q  Why do you have two?
3 A  The reason you have two is because initially,
4   there was only one patrol support lieutenant.
5   And he was supervising roughly about 50
6   people.  Any police organization, if you look
7   at the span control, which is considered how
8   many subordinates that a supervisor is
9   supposed to supervise, that didn't meet the
10  criteria of one lieutenant supervising 50
11  individuals.
12      At that time, it was Lieutenant Dwayne
13  Prejean who was the supervisor.  After
14  several meetings and him bringing that issue
15  to the forefront, they decided to seek
16  another additional lieutenant in that patrol
17  support.
18      And they went through the process, going
19  to civil service, and as well as the council,
20  in order to get that position and allocate
21  the money for a second patrol support
22  lieutenant.
23 Q  All right.  Were you the person that became
24  the second lieutenant?
25 A  No, sir.

---

Page 70

1 Q  There was somebody before you?
2 A  There were two patrol support lieutenants
3   when I got promoted to lieutenant and assumed
4   the patrol support lieutenant position.
5 Q  When, in relation to when you got promoted in
6   April of '11, did they start with the second
7   lieutenant in that position?
8 A  I can't tell you the exact time frame.
9 Q  Was it within the year?
10 A  No.  It was a little bit longer than that
11  probably.
12 Q  Okay.  All right.  So you come in.  And how
13  many people were you supervising?
14 A  On paper, I was supposed to supervise roughly
15  23 people.  I was in charge of downtown
16  detail, the traffic section.  And let's see
17  who else?  I have it in there.  I can't think
18  of the other people.  But it added up to
19  about 23 that I actually was supposed to
20  supervise.
21 Q  It was downtown detail, traffic.  Anything
22  else?
23 A  Yeah.  There's going to be another section, I
24  just can't recall right now.
25 Q  All right.  If you think of it later on, just

---

Page 71

1   tell me.
2 A  Okay.
3 Q  And where was your office?
4 A  900 East University.
5 Q  Okay.  The same place it was when you were
6   working in the power squad?
7 A  Yes.
8      MR. SPRING:
9          Can we go off the record for just a
10      second?
11     MR. CORRY:
12         Yes.
13     MR. SPRING:
14         Can we take a little break?
15     MR. CORRY:
16         Why don't we take a lunch break?
17  (SHORT BREAK TAKEN IN DEPOSITION
18  FROM 11:49 A.M. TO 12:00 P.M.)
19     MR. SPRING:
20         I received an e-mail from Mr.
21      Poiencot.  His deposition is scheduled
22      for tomorrow, which is what we had
23      agreed last week.  He's called offshore,
24      so he said he can't be here tomorrow.
25      And we'll advise when he can.

---

Page 72

1      MR. CORRY:
2          Okay.  And I would just like to
3      make a note that we -- I think this is
4      the second time it's been canceled, and
5      we want to have it reset as soon as
6      possible.
7      MR. SPRING:
8          He does, too.
9  MR. CORRY:
10 Q  Okay.  Greg, are you ready?
11 A  Yes, sir.
12 Q  I was asking you about being promoted to
13  lieutenant around April of 2011.  And I think
14  you told me you went into -- your office
15  is located at 900 East University.  You had a
16  downtown detail, a traffic group.  And you
17  could not recall the third group that you
18  were -- (Interrupted)
19 A  Mounted patrol.
20 Q  I'm sorry?  Mounted?
21 A  Mounted patrol.
22 Q  Is that a specialty?  Do you have to be
23  certified to be in the mounted patrol?
24 A  Yes.
25 Q  Were you certified?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

**Page 73**

1 A   I just was a supervisor --
2 Q   You weren't riding?
3 A   -- I wasn't actually riding.
4 Q   Okay. So you didn't have to ride them. All
5     right.
6 A   But I can ride a horse.
7 Q   Okay. What were your duties as a lieutenant?
8 A   Duties as a lieutenant was to actually
9     supervise the sergeant, to assure that the --
10    all the different units that I was assigned
11    to as a group is being ran effective and
12    efficiently.
13        I also prepared payroll. But actually
14    wasn't just with the sections that I was
15    assigned to. I prepared payroll for the
16    entire patrol support section, which was not
17    actually what it was supposed to do -- be.
18 Q   What do you mean by that?
19 A   Lieutenant Bejsovec was supposed to prepare
20    his payroll for his subordinates, and I was
21    supposed to do likewise, for mine.
22        I conducted shift level investigations
23    for my guys, and I guess you can say as well
24    his. Because the two shift level
25    investigations that he had, I was tasked to

**Page 74**

1     do it.
2 Q   Was that the first time that -- and I don't
3     want to cut you off, but I do want to ask you
4     this.
5 A   Go ahead.
6 Q   Was that the first time that your duties
7     included conducting shift level
8     investigations?
9 A   On?
10 Q   When you became lieutenant in patrol support?
11    Okay. Could you clarify that a little bit as
12    far as shift level investigations on
13    individuals that fell under my supervision,
14    or in addition to his?
15 Q   No. No. Prior to becoming lieutenant --
16 A   Uh-huh (yes).
17 Q   -- in patrol support, in April of 2011.
18    Anytime before that, were you ever -- was it
19    ever part of your duties to conduct shift
20    level investigations?
21 A   No. But I was tasked to do a couple of them
22    when I was a sergeant.
23 Q   Okay. By who?
24 A   Retired Captain Dwayne Arceneaux.
25 Q   All right. And where were you when you were

**Page 75**

1     -- what was your position when you were --
2     (Interrupted)
3 A   I was a sergeant in the action unit.
4 Q   And Arceneaux would have been your
5     lieutenant?
6 A   Yes.
7 Q   And is there any particular reason that he
8     asked you to conduct a couple of shift level
9     investigations?
10 A  One of them was a guy that worked for me, and
11    I'm trying to remember the other officer who
12    was in the patrol division. And he asked me
13    to do it because he was inundated with a lot
14    of things. And I guess the sergeants -- the
15    other sergeants were -- I guess weren't
16    reliable in order to do it in a proficient
17    manner.
18 Q   You don't have any issue with having
19    Lieutenant Arceneaux ask you to do those, do
20    you? I mean, it's just a part of your
21    duties?
22 A   It wasn't actually part of my duties, but if
23    he asked me to do it, I did it.
24 Q   Okay. And what time frame was that?
25 A   That would have been 2005 -- in between 2005,

**Page 76**

1     to the end of 2006, I'd say.
2 Q   Were any of those shift level -- those two
3     shift level investigations appealed to civil
4     service?
5 A   I don't know.
6 Q   Don't know.
7 A   They should -- well, I take that back. One
8     of them was unfounded. That was Tom Bercier.
9     The other one, I don't know what was the
10    outcome of that.
11 Q   All right. So then, when you get into
12    lieutenant -- when you're promoted to
13    lieutenant in patrol support, then part of
14    your duties is to conduct shift level
15    investigations for your men. And then,
16    you're telling me you also had to do it a
17    time or two for Lieutenant Bejsovec's men?
18 A   I don't know if it's actually on paper that
19    that's part of your duties, as far as if you
20    look up a patrol support lieutenant, if it's
21    on there or not. From me reviewing that, I
22    don't recall seeing it. And I may be wrong.
23        But I know it was common knowledge
24    throughout the police department, the chief,
25    when he would actually authorize an

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 77

1  investigation, because he's the only one that
2  actually can do that, according to general
3  orders, he would elect to pick certain
4  lieutenants that he knew definitely would do
5  a proficient job in conducting an
6  investigation on an officer.
7      I don't know if, you know, it was me.
8  You know, retired Lieutenant Gabe Thompson,
9  was, you know, one individual that was
10  proficient in that field, where he was
11  knowledgeable of policies and procedures, as
12  well as officer's due process rights.
13     So there were certain lieutenants that
14  -- a pool of lieutenants that he should
15  choose to do that, apart from Internal
16  Affairs.
17 Q  And you were one of them?
18 A  Sometimes, yes.
19 Q  Okay.  That's good police policy to have guys
20  that can do a good investigation do them?
21 A  If they do a fair and impartial and thorough
22  investigation, yes.
23 Q  Okay.  And do you know for a fact that Gabe
24  Thompson was one that the chief relied on, as
25  well?

Page 78

1 A  I think Gabe Thompson would be -- I'd say as
2  far as be a benchmark.  If you want another
3  lieutenant to emulate what he does, it would
4  be him.
5 Q  All right.  Okay.  So then, you get into
6  patrol support, and you worked there from
7  April of '11, to when?
8 A  April of 2011 to --
9 Q  April of 2011, until your termination?
10 A  No, sir.
11 Q  All right.  Until when?
12 A  May 22nd.
13 Q  Of?
14 A  2012.
15 Q  Okay.  Where were you transferred then?
16 A  Precinct 4, night shift.
17 Q  What was your duties?  I'm backing up on you.
18  When you were in patrol support, what were
19  your working hours?
20 A  Initially, it was 7:30 to 3:30, as I can
21  recall.
22 Q  A to P?
23 A  Yes, sir.
24 Q  And you worked there roughly a year and a
25  month, something like that, 13 months,

Page 79

1  something?
2 A  Yes.
3 Q  All right.  And were you assigned to a
4  particular precinct or shift when working as
5  patrol support section lieutenant?
6 A  No.  You work for the patrol support.
7 Q  Okay.
8 A  But I may add.  You said in the excess of 13
9  months, or roughly 13 months.  That was my
10  schedule, 7:30 to 3:30.  It changed, so --
11 Q  When?
12 A  If my memory serves me correct, May 27th, the
13  hours changed.
14 Q  Of what year?
15 A  2012.
16 Q  Okay.  When you were -- you were transferred
17  to a different position.
18 A  When?
19 Q  May 22nd of 2012.
20 A  No, sir.
21 Q  You were not?
22 A  No, sir.
23 Q  You were still the lieutenant in patrol
24  support?
25 A  The official letter came out May 22nd, of me

Page 80

1  being transferred.  The actual transfer was
2  going to take in effect, June 10th of 2012.
3 Q  And at that point, your duties -- excuse me,
4  your hours of work changed?
5 A  From May 22nd to June 10th, yeah.  That's
6  correct.
7 Q  And what they were they?
8 A  They were 8:00 to 4:30.
9 Q  A to P?
10 A  Yes.
11 Q  And what was the reason for the change?
12 A  According to Captain Ron Czajkowski, after
13  having a discussion with Major Alfred, they
14  decided to change my working hours, and also
15  assign me a PD cellular phone.  And also,
16  they asked me to -- when I'm not working my
17  normal patrol support duties as a lieutenant,
18  to make myself available to answer calls on
19  the road.  And also, prohibited me from
20  speaking to any individuals outside the realm
21  of patrol support duties.
22 Q  Okay.  Did you ever work with -- directly
23  within the chain of Kane Marceaux?
24 A  No, sir.
25 Q  What about Scott Poiencot?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 81

1  A   Poiencot.
2  Q   Yes.
3  A   No, sir.
4  Q   What about Norbert Myers?  I think he told me
5      he was your lieutenant way back.
6  A   He was my field training officer.  That's
7      about it.
8  Q   Okay.  What about Novey Stelly?
9  A   Yes, we worked on shift.
10 Q   When?
11 A   I'd venture to say the end of '92 to
12     probably '94, something like that.  Maybe a
13     little bit longer than that.
14 Q   All right.  What about with Mr. Hewitt?
15 A   No, sir.
16 Q   What about Mr. Gabe Thompson?
17 A   We worked on shift together when I initially
18     was cut loose from the field training
19     program.
20 Q   Way back when?
21 A   I would say the tail end of '91, until I
22     was -- went to the opposite shift.  We were
23     actually on the same shift, but actually --
24     no, we did work -- I take that back.  Yeah,
25     we worked on the north side together.  That's

Page 82

1      true.
2  Q   All right.  I think I did cut you off --
3  A   Uh-huh (yes).
4  Q   -- when I was asking you about your duties
5      when you were the patrol support section
6      lieutenant.  And we got sidetracked on the
7      shift level investigations.  And I didn't
8      want to cut you off.
9          Was there anything that you wanted to
10     add to your duties?  You told me about
11     payroll.  You told me about if you needed to
12     do a shift level investigation, you would be
13     the one to do it, if ordered.
14 A   No, sir, not if ordered.  If -- I was
15     required to on paper, as far as your -- your
16     duties were to supervise the people, like I
17     said, monitored traffic and downtown detail.
18         It was common knowledge, I don't know if
19     it's actually on paper or not, but you also
20     would -- if it was warranted, that the chief
21     of police, like I said, who is the only
22     person authorized to authorize an
23     administrative investigation or to call for
24     some type of investigation on an officer for
25     alleged misconduct, that shift lieutenant, or

Page 83

1      that patrol support lieutenant that is in
2      charge of those guys, if it was an allegation
3      of employee misconduct against that
4      particular officer that fell under him --
5      under that shift lieutenant that works for
6      him, he would normally conduct the
7      investigation.
8          Well, when you cut me off, I was about
9      to say, well, that wasn't the case, because I
10     was working Bert Bejsovec's employees, also,
11     that he supervised.
12 Q   Why is that?
13 A   That question needs to be posed to Chief
14     Craft.  I can venture to say, they didn't
15     want to inundate Bert Bejsovec with -- bog
16     down anymore cases, because he was friends
17     with Ron Czajkowski, Major Randy Vincent at the
18     time.  And every Thursday after the
19     conclusion of Compstat, they would go off and
20     play golf.
21         So if he was tasked to do
22     investigations, he wouldn't be able to do
23     that.
24 Q   So they played golf every Thursday after
25     Compstat meetings?

Page 84

1  A   Pretty much.  That's common knowledge.
2  Q   52 weeks a year?
3  A   I wouldn't say 52 weeks a year.  But let's
4      see.  I have the transfer letter when Ron
5      Czajkowski was transferred to the patrol
6      support section as a major, as well as
7      retired Major Randy Vincent was promoted and
8      transferred to patrol major.  And maybe a
9      month or two afterwards, after they were
10     promoted, they would play golf.
11 Q   All right.  So Czajkowski was a major at the
12     time they started golf?
13 A   Czajkowski was a captain.
14 Q   Okay.  When he became a captain, they started
15     playing golf?
16 A   Yeah, pretty much.
17 Q   Okay.  But you told me that you were
18     supervising his men when both of y'all were
19     lieutenants in patrol support.
20 A   Whose men?
21 Q   Lieutenant Bejsovec's.
22 A   Yes.
23 Q   Okay.  And you had to do shift level
24     investigations for his guys as well?
25 A   Yes.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 85

1  Q  How many did you have to do for them?
2  A  I did two.  Pretty much all the allegations
3     of employee misconduct, complaint form, if
4     you go back, my name is on it as far as
5     interviewing the person that complained and
6     came in.
7  Q  How many did you -- how many shift level
8     investigations did you perform, either for
9     your guys or Bejsovec's guys, while you were
10    the patrol support lieutenant, total?
11 A  Four.
12 Q  Pardon?
13 A  Four.
14 Q  Two for him, and two for you?
15 A  Yes.
16 Q  Okay.  And it was during that time frame from
17    April of '11, through May of '12?
18 A  Yes.
19 Q  Do you know if any of those were appealed to
20    civil service?
21 A  No.
22 Q  Were all of those investigations completed
23    within the police officer's bill of rights?
24 A  Yes.
25 Q  And you know what I mean by that, the time

Page 86

1     delays, the 60 days, unless there was an
2     extension?
3  A  No.  One of them wasn't.
4  Q  It was one that you investigated, you were in
5     charge of it?
6  A  When I was tasked to, yes.
7  Q  Okay.  Did it involve your men or Lieutenant
8     Bejsovec's men?
9  A  Lieutenant Bejsovec.
10 Q  What was the ultimate outcome of that
11    investigation?
12 A  I don't know.  I received a letter of
13    reprimand.
14 Q  You did?
15 A  Yes.
16 Q  Why?
17 A  For failing to complete in 60 days.
18 Q  I think you have that in your submission,
19    too, don't you, your discovery responses?
20 A  Yes, sir.
21 Q  We'll come back to that when we get to the
22    documents, but let me ask you about it now.
23       Did you violate the 60 days?
24 A  (No response.)
25 Q  Did you not complete the investigation in the

Page 87

1     60 days?
2  A  Yes.
3  Q  Do you have a reason why?
4  A  Yes, sir, I do.  I was working the initial
5     investigation, in which Jeremy Dupuis
6     received a one-day suspension.  I had another
7     investigation of one of my guys.  I had an
8     evaluation to complete.  Every other
9     Thursday, I was conducting -- I mean, I was
10    inputting payroll for in the excess of 48
11    people, the entire patrol support section, as
12    well as doing the annual report for the
13    traffic section.  One lieutenant.  Some of
14    the tasks that I named.  Bert Bejsovec was
15    supposed to do it.
16       I brought that to the attention of my
17    immediate supervisors.  It fell on deaf ears.
18 Q  Who were your immediate supervisors?
19 A  Ron Czajkowski and Randy Vincent.
20 Q  And Greg, for purposes of the record, were
21    they your captain and major from April of
22    2011 until May 22nd of 2012?
23 A  I would -- I would guess.  But to give you a
24    definitive answer, I would have to look at
25    the transfer letters.

Page 88

1  Q  That's fine.
2        But your recollection is that they --
3     that was your major and captain.  We'll look
4     at the documents to make sure it didn't
5     change, but you don't recall a change.
6  A  Well, I can tell you roughly six months when
7     I initially was promoted and assumed the
8     position of patrol support lieutenant, it was
9     Captain Dwayne Arceneaux and Major Alfred.
10    So I don't know where that separation takes
11    place, if it's April or not.
12 Q  Did Captain Arceneaux retire?
13 A  Yes.
14 Q  And is that the reason the captain switched
15    from Arceneaux to Czajkowski?
16 A  No.
17 Q  What was the reason for that, if you know?
18 A  Captain Arceneaux and Major Alfred decided
19    that they wanted to become captain and major
20    in Criminal Investigation Division.
21 Q  Okay.  So they were transferred to CID, you
22    remained in patrol support?
23 A  Correct.
24 Q  All right.  So in summary, the investigation
25    that you performed exceeded the 60 days.  And

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 89**

1  it's your opinion, it's because you had a lot
2  of duties to perform, and it just simply
3  slipped through the cracks.  Is that a fair
4  -- (Interrupted)
5  A   No.
6  Q   Okay.
7  A   I had duties that I were performing that, in
8  all actuality, I shouldn't have been
9  performing them because it should have been
10  the responsibility of the other lieutenant.
11  But because of preferential treatment and
12  favoritism, I was tasked to do it.
13  Q   All right.  And who -- (Interrupted)
14  A   It -- can I finish?
15  Q   Yes.
16  A   It finally came to a head in February, which
17  I should have an official e-mail, where they
18  actually decided that they were going to
19  separate the duties.  But that was after the
20  investigation and the letter of reprimand
21  started.
22  Q   Okay.  In February of what year?
23  A   2012.
24  Q   Did you appeal the letter of reprimand?
25  A   No.

---

**Page 90**

1  Q   What was the -- what was the date of the
2  letter of reprimand, roughly?  And I know
3  it's in the book, and we're going to get to
4  all of the documents.
5  I guess it was before February of '12?
6  A   No, sir.
7  Q   It was after?
8  A   Yes, sir.  It was the day prior to the civil
9  service hearing with the issue of Bert
10  Bejsovec's complaint that I filed.
11  Conveniently, the day before.
12  Q   Do you remember the date of that letter of
13  reprimand?
14  A   Yes.  If I can refer to my documents.
15  Q   Okay.  If you want to look in these, because
16  we have them --
17  A   All right.
18  MS. COREIL:
19  Look at GC-280.
20  MR. CORRY:
21  Q   That's it.
22  A   (Witness examines documents.)
23  Q   Is that it, Greg, GC-280 and 281, that's the
24  letter of reprimand?
25  A   That's correct.

---

**Page 91**

1  Q   And it is dated April 20th of '12, correct?
2  A   I didn't receive it April 20th, 2012.
3  Q   But the letter's dated April 20th?
4  A   I know that, but I didn't receive it April
5  20th, 2012.
6  Q   When did you receive it?
7  A   April 17th, I was told I was getting a letter
8  of reprimand from Major Alfred.
9  Q   When did you actually get this?
10  A   I can't remember, Mr. Corry.
11  Q   But you do recall receiving it?
12  A   I do recall it -- receiving it, and I vividly
13  remember it was the day prior to the civil
14  service hearing with Bert Bejsovec's payroll
15  form.
16  Q   All right.  You said that you complained to
17  -- those are your copies?
18  MS. COREIL:
19  Yes.
20  A   Uh-huh (yes).
21  MR. CORRY:
22  Q   -- that you complained to Captain Czajkowski
23  and Major Randy Vincent about having to do
24  your duties as well as Lieutenant Bejsovec's.
25  A   Yes.

---

**Page 92**

1  Q   Okay.  Did you have to do all of his duties,
2  or just some of them?
3  A   Let's see.  Duties he's supposed to do.
4  Payroll, I did payroll.  Shift level
5  investigations, I did shift level
6  investigations.
7  Let's see, what else?  Fielding
8  questions from his subordinates, I did it.
9  Let's see.  What else?  I think that's
10  about it.
11  Q   Okay.  Is it safe to say that you didn't have
12  to do all of his duties, just the areas that
13  you've described?
14  A   Those that I listed is the major duties.
15  Q   Okay.
16  A   Yeah.  That takes up the bulk of his time.
17  Q   What was he doing?
18  A   I don't know.  Playing golf, or something.  I
19  can't answer that.
20  Q   Did you -- (Interrupted)
21  A   But I know definitely he played golf every
22  Thursday, or every Friday.
23  Q   Did you -- when y'all worked, did he also
24  worked at 900 East University?
25  A   The white house, yes, sir.

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 93

1  Q   Did you -- (Interrupted)
2  A   Uh-huh (yes).
3  Q   Were your offices in close proximity to each
4      other?
5  A   Yes, sir.
6  Q   Describe it for me.  Where were y'all's
7      offices, what floor?
8  A   Third floor.
9  Q   Okay.
10 A   The -- in relationship to the overlay of the
11     building, it would be the -- I guess you can
12     call it the southwestern corner.
13 Q   Were y'all next door to each other?
14 A   No, sir.
15 Q   Did y'all work the same shift?
16 A   I can't tell you his hours.  He -- he came in
17     when he wanted.  According to Major Alfred,
18     and when -- from the inception of adding the
19     second patrol support lieutenant, he was
20     supposed to work the evening shift because
21     the people he supervises worked the evening
22     shift.
23 Q   And what shift would that have been?  What
24     are the times of the evening shift?
25 A   I don't know, it varies.  K-9 come in the

Page 94

1      evening.  I don't know if it's 4:00 p.m., to
2      whatever time they get off.  ATAC come in
3      between 4:00 and 5:00.  And CSU, they
4      normally work in the evening, sometimes 12
5      noon, but the bulk of the time is in the
6      afternoon, 3:00, 4:00 or 5:00.
7  Q   And what I'm trying to do -- what I'm getting
8      at is, were y'all -- did y'all's working
9      hours mandate that you were both in the
10     building at the same time, or did they --
11     were they separate hours, or did they
12     overlap?
13         I'm just trying to figure out if -- I
14     understand what you're saying, that you were
15     having to do some of his duties.  I'm just
16     wondering if you didn't see him there was
17     because y'all worked different hours.  That's
18     what I'm trying to find out.
19 A   No, sir.  When I was doing his duties, as far
20     as fielding complaints from people that were
21     there to file an allegation of employee
22     misconduct, Lieutenant Bejsovec was there on
23     that date and he was there at the time that
24     these people were fielding -- coming in and
25     complain.

Page 95

1          It was common knowledge, everybody at
2      that police department thought I was the only
3      patrol support lieutenant there.  They
4      wouldn't even call him.
5  Q   All right.  How often did you have to do his
6      payroll?
7  A   Every other Thursday.
8  Q   Did you ever discuss it with him?
9  A   I discussed it with him, as well as Captain
10     Czajkowski, as well as Major Randy Vincent.
11 Q   And how many times did you discuss it with
12     Bejsovec first?
13 A   Twice.
14 Q   And what time frame was that?
15 A   That was around the tail end of November of
16     2011.
17 Q   And what did he say?
18 A   He said that that's above his pay grade.  His
19     exact words.
20 Q   What did you complain to him?
21 A   It wasn't a complaint.  I was just bringing
22     up that, according to the patrol support
23     lieutenant duties, they're supposed to be
24     shared equally and there's supposed to be an
25     equitable process.  You have these amount of

Page 96

1      people that you're supposed to be doing
2      duties for, and I have these amount of
3      people.
4  Q   Okay.  What did he say?
5  A   I just told you what he said, that's above
6      his pay grade.  He cannot address it.
7  Q   All right.  Did you tell him you were doing
8      the payroll for his guys?
9  A   I didn't have to tell him that, Mr. Corry, he
10     knew that already.
11 Q   All right.  Greg, I don't work there and I
12     never have worked there, so I'm just trying
13     to find out what went on.  It may -- some of
14     my questions may seem silly, but I don't
15     know.  And this is my opportunity to question
16     you to find out --
17 A   Okay.
18 Q   -- what went on there, and the nature of your
19     complaints, and how it relates to this
20     lawsuit.
21         So I'm trying to figure out, you went to
22     him, said, hey, man, we're supposed to be
23     sharing this equally, and that's what his
24     response was, above my pay grade?
25 A   That pretty much sums it up.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 97

1 Q  All right.  Did you say, specifically, hey,
2      I'm doing the payroll for your guys, why
3      don't you start doing it?
4 A  Yes.
5 Q  And what did he say?
6 A  It's above my pay grade.
7 Q  All right.  So you complained to him on two
8      occasions, roughly in November of 2011.  You
9      complained to him first?
10 A  Yes.  November, and then, the beginning of
11      December.
12 Q  Okay.  And then, you went to who after that,
13      when you got -- (Interrupted)
14 A  I didn't go to anybody, in particular.  I
15      called Captain Czajkowski, and told him that
16      I needed to discuss a matter with him.  And
17      He came to my office.  And I brought this to
18      light, about this patrol support lieutenant
19      position is not a fair and equitable process
20      right now.  There's two lieutenants in that
21      position and they should be doing equal
22      amount of work.
23          And he summoned Lieutenant Bejsovec to
24      my office, and we discussed it further.  And
25      he said he would get back with me.

Page 98

1 Q  All right.  And when was that?
2 A  The early part of December.
3 Q  I'm sorry?
4 A  The early part of December.
5 Q  And you went to him one time --
6 A  No, sir.
7 Q  -- the captain?
8      How many times?
9 A  Maybe two, three times.  Now, the -- the
10      additional times, Major Vincent was there.
11 Q  Okay.  And what was -- the first time, it was
12      just the captain, he brings in the
13      lieutenant?
14 A  Uh-huh (yes).
15 Q  The next time or two, the major was there, as
16      well?
17 A  Yes.
18 Q  Was the lieutenant there, also?
19 A  Bejsovec?
20 Q  Yes.
21 A  Yes.
22 Q  And what, the same complaints, did you have
23      any different complaints?
24 A  No, it was pretty much the same complaints.
25 Q  And what did the major tell you, if anything?

Page 99

1 A  The major didn't say too much.  The bulk --
2 Q  That was Randy Vincent?
3 A  Yes.  The bulk of the dialogue was between
4      myself, Lieutenant Bejsovec and Captain
5      Czajkowski.  And to sum it up, they
6      basically said that he had additional duties,
7      one of them was scheduling the downtown
8      detail.
9 Q  All right.  How many officers does that
10      involve?
11 A  That's off duty.  That's not part of his
12      duties.
13 Q  Okay.  How many officers does that involve?
14 A  I can't give you an exact number.
15 Q  Well, you've worked the downtown -- or
16      supervised the downtown detail, didn't you?
17 A  No, sir.  That's extra detail when you work
18      on the weekend.  That's -- afterwards you the
19      spring board of this complaint being filed on
20      him.
21 Q  Right.  But you said you supervised a
22      downtown detail.
23 A  That's a separate --
24 Q  That's what I'm trying to figure out, what
25      the difference is.

Page 100

1 A  And I'm about to elaborate so you can get a
2      picture.
3 Q  All right.  Go ahead.
4 A  All right.  The downtown detail that I
5      supervised worked strictly downtown,
6      predominantly the area of Jefferson, I'd say
7      the 100 block of Jefferson, all the way up to
8      600 or 700 block of Jefferson.
9 Q  Where all the bars are?
10 A  Pretty much, and businesses.
11 Q  All right.
12 A  And that's during the day.
13 Q  That was what?
14 A  That's during the day.
15 Q  All right.
16 A  And they're not there to concentrate on the
17      bars, they're there to show a presence to
18      businesses and vendors there pretty much.
19      Because there were always complaints about
20      transients --
21 Q  Okay.
22 A  -- loitering downtown.
23 Q  All right.  And what's the detail you're
24      referring to that --
25 A  The downtown detail is the evening detail

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 101

1  that they work Thursday, Friday, and Saturday
2  evenings. And they particularly concentrate
3  on the area where the clubs are at.
4  Q  Okay.
5  A  And that is over --
6  Q  That is extra duty work?
7  A  Overtime pay.
8  Q  All right. Are there any officers down there
9  that were part of your detail, that were not
10  part of the overtime detail during those
11  hours at night, Thursday, Friday and
12  Saturday?
13  A  No, sir.
14  Q  What else did the captain and/or the major
15  tell you?
16  A  The major didn't say anything pretty much.
17  The captain said, well, he assumed basically
18  that when he took over the position of
19  captain in patrol support, that I was going
20  to be the administrative lieutenant, and
21  Lieutenant Bejsovec was going to be the
22  operational lieutenant.
23  Q  Is that kind of how it's divided up
24  throughout the police department --
25  A  No, sir.

---

Page 102

1  Q  -- you have one that's administrative, and
2  one that's operational?
3  A  No, sir.
4  Q  It's not?
5  A  Not in patrol support.
6  Q  Is it now?
7  A  I don't know how it is now. I'm not there
8  any more.
9  Q  All right. Any other complaints? Or scratch
10  that.
11  Any other discussions with either the
12  captain, or the major, or the lieutenant,
13  about your complaints?
14  A  At that meeting, I brought up the Jeremy
15  Dupuis.
16  Q  Okay. And I don't want to -- I've
17  intentionally not brought up any individuals
18  names because I don't want to get into
19  private personnel matters. We've had those
20  issues with the state courts.
21  A  Private personnel matters?
22  Q  Yes. Things that weren't appealed to civil
23  service are private personnel, so I don't
24  want to get into those names here. If you
25  choose to do so, that's between you and your

---

Page 103

1  attorney. But I'm not going to ask specifics
2  about particular --
3  MR. SPRING:
4  Why don't you just refer to him by
5  initial? How's that? That way his
6  name's not in there.
7  MR. CORRY:
8  Q  We were talking about the administration in
9  operations, and the discussions with the
10  captain, the lieutenant, and the major.
11  Any other discussions or complaints by
12  you to them on having to do what you
13  perceived as extra duties?
14  A  I just alluded to the investigations that
15  Bert Bejsovec was supposed to be conducting
16  on his people.
17  And I don't mean to banter with you, Mr.
18  Corry, but the person that I just mentioned,
19  there were some hearings where it was a
20  matter of public record, people could have
21  attended the forum. But --
22  MR. SPRING:
23  Just refer to him by JD.
24  A  But I'll refer to him as JD.
25  MR. CORRY:

---

Page 104

1  Q  Okay. So anything else on the payroll,
2  having to prepare the payroll, discussions
3  with those three?
4  A  You're talking about that particular meeting
5  or --
6  Q  Any meeting?
7  A  -- meetings thereafter?
8  Q  Any meetings thereafter.
9  A  That's all I can recall.
10  Q  How long does it take you to prepare a
11  payroll every other Thursday?
12  A  I can't give you a time frame. There's
13  different variables in that, Mr. Corry. It
14  depends on when the sergeant finishes payroll
15  for his guys.
16  Q  All right. The sergeant prepares the
17  payroll, gives it to you, you verify it, and
18  send it up the chain?
19  A  No. I input it in the computer system.
20  Q  Okay. He's got it all prepared. You take
21  that information he gives you, verify it, and
22  then put it into the computer?
23  A  No, sir.
24  Q  Okay. Tell me how you do payroll.
25  A  Well, when all the sergeants, including

---

Lori Heaphy & Associates, LLC

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 105**

1  Lieutenant Bejsovec's sergeants, prepare the
2  payroll, he gives it to me.  And then, I
3  input it into the system.  And I have his
4  signature stamp, and I stamp it.
5  Q  Okay.  And who do you send that to?
6  A  I send it at the time, to Charita --
7  Q  Where is she?
8  A  -- Benoit.
9  Q  Where is she?
10 A  I guess she's the comptroller for the police
11    department.  She's downstairs.
12 Q  Okay.  And then, do you know how it gets from
13    there to human resources, or is that outside
14    of your -- (Interrupted)
15 A  No, sir.
16 Q  You're not involved in that?
17 A  No.
18 Q  And you were inputting roughly 50 people?
19 A  Pretty much.
20 Q  That included you and Lieutenant Bejsovec?
21 A  Yes.
22 Q  And that was the entire time that you worked
23    in patrol support?
24 A  Up until March 2012.
25 Q  Why did you stop doing payroll in March of

---

**Page 106**

1  2012?
2  A  For some reason, they decided that my
3    complaints had some merit to it.
4  Q  What were your complaints?
5  A  The same complaints I alluded to before.
6  Q  Okay.  That you were doing what you perceived
7    to be more duties than you were --
8    (Interrupted)
9  A  No, it wasn't a perception.  It was a fact.
10 Q  Okay.  That's your opinion.
11 A  No, sir.
12 Q  But you were doing -- (Interrupted)
13 A  No, sir.
14 Q  But you were doing -- (Interrupted)
15 A  All right.
16 Q  You were doing more duties than you thought
17    you should have been.  And in March of 2012,
18    you stopped doing payroll altogether, or just
19    for Lieutenant Bejsovec's people?
20 A  Just for Lieutenant Bejsovec.
21 Q  All right.  And then, you were cast with
22    having to conduct two shift level
23    investigations for yourself, for your guys,
24    and two for Lieutenant Bejsovec?
25 A  Yes.

---

**Page 107**

1  Q  Okay.  And the one that the 60 days was
2    violated, was that one of your guys or one of
3    Lieutenant Bejsovec's guys?
4  A  His.
5  Q  His.  Okay.
6       How long does it take you to do a shift
7    level investigation?  I guess it depends on
8    what -- (Interrupted)
9  A  Exactly.
10 Q  You might have one witness, you might have
11    ten?
12 A  No.  The one particular investigation in
13    which -- JD, I had a total of 15 witnesses.
14 Q  Okay.  Was that one of yours, or one of his?
15 A  JD is Lieutenant Bejsovec's.
16 Q  All right.  Now, fielding questions --
17    anything else on the shift level
18    investigations, other than you had to do two
19    of his and two of yours?  Anything else?
20 A  What do you mean?
21 Q  Did you have to do any more for anybody else,
22    or was it just those four?
23 A  It was just those four.
24 Q  All right.  Fielding questions from
25    subordinates.  How often would you have to

---

**Page 108**

1  field questions from your subordinates?
2  A  I can't answer that, Mr. Corry.
3  Q  Give me -- (Interrupted)
4  A  It may be a particular day, I may have a
5    conversation with one of my sergeants, five,
6    six times a day.  If it's a particular
7    project he's working on, and he needs
8    guidance or direction, as far as how he
9    should pursue it.  He may sit down with me
10   and we may discuss it a couple of hours.
11 Q  Okay.
12 A  And then, it may be a day that I don't have
13   contact with him at all.
14 Q  How many sergeants did you have under you?
15 A  Two.
16 Q  What were their names?
17 A  Austin Provost and Ricky Rees.
18 Q  All right.  And were those the same --
19   (Interrupted)
20 A  And -- let me finish.
21     Initially, I had two.  At the tail end,
22   I had three.  And I had Dwayne Stutes.
23 Q  He was the third?
24 A  Yes.
25 Q  And did Lieutenant Bejsovec have the same

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 109

1  three?
2  A  Yes, he should have three.
3  Q  Those same individuals?
4  A  No, sir.  He had three sergeants as well.
5  Q  Who were they?
6  A  I don't know who all of them are.  I know,
7     because they changed a little bit.  There was
8     a sergeant in K-9, there was a sergeant in --
9     two sergeants in CSU.
10 Q  What is CSU?
11 A  Crime Suppression Unit.
12        And when they decided to share the
13    responsibilities equally, he would have had
14    four.  So I took Dwayne Stutes.
15 Q  Okay.  So when you said you did the downtown
16    detail, the mounted patrol, and the -- what
17    was the third one?
18 A  Traffic unit.
19 Q  -- traffic unit, what do you describe those,
20    units?
21 A  Units, sections.
22 Q  Okay.  And how many did he have?  He had the
23    downtown detail --
24 A  Who?
25 Q  Lieutenant Bejsovec.

Page 110

1        -- the crime suppression.  What other
2     unit did he have?
3  A  No, sir.  He didn't have the downtown detail.
4  Q  Okay.
5  A  That was the explanation they gave me as far
6     as additional responsibilities.
7  Q  Well, he had the crime suppression, he had
8     the K-9.  What other unit did he have?
9  A  And he had ATAC for some time before it came
10    over to me.
11 Q  All right.  How often did you have to take
12    questions from his subordinates?
13 A  Every week.  Payroll issues.  Sometime it was
14    one of his sergents with CSU would be at his
15    wit's end on a call dealing with a criminal
16    matter.  They would call me, as opposed to
17    him.
18        Something dealing with addressing a
19    subordinate, they would call me to seek
20    guidance, as far as how they should address
21    that issue with them without violating any
22    policies or procedures.  They would call me.
23 Q  Any other complaints that you made to anybody
24    about those duties, issues, regarding
25    payroll, shift level investigations and

Page 111

1  fielding questions?
2  A  Besides my chain of command?
3  Q  Correct.
4  A  No.
5  Q  And the only -- not the only, but you made
6     two to three to the captain, and the major
7     total.  Is that accurate?
8  A  (No response.)
9  Q  One initially to the captain, and then a
10    couple more, one or two more.
11 A  No, I wouldn't say accurate.  I would say I
12    would guess it's somewhere in that ballpark.
13 Q  Okay.  All right.  You mentioned something
14    earlier about this Glen Dartez incident, that
15    somebody blamed you for it.  What do you
16    describe, what are you talking about?
17 A  Somebody?
18 Q  Tell me what that means.  What was the Glen
19    Dartez incident?
20 A  Major Glen Dartez was in -- was the criminal
21    investigation commander.  There was an
22    incident where I was on-call as a criminal
23    investigation supervisor that week.  I
24    received the initial phone call.  I can't
25    remember who was the supervisor in patrol.

Page 112

1        But there was an incident at 202 Wilcox,
2     in which there was an argument, a verbal
3     argument that occurred.  It escalated into it
4     becoming physical.  And it was between a
5     female and a male.
6        The female sustained some unknown
7     injuries to her facial area, and she was
8     transported to Lafayette General.
9        And at the time, the initial
10    conversation with the supervisor in patrol,
11    we didn't know the status of her injuries at
12    the time.
13 Q  Who contacted you?
14 A  I don't remember the supervisor.
15 Q  But it was someone below you, or someone
16    above you in the chain?
17 A  I don't remember if it was a sergeant or a
18    lieutenant.  Sometimes sergeants who's out
19    there in the field working the case, who's
20    the best person to actually communicate with
21    because he had firsthand knowledge and he's
22    there.  But sometimes the watch commander,
23    who is a lieutenant, will call the on-call
24    supervisor and communicate with him on an
25    incident that they think requires criminal --

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 113

1  the Criminal Investigation Division to
2  further investigate it.
3  Q  All right.  At this point, though, you're not
4  in the CID, are you, you're in patrol
5  support?
6  A  I'm in CID.
7  Q  Okay.  A sergeant in CID?
8  A  Yes, sir.
9  Q  Do you know what time frame this was?
10  A  If I can refer to the binder, I can tell you
11  exactly.
12  Q  Okay.  We're going to get to that.
13  A  Okay.
14  Q  I think it's just quicker to kind of go
15  through it, and then I'm going to take you
16  through every document so we can flip and
17  you'll be able to tell me specifically.
18  A  All right.
19  Q  Roughly, when was it?  Sometime in 2010?
20  A  Yes.  I'd venture to say around June.
21  Q  All right.  And you don't recall who it was,
22  whether it was a subordinate, or whether it
23  was a superior officer, but somebody
24  contacted you?
25  A  It would have been either an officer of equal

Page 114

1  rank, or someone with the rank above me,
2  which would have been a lieutenant.
3  Q  And you don't recall, or do you recall how
4  you were contacted?
5  A  By phone.
6  Q  Okay.  And they relayed to you the
7  information you just relayed to me.
8  What did you do at that point?
9  A  At that point, I summoned the person's
10  investigator, who was David Leblanc, as well
11  as Malcolm Bussey, who was also an
12  investigator at the time.  And if my memory
13  serves me correct, it should have been Jeff
14  Hebert as well.
15  And the last two, Bussey and Hebert,
16  were persons -- I mean, property
17  investigators.
18  But normally, a case of that nature,
19  you're going to call everyone out to make
20  sure that responsibilities are disseminated
21  equally and to make sure that it's done in a
22  proper manner.
23  Q  Do you remember if these guys are at 900 East
24  University?
25  A  No, sir.  I called them on the phone and gave

Page 115

1  them direction --
2  Q  So it was all on the phone?
3  A  -- as far as what they needed to do.
4  Q  Where were you?
5  A  I was at home.
6  Q  Okay.  So you were on-call?
7  A  Yes.
8  Q  And that's the reason you took the call?
9  A  Yes.
10  Q  All right.  And what -- what happened from
11  there?
12  A  David Leblanc and myself proceeded to the
13  scene.  Malcolm Bussey, if I'm not mistaken,
14  I directed him to the hospital to give me a
15  status update on the victim's condition.  And
16  I think Jeff Hebert proceeded to the
17  department in case we needed to type up any
18  type of warrant, he was there.
19  Q  All right.  And then, what?  Completed your
20  investigation?
21  A  No.  We did a preliminary investigation.  We
22  identified the suspect, interviewed him.  He
23  provided a statement.  At a time, we did get
24  a status update, as far as the victim's
25  condition.  And she was in a vegetable state.

Page 116

1  And they were waiting for notification to a
2  family member in order for them to sign an
3  authorization signature in order to, in
4  laymen's term, pull the plug on the person.
5  At that time, I directed David Leblanc
6  that when that would occur, and they would
7  pull the plug and she would expire, that we
8  needed to upgrade the charges, and to go back
9  and get a secondary interview with the
10  suspect.
11  The suspect provided a statement
12  initially at the time that we went out at the
13  scene.  And he basically said, they got in an
14  argument, he inadvertently elbowed her.  She
15  had some medical issues prior to that, as far
16  as she would catch seizures.  And he said,
17  when he elbowed her, she became in an
18  incoherent state.  He ran outside because
19  they were utilizing the same phone lines
20  as -- they stayed in the apartment in the
21  back.  The main house in the front, they
22  shared the same phone lines.  When he tried
23  to call 911, someone in the front was on the
24  phone.
25  So he ran outside to go to alert them

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 117

1  that you need to get off the phone, there's
2  an emergency.
3       But during the course of him doing that,
4  he noticed a white vehicle, who he described
5  as an Avalanche, but he said it's a law
6  enforcement vehicle because there's a black
7  light on the side mirror.
8  Q  A black what?
9  A  A black spotlight.
10 Q  Okay.
11 A  He approached the person that was driving it,
12    at the time he was talking to a female named
13    Debbie, who, which the argument started over
14    her.  And he asked him for assistance.  Said,
15    hey, my girl is in the back, she needs some
16    assistance.  Can you get on your radio, call?
17    He casually looked at him, told him, I'm off
18    duty, rolled his window up and left.
19 Q  Okay.  He told you this, or told your
20    investigators this?
21 A  You're talking about the suspect?
22 Q  Yes.
23 A  He told me the investigator this.  I was
24    monitoring it in my office, the interview.
25 Q  So the interview was happening at the police

Page 118

1  station?
2  A  That's correct.
3  Q  At 900 -- (Interrupted)
4  A  East University.
5  Q  Okay.
6  A  Yes, sir.
7       We actually charged him with, if I'm not
8  mistaken, I think it was homicide at the
9  time.
10      When David Leblanc went back and
11 conducted the secondary interview after they
12 pulled her off of life support, we upgraded
13 the charges to second degree murder.
14      The following morning, I report to work
15 as usual, went in to get a cup of coffee, get
16 on the computer and review all my cases that
17 have warrants to assign to investigators.
18      David Leblanc comes in and tells me that
19 the person that the suspect was referring to
20 is Major Glen Dartez.
21      At the time, he doesn't know what to do.
22 So I instructed him that you need to report
23 it to your supervisor, who was Lance Leblanc.
24 Q  You were not his supervisor?
25 A  I was his supervisor for that weekend

Page 119

1  on-call.  David Leblanc's immediate
2  supervisor was Lance Leblanc.
3  Q  And Lance Leblanc was a sergeant?
4  A  Sergeant.
5  Q  All right.  Did you have anything else to do
6    with it?
7  A  Yes.
8  Q  What was it?
9  A  At the time, he said he couldn't do it.  I
10    said, well, come on, I'll go with you.
11      We proceeded to Lance Leblanc's office.
12 I closed the door and I told him, David
13 Leblanc has something to tell you.  He
14 couldn't verbalize what occurred, so I
15 assisted him and told him exactly what
16 happened.
17 Q  What was the problem?
18 A  I guess he was so nervous and he was caught
19    up, because it was a major, high ranking
20    individual that had basically committed
21    malfeasance in office, although they said it
22    wasn't.  But he didn't respond as a first
23    responder, put it that way.
24      And he knew by reporting Major Dartez --
25 Q  Greg, and --

Page 120

1  A  What?
2  Q  -- I don't want you to speculate on what --
3    (Interrupted)
4  A  I'm not speculating.  That came exactly from
5    his mouth.
6  Q  Okay.  And that's from David?
7  A  David Leblanc.
8  Q  Okay.
9  A  He knew by reporting Major Dartez that there
10    would be some reprisals.  Because prior to
11    that, there was an incident that occurred at
12    Acadiana High involving a school teacher, and
13    which you're familiar with it, Mr. Corry,
14    because you defended the city on it, in which
15    Sergeant Greg Randall was suspended for five
16    days for not properly investigating an
17    incident.  Do you recall that?
18 Q  Yes.
19 A  Okay.  So prior to the investigation actually
20    being launched on Greg Randall, Major Dartez
21    had conducted a criminal investigation -- a
22    meeting in CID, in which he got in a verbal
23    exchange with Greg Randall, in which he
24    yelled at --
25 Q  Were you present?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 121**

1  A   Yes, sir, I was present.
2  Q   Okay.
3  A   He yelled at Greg Randall, and that caused
4     Greg to file a complaint on him.  He filed a
5     complaint on him the Friday.
6        The Monday, an investigation started on
7     Greg Randall.
8        Major Randy Vincent, who was also
9     present, who was listed as a witness in Greg
10    Randall's complaint, was tasked to
11    investigate the complaint that Major Dartez
12    filed on Greg Randall for failing to properly
13    investigate an investigation.
14       Now --
15 Q   All right.  Let's get back to the Dartez.
16 A   I'm getting to it.
17 Q   Okay.
18 A   Well, with that in mind, he knew it was
19    already established that if you report
20    somebody with higher ranking, somewhere down
21    the line, they're going to return the favor
22    in some form or fashion.  So he was leery
23    about reporting it.
24 Q   When you say "he", David Leblanc?
25 A   That's correct.

---

**Page 122**

1  Q   Okay.  Just so it's clear for the record.
2  A   So I instructed him that you're obligated to
3     report any misconduct immediately, as per
4     general order.
5  Q   All right.  So y'all go meet with --
6     (Interrupted)
7  A   We meet with Lance Leblanc.  I tell him what
8     occurred.  He looked up at the ceiling,
9     ceiling tex.  And I said, the answer's not
10    there.  You have only one choice.  You can
11    either report it to a lieutenant, who's both
12    of our immediate supervisors, because we're
13    sergeants at that time, who is Lieutenant Mac
14    Gallien.  He elected not to report it to Mac
15    Gallien because he said that -- I can't
16    remember what he said, sometimes Mac has
17    erratic behaviors, so he didn't want to
18    report it to him.
19       I said, well, you're going to have to
20    report it to Randy Vincent, who was the
21    captain at the time.
22       I turned to David Leblanc and Lance
23    Leblanc and said, you know what, I'm done, I
24    did my part.  And I walked off.
25 Q   Did you have any further follow-up -- scratch

---

**Page 123**

1     that.
2        Did you do -- did you undertake any
3     further actions on reporting the information
4     about Major Dartez to anybody else --
5  A   No, sir.
6  Q   -- after that point?
7  A   Because I thought, at that point, by
8     reporting it to a supervisor at the same
9     level as I, who is obligated and should be
10    aware of policies and procedures that are in
11    -- at least that compels him to report
12    misconduct, that it wasn't warrant for me to
13    follow up on it.
14 Q   Okay.  And I just want to make sure it's
15    clear, because you started your answer --
16 A   Go ahead.
17 Q   -- before I responded.
18 A   Uh-huh (yes).
19 Q   Did you undertake any further actions after
20    that meeting with Sergeant Leblanc, regarding
21    an incident with Major Dartez in reporting
22    his presence to anybody?
23 A   I didn't take any action, as far as me
24    initiating -- self-initiating something where
25    I went there and tried to get the outcome of

---

**Page 124**

1     what occurred.
2        They came to me, closed the door the
3     following morning, and told me they reported
4     it to lieutenant -- well, actually, Major
5     Vincent.  The only problem is, as they were
6     walking in to report it to Major -- I mean,
7     Captain Vincent at the time --
8  Q   Which Vincent?
9  A   Randy Vincent.  When they were getting ready
10    to report it to him, Lieutenant Gallien
11    walked in, and Captain Vincent invited him
12    in.  So it was kind of unintended, but
13    Lieutenant Gallien was present at the time.
14 Q   All right.  Let me back up.
15       It was Captain Ted Vincent, or Randy?
16 A   Randy.
17 Q   Okay.  And we're kind of all over the place
18    and I want to make sure that we're specific.
19       Leblanc comes to you.  You tell Leblanc,
20    we need to go to your direct supervisor.
21 A   I don't mean to cut you off.  There's two
22    Leblanc's, so --
23 Q   Right.
24       David Leblanc comes to you --
25    Investigator David Leblanc comes to you the

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 125

1 next morning after this incident, or within a
2 few days of the incident. Do you know the
3 time frame?
4 A  Not exactly. I would venture to say it's
5 probably a day, because we were called out
6 early Sunday morning, somewhere around there.
7 That Sunday evening is when he received a
8 call that they had pulled her off life
9 support, so --
10 Q  Within a few days?
11 A  It's within a day or so.
12 Q  All right. So Investigator David Leblanc
13 comes to you to report this incident. Since
14 you were the on-call supervisor, you said,
15 look, we need to go -- or you need to go to
16 your direct supervisor, Lance Leblanc.
17 Correct?
18 A  No.
19 Q  Okay.
20 A  He didn't report it to me because I was on
21 the on-call supervisor. He reported it to me
22 because he was aware, and I was aware of what
23 had occurred.
24 Q  Okay. All right.
25 A  And he felt comfortable reporting it to me,

Page 126

1 as opposed to going initially to his
2 supervisor.
3 Q  All right. So you say, hey, we need to go --
4 or you need to go directly to your immediate
5 supervisor?
6 A  Correct.
7 Q  So y'all -- you and Investigator David
8 Leblanc go to Sergeant Lance Leblanc?
9 A  Correct.
10 Q  Was there anybody else present other than the
11 three of you?
12 A  No, sir.
13 Q  All right. Sergeant Lance Leblanc says, this
14 needs to go to my supervisor, the lieutenant,
15 who is Mac Gallien?
16 A  Incorrect.
17 Q  What did he say?
18 A  He didn't say anything. He looked up at the
19 ceiling. I told him, it needs to go.
20 Q  All right. You told Investigator David
21 Leblanc -- (Interrupted)
22 A  No, sir.
23 Q  You told Sergeant Lance Leblanc it needs to
24 go to the lieutenant?
25 A  Yes, sir.

Page 127

1 Q  All right. So then you and -- at that point,
2 you were done, correct?
3 A  Yes.
4 Q  All right. And do you know if Sergeant Lance
5 Leblanc and/or Investigator David Leblanc
6 went directly to Lieutenant Mac Gallien?
7 A  Yes.
8 Q  They did?
9 A  They didn't.
10 Q  They did?
11 A  Didn't.
12 Q  Did not. That's accurate?
13 A  Yes.
14 Q  Okay. I'm hard of hearing, so that's why
15 I'm --
16 A  Okay.
17 Q  They did not.
18     But at some point, they go to Captain
19 Randy Vincent?
20 A  Yes.
21 Q  And you were not present for that?
22 A  No, sir.
23 Q  Don't know -- you weren't a firsthand -- you
24 have no firsthand knowledge of what was
25 reported by Sergeant Lance Leblanc and

Page 128

1 Investigator David Leblanc to Captain Randy
2 Vincent?
3 A  Yes, I do.
4 Q  How so, if you weren't there?
5 A  They told me what exactly they said.
6 Q  Okay. But you weren't there?
7 A  You're talking about that particular day?
8 Q  Yes.
9 A  No, sir, I wasn't.
10 Q  All right. And do you know where it went
11 from Captain Randy Vincent, firsthand
12 knowledge?
13 A  No.
14 Q  All right.
15     MR. CORRY:
16       Steve, it's 1:00. Do you want to
17 take your break and come back, meet back
18 here about 1:45?
19     MR. SPRING:
20       Yes, that would be great.
21     MR. CORRY:
22       All right.
23       (LUNCH BREAK TAKEN FROM
24 1:04 P.M. UNTIL  1:54 P.M.)
25     MR. CORRY:

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 129

1  Q   Let me back up.
2       You were transferred to Precinct 4,
3  night shift, which took effect on June 10th
4  of '12; is that accurate?
5  A   Correct.
6  Q   Okay.  So you were no longer in patrol
7  support?
8  A   The letter came out May the 2nd -- 22nd.  You
9  got that?
10 Q   Yes.
11 A   The same day the TRO was filed.
12      As a matter of fact, the letter of
13 transfer came out that afternoon.
14 Q   And that was the TRO that was filed in state
15 court to stop the Mclean investigation?
16 A   That's correct.
17 Q   Okay.  So when you were in Precinct 4, night
18 shift, you were no longer in patrol support?
19 A   That's correct.
20 Q   And worked from June 10th, until your
21 termination?
22 A   September 12th, 2012 is the year.
23 Q   September 12 of '12?
24 A   Yes.
25 Q   That was your last day of work?

Page 130

1  A   If I'm not mistaken, according to the letter.
2       MR. SPRING:
3       Is it '12?
4  MR. CORRY:
5  Q   And I've got that.  It's in the book.  We'll
6  get the exact date.
7  A   Okay.
8  Q   But you worked from June 10th, until your
9  termination day?
10 A   That is correct.
11 Q   Okay.  And all the while in Precinct 4, night
12 shift?
13 A   That's correct.
14 Q   And who was your chain?
15 A   Captain Cornell Montgomery, Major George
16 Jackie Alfred, and Police Chief James P.
17 Craft.
18 Q   All right.  Let's go back to the Dartez
19 incident.
20      Is there anything else about the Dartez
21 incident that we did not cover?  I know
22 there's some documents and I know there's
23 some allegations in the lawsuit that I'm
24 going to take you through.
25      So when we -- you'll have those

Page 131

1  documents in front of you to specifically
2  look at.  But anything else that you think is
3  significant that we did not talk about?
4  A   In the Dartez --
5  Q   Regarding the Dartez incident.
6  A   Yes.  But I don't know if you want to address
7  that now or --
8  Q   With the documents?
9  A   (Witness nods affirmatively.)
10 Q   Why don't you tell me what it is?
11 A   Well, I just make the analogy of despaired
12 treatment.  When we were discussing about the
13 David Leblanc being reluctant in reporting it
14 because of fear of reprisal was down the
15 road, I had referenced Greg Randall and his
16 ordeal, which you were aware of it because
17 you represented the city in his appeal
18 hearing for the five-day suspension for
19 failing to properly investigate an incident
20 at Lafayette High.
21      Now, there was a supreme board case
22 after Greg Randall, in which Stephen Bajat
23 investigated another employee of Acadiana
24 High, in which this gentleman right here that
25 you're reading -- there's a newspaper

Page 132

1  article -- provided information initially to
2  Agent -- if I'm not mistaken -- William
3  Sherman, as well as ADA -- or USADA, Luke
4  Walker.
5  Q   And let's hold off one second.  I think this
6  is new documents.
7       MR. CORRY:
8       Did you produce these?
9       MR. SPRING:
10      Did you put it in the notebook?
11      THE WITNESS:
12      Yeah.
13      MR. SPRING:
14      I never got a copy of the notebook.
15 I've never seen that.
16      THE WITNESS:
17      You can even see the holes in
18 which, I made an extra copy.
19      MS. COREIL:
20      I don't recognize this.
21      MR. CORRY:
22      And I don't recognize seeing that
23 either.  You know, to make it run
24 smoother, for your benefit and for ours,
25 it's just important that we get

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 133**

1 everything. I mean, y'all have produced
2 documents to us three times.
3 THE WITNESS:
4     Mr. Corry -- go ahead. I don't
5 mean to cut you off.
6 MR. CORRY:
7     Well, and I don't know where the
8 breakdown is. But it's --
9 A  I can tell you this, when Uletom Hewitt had
10 his deposition, and I came in and Mr.
11 Alexander was sitting right over there, I
12 brought in a black binder.
13 MR. CORRY:
14 Q  You gave us a copy.
15 A  This (indicating) was in that black binder.
16 Q  It's not in our black binder.
17 A  Now, I don't know what to tell you, if it
18 disappeared.
19 Q  Well, I can tell you this, we didn't take any
20 documents out of your black binder. We
21 copied the black binder, and it's part of
22 this record, and we Bates stamped it.
23 A  Mr. Corry, I never insinuated that you did.
24 I can assure you as a system of checks and
25 balance, if we would have sat there and went

---

**Page 134**

1 through every page, and to assure that, then
2 there wouldn't be any discussion about --
3 Q  Why don't we do this, to make it easier for
4 flow purposes, why don't we take this
5 document, and then I know you -- there were a
6 few other documents that were not in the
7 binder that you made copies, that we made
8 copies of. Let's do that at the end of all
9 the documents. We'll go through all of these
10 documents, and that way it'll refresh your
11 memory as to what we have.
12     We can identify what we have for the
13 record. And then, we're through with the
14 ones that we Bates stamped and marked, then
15 we can get into the documents that perhaps
16 weren't in there for whatever reason.
17 A  Okay, sir.
18 Q  And that way it'll make it easier for you and
19 easier for us.
20 A  Okay. So do you want me to continue to
21 elaborate on that or wait until the end?
22 Q  Just tell me about -- we'll talk about the
23 document when we get to it, but just tell me.
24     So it's your --
25 MR. SPRING:

---

**Page 135**

1     Do you want to --
2 MR. CORRY:
3 Q  Let me kind of summarize it, if I can.
4     It's your belief that Dartez was treated
5 differently than perhaps other officers
6 regarding that incident?
7 A  Well, not only Dartez. Prior to that, they
8 had already established a pattern where if
9 you're a favorite son of the chief or the
10 powers that be, that you're going to get
11 preferential treatment.
12     This is a shining example in which the
13 whole irony of the thing is, and it can cross
14 over to racial lines. Greg Randall received
15 a five-day suspension for allegedly failing
16 to properly investigate an investigation.
17 But yet, thereafter, Stephen Bajat conducted
18 another investigation, which was a
19 springboard from this initial investigation,
20 where he setup an interview with an alleged
21 suspect, and failed to even, you know, find
22 out prior to him even indulging himself into
23 the investigation that he didn't have a
24 particular crime. The suspect was Elizabeth
25 Savoy. She wound up committing suicide as

---

**Page 136**

1 opposed to being exposed publicly in the
2 media. And there was no crime.
3 Q  All right. And we'll get to that.
4     Let's -- I want you to tell me how the
5 Dartez incident, specifically Dartez, not
6 these other ones. We'll get to those.
7 Dartez specifically, how is it -- how do you
8 think that affects your lawsuit?
9 A  How that what?
10 Q  Why is that relevant to your lawsuit?
11 A  Because of despaired treatment, the way most
12 black officers when they are investigated for
13 an alleged misconduct, they're treated
14 harshly by, particularly Chief Craft, because
15 he's the ultimate person that renders the
16 decision on the investigation, as opposed to
17 white officers.
18     And I was making the analogy, the same
19 investigation where he didn't investigate it
20 appropriately, he didn't even receive a
21 verbal warning. And this lady lost her life.
22 She committed suicide because of his
23 ineptness. But nothing was done to him.
24     But yet Greg Randall got a five-day
25 suspension, and he did investigate it

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 137**

1  properly.  It went to civil service, and they
2  agreed and overturned Chief Craft's five-day
3  suspension.
4      That's just one shining example of
5  what --
6  Q  Okay.
7  A  It's applicable to our lawsuit.
8  Q  Okay.  And how is Dartez?  How was he treated
9  differently?
10 A  How was Dartez treated differently?
11 Q  Yes.
12 A  Dartez was never placed on administrative
13 leave.  He was forced -- Chief Craft was
14 forced to put him on administrative leave
15 after everyone in the police department found
16 out that he was at the scene of a homicide
17 and never rendered any type of assistance,
18 and failed to even mention he was there.
19     And even afterwards, when we discovered
20 that the key witness in which the argument
21 started over was there and was picked up by
22 him, he refused to provide information on how
23 to get in contact with this person, which is
24 obstruction of justice.
25 Q  When he was placed on administrative leave,

---

**Page 138**

1  was it because an investigation had been
2  started, or do you know?  Do you know why
3  Dartez was placed on administrative leave?
4  A  He was placed on administrative leave after
5  the media got involved and he was exposed.
6  Q  Do you know why, though?  Was it because of
7  this incident that you described?
8  A  Yes, because of this incident.
9  Q  That's what I'm trying to -- (Interrupted)
10 A  Yes.
11 Q  Okay.  And do you know the outcome of that
12 investigation?
13 A  He retired before the chief rendered a
14 disposition on what was going to happen.  But
15 there's a recording of the chief telling him
16 that it's a possibility that he's going to be
17 suspended at a bear minimum, or terminated.
18 Q  Okay.
19 A  So prior to taking -- or taking a chance on
20 his fate in the hands of the chief --
21 Q  He retired?
22 A  -- he decided to retire.
23 Q  Okay.  What was the outcome of Gabe
24 Thompson's investigation?
25 A  Which investigation?

---

**Page 139**

1  Q  The one that you and Poiencot were involved
2  with?
3  A  Poiencot.
4  Q  Poiencot.
5  A  Poiencot.
6  Q  Poiencot.  Scott.
7  A  All right.
8  Q  Scott.
9  A  Okay.
10 Q  What was the outcome of Gabe's?  Did it go to
11 discipline, or did he retire?
12 A  Which one are you referring to, Mr. Corry?
13 Q  Regarding the Mclean document.
14 A  (No response.)
15 Q  Was Gabe disciplined, or did he retire?
16 A  The Mclean document, he was exonerated.  But
17 he never got an official letter.  It went
18 to --
19 Q  Go ahead.
20 A  I'm going to answer the question.
21 Q  That's fine.
22 A  But you're cutting me off.
23 Q  I don't want to cut you off.
24 A  As you recall, you were present at that civil
25 service hearing behind the administrative

---

**Page 140**

1  leave issue with my racing heart.  At the
2  tail end of the hearing in which there was an
3  issue as far as me alleging that I didn't
4  have a racing heart, and I didn't divulge
5  that information to either Joey Provost or
6  Dwayne Prejean.  And they saying I did.  I
7  went up and told them the only compelling
8  evidence that would dispute either of our
9  assertions would be the prerecorded statement
10 from the polygraph.
11     And it took them awhile, but they
12 finally went and they got it, and it came
13 back, and I never said that.
14     And at the conclusion of this, the board
15 ruled that they need -- they weren't going to
16 get an extension, and they said -- Norbert
17 Myers, Scott Poiencot and Gabe Thompson, they
18 asked -- they asked them what is the status
19 of it?  And they said, well, they basically
20 exonerated, nothing occurred.
21     So in essence, in the open meeting, they
22 said, they were cleared of it.
23 Q  Did Gabe retire, or was he disciplined?
24 A  For which incident?
25 Q  I'm asking you.  How did he end his career at

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 141**

1  the Lafayette Police Department?
2  A  Mr. Corry, I cannot answer as far as what
3  he --
4  Q  You don't know?
5  A  City hall.  No, I can't.
6  Q  Okay.
7  A  That's a personal issue.
8  Q  All right.  Was there anything that prevented
9  you from retiring?
10  A  Yes.
11  Q  What?
12  A  I was terminated.
13  Q  Could you have -- when you were given an
14  administrative leave notice, could you have
15  gone and retired at that point?
16  A  Why would I retire for something I didn't --
17  I'm answering the question.
18  Q  No.  You've got to answer it yes or no.
19  MR. SPRING:
20  Then you can explain.
21  MR. CORRY:
22  Q  Then you can explain all you want.
23  A  Okay.  Repeat the question.
24  Q  Was there anything that prevented you from
25  retiring when you received the administrative

---

**Page 142**

1  leave notice regarding the investigation that
2  you were ultimately terminated for?
3  A  No, there was nothing that could have
4  prevented me from retiring.
5  Q  Okay.  And there's no difference with Glen
6  Dartez, either.  He chose to retire, as you
7  say, prior to the investigation running its
8  course and him being disciplined?
9  A  No, sir.  He was told what was going to be
10  the outcome of the investigation way before
11  he decided to retire.  He retired after he
12  was told, he was going to receive some form
13  of discipline up to termination.
14  Q  Okay.
15  A  No one told me that.  There's a difference.
16  But I didn't retire because I didn't do
17  what I was accused of doing.
18  Q  After you were terminated, where did you go?
19  Where were you employed?
20  A  I was employed at Wal-Mart Distribution
21  Center for a month.
22  Q  October of '12?
23  A  Uh-huh (yes).  Yes.
24  Q  What did you do?
25  A  I guess, if you want to call it, inventory

---

**Page 143**

1  clerk.  I was served inventory that needed to
2  go to the Wal-Marts in this -- the particular
3  region that the distribution center was in.
4  And I would get an order, and we would fill
5  the order.
6  Q  What was your rate of pay when you were
7  terminated?  Were you paid salary, or by the
8  hour?  How are you paid?
9  A  We were paid by the hour.  If memory serves
10  me correct, I was making $34.32 an hour.
11  Q  What did that translate into a yearly salary?
12  A  I can't answer that, Mr. Corry.  I'd have to
13  see the --
14  Q  And what were you making at Wal-Mart?
15  A  $15.25 an hour.
16  Q  40 hours a week?
17  A  36.
18  Q  Did you have any benefits?
19  A  Yes.
20  Q  What?
21  A  Medical.
22  Q  They paid for it?
23  A  No.  It came out of your check.  It was a
24  deduction out of your payroll check.
25  Q  You paid 100 percent of it?

---

**Page 144**

1  A  What?
2  Q  You paid 100 percent?
3  A  No, they paid a certain percentage that they
4  paid.  I can't give you the exact amounts.
5  Q  You benefits with the city, health insurance.
6  Did you have to pay a portion of that?
7  A  Yes.
8  Q  Was it because your family was on it?  Does
9  the city pay 100 percent of an officer's
10  health insurance?
11  A  No, sir.
12  Q  Okay.  You have to pay a percentage?
13  A  Yes.  It's mandatory.
14  Q  Do you know what percentage it is you pay?
15  A  I'd have to look.
16  Q  That's fine.
17  A  Do you still want me to answer it, or look
18  through --
19  Q  No, we'll get to it.
20  Roughly?
21  A  (Witness shakes head negatively)
22  Q  You don't know?
23  A  No.
24  Q  What other benefits did you have?
25  A  With Wal-Mart or the city?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 145

1 Q   With LPD.
2 A   LPD.  That is pretty much the extent of it.
3 Q   Sick leave, I guess, which was accrued in
4     annual leave?
5 A   I thought you were referring to medical.
6 Q   No.  I was referring to benefits.
7 A   Okay.
8 Q   All benefits.
9         Sick leave, annual leave.  What else?
10 A   On the annual, since I was terminated, I
11     forfeit my sick leave and accrued time.
12 Q   Did you have any accrued time?  I thought you
13     had used it all for that month and a half
14     before you started that new -- (Interrupted)
15 A   Not -- not sick leave.
16 Q   How much sick leave did you have?
17 A   I don't know, Mr. Corry.  I only missed two
18     days.  So if you would calculate 22-1/2
19     years, minus two days, that would give you
20     the figure.  I can't tell you.
21 Q   Do you know what it is, roughly?
22 A   No, sir.  I wasn't concerned about that,
23     because I anticipated on retiring at 33
24     years.  So I wasn't concerned about that at
25     this juncture.

---

Page 146

1 Q   What -- how many years did you have in, 22?
2 A   22-1/2.
3 Q   And you were going to retire at?
4 A   At least 33.
5 Q   All right.  And how much annual leave did you
6     have accrued?
7 A   I can't tell you that.
8 Q   Is it by hours or by days?
9 A   You asked me how much annual leave I accrue
10     over a year period, or --
11 Q   No, no.
12 A   -- how much I had at the current time?
13 Q   At the time you were terminated.
14 A   I cannot answer that, sir.
15 Q   Any other benefits you had with the city?
16 A   That's all I can think of.
17 Q   Okay.  And you went to Wal-Mart.  Where did
18     you go after that?
19 A   St. Landry Parish Sheriff's Department.
20 Q   And is that where you are currently employed?
21 A   Yes, sir.
22 Q   When did you start there?
23 A   December 9th, or December 12th, somewhere in
24     that vicinity.
25 Q   Of '12?

---

Page 147

1 A   Yeah.  9th or 12th, somewhere around there.
2 Q   Of 2012, though?
3 A   That's correct.
4 Q   And what is your position?
5 A   Investigator.
6 Q   And what is your rate of pay?
7 A   $15.35, something like that.
8 Q   An hour?
9 A   Yes, sir.
10 Q   Do you work 40 hours a week?
11 A   Yes.
12 Q   Do you work overtime?
13 A   Yes.
14 Q   How much?
15 A   It varies.
16 Q   Who is your supervisor?
17 A   Captain Ivory Chevis.
18 Q   Is there a major on top of him?
19 A   No, sir.
20 Q   He reports for the sheriff?
21 A   No, sir.
22 Q   Who does he report to?
23 A   He reports to Chief Deputy Hilman
24     Popillion.
25 Q   And he reports to the sheriff?

---

Page 148

1 A   Mr. Popillion?
2 Q   Yes.
3 A   Yes, sir.
4 Q   The sheriff is?
5 A   Bobby J. Guidroz.
6 Q   Have you had any incidences at the St. Landry
7     Parish Sheriff's Office where you've been
8     disciplined for any reason?
9 A   No.
10 Q   Have you had any injuries?
11 A   No.
12 Q   What is your work schedule?
13 A   8:00 a.m. to 4:30.
14 Q   Monday through Friday?
15 A   Yes.
16 Q   What do you investigate?  Are you assigned to
17     a particular unit or division, how is it
18     broken up?
19 A   I'm assigned to adult investigations,
20     investigate all crimes committed by adults,
21     as well as crimes committed against adults,
22     be it persons or property crimes.
23 Q   Other than the investigation where you
24     received a letter of reprimand for having the
25     -- your investigation -- that shift level

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 149**

1 investigation go over 60 days, and the
2 investigation where you were ultimately
3 terminated in September of 2012, did you have
4 any other investigations that you were
5 involved in at the Lafayette Police
6 Department?  Were you the subject of the
7 investigation?
8 A  No, sir.
9 Q  Did you ever receive any discipline, other
10 than a letter of reprimand prior to this
11 termination?
12 A  What do you consider discipline?
13 Q  Anything.
14 A  Well, that's a subject that -- it's an
15 open-ended question.  It's kind of ambiguous.
16 Because certain individuals consider
17 counseling form discipline, and others say
18 it's not.
19 Q  Did you receive any counseling forms at the
20 Lafayette Police Department?
21 A  The problem we have with that is you're not
22 even supposed to see this one, because after
23 a year, it's supposed to be expunged from
24 your record.  So how are you going to say
25 it's discipline if it's not there any more?

---

**Page 150**

1 Q  Well, I'm asking you a very direct question.
2     MR. SPRING:
3         Just answer his question.
4 A  All right.  Yes.
5 MR. CORRY:
6 Q  Did you ever receive a counseling form?
7 A  Yes.
8 Q  How many?
9 A  Two.
10 Q  And what were the dates of them?
11 A  I can't --
12 Q  Roughly?
13 A  I can't tell you.
14 Q  What years were they in?
15 A  I'm not going to able to answer that
16 question.
17 Q  Are they contained in your material?
18 A  I'm sorry?
19 Q  Are they contained in the material that
20 you've produced?
21 A  No, sir.  I wouldn't be able to retrieve it
22 because it happened after the year time
23 frame.  It's not supposed to be in there.
24 Q  Okay.  I just didn't know if you had a copy
25 of them.

---

**Page 151**

1     Do you remember what they were for?  Two
2 separate incidents, I guess?
3 A  Yes, sir.  One was missing court.
4 Q  Had a subpoena to attend a hearing, or trial,
5 or something, and you didn't go?
6 A  No.  It wasn't that, that happened.  I was in
7 criminal investigation.  I made the assistant
8 DA aware that if you need me, I can respond
9 within a 30-minute time frame.  And there was
10 a communication gap, where they still gave me
11 a counseling form and said it was my fault.
12 Q  Okay.  And what was the other one?
13 A  Being late five minutes for duty, for the
14 train derailment.
15 Q  That's the one that happened a few years ago
16 by the Ambassador Caffery?
17 A  Yes.
18 Q  Who was your chain for the missing court
19 counseling form?
20 A  Sergeant Dave Morris.  I can't remember who
21 was the lieutenant and the captain.  I don't
22 know if it was Chief Craft or not.
23 Q  And what about the train derailment?
24 A  It was Lieutenant Mac Gallien, Captain Randy
25 Vincent, and Major Glen Dartez.

---

**Page 152**

1 Q  Do you anticipate being at the Lafayette
2 Parish -- excuse me.  Scratch that.
3     Do you anticipate being at the St.
4 Landry Parish Sheriff's Office for the
5 foreseeable future?
6 A  I can't answer that question, Mr. Corry.  I
7 don't know what lies in my future.
8 Q  Do you plan on leaving?
9 A  No.  I plan on appealing my termination and
10 being exonerated.
11     Now, at that point, I don't know what's
12 going to happen after that.
13 Q  Okay.  You received a copy of the general
14 orders at some point, when you were with the
15 Lafayette Police Department, that were made
16 available to you?
17 A  Yes.
18 Q  And the PPM's, as well?
19 A  Some PPM's.
20 Q  Did you have the ability to gain access to
21 all PPM's?
22 A  Not all the time.
23 Q  Pardon?
24 A  Not all the time.
25 Q  I mean, at some point in time, you were able

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 153**

1   to get all of them?
2 A   Yes.
3 Q   Okay.  Have you ever filed an EEOC claim?
4 A   No, sir.
5 Q   Have you ever filed a workers' compensation
6   claim?
7 A   No, sir.  You asked me that question already.
8 Q   Did I?  I'm sorry.
9       Have you ever filed a grievance with LPD
10   or LCG?
11 A   No, sir.
12 Q   Have you ever run for any type of political
13   office?
14 A   No, sir.
15 Q   Did you ever run for any type of office
16   within the police department?
17 A   No, sir.
18 Q   Have you ever had to undergo a fit for duty
19   evaluation?
20 A   What do you consider a fit for duty?
21 Q   Where you were sent to a doctor to see if you
22   were fit for duty?
23 A   When I initially applied for the police
24   department in 1990.
25 Q   None after that?

---

**Page 154**

1 A   No, sir.
2 Q   Were you ever the subject of an IA
3   investigation?
4 A   Yes.
5 Q   Other than the one where you were ultimately
6   terminated, any others?
7 A   No, sir.
8 Q   Have you ever filed a complaint against
9   another member of the LPD?
10 A   Yes, sir.
11 Q   How many times?
12 A   Once.
13 Q   And that was the payroll incident with
14   Lieutenant Bejsovec?
15 A   I take that back.  Twice.
16 Q   All right.  What was the first one?
17 A   The first one was Lieutenant Bert Bejsovec.
18 Q   And we're going to get to that, because I
19   know you have some documents.
20 A   Uh-huh (yes).
21 Q   What was the other one?
22 A   The second one was for Dwayne Prejean, Joey
23   Provost, and Jim Craft, the police chief, for
24   the administrative leave issue for them
25   appearing in civil service, and --

---

**Page 155**

1 Q   Regarding the -- (Interrupted)
2 A   -- making false testimony.
3 Q   Both of those complaints were filed with
4   civil service?
5 A   Yes.
6 Q   And what was the outcome of the Bejsovec?
7 A   The outcome of Bert Bejsovec, the human
8   resource conducted an investigation and it
9   was unfounded.  And I appealed it to civil
10   service, and that's where the implementation
11   of the stay order, and it's still in limbo.
12 Q   Okay.  And then, what about the Dwayne
13   Prejean, Jim Craft, Joey Provost?
14 A   The same thing.  A stay order was
15   implemented, they would not hear it.
16 Q   Did you -- HR had nothing to do with that,
17   correct?
18 A   With what?
19 Q   Prejean, Craft and Provost.
20 A   No, sir.
21 Q   So as you appreciate it, they're still
22   pending with civil service to be heard at
23   some later date, or has there been a decision
24   by civil service not to hear them?
25 A   There was no decision.  The decision was

---

**Page 156**

1   there was going to be a stay order until the
2   federal lawsuit was resolved.  Because there
3   was same issues that we were addressing in
4   the lawsuit was going to be addressed in the
5   civil service, which I don't know how they
6   made that association.
7 Q   Any other complaints against any other police
8   officers?
9 A   No, sir.
10 Q   Any other complaints against any other
11   employees of LCG?
12 A   Official complaints?
13 Q   Yes.
14 A   No, sir.
15 Q   What about unofficial?
16 A   What do you mean, "unofficial"?
17 Q   I don't know, you said, you mean official, so
18   I thought you meant something else.
19 A   I just wanted to make some clarity in it.  We
20   can -- you know, I can see somebody and say,
21   hey, man, I don't like what this guy did.
22   That's --
23 Q   Officially, you haven't gone to complain
24   about anything?
25 A   No, sir.  Apart from them two, no.

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 157

1 Q  Have you filed any other complaints at the
2    Civil Service Board, other than the two that
3    you told me?
4 A  No.  That would be it, because an appeal is
5    not one.
6 Q  Have you ever published anything related to
7    your employment with LPD, or involving LPD,
8    with anyone?
9 A  No.
10 Q  When did you first decide to file the TRO?
11 A  I can't give you an exact date, Mr. Corry.  I
12    know it was -- I guess when I was officially
13    served with the notice of investigation.  The
14    first notice of investigation, I guess.
15 Q  Who did you consult with?  And I'm not
16    talking about attorneys.
17 A  In relation to?
18 Q  Filing the TRO.
19 A  I guess my wife.
20 Q  Okay.  Anybody else?
21 A  I can't remember pinpointing an exact person.
22    I'm pretty sure there was some dialogue
23    between the people on the lawsuit.  But as
24    far as me specifically saying, yes, I spoke
25    to this gentleman here.  I'm not going to be

---

Page 158

1    able to answer that.
2 Q  What was the discussion amongst you and the
3    other members of the lawsuit about filing
4    that TRO?
5 A  I can't recall everything.  I know we
6    discussed numerous issues, as far as how this
7    started, when the investigation started
8    officially, who was investigating it, who was
9    the complainants, it being a conflict.  Just
10    overall, that it wasn't going to be a fair
11    and impartial investigation.  And it needed
12    somebody pretty much outside the realm of the
13    normal arbitrary process that the classified
14    civil service employee used, and that venue
15    would be the court system.
16 Q  Okay.  Isn't it a violation of the general
17    orders of the PPM's to take a document out of
18    a closed IA investigation, or shift level
19    investigation, doctor it, white it out, and
20    give it to someone, leak it to someone to use
21    in another proceeding?  Is that a
22    violation?
23 A  I was made aware of that when I was served
24    with a notice of investigation.
25 Q  You didn't know that before?

---

Page 159

1 A  (Witness shakes head negatively.)
2 Q  You've got to respond out loud.
3 A  No..
4       And when you said doctor it and gave it
5    to someone, who are you referring to, that I
6    gave it to?
7 Q  I'm asking the questions today.
8 A  I'm aware of that, Mr. Corry.  I don't mean
9    to come across being --
10 Q  And I was speaking in general terms.
11 A  Okay.  Well, that's the only clarity I wanted
12    to specify.
13 Q  I'm speaking in general terms.
14 A  Okay.
15 Q  You were not aware that that would be a
16    violation of general orders or PPM's, before
17    being given a notice of investigation,
18    specifically for the Mclean incident?
19 A  No, sir.  Because that was done in the past.
20 Q  Was it?
21 A  Yes.
22 Q  Had you ever done it in the past?
23 A  No.  It wasn't me, but it was done in the
24    past.
25 Q  Did you have firsthand knowledge of it being

---

Page 160

1    done in the past?
2 A  Yes.
3 Q  How?  Not what somebody told you, but what
4    you actually -- (Interrupted)
5 A  I have a document of it.
6 Q  Okay.
7 A  Heather Martin.
8 Q  Okay.  We'll get to that.
9 A  Okay.
10 Q  Any other incidents that you recall?
11 A  What are you referring to, Mr. Corry?
12 Q  Where a document was taken out of a shift
13    level or an IA investigation, whited out, or
14    doctored, and then used in another
15    proceeding?
16 A  No.
17 Q  Do you know the outcome of the Mclean appeal?
18 A  No, sir.
19 Q  So you think you spoke with Scott about the
20    TRO?
21 A  I never named Scott at all.
22 Q  I'm asking you now.
23 A  I said I don't remember the individuals.
24 Q  Okay.
25 A  So I don't want to go on the record saying I

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

**Page 161**

1  spoke to this particular individual.
2  Q  Okay.  Well, I've still got to ask you.  If
3  you don't know, that's fine.
4  A  Okay.
5  Q  If you don't remember, that's fine.
6     Scott, you don't recall, or you don't
7  know one way or the other?
8  A  One way or the other, I don't know.
9  Q  What about Mr. Hewitt?
10  A  Same response, I don't know one way or the
11  other.
12  Q  What about Mr. Thompson?
13  A  Same thing.
14  Q  What about Mr. Marceaux?
15  A  Same thing.
16  Q  What about Mr. Myers?
17  A  If I definitely spoke to him?
18  Q  Yes, about the TRO.
19  A  No, I don't remember if I spoke to him or
20  not.
21  Q  Would it be the same answer if I asked you
22  about every person at the Lafayette Police
23  Department at the time the TRO was issued,
24  that you don't know one way or the other if
25  you spoke to them about the TRO?

**Page 162**

1  A  There was a lot of discussion about that TRO.
2  Q  Do you recall who specifically you talked to
3  about it?
4  A  (Witness shakes head negatively.)
5  Q  You've got to respond out loud?
6  A  Apart from -- no.  I'm rubbing my head first
7  before I respond.
8  Q  Okay.
9  A  Apart from my attorney?
10  Q  Yes.  I don't want to know anything that you
11  talked to with your attorney.
12  A  I'm trying to get some clarity on, besides my
13  attorneys, you're asking -- is that the
14  question you're asking?  Besides the
15  attorneys, is there anyone else in
16  particular?
17  Q  Yes.  That's the question I asked.
18  A  That's an open-ended question, I can't answer
19  that.
20  Q  Okay.  When did you first decide to file the
21  federal lawsuit?
22  A  I can't give you an exact date, Mr. Corry.
23  Q  Why?
24  A  I'm sorry.  What you said?
25  Q  Why did you decide to be a party in the

**Page 163**

1  federal lawsuit?
2  A  Because of all the things that we cited in
3  the federal lawsuit.  Particularly me,
4  starting with the investigation that wasn't
5  fair and impartial from the onset.  And other
6  issues that was transpiring at the police
7  department.
8  Q  Such as?
9  A  Despaired treatment, the words black officers
10  versus white officers, favoritism.  I can't
11  give you exactly every one, but the list goes
12  on and on, and is still going.
13     Reprisals for reporting misconduct,
14  reprisals for exercising your arbitrary
15  process, and filing an appeal for any
16  discipline that is rendered, stuff like that.
17  Q  What misconduct did you report --
18  A  Bert Bejsovec.
19  Q  -- where you suffered reprisals?
20  A  Bert Bejsovec.
21  Q  Well, that was investigated, was it not?
22  A  You -- are we going to get to that now, or
23  later?
24  Q  I'm just asking a question.  We're going to
25  get to all the documents.

**Page 164**

1  A  Okay.
2  Q  I'm just asking you a question.
3  A  No, no.  The answer, that's what I'm getting
4  at, because it's going to take some
5  elaboration.  Because you're saying it was
6  investigated.  My contention is, it wasn't
7  properly investigated.
8  Q  Okay.
9  A  But to answer the question, yes, it was.
10  Q  All right.  And the outcome of that
11  investigation was what?
12  A  Initially by human resource, it was
13  unfounded.
14  Q  Okay.  Has there been any follow-up to that
15  investigation?
16  A  Yes.  I appealed it to civil service and it's
17  still pending.
18  Q  Okay.  That's what we discussed earlier?
19  A  Yes.
20  Q  All right.  Any other contentions of why you
21  decided to file the federal lawsuit, other
22  than what you told me?
23  A  That pretty much sums it up, with the
24  exception of, also to make people outside of
25  the proverbial white house that they call it,

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 165

1  900 East University, make people aware of
2  what is actually going on, and that the
3  department should be a transparent
4  department, and the fine citizens of
5  Lafayette and the taxpayers should be knowing
6  what is going on in the department that
7  they're paying the salary for.
8      But obviously, that's not the case. And
9  what is the profound statement that was ever
10  made throughout the course of all of this
11  came from Major George Jackie Alfred, in
12  which he said, you're not going to air out
13  the department dirty laundry in the general
14  public and walk away and think nothing's
15  going to happen.
16     Now, that, I can assure you, Mr. Corry,
17  they made good on that statement.
18 Q  Was that part of the recording that was
19  played to Judge Earles in the TRO?
20 A  I can't definitely tell you that. I know
21  there was a recording of Major Alfred with
22  Gabe Thompson, in which he made that
23  statement. And that came on the heels of me
24  filing the complaint with Bert Bejsovec. As
25  well as Kane Marceaux filing a complaint on

Page 166

1  him, as well.
2 Q  Okay. Do you know if that was a recording
3  that was played for Judge Earles?
4 A  I can't remember that, Mr. Corry. That's two
5  years ago. No.
6 Q  Were you present at the hearing on the TRO?
7 A  Yes.
8 Q  Have you made any recordings of anyone?
9 A  Yes.
10 Q  How many?
11 A  I can't give you a number.
12 Q  More than ten?
13 A  I don't think so. I don't think it's ten.
14 Q  Have you provided us copies of all recordings
15  you've made?
16 A  That, I'm not sure. I provided copies of the
17  most relevant recordings.
18 Q  Okay. Well, I think the discovery asked for
19  all recordings.
20     Are there any recordings that you have
21  of anyone at the Lafayette Police Department
22  that you have not provided?
23 A  Listen, I'm going to answer it and
24  hopefully --
25     (INTERRUPTION IN DEPOSITION)

Page 167

1 MR. CORRY:
2 Q  You can explain, but you have to answer
3  first.
4     Are there any recordings that you have
5  of anyone at the Lafayette -- (Interrupted)
6 A  We're back on?
7 Q  Yes, we're back on.
8 A  All right.
9 Q  Are there any recordings that you have of
10  anyone at the Lafayette Police Department
11  that you have not provided to us?
12 A  The response to that question is, I made the
13  recordings. I gave them to Scott Poiencot
14  and retired Captain Norbert Myers.
15     Now, at that point, I don't know if they
16  provided it to --
17     (INTERRUPTION IN DEPOSITION)
18 MR. CORRY:
19 Q  Are you ready, Greg?
20 A  Yes.
21 Q  So you don't know if those recordings that
22  you made have not been given to us?
23 A  That question would be better suited to most
24  probably Scott Poiencot.
25 Q  Okay. Turn to GC-139.

Page 168

1 A  (Witness complies.)
2 Q  I guess look at 138, and then, 139, the page
3  before.
4 A  Okay.
5 Q  That's an envelope that contained, I don't
6  know if it was a zip drive, or a CD, or what
7  it was, but -- and those were the recordings
8  that were attributable to you as outlined in
9  GC-139.
10     Do you know if there are any others,
11  other than those?
12 A  (Witness examines documents.)
13 Q  And A bunch of them don't play.
14 A  This should be an updated version that we
15  submitted.
16 Q  Yes. We'll get to that.
17     Just as it deals with 139, do you know
18  if there's anything else?
19 A  The only problem, right offhand, looking at
20  track 1, 2, and all of that --
21 Q  I don't know what that means.
22 A  -- I can't tell you offhand, but --
23 Q  Did you generate 139?
24 A  No.
25 Q  Do you know who generated it?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 169

1  A  It probably came from the audio files that --
2     I can tell you this.  Alfred retaliation,
3     that's Gabe.
4        Civil service hearing, I can't tell you
5     who provided it, but it's beneficial towards
6     the interrogatories.
7  Q  Okay.  Let me ask you this --
8  A  Go ahead.
9  Q  -- 5/8/12, civil service hearing.  Is that
10    just a recording of the civil service
11    hearing?
12 A  Most probably, yes.
13 Q  Okay.  And then, the May 12, Gremillion
14    testimony, that's when Lieutenant Gremillion,
15    or Sergeant Gremillion at that time,
16    testified, I think it was about the Mclean
17    document?
18 A  (Witness nods affirmatively.)
19 Q  Is that what that is?
20 A  Yes.
21 Q  Okay. And you don't know what the tracks 1,
22    2, 1, 4, 3, 2 mean?  You don't know what's on
23    those?
24 A  No, not offhand right now.
25 Q  Okay.  Are there any recordings that you gave

---

Page 170

1     directly to your attorneys?
2  A  No.
3  Q  Everything you recorded, you gave to Scott or
4     Norbert Myers, and then what they did with
5     it, you don't know, or do you?
6  A  No.  I don't definitely know, but I would
7     assume they gave it to the attorney.
8  Q  All right.  How did you -- does this jog your
9     memory about any other recordings you may
10    have made?
11 A  No, sir.
12 Q  All right.  Look at GC-576.
13 A  (Witness complies.)
14 Q  There's eight listed on GC-576 and GC-577.
15 A  Are you posing a question to me, Mr. Corry?
16 Q  Yes.  There's eight listed.
17 A  Yes, there's eight.
18 Q  Are these all recordings that you made?
19 A  No, sir.
20        (INTERRUPTION IN DEPOSITION)
21 MR. CORRY:
22 Q  Did you make any of the recordings noted on
23    576 and 577?
24 A  Yes.
25 Q  Which one?

---

Page 171

1  A  Number 8.
2  Q  Where was that recording made?
3  A  In --
4        (INTERRUPTION IN DEPOSITION)
5  MR. CORRY:
6  Q  We're referring to GC-577, number 8, noted,
7     consensual audio recording, Greg with Dwayne
8     Prejean, February 14, 2012.
9        And I asked you, where was that done?
10 A  Lieutenant Dwayne Prejean's former office in
11    Internal Affairs.  Former Lieutenant Phil
12    Fontenot's office, and my former office in
13    patrol support.
14 Q  So it was three recordings on February 14th,
15    2012, in three different offices?
16 A  No, sir.  One recording, three different
17    offices, three different locations.
18 Q  Did Lieutenant Prejean know that you were
19    recording him?
20 A  No, sir.
21 Q  Did you advise him of his police officer's
22    bill of rights before you recorded him?
23 A  I wasn't investigating him.  No, sir.
24 Q  Okay.
25 A  I need to elaborate on that.

---

Page 172

1  Q  All right.
2  A  It wasn't an investigation that warranted me
3     to advise him with his police officer's bill
4     of rights.
5  Q  All right.
6  A  I wasn't doing anything illegal.
7  Q  Was that before or after the clandestine
8     recording general order had come out?
9  A  The illegal general order?  It was before.
10 Q  Pardon?
11 A  The illegal general order, it was before.
12 Q  Okay.  So you made the recording on February
13    14th, 2012, after there was a general order
14    issued that said clandestine recordings are
15    prohibited?
16 A  You're incorrect.  The recording came before.
17    The clandestine recording came way after.
18 Q  Okay.  That's what I'm asking.  I thought you
19    said it was before.
20        So the general order came after February
21    14th of '12?
22 A  Yes.
23 Q  Okay.  Did Lieutenant Philip Fontenot know
24    that you were recording him?
25 A  No.

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 173**

1  Q  Okay.  Did you advise him of his bill of
2     rights before you recorded him?
3  A  No.  Once again, it wasn't an investigation,
4     so he didn't need to be afforded the police
5     officer bill of rights.
6  Q  Go ahead.
7  A  And let me finish.
8        Before we go any further, Mr. Corry, it
9     was a standard practice that officers record
10    other officers, particularly supervisors.  It
11    started with the Gus Sanchez.  The reason
12    they started recording, particularly
13    supervisors, was because it was a common
14    knowledge that supervisors would instruct
15    officers to perform a task, and when it
16    wouldn't turn out the results that they were
17    seeking, the particular supervisor, they
18    would blame the officer for running rouge and
19    doing something that he wasn't instructed to
20    do so.
21       And then, the officer, when he would
22    contest what the supervisors were saying,
23    there was no compelling evidence to
24    corroborate his assertions.  So therefore,
25    they would always believe the supervisor.

---

**Page 174**

1        So they started making a conscientious
2     decision to record people.
3  Q  Who is "they"?
4  A  Officers, in general.
5        Gus Sanchez was, I guess, the shining
6     example, because there was an issue -- well,
7     his lost radio.  And Phil Fontenot and Chief
8     Craft had a meeting with him and Chief --
9  Q  You can finish, but let me just ask you.
10    Were you directly involved in that, or that's
11    just something that you heard, hearsay?
12 A  It's not hearsay.
13 Q  Were you directly involved with it?
14 A  That came exactly from Gus Sanchez.
15 Q  That's hearsay.
16       Were you involved in that?
17 A  No, sir.
18 Q  All right.
19 A  Will you let me finish?
20 Q  Absolutely.
21 A  Okay.  Well, what happened was, he filed a
22    complaint because of the chief's behavior,
23    particularly commanding a temporary general
24    order under professional conduct and
25    responsibility.  He filed a complaint with

---

**Page 175**

1     human resource, they dispelled his complaint
2     until he produced that compelling evidence,
3     the recording.
4        Afterwards, an investigation was
5     launched against Chief Craft, where he was
6     allegedly disciplined.
7        At that point, officers started
8     recording police officers to protect
9     themselves.
10 Q  Did you ever, as a supervisor, instruct any
11    of your subordinates to record?
12 A  No, sir.
13 Q  Did you ever accuse anything of your
14    supervisors -- excuse me, your subordinates
15    of having going rouge when something didn't
16    turn out right that you had ordered them to
17    do?
18 A  No, sir.
19 Q  All right.  Who was in your office when this
20    recording was made, number 8 on GC-577?
21 A  Dwayne Prejean.
22 Q  Anybody else?
23 A  No, sir.
24 Q  How long is the recording?
25 A  I can't give you an exact time.

---

**Page 176**

1  Q  What did you do -- what did you record it on?
2  A  An ink pen.
3  Q  Pardon?
4  A  An ink pen.
5  Q  Scott's?
6  A  Mine.
7  Q  And what did you do with it after you
8     recorded it?
9  A  I gave it to Scott to download it, if I'm not
10    mistaken.  It would either be Scott or
11    Captain Myers.  I can't remember which one.
12 Q  Did either one of them work for you, or under
13    you?
14 A  Who?
15 Q  Scott or Norbert?
16 A  Scott never worked for me.  Captain Myers was
17    a rank above me, so there was no way he would
18    have possibly have worked for me.
19 Q  Okay.  And do you know what they did with the
20    recording after you gave it to them to
21    download it?
22 A  No, sir.
23 Q  Did you ever hear it after you recorded it?
24 A  Yes, sir.  I heard it from my pen.
25 Q  Okay.  After it was downloaded, did you hear

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 177

1   it?
2 A   Yes.
3 Q   When?
4 A   To confirm what the recording was actually
5     about.
6 Q   Okay.
7 A   The nature of it and the relevance of it.
8 Q   Was there anything that had changed from your
9     original recording?
10 A   No, sir.
11 Q   Was there anything added?
12 A   No, sir.
13 Q   Was there anything deleted?
14 A   The recording was never edited.
15 Q   You're sure of that?
16 A   I'm positive.
17 Q   Were you with Scott when he downloaded it,
18     or Norbert?  I guess you weren't with either
19     one because you don't know who downloaded it,
20     right?
21 A   Correct.
22 Q   Do you know how they transferred it from the
23     download to give it to your attorneys to
24     provide it to us?
25 A   No, sir.

Page 178

1 Q   Do you know if it's been provided to us?
2 A   It should.
3 Q   Do you know?
4 A   No.
5 Q   That's the only recording that you were
6     responsible for that's listed on GC-576 or
7     577?
8 A   You said responsible.  You're referring to --
9 Q   That you made.
10 A   -- that I made, correct?
11 Q   Yes.
12 A   Yes.
13 Q   Number 1 on GC-576, consensual recording,
14     Gabe and Jackie, recording April 19th, 2012.
15     That's the one that was played at the TRO
16     hearing?
17 A   Yes.
18 Q   Okay.  And you heard what Judge Earles'
19     comments were to that, didn't you?
20 A   I can't recall that, Mr. Corry.
21 Q   Okay.
22 A   That's been two years ago.
23 Q   Consensual recording, Gabe and Jackie
24     recording, call it retaliation.  Do you know
25     when that was made?

Page 179

1 A   I can't give you an exact date.  I know it
2     was either the day after Kane Marceaux and I
3     filed the civil service complaint, or it was
4     two or three days thereafter.
5 Q   Which civil service complaint, for the
6     record's purposes?
7 A   I filed a civil service complaint on Bert
8     Bejsovec for payroll fraud.  And Kane
9     Marceaux filed a complaint on retired Major
10     Jackie Alfred and Chief Craft.
11 Q   Okay.  But you don't know the date that that
12     recording was made?
13 A   No, sir.
14 Q   Do you know who made it?
15 A   Gabe Thompson.
16 Q   Do you know what he made it on, or with?
17 A   No, sir.
18 Q   Do you know what he did with the device that
19     he made the recording after it was made?
20 A   No, sir.
21 Q   What about number 3, GC-577, consensual
22     recording, Greg and Reggie Thompson and Gabe
23     Thompson.  Reggie Thomas and Gabe Thompson.
24     Subject, suspect they were looking at failed
25     polygraph at CVSA.  Did you make that

Page 180

1     recording?
2 A   No, sir.
3 Q   Do you know who made it?
4 A   Gabe Thompson.
5 Q   Do you know when it was made?
6 A   It was in the wake of the Mickey Shunick, so
7     that would be -- let's see.  We filed a TRO
8     May 22nd.  I can't remember what day it was.
9     I don't know if it was the -- if you give me
10     if it was a Monday or Tuesday.
11     But I know thereafter, we had a general
12     staff meeting.  And that's when Chief Craft
13     came in there complaining about us filing the
14     TRO, and basically said we should be
15     concentrating more on the Mickey Shunick, as
16     opposed to me and them concerning themselves
17     on that.
18     So it had to be sometime after in the
19     wake of Mickey Shunick, because they were
20     discussing the Mickey Shunick investigation.
21 Q   That's the nature of what this recording is
22     about, number 3?
23 A   What?
24 Q   That's what's on number 3?
25 A   The meeting, or the Mickey Shunick

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 181

1   investigation?
2   Q   I'm asking you what's on the recording.
3   A   That's what I'm trying to clarify.
4       Are you asking the question about Mickey
5   Shunick, or are you asking a question about
6   that?
7       (SHORT BREAK TAKEN IN DEPOSITION)
8   MR. CORRY:
9   Q   Number 3, I was asking you if the recording
10  contained the contents of what you just
11  described at that meeting where Craft said,
12  y'all need to be focusing on Mickey Shunick,
13  as opposed to -- is that what's on number 3,
14  or you were using that meeting as a reference
15  point for a date?
16  A   I was using that meeting as a reference
17  point.
18  Q   Okay.  What is the significance of -- and you
19  don't know the date of it, you just know
20  about when it was?
21  A   Correct.
22  Q   Sometime after the TRO?
23  A   Yes.
24  Q   Do you know what the nature of the recording
25  is?

Page 182

1   A   It was a discussion of what's -- Lieutenant
2   Reggie Thomas came over and he interjected
3   himself in the conversation.  And the issue
4   came up about the -- I guess you would say,
5   current status of the Mickey Shunick, and
6   that's when he made reference to how inept
7   the lead investigator, who is Stephen Bajat,
8   was.  And he discussed about the suspect, and
9   that they were initially targeting, and that
10  the subject failed the polygraph miserably,
11  as well as the CVSA, the computer-voice
12  stress analyzer test, which is two
13  investigative tools that the Lafayette City
14  Police Department used, or utilized in
15  investigations, particularly administrative
16  investigations, as well as criminal, to try
17  to identify deception.
18  Q   Was somebody eventually convicted in the
19  Mickey Shunick case?
20  A   Somebody confessed in the Mickey Shunick
21  case, and it wasn't the subject that failed
22  the polygraph and the CVSA.
23  Q   Who found the subject that eventually
24  confessed, the Lafayette Police Department?
25  A   No.  It was a collaborate effort with the

Page 183

1   Lafayette City Police, sheriff's department
2   state police and other agencies.  It was a
3   joint task force.
4   Q   Who took the lead on it?
5   A   Lafayette City Police.
6   Q   Were you involved in the Mickey Shunick
7   investigation at all?
8   A   No, sir.
9   Q   Okay.  Number 4, Mark Francis recording.
10  Greg, Scott, Gabe, Mark, and Mark Francis.
11  Do you know when that was done?
12  A   There should be two recordings of that.  So I
13  mean, one was outside the police department,
14  and that was prior to the TRO, prior to the
15  investigation.  It was -- the second one as
16  well, if my memory serves me correct, was
17  also prior to the TRO.
18  Q   What does it have to do with your lawsuit?
19  A   It has to do with Mark Francis talking about
20  the police chief, and his bad decision
21  making, as well as favoritism, as well as
22  Mark referencing that everybody, inclusive of
23  the chief, believed that I was responsible
24  for Glen Dartez's demise, as well as Mark
25  discussing pretty much how inept the chief

Page 184

1   is.  And he made reference to the Zeryk
2   Guillory's civil service appeal.
3   Q   Okay.
4   A   And how it was an embarrassment to the police
5   department to have a chief that basically
6   went up there and was unprepared.  And he
7   made the analogy that he shouldn't be police
8   chief in Lafayette, he should be a police
9   chief in a town like Duson.
10  Q   Were you involved in the Zeryk Guillory civil
11  service appeal?
12  A   No, sir.
13  Q   When it says, consensual recording on 1
14  through 8, does Mark Francis know that he was
15  being recorded?
16  A   No.  He doesn't have to know.
17  Q   Simple question.
18      Number 3.
19  A   Mr. Corry, hold on.  I answered you.  You
20  said answer the question, then you can
21  elaborate.  Correct?
22  Q   Absolutely.  Absolutely.
23  A   Okay.  So prior to you cutting me off, I was
24  trying to elaborate further from the initial
25  response I gave you.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 185

1  Q  All right.
2  A  Okay.  So I said, he doesn't have to.
3  Q  All right.  Same thing with number 3.  Did
4     Reggie Thomas know that he was being
5     recorded?
6  A  No, sir.  It's -- he doesn't have to, nor do
7     I have to give him notice that I'm recording.
8     Louisiana is a one-party consent state.
9  Q  All right.  Were the two recordings on 3 and
10    4 made before or after the general order
11    about prohibition against clandestine
12    recordings?
13 A  They were made before.
14 Q  All right.  Number 5, consensual audio
15    recording of Richard Chappuis, August 2012.
16    Did Mr. Chappuis know that he was being
17    recorded?
18 A  No, sir.
19 Q  And that's the Richard Chappuis that's on the
20    Civil Service Board?
21 A  That's correct.
22 Q  Were you present for that recording?
23 A  I sure was.
24 Q  And was there discussion with Mr. Chappuis --
25    and was Scott Poiencot on the board at that

Page 186

1     time, or he had been removed?
2  A  I can't tell you.
3  Q  All right.
4  A  I can't remember.
5  Q  Was there a discussion about a particular
6     pending matter before the board with Mr.
7     Chappuis?
8  A  Yes.
9  Q  Which one?
10 A  The administrative leave for my racing heart.
11 Q  Okay.  And that was discussed with Mr.
12    Chappuis during the board meeting?
13 A  No.  That was discussed afterwards.  It was a
14    discussion about my racing heart and about
15    the polygraph, and about Mr. Chappuis saying
16    he's aware that the Internal Affairs has a
17    habit of manipulating the polygraph exam to
18    benefit their outcome.
19    He also discussed about grievances, and
20    how it's an unfair process, and that the CAO
21    always arbitrarily is going to side with the
22    appointing authority designee, which is Chief
23    Craft or Chief Robert Benoit, who's the fire
24    chief.
25 Q  How did -- how was Mr. Chappuis engaged in

Page 187

1     this discussion?
2  A  We were all standing outside, and Mr.
3     Chappuis interjected himself in a
4     conversation that we were having, and that
5     subject matter came up about the
6     administrative leave, and the circumstances
7     of how I was placed on administrative leave.
8     And he expressed his displeasure in how it
9     was done because he knew it wasn't
10    appropriate, and it led into the polygraph,
11    as well as grievances.
12 Q  Who made the recording?
13 A  If I'm not mistaken, I think it is Scott
14    Poiencot.
15 Q  All right.  Number 6, consensual audio
16    recording of Olita Magee and Scott.  Did
17    Ms. Magee know she was being recorded?
18 A  Now, Mr. Corry, you're going to have to pose
19    that question to Scott Poiencot --
20 Q  Fair enough.
21 A  -- because I have no knowledge of that.
22 Q  All right.  What does that have to do with
23    your allegations you made in your lawsuit,
24    number 6?
25 A  I was terminated for providing a confidential

Page 188

1     document to Olita Magee.  In this recording,
2     she says on three separate occasions, the
3     investigator that conducted this allegation
4     of employee misconduct, in which I was the
5     subject of that investigation and was
6     terminated, Lieutenant Dwayne Prejean,
7     approached Ms. Magee on three separate
8     occasions.  The first being from the onset,
9     in which he showed her the copy of a notice
10    of investigation with all the officers, and
11    afforded the opportunity to look at all the
12    officers.  And he posed the question to her,
13    is any of the officers on there?  And she
14    said no.  But they continued the
15    investigation after that point.
16    And he went back and questioned her
17    again.  And she said that I had no
18    involvement, as well as Scott Poiencot.  Even
19    put in a brief that Scott Poiencot had no
20    involvement.  But he continued the
21    investigation even though they -- I don't
22    know how you're going to say it's a fair and
23    impartial the investigation.
24    And the third and final time, she said
25    he was almost coercing her into saying it was

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 189

1    me.
2 Q   How do you know that?
3 A   It's on the recording.
4 A   It's my understanding it's one recording.
5 A   Exactly.
6 Q   It's three separate events, though?
7 A   She refers to three separate events that
8    Dwayne Prejean approached her on that
9    recording.
10 Q   Got you.
11     Who gave her the document?
12 A   I don't know.
13 Q   You have no knowledge of who gave her that
14    document that was the subject of that
15    Mclean?
16 A   I'll refer to my statement. It's going to be
17    consistent. That statement I provided to
18    Dwayne Prejean at that time is the same
19    statement I'm going to refer to now. I don't
20    know who gave her the document.
21     As of this point, everybody can -- no
22    one can tell you. Last I heard, Allyson
23    Prejean was going around saying it was Greg
24    Randall.
25 Q   Okay. Do you know when that recording was

---

Page 190

1    made? I guess we would have to ask Scott
2    that, right?
3 A   Yes, sir.
4 Q   All right. Number 7 -- or anything else on
5    number 6 that we didn't discuss?
6 A   No. But I can -- no. Go ahead, we'll get to
7    number 8.
8 Q   Okay. Number 7, Jim Craft, April 13th, 2012,
9    with Scott. What does that have to do with
10    anything? And before you answer that, have
11    you listened to all the recordings that you
12    provided, that are attributed to this
13    document, 576 and 577?
14 A   For the most part, yes. Yes.
15 Q   All of them?
16 A   Yes.
17 Q   Okay. What is number 7?
18 A   Number 7 is a conversation in which Police
19    Chief Jim Craft summoned Scott Poiencot to
20    his office, and he expressed some concerns
21    that Bert Bejsovec had came in and said that
22    after I filed the complaint for payroll
23    fraud, he felt that he wasn't going to get a
24    fair shake. Because he passed one day going
25    down the hall to his office, and he saw Gabe

---

Page 191

1    Thompson, myself and Scott Poiencot in my
2    office. And as he passed, we were laughing.
3    And for some reason, he perceived that as we
4    were laughing at him, and he was the subject
5    matter of our conversation.
6 Q   Was he?
7 A   Although that wasn't -- I was about to answer
8    that for you.
9     Although that wasn't the case. We were
10    talking about something totally different.
11    As a matter of fact, there was never any
12    dialogue between myself, Scott Poiencot, or
13    Gabe Thompson concerning the payroll fraud.
14 Q   Were you a party to that recording?
15 A   Which recording?
16 Q   Number 7?
17 A   No, sir.
18 Q   Okay. So it's just something that Scott
19    recorded, told you about it, and then, you
20    listened to it?
21 A   Yes, I listened to it.
22 Q   All right.
23 A   Are you going to let me finish?
24 Q   Yes.
25 A   Okay. Chief Craft assured Bert Bejsovec,

---

Page 192

1    according to Scott Poiencot, that no,
2    everything is fair and above board, that
3    Scott has always been fair. He has always
4    been professional. And that he has --
5 Q   Let me do this. I am going to cut you off.
6 A   Uh-huh (yes).
7 Q   I don't need you to tell me what's on it, we
8    can all listen to it. You weren't a party to
9    it. Is that fair?
10 A   (No response.)
11 Q   I mean, your interpretation of what it
12    says -- (Interrupted)
13 A   But there's some relevant information in that
14    recording --
15 Q   Okay.
16 A   -- that I need to discuss.
17 Q   Well, tell me.
18 A   Okay. And that he know that those guys on
19    the third floor, and excuse my French, is
20    knocking his dick in the dirt, and that
21    everybody's telling him that he needs to
22    transfer him. But as long as they're doing
23    what they're supposed to, that that he's not
24    going to transfer them. And he said, I know
25    the issue came up about who leaked that

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 193**

1  information about the payroll fraud to the
2  media. And once it was disclosed to the
3  media, CAO Dee Stanley, called Chuck Huebner
4  and asked him, why are you covering that type
5  of story? And he said, well, it's news. And
6  he said, well, how would you like if I say
7  you're a child molester? And then, he said,
8  well, who -- the question came up, who
9  provided the information? And Chuck Huebner
10 said, I met with Greg Cormier and he gave it.
11 And he said, that's the same guy that gave me
12 the information with Glen Dartez. And that's
13 the furthest from the truth.
14 Q  All right.
15 A  So -- and again, Chief Craft is saying it
16 there, I am responsible for Glen Dartez.
17 Q  Did you give anyone with the media anything
18 having to do with the payroll fraud
19 complaint?
20 A  No, sir.
21 Q  Did you go to Chuck Huebner?
22 A  No, sir.
23 Q  Have you ever gone to the media with
24 anything?
25 A  No, sir.

---

**Page 194**

1  Q  And when I say "media," I'm talking about TV,
2  radio, newspaper, internet.
3  A  No media outlet whatsoever.
4  Q  All right. The same thing with the Glen
5  Dartez incident, the same question?
6  A  No, sir.
7  Q  All right. Number 8, Greg with Dwayne
8  Prejean. I think we've already talked about
9  that, right?
10 A  Yes. We talked about it, but we never talked
11 about the contents of it.
12 Q  Okay. You made the recording?
13 A  I sure did.
14 Q  And you told me where you made it, three
15 different offices.
16 A  That's correct.
17 Q  All right. The letter of reprimand is as a
18 result of the last sentence in that
19 description of number 8, that's your letter
20 of reprimand?
21 A  The investigation was filed. It was Dwayne
22 Prejean was a witness, as well as Keith
23 Gremillion, that same afternoon after the
24 heated discussion he and I had.
25 Q  All right. You've got to answer my question

---

**Page 195**

1  first.
2  A  I'm sorry.
3  Q  All right. And you can explain it.
4  A  Uh-huh (yes).
5  Q  I think I've been fair to you in letting you
6  explain everything you wanted.
7  A  Go ahead.
8  Q  That last statement in that description of
9  number 8, is that the result of the letter of
10 reprimand that you received?
11 A  That is correct.
12 Q  All right. Okay. Anything else about that
13 recording?
14 A  Yes.
15 Q  Okay. Go ahead.
16 A  In that recording, Dwayne Prejean accused me
17 of leaking information to the media.
18 Q  Did you deny it?
19 A  Hold on. As well as -- no, I take that back.
20 Not to the media.
21   Leaking document, or providing
22 documentation to attorneys, which I denied.
23 But he said he was -- when I questioned him
24 where did he get that information, he said he
25 got it from Greg Randall.

---

**Page 196**

1    And at that time, I said, well, you're
2  an Internal Affairs supervisor, you're the
3  head of Internal Affairs. Start an
4  investigation to see if it's me. I can tell
5  you it's not.
6    So he had information, according to him,
7  in February. He failed to report it. Why is
8  that? That's a violation of the general
9  order.
10 Q  Have you ever leaked any documents to any
11 attorneys?
12 A  I just told you. I answered that question
13 already. No.
14 Q  All right. Anything else about number 8?
15 A  That's pretty much it.
16 Q  Okay. Anything else about any other
17 recordings? Does that jog your memory as to
18 whether you made any other recordings at any
19 time, that you have not given to your
20 attorney, who has, in turn, not given to us?
21 I just want to make sure that we got
22 everything.
23 A  As part of discovery or --
24 Q  Yes. Because we've asked for every recording
25 that y'all have made.

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 197

1  And so, can you tell me now that there's
2  no other recordings out there?
3  A  That's not the question you were --
4  Q  Well, that's the question I'm asking you.
5  A  Is the question you're asking me, is there
6  any other recordings out there?  Or is the
7  question you're asking me, are there
8  recordings relevant to the interrogatories
9  that you asked?
10  Q  Both.  Are there any other recordings that
11  you're responsible for making that are not
12  contained in 576, 577, or GC-139?
13  A  Yes.  There should be.
14  Q  All right.  And where are they?
15  A  They should be with the Scott Poiencot audio
16  files.
17  Q  Okay.  Do you know specifically which ones?
18  A  Mr. Corry, there should be a recording of a
19  conversation with myself, and Ray Domingue,
20  and Rick Zeno.  There should be -- I'm
21  sorry.
22  Q  Slow down.
23  A  Okay.
24  Q  Those are two different recordings?
25  Which ones?

---

Page 198

1  Q  The one with Ray Domingue and the one with
2  Rick Zeno?
3  A  No, they both were present at the time.
4  Q  Okay.  And when was that done?
5  A  I would have to refer to my documents, but
6  there was -- there's two recordings.  One was
7  when I was summoned to Mr. Domingue's office
8  to provide a statement in conjunction with
9  the payroll fraud.  The second one was when I
10  requested an audio recording of my statement.
11  And I recorded the conversation because there
12  were some questions I wanted to address.
13  Q  All right.  Any others?
14  A  There's an audio recording of Ron Czajkowski
15  and Bert Bejsovec.
16  Q  When was that done?
17  A  I can't give you an exact date.  I can tell
18  you it was -- the nature of the conversation
19  was a meeting we had over separating their
20  duties as a patrol support lieutenant, where
21  it would be fair and equitable.
22  Q  You made the recording?
23  A  Yes, sir, I did.
24  MR. CORRY:
25  And Steve, I'm just going to

---

Page 199

1  reserve my right to come back and finish
2  deposing him if I need to once you
3  provide that.
4  MR. SPRING:
5  All right.
6  MR. CORRY:
7  Q  Any others?
8  A  There should be one with Major Jackie Alfred,
9  in which we had -- he had a conversation
10  about transferring people because they were
11  hiding, as opposed to their explanation for
12  transferring people to make them better, well
13  rounded, in which he referenced Dewitt
14  Sheridan, who is a lieutenant, and retired
15  Lieutenant Calvin Floyd.  And he was going to
16  transfer them because they were hiding and
17  avoiding their duties as a lieutenant.  So he
18  was going to transfer them in order to place
19  them under a captain to watch them.
20  There's another recording of Major
21  Alfred --
22  MR. SPRING:
23  This is one you made?
24  THE WITNESS:
25  Yes.

---

Page 200

1  MR. SPRING:
2  Okay.
3  A  There's another recording of Major Alfred in
4  which -- and I might be mistaken, it might be
5  the same recording.  But I know if it's not
6  that same recording, I know it was the
7  conversation with myself and Major Alfred,
8  where he questioned me about the payroll
9  issue with one of the guys in ATAC.  And
10  during that conversation, he received a phone
11  call from Reginald Thomas, in which he was, I
12  guess, conducting some type of investigation
13  on Scott Poiencot to catch him conducting
14  civil service business on the clock, in which
15  he had solicited the help of Reginald Thomas
16  to see if there was any policy, or procedure,
17  or state law, in which Scott was violating.
18  And Reginald Thomas said he sought the
19  advice of the state examiner, and they told
20  him no.
21  Q  Do you know if any matters were discussed,
22  civil service matters were discussed with
23  Scott while he was a board member before
24  being presented to the board?
25  A  What do you mean?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

**Page 201**

1 Q   Did any officer go discuss with him their
2     case, or on behalf of someone, prior to it
3     coming before the board?
4 A   Not that I can recall.  I know there was --
5 Q   Have you heard any recordings about that?
6 A   No, sir.
7       I know there was -- you want to let me
8     finish?
9 Q   Okay.
10 A   I know there was officers that would come up
11     on the third floor, and that's where the
12     third floor boys came from, from Chief Craft.
13     They would come on the third floor to seek
14     advice for an issue they were having with
15     either myself or Gabe Thompson.
16       And then, at some point in time, Scott
17     Poiencot may be in the general vicinity.  But
18     as far as me hearing an officer sitting there
19     and discuss an upcoming appeal, no, I never
20     heard that.
21 Q   Okay.  Was there any reason why you, and Gabe
22     Thompson, and Scott Poiencot would be
23     together in one office?  Was there any
24     official police business that was being
25     discussed?

**Page 202**

1 A   Sometime cases, yes.
2 Q   Why would y'all -- the three of y'all be
3     discussing cases?
4 A   Well, Scott Poiencot was the precinct
5     investigator.  At some point in time, he
6     would discuss certain cases that he was
7     assigned.  He was aware that I was in the
8     criminal investigation section for an
9     extended period.  And I had some background
10     in criminal investigations, or
11     investigations, particularly.  And he knew
12     Gabe Thompson was in there.  And Gabe
13     Thompson was the supervisor.
14       Sometimes when we're on break, we
15     discussed general things of the police
16     department, as well as things outside the
17     realm of the police department, so --
18 Q   Do you -- did you ever discuss any civil
19     service matters with Scott before they became
20     -- came to hearing?
21 A   No, sir.  I had no interest in discussing any
22     matters.
23 Q   Do you know if Scott discussed with any other
24     board members, matters before they came
25     before the board?

**Page 203**

1 A   No, sir.
2 Q   Did Scott do any civil service work while he
3     was on the clock for LPD, during working
4     hours?
5 A   To my knowledge?
6 Q   Yes.
7 A   No, sir.
8 Q   You don't know?
9 A   I said, to my knowledge, I said no.
10 Q   Okay.
11 A   Now, if he's doing it, and I -- no, don't
12     know.
13 Q   Okay.
14 A   But no, I wasn't aware of it.
15 Q   Do you have any other recordings that you
16     recall making that we have not been
17     provided?
18 A   You're asking me a hard question, Mr. Corry.
19     I can't remember the exact number of
20     recordings and the nature of the recordings.
21     We're talking about in the excess of almost
22     three years ago.
23       I can remember the most relevant
24     recordings off the top of my head.  But to
25     exactly remember, you know, that I recorded

**Page 204**

1     25 recordings, and these would encompass all
2     the recordings, I can't tell you.
3 Q   Okay.  Well, we've asked for all of them in
4     discovery, so -- (Interrupted)
5 A   I can tell you this, the recordings that I
6     made, no matter if it's one, or 350, it was
7     provided to Scott Poiencot.
8 Q   Okay.  And did you conduct all of your
9     recordings on one device?
10 A   Yes, sir.
11 Q   A pen?
12 A   Yes, sir.
13 Q   Where is that pen?
14 A   I don't know where the pen is.  The last time
15     I saw it was several years ago.  It may be at
16     my house.  I don't know.  It may be at the
17     office.
18 Q   All right.  Did it have a disc on it to take
19     the recorded information out of it?
20 A   It had a separate disc.
21 Q   It did?
22 A   Yes, sir.
23 Q   So you could take the disc out?
24 A   The disc wasn't on the recording device.
25 Q   How did you get the information off the

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 205

1    recording device onto a jump drive, or a CD,
2    or something like that?
3  A  I never retrieved that information off the
4    pen.
5  Q  You don't know?
6  A  It was someone else.
7  Q  Is the information you recorded still on the
8    pen, or was it deleted?
9  A  I can't tell you that, Mr. Corry.  And in the
10   wake of all that hysteria with the unfair
11   investigation and all of that that followed
12   with the transfers, and administrative leave,
13   and all of that, that wasn't my number one
14   concern about the pen.
15       MR. CORRY:
16           Steve, I'm going to ask that the
17       pen be produced.
18       MR. SPRING:
19           Where is the pen?  Do you have the
20       pen?
21  A  I don't know where the pen is.  That's a good
22    question.  As far as I'm concerned, the last
23    time I saw it was at --
24       MR. SPRING:
25           It's your pen, right?

Page 206

1  A  Yes.  It was at home and --
2       MR. CORRY:
3           Okay.  I've asked for it, so --
4       MR. SPRING:
5           Okay.
6  A  Well, I'm just making it known on the record,
7    my wife may not know it's a pen, and she may
8    have discarded it.  So she may not know it's
9    a recording device.  Because to the naked
10   eye, it looks like a stereotypical pen.
11  MR. CORRY:
12  Q  I think Kane had one, too.
13  A  No, sir, he didn't.
14  Q  Did you make any recordings after General
15    Order 201.2?
16  A  Let's see if I can find that, because I don't
17    want to go on record and answer something
18    that -- see, the way you have it, it's not --
19  Q  While you're looking for that, Greg.  As I
20    understand it, you gave all recordings to
21    Scott and no one else.  Is that accurate?  Or
22    I'm sorry.  Or Norbert Myers?
23  A  I gave the pen, not the recording.
24  Q  Okay.  You gave the pen to either Scott or
25    Norbert Myers, and no one else?

Page 207

1  A  Yes, sir.  That is correct.
2  Q  And you did not publish any of the
3    recordings?
4  A  That is correct.
5  Q  We're going to go through that, so if you
6    want to wait.  I'll make a note to come back
7    and ask you that, follow that question up.
8        And for the record, did you make any --
9    record any conversations after General Order
10   201.2?  I guess you want to see the date of
11   it?
12       MR. SPRING:
13           Did you say June?
14  MR. CORRY:
15  Q  General Order 201.2.  I don't remember the
16    exact date.
17  A  (Witness examines his documents.)
18       Actually, it wasn't a general order when
19   it was disseminated.  It was a special order.
20   There was no number.
21       When it became a general order, Mr.
22   Corry, was after I was terminated.  Because
23   the special lawyer had in there that it was
24   going to become a general order in the near
25   future.  That, I can roughly tell you that.

Page 208

1        Now, June 4, 2012, is when the Special
2    Order 12.1 came out on clandestine
3    recordings.
4        To answer your question, no, I didn't.
5  Q  Turn to the front of that binder, Greg, if
6    you will.  Number 1, 2 and 3, 4, 5 and 6 and
7    7, 8, 9, 10 and 11, are the documents that
8    we've provided to your attorney for you to
9    answer.  Do you recall seeing those?
10  A  (Witness examines documents.)
11  Q  You're going ahead.  Did you answer the
12    question?  1 through 11, you saw those
13    requests?  And then, the responses are 12
14    through 21, the initial responses.
15  A  I don't recall looking at that.  I recall you
16    sent out interrogatories, but you specified
17    exactly what you were looking for.
18        Like number 2 through 12, you had
19    information you were asking for.
20  Q  You don't recall seeing number 2 through
21    12?
22  A  Yes.
23  Q  You do recall seeing it?
24  A  Yes.
25  Q  Okay.  And then, your responses, your initial

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 209

1  responses. And I know they've been
2  supplemented a couple of times. Your initial
3  responses were 12 through 22 -- 21. Is that
4  accurate?
5  A  Yes.
6  Q  All right. And then, documents number 22
7  through 25 are what?
8  A  This is a copy of the letter, 22, sent by the
9  computer voice stress analyzer administered.
10  The test results is number 23. And 24 is
11  basically his written report.
12  Q  24 and 25?
13  A  Yes.
14  Q  Okay. And then, 26, 27 -- or scratch that.
15  26 is your acknowledgement of your
16  letter of termination. Is that accurate?
17  A  Yes. That's what it says at the top.
18  Q  All right. You received the letter of
19  discipline, number 27 through 29, through
20  your attorney or from your attorney?
21  A  Correct.
22  Q  Okay. And that's the letter of discipline,
23  where you were terminated for AD2012-007?
24  A  Yes. According to the letter, yes.
25  Q  I'm going to mark this since it's not part of

Page 210

1  your submission. I'll just do it as D-1,
2  since we have Greg Cormier, GC, for all the
3  documents that we're referring to.
4  I'm going to let you take a look at
5  that, what we marked as D-1.
6  A  (Witness examines document.)
7  Q  Have you ever seen that document before?
8  MR. SPRING:
9  Let me see.
10  A  Yes, I have.
11  MR. CORRY:
12  Q  When was the first time that you saw it?
13  A  In the statement I provided Dwayne Prejean,
14  he showed me the document.
15  Q  Are you responsible for obtaining this
16  document out of the shift level investigation
17  that it was contained in, in its original
18  form?
19  A  Yes.
20  Q  Without giving a name, do you know the shift
21  level number that it pertained to?
22  A  No, sir, because it's not on there.
23  Q  All right.
24  A  Keith Gremillion can tell you that question.
25  Q  Well, you took it -- I think you just

Page 211

1  testified that you took it out of the shift
2  level file in its original form. Correct?
3  A  Yes.
4  Q  Okay. Do you remember the shift level file
5  that it was taken out of by number?
6  A  Not by number, no, sir.
7  Q  And if we look at, it's marked as D-1, it's
8  got Olita Magee's, it looks like her fax
9  header on top. It says, April 5th, 2012.
10  And at the bottom, it says, Exhibit A.
11  Can you tell me what information was
12  whited out of this document from its original
13  form to the form that it's in in D-1?
14  A  Can I look at the form?
15  Q  Yes.
16  A  (Witness examines document.)
17  Q  And while you're looking at it, Greg, were
18  you the one responsible for whiting it out?
19  A  I think I answered that question. I said
20  yes.
21  Q  Okay.
22  Q  Now, what was your question? You wanted to
23  know what was whited out?
24  Q  Yes.
25  A  The SL number, as well as the complainant.

Page 212

1  Q  And what are you comparing Exhibit D-1 to?
2  A  Internal Affairs SOP. This is where the
3  document was generated from.
4  Q  Okay. Is that Internal Affairs SOP part of
5  the submission that's in the binder?
6  A  Yes.
7  Q  What number is it?
8  A  You're talking about the binder you got?
9  Q  Yes.
10  A  I don't know. That's another document that's
11  not in here. This came out of my binder.
12  See the holes that's punched in it?
13  Q  But you did not see it in the binder --
14  A  No, sir.
15  Q  -- in the documents that you provided to us?
16  A  No, sir.
17  Q  Okay.
18  A  But wait. Hold up. Hold up.
19  MS. COREIL:
20  Does that have a number on it? SOP
21  number something or other?
22  A  No.
23  MR. CORRY:
24  He pulled that out of his binder.
25  A  No, that came out of my binder. So there

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 213

1  wouldn't be any number.
2       MS. COREIL:
3          I mean --
4       MR. SPRING:
5          Can we take ten when you finish?
6       MR. CORRY:
7          Yes.
8       MS. COREIL:
9          I mean, like a general order,  if
10  you had a general order number
11  whatever.
12  A  It's in Internal Affairs SOP, standard order
13  procedure.
14       MR. CORRY:
15          We can take, Steve, if you want to
16  take ten minutes while he's looking for
17  that, that'll be fine.
18       MR. SPRING:
19          Yes.
20       MR. CORRY:
21          Greg, if you need to take a break.
22  A  That's it right here (indicating).
23  MR. CORRY:
24  Q  Okay.  Good.
25          And what number?

Page 214

1  A  It's GC-505.
2  Q  Okay.  Good.
3       MR. CORRY:
4          All right.  We can take ten.  You
5  need to take a break, Greg.
6       (SHORT BREAK TAKEN IN DEPOSITION
7          AT 3:35 P.M.)
8       MR. CORRY:
9          Steve wants to take a break now,
10  and we'll come back and finish at 9:30.
11  And that's not a problem for you to come
12  back, Mr. Cormier?
13       THE WITNESS:
14          No, sir.
15       MR. SPRING:
16          All right.  I appreciate that.
17       MR. CORRY:
18          Look, I actually don't have a
19  problem, Steve, because this is all
20  Bates stamped, with Mr. Cormier taking
21  the copy that we have made --
22       MR. SPRING:
23          And compare them with the book?
24       MR. CORRY:
25          -- and comparing them with what he

Page 215

1  has --
2       MR. SPRING:
3          And bring it back tomorrow.
4       MR. CORRY:
5          -- and bring it back tomorrow.
6          We have documents 1 through 577.
7  And, you know, if there's 593, then
8  provide us the rest.
9       THE WITNESS:
10          All right.
11       MR. SPRING:
12          Let's do that.  That's your
13  homework for tonight.
14       MR. CORRY:
15          Just take this with you and bring
16  it back in the morning.
17       THE WITNESS:
18          Okay.
19       MR. CORRY:
20          And what you might want to do is if
21  there's something that we don't have,
22  segregate it out, and I will have my
23  office -- Steve, with your permission,
24  if he gets here --
25       MR. SPRING:

Page 216

1          That's fine.  I have no problem.
2       MR. CORRY:
3          -- at 9:00, he can give me that
4  stack, and we can run it through the
5  Bate's Stamp and add it to the end.
6       MR. SPRING:
7          That's fine.
8       MR. CORRY:
9          Mr. Cormier, is that good with you?
10       THE WITNESS:
11          That's fine.
12       MR. CORRY:
13          Okay.
14       MR. SPRING:
15          All right.  I appreciate it.
16       (DEPOSITION RECESSED AT 3:49 P.M.
17          UNTIL TUESDAY, 9:30 A.M.)

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 217

1      (DEPOSITION RESUMES ON THE
2   1ST DAY OF APRIL, 2014,
3   BEGINNING AT 9:49 A.M.)
4      GREG CORMIER,
5   after being first duly sworn, was examined and
6   testified as follows:
7      THE WITNESS:
8         I do.
9      EXAMINATION (4/1/14)
10  MR. CORRY:
11  Q   Greg, we're starting back.
12      Were you able to compare your binder to
13  the binder that we had?
14  A   Yes.
15  Q   Did you find any additional documents that
16  were not included in the production that you
17  provided to us?
18  A   Yes.
19  Q   Okay.  This is it?
20  A   Yes.
21  Q   Do you know how many pages this is?
22  A   No.
23      MS. COREIL:
24         Does that stack include the stuff
25  that we got yesterday?

---

Page 218

1      MR. CORRY:
2         It looks like it, yes.  I see the
3   --
4   A   Some of it, but there's some that's not in
5   there.
6      MR. CORRY:
7         Why don't we do this?  Hallie, I'll
8   start.  We'll count it, and then she'll
9   copy it, and we can add it to the --
10     MS. COREIL:
11        Bates stamp it?
12     MR. CORRY:
13        We'll Bates stamp it and add it.
14  At a break, we can do that.
15        Why don't you count it here, so we
16  know how many pages there are?
17     MS. COREIL:
18        Okay.
19  MR. CORRY:
20  Q   Okay.  Let's start back where we were.
21      Greg, when we broke yesterday, we were
22  talking about an exhibit which we've attached
23  as D-1, which is noted to be a Lafayette
24  Police Department interoffice communication
25  SL Notice/Instructions, that you admitted

---

Page 219

1   taking out of a shift level file.
2      In looking back at your termination
3   letter, the -- I think you told me yesterday
4   you didn't recall the shift level number that
5   the file was taken out of?
6   A   That's correct.
7   Q   The file number.
8   A   That's correct.
9   Q   Looking at the termination letter dated
10  September 12th of '12, it references SL
11  2011-028.  Does that refresh your memory?
12  A   No, because it's not on here.
13  Q   Okay.  When you took the original, though,
14  before you made the Wite-Out changes, was
15  there a reference to 2011-028?
16  A   I can't remember that, Mr. Corry.  That's
17  awhile back.
18  Q   Okay.  Were you in charge of 2011-028?  Were
19  you the officer assigned in charge of that
20  investigation?
21  A   Which one is it?
22  Q   SL 2011-028.
23  A   You're going to have to give me a little bit
24  more information.
25  Q   I think it involves JD, as we referenced

---

Page 220

1   yesterday.
2   A   Yes.
3   Q   Okay.  Is that the file you took this
4   document out of?
5   A   Yes.
6   Q   Did anyone, any superior officer at the
7   Lafayette Police Department authorize you to
8   take that document out of the file?
9   A   I didn't take the document out the file.  I
10  copied the document.  The document still
11  remained in the file.
12  Q   Okay.  Did anybody authorize you to make a
13  copy of that document?
14  A   No.
15  Q   Did you discuss making a copy of that
16  document with anyone?
17  A   Scott Poiencot.
18  Q   And when was that discussion?
19  A   I can't give you an exact date.
20  Q   Okay.  Can you give me a reference as to how
21  it came up, the discussion between you and
22  Scott, and that document, and the need for
23  you to copy it?
24  A   Yes, I sure can.  It was after a hearing with
25  Ed Mclean in which the discussion came up.

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 221

1  You should be familiar with that, Mr. Corry,
2  you represented the city. It was over the
3  60-day rule. He had mentioned that board
4  president, Civil Board President Jason
5  Boudreaux, had some issue with the
6  investigation. And he had determined that
7  they had violated the police officer bill of
8  rights, Louisiana Revised Statute 40:2531, in
9  which they had went over the 60-day time
10  limit. And he had determined that either
11  would be 62 days or 63 days, and he had
12  factored in meeting out discipline.
13      There was an argument with -- over a
14  policy that the Lafayette City Police
15  Department had, that compelled them to
16  complete an investigation within the 60-day
17  parameter. And which Chief Craft testified
18  and said he didn't, which he lied.
19      Ray Domingue, Human Resource Director,
20  got up and testified, and lied, and said that
21  they didn't, as well as Gail Smith.
22      When I was having a discussion with
23  Scott Poiencot, I told him, you ought to be
24  aware -- I don't know if you're aware of
25  this, there is a policy or an SOP that

Page 222

1  compels them to do it. And I don't know if
2  that's going to be an issue.
3      Later on, unbeknown to me, Major Ted
4  Vincent had the same discussion. So
5  apparently that was being discussed around
6  the police department. So it wasn't
7  something of a confidential nature. And
8  being that Captain Ted Vincent, who is now a
9  major, spent extensive time in Internal
10  Affairs section, he approached Scott
11  Poiencot, also, and discussed this same
12  document with him, and also, the 60-day rule.
13  Q  Did Scott come to you or you went to Scott --
14  A  We met in the hallway.
15  Q  -- about this document?
16  A  No, it wasn't about a document. It was about
17  a discussion.
18  Q  Okay. And we went over there on Mclean, on
19  several occasions. There were several
20  discussions before the board, and it was
21  ultimately tried.
22      Do you recall which meeting of the
23  Lafayette Civil Service Board, on which you
24  just told me -- do you remember which time it
25  was that we went over there.

Page 223

1  A  It would have to have been the meeting in
2  which y'all asked to prepare a brief. And I
3  can't give you the date. I can tell you that
4  your clients went in there and testified
5  under oath, and made a false statement, and
6  nothing was addressed about that.
7  Q  So you don't remember which one it was? It
8  was just the one dealing with the 60-day
9  rule?
10  A  That would be the meeting. Because on March
11  8th, you deposed Keith Gremillion, in which
12  he conducted an unauthorized investigation
13  into trying to find out where this document
14  came from. So it would have to be the
15  meeting prior to that. Now, I can't give you
16  the exact month.
17  Q  You don't know the date?
18  A  I think I answered that already, Mr. Corry.
19  I said I didn't know.
20  Q  Okay. Do you know the outcome of the Mclean
21  matter?
22  A  Yesterday, I answered that. I told you no.
23  Q  Okay. Well, would it surprise you if I told
24  you that the board voted in favor of the
25  appointing authority, and upheld the

Page 224

1  termination of Mr. Mclean, and found that the
2  chief acted in good faith and for cause, and
3  that the 60-day rule was not violated? You
4  didn't know that?
5  A  It wouldn't have mattered to me, Mr. Corry,
6  one way or the other. The issue was that
7  there's general orders, as well as civil
8  service rules, which is a terminable offense
9  to testify under oath and make false
10  statements, and --
11  Q  Okay.
12  A  Let me answer that question.
13  Q  You've got to answer my question first. You
14  didn't answer it.
15  A  I did.
16  Q  You didn't --
17  A  Yes, I did.
18  Q  No, you didn't.
19      MR. SPRING:
20      He asked you if you know what?
21  MR. CORRY:
22  Q  The outcome was.
23      MR. SPRING:
24      Okay.
25  A  I said I didn't know. I did say that.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 225

1  MR. CORRY:
2  Q   Go ahead.  You can respond.
3  A   I said the issue here is, this document was
4      produced.
5          Now, the issue came up where it was
6      alleged that I produced the document.  But
7      the last person that had his hands on it, as
8      far as I was concerned, or I was told was Ted
9      Vincent.  But yet he was never investigated,
10     none whatsoever.  Which leads back to this
11     being a fair and impartial investigation that
12     was conducted by the police department.  But
13     the issue was, this document here, they said
14     they never had it.
15         They testified under oath, civil
16     service, which is basically perjury, Chief
17     Craft, who is a classified civil service
18     employee, which is a terminable offense.
19         Now, you was there, you allowed that to
20     happen.  Were you aware of that?
21 Q   I'm not under oath and I'm not answering
22     questions today.
23 A   Okay.  But -- but you had a client that made
24     a false statement.
25 Q   We're going to be here until Saturday.  If

Page 226

1      you answer my questions and you want to
2      explain, that's fine.  And I've given you
3      every opportunity to explain.  But if you
4      want to just keep going on, and on, and on,
5      unresponsive answers, I'm going to note that
6      it's unresponsive to the question and we'll
7      take it up with the Court.
8  A   Mr. Corry --
9  Q   That's what we'll do.
10 A   -- I answered the question.
11 Q   Okay.
12 A   Didn't I answer the question?
13 Q   Not initially.
14 A   Didn't I answer the question?
15 Q   Well, I'm asking the questions today.  Are
16     you through?
17 A   Yeah, I'm through now.
18 Q   All right.  Do you know if the Mclean matter
19     was appealed to the Fifteenth Judicial
20     District Court, Judge Rubin's courtroom?
21 A   No.
22 Q   Okay.  Do you know that Judge Rubin upheld
23     the termination of Ed Mclean, and found that
24     there was no violation of the 60-day rule?
25     Do you know that?

Page 227

1  A   No.
2  Q   Okay.
3  A   I'm not finished.  But at the time this same
4      document was discussed, it was the issue
5      dealing with the 60-day rule, and the pending
6      litigation that you just alluded to, going to
7      the appellant -- I mean, to appeal to Judge
8      Rubin wasn't an issue there.  So at the time,
9      it wasn't decided if it was upheld or not.
10     Okay?
11 Q   The record speaks for itself, Mr. Cormier.
12 A   I'm just making note of that.
13 Q   That's fine.
14 A   At the time when that was being discussed.
15 Q   That's fine.
16         Were you at that board meeting when the
17     60-day rule was discussed, and you thought
18     that you needed to go copy that document,
19     D-1, out of the shift level file that you had
20     worked?
21 A   No.
22 Q   How did you find out that that issue was
23     discussed at that board meeting?
24 A   I just told you, Scott Poiencot and I had a
25     discussion about it.

Page 228

1  Q   And was he sitting on the board at that time?
2  A   When?
3  Q   When he had the discussion with you.
4  A   Yes.
5  Q   He was the representative of the police
6      department on the civil service board?
7  A   Yes.
8  Q   Did you know that he was sitting on that
9      board in violation of Louisiana law?
10 A   What violation?
11     MR. SPRING:
12         I'm going to object to the
13     question.  It calls for a legal
14     conclusion on his part.  Subject to the
15     objection, answer the question.
16 A   What violation?
17 MR. CORRY:
18 Q   Did you know that he was sitting on the board
19     in violation of Louisiana law?
20 A   No.  And what violation?
21 Q   Do you know that there was a judgment granted
22     removing him from the board for sitting on
23     it, in violation of Louisiana law?
24     MR. SPRING:
25         Again, I'm going to object.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 229

1    MR. CORRY:
2        That's fine.
3    A   No.  And I'm going to expound on that.
4        When you asked, posed that question to
5    Uletom Hewitt, as well as Kane Marceaux, the
6    issue was him living outside the parish.
7    Scott Poiencot was on that board for about
8    almost a year before y'all took exception to
9    it when he started doing what was proper.  I
10   found that odd that y'all had an objection
11   way after a year that he was presiding over
12   the board.
13   MR. CORRY:
14   Q   Mr. Cormier, what did Scott tell you on that
15   initial meeting you had with him?  You said
16   it was in the hallway?
17   A   Yes.
18   Q   At the PD?
19   A   Yes, sir.
20   Q   900 East University?
21   A   Yes.  The white house.
22   Q   On the third floor?
23   A   Yes.
24   Q   Outside of your office or his?
25   A   The hallway would be outside of the office.

Page 230

1        His office is in close proximity to mine.
2    Q   Okay.
3    A   So it would be in between.
4    Q   Was it a predetermined, scheduled meeting, or
5    you just happened to bump into him in the
6    hall?
7    A   I said, I ran into him --
8    Q   Okay.
9    A   -- if my memory serves me correct.
10   Q   All right.  And what did he say to you?
11   A   I asked him how the meeting went.
12   Q   And what did he say?
13   A   Okay.
14   Q   All right.  And how did the 60-day issue come
15   up?
16   A   He said it was continued, and there was an
17   issue dealing with the 60-day rule.  And he
18   went in detail about it.  And I said, well, I
19   don't know if you're aware, and that's when
20   the document came up.
21   Q   Do you know if the Mclean matter was a shift
22   level investigation or an administrative
23   level investigation?
24   A   I don't know either one.
25   Q   I'm sorry?

Page 231

1    A   I don't know either one.
2    Q   All right.  And what else did Mr. Poiencot
3    tell you?
4    A   That's pretty much it.
5    Q   Did you have any affiliation with the Civil
6    Service Board?
7    A   What do you mean by that question?
8    Q   I mean, did you work for them, were you
9    appointed by them to do anything at that
10   time?
11   A   No.
12   Q   Okay.  What else did Mr. Poiencot say?
13   A   That was the extent of it.
14   Q   Okay.  And what did you say to him?
15   A   What I just told you earlier, that I don't
16   know if you're aware when they addressed the
17   60-day rule.  And I said there's an SOP that
18   governs the police department to conduct an
19   investigation within the 60-day parameter,
20   inclusive of discipline.
21   Q   Okay.  And who made the decision to go get
22   this document, which we've marked as D-1, and
23   make -- well, this is the copy, whited out?
24   Who made the decision to go copy that
25   document; you or Scott?

Page 232

1    A   I told you earlier, I did.
2    Q   All right.  And when in relation to the
3    meeting with Scott did you decide to do that?
4    A   Afterwards.
5    Q   That day?
6    A   I said I couldn't give you an exact date.
7    Q   All right.  Was it within a few days of that
8    date?
9    A   I can't remember, Mr. Corry.
10   Q   All right.  Where was that file located when
11   you went to make the copy?
12   A   In my office.
13   Q   It was not -- where was the original file
14   located?
15   A   In my office.
16   Q   Okay.  Were you the custodian of Internal
17   Affairs files?
18   A   No, sir.  That would be, at the time,
19   Sergeant Gremillion.
20   Q   How did the file that you made the copy out
21   of -- why was it being kept in your office?
22   A   I was investigating the case.
23   Q   Had the case concluded?
24   A   I can't remember.
25   Q   All right.  What are you supposed to do with

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 233

1 the file after you finish your investigation?
2 A   The original file is turned in.
3 Q   To?
4 A   The supervisor.
5 Q   And who would that have been at the time?
6 A   Captain Ron Czajkowski.
7 Q   All right.  Did you turn in the file to
8    Captain Czajkowski prior to making the
9    copy?
10 A   I can't remember that.
11 Q   Did you ever turn in the file that you had in
12    your office on that investigation?
13 A   Yes.  Because if I wouldn't have, there would
14    be another investigation of failing to
15    complete an investigation.
16 Q   All right.  Is that the investigation that
17    was not completed within the 60 days?
18 A   No, sir.
19 Q   It was a different one?
20 A   I can't remember.
21 Q   So it could have been that one?
22 A   Yeah, it could have been that one.
23 Q   All right.
24 A   I had two investigations with Jeremy.  I
25    mean, JD.

Page 234

1 Q   After you made the copy of the document, what
2    did you do with the copy?  Took it back to
3    your office?
4 A   I gave it to Scott Poiencot.  I think I
5    answered that already.
6 Q   Who put the Wite-Out on it, you or Scott?
7 A   I did.
8 Q   Okay.  Where did you do that?
9 A   In my office.
10 Q   That's what I'm asking you.  So you made the
11    copy, took the copy back to your office and
12    whited it out?
13 A   Repeat that question.
14 Q   You made the copy out of the shift level
15    file, put the original back in, took the copy
16    back to your office and whited out the
17    information you told me yesterday that you
18    whited out?
19 A   Yes.
20 Q   Okay.  Did you do that at the same time you
21    made the copy?  The same day, the same time
22    frame, walked from the copier back to your
23    office, or was it done sometime later?
24 A   It was done the same time frame.
25 Q   Okay.  Was anybody with you when you made the

Page 235

1 copied that document?
2 A   No.
3 Q   Was anybody with you when you whited out the
4    information?
5 A   No.
6 Q   What did you do with the original document
7    that has the Wite-Out on it?
8 A   The original document is whited on.
9 Q   The original whited out document?
10 A   I gave to Scott Poiencot.
11 Q   Okay.  So he had the original copy with the
12    original Wite-Out?
13 A   No, sir.
14 Q   It wasn't a copy?
15 A   No.
16 Q   It was a copy of what you had done?
17 A   Yes.
18 Q   All right.  What did you do with the original
19    that has the Wite-Out on it?
20 A   The original didn't have Wite-Out.
21 Q   The original copy that you made to put the
22    Wite-Out -- where you put the Wite-Out on it?
23 A   I just said, I gave it to Scott Poiencot.
24    But the way you're phrasing your
25    question, or posing your question, it doesn't

Page 236

1 make any sense.
2 Q   Well, just tell me that.
3 A   I'm telling you that now.
4 Q   All right.  And let's start back over to make
5    sure we're clear.
6 A   Yes.
7 Q   D-1, in its original form, was copied?
8 A   Correct.
9 Q   D-1 in its original form, the copy that was
10    made, you put Wite-Out on it, you whited out
11    some information on the copy, correct?
12 A   Yes.
13 Q   All right.  The document that has the
14    Wite-Out on it, you gave that to Scott?
15 A   Correct.
16 Q   You did not make a copy of that document?
17 A   Of the Wite-Out document?
18 A   Correct.
19 A   That's what you're asking me?
20 Q   Yes.
21 A   No, sir.
22 Q   All right.  When did you give it to Scott?
23 A   I think I answered that already.  I can't
24    gave you an exact date of when I gave it to
25    him.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

**Page 237**

1 Q   Would it have been the day you copied it, or
2     you don't recall?
3 A   I don't recall.
4 Q   Did Scott, at any time, tell you the
5     information y'all were discussing was pending
6     before the board?
7 A   I can't answer that.  It's been awhile, Mr.
8     Corry.
9 Q   Were you ever consulted or contacted by
10    anyone representing Mr. Ed Mclean to obtain
11    the document?
12 A  No.
13 Q   Were you ever contacted by Ed Mclean to
14    obtain the document?
15 A  No.
16 Q   Did Ed Mclean know that you and Scott had a
17    discussion and you copied the document?
18 A  No.
19 Q   When you gave it to Scott, was anyone else
20    present?
21 A  I answered that already.  No.
22 Q   All right.  Where did you give it to him?
23 A  In the hallway.
24 Q   All right.  The same place that y'all met?
25 A  Yes, sir.

**Page 238**

1 Q   And do you know what he did with it?
2 A   Exactly, no.  I know later on down the line,
3     Ted Vincent had it.
4 Q   All right.  And do you know how Ted Vincent
5     got it?
6 A   As far as I know, Scott Poiencot.
7 Q   Okay.  And how do you know Ted Vincent had
8     it?
9 A   Scott Poiencot said it.
10 Q   All right.  Were you present when it was in
11    the possession of Ted Vincent?
12 A  No.
13 Q   Do you know who was present when Scott
14    Poiencot gave it to Ted Vincent?
15 A  As far as I know, Scott and Ted had a
16    conversation, just those -- them two.
17 Q   Did Scott give him the document, or simply
18    show it to him?
19 A  He said he gave it to him.
20 Q   All right.  Do you know if Scott made any
21    copies of that document before giving it to
22    Ted Vincent?
23 A  No.
24 Q   Do you know, in relation to the time that you
25    copied the document, whited it out and gave

**Page 239**

1     it to Scott, when Ted Vincent got a copy?  I
2     mean, was it within a day or two, a few days,
3     a few weeks, or do you have any idea?
4 A   It should have been around --
5 Q   The same time?
6 A   Yes.
7 Q   Do you know if there are any recordings
8     between Scott and Ted regarding that
9     document?
10 A  Yes.
11 Q   There are?
12 A  Yes.
13 Q   Who made it?
14 A  Scott.
15 Q   Have you heard it?
16 A  Yes.
17 Q   What do you recall being on that recording?
18 A  I recall on the recording, Scott being in his
19    office, Ted knocks on the door and enters.
20    They start talking about things going on in
21    Internal Affairs, in which Ted was expressing
22    his displeasure.  And the current affairs
23    director or head Internal Affairs, Dwayne
24    Prejean, they had a discussion about this guy
25    not being qualified to be in there based on

**Page 240**

1     his history at the police department.
2         And they basically discussed that it was
3     some sort of deal that was garnered between
4     Allyson Prejean, Dwayne's wife, and Chief
5     Craft, in exchange for Allyson to stop
6     representing the officers that was beating up
7     Jim Craft.  That's Ted Vincent words.  That
8     Dwayne would be transferred into Internal
9     Affairs section.
10        During the course of that, he talks
11    about how Dwayne instruct his officers to lie
12    to target officers that are being
13    investigated.  And when he became aware of
14    that, he and Dwayne had a discussion
15    concerning that, and Dwayne's response was,
16    the supreme court says they can lie to
17    officers.
18        He also referenced an incident in
19    which --
20 Q   I'm listening, keep going.
21 A  He also references an incident in which he
22    was having a discussion with Dwayne, and at
23    the time, communications supervisor, Brad
24    Ridge, was assisting Dwayne in showing him
25    how to navigate the computer, as far as

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 241

1  listening in on other officers.
2      And during the course of Brad
3  demonstrating how to utilize this new device
4  that was implemented on Dwayne's computer,
5  they inadvertently keyed on a conversation in
6  which a DPR officer was having with her
7  boyfriend, in which they were having a heated
8  discussion. And at the time --
9 Q  What is a DPR?
10 A  Deferred police reporter.
11     At the time, he was upset over it. He
12 didn't make Dwayne aware of it. But at the
13 time, he told Scott Poiencot that that's
14 illegal, and that they thought they had
15 removed all of those devices in the wake of
16 former Chief Randy Hundley, and that they
17 were still listening in on people's private
18 conversation without them knowing.
19     He went on to say that Dwayne basically
20 went in and all the hard work that he did in
21 Internal Affairs, as far as bringing it up to
22 be a reputable section that had some
23 integrity, that it was tarnished in a matter
24 of blinking of an eye, with Dwayne going in
25 there.

Page 242

1 Q  Was there any discussion about this document?
2 A  I'm getting to that.
3      During the course of that discussion,
4  Ted had told Scott that, hey, I heard what
5  happened in the Mclean hearing. I had a
6  discussion with Jim Craft. So I don't know
7  if, you know, an appeal is pending and you
8  deem that confidential. But the chief of
9  police should know better than anything to be
10 discussing a pending matter with other
11 employees. Which, he does it on a regular
12 basis anyway. But he said he had a
13 discussion with Jim and some other people.
14 And he heard what happened in the Mclean
15 hearing, and the issue of the 60-day rule
16 came up.
17     And he basically said, well, I don't
18 know what they're going to do.
19     And at the time, Scott produced this
20 document and showed it to him. And gave it
21 to him, and said -- and his exact words,
22 well, if they have a document like this, then
23 they're shooting themselves in the foot, and
24 it's a mute point for them to argue if they
25 have a policy or procedure that governs them

Page 243

1  to do something. And that was the extent of
2  it.
3 Q  Okay. So you didn't have any authorization
4  by anyone to make a copy of that document; is
5  that accurate?
6 A  No.
7 Q  It's not accurate, or it is accurate?
8 A  It is accurate.
9 Q  Okay. Have you ever filed a grievance?
10 A  You asked me that yesterday. No, sir.
11 Q  Okay. You didn't file a grievance over this
12 60-day issue that you thought was an issue,
13 you and Scott thought was an issue regarding
14 Mclean? You didn't file any grievance on
15 that. Is that accurate?
16 A  No.
17 Q  It's not accurate?
18 A  I didn't file a grievance.
19     Let me finish before you cut me off, Mr.
20 Corry. And I'm not finished. I'm going to
21 expound on that.
22     There's no point of filing a grievance.
23 I said it yesterday. It's -- a grievance
24 doesn't go anywhere. The CAO is going to
25 agree with the chief every single time.

Page 244

1      Don't take my word for it, prove me
2  wrong. But any grievance, he's going to
3  agree with him. That was said by Richard
4  Chappuis. He knows, it's common knowledge.
5 Q  Do you know -- and if I asked you this, I
6  apologize. But you've talked a lot, and I
7  just want to make sure it's clear for the
8  record. Sometimes we have to go back to make
9  sure things are clear for the record.
10     Do you know if Scott gave Ted Vincent
11 the original whited out version of D-1, or
12 did he give him a copy?
13 A  I can't answer that question. I don't know
14 if he gave him the original or a copy.
15 Q  All right.
16 A  I know he gave him a copy --
17 Q  Okay. Do you know?
18 A  -- that --
19 Q  Go ahead.
20 A  -- that came from me.
21 Q  All right. Do you know what Ted Vincent did
22 with it?
23 A  No, sir.
24 Q  Okay. Other than giving your whited out
25 original copy to Scott, you didn't give that

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 245

1  document to anybody else, did you?
2  A   No.
3  Q   Do you know if Scott gave that document to
4  anyone other than Ted Vincent?
5  A   I think you asked me that already.  And my
6  response was no.
7  Q   Do you know if Ted Vincent gave it to anybody
8  else?
9  A   You just asked me that.  And no, I don't
10  know.
11  Q   You mentioned Greg Randell's name yesterday.
12  And I don't recall in what context.  Did he
13  have something to do with this document?
14  A   According to Dwayne Prejean.
15  Q   Well, I mean, according to you, do you know
16  if Greg Randell had anything to do with it?
17  A   No.
18  Q   Okay.
19  A   I just said, according to Dwayne Prejean and
20  Allyson Prejean, Greg Randell was the one
21  that released that document to Olita Magee.
22  Greg Randell's name came up with Dwayne
23  Prejean, when we got in the heated argument
24  over him being upset with me looking at his
25  vehicle, which when he got in the wreck.  And

Page 246

1  he probably was impaired when that happened,
2  because it's common knowledge everybody calls
3  him the Otis Campbell of the police
4  department.
5  But he was upset for some reason.  I
6  passed, and that's how the argument started.
7  And during the course of the argument, he
8  mentioned Greg Randell told him that I was
9  providing reports to attorneys.
10  Q   Greg Randell told Dwayne Prejean that you,
11  Greg Cormier, were providing reports to
12  attorneys?
13  A   Yes.  Then, later on, I discovered lately,
14  Allyson Prejean is saying Greg Randell is the
15  one that gave this document to the media.
16  Q   Where did you get that information from?
17  A   Several people.  I'm not going to provide the
18  names because --
19  Q   I think you have to.
20  A   Hold on.  Let me tell you why.
21  Q   All right.
22  A   Kane Marceaux gave a deposition February
23  17th.  From the information he provided in
24  the deposition, there were some people that
25  were transferred.  They retaliated against

Page 247

1  them.  I don't want that to happen, Mr.
2  Corry.
3  Q   Well, I'm asking you where you got the
4  information.
5  A   There were several people that said that.
6  Q   Who?
7  A   Dwayne Bertrand.  Let's see who else?
8  Q   Dwayne Bertrand told you that Allyson Prejean
9  said it was -- (Interrupted)
10  A   No.  That -- I'm trying to think who told me
11  that Dwayne Bertrand told them, because
12  Dwayne is friends with Allyson and Dwayne
13  Prejean.
14  Q   So what did Dwayne Bertrand say?
15  A   Dwayne Bertrand said that Allyson was saying
16  that Greg Randell provided this document that
17  we're discussing currently right now, Exhibit
18  A, D-1, to Olita Magee.
19  Q   Anybody else?  You said there were several
20  people.
21  A   I'm trying --
22  Q   I'm sorry.  Go ahead.
23  A   I'm trying to think of the other people.
24  I can't remember the rest of them, Mr.
25  Corry, because I was laughing about the whole

Page 248

1  thing.  Because it really doesn't matter at
2  this juncture.  Because they conducted the
3  investigation and it says Scott Poiencot and
4  I provided that document.  So I wasn't, you
5  know, pretty much concerned about it.
6  If I'm not mistaken, I think Andres
7  Landor mentioned that, too.  I got the
8  information, if I'm not mistaken, from Mike
9  Brown, maybe.  But don't quote me on that.
10  Q   As you're sitting here today, do you know how
11  Olita Magee got her hands on it?
12  A   You're going to have to ask that question to
13  Olita Magee.  And I'm going to answer it for
14  you, because I know you answer first, and
15  then expound on it.
16  I don't know.
17  Q   Was there any discussion between you and
18  Scott about Ed Mclean needs to see this
19  document?
20  A   You asked me that already.  No.
21  The conversation was over the 60-day
22  rule, and the violation of the police officer
23  bill of rights minimum standard, as it's
24  known in Title 33.
25  Q   Kane mentioned a name of somebody that he

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 249

1 thought gave it to Olita Magee. Do you
2 remember that?
3 A  Mr. Corry, that's about a month ago.
4 Q  Okay. That's a no?
5 A  And y'all were talking for a long time.
6 No.
7 Q  I think you told me yesterday you had not
8 given any recordings to any news outlet; is
9 that accurate?
10 A  Yes.
11 Q  The description of this document in the
12 60-day rule, as you perceived it to be a
13 violation, was contained in your federal
14 lawsuit. There were some allegations in
15 there about that? Do you know?
16 A  I would have to go -- no, I don't know. I
17 would have to go through the lawsuit.
18     MR. CORRY:
19        How many pages were there?
20     MS. COREIL:
21        I counted 104.
22     MR. CORRY:
23        104.
24 MR. CORRY:
25 Q  Do you want to make sure that everything you

Page 250

1 gave us is in there?
2 A  Well, it's kind of a little late for that,
3 Mr. Corry.
4 Q  Pardon?
5 A  It's kind of late for that. I should have
6 been assured that before you made the copies.
7 Q  Well, I assumed you knew what you gave me.
8 A  Well, you said prior to giving copies, we
9 were going to count them before.
10 Q  I did.
11     MR. CORRY:
12        Did you count them?
13     MS. COREIL:
14        Yes.
15     MR. CORRY:
16        And there was how many?
17     MS. COREIL:
18        There's 104.
19 A  I didn't hear an official count prior to you
20 walking out.
21     MR. CORRY:
22        Did you tell us how many there
23     were?
24 A  No, sir.
25     MR. CORRY:

Page 251

1        Did you write down?
2     MS. COREIL:
3        I did write it down. 104.
4        And just for clarification, you
5        have a PAR form that has got like carbon
6        copies.
7 A  Uh-huh (yes).
8     MS. COREIL:
9        I just made -- I counted that as
10        one copy, but she made a copy of the
11        front and the back. So that's in
12        here.
13 A  Okay. Good.
14 MR. CORRY:
15 Q  What? I was going to let you count.
16 A  I'm going to take your word for face value.
17 Q  Pardon?
18 A  I'm going to take your word for face value.
19 Q  Okay. I've given your lawyer a copy. If
20 there's an issue, we can certainly address
21 it. There shouldn't be.
22        Other than discussing this with Scott,
23 did you complain to any other supervisor that
24 you thought Mclean -- that the 60-day rule
25 was being violated?

Page 252

1 A  That's about two years ago, Mr. Corry. I
2 can't tell you yes or no.
3 Q  I know it's in your stack of documents, but
4 just to make it easy, for purposes of our
5 discussion, I'm going to show you what I'll
6 mark as D-2. It's a memo dated May 11th,
7 2012, to you, where you were placed on
8 administrative leave for AD-2012-007. Did
9 you receive a copy of that?
10 A  It's not for administrative leave.
11 Q  What's it for?
12 A  Notice of investigation for AD-2012-007, I
13 think.
14 Q  Were you later on put on administrative
15 leave?
16 A  Yes.
17 Q  When, in relation to May 11th, 2012?
18 A  In August.
19 Q  Okay.
20     MR. CORRY:
21        I'll attach that as D-2.
22 MR. CORRY:
23 Q  Do you remember the date that you were put on
24 administrative leave?
25 A  I'd have to refer to my binder.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

**Page 253**

1  Q   We'll get to it.
2      You had a predetermination hearing, I
3   think, on September 7th of 2012.
4  A   Correct.
5  Q   And your two attorneys were present?  Mr.
6   Alexander and Mr. Spring were present for
7   that?
8  A   Yes.
9  Q   You also gave a statement, I think it's
10   GC-373, if you want to look at.  If you want
11   to look here at 373.
12  A   (Witness examines document.)
13  Q   Greg, you see Exhibit 373?
14  A   Yes.
15  Q   That's the statement that you gave in
16   connection with this investigation.  I think
17   you had your attorneys present with you.
18  A   Yes.
19  Q   Okay.  And then, 370 is where you were
20   notified of the predisciplinary hearing.
21   That's your signature on 370?
22  A   Yes, sir.
23  Q   And then, ultimately, you received -- and you
24   have it in your submissions at several
25   places.  GC-27, that's the letter of

**Page 254**

1   determination dated September 12th, 2012?
2  A   (Witness examines documents.)
3      Yes.
4  Q   Okay.  I think you told me yesterday it was
5   provided to you through your attorneys.  It
6   was sent to your attorney and he provided a
7   copy to you.  Is that accurate?
8  A   Yes.
9  Q   Okay.  We've referenced it in the exhibits.
10      MR. CORRY:
11         I'm going to mark it as D-3 and
12      attach it, with the acknowledgement,
13      four pages.
14      MR. SPRING:
15         Is that his termination?
16      MR. CORRY:
17         Yes.  September 12th of 2012.
18  MR. CORRY:
19  Q   I want to go back to something on the Dartez
20   matter.  Turn to GC-238, if you would,
21   please.
22  A   (Witness complies.)
23  Q   Do you see that?  Do you see that there,
24   Greg?
25  A   Yes.  Hold on one second.  Yes, sir.

**Page 255**

1  Q   That's a 17-page statement that you gave in
2   connection with the investigation of Major
3   Glen Dartez, under AD-2010-012?
4  A   Yes.
5  Q   Up until today, have you ever had a
6   discussion with Ed Mclean about that
7   document?
8  A   You asked me that already, Mr. Corry.  No.
9  Q   And what about Olita Magee, up through today?
10  A   I responded already.  No.
11  Q   Okay.
12      MR. SPRING:
13         Can I ask you, is that GC-238, or
14      we're talking about the other one, D-1?
15      MR. CORRY:
16         No.  I was talking about D-1.
17      MR. SPRING:
18         Okay.  All right.  I'm sorry.
19  MR. CORRY:
20  Q   Let's talk about the number of times you were
21   transferred in your 22-year career.  Do you
22   know how many times you were transferred?
23  A   No, sir.
24  Q   Was it more than five times?
25  A   Yes.

**Page 256**

1  Q   Was it more than ten?
2      (INTERRUPTION IN DEPOSITION)
3  MR. CORRY:
4  Q   Do you need to get that?
5  A   No.
6      I'm adding them.
7  Q   Okay.
8  A   I don't know if it's ten or not.
9  Q   Somewhere between five and ten, you think?
10  A   Maybe.  I don't have my personnel file to be
11   able to tell you.  It should be in there.
12  Q   Let me show you, and we can mark this as D-4.
13   This looks like a transfer on December 8th of
14   2010.  There's a number of officers noted on
15   it.  Do you have that in your binder?
16  A   Yes.
17      MR. CORRY:
18         What number is that?
19      MS. COREIL:
20         I think it's in the new
21      documents.
22  A   It was given to you yesterday.
23  MR. CORRY:
24  Q   Okay.  It's in the new stack that you gave to
25   us this morning?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 257

1 A  But it was already in your binder.
2 Q  Was it?
3 A  Yes.
4 Q  GC --
5 A  (Witness examines his document.)
6     Uh-uh (no).  Not that one.
7 Q  Pardon?
8 A  I take that back.  It wasn't.
9     MS. COREIL:
10    I mean, we have it in this stack.
11 MR. CORRY:
12 Q  The stack you gave us this morning, did it
13    include the four or five documents you gave
14    us yesterday, or was that separate?
15 A  Separate.
16    MS. COREIL:
17    I thought you said they were in
18    there.  Okay.  We'll have to add those
19    in.
20    MR. CORRY:
21    We'll have to add those in at the
22    end.
23 MR. CORRY:
24 Q  Okay.  For ease of purposes for this, I'm
25    going to show you what I've marked as D-4,

Page 258

1    and it looks like it's a four-page transfer
2    document dated December 8th, 2010.
3 A  (Witness examines document.)
4 Q  Is that accurate, four pages?
5 A  Yes.
6 Q  What was the reason for that transfer?  Where
7    were you transferred from, and where were you
8    transferred to?
9 A  You're asking me the reason why?  They didn't
10   give me a specific reason why I was
11   transferred.
12 Q  Where were you transferred -- what was your
13   position you were in before the transfer on
14   December 8th of '10?
15 A  Criminal investigator supervisor.
16 Q  And how long had you been in that position?
17 A  Four and a half years, maybe five years.
18 Q  Okay.  And where were you transferred to?
19 A  The power squad --
20 Q  Okay.
21 A  -- shift, AC rotation.
22 Q  I'm sorry.  What rotation?
23 A  AC.
24 Q  What does that mean?
25 A  Shift alpha, shift Charlie.

Page 259

1 Q  What is the A shift?
2 A  The A shift is a 100 shift.
3 Q  Okay.  And what is 100?
4 A  Night shift.
5 Q  And what is the Charlie shift?
6 A  Charlie shift is the 300 shift, night
7    shift.
8 Q  And how long did you remain in that position?
9 A  One day.
10 Q  And where were you transferred from there?
11 A  I don't know.
12 Q  What do you mean?
13 A  Like I told you yesterday, I was assigned to
14   work cold cases.  And later on, I guess when
15   retired Captain Dwayne Arceneaux had an
16   epiphany of all the things that were going on
17   at the police department, he actually
18   summoned me to his office prior to him
19   retiring.  And he basically ran down
20   everything that was going on at the police
21   department, and expressed his displeasure.
22   But he said this document here, he
23   thought I was responsible for it.  And in
24   order for him not to be exposed, since he
25   thought I was responsible for it, he tried to

Page 260

1    appease me by taking me away from the power
2    squad.  But his explanation for my transfer
3    was because of the Glen Dartez ordeal.
4    And when I asked him, where he got that
5    from, he said he was in a meeting where Craft
6    said that was my pay back.
7 Q  Okay.  So --
8    MR. CORRY:
9    Hallie, I think this is part of
10   what he gave us.  Can you get the number
11   on it?  It's in the new stuff that we
12   copied today.
13   MS. COREIL:
14   It's in the new stuff?
15 A  He also --
16 MR. CORRY:
17 Q  Hold on.
18 A  Okay.
19 Q  So you worked cold cases for one day?  Or you
20   worked the power squad one day, then you
21   started working cold cases in response to
22   what Arceneaux told you?
23 A  When you --
24   MS. COREIL:
25   GC-590.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 261

MR. CORRY:
2 Q  Is that the same document, GC-590?
3 A  Yes.
4 Q  Okay. And let's take a time out, because
5    it's not going to be clear for the record if
6    you're going through your binder. You've
7    provided us copies of everything you've done.
8    So we've got to refer to these documents by
9    their number.
10 A  Okay.
11 Q  So let me get these and put them in the
12    binder. And then, we can make copies of
13    those other documents.
14    (SHORT BREAK TAKEN FROM
15    10:42 A.M. 10:56 A.M.)
16    MR. CORRY:
17    So that we're clear and it makes it
18    easy for all of us and we can get out of
19    here, GC-578 through 682 are the
20    documents that Mr. Cormier gave us this
21    morning, after comparing the exhibit
22    book that we had with all the documents
23    that were previously provided, in
24    comparison to his binder. And these are
25    the documents consisting of 104 pages,

Page 262

1    that he found were not contained within
2    the binder.
3    MR. CORRY:
4 Q  Accurate?
5 A  Let's me add to this. I know you have it
6    stamped on there, April 1st. That is not a
7    reflection of when it was actually given,
8    correct?
9 Q  What is that? Where do you see that?
10 A  Down here (indicating).
11 Q  I think that's on your document.
12 A  No, sir. No, sir. Not at all.
13    MS. COREIL:
14    No. We put it on the Bates stamp
15    so that you know what date we got it.
16    MR. CORRY:
17 Q  Oh, yes. April 1st is when we received it
18    today. These 104 documents are when we
19    received them today.
20 A  No, sir. You originally received them -- I
21    just want to make it known, that was
22    inclusive of my binder when I handed it over
23    to you for Hewitt's deposition.
24 Q  Okay.
25 A  Now --

Page 263

1 Q  We can dispute that until the cows come home
2    because I got the binder, you looked through
3    it yesterday and they weren't in there. We
4    got them today.
5 A  Right. I'm just --
6 Q  So they weren't in there. That's why we have
7    them. Because if we'd had had them, they'd
8    have been in this white binder, and they
9    weren't.
10 A  No, sir. We -- just like you said, we can
11    debate.
12    MR. SPRING:
13    Stamped April 1st, subject to your
14    qualification. Now, can we move on?
15    MR. CORRY:
16 Q  Got it.
17    And then, we've got --
18    MS. COREIL:
19    It should be 11 pages.
20    MR. CORRY:
21 Q  -- GC-683 through GC-693, were the documents
22    that you gave us yesterday. They have the
23    Bates stamp on them, received today. Because
24    when you run it through the Bates stamp,
25    that's when it was. You gave them to us

Page 264

1    yesterday, March 1st, 2014. These are the
2    remaining documents. So now we have
3    everything. Accurate?
4 A  No. But --
5 Q  What don't we have?
6 A  You have everything, but it was initially
7    given to you on the date. So, if --
8    MR. SPRING:
9    Right, we got that.
10 A  All right.
11    MR. CORRY:
12 Q  And you got the hundred?
13    MR. SPRING:
14    Yes. Here you go.
15    MR. CORRY:
16    Did you pick up my copy?
17    MS. COREIL:
18    Of?
19    MR. CORRY:
20    The 104 documents.
21    MS. COREIL:
22    We put one in there and you put one
23    in there (indicating).
24    MR. CORRY:
25    Well, I'll need a copy. No, I got

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 265

1  it.
2        MR. SPRING:
3          That's ours.
4        MS. COREIL:
5          One is stuck at the bottom of that,
6  because you put them all --
7        MR. CORRY:
8        Okay.  This is it.  All right.
9  MR. CORRY:
10  Q  All right.  Let's go through the book, Greg.
11      If you would, turn to -- I think we got
12  through GC -- yesterday, we got through
13  GC-29.  If you would turn to that, please.
14  A  (Witness complies.)
15  Q  That's your letter of termination that we
16  talked about.  And then, GC -- correct?
17  A  (Witness examines document.)
18      Yes.
19  Q  All right.  GC-30, what is the significance
20  of that?  Why have you provided that to us?
21  A  This is an allegation of miss -- employee
22  misconduct complaint form.  If you notice on
23  the date, it's February 14th, 2012.  The time
24  of it, if you look at the top left-hand
25  corner, number 1, 2/14/12 1600 hours.  It was

Page 266

1  on the heels of the heated argument with
2  Dwayne Prejean and myself.
3        I find it ironic after an argument with
4  Dwayne Prejean, the complaint is lodged
5  against me.  Which goes back to, you have a
6  disagreement, or you file complaints, or
7  exercise your arbitrary process against the
8  powers that be, or Craft's -- Police Chief
9  Craft's favorite son, you're retaliated
10  against.
11  Q  The reporting party is Major Randy Vincent?
12  A  Yes.
13  Q  And this involves the investigation that was
14  not completed within 60 days?
15  A  That is correct.
16  Q  And that's the same investigation where you
17  received a letter of reprimand?
18  A  Yes.
19  Q  And that's the same investigation that you
20  did not appeal that letter of reprimand to
21  the Civil Service Board, correct?
22  A  Yes.
23  Q  All right.  31, what is that?  That has to do
24  with that investigation of 30?
25  A  Let's go back to 30.

Page 267

1        Okay.  Are you on 30?
2  Q  Yes.
3  A  Okay.  Like I said, the problem you have is,
4  Keith Gremillion is a witness on this.  Okay?
5  Keith Gremillion is the custodian of Internal
6  Affairs, he's the sergeant.  He was never
7  disciplined for that.  He's supposed to
8  assure that the 60 --
9  Q  Did you file a complaint?  Go ahead.
10  A  Let me finish.
11      The 60 days, I don't have to file a
12  complaint.  The chief is supposed to initiate
13  that.
14      First of all, according to SOP, there's
15  supposed to be a 30-day status update.  There
16  was none ever given.  The reason that one
17  wasn't given?  Because Keith Gremillion was
18  under the impression that this investigation
19  was being handled by Bert Bejsovec.  When he
20  came to me -- when Gabe Thompson was in my
21  office inquiring about who was assigned to
22  it, he wasn't aware that I was working it.
23  He was still under the impression that Bert
24  was working it.  Therefore, he was inept in
25  his duties, but yet, he was never

Page 268

1  disciplined.
2  Q  All right.
3  A  Which shows the despaired treatment.
4  Q  Did you make a -- did you file any complaints
5  as a result of that, against anybody?
6  A  They said they didn't want to hear it.
7  Q  Did you file -- you've got to answer the
8  question.  Yes or no?
9  A  No.  Yes.  Yes.
10  Q  You did?  Who did you file a complaint
11  against?
12  A  It was a verbal complaint.  They didn't want
13  to take it.
14  Q  To who?
15  A  Captain Czajkowski.
16  Q  All right.
17  A  Who was our immediate supervisor.
18  Q  What's the highest rank that you've ever held
19  at the Lafayette Police Department?
20  A  Lieutenant.
21  Q  And how long were you in that position?
22  A  Roughly a year.
23  Q  Okay.  So you don't know what goes on in the
24  chief's -- as -- the duties and
25  responsibilities of the chief, or the major,

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 269

1　or the captain, because those are all ranks
2　above you that you've never held, correct?
3　A　No.  You're incorrect in that statement.
4　Q　You've held those -- have you held -- answer
5　my question, first.
6　　　Have you ever held those ranks?
7　A　That's not the question you asked.  It's a
8　two-fold question you asked.
9　　　I was trying to address the first one
10　first before you cut me off.  And then, you
11　asked another one.
12　　　Now, if you allow me to answer the first
13　one, then I'll answer the second one.
14　Q　Go ahead.
15　A　Could you rephrase that question?
16　　　MR. CORRY:
17　　　Go ahead and read it, please.
18　(COURT REPORTER READS BACK PREVIOUS QUESTION)
19　MR. CORRY:
20　Q　That's a yes or no answer.
21　A　Yes.
22　Q　You do know, or you do not know?
23　A　With some of the decisions?
24　Q　Yes.
25　A　Yes, some.

Page 270

1　Q　Do you know what their duties are?
2　A　Yes.
3　Q　How?
4　A　There's general orders that delineates their
5　duties.
6　Q　Okay.  Anything else on 30?
7　A　No.
8　Q　31 is where you were notified of the
9　complaint that was filed, SL-2012-005.  You
10　signed off on it on February 23rd of 2012; is
11　that accurate?
12　A　Which number?
13　Q　31?
14　A　(Witness examines document.)
15　　　Yes.
16　Q　Then, 32, is the Lafayette Police Department
17　Operational Plan for Homeland -- for
18　Operation Homestead, revised August 4th of
19　2008.  And it goes from GC-32 through -- how
20　far does it go, 41?
21　A　You're asking me that question, Mr. Corry?
22　Q　Yes.
23　A　40.
24　Q　40.  Okay.
25　　　Where did you obtain this document,

Page 271

1　　　GC-32 through 40?
2　A　That document was given to me.
3　Q　By?
4　A　(Witness examines document.)
5　Q　Did you answer?
6　A　Not yet.  I'm trying to look to see who
7　prepared it, because that's the individual
8　who gave it to me.
9　　　Dwayne Prejean.
10　Q　And when was that given to you?
11　A　Somewhere -- I can't give you an exact date,
12　but it was during that summertime when they
13　were launching the operation.
14　Q　Sometime in the summer of 2008?
15　A　That is correct.
16　Q　Is this a proprietary document that should be
17　kept confidential?
18　A　No.
19　Q　Did you get permission from anyone with the
20　Lafayette Police Department to take this
21　document out of the police department?
22　A　No.  Because I didn't have to.
23　Q　And what is the significance of this
24　document?
25　A　The significance of the document is how Chief

Page 272

1　Craft targeted certain people in society that
2　he deems are undesirable.  That came exactly
3　from his mouth in one of the briefings.
4　Q　Did you complain to anyone about this
5　document?
6　A　Yes.
7　Q　Who?
8　A　At the time, it was Captain Arceneaux, as
9　well as Dwayne Prejean, as the lieutenant.
10　Q　Who was the lieutenant?
11　A　Dwayne Prejean.
12　Q　Okay.
13　A　Will you let me finish why?
14　Q　Sure.
15　A　Or you asked that.
16　　　Well, I was displeased in the way the
17　operational plan was written.  The way they
18　instructed officers to conduct the operation
19　was to go around the downtown area, pick up
20　transients, transport them to Beaver Park,
21　fingerprint them, swab them for DNA, and send
22　them on their way.
23　　　I had an issue with it because I said,
24　we're tip-toeing on the gray area, this chalk
25　line of violating some people's rights.  It

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 273

1 fell on deaf ears. And they basically told
2 me, the best thing you know, keep your mouth
3 shut and follow the orders.
4 Q   Did you follow the orders?
5 A   I didn't participate in it because I didn't
6 want to be in violation of somebody, that if
7 they would complain, I would have an issue
8 down the line of civil litigation with one of
9 the transients.
10 Q   Do you know if there was any civil litigation
11 as a result of this?
12 A   No.
13 Q   You don't know, or there wasn't?
14 A   There wasn't.
15 Q   All right.  GC-41 is what?
16 A   Officer Safety Bolo.
17 Q   I'm sorry?
18 A   An Officer Safety Bolo.
19 Q   Is this a confidential document?
20 A   No.
21 Q   Rhonda Huebner and Charles Huebner, who is
22 that?
23 A   Rhonda Huebner is Chunk, or Charles, Chuck
24 Huebner's wife.
25 Q   Chuck Huebner is the reporter with one of the

Page 274

1 local TV stations?
2 A   That is correct.
3 Q   What is the significance of this being in
4 your discovery responses?
5 A   According to Sean Arwood, Chief Craft
6 instructed him to prepare this Officer's
7 Safety Bolo to try to find something on Chuck
8 Huebner, if they were ever dispatched to his
9 residence, to embarrass him. Because he was
10 returning the favor for Chuck Huebner
11 embarrassing him for the Glen Dartez
12 ordeal.
13 Q   Were you involved in this, in the preparation
14 of 41?
15 A   I just said, Sean Arwood prepared it.
16 Q   Were you involved in its creation at all?
17 A   No, sir.
18 Q   So it's just something that Sean Arwood gave
19 to you?
20 A   No.  It was disseminated via the e-mail.
21 Q   To the entire police department?
22 A   That is correct.
23 Q   All right.  Did you have anything to do --
24 and I may have asked you, if I did, I'm sorry
25 -- with GC-32 through 40?  Did you have any

Page 275

1 input in the preparation of that document?
2 A   (Witness examines document.)
3        In the preparation?
4 Q   Yes.
5 A   No.
6 Q   Did you complain to anyone -- and I'm
7 bouncing around on you.
8        Did you complain to anyone about GC-41?
9 Did you complain to anyone about GC-41?
10 A   No.
11 Q   GC -- (Interrupted)
12 A   I'm not finished.
13 Q   Go ahead.
14 A   And the reason at that time, the climate of
15 the police department was you better not
16 complain, otherwise there would be reprisals.
17 That was in the wake of Glen Dartez.
18        And at the time, I was transferred
19 because of Glen Dartez, so I didn't want to
20 take on more heat.
21 Q   And I think you've already -- go ahead and --
22 that's it?
23 A   You cut me off.
24 Q   I didn't mean to.
25 A   I didn't want to take anymore heat by

Page 276

1 complaining because that's what would have
2 happened.
3        It's known, if you complain, especially
4 for a document that was instructed by the
5 chief to prepare to someone.  So basically,
6 in essence, you're complaining on the chief.
7 And there's reprisals when you do that.
8 Q   Did -- GC-42 is a clip of a newspaper
9 article?
10 A   That's correct.
11 Q   And how do we know that it's 11/20/99, as
12 handwritten on the side?
13 A   It's been awhile, Mr. Corry.  I can't give
14 you an explanation of why it's written right
15 here.
16 Q   Where did you get this?
17 A   I would suspect the public library.
18 Q   Okay.  Were you employed which the Lafayette
19 Police Department in 1999?
20 A   Yes.
21 Q   What was your position?
22 A   I was in investigations.
23 Q   Did you work for Corporal Dwayne Prejean, or
24 with Corporal Dwayne Prejean at that time?
25 A   With him?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 277**

1 Q  Yes.
2 A  I'm trying to remember, because I'm trying to
3     remember where he was.  I don't know if he
4     was in Metro Narcotics at the time, or if he
5     was in crime scene.
6        I know there was an incident when he was
7     in Metro Narcotics, in which he was battered
8     by a street level drug dealer who he picked
9     up a local prostitute in the four corners
10    area in exchange for sexual favors.
11       MR. CORRY:
12          No, no, no.  Steve, hold on a
13       minute.
14 A  I'm trying to figure out --
15       MR. CORRY:
16          I let him go for a day and a half.
17       He's not being responsive to the
18       question.
19          Dwayne Prejean is not a defendant
20       in this lawsuit.  He's talking about
21       things -- because he's been dismissed,
22       he's talking about things, about
23       individuals that are not involved in
24       this.  We've had these matters before
25       the judge before.  So, you know, if he

---

**Page 278**

1     wants to keep going there, that's fine.
2     But I am going to take them up with the
3     Court if I have to.
4        So, you know, I want him to be
5     responsive to my questions.  And my
6     question was a yes or no answer, and
7     he's launching into this, that has
8     really nothing to do with this lawsuit
9     at all.
10       So I don't know if y'all want to
11    discuss it, or how you want to address
12    it.
13       MR. SPRING:
14          I thought you asked him the
15       significance, and he's trying to explain
16       that.
17 A  You asked me about Dwayne Prejean.
18       MR. CORRY:
19 Q  No.  I asked you if you worked with him
20 A  And who --
21 Q  That's all I asked, who did you work with?
22 A  Hold on.  What did you ask me, who I worked
23    with?  Dwayne Prejean, correct?
24 Q  I said, did you work with him?
25 A  Dwayne Prejean, correct?

---

**Page 279**

1 Q  Correct.
2 A  Okay.  And my --
3 Q  What does a battery and prostitution have to
4    do with that?
5 A  Hold on, Mr. Corry.
6 Q  What does that have to do with that?
7 A  Will you let me explain?
8 Q  That's a yes or no question.
9       Did you work with him?  That's it.  That
10    was the question.
11 A  And my response was, I don't know at that
12    time.
13 Q  Okay.  That's fair.  You don't know.
14 A  And when --
15 Q  Got you.
16 A  And when I said, I didn't know, I was
17    elaborating on why I said I didn't know.
18 Q  I didn't ask you why you didn't know, I just
19    asked you if you knew.  If you worked with
20    him yes or no.  That's it.
21       Did you work with him?  Yes or no?
22 A  Mr. Corry, hold on.
23       I don't mean to banter with you, but
24    there's been some responses where you didn't
25    ask me to elaborate.  And initially, from the

---

**Page 280**

1     onset of this deposition, you said, I'm going
2     to pose a question, once I finish the
3     question, answer yes or no.  If it entails
4     some elaboration, then you elaborate.
5 Q  I said, if you need to explain, feel free.
6 A  Well, it's the same thing.
7 Q  Okay.
8 A  Correct?
9 Q  I'm not under oath.  I'm not answering
10    questions, I've told you that.
11       All right.  GC-43 through 93, appears to
12    me to be the Lafayette Police Department
13    Internal Affairs section, standard operating
14    procedures.
15       Can you verify that that's what this is;
16    what this document is?
17 A  (Witness examines document.)
18       Yes.
19 Q  It is?
20 A  (Witness nods affirmatively.)
21 Q  Okay.  Did you have --
22       MR. SPRING:
23          Answer affirmatively.  He was just
24       shaking his head a lot.
25 MR. CORRY:

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 281

1 Q   You said yes?

2 A   Yes.  I said yes.  Did you say yes?

3 Q   Did you have authority to take this document

4    out of the Lafayette Police Department?

5 A   Yes, it's -- you're not prohibited from

6    taking it.  It's not considered

7    confidential.

8 Q   Okay.  Have you ever worked in Internal

9    Affairs?

10 A   No.

11 Q   How did you get a copy of this?

12 A   It's on the police server.

13 Q   Okay.  And when did you obtain a copy of

14    this?

15 A   I can't give you an exact date, Mr. Corry.

16 Q   Did you obtain a copy of GC-43 through 93, or

17    did someone else on your behalf?

18 A   I did.

19 Q   And you don't know when?

20 A   No, sir.

21 Q   And why is this included in your discovery

22    responses?

23 A   Because that infamous document, the

24    confidential document that you referenced to,

25    it's in Internal Affairs SOP, so --

Page 282

1 Q   What number is it?

2 A   GC-79.

3 Q   I didn't understand your explanation.

4 A   You asked me the significance of why I

5    submitted the Internal Affairs SOP.  And I

6    said, the infamous document that you're

7    referring to, Exhibit D-1 --

8 Q   Okay.

9 A   -- it's in Internal Affairs SOP.

10 Q   Okay.  So your testimony is that D-1 is the

11    same as GC-79?

12 A   With the exception of the Keith Gremillion

13    signature.

14 Q   Okay.  But D-1, as you've testified, was

15    taken out of a shift level investigation?  It

16    was not taken from the Internal Affairs

17    section, standard operating procedures, was

18    it?

19 A   No.

20 Q   Okay.

21 A   I'm not finished.

22 Q   Go ahead.

23 A   I said it was the same, meaning that same

24    document which instructs you to complete an

25    investigation within the 60 days is in

Page 283

1    Internal Affairs.

2        So when Chief Craft and the rest of them

3    perjured themselves in civil service, they

4    were aware that it's an SOP that he approves,

5    that he signs off on.

6 Q   And the board found that the 60-day wasn't

7    violated, which you didn't know, and the

8    Fifteenth JDC affirmed the decision, which

9    you didn't know, so -- (Interrupted)

10 A   That wasn't the issue.

11 Q   All right.

12 A   It's making that false statement, Mr.

13    Corry.

14 Q   GC-94 is a general order, 301.10.  Polygraph

15    examination/computerized voice stress

16    analysis.  That's the general order that

17    refers to that, correct?

18 A   Yes.

19 Q   Where is the second page?

20 A   That, I don't know.  The second page should

21    be the signature of the chief.

22 Q   All right.  Were you given -- or did you give

23    a polygraph in connection with 2012-007, the

24    Mclean document?

25 A   Yes.

Page 284

1 Q   Did you pass it?

2 A   No.  I was told I didn't.

3 Q   I'm sorry.

4 A   I was told I didn't.

5 Q   By who?

6 A   The polygraphist.

7 Q   Who is that?

8 A   Joey Provost.

9 Q   He told you you passed the polygraph?

10 A   I just said, I was told I didn't.

11 Q   Did not?

12 A   I didn't.  Didn't means did not.

13 Q   Well, I couldn't understand you.

14 A   Okay.

15 Q   So Joey Provost told you that the polygraph

16    you gave in connection with the Mclean

17    document, you did not pass, correct?

18 A   Correct.

19 Q   And what is the significance of having the

20    general order in here?

21 A   The significance of the general order, if you

22    refer to section D-1, examination assistance

23    to other law enforcement agencies, LCG

24    Department.  Polygraph and CVSA examinations

25    may be conducted for the Lafayette

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 285

1  Consolidated Government departments when
2  authorized by the chief of police.  It also
3  says up in the top, that the chief of police
4  is the only one that can authorize the CVSA
5  or a polygraph.  Dee Stanley authorized the
6  polygraph.
7  Q  Dee Stanley is the CAO, right?
8  A  Yes.
9  Q  And it's your position he cannot authorize or
10  order an investigation?
11  A  Not when it's the duties of the chief of
12  police to order the administrative
13  investigation.
14  Q  Well, he did in this case, didn't he?
15  A  Yes, and he was also the complainant.
16  Q  And you were also terminated as a result of
17  that, correct?
18  A  Yes.
19  Q  So he did order the investigation, correct?
20  A  Yes.
21  Q  Okay.
22  A  But he went against policy and procedure.
23  Q  All right.  GC-95 through 125 appears to be
24  the Lafayette Police Department Seniority
25  List, as of July 8th of 2010.  Am I reading

Page 286

1  that right, at the top of the page?
2  A  Yes.
3  Q  That is -- I am reading that correctly, that
4  that's the seniority list as of that date?
5  A  Yes.
6  Q  Where did you get a copy of this?
7  A  The computer.
8  Q  Okay.  That's something that's provided to
9  all Lafayette Police Department personnel?
10  A  Yes.
11  Q  Is it accessible at any time?
12  A  I don't know now.  I know it was when I was
13  there.
14  Q  It's something you can look at?
15  A  Correct.
16  Q  And the reason you have this in your
17  submission of discovery responses is simply
18  to show where you rank?
19  A  That is correct.
20  Q  All right.  GC-126, what is that?
21  A  (Witness examines document.)
22  That's a second investigation -- notice
23  of investigation.
24  Q  For what investigation?
25  A  Unauthorized press release.

Page 287

1  Q  What did you release to the press?
2  A  Nothing.
3  Q  Do you know the outcome of that
4  investigation?
5  A  No.  But that investigation was intertwined
6  in my termination letter for 2012 --
7  AD-2012-007.
8  Q  Okay.  What is it alleged that you released
9  to the press?
10  A  The audio recording.
11  Q  Of what?
12  A  Conversation or meeting with Police Chief Jim
13  Craft and several others.
14  Q  Who are the others?
15  A  Captain Randy Vincent, Lieutenant Dwayne
16  Prejean, Captain Ron Czajkowski.  That's all
17  I can think of.
18  Q  When was that?  Were you part of that
19  recording?
20  A  Yes, sir.
21  Q  Did you record it?
22  A  Yes.
23  Q  And that is, I think we talked about it
24  yesterday.  That is the recording -- or maybe
25  we didn't.  I thought it was number 8 on

Page 288

1  GC-577.
2  Where is the reference to that recording
3  you're referring to, that you just told me
4  about?
5  A  The reference where?
6  Q  Do you have a reference to it anywhere?
7  A  As part of discovery?
8  Q  Yes.
9  A  No, sir.  I don't think so.
10  MR. CORRY:
11  Steve, we've asked for all
12  recordings.  Now we're talking about one
13  that we don't have.
14  MR. SPRING:
15  Is this the JD?
16  A  Yeah, he's talking about discovery.  I didn't
17  submit that with the interrogatories.  You're
18  talking about interrogatories, or are you
19  talking about the whole entire discovery?
20  MR. CORRY:
21  Q  We asked for copies of all recordings.
22  MR. SPRING:
23  That's on the website.  That's the
24  recording he's talking about.
25  MR. CORRY:

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 289

1  Q   Well, that's what I'm asking you.  Did you
2      provide me with a copy of it?  Pardon?
3  A   Yes.
4  Q   When?
5  A   I don't know.  It should be on the Scott
6      Poiencot's --
7  Q   Okay.
8  A   -- audio recording.
9  Q   So it's on Poiencot recordings, not yours?
10 A   Yes.
11 Q   But you -- (Interrupted)
12 A   I asked you -- I asked particularly about
13     discovery dealing with my interrogatories.
14 Q   Okay.
15 Q   Okay.
16 Q   Did you make this recording?
17 A   Yes.
18 Q   Was Scott present?
19 A   No.
20 Q   You gave the recording to Scott?
21 A   No.
22 Q   What did you do with it?
23 A   I gave him the pen.
24 Q   With the recording on it?
25 A   Yes.

Page 290

1  Q   And that recording ended up on the Real Cops
2      versus Craft website?
3  A   I'm not sure if it was on that website.  I
4      was investigated for allegedly releasing it
5      to Busted in Acadiana.
6  Q   So it was on the Busted in Acadiana
7      website?
8  A   I would suspect.  That's what they allege
9      that I did.
10 Q   Did you tell anybody, or did you tell Scott
11     when you gave him the pen of that recording,
12     not to release it to anybody?
13 A   No.  I didn't give him detailed instructions
14     as far as what he should do or do not.
15 Q   Did he tell you what he was going to do with
16     it?
17 A   No.
18 Q   Did it come as a surprise to you that it was
19     on the Busted in Acadiana website?
20 A   Surprises me what?
21 Q   I mean, did you have the anticipation that
22     the recording was going to be released to
23     someone by Scott, or someone else?
24 A   Are you -- no.  Are you asking me if someone
25     forewarned me that it was going to come out?

Page 291

1  Q   Yes.
2  A   No.
3  Q   Why did you give it to Scott?
4  A   Because he had the device to download the
5      recording.
6  Q   Okay.  Have you heard it since that day that
7      you gave it to him?
8  A   Yes.
9  Q   When?
10 A   I heard part of it when -- I can't remember.
11     I know I heard it.
12 Q   All right.  What was the date of that
13     recording?
14 A   I can't give you the exact date, Mr. Corry.
15 Q   And what was the nature of the recording?  I
16     don't want you to disclose a person's name if
17     it involves a private personnel matter.  But
18     you can still give me the gist of what the
19     recording entailed.
20 A   It was a discussion after I conducted an
21     investigation on JD that was being supervised
22     by Bert Bejsovec, in which at the conclusion
23     of my investigation, I submitted the report
24     through the chain.
25         Prior to my completion of the

Page 292

1      investigation, there was a formal dialogue
2      between myself, the captain, the major, as
3      well as the chief.  There's some e-mails to
4      verify that, which I was -- that was the
5      purpose of me recording it, because they were
6      concerned about that particular
7      investigation, because other investigations,
8      the chief never consulted with me about.
9          He sent me an e-mail requesting to setup
10     a meeting, because at the conclusion of the
11     investigation, I had determined and suggested
12     that the allegations were proven.  And as
13     well, there was some other officers during
14     the course of conducting the investigation
15     had lied, and that was an issue that needed
16     to be addressed as well.
17         Therefore, he requested a meeting to
18     discuss this in further detail, which we all
19     met, and -- well, prior to that, Captain
20     Czajkowski and Dwayne Prejean, who was
21     Internal Affairs head at the time requested a
22     meeting with me prior to that.  And we had a
23     discussion about the investigation, and what
24     direction the chief should take on it, as far
25     as disciplining JD, as well as what he should

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

**Page 293**

1  do with the officers that lied.

2  And as well as there was a summons
3  issued to a bar owner, Brandon Hargrave, and
4  which at that time, in the meeting, Dwayne
5  Prejean basically said that the chief was
6  upset because the guy was given a summons,
7  and that he considered him a good friend,
8  that he would go and drink all the time. So
9  he was upset that I gave him a summons during
10  the course of the investigation.

11  And he suggested that these officers get
12  some form of a remedial training. That was
13  thrown around. And at the time, I said,
14  well, that violation that was committed
15  warrants more than just remedial training,
16  because you lied and you failed to cooperate
17  in an investigation, which is a terminable
18  offense. If you look at the general order
19  under the discipline area, it is.

20  Anyway, later on, we had a meeting with
21  the chief. That issue was discussed again.
22  They talked about officers not being
23  forthcoming, and lying in the investigation,
24  in which Dwayne Prejean suggested that they
25  receive remedial training because of their

**Page 294**

1  credibility, because they were all on SWAT.

2  And I was baffled when he made that
3  statement, because two weeks or -- I know
4  there was a previous incident in which an
5  officer was investigated. I'll be mindful
6  you said not to divulge the name because he
7  didn't appeal it. So I'll just use the
8  initials, DM, in which it was alleged that he
9  lied to someone. And he was a black officer.
10  He received a five-day suspension.

11 Q  Let me ask you --
12 A  Go ahead.
13 Q  -- a question. Did the activity that you're
14  referring to with these officers, involve on
15  duty or off duty activities?
16 A  Off duty.
17 Q  Okay. Does it have anything to do with
18  copying a confidential document and providing
19  it to someone within the police department?
20  I guess the answer to that's no, correct?
21 A  No.
22 Q  Okay. Anything else on that?
23 A  Will you let me finish, Mr. Corry?
24 Q  Yes. That's what I'm saying, is there
25  anything else on that?

**Page 295**

1 A  He also touched upon the probable cause of
2  the issuance of the misdemeanor summons, in
3  which I told him that I was justified in
4  issuing the summons. And Captain Czajkowski
5  agreed with me.    And then, later on, at
6  the conclusion of the meeting, Captain
7  Czajkowski met me upstairs. They had stayed
8  downstairs maybe 20, 30 minutes. And when I
9  say "they", the rest of the people present in
10  the meeting. And I left. They excused me
11  from the meeting.

12  Captain Czajkowski came up and said that
13  Chief Craft was upset with me because I had
14  disagreed with him, and I wasn't a team
15  player. He said, Greg, you know how he is.
16  Just be careful, something may be coming down
17  the pike.
18 Q  Did you complain about that to anybody?
19 A  No. But let me -- let me expound on that.
20  There's no need for me to complain, Mr.
21  Corry. Who am I going to complain on? If I
22  file a grievance, it goes to Dee Stanley.
23  He's going to agree with the chief.
24  I can't go and complain on the chief for
25  something he did. I can't go to human

**Page 296**

1  resource, they give the round around.
2 Q  All right.
3 A  What recourse I had?
4 Q  All right. GC-127, that was where there was
5  a typo in the initial memo that was sent to
6  you? Is that what that refers to?
7 A  No, sir. That should be another -- you've
8  got it disorganized. Okay.
9  GC-128 should be in front of GC-127.
10 Q  Okay. It's self-explanatory, isn't it?
11 A  No, sir. I'll explain to you why. As well
12  as GC-129 should be in front of 127.
13  As a matter of fact, 128 and 129 should
14  be -- 128 should be first, 129 should be
15  second. And then, 127 should be following
16  both, too.
17 Q  All right. Got it.
18 A  All right. I'll explain to you the relevance
19  of that.
20  Initially, I was served with a notice of
21  investigation on May 15th, 2012. If you
22  notice, you are hereby required to fully
23  cooperate in the investigation, which shall
24  include giving a statement, and may include a
25  polygraph examination, if so directed by the

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 297

1  chief of police. Which refers back to, he's
2  the only one that can authorize a polygraph
3  exam.
4      But turn to 129. This is a second
5  notice that was sent to us by Dwayne Prejean,
6  who actually issued the first one. The
7  second one was pretty much similar, with the
8  exception, if you read down, you are required
9  to cooperate fully with the investigation,
10 and shall include giving a statement, which
11 is in bold letters, and a polygraph
12 examination, which is also in bold letters.
13     Now, it's common practice, Mr. Corry,
14 you give a statement -- when you're
15 investigating any type of allegation of
16 employee misconduct, or any criminal
17 investigation, you get initial statement from
18 the person. If you determine that there's
19 some deception, then you request another
20 interview, which is a CVSA or a polygraph.
21     Automatically, I was required to give a
22 polygraph, as well as provide a statement.
23 Q  And you gave them both, didn't you?
24 A  The relevance of it is --
25 Q  You've got to answer the question.

Page 298

1  A  Yes.
2      The relevance is automatically, I was
3  targeted. And I was guilty.
4      And this is by Dwayne Prejean, which is
5  a conflict. He's the complainant in the
6  investigation, and as well as he's
7  investigating. Do you think I'm going to get
8  a fair and impartial investigation? No.
9  Q  127 is the e-mail that was sent, and the 2 is
10 the various officers that it was sent to?
11 A  Which various officers?
12 Q  The e-mail at 127, there were multiple people
13 identified as the e-mail being sent to. Is
14 that accurate?
15 A  No, sir.
16 Q  It didn't go to these people, or do you know?
17 127, I'm talking about?
18 A  127. (Witness examines document.)
19     No, sir.
20 Q  It didn't go to those people?
21 A  No, it didn't go to all of them. Not both
22 forms.
23 Q  All right.
24 A  Let me --
25 Q  Let's look at -- (Interrupted)

Page 299

1  A  Let me finish. The reason I responded and
2  said no is Forrest Blanton didn't receive a
3  second notice, Nancy Hebert didn't receive a
4  second notice, as well as Austin Provost.
5  Q  And how do you know that?
6  A  They told me.
7  Q  Do you have any documentation to support
8  that?
9  A  Their verbal statement.
10 Q  That's not a document, is it?
11 A  (No response.)
12 Q  Is it?
13 A  No.
14 Q  Okay. And you never worked in the IA, I
15 think you told me, Internal Affairs?
16 A  No.
17 Q  And 130, it looks like you're citing a
18 statute.
19 A  Yes.
20 Q  Is that accurate?
21 A  Yes.
22 Q  What is the significance of that?
23 A  It shows his ineptness. He cited that
24 statute was not applicable to the police
25 officer bill of rights.

Page 300

1  Q  People make mistakes, don't they?
2  A  No, sir. You can't afford to make a mistake
3  in Internal Affairs where you have officers'
4  livelihood in the palm of your hands. No,
5  sir.
6  Q  Have you ever made a mistake in your police
7  work?
8  A  That's inexcusable.
9  Q  Have you ever made a mistake in your police
10 work?
11 A  Not when -- yes, sir.
12 Q  That's a yes or no question.
13 A  Yes. But not when it concerns that.
14 Q  Have you ever made a mistake where someone
15 was arrested?
16 A  No.
17 Q  All right. 131, that's an e-mail that was
18 sent to you?
19 A  (Witness examines document.)
20     Yes.
21 Q  Does that have anything to do with the two or
22 three documents before?
23 A  Yes.
24 Q  That's where he enclosed which document?
25 A  That's where he enclosed the second document

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 301

1  that was sent via e-mail.
2  Q  129?
3  A  Yes.
4  Q  132, that's where he's noting the mistake had
5  been made?
6  A  That's correct.
7  Q  133 is what?
8  A  My response to his question.
9  Q  That you are choosing the first option, which
10  meant what?
11  A  (Witness examines document.)
12     I will be seeking an attorney or
13  representative.  My interview is to be
14  suspended up to 30 days.
15  Q  Okay.  And you actually exercised that right
16  and had your attorneys present.  We talked
17  about that earlier, correct?
18  A  Yes.
19  Q  Okay.  134, it looks like the major is asking
20  you for your city cell phone number.
21  A  Yes.
22  Q  What's the significance of that?
23  A  Notice the date at the top, April 13th.
24     Notice my response, which should be the next
25  page, 135.  Personal cell phone is 351-6827,

---

Page 302

1  and the business cell phone.  Major, I listed
2  my personal as primary because I always have
3  it with me.  I can turn into PD, if needed.
4  I do not have a problem with you using your
5  personal cell.  You understand that are you
6  to answer your personal phone while on
7  duty.
8  Q  Was there some allegation that you weren't
9  being responsive when people were trying to
10  call you?
11  A  When that came out?
12  Q  Yes.
13  A  No, sir.
14  Q  Okay.  Do you have a problem with that?
15  A  With what?
16  Q  With the major asking you for your cell phone
17  number?
18  A  I never had a problem with it.  The reason I
19  referenced this is because later on, on May
20  27th, he brings up the same issue, in which
21  he said it was already addressed.
22  Q  Okay.
23  A  But that was after the TRO.
24  Q  All right.
25  A  And let's go back to 135.

---

Page 303

1  Q  The TRO that was dismissed, right?  That one?
2  Is that the one we're referring to?
3  A  Yes.  May 22nd, yes.
4  Q  Okay.  Go back to what?  What document do you
5  want to go back to?
6  A  135.
7  Q  Okay.
8  A  You are trying to insinuate that the reason
9  he sent this e-mail inquiring about my cell
10  phone is because there was an issue with me
11  not answering it.  That wasn't the case.
12     The reason he was requesting my cell
13  phone is because he just recently had
14  returned back to patrol support.  So he was
15  e-mailing everybody under his chain for their
16  numbers, just in case he needed to contact
17  them if they weren't answering their office
18  phone.
19  Q  Okay.  And you don't have a problem with the
20  major trying to run the department that he's
21  assigned to, do you?
22  A  I don't think I ever made any assertions that
23  I had an issue with the major running the
24  department.
25  Q  All right.  137, that's just kind of a

---

Page 304

1  continuation of that e-mail chain?
2  A  (Witness examines document.)
3     Which chain?
4  Q  It looks like it's a chain from 136 to 137,
5  it's the same chain.
6  A  Are you talking about the e-mail where they
7  changed my working hours?
8  Q  Well, I'm looking at 137.  Maybe it's not,
9  because it has a different date.
10     What is 137 for?
11  A  Well, I was following instructions, that when
12  they changed my working hours and prohibited
13  me from speaking to somebody which, you know,
14  is kind of borderline on your first amendment
15  right.  But I just e-mailed the captain to
16  apprise him of what I would be doing on my
17  daily activities.
18  Q  Who did they instruct you not to talk to?
19  A  Hold on one second.  Let me refer to the
20  e-mail.  (Witness examines document.)
21     Okay.  Right here.  Additionally, as a
22  result of a meeting between Major Alfred and
23  I, you are no longer to participate in a
24  gathering, meeting or otherwise congregate in
25  situations that are not specifically related

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 305

1 to assignments, tasks and/or
2 responsibilities, as associated with your
3 current assignment with patrol support.  You
4 are to make yourself available to respond to
5 calls for service on the road as a field
6 supervisor if there are no other assignments
7 for you to complete.
8 Q  Okay.  It doesn't say anything about a
9 specific person, does it?
10 A  You asked me about a specific person.  I
11 never said that.
12 Q  All right.  And you don't have a problem with
13 the major wanting his officers to perform the
14 tasks that they're being paid by the
15 taxpayers to perform, do you?
16 A  No.
17 Q  Okay.
18 A  I'm not finished.
19 Q  All right.
20 A  That's the reason I supplied you with the
21 duties of a patrol support lieutenant, which
22 is considered an administrative lieutenant.
23 The reason this is here is because no other
24 administrative lieutenant was required to
25 answer a call for service but me.

Page 306

1 Q  All right.  138 -- (Interrupted)
2 A  I'm --
3 Q  Go ahead.
4 A  I'm still not finished.
5     No other administrative lieutenant --
6 Q  How do you know that?
7 A  Because I spoke to them.
8 Q  Who did you speak to, what other
9 administrative lieutenants did you speak
10 to?
11 A  There was Lieutenant Jim Morris.  There was
12 Administrative Lieutenant Phil Fontenot.
13 Gabe Thompson.  I'm trying to think of the
14 administrative lieutenants for Precinct 1.
15 Luranie Richard, as well as Bert Bejsovec.
16 Q  All right.  138 is just a cover of an
17 envelope containing the items listed in 139.
18 Accurate?
19 A  Say that again.  You're going a little too
20 fast.
21 Q  138 is an envelope cover containing the items
22 noted in 139.  I think they were provided to
23 us on the zip drive.
24 A  Yes.
25 Q  All right.  140, that's the Dartez -- what is

Page 307

1 that?
2 A  (Witness examines document.)
3     That is an official document in which --
4 or one of the documents from the Lafayette
5 Police Department counseling form, in which
6 Chief James Craft and Glen Dartez were
7 playing a joke on each other, which shows
8 their friendship, as well as them utilizing a
9 document to play jokes.
10 Q  How did you get a copy of that?
11 A  I don't know, Mr. Corry.
12 Q  Pardon?
13 A  There was an envelope that was put in my bin.
14 Q  When?
15 A  I -- I can't tell you the exact time or date
16 when that happened.
17 Q  Obviously sometime recently, or back in '04,
18 when this was generated?
19 A  No.  No.  I don't think it's '04.
20 Q  Have you ever joked with anybody at the
21 police department?
22 A  Verbally, yes.  Not on an official
23 document.
24 Q  141 is the law enforcement code of ethics?
25 A  Yes.

Page 308

1 Q  Is that a complete document?
2 A  (Witness examines document.)
3     No.  There's a piece missing off of
4 it.
5 Q  Okay.  142 looks like it's your employment
6 history, or -- yes, your employment history
7 starting on June 25th of '90.  Is that
8 accurate?
9 A  Yes.
10 Q  And that goes through 148.  Are those
11 altogether, or not?
12 A  Which ones?
13 Q  142 to 148.
14 A  It goes further than that.
15 Q  What is that?  It looks like your application
16 for employment or something.
17 A  No, sir.  That's my employment history from
18 -- that was in the civil service file.
19 Q  Okay.  So it goes from 142 to what?
20 A  142 to 181.
21 Q  All right.  And how do you describe that?
22 That's your -- it's a file you got from civil
23 service?
24 A  Employment history from civil service.
25 Q  Okay.  Is there anything significant, other

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 309

1  than it's showing your employment history
2  throughout your -- throughout the dates
3  noted?
4  A  Yes.
5  Q  Okay.  What?
6  A  Number one, it shows the 22-1/2 year police
7  officer, that had no disciplinary record
8  entered into the civil service up to the last
9  six months of his employment.
10     Two, it establishes that anytime there's
11  any change in a classified civil service
12  employee status, which is in relation to
13  Louisiana Revised Statute 2503, a personal
14  action form is filled out.
15     As you noted, or as you can see in
16  there, I was here through six chiefs.  Just
17  about all of them did personal action forms.
18  But now, it was determined that that form
19  doesn't exist, and it wasn't an adopted form.
20  But this entire employee packet right here,
21  this personal action form, advises civil
22  service of my change of status.
23  Q  Are you saying that a personal action request
24  was not completed on you?
25  A  No, I'm not saying that.

Page 310

1  Q  Okay.
2  A  What I'm saying --
3  Q  They were all completed on you?
4  A  Will you let me answer the question, Mr.
5  Corry?
6  Q  Sure.
7  A  No, I'm not saying that.  What I am saying
8  is, I was placed on administrative leave.
9  And I stand to be corrected.  Yes, there
10  wasn't one done on me.
11  Q  I'm sorry?
12  A  There wasn't one done on me.
13  Q  Okay.  Is it when?
14  A  Administrative leave.
15  Q  Is there a requirement that a personal action
16  request be performed, or be prepared on
17  administrative leave?
18  A  Yes, sir.
19  Q  Were you present at the hearing that we had
20  recently with the Civil Service Board, where
21  Mr. Stelly brought that issue before the
22  board?
23  A  Yes, sir.
24  Q  And did you hear their vote?
25  A  No, sir.

Page 311

1  Q  Okay.
2  A  Let me finish.
3  Q  Were you -- (Interrupted)
4  A  Go ahead.
5  Q  Let me finish.
6     Were you not in the room at the time?
7  A  You asked me if I was present.  If I'm not
8  present, I'm not in the room.
9  Q  Oh, so you were not present?
10  A  No.
11  Q  I thought you said you were present.
12     You were not present at that hearing?
13  A  No, sir.
14  Q  Okay.  Go ahead.
15  A  All right.  Louisiana Revised Statute 2503
16  clearly states it on this form.
17  Q  Well, it's not so clear.  Because the Civil
18  Service Board is taking it up in Mr. Stelly's
19  -- and you're welcome to go get a transcript
20  from them, because they discussed that form
21  when Mr. Stelly brought it before the board.
22  A  It's a state --
23  Q  It was discussed in detail.
24  A  It's a state law.
25  Q  Take it up with the board.

Page 312

1  A  Okay.
2  Q  Because it was discussed in detail with the
3  board.
4  A  Good.
5  Q  All right.  Anything else between 142 and
6  181?
7  A  No.
8  Q  All right.  182 -- how far does document 182
9  go through?
10  A  (Witness examines documents.)
11     236.
12  Q  All right.  And 182 through 236 is what?
13  A  Medical history.
14  Q  Medical reports, or how would you --
15  (Interrupted)
16  A  History.
17  Q  Medical history.  As maintained by who?
18  A  That's a million dollar question, according
19  to city nurse.  She was supposed to maintain
20  it.  But the files were kind of transferred
21  back and forth from her office to Luwanda
22  Sheer's office, who is now retired.  And she
23  had some issue with that, because she said
24  that maybe in violation of HIPAA.  So I can't
25  answer who maintained it.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

**Page 313**

1  Q   Where did you get documents 182 through
2      236?
3  A   The city nurse.
4  Q   Who is that?
5  A   Kim Baer.
6  Q   And when did you get those?
7  A   (Witness examines his documents.)
8  Q   What are you looking for?
9  A   The scheduled appointment with Dr. Chen,
10     where I was supposed to do a fit for duty.
11 Q   Look at -- hold on.  I just saw it.  Does 185
12     help you?
13 A   (Witness examines document.)
14     That's it.
15 Q   Okay.  And the original -- (Interrupted)
16 A   The date is 8/24, is when I received it.
17 Q   Okay.  So you received 182 through 236, on
18     August 24th, 2012, as document GC-185
19     refreshed your memory?
20 A   Yes.
21 Q   All right.  The issue about the polygraph,
22     you were initially required to give a
23     polygraph and you went there.  And there were
24     some questions asked of you.  And it was the
25     interpretation of, was it Provost?

**Page 314**

1  A   Go ahead, finish, Mr. Corry.  I don't know
2      where you're going, before I answer that.
3  Q   About the racing heart issue.  Who were you
4      in discussions with, Joey Provost?
5  A   When the racing heart came up?
6  Q   Yes.
7  A   I wasn't in discussion with Joey Provost at
8      all with the racing heart, because I never
9      mentioned that.
10 Q   All right.  I understand that.
11     But there were some discussion at some
12     point that he interpreted something you said,
13     that perhaps you had a racing heart, or some
14     heart issue.  I think you were there at the
15     civil service hearing when that was brought
16     up, correct?
17 A   Yes, I was at the civil service hearing.
18 Q   All right.  And he did not initially
19     administer the polygraph because he had some
20     concerns, correct?  You went to give the
21     polygraph, and he wouldn't do it.  Then you
22     came back later on and had it done after you
23     went and saw Dr. Chen.  Is that fair?
24 A   No.
25 Q   Tell me the sequence of events.

**Page 315**

1  A   I will.
2      I went over to take a polygraph.  If
3      memory serves me correct, I think it's --
4  Q   We're going to get to that.
5  A   Whatever date.
6  Q   Yes, we're going to get to it.
7  A   Went to take a polygraph.  During the course
8      of him asking medical -- family medical
9      history, I discussed about an elevated blood
10     pressure every now and then.  It wasn't
11     monitored.  I wasn't seeing any physician,
12     whatever.
13     And at the conclusion at the
14     preinterview for the polygraph, he left.  He
15     came back, and told me that he wouldn't be
16     able to do it after a discussion with
17     Lieutenant Prejean.  And they had decided
18     collectively, that I shouldn't take the
19     polygraph because of lack of sleep and a
20     medical condition.  But he didn't specify
21     what condition.
22 Q   Had you not had a lot of sleep the night
23     before, were you working that night?  Or why
24     did the lack of sleep issue come up?
25 A   I can't remember, Mr. Corry.  That's --

**Page 316**

1      you're asking me something that happened
2      about two years ago, almost three years.
3  Q   Okay.  Wouldn't you want them to err on the
4      side of caution if you weren't in the state
5      best for you to give a polygraph, that it
6      should be put off?  I don't understand why
7      there's such a big issue with that.  They put
8      it off because they were looking for you,
9      weren't they?
10 A   No, sir.  That's -- don't make it seem
11     something that it's not.
12     And it wasn't a misinterpretation,
13     because if it was, you have the audio
14     recording that you could go back and play.
15     Like I said earlier, you're in Internal
16     Affairs.  Your only job is to investigate
17     officers.  So that should be paramount
18     because their livelihood is in the palm of
19     your hands, so you shouldn't be making
20     mistakes like that.  You see, there's
21     mistakes after mistakes after mistakes in
22     this investigation.
23     Dwayne Prejean was making mistakes.
24     Joey Provost was making mistakes.  How many
25     mistakes you need to make?  But you're taking

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 317

1   food off of somebody's table.  But that's
2   okay to make a mistake.  Oops.
3        No, sir.  That's unacceptable.  The
4   bottom line is, I specifically told him that
5   I had -- my family has a medical history of
6   hypertension.  And he asked me, he said,
7   well, do you have it?  Is there anything?  I
8   said, last checkup I had, it was kind of
9   elevated but it was nothing alarming.  It was
10  nothing that needed -- required monitoring,
11  or anything of that nature.
12       How you misinterpret that, I don't know.
13  It wasn't a language that I was speaking to
14  him besides English.
15 Q  It works to your benefit, though.
16 A  No, no, sir.  No, no, no, no.
17 Q  Why not?  Were you going to pass the
18  polygraph that day?
19 A  No, no.
20       Yes.  But here's --
21 Q  As opposed to when you gave it to later on?
22 A  Well, the problem you have is, this
23  polygraphist is not credible because he went
24  up there and lied.  He basically was adamant
25  about testifying.  I told him I had a racing

Page 318

1   heart.  So why would I trust somebody that's
2   not credible?
3        And he never went up there and said,
4   well, I think Greg said that.  He was adamant
5   about saying that's what I said.  Dwayne
6   Prejean went up there and said, I said I had
7   a racing heart beat.  Chief Craft agreed with
8   them.
9        Now, I don't know, but the last time I
10  checked, none of them have an MD behind their
11  name to diagnose me with a racing heart.
12 Q  But you did tell them that you had
13  hypertension and a history of high blood
14  pressure.
15 A  No, I didn't say I had hypertension.  I said
16  my family has a medical history of
17  hypertension.
18 Q  And that your blood pressure had been
19  elevated before?
20 A  On an checkup.
21 Q  All right.
22 A  But let me finish --
23 Q  All right.
24 A  -- for clarity purposes, because you're
25  venturing off to something else.

Page 319

1        I had also said that it was nothing
2   alarming where I had to be monitored by a
3   doctor, or anything.  So --
4  Q  Okay.  Was there any harm to you by not
5   giving it that day?
6  A  I wanted to give it that day.
7  Q  Okay.  But you had the opportunity to give it
8   later on after you were cleared.  Wouldn't
9   you want to err on the side of caution?
10 A  That's not the issue here, Mr. Corry.
11 Q  All right.
12 A  I gave the polygraph.
13       The issue here is, officers went up
14  there and personally lied, which is a
15  violation of the general order.
16 Q  Well, that's up for debate.
17 A  It's not going to be up for debate.  I'm
18  going to prove that.
19       But that's -- you jeopardized somebody's
20  career behind that.
21 Q  All right.
22 A  And that's unacceptable.
23 Q  Anything else in 182 through 236, other than
24  -- (Interrupted)
25 A  And let me add.  You was aware that they

Page 320

1   weren't telling the truth because you didn't
2   want for them to go get the recordings.
3  Q  Mr. Cormier, don't insinuate anything about
4   what I knew or didn't know.
5  A  I'm not insinuating anything, Mr. Corry.
6  Q  Don't do it.
7  A  I'm not.
8  Q  I'm telling you.
9   MR. SPRING:
10       Can we take a break now for lunch,
11  maybe, 45 minutes?
12   MR. CORRY:
13       Yes.
14   (LUNCH BREAK TAKEN IN DEPOSITION
15   FROM 12:04 P.M. TO 1:10 P.M.)
16 MR. CORRY:
17 Q  Greg, jumping back for a second.
18       On D-1, the document that you whited
19  out, why did you white it out?  Why did you
20  Wite-Out the information that you did?
21 A  Because it had information from an
22  investigation for an officer.
23 Q  And you didn't want that to be disclosed?
24 A  That's correct.
25 Q  So you knew that it was personal information,

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 321

1  it was a personal form?
2  A  I'm not saying personal information.  I just
3  didn't want that officer's name on it.
4  Q  Okay.  If D-1 is the same as GC-79, that SOP
5  that we looked at earlier, why did you have
6  to take this one out of the investigative
7  file?
8  A  Because it was readily available at the time.
9  Q  Okay.  All right.  Let's go back to the
10  documents.
11  We were on your medical file up through
12  236.  Was there anything else in there that
13  was of significance that you wanted to bring
14  out?
15  A  Yes.  Let me go back to the administrative
16  leave issue, as far as civil service, when
17  you was referencing it was just a mistake.
18  Q  What number are you on?  Are you on a
19  particular document?
20  A  No.
21  Q  Okay.
22  A  I'm following up on the conversation that we
23  had before we went on break.
24  Q  Okay.
25  A  And you referenced making mistakes and, you

---

Page 322

1  know, people make mistakes, they're human.
2  The only difference with that is, an officer
3  is held accountable for his mistakes for
4  something in that nature.  That was the
5  purpose of me filing this complaint with
6  civil service, particularly on something as
7  serious as that.
8  Like I said, when you're dealing with
9  somebody's livelihood, you should be held
10  accountable.
11  Q  Okay.
12  A  All right.
13  Q  Anything else on the medical documents that
14  we went through, 182 through 236?
15  A  (Witness examines documents.)
16  Yes.  Let's look at 184.
17  Q  Okay.
18  A  Go down to 158, I guess is -- I don't know if
19  it denotes p.m.
20  Q  Yes.
21  A  But 158.
22  Q  Okay.
23  A  I received a call from Luwanda Sheer, risk
24  management, had the initials RM, I assume.
25  Advised she sent employee for fit for duty --

---

Page 323

1  FFD, that's what that acronym stands for, I
2  assume -- to do employee claim.  He has a
3  racing heart.  Will approve for a stress, I
4  guess, it looks like fit and stress test
5  needed.  Narrative, repair, initials Kim
6  Baer.
7  But if you go just above that, as
8  consultation with Luwanda Sheer, risk
9  manager, with reference to fit for duty test,
10  advised Luwanda Sheer would be consulting
11  with Chief Jim Craft and advise.  So --
12  Q  These are Ms. Bear's notes?
13  A  That's correct.
14  Q  So I guess it's best to talk to her about
15  what they mean and what the initials mean et
16  cetera?
17  A  I spoke to her.
18  Q  Okay.
19  A  And the reason I'm making reference to this,
20  she told me that not only Joey Provost and
21  Dwayne Prejean said I had a racing heart,
22  Chief Craft said that I had a racing heart.
23  So it was a concerted effort through all
24  three of them to say have a racing heart,
25  which that never came out of my mouth.

---

Page 324

1  Q  Okay.
2  A  But it's a mere mistake, correct?
3  Q  And you were cleared by Dr. Chen?
4  A  No, sir.  I never went to Dr. Chen.
5  Q  You never went to Dr. Jeffery Chen?
6  A  No, sir.
7  Q  Why not?
8  A  There was no need for it.
9  Q  Okay.
10  A  First of all, there was -- let me --
11  First of all, there was a question in
12  order for you to be referred to a specialist,
13  you have to go to a general practitioner, or
14  a physician to deem you having an issue that
15  requires some type of position in a
16  specialized field.
17  Q  So you went to Dr. Swan, and he cleared
18  you?
19  A  Yes, sir.
20  Q  Okay.
21  A  That's GC-186.
22  Q  Okay.
23  A  Even after I was cleared, I was still
24  required to bring a medical release form, or
25  some documentation in order to submit to the

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 325

1 polygraph.
2 Q Well, the GC-186, you were actually seen for
3 a lumbar strain, not for -- (Interrupted)
4 A No, sir. I was seen for an overall physical.
5 Q Why does it say diagnosis, lumbar strain?
6 A Because I had an accident during the course
7 of me being on administrative leave.
8 Q Okay. So you did tell Dr. Swan, as evidenced
9 in 186 and 187, which I guess is the same
10 thing, that you had had a back injury and
11 were suffering from a lumbar strain?
12 A Yes.
13 Q And he examined you for that?
14 A Yes, he did.
15 Q Okay. Did he examine anything having to do
16 with your heart?
17 A I did an overall physical.
18 Q So that included your heart?
19 A Yes. And I explained the purposes of me
20 coming here --
21 Q Yes.
22 A -- was for a physical for fit for duty.
23 During the course of it, the
24 questionnaire was, do you have any other
25 injuries? And that's how the lumbar strain

Page 326

1 came about.
2 Q All right. 182 to 236 is your medical
3 history as contained in the city nurse's
4 office, or -- where did you obtain these
5 documents?
6 A (Witness examines his documents.)
7 I answered that earlier, Mr. Corry. The
8 city nurse --
9 Q Okay.
10 A -- provided me with the documents.
11 Q Okay. All right. And then, 237 is where you
12 got a copy of the statement which is -- we've
13 talked about earlier, 238 -- I think it was
14 17 pages, if I'm not mistaken -- yes, through
15 254, regarding the Glen Dartez investigation.
16 And 255 looks like a copy of 237, except
17 it's got you received it, or somebody
18 received it.
19 A Which one are you referring to?
20 Q 255 and 237 are the same thing, it's just got
21 the received by.
22 A 235 and what, 257?
23 Q No.
24 MR. SPRING:
25 237, 255.

Page 327

1 MR. CORRY:
2 Q Yes.
3 A (Witness examines documents.)
4 That's me signing it and submitting for
5 the request, 237. 255 is when they provided
6 me with the document. I requested the
7 receipt. I received it.
8 Q Okay. And that was the statement we talked
9 about earlier.
10 All right. 256, it looks like an
11 Independent news story of eight pages. Is
12 that accurate? Taken out of the Independent
13 Weekly, 256 through 263.
14 A (Witness examines documents.)
15 Yes.
16 Q All right. Did you have -- did you provide
17 any of the information contained within that
18 newspaper article?
19 A No.
20 Q All right. 264 looks like another nine-page
21 document from the Independent Weekly. It
22 goes from 264 to 272. Did you provide any of
23 the information contained within that
24 newspaper article?
25 A What numbers are you referring to?

Page 328

1 Q 264 through 272.
2 A No.
3 Q All right. 273 through 278 is another
4 Independent Weekly news article. It looks
5 like it's six pages. Did you provide any of
6 the information contained within that
7 document?
8 A (Witness examines documents.)
9 No.
10 Q All right. 279 is you being notified of your
11 shift level investigation for 2012-005, and
12 that's where you received the letter of
13 reprimand. Is that accurate?
14 A No.
15 Q It's not?
16 A Yes. It's not.
17 Q You didn't receive notice of your
18 predetermination hearing?
19 A That's not what you said. You said received
20 notice of my investigation.
21 Q I'm sorry. Scratch that.
22 279 is you being notified of your
23 predetermination hearing regarding
24 SL-2012-005?
25 A Correct.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 329

1 Q  All right.

2 A  Before you go any further.

3 Q  And then -- (Interrupted)

4 A  Refer back to GC-279.

5 Q  Yes.

6 A  Okay.  You notice who's the author of it, the
7    bottom?  Captain Ned Ewing.
8        AD-2012-007, predetermination notice,
9    it's the human resource director, Ray
10   Domingue.
11       Remember you asked Gabe Thompson about,
12   have you ever had any other occasions where
13   you recall the human resource director
14   disseminating a predetermination notice, or
15   deciding what violations was being cited?
16   They never have.  This is the documentation.
17   And I can show you some more where they never
18   get involved.  This is a special case that I
19   was terminated on.

20 Q  All right.  280, 281, we talked about.
21   That's your letter of reprimand, correct?

22 A  Yes.

23 Q  282 and 283, I think we saw these earlier.
24   But that's the notice -- investigation of
25   possible misconduct.  And then, your rights

---

Page 330

1    is 283, where you signed off.

2 A  Yes.

3 Q  284 is a transfer of May 22nd, 2012.  And
4    it's a three-page document.  Correct?

5 A  Yes.  The same day the -- well, this came
6    that afternoon after the TRO was filed in
7    district court, which shows evidence of
8    retaliation.

9 Q  Do you know when the city officials, either
10   the administration, or Chief Craft, or anyone
11   -- or Chief Craft found out about the TRO
12   suit being filed?

13 A  No, sir.

14 Q  You don't know when they found out?

15 A  No, sir.

16 Q  So if they found out after that transfer
17   notice, you would change your testimony?

18 A  Repeat that again.

19 Q  If they found out about the TRO after this
20   transfer notice, would you change your
21   opinion that the transfer was as a result of
22   the TRO?

23 A  You're asking me if the -- if they found out
24   the TRO was filed on the same day of the
25   transfer letter --

---

Page 331

1 Q  No.

2 A  -- being issued?

3 Q  No.  If the TRO -- (Interrupted)

4 A  I'm trying to get some clarity.  And once I'm
5    finished, I'll let you know.

6 Q  Okay.

7 A  Then, if it's not the question that you
8    posed, if it's incorrect, then okay.
9        What you're saying is, be it that the
10   TRO was filed that morning, May 22nd of 2012,
11   and the letter of transfer was disseminated
12   out the same afternoon of the same day the
13   TRO was filed, you're saying if they had
14   discovered that it was filed somewhere down
15   the line, I would change my testimony?
16       Or are you saying if the TRO was filed
17   -- well, you tell me.

18 Q  Well, let me scratch that.

19 A  Yeah.

20   MR. SPRING:

21       Just reask it.

22 MR. CORRY:

23 Q  Let me reask it.

24       Do you have any information to suggest
25   that Chief Craft knew about the TRO at the

---

Page 332

1    time he issued this memo dated May 22nd,
2    2012, regarding your transfer?

3 A  The guys at the police department were saying
4    he knew about it, and he was upset.

5 Q  That's hearsay.  You heard that from people
6    in the police department?

7 A  That came from officers at the police
8    department.  Now, there were so many
9    officers, I'm not going to be able to give
10   you exactly how many officers and the
11   individual names.  But there's nothing in
12   that department that's considered
13   confidential.  And as soon as an individual
14   discovers something, it spreads like wild
15   fire.

16 Q  All right.  And the transfer that you
17   received effective June 10th, on page GC-285,
18   you were transferred from patrol division,
19   patrol support under the supervision of
20   Captain Ron Czajkowski, to patrol division
21   Precinct 4, Shift C, shift lieutenant under
22   the supervision of  Captain Cornell
23   Montgomery.  That's accurate?

24 A  Yes.

25 Q  Was your pay changed?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 333

1 A  No.

2 Q  Did you any of your benefits change?

3 A  No.

4 Q  Did your work hours change?

5 A  Yes.

6 Q  How so?

7 A  I went from working 8:00 -- not really 8:00

8  to -- well, it was 8:00 when -- on the 27th,

9  they changed my working hours from me having

10  it for almost two years in that section. But

11  it went from working 8:00 to 5:00, Monday

12  through Friday, and off on weekends, to

13  working the 12-hour evening shift, rotating

14  shift, where you work two days on, three days

15  off, then three days on, two days off, and

16  you worked nights.

17  My responsibilities changed. I went

18  from -- which is, you know, the motion. It

19  went from not being responsible for 48 guys,

20  as opposed to ten, 12 guys at the most, not

21  conducting administrative investigations.

22 Q  So you had less to do?

23 A  Far less.

24 Q  Pardon?

25 A  Far less.

Page 334

1 Q  Okay. And that was a problem?

2 A  It was a problem because of the working

3  hours, as well.

4 Q  And some police officers have to work nights,

5  right?

6 A  No, sir.

7 Q  None do?

8 A  Let me finish that question. You're right,

9  yes, some have to work nights.

10  But I went from an administrative

11  lieutenant position with no former

12  documentation to show that I wasn't

13  proficient in that area. There's a recording

14  of Chief Craft making reference to the third

15  floor boys, which, it was common knowledge if

16  you pose that question to Jim Craft, the

17  police chief, he's going to tell you who were

18  the third floor boys, in which he says, you

19  know, as long as they're doing their jobs, I

20  can't help that.

21  So in essence there, he's saying, you're

22  doing -- we're working, doing the job in a

23  proficient manner. But yet, you are

24  transferred.

25 Q  Well, but the chief has the authority to

Page 335

1  transfer anybody he wants at any time, does

2  he not?

3 A  Well, it's just ironic --

4 Q  Wait, wait, wait.

5 A  Go ahead. Go ahead.

6 Q  You have to answer the question.

7  MR. SPRING:

8  Answer the question.

9  MR. CORRY:

10 Q  Does he not?

11 A  Say it again.

12 Q  Doesn't the chief have the ability to

13  transfer anybody he wants at any time within

14  his department?

15 A  Yes.

16 Q  Okay.

17 A  Hold on, Mr. Corry. Let me finish.

18 Q  Go ahead.

19 A  But if it's not in a discriminatory and a

20  retaliatory manner.

21  And if I knew you was going to pose that

22  question, I would have provided you with the

23  civil service law that says you can't do

24  it.

25 Q  All right. 287 is what, where your hours

Page 336

1  were changed?

2 A  I think we covered that already. Not only

3  were the hours changed, there was an alleged

4  issue that was brought up where they couldn't

5  get in contact with me.

6  When I went to Captain Czajkowski, and

7  inquired about who was trying to call me, not

8  only I spoke with him, I communicated with

9  him via e-mail, which you can see up here,

10  who was trying to contact me and what phone

11  number were they trying to contact me from.

12  He never responded. He was extremely

13  evasive.             Thereafter, this is

14  the e-mail that was prompted from our

15  conversation, where he and Major Alfred

16  collectively decided that they were going to

17  change my hours, and prohibited me from

18  communicating with anybody, if it's outside

19  the realm of my duties as a patrol support

20  lieutenant.

21 Q  Okay.

22 A  Go ahead.

23 Q  And the major and the captain have the

24  authority to change your work hours, do they

25  not?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 337

1 A  Yes.

2 Q  Okay.

3 A  I'm not finished.

4 Q  Go ahead.

5 A  Just ironic, the TRO was filed May 22nd.
6 Prior to that, Major Alfred was in -- I can
7 tell you this.  He was there since April of
8 that same year.  There was no issue until the
9 TRO was filed.  He never had an issue of
10 contacting me.  There's no documentation
11 where I was called in, and I was formally
12 counseled for failing to answer my phone, be
13 it office phone or cell phone.  But all of a
14 sudden, my hours changed and he can't get in
15 contact with me.

16 Q  This is -- (Interrupted)

17 A  This is after the TRO.

18 Q  Yes.  Go ahead and look at GC-364 for me real
19 quick.

20 A  (Witness complies.)

21 Q  Are you there, GC-364?

22 A  Yes.

23 Q  What's the date of that?

24 A  May 11th.

25 Q  2012?

Page 338

1 A  The day that it was authored?

2 Q  Yes.

3 A  Yes.

4 Q  Okay.  And you received it on the 15th?

5 A  Yes.

6 Q  Okay.  All right.  Let's go back to 290, or
7 289 and 290.  I think we talked about that.
8 No.  Something to do with the performance
9 evaluation.

10 A  (Witness examines documents.)
11 Yes, sir.

12 Q  What was the issue with that?

13 A  There was numerous issues that I wanted to
14 address.  The performance evaluation wasn't
15 accurate.  It was placed in a bin, my bin
16 when I was transferred from patrol support to
17 Precinct 4 with no explanation.
18 When you prepare a performance
19 evaluation and you're the reader, you have to
20 discuss the performance evaluation with the
21 employee that you prepared it for.  That was
22 never done.

23 Q  Who did -- who prepared this one?

24 A  Captain Czajkowski, Ron Czajkowski.

25 Q  Doesn't it say he was on vacation?

Page 339

1 A  When?

2 Q  One of your e-mails, doesn't it say he was on
3 vacation?

4 A  He was on vacation afterwards, after he
5 responded several days later.  But the
6 evaluation was due in June.  Look at the date
7 when the e-mail was sent out.  We're in
8 August.

9 Q  In your 22 years at the LPD, did you ever
10 have a performance evaluation done where you
11 didn't talk to the person evaluating you?

12 A  No.

13 Q  You talked to them every time?

14 A  Yes, sir.

15 Q  Okay.  And that's documented?

16 A  It's not only documented, it's in the
17 performance evaluation manual.

18 Q  All right.  Did you ever talk to Captain
19 Czajkowski about your performance
20 evaluation?

21 A  No, sir.  I was terminated before that
22 occurred.

23 Q  Okay.  291 and 292 is what?  Back to the cell
24 phone?  I think we talked about those
25 already, right?

Page 340

1 A  Yes.

2 Q  294 is your complaint to the board regarding
3 the alleged payroll fraud.  Is that accurate?

4 A  Which one?

5 Q  294.

6 A  (Witness examines his documents.)
7 You're referring to that particular
8 document in itself?

9 Q  Yes.  What is that?  What is that for?

10 A  That's a letter that Dee Stanley sent to --
11 the CAO sent to the Civil Service Board.

12 Q  Okay.  And it contains your complaint
13 regarding the payroll fraud of Lieutenant --
14 alleged payroll fraud of Lieutenant Bert
15 Bejsovec?

16 A  Yes.  It contains the complaint, as well as
17 the written report by the person conducting
18 the investigation, human resource director,
19 Ray Domingue.

20 Q  And 294 encompasses how far back?

21 A  (Witness examines his documents.)
22 Up to 360, with the exception of a
23 document that I had in my original file
24 wasn't -- when I looked through it, it wasn't
25 in your binder.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 341

1 Q   Okay.  So it goes from 294 to 360, and then,
2 there were some additional documents provided
3 this morning.  Which number are you referring
4 to?  Was it in the 104?
5 A   No.  It should be the document that I gave
6 yesterday.
7 Q   Yesterday.  Okay.
8       That's this small stack.
9 A   That one (indicating).
10 Q   685?
11 A   I can't see the number from here, Mr. Corry.
12       That's correct.
13 Q   Okay.  And you have it in yours.  That's
14 stuck in there.  Okay.
15       So 685 ought to be included in that
16 payroll issue as well, correct?
17 A   Yes.
18 Q   All right.  And do you know the outcome of
19 the investigation?
20 A   From who?
21 Q   From the city.
22 A   It was unfounded.
23 Q   Okay.
24 A   But let me -- let me make sure.  Let me not
25 go on the record and say that.  Let me give

Page 342

1 you the exact language of it.
2 Q   And how did you get a copy of 295?
3 A   2 what?
4 Q   How did you get a copy of 295?  GC-295, how
5 did you get that?
6 A   That packet was placed in my bin.
7 Q   Do you know by who?
8 A   No, sir.
9 Q   So the packet being 294 to 360, plus the
10 additional document we talked about, was
11 placed in your bin?
12 A   The additional document that we just talked
13 about, that I provided later --
14 Q   Yes.
15 A   -- no, that was given to me by retired
16 Captain Dwayne Arceneaux.
17 Q   All right.  But I asked how you got document
18 295, and you said the packet was placed in my
19 bin.  I'm trying to figure out what the
20 packet is.  This 294 through 360 would be
21 what you're referring to as the packet?
22 A   394 to what?
23 Q   294 to 360.
24 A   No, not the entire packet.  There's some
25 e-mails that you're going to see Greg Cormier

Page 343

1 printed at the top.
2 Q   Okay.
3 A   That came from me.  That was Lieutenant
4 Bejsovec e-mailing that on the police -- his
5 police -- via his police computer.
6 Q   All right.  And that would have been e-mails
7 from 354 to 360?
8 A   354 to what?
9 Q   360.  That's the e-mails you're referring to?
10 A   No, sir.  363 is one.  360, no.
11 Q   363?
12 A   Uh-huh (yes).  Yes.
13 Q   354 to 363?
14 A   Well, no.  Not -- the way you have it
15 numbered, there's some in there that's not --
16 362 is JD's investigation e-mail.
17 Q   Okay.
18 A   361 is the same.  It's not correlated with
19 that.
20 Q   Okay.
21 A   What we were discussing.
22 Q   All right.  Do you know the complaint that
23 you made and that was investigated by human
24 resources, as you said, was unfounded?
25 A   I initially said unfounded.  And then, I

Page 344

1 said, let me refer to the official --
2 Q   And what document -- (Interrupted)
3 A   -- disposition letter.
4 Q   And what document is that?
5 A   296.
6 Q   Okay.  Does that refresh your memory?
7 A   (Witness examines document.)
8       Yes, sir.  It refreshes my memory.
9       Also, the board president had a
10 discussion with me, and he told me it was
11 unfounded.
12 Q   When did you have that discussion with the
13 board president?
14 A   I can't remember.  It was -- it was, I guess,
15 after they received the results.  I don't
16 know.
17 Q   Was it by phone or in person?
18 A   Person.
19 Q   At the civil service office?
20 A   (Witness shakes head negatively.)
21 Q   Where?
22 A   City hall.
23 Q   So you met with Board Chairman Boudreaux?
24 A   No, I didn't --
25 Q   Was it just the two of you?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 345

1  A   I didn't personally meet with him.  It was --
2      if I'm not mistaken, it was after the civil
3      service hearing.
4  Q   Okay.  And he came up to you and said that it
5      was unfounded?
6  A   He said it was unfounded, and if you want to
7      appeal it to the board, if you're not pleased
8      with the decision, you can, and we'll take
9      that up at a later date.
10 Q   And did you do that?
11 A   Yes.
12 Q   Okay.  What is the status?
13 A   They decided to implement a stay order.  I
14     don't know if it was on the heels of -- I
15     can't remember the exact day, but I want to
16     say it was -- I'm not going to say the exact
17     date.  But I know it was sometime after he
18     went to the board, I want to say in
19     September,  and handed each board member a
20     sheet of paper.  I guess y'all had some kind
21     of hearing in front of Judge Hanna.  And he
22     implemented some type of ruling, and --
23 Q   So it's still pending?
24 A   Will you let me finish explaining, Mr. Corry?
25 Q   Yes.

---

Page 346

1  A   Okay.  Thank you.
2          And after that September meeting in
3      which you presented them with that document,
4      they read a document, and they said that the
5      there would be in violation of a gag order,
6      if they would discuss any complaints, that
7      they would have to review the lawsuit to see
8      what was in the lawsuit.  And thereafter,
9      they implemented the stay order further down
10     the line.
11         After -- in November, the complaint
12     issue with the administrative leave came up.
13     And that's when they said, any complaints,
14     with any litigants in the lawsuit that are
15     plaintiffs, they won't hear it because it may
16     be a conflict with the federal lawsuit that
17     is pending, because they don't want to render
18     a decision that may be contradictory to what
19     the federal judge is going to do.
20 Q   Did you know that Mr. Hewitt had filed a
21     complaint with the board and asked them to
22     hear his appeal and they declined?  And that
23     that was appealed to the Fifteenth Judicial
24     District Court, Judge Rubin, and he agreed
25     with the board, they didn't have to hear it

---

Page 347

1      until the federal lawsuit was concluded?  Did
2      you know that had taken place?
3  A   No, sir.  But let me finish.
4          Although the federal judge never
5      mentioned anything about prohibiting civil
6      service from conducting their normal
7      business, the only issue he had was that he
8      said it would be up to them if they won't
9      allow the media in any civil service hearing,
10     and that appeals governing employment is
11     better suited in civil service.
12 Q   All right.  Let's look at, I think 364 and
13     365 we've talked about more than once.  Is
14     that accurate?
15 A   Will you hold on a second and let me get to
16     it, please?
17 Q   Yes.
18 A   (Witness examines his documents.)
19         I noticed on -- I make reference.  Well,
20     I guess it's a question that we have to ask
21     the chief of police, why his name is on those
22     documents.
23         Did I answer your question, Mr. Corry?
24 Q   We've talked about these, right?  Weren't
25     they contained earlier in the binder?

---

Page 348

1  A   Yes, sir.
2  Q   And then, 366, I think is -- we had talked
3      about the polygraph and who got notice to
4      give the polygraph.  And you were going to
5      dig for the document.  And I said, well, I
6      know we'll come to it while we're here.  This
7      is the one that you were referring to?
8  A   No, sir.  There were several notices relating
9      to this polygraph.
10 Q   Okay.  Was this the first polygraph with the
11     racing heart issue, or was this the second
12     polygraph that you actually gave?
13 A   None.
14 Q   This wasn't?
15 A   No, sir.
16 Q   Okay.  What is the significance of this?
17 A   The significance is -- you have the documents
18     out of order.  Because I was going to show
19     the significance of -- this notice is sent to
20     us, and then, there's another e-mail with the
21     same dates in which it was sent out to
22     yourself, Mr. Corry, as well as other people,
23     human resource, Mr. Stanley, and a few
24     others.  Let me see if I can find it.
25         I have it in my binder.  I'm trying to

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 349

1  find it in yours.
2      MS. COREIL:
3          What's the date on it?
4  A  July 6th.
5      What number were you initially referring
6  to, Mr. Corry?
7      MR. SPRING:
8          366.
9  MR. CORRY:
10 Q  366.
11 A  Okay.
12     MR. CORRY:
13         Is it in the stuff that he gave us?
14     MS. COREIL:
15         July 6th, you said?
16     MR. CORRY:
17         Yes.
18 A  That ones not in there.
19 MR. CORRY:
20 Q  Well, you went through it last night and
21 compared it, didn't you?
22 A  I guess I made a mistake, Mr. Corry.
23 Q  Even you make them, right?
24 A  But not with something of that magnitude like
25 they did.

Page 350

1  Q  We can shoot a copy of this at a break.
2      So you were comparing 366 with this memo
3  dated -- e-mail dated July 6th, 2012.
4      And tell me what the -- what's the
5  issue?
6  A  The individuals that they cc'd; Dee Stanley,
7  Michael Hebert, Michael P. Corry.
8  Q  So it's just the cc's that is an issue for
9  you?
10 A  No.
11 Q  Is that accurate?
12 A  No.  The highlighted portion, Michael P.
13 Corry.
14 Q  Okay.  Just hold it out.  We'll make a copy.
15 A  All right.
16 Q  Okay.  367, we talked about that earlier.
17 368 is the notification of predetermination
18 hearing for 2012-007.  I think we talked
19 about that earlier as well, dated September
20 4th of 2012.
21 A  Yes.  Turn to 369.
22 Q  Okay.
23 A  You notice the author of -- who was the
24 author that authored that predetermination
25 notice?  Ray Domingue.

Page 351

1  Q  All right.
2  A  You're not going to recall another incident,
3  Mr. Corry.
4  Q  I'm sorry?
5  A  You're not going to find another incident
6  where Mr. Domingue presided over a
7  predetermination hearing in most recent
8  events, where he authored the
9  predetermination notice, and he actually
10 cited all the violations.  You're going to
11 find it was always the assistant to the
12 chief, who is a captain.  Current position
13 right now is Captain Ron Czajkowski.  Prior
14 to that, it was Captain Ned Ewing.
15 Q  So it's your belief that human resource has
16 never authored a notice of predetermination
17 hearing?
18 A  I didn't say never.  I said in most recent
19 events that I'm aware of, they haven't.
20 Q  Okay.  370 is your receipt.
21 371 is the transcript, two pages.  371
22 and 372 is the transcript of that
23 predetermination hearing on September 7th.
24 A  371?
25 Q  371 and 372.

Page 352

1  A  I noticed, because you were there, Mr. Corry.
2  Q  Yes.  My name is misspelled, too.  Correct?
3  A  So you -- I know -- I'm pretty sure there is
4  some dialogue on --
5  Q  371 and 372 -- (Interrupted)
6  A  I just want to make a statement.
7  Q  Is it in response to a question?
8  A  No.  I'm not posing a question.  I just want
9  to make a statement on the record.
10     I know I can't ask you any questions,
11 because you said you do the questioning,
12 correct?
13     MR. SPRING:
14         It has to be in response to a
15         question.
16 A  All right.  Go ahead.
17 MR. CORRY:
18 Q  371 and 372 is the transcript?
19 A  Yes.
20 Q  And your only explanation is on page 372,
21 that says, quote, the only thing I can say is
22 all these allegations that you cited, I
23 didn't do.  That's about it.  That was the
24 extent of your testimony, correct?
25 A  That is correct.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 353**

1  Q   All right.  373 is your transcribed statement
2      involving the AD-2012-007 statement date,
3      June 30th of 2012, where you had two lawyers
4      present with you, Mr. Spring and
5      Mr. Alexander?
6  A   Yes.
7  Q   Okay.  What is 379?
8  A   (Witness examines his documents.)
9  Q   It may be the back side of that faxed cover
10     sheet.  I'm not sure, though.
11         Anyway, 380, 381 is me forwarding to
12     your attorneys, your statement taken on June
13     20th, in the predetermination, or
14     predisciplinary hearing transcript of
15     September 7th.
16 A   (Witness examines document.)
17 Q   Is that accurate?
18 A   Which one are you talking about?
19 Q   381.
20 A   Yes, sir.
21 Q   Okay.  382 is another copy of your
22     termination letter.  It goes from 382 to 385.
23     Accurate?
24 A   Yes, sir.
25 Q   Is there any particular reason you put it in

---

**Page 354**

1      here so many times?
2  A   No, no particular.
3  Q   All right.  And then, 386 is some type of
4      psychological stress evaluator test that you
5      were sent to by your lawyer with Lauland
6      Security Consultants?
7  A   I don't know if you would call it a
8      psychological.  But it's a stress test that
9      the police department utilizes, as well as a
10     polygraph in order to determine if someone's
11     telling the truth.
12 Q   You can explain, but you've got to answer the
13     question first.
14 A   Yes.
15 Q   Your attorney sent you there?
16 A   No.
17 Q   Why is it addressed to him?
18 A   Because he accompanied me over there.
19 Q   Okay.  How long did you spend with this
20     guy?
21 A   Oh, I can't -- I can't tell you.
22 Q   You can't remember?
23 A   No, sir.  That's -- that's September 8, 2012,
24     Mr. Corry.
25 Q   Does Lauland Security Consultants do work for

---

**Page 355**

1      the Lafayette Police Department?
2  A   No, sir.
3  Q   Do they do work for any police department in
4      the State of Louisiana that you're aware
5      of?
6  A   That question would be better suited for Mr.
7      Lauland.
8  Q   All right.
9  A   I can't answer as far as all his credentials.
10         I can tell you from conversing with him,
11     he was deemed an expert witness in court
12     testimony, based on --
13 Q   How many times did you meet with him?
14 A   Once.
15 Q   Have you met with him since, or have you
16     spoken to him since?
17 A   No, sir.
18 Q   Did you meet with him on September 8th of
19     '12?
20 A   I don't know if September 8th is the date.  I
21     don't know if it's the date that we met, or
22     it's the date that he authored the letter.  I
23     can't -- I can't go on record and tell you.
24         I know I met with Mr. Lauland --
25 Q   Okay.

---

**Page 356**

1  A   -- and submitted to a test.
2  Q   All right.  Had you ever had a psychological
3      stress evaluator test prior to the one with
4      Mr. Lauland?
5  A   No.
6  Q   Had you ever administered one?
7  A   No.
8  Q   Are you certified to administer a
9      polygraph?
10 A   No.
11 Q   Are you certified to administer a
12     psychological stress evaluator test?
13 A   No.
14 Q   What did they do to perform the psychological
15     stress evaluator test on you?
16 A   What do you mean?
17 Q   Well, how did they do it?  How was the test
18     administered?
19 A   I think that's best suited for Mr. Lauland to
20     answer.
21     MR. SPRING:
22         Tell him what you remember.
23 A   I can tell you what I remember is, they asked
24     me a series of questions in relationship to
25     the Olita Magee document that was allegedly

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

**Page 357**

1  released to her, pertaining to me releasing
2  it.
3  MR. CORRY:
4  Q   Did they ask you any questions other than the
5  three that are contained in 386, or do you
6  remember?
7  A   I can't remember, as far as that.
8  Q   All right.
9  A   I know that the three that you're referring
10  to were the key questions.
11  Q   But there were others that they asked?
12  A   It could be, Mr. Corry. I don't want to go
13  on record and tell you yes or no.
14  Q   All right.
15  A   It's been a while.
16  Q   Did they hook anything up to you when you
17  were asked these questions?
18  A   I can't remember if that was the case.
19  Q   How does he determine that you answered the
20  questions truthfully, by looking at you when
21  you answer them?
22  A   Mr. Corry, I cannot answer that. That's
23  better suited for Mr. Lauland.
24  Q   Okay.
25  A   But before we move forward, I can tell you

**Page 358**

1  this, that the purpose of me taking it was, I
2  knew I didn't provide that document to Olita
3  Magee. This test proved it.
4  It also proved that the Lafayette City
5  Police Department utilizes the same mechanism
6  in conjunction, or as well as the polygraph
7  when they're conducting investigation
8  pertaining to administrative leave, as well
9  as criminal, where they feel that somebody is
10  being deceptive. I passed. I passed this
11  test.
12  The same person that administered my
13  polygraph, Joey Provost, said I failed it.
14  But he's the same person that administered a
15  polygraph, and there was a CVSA that was
16  administered as well by Reggie Thomas, on an
17  individual during the Mickey Shunick case.
18  And he failed it.
19  So what does that say about the test?
20  Q   Did you take this test with Lauland Security
21  Consultants before or after you took the
22  polygraph with Joey Provost?
23  A   After.
24  Q   After you had failed the polygraph?
25  A   Yes. After he said I failed it.

**Page 359**

1  Q   Okay. All right. 388, that's when you're
2  being placed on administrative leave, dated
3  August 17th of '12. Is that accurate?
4  A   Yes. Let's discuss that document.
5  Q   Okay.
6  A   Look at number one, under the departmental
7  fit for duty exam in reference to the medical
8  condition that you advised was not being
9  treated by a medical physician.
10  They can remember that, but they can't
11  remember that I said I had a racing heart.
12  Okay. They can remember that detail.
13  Q   389, what is that for?
14  A   389 is a copy of my check stub.
15  Q   Okay.
16  A   Hold on. I'm going to explain the relevance
17  of it.
18  You notice pay period ending, it says
19  9/15. If you look at the top, that starts
20  from 9/15 to 9/21.
21  Q   All right.
22  A   Go down the description, do you follow me?
23  Q   Yes.
24  A   Okay. You go across, administrative leave.
25  During that pay period, I was still on

**Page 360**

1  administrative leave even after the board, on
2  August 31st, and denied them an extension and
3  told them to put me back to work, he still
4  kept me on administrative leave, the police
5  chief.
6  Q   I'm not sure -- do you know if the board has
7  the authority to tell the chief whether he
8  can or can't put somebody on administrative
9  leave?
10  A   It wasn't the issue of he can or can't. He
11  went there for an extension of the
12  administrative leave, that's why we had the
13  hearing, because of an alleged racing heart
14  beat. It was determined that I didn't have
15  it, and they told him, your extension is
16  denied, conduct the polygraph, and that's it.
17  When it was denied, I was supposed to
18  return back to work. He didn't do it.
19  Q   Does the board have the authority to tell the
20  chief how to run the department on a
21  day-to-day basis?
22  A   Not on a day-to-day basis. But the board has
23  the authority to advise him when he's
24  violating an employee's due process rights.
25  Q   Did you make any complaints to anybody about

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 361

1 that?
2 A  Yes, I did.  I filed a complaint with the
3 Civil Service Board about the violation of
4 administrative leave policy, as well as Joey
5 Provost, Chief Craft, and Dwayne Prejean,
6 lying in front of the Civil Service Board, in
7 relations to the administrative leave hearing
8 on August 31st.
9 Q  All right.  390, that's an e-mail from you to
10 the people noted?
11 A  Yes.  The relevance of that e-mail is that
12 was Lieutenant Dwayne Prejean's smoking gun.
13 In the civil service hearing, he extracted
14 that from his, I guess his iPhone, his PD
15 iPhone.  And that was his basis for saying
16 that I had a racing heart.  And as you can
17 see, I make no reference to a racing heart.
18 Q  But you make reference to heart, don't you?
19 A  Racing heart.
20 Q  No, no.
21     Do you make reference to heart?  The
22 most notable issue, and I'm quoting, was my
23 medical condition, open paren, heart, closed
24 paren, period.
25 A  And that was -- will you allow me to answer

Page 362

1 it?
2 Q  No.  Is that in there?
3 A  Yes, it's in there.
4 Q  Okay.
5 A  Now, let me answer it for you.
6 Q  I'm not sure I asked a question.  I just
7 wanted you to identify that language being in
8 that e-mail.
9 A  You asked a question.  You asked, do I make
10 any relations to heart in there?
11 Q  Yes.  And you answered that.
12 A  That's a question.  You said you're not sure
13 if you asked a question.
14 Q  Okay.
15 A  Okay.  Then, let me expound on that.
16     The reason I put that in there, that was
17 after they denied me to take the polygraph
18 and put me on administrative leave.  And
19 their explanation was for a racing heart.
20 Q  All right.
21 A  And that's why I make reference to physician,
22 cardiologist, because they wanted to send me
23 to some specialist.
24 Q  And you just -- (Interrupted)
25 A  A heart specialist.

Page 363

1 Q  And the purpose of the e-mail was to make
2 sure that they were going to pay for it,
3 right?
4 A  Of course.  It wasn't my responsibility to
5 pay for it.
6 Q  Certainly not.
7     And you had no problem going to a
8 cardiologist, did you?
9 A  (No response.)
10 Q  Did you?
11 A  Yes.
12 Q  You put it in there, that's your e-mail.
13 A  Yes.  Yes.
14 Q  You would have gone to the cardiologist?
15 A  No.  You asked me if I had a problem going to
16 the cardiologist, and my response was yes.
17 Q  Okay.
18 A  But if they ordered me to go, I have no
19 choice to go.  I'm compelled to do it.
20 Q  All right.
21 A  But the issue I had with them was, I was
22 being sent to a cardiologist in the absence
23 of a physician recommending me.
24 Q  All right.  GC-391 is the consent to be
25 polygraphed.  That's the first time, and you

Page 364

1 agreed, signed off on it?
2 A  Yes.
3 Q  All right.  395 is General Order 301.1,
4 polygraph examination.  I think we talked
5 about that already.
6     All right.  404, this is your
7 performance evaluation of June 2011 to June
8 2012.  This is the one you say you didn't
9 meet with Ron Czajkowski?
10 A  That's correct.
11 Q  All right.  Look at 406, halfway down on
12 12/4/11.  Do you see that?
13 A  (Witness examines document.)
14     Yes.
15 Q  You actually have a star by yours.
16 A  Yes.
17 Q  That was regarding a letter of reprimand for
18 the 60-day issue, right?
19 A  No, sir.
20 Q  That wasn't?
21 A  No, sir.  That's a bold face lie.
22     What he's referencing right here is the
23 investigation with JD, where he received a
24 one-day suspension.
25 Q  How do you know that?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 365

1 A   Because he would communicate with me on a
2     regular basis on the status of that
3     investigation because they were concerned,
4     and he was getting pressure from the chief.
5     And that's why he kept inquiring about the
6     status update of the investigation.
7 Q   All right.  What about on 407, that May 23rd,
8     2012, notation that you have underlined, is
9     that accurate?
10 A   As far as what, the --
11 Q   The contents.
12 A   -- the underline?
13 Q   No.  As far as the contents of it.
14 A   No, it's inaccurate.
15 Q   Why?
16 A   Because I was never apprised that I was going
17     to be the coordinator of the Mickey Shunick,
18     as the go between between patrol and CID.
19         And if you notice, the reason it's
20     underlined is the day after the TRO was
21     filed.   Kelly Gibson didn't want to
22     communicate with me at all, and he expressed
23     that.
24 Q   Did he know about the TRO at that point?
25 A   Yes, sir, he did.

Page 366

1 Q   All right.  409.  May 27th, that's when you
2     were gathering with Poiencot on non-Lafayette
3     Police Department business?  Is that what
4     that gathering is referring to?
5 A   Where are you referring that to, Mr. Corry?
6     Show me exactly where.
7 Q   Where you have your -- are you on 409?
8 A   Yes, sir.  I'm on 409.  Okay.  Go ahead.
9 Q   Where you have the star.
10 A   Okay.
11 Q   Do you see where it says gathering?  Is that
12     the gathering that is  being referred to
13     there?
14 A   No, he never specified what gathering I'm
15     prohibited, as far as who I should not talk
16     to or not.  That was just a general statement
17     he made.  So I don't know who he was
18     prohibiting me from talking to.
19         But if you go further down, if you start
20     here, however, even after this directive,
21     Lieutenant Cormier continued to participate
22     in various meeting with officers, he doesn't
23     say who, that were not his subordinates.
24 Q   Is that accurate?
25 A   No, sir.

Page 367

1 Q   You didn't meet with people that were not
2     your subordinates?
3 A   No, sir.
4 Q   Not one time?
5 A   Not on May 27th.  Not -- not what he's
6     referencing to after May 27th.
7 Q   What about prior to May 27th?
8 A   We're talking about May 27th.
9 Q   I'm talking about prior now.
10 A   No, sir.
11 Q   You never met with any subordinates -- you
12     never met with any officers that were not
13     your subordinates prior to May 27th, 2012?
14 A   What do you mean by "meeting"?  Because I can
15     encounter somebody in the hallway.  Do you
16     consider that a meeting?
17 Q   You know what I mean.
18 A   No, sir.  I'm just asking.
19 Q   You just said you didn't meet with anybody
20     after, so you knew what meeting was.
21         Now, I'm asking you, did you meet with
22     anybody before --
23 A   I'm saying I --
24 Q   -- and you're asking me explain what meeting
25     is.

Page 368

1         The same meeting that you were referring
2     to after, I'm referring to before.
3 A   Okay.  The meeting I'm referring to is the
4     meeting in the context of what he wrote here.
5     Meeting is a formal gathering where we are
6     discussing some form of issue.
7 Q   Okay.  Did you do that before May 27th of
8     2012?
9 A   No.
10 Q   All right.
11 A   Could you go back?
12 Q   I don't need to.  But if you need to, you're
13     more than welcome.
14 A   Okay.  Yes.  We can go back.
15         It says right here, here's where I was
16     referring.  The result of these meetings did
17     not seem to have anything to do with the task
18     or obligations for the units under his
19     supervision or any other patrol support.  I
20     noted that Lieutenant Cormier never
21     approached me about the content of these
22     meetings, or results of these conversations
23     in these meetings, or had no plans or
24     presentations resulted in the meetings that
25     were directed towards proactive activities in

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 369

1  patrol support.
2      That wasn't a requirement.  And there
3  was no meetings.
4  Q  There were never any meetings between you and
5  Poiencot about recordings about IA documents
6  that were taken out, that we've referred to
7  as D-1?  You never had those meetings with
8  Poiencot?  I think you told me earlier, you
9  did.
10 A  Are you going to let me answer it, Mr. Corry?
11 Q  Yes or no, please.
12 A  Let me answer it.  The meetings he's
13 referring to is after May 27th, where
14 apparently he found it an issue, which he
15 never addressed it to me prior to that up
16 until that point.
17     Now, what you consider a meeting wasn't
18 a meeting.  I encountered him in the hallway,
19 and a discussion happened.
20 Q  Okay.
21 A  Isn't that what I said?
22     Since your own evaluations --
23 Q  I'm off of them now.
24 A  It would be inappropriate for me to refer
25 back to a particular page in there, or are

Page 370

1  you presiding over that?
2      MR. SPRING:
3          It's his deposition.
4  A  Yeah.  That's why I'm asking.
5  MR. CORRY:
6  Q  If you've got something you want to add.
7  A  Yes.  GC-411.  Down at the very bottom,
8  you're going to see a star.
9  Q  Okay.
10 A  In my observation in dealing with Lieutenant
11 Cormier, I found that he was approachable for
12 myself, subordinates, and others, though
13 there were a marked change in his ability
14 when through the action of he and some other
15 officers took, it was learned that Lieutenant
16 Cormier was believed to be secretly and
17 covertly recording conversation.
18 Q  That's accurate.  Isn't it?
19 A  It was believed.  You can't put beliefs in
20 evaluation.  If you refer to any evaluation
21 manual, it's going to strictly prohibit you
22 from doing it.
23     That's why I had an issue with Captain
24 Czajkowski, and I wanted to address these.
25     But you also note, he said, it was my

Page 371

1  observation I was approachable, but he
2  contradicts himself earlier.  But -- were
3  being recorded, retained and distributed to
4  use against various police officers.  And it
5  is believed the majority of the recorded
6  conversations were done without the consent
7  of the officers being recorded.
8  Q  That's accurate, isn't it?
9  A  No, sir.  I don't need to --
10 Q  Every -- right.
11 A  Go ahead.
12 Q  But the question was, the person that you
13 were recording didn't know you were recording
14 them.
15 A  No.
16 Q  I understand what you think the law is.  But
17 the question is, did the person that was
18 being recorded know you were recording them?
19 And the answer is what?
20 A  Mr. Corry, you're asking me --
21 Q  What is the answer?  Yes or no?
22 A  You asked me two questions, and you
23 intertwined them again.
24     Your initial question was, is that
25 accurate?  And before I could respond, you

Page 372

1  cut me off, and you gave me another question.
2  Q  Was it accurate?
3  A  Could you refer back to the first question?
4  Q  Was it accurate?
5  A  Which one?
6      MR. CORRY:
7          Read it to him, please, Debbie.
8  (COURT REPORTER READS BACK PREVIOUS QUESTION)
9  A  But he asked me two questions.
10 MR. CORRY:
11 Q  We can scratch the other one.
12 Q  Why do you want to -- never mind.
13 Q  These e-mails back in 2011, that start out at
14 423, 424, 425, that's regarding -- I think we
15 talked about that yesterday, the duties of
16 doing the payroll?
17 A  Were what?  Which one you said?
18 Q  423.
19 A  No, sir.
20 Q  What is 423?
21 A  423 is a shining example of a document that
22 contradicts what Captain Czajkowski was
23 making notation in his evaluation.
24 Q  All right.  424 -- (Interrupted)
25 A  This is an e-mail from Captain Czajkowski

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 373

1   regarding JD, the one he received the one-day
2   suspension, where we're communicating and I'm
3   apprising him of the status of the
4   investigation, and he's giving me directions,
5   as per Chief Craft, like I told you.  So
6   the --
7   Q   Okay.
8   A   -- the evaluation where you made reference to
9   him saying when he was communicating with me,
10  as far as the status update for the
11  investigation with the letter of reprimand,
12  that is not true.  This is the example right
13  here.
14  Q   All right.  426, the relocation of Our Lady
15  of Lourdes goes 426 to 429?
16  A   Yes.
17  Q   What does that have to do with anything?
18  A   Back to the evaluation, again, would be not
19  fair and objective.  He put in the
20  evaluation, apart from doing payroll and
21  performing evaluation and investigations, I
22  never prepared anything -- I mean, any other
23  documents.
24  Q   You prepared 426 through 429?
25  A   Yes, sir.  I'm sorry.  I cut you off.

Page 374

1       Yes, sir, I did.
2   Q   All right.
3   A   If you look at 427, you will see submitting
4   officer.
5   Q   I saw that.
6   A   Yes.
7   Q   Okay.  433 is what you talked about earlier.
8   I think you have a recording to go along with
9   that.  E-mail dated January 17th, 2012.
10  A   Yes.  And if you notice, it even says here,
11  if it can be established, it violates LPD
12  general order, and LCG PPM regarding
13  truthfulness in investigations.  We will need
14  to meet and discuss this issue to determine
15  if those officers were held accountable.  It
16  never happened.
17  Q   All right.  434.  That's that same
18  investigation we referred to earlier?
19  A   Can you go back to it, please?
20      Okay.  You remember earlier during the
21  deposition, we had a discussion about Bert's
22  duties, and as far as he investigating his
23  certain people and I investigating mine?
24  This is the e-mail where it clearly shows he
25  should have been doing it, but yet I was

Page 375

1   tasked to do it.
2   Q   435 through 437 is the patrol support
3   lieutenant description?
4   A   Yes.  And if you look in there, the duties of
5   them, you don't see anything about responding
6   for call for service in patrol.
7       Also, if you notice, Mr. Corry, could
8   you go back to it real quick?
9   Q   Yes.
10  A   Take notice of the person that authored this,
11  Captain Dwayne B. Arceneaux.  And you're not
12  going to find any duties, or any task
13  responsibility by Captain Czajkowski.  He
14  referred to Captain Dwayne Arceneaux, his
15  predecessor.
16  Q   All right.  459 is the Special Order 12.1
17  that we referred to yesterday regarding
18  clandestine recordings, a two-page document,
19  459 and 460.  Is that accurate?
20  A   Yes.
21  Q   And then, 461 is another copy of the Internal
22  Affairs standard operating procedures that
23  goes through 518?  Is that accurate?
24  A   No, sir.
25  Q   What does it go through?

Page 376

1   A   According to your binder, 516.
2   Q   560?
3   A   16.
4   Q   16.
5       Okay.  All right.  And then, 517 and
6   518, is that case regarding the city marshal.
7   Did you have anything to do with that case?
8   A   No.
9   Q   Okay.  Did you have anything to do with this
10  Advocate report?  Did you provide any
11  information for this Advocate report --
12  A   No.
13  Q   -- that's contained in 517 and 518?
14  A   If you read that report, Mr. Corry, that
15  report was -- the article was written from
16  testimony that was taken in the court
17  proceeding.
18  Q   Okay.  I'm just asking, did you have any
19  input in it?
20  A   No, sir.  No, sir.
21  Q   And 519 is General Order 201.2; 519 through
22  523?
23  A   Can we refer back to that GC-517?
24  Q   Is that in response to a question?
25  A   No, you can move on.  I apologize.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 377**

1 Q All right. General Order 201.2 is 519
2   through 523, and that's professional conduct
3   and responsibilities?
4 A You said 519 and what?
5 Q 523.
6 A Yes.
7 Q And General Order 301.9, internal
8   investigations is 524 through 531?
9 A Yes.
10 Q And then, General Order department discipline
11   is General Order 204.5 is 532 through 556 --
12   or excuse me, 544?
13 A Yes.
14 Q All right. 545, that had nothing to do with
15   you, did it?
16 A Yes.
17 Q It did?
18 A It's a correlation, like I alluded to
19   earlier, Heather Martin --
20 Q Whoa, Whoa, Whoa. You've got to answer my
21   question.
22   Did GC-545, dated September 19th, 2008,
23   have anything to do with you, AD-2008-005?
24 A No.
25 Q Okay.

---

**Page 378**

1 A Will you let me finish?
2 Q Yes. Go ahead.
3 A Okay. AD-2008-005 was an investigation in
4   which another white female officer was
5   investigated for releasing a confidential
6   document. And admitted to it, breaching a
7   confidential document, and received a letter
8   of reprimand.
9 Q Was it a confidential -- was the confidential
10   document something that she had generated, or
11   something she had taken out of somebody
12   else's file?
13 A Something she took out of a report.
14 Q Okay. Was it a document that she generated,
15   or do you know?
16 A It was a statement.
17 Q That she had given?
18 A Yes.
19 Q Okay. That's different than taking a
20   document out of somebody else's file, whiting
21   it out and giving it to a Civil Service Board
22   member.
23 A No, sir.
24 Q It's not?
25 A It's not different. It's the same thing.

---

**Page 379**

1 Q Okay.
2 A And if you read the disposition letter, it
3   says, it was considered a confidential
4   document. And also --
5 Q How did you get a copy of the disposition
6   letter?
7 A There was an envelope in my bin.
8 Q Do you know who gave it to you?
9 A No, sir.
10 Q When did you get it?
11 A I can't tell you the exact date, Mr. Corry.
12 Q Before or after this lawsuit was filed?
13 A The federal lawsuit or the --
14 Q The federal lawsuit.
15 A -- TRO?
16   I'm not sure. I know it was before I
17   was terminated, I can tell you that.
18 Q What did you do with it?
19 A With what?
20 Q That document?
21 A I kept it.
22 Q Where is it?
23 A Right here (indicating). It's a copy of it.
24   But the original one is in my binder.
25 Q Okay.

---

**Page 380**

1 A That they gave me, whoever it was.
2 Q And you don't have any idea who that was?
3 A No, sir.
4 Q All right. 546?
5 A I'm not finished with the document, Mr.
6   Corry.
7 Q Where is the signature page?
8 A I don't know. If I'm not mistaken, let me
9   see -- that particular document is -- it
10   mirrors the one in which I was terminated.
11   But Chief Craft authorized that
12   investigation, not Dee Stanley. But same
13   allegation, different discipline that was
14   meted out. The only exception is Heather
15   Martin never filed a lawsuit against the
16   police chief like I did.
17 Q Do you think any discipline was warranted?
18 A That's it right here (indicating).
19 Q What's that?
20 A That's the second page, GC-559.
21 Q So GC-559 is the second page behind GC-545?
22 A Yes.
23 Q Do you feel like any discipline was warranted
24   in what you did?
25 A No.

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

**Page 381**

1  Q   All right.  GC -- (Interrupted)
2  A   Will you let me expound on that?
3  Q   Sure, if you want to.
4  A   Okay.  First of all, I didn't think I did
5  anything wrong.  It was an issue that I was
6  discussing the policy or whatever.  And I
7  just made someone aware of a potential
8  problem that the city was going to have down
9  the road.
10       Now, if that's an issue they feel that
11  it's going to disrupt the interworkings of
12  the police department for me trying to
13  prevent them from having an issue by them not
14  being aware that there's an document that
15  actually compels them to do something and
16  they weren't doing it, then I don't know what
17  to tell you.
18  Q   All right.  GC-546, what is that?
19  A   It's an e-mail from Chief Craft that he
20  disseminated out to all officers apprising
21  them there's going to be a fundraiser at City
22  Bar.
23  Q   For?
24  A   Joel Grayson.
25  Q   Was he the one that killed?

**Page 382**

1  A   Yes.
2       Will you let me finish?
3  Q   Sure.
4  A   The same individual that owned City Bar, I
5  issued him a summons.  Chief Craft had this
6  big thing about officers establishing a
7  relationship with bar owners because it would
8  clog their judgment if they would ever be
9  called to respond to a call at that
10  establishment.  And he basically prohibited
11  officers from establishing some type of
12  relationship with them.
13       Thereafter, he condones a fundraiser at
14  this bar where this individual that violated
15  the law, and found it okay.
16  Q   Well, he was -- he was actually raising money
17  for an officer's widow, was he not?  Is that
18  what the purpose of the e-mail was for?
19  A   Yes, but --
20  Q   Did you donate to it?
21  A   To what?
22  Q   To the cause for Joel Grayson?
23  A   I sure did.  I donated to it because I'm
24  familiar with Joel Grayson's father.  He was
25  an officer in the Marine Corps, and he was in

**Page 383**

1  the Marine Corps League.
2  Q   547, what is that for?
3  A   February 19th is the date.
4  Q   Actually, it's February 17th, is it not?  The
5  date of the e-mail?
6  A   No, sir.  I'm not referring to the date of
7  the e-mail.
8  Q   Okay.
9  A   I'm referring to the contents of the e-mail.
10  Q   All right.
11  A   Effective Sunday, February 29th, Bert
12  Bejsovec -- basically, it's an official
13  notice that he's going to start doing his
14  responsibilities that he should have been
15  doing from the onset.  After multiple
16  complaints to the captain, and the major,
17  they finally decided.  And you had reference
18  if I had any documentation to verify that,
19  and that's it.
20  Q   All right.  So they addressed your concern?
21  A   Months -- several months later.
22  Q   All right.  That's a yes?
23  A   Yes.  They addressed it even after I was
24  inundated with work.  That, if you notice the
25  date, February 19th -- go back to it -- it's

**Page 384**

1  after they filed on a complaint on me for the
2  60-day violation of me not completing an
3  investigation.  So they were trying to
4  make-up for it.
5  Q   The one you didn't appeal?
6  A   Yes.
7  Q   All right.  551 and 552, that was the July
8  7th, 2011 transfer.  Did that involve you?
9  A   No.
10  Q   Okay.  553?
11  A   Will you let me explain the purpose of it?
12  Q   Sure.
13  A   Okay.  The purpose of it is, it shows when
14  Captain Czajkowski and Major Randy Vincent
15  came to patrol support, and how long they
16  were there.  There was no issues up until
17  after the lawsuit was filed.
18  Q   All right.  What lawsuit are you referring
19  to?
20  A   The TRO.
21  Q   That's the one where you were trying to stop
22  the investigation that you were ultimately
23  terminated for, that TRO?
24  A   Yes.
25  Q   Okay.  553, this is where there's the -- what

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 385

1 is this for?  Is this when you were promoted?
2 A No, sir.
3 Q What is 553?
4 A 553?
5 Q Yes.
6 A It's not a promotional e-mail.
7 Q Okay.  What is it?
8 A It's an e-mail designating the time entry
9   designee, which I am, that's the acronym,
10   TED, what you see, T-e-d.  The purpose of it
11   is to show how many people I was doing
12   payroll for.
13 Q All right.
14 A Inclusive of, if you notice -- go back,
15   please.  553, look at number 2.
16 Q Bert Bejsovec.
17 A Exactly.
18 Q So you were a senior?  You had been at the
19   police department longer than he had?
20 A No, sir.
21 Q All right.  555, what is that for?
22 A Mr. Corry, there's a -- the top sheet to this
23   is missing.
24 Q Well, maybe we'll find it when we go through.
25   All right.  558, dated September 18th,

Page 386

1 2008, that has nothing to do with you, does
2 it?
3 A (No response.)
4 Q You weren't involved in that investigation,
5   were you?
6 A No.
7 Q Where did you get a copy of this from, Novey
8   Stelly?
9 A No, sir.  Will you let me answer the
10   question?  It was in the envelope, the same
11   envelope that had the Heather Martin.
12 Q Was there anything else in that envelope?
13 A I can't remember.  There were numerous
14   occasions, Mr. Corry, they would put stuff in
15   my bin when I would show up for work.
16 Q All right.  Let's look at the documents 578
17   through 682, that you gave us this morning.
18      MR. CORRY:
19         And if you want to take a smoke
20      break.
21      MR. SPRING:
22         Yes, please.
23      (SHORT BREAK TAKEN FROM
24      2:37 P.M. TO 2:49 P.M.)
25 MR. CORRY:

Page 387

1 Q Let's move to stack three that we got on
2   April 1st.  578, does this have anything to
3   do with you?
4 A Yes.
5 Q What?
6 A It's something we allege in the lawsuit.
7   This deals with Paul Taylor, black officer.
8 Q I'm sorry?
9 A Paul Taylor, black officer, where he publicly
10   humiliated him when he was at the front desk
11   position.  All previous sergeants that were
12   front desk sergeants never had to post his
13   desk outside the police department.  And
14   basically, he put him in time out.
15 Q Is Paul Taylor a party to the lawsuit?
16 A Currently?
17 Q Yes.
18      MR. SPRING:
19         Not now.
20 A I don't know.  I can't answer that question,
21   Mr. Corry.
22 MR. CORRY:
23 Q All right.
24 A But the reason I reference it is to show
25   despaired treatment, black officers versus

Page 388

1 white.
2 Q You've got something blacked out to and from.
3   Who is it from?
4 A I don't know.
5 Q Where did you get this?
6 A In the bin -- in the envelope.
7 Q All right.
8 A Not the same envelope, though.
9 Q A different envelope.  How many envelopes
10   have you received?
11 A Mr. Corry, I couldn't give you a number.
12 Q Well, you're going to have to.
13 A I can't give you an exact number.  I can't
14   say ten, 20, whatever.  There were several,
15   and it was over extended periods, so --
16 Q More than five?
17 A Oh, yes.  Yes.
18 Q More than ten?
19 A I don't know.  It could be or it could not.
20 Q Are there any documents contained in those
21   envelopes as you've described that have not
22   been produced to us?
23 A As part of discovery?
24 Q Yes.
25 A The overall discovery?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 389

1 Q  Yes.

2 A  No.  Everything that was in the documents I
3    gave.

4 Q  All right.  Number 579, what does this prove,
5    if anything?

6 A  Light duty, special accommodations.

7 Q  Were you ever placed on light duty?

8 A  No, sir.

9 Q  Okay.  So is there any claim about light duty
10   as it relates to you, Greg Cormier, have
11   anything to do with this lawsuit?

12 A  No.

13 Q  Okay.  580, what does this have to do with
14   anything?

15 A  We got a serious tongue lashing for this
16   e-mail, as well as Novey.  Well, Novey Stelly
17   was -- got the brunt of it because he put in
18   there -- but there was one of Chief Craft's
19   directives, one of his major case, put out an
20   e-mail and disseminated through his chain.
21   The only issue was, the victim in this crime
22   was his illegitimate son.  And then --

23 Q  Okay.  So this is bringing a third party
24   that's uninvolved in the lawsuit into the
25   lawsuit, which Judge Hanna has previously

Page 390

1    said he didn't want to have happen.  Is that
2    what this shows, 580?

3 A  I don't know if that's what it shows.  That
4    wasn't my intention.

5 Q  Okay.  Were you involved in the incident from
6    Novey Stelly?  Because it says March 9th,
7    2012, to Ned Fowler, cc Norbert Myers and
8    Novey Stelly.  I don't see where you're
9    involved with it.

10   Did you have anything to do with this
11   incident as described by Stelly?

12 A  No.  As far as working --

13 Q  Okay.  It was just forwarded to you by Gabe
14   Thompson?

15 A  Yes.

16 Q  And it was forwarded to you and Scott
17   Poiencot, by Gabe?

18 A  Yes.  And Novey Stelly forwarded it to Gabe,
19   because Gabe was the precinct administrative
20   lieutenant.

21 Q  Okay.  Does it show anything pertinent to the
22   allegations you've made in the lawsuit, or is
23   it just simply an attack on this
24   individual?

25 A  I wouldn't say it's an attack.

Page 391

1 Q  Okay.  Does it support your allegations in
2    your lawsuit?

3 A  Yes.

4 Q  How?

5 A  That he got upset because he found out about
6    the e-mail.

7    And look at the date, March 9th, 2012.
8    There were some reprisals thereafter.

9 Q  All right.  581.

10   What were the reprisals, did they affect
11   you?

12 A  Yes, sir.

13 Q  What?

14 A  Transfers.

15 Q  When were you transferred?

16 A  May.

17 Q  Pardon?

18 A  May.

19 Q  All right.  581, how does that support the
20   allegations you made in the lawsuit?

21 A  It supports the corruption, lack of
22   truthfulness.  Initially, Chief Craft had had
23   a meeting in Compstat, and he had basically
24   said that his weapon was left in his vehicle
25   at a chief conference in Lake Charles, and

Page 392

1    that Lake Charles Police Department was --

2 Q  Do you know that for a fact, or is that
3    something that was told to you?

4 A  It came from Chief Craft's mouth.  He said
5    it.  Now, you can't get any better than
6    coming from the original person.

7    And he said that they were looking for
8    video footage and unable to identify the
9    subject that had taken his weapon.  And --

10 Q  Go ahead.

11 A  And he had negligently left his weapon in the
12   vehicle and someone had taken it.

13   Later on, he files a report, in which
14   Sean Arwood is the person that took the
15   report, and he -- he now had claimed that it
16   was taken from his residence.

17 Q  Is it a violation of a state statute to
18   disclose a police officer's home address?  Do
19   you know that?

20 A  (Witness shakes head negatively.)

21 Q  You've got to answer.

22 A  No.

23 Q  You don't know?

24 A  No.

25 Q  Is this --

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 393

1 A   And his address --
2 Q   -- a confidential document?
3 A   Hold on a second.  His address is not on
4       there.
5 Q   The street is.
6 A   You said his address.  You said the street.
7       MR. SPRING:
8           What are you on?
9       MR. CORRY:
10          I'm on 581.
11 A   581.
12      MR. SPRING:
13          Okay.
14 A   An address would be an numerical address.
15      Let's say, 599 Wood Duck.  That's not what it
16      says.
17 MR. CORRY:
18 Q   Okay.  I'm just asking you if you're aware
19      that disclosing a police officer's home
20      address is a violation of state statute.  Do
21      you know that?  Yes or no?
22 A   No.
23 Q   You don't know?
24 A   No, I don't know if it's a violation.  But --
25 Q   Is this a confidential document?

Page 394

1 A   No.
2 Q   All right.  582.
3 A   Let me explain why it's not confidential,
4       though.  If it's confidential, it wouldn't be
5       disseminated throughout the department.
6           Confidential document is something
7       that's kept within a certain area.
8 Q   582, what does that prove?  Memo dated
9       November 23rd, 2010.
10 A   That the officer was afforded light duty in
11      initial phase training.
12 Q   You don't have any allegations in your
13      lawsuit relative to light duty as they
14      pertain to you, do you?
15 A   No.
16 Q   Okay.
17 A   Let me finish, Mr. Corry.
18          The reason it's in there is because that
19      officer is a white officer.  And black
20      officers weren't afforded that opportunity.
21      Now, I have that in the lawsuit.
22 Q   But light duty was never an issue for you,
23      was it?
24 A   I'm not talking about light duty.  The reason
25      it's in there is making reference to black

Page 395

1       officers versus white officers in
2       preferential treatment.  That's why it's in
3       here.  And it's an example to show that this
4       officer -- he wasn't even confirmed a police
5       officer, he was in training, and they gave
6       him -- they afforded him the opportunity to
7       be placed on light duty.  Where you had
8       officers that were confirmed, sergeants that
9       were black, that were sent home.  This guy
10      was afforded special accommodations where he
11      worked at the police department and was paid
12      his regular salary as opposed to an officer
13      that was confirmed that was black.
14 Q   Who?
15 A   The particular officer?
16 Q   Yes.  Which officer are you -- (Interrupted)
17 A   Sergeant Mike Brown, Sergeant Paul Taylor.
18 Q   No.  Which officer are you referring to in
19      this 582?  I don't see anything on there
20      about light duty.
21 A   PO Randy Guidry.  If you look on this
22      training officer, light duty due to an
23      injury, FTO.  He broke his arm.
24 Q   Okay.  All right.  583, we've talked about.
25 A   No, we didn't actually talk about it.  It was

Page 396

1       submitted afterwards, and you said you was
2       going to discuss that further down the
3       line.
4 Q   Okay.  That's with the payroll, the alleged
5       payroll fraud that you -- the complaint you
6       filed, this went with it?
7 A   Yes.  And the purpose I submitted that was,
8       Dwayne Arceneaux was submitting his times as
9       opposed to Lieutenant Bert Bejsovec.  But in
10      Mr. Domingue's report, he said -- let me
11      don't paraphrase it.  I'll read it exactly.
12 Q   I don't necessarily need to go back to that.
13      We know the results.
14 A   No, sir.  I need to go back there because I
15      want to make reference to why this is
16      relevant.  Because it shows there was a cover
17      up in the investigation, and that they had
18      formed a defense for Bert Bejsovec, and it
19      wasn't thoroughly investigated.
20 Q   That's your opinion.  That's your opinion?
21 A   No, it's not my opinion.  It's still pending,
22      in which they're going to make a decision on
23      it.  But there's a stay order put in place.
24 Q   Okay.  584, that's the misdemeanor summons
25      you talked about earlier?  Is this a public

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 397

1  record, 584 and 585?
2  A  The summons?
3  Q  Yes, sir.
4  A  Yes, sir, it is.
5  Q  All right.  And 586, is that a public record?
6  A  Which one?
7  Q  586.
8  A  I don't know.
9  Q  Did you get Mr. Hargrave's permission to
10  disclose this?
11  MR. SPRING:
12  I'm going to object.  I do think it
13  was disclosed --
14  A  Yes, it was.
15  MR. SPRING:
16  -- in the mandamus that had been
17  filed earlier.
18  MR. CORRY:
19  I'm just asking him.  Your
20  objection is noted.
21  MR. CORRY:
22  Q  Did you?
23  A  No.
24  Q  All right.  587.  That's just the ordinance?
25  A  Yeah.  That was an ordinance to prove that

Page 398

1  the -- I had probable cause to issue him that
2  summons.
3  Q  All right.  And 588 and 589 is the personal
4  action request that the board took up, I
5  think at the last meeting, actually.
6  Is that what that is, a blank personal
7  action request, 588 and 589?
8  A  It's a personal action form, not request.
9  Q  I'm sorry, form.
10  That's what that is, the front and back?
11  A  Yes, sir.
12  Q  All right.  590, what is that?
13  A  That is a letter that was sent to retired
14  Captain Dwayne Arceneaux.
15  Q  Was it sent to some other officers?
16  A  No, sir.
17  Q  Just him?
18  A  Yes, sir.
19  Q  And who sent it?
20  A  I don't know.
21  Q  And what does it have to do with your
22  lawsuit, the allegations you made in your
23  lawsuit?
24  A  Well, what it has to do with that is, Captain
25  Arceneaux, when I alluded to earlier, when I

Page 399

1  was transferred to the power squad in the
2  wake of the Glen Dartez ordeal, in which they
3  retaliated against me for -- under their
4  belief that I was responsible for reporting
5  misconduct.  I was transferred to the power
6  squad.
7  When I mentioned I reported in uniform
8  to -- as a power squad sergeant, Captain
9  Arceneaux summoned me to his office, and told
10  me I wasn't in proper attire.  And he told me
11  reporting tomorrow, that I need to report in
12  plain clothes because I would be assigned to
13  the cold case file.
14  Later, before he retired, Captain
15  Arceneaux gave me a packet inclusive of this
16  letter.  The -- I don't know if you want me
17  to get to it now or you're going to get to it
18  later.
19  Q  That's fine.  We can get to it.
20  A  Okay.  As well as the --
21  Q  673?
22  A  -- 673, 674, 676, 677, 678, 679, 680.
23  Q  All right.  What does that show?
24  A  Hold on one second.  There's one more.  As
25  well as 583.

Page 400

1  He gave me an entire packet.  And like I
2  said earlier, I guess he had an epiphany, and
3  he wanted to extend an olive branch to people
4  that he felt that he had wronged.  And he
5  produced that letter.
6  And he was upset, because he said,
7  basically in the letter that was given to him
8  was indicative of his career at the police
9  department.  And he cautioned me, he said
10  that they were coming after me because I
11  filed a complaint against Bert Bejsovec.
12  And there's a recording that -- between
13  Captain Arceneaux and myself.  I don't know
14  if -- I think Uletom Hewitt submitted that or
15  not, in which he indicates in the onset of
16  the recording that Mark Francis, as well told
17  him that they're coming after Greg.  And that
18  was on the heel of me filing a complaint
19  against Bert Bejsovec.
20  He told me to be careful of Jackie
21  Alfred, that he was nothing but a tool for
22  Chief Craft to do his dirty work, and that
23  they were going to start a paper trail in
24  order to terminate me.  And any investigation
25  that they could garner, they were going to

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 401**

1  utilize to fire me down the line.
2  Q  Was that before or after you had taken that
3  document out of that file and whited it
4  out?
5  A  That was after.
6  Q  After you had done that?
7  A  Yes.
8  Q  All right.  591?
9  A  I'm not finished, Mr. Corry.
10     He also said that -- and this came from
11  Scott Morgan as well.  He also said that Dee
12  Stanley personally told Jackie Alfred, as
13  well as Chief Craft in a meeting -- I don't
14  know if it's -- because I didn't try to get
15  any clarity with him, as far as if it was the
16  same meeting, where it was the defense
17  meeting or not.  But he said personally that
18  he was going to take care of me for filing a
19  complaint with civil service and airing out
20  the department's dirty laundry, and also
21  embarrassing Bert Bejsovec, as well as his
22  wife, who works at city hall in the IT
23  section.
24  Q  All right.
25  A  And he said that -- be careful, because

---

**Page 402**

1  they're probably going to fire you somewhere
2  down the line.
3  Q  All right.  591 and 592, I guess that has
4  something to do -- and 593 has something to
5  do with off duty security at the bars.  Your
6  lawsuit doesn't have anything to do with
7  that, does it?
8  A  No, sir.
9  Q  All right.  594, we've already discussed, it
10  was copied earlier.
11     595, what does that show?
12  A  Remember I referred to you as far as Keith
13  Gremillion being the custodian of Internal
14  Affairs?
15  Q  Right.
16  A  And actually, it's insuring that the
17  investigation is conducted with the 60-day
18  time frame according to SOP and policy.  He
19  e-mails the shift captain, as well as the
20  person investigating the shift level
21  investigation, will get a 30-day status
22  update, in order to find out --
23  Q  And that's what he did here?
24  A  Yes.
25     Will you let me finish?  That's what he

---

**Page 403**

1  did here on a separate investigation, which
2  shows that there was none never done on JD
3  for the 60 days, because he didn't know who
4  was -- who was conducting the investigation.
5  Q  All right.  596, 97 and 98, does that have
6  anything to do with you?
7  A  (Witness examines documents.)
8  Q  It looks like a sheriff's department maybe
9  golf tournament, or something, announcing the
10  winners.  Does that have anything to do with
11  you, 596, 97 and 98?
12  A  That was given to me by Captain Arceneaux to
13  show preferential treatment.
14  Q  How does the Lafayette Parish Sheriff's
15  Office golf tournament show preferential
16  treatment?
17  A  Because they were playing golf on company
18  time.
19  Q  How do you know that?  You have their payroll
20  records?
21  A  He submitted me his payroll record.
22  Q  Who did?
23  A  This is Captain Arceneaux.  He gave me his
24  payroll sheet.
25  Q  So he got paid to play golf?

---

**Page 404**

1  A  If you look at the dates.
2  Q  Is Captain Arceneaux a defendant in this
3  lawsuit?  Did you sue him?
4  A  No, sir.
5  Q  He's black, isn't he?
6  A  Yes.  But the same race discrimination is --
7  Q  All right.
8  A  -- where you can discriminate against black.
9     You were asking the question if he
10  was playing on company time.
11  Q  Yes.
12  A  Do you want me to answer that?
13  Q  Yes.
14  A  That's hard to see on this copy.  Let me get
15  the original.  April 29th.
16  Q  Where are you getting that date from?
17  A  Right here (indicating).  His payroll
18  sheet.
19  Q  I didn't see a date on the -- (Interrupted)
20  A  April 29th.  You can -- if you want to
21  archive.  You want to get with the Lafayette
22  Sheriff's Department?
23  Q  I don't see a date on 596, 597 --
24     MR. SPRING:
25     599, there is.

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 405

1 MR. CORRY:

2 Q   -- or 598.  Is there a date on there?

3 A   Hold up.

4 Q   Simple question.  Is there a date on it?

5 A   No.  On which form?

6 Q   The ones I just mentioned.

7 A   Which ones you just mentioned?

8 Q   596, 97 and 98.

9 A   (Witness examines documents.)

10 Q   Other than at the bottom of 597, it says August 25th, 2011.  And it says, August 25th, 2011 on 598.  And the documents you provided of 599 and 600, don't have that date on them.

14 A   No.

15 Q   All right.  601, what is that for?  You're asking the board chairman for a copy of a statute?

18 A   No.  Not only a copy of a statute.  There was a conversation -- there was a discussion about the administrative leave dealing with Uletom Hewitt, in which the board president referenced Chief Craft coming to the board in May of that year, June and July, for an extension of administrative leave, and which that never occurred.  Chief Craft wasn't even

Page 406

1 present for the May hearing.

2 And he also cited RS 33:2557, which he entitled leave of absence.  And I couldn't find it.  And I was e-mailing him to --

5 Q   Why did you contact the board president, instead of contacting the police officer representative?

8 A   Because it was Reginald Thomas.

9 Q   Okay.

10 A   He's not proficient in civil service issues.

12 Q   Even though he was the board representative for years?

14 A   Anytime --

15 Q   Is that -- you have to say yes?

16 A   Yes.  Anytime --

17 Q   And he was elected by the police department?

19 A   Mr. Corry, will you let me respond?  You cut me off.  I give you an initial answer, and then you cut me off before I can elaborate.

22 Q   All right.

23 A   Will you let me -- you'll afford me the opportunity to respond?

25 Q   Yes.

Page 407

1 A   Okay.  Everyone knew at the police department that it was useless to go to Reginald Thomas with any civil service issue because he would either give you guidance that wasn't according to -- to the applicable laws governing civil service.

7 Q   All right.  602 and 603, does that have anything to do with the allegations you made in the lawsuit?

10 A   (Witness examines his documents.)

11 Q   Or are we bringing someone into the lawsuit that's a third party and not involved?

13 A   Which number?

14 Q   602.

15 A   Give me the question again.

16 Q   Does this have anything to do with -- 602 and 603, does that have anything to do with the allegations you've made in the lawsuit?

19 A   No.  That was in the stack.

20 Q   All right.  Why is it in there?

21 A   I don't know.

22 Q   What?

23 A   I can't answer that question.

24 MR. SPRING:

25 Is it a mistake?

Page 408

1 A   Yes.  Other than a mistake.

2 MR. CORRY:

3 Q   I'm sorry?

4 A   Other than a mistake, there's a few things in there that shouldn't be in there, like --

6 Q   All right.  604, that's a statute?

7 A   Yeah.  That -- that shouldn't be in there.  605 as well.

9 MR. SPRING:

10 Do you want to excise 602 and 603, put a note on them?

12 A   And 606.  And that one, too.

13 MR. SPRING:

14 A   This one, too, shouldn't be in there.  606.

15 MR. SPRING:

16 60-what?

17 A   606.

18 MR. CORRY:

19 Q   All right.  611, where did you get a copy of this?

21 A   That's disseminated throughout the police department.

23 Q   Does it have anything to do with the allegations in your lawsuit?

25 A   Hold on one second.  (Witness examines

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 409

document.)
Yes. It shows when Mr. Ottinger was stepping down and Chief Craft had testified that -- when the question was posed to him concerning -- saying that I released confidential information with JD, and he had did the same with BR -- and I'll say BR, although he mentioned the guy's name in court -- that he had mentioned that he had got the advice of City Attorney Michael Hebert, when it was actually Pat Ottinger. That's the only reason that's in there.
Q  All right. 614 and 15. It looks like some kind of letter from Paul Marx. Did you have anything to do with the contents of this document? Did you provide any information in 614 or 615?
A  Any input? Is that a question you're asking me, sir?
Q  Yes.
A  No, sir.
Q  616, where did you get that?
A  Ricky Rees gave it to me.
Q  All right.
A  And the reason he gave it to me, or the

Page 410

reason I kept it is, Ms. Prejean had testified that she had no knowledge of this letter being authored by Mr. Marx. But yet she disseminated it through the people in the police department. And Ricky had some concerns, and he came to me with the letter. And I said, you better not be disseminating that letter or attaching your e-mail and forwarding it to other people, because there's a general order that governs you, utilizing police department, or LCG equipment for purposes unintended to work relations.
Q  All right. And 616, 617, 618 and 619, did you have any input in the contents of that document?
A  617, 618, and what's the number?
Q  619.
A  (Witness examines documents.)
No, sir.
Q  And 620, did you have any input in this news story?
A  No, sir.
Q  What does that have to do with anything?
A  Despaired treatment. Black officers get discipline heavy handed by the chief versus

Page 411

white officers.
This article was the incident in which, like I alluded to earlier, yesterday, I want to say, in which Greg Randell received a five-day suspension in which he appealed it, and you represented the city. And Stephen Bajat conducted a follow-up investigation after this gentleman here, in Exhibit GC-620, was willing to provide information on other faculty members at Acadiana High that was pretty much doing the same thing, having inappropriate relationships with students.
He started the investigation without even verifying if there was a crime that actually occurred. He went and did a non-custodial interview with this lady, Ms. Elizabeth Savoy.
Q  Is this public record that you're talking about, or is this something that's private?
A  What?
Q  What you're talking about right now.
A  I don't know what you want to determine as public record or private.
Q  Well, I don't know. I mean, the judge has made it very clear, he doesn't want third

Page 412

parties brought into this lawsuit that don't have anything to do with it.
A  Well, it has something to do with it. It shows preferential treatment as far as how black officers are disciplined compared to white, and they are heavy-handed with Chief Craft meting out discipline compared to white officers.
Q  Let me ask you this --
A  Okay.
Q  -- you and Scott Poiencot were both fired because of the investigation arising out of AD-2012-007, were you not?
A  Yes.
Q  He's a white officer, and you're a black officer, correct?
A  Yes.
But let me go back to GC-621.
Q  All right. Well, before you do that, I want to ask you. Is GC-621 through 626 a matter of public record?
A  621 and 626?
Q  Yes.
A  (Witness examines documents.)
626, it appears that came off of a

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 413

1  website.  621 --
2  Q   Are those all related to each other?
3  A   Yes, sir, it is.
4        621 to 625, I would say no.
5  Q   Okay.
6  A   I would also add, I never released that
7  document to anyone in order to make it a
8  public record.
9  Q   You produced it in discovery?
10 A   I'm producing it now.
11 Q   You sure did.
12       All right.  The last thing is 681 and
13 682.  Does that involve you?
14 A   (Witness examines document.)
15       I think I addressed that already, Mr.
16 Corry.  And no, it doesn't.
17       And is reason I submitted that was to
18 show when Captain Ron Czajkowski and Randy
19 Vincent came to the patrol section.
20 Q   All right.  And 683 is just another copy of
21 the same thing.  I'm looking at the stack
22 that we got this morning, that you actually
23 left here yesterday.
24 A   I don't have 683.
25 Q   You should.  Right here (indicating).

Page 414

1  A   Oh.
2  Q   That's the same thing we just talked about,
3  683 and 84, correct?
4  A   Yes.
5  Q   685, we've talked about.
6        And 686, 87 and 88, 89, 90 to 93, we've
7  talked about.
8  A   No, sir, we didn't.
9  Q   Well, you've referenced them earlier with
10 Dwayne Arceneaux.
11 A   You never let me finish.
12 Q   Go ahead and finish.
13 A   The reason he gave me all of this is he was
14 upset with me, and he was under the
15 assumption that I was responsible for these
16 documents.
17 Q   Do you deny you were?
18 A   I didn't have to deny it, because when he
19 gave them to me, he basically told me, I know
20 you didn't do it.
21 Q   I'm asking you.  Did you do it?
22 A   No.
23 Q   Okay.
24 A   And he -- the documents 686 through 687, he
25 basically said that this story was indicative

Page 415

1  of Major Alfred and how he treats black
2  officers, and how he goes above and beyond to
3  publicly embarrass them in their
4  decision-making.
5        And as well as, he'd go out of his way
6  to be Police Chief Jim Craft's whipping boy.
7  When they're meting out discipline, black
8  officers were -- they'd camouflage it, where
9  it's not directly coming from Police Chief
10 Jim Craft.
11       And he said if you go back and look at
12 most of the documents dealing with
13 predetermination notices and notices of
14 investigations, as well as discipline
15 letters, you're going to have Major Alfred as
16 the person's signature, and under there, the
17 chief designee.
18 Q   All right.  Let's look at your supplemental
19 responses that you gave us.
20       561, that will be in --
21 A   All right.
22 Q   Look at 561.
23 A   (Witness examines his documents.)
24 Q   Got it?
25 A   Yes.

Page 416

1  Q   Do you see the witnesses down there at the
2  bottom?
3  A   Yes.
4  Q   I know we've talked about a lot of these
5  people, so I just want to make sure that we
6  covered everything there was to cover, and
7  the reason you listed them.
8        Joey Provost.  That's the polygraph
9  incident?
10 A   Yes.
11 Q   Anything else?
12 A   When you're referring to the polygraph
13 incident, you're referring to the whole
14 entire incident?
15 Q   Yes.
16 A   Yes.  And that's inclusive of --
17       MR. CORRY:
18       You got that, Hallie.
19 MR. CORRY:
20 Q   I'm sorry.
21 A   I'm not finished, Mr. Corry.
22 Q   Go ahead.
23 A   That's inclusive of the complaint that I
24 filed, too.  Are you encompassing all of
25 that?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 417

1  Q  Yes.
2  A  Okay.  Yes.
3  Q  Is there anything that we haven't talked
4     about that relates to Joey Provost?  I think
5     we've covered it, but --
6  A  No, not really.  When I touched on it and you
7     cut me off and veered off of it.
8  Q  All right.  I don't want to cut you off.
9  A  Well, when I tried to establish that dealing
10    with CVSA's and polygraph, and that his
11    credibility was at issue because he was
12    basically deemed being untruthful.  I -- I
13    don't know why you would utilize this person
14    to conduct a polygraph thereafter.
15 Q  All right.  Keith Gremillion?
16 A  You asked me why he's there?
17 Q  Yes.
18 A  He's there as a witness, number one, to
19    identify -- first of all, he conducted his
20    own investigation.  And that was from the
21    testimony which you deposed him on March 8th,
22    in which he started an investigation on his
23    own, which was without authorization from the
24    police chief.  And that's according to --
25 Q  That has to do with the Mclean document?

Page 418

1  A  Yes, sir.
2  Q  Anything else?
3  A  Yes.  Hold on one second.
4        General Order 204.5, under departmental
5     discipline, section 3.6.  No employee will
6     institute an independent investigation on any
7     other employee or any public official without
8     first obtaining authorization from the police
9     chief.
10 Q  All right.
11 A  That investigation which he started to
12    identify the document, he conducted on his
13    own.
14 Q  All right.  Jackie Alfred?
15 A  I'm not finished.
16 Q  Oh, okay.
17 A  As well as identifying when did he receive
18    the document and when he started his
19    investigation.
20 Q  All right.
21 A  That's Keith Gremillion.
22 Q  Okay.  Jackie Alfred?
23 A  Why he's a witness?  We need to identify --
24    well, on several issues.  What he meant by,
25    you cannot air out the police department

Page 419

1     dirty laundry in the general public and walk
2     away without anything happening to you.  And
3     this was in the wake of the Bert Bejsovec
4     payroll  fraud complaint in April.
5        Also, we need to identify from him who
6     were the participants in this meeting at city
7     hall on the Wednesday in which they were
8     forming a defense.
9        We also need to find out what he meant
10    by forming a defense.  Because there was an
11    audio recording with he and Gabe Thompson, in
12    which they discussed the payroll issue.  And
13    particularly, the overtime slip in which he
14    -- he made the statement that he was going to
15    chop Ron Czajkowski ass when all of this is
16    over with, because he shouldn't have approved
17    that overtime slip in the absence of not
18    filling in the times.
19 Q  Is that the recording that was played for the
20    TRO?
21 A  You asked me that already, Mr. Corry.  I
22    can't tell you all the contents of that
23    recording.
24 Q  Do you know if the recording has been
25    produced?

Page 420

1  A  It should have.
2  Q  Do you know?
3  A  Yes.
4  Q  You do?
5  Q  That it was produced?
6  Q  That it was produced to us.
7  A  Yes.  That should be part of Scott Poiencot's
8     audio file.
9  Q  All right.  Anything else on Jackie?
10 A  Why he was the designee for the chief of
11    police in the notice of investigation of
12    AD-2012-007, as opposed to Chief Craft.  And
13    how many other times has he stepped in for
14    the chief, and why the chief wasn't there to
15    do his responsibility as authorized in an
16    investigation.  That should be it.
17 Q  All right.  Pat Pattum?
18 A  Pat Pattum conducted an investigation on the
19    unauthorized press release in which I never
20    received a disposition letter on it.
21 Q  Okay.  Gabe, I think we've covered him.  I
22    deposed him.  I know what he's going to say.
23        Norbert?
24 A  You don't know why Norbert was listed?
25 Q  Yes.  Why is he listed?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 421

1  A   Well, he's listed to testify or to pretty
2     much verify pretty much all of our claims,
3     starting with the unfair treatment for blacks
4     versus white officers, to investigations
5     being conducted by the --
6  Q   You're aware he got dismissed from the
7     lawsuit by the Court, aren't you?
8  A   Yes.
9  Q   Okay.
10 A   As well as -- as well as the retaliation that
11    Chief Craft meted out on him when he
12    disagreed with him.  And it all started over
13    a disagreement over an officer in the way he
14    investigated an investigation.
15        He's also going to be a witness to
16    corroborate how this investigation, which I
17    was terminated, wasn't a fair and impartial
18    and above board investigation.
19 Q   Was he retired before the investigation?
20 A   No.  I -- I don't know.  I can't answer that.
21    I can't remember.
22 Q   Did he participate in the investigation?
23 A   Yes, he did.
24 Q   He did?
25 A   Yes, he did.

Page 422

1  Q   How so?
2  A   He cooperated in the investigation like any
3     other officer that was the subject of an
4     investigation.
5  Q   Okay.  Anything else?
6  A   No.
7  Q   Rick Zeno?
8  A   Rick Zeno sat on the old review board.  He
9     was also present and have knowledge of the
10    Bert Bejsovec payroll fraud.  He was also
11    present when I expressed my concerns about
12    how the investigation was conducted, in which
13    it wasn't proper.  And Mr. Domingue wasn't --
14    didn't have expertise to properly
15    investigate.
16 Q   That's your opinion?
17 A   No, sir, it's not my opinion.
18 Q   Sure, it is.  Because the CAO charged him
19    with the duties to do and that and he
20    conducted the investigation.
21 A   No, sir.  It's still in limbo.  Mr. Domingue
22    doesn't have no investigative background
23    compared to me.
24        Now, when the civil service hearing
25    takes place, where they decide, and I

Page 423

1     actually go through the investigation and
2     layout what investigative tools that they
3     could have utilized in order to prove or
4     disprove it, then we'll see.  But I can
5     assure you, there's not going to be a matter
6     of opinion.
7  Q   Okay.  All right.  Ray Domingue, I guess the
8     payroll investigation?
9  A   Payroll investigation, the AD-2012.
10 Q   007?
11 A   Yes.  The grievance procedure, as far as what
12    happens.
13 Q   He didn't file a grievance, did he?
14 A   No.  He was going to testify as to the
15    grievance procedure, and basically say what
16    normally happens.
17 Q   All right.  Dee Stanley?
18 A   Mr. Stanley, CAO, he's going to be a witness
19    as far as what compelling evidence that would
20    make him the complainant, and what statement
21    that he provided to definitely say that Greg
22    Cormier was an individual that was involved
23    in releasing that document to Olita Magee.
24 Q   Well, you told us today more than once, on
25    the record, under oath, that you're the one

Page 424

1     that copied it, whited it out and gave it to
2     Scott Poiencot.  So you can't deny your
3     involvement.
4  A   No, sir.
5  Q   Can you?
6  A   The --
7  Q   Wait, wait.  Answer my question.
8         You can't deny your involvement, can
9     you?
10 A   Yes, I'm going to deny my involvement.
11    Because if you refer back to the termination
12    letter, and if you'd like, we can.  The -- in
13    the letter, it says, I released the document
14    to Olita Magee, not Scott Poiencot.
15 Q   Okay.
16 A   Do you want to refer to it?
17 Q   I don't need to refer to it.
18 A   Okay.  Well, I will, for the record.
19 Q   The document speaks for itself.
20 A   And that --
21 Q   You don't need to read it into the record,
22    and I'm not asking you a question on it now
23    because I already have asked you a bunch of
24    questions on it.
25 A   Well, you asked --

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 425

1 Q   Anything else on Dee Stanley?
2 A   You asked the question that I was involved,
3     and that's the reason why he did it.
4        The problem is, when did he become aware
5     of it, and who provided him with that
6     information?  And why he authorized that
7     investigation as opposed to Chief Craft, and
8     why didn't Chief Craft do it.
9 Q   You ought to know the answers to those
10    because y'all filed a TRO to stop the
11    investigation, right?
12 A   Why would I know the answers?  Mr. Stanley
13    was never deposed and asked those questions,
14    Mr. Corry, was he?
15 Q   Why was the TRO filed then?
16 A   Because it was -- from the onset, it was
17    conducted where Keith Gremillion -- you
18    deposed Keith Gremillion, he had knowledge.
19 Q   For the record, I've never deposed Keith
20    Gremillion.
21 A   You never deposed Keith Gremillion?
22 Q   I never have deposed him.
23 A   You never have?  At any time dealing with the
24    document?
25       MR. SPRING:

Page 426

1        It's a different term of art.
2 A   Huh?
3        MR. SPRING:
4        The testimony in civil service is
5     not a deposition.
6 A   Well, not deposed.  Well, you had him testify
7     in the civil service proceeding.
8 MR. CORRY:
9 Q   Anything else on Dee Stanley?
10 A   Yes.  He needs to be questioned as well about
11    the conversation he had with Suzanne
12    Bejsovec, and in relation to him stating that
13    he was going to take care of me for filing a
14    complaint on Bert Bejsovec and embarrassing
15    the family.
16 Q   All right.  Anything on Dwayne Prejean we
17    have not already covered?
18 A   Yes.
19 Q   What?
20 A   He needs to be a witness, and we need to know
21    exactly how he conducted the investigation.
22    Was it a fair and impartial investigation?
23    Did he have a conversation with Olita Magee
24    on three separate occasions in which, from
25    the onset, she was told that we had no

Page 427

1     involvement in the document being produced to
2     her by me, as well as Scott Poiencot.  Even
3     though he had that knowledge, he continued
4     the investigation, which clearly shows that
5     we were targeted from the onset.
6 Q   All right.  Kim Baer, anything about her,
7     that's the city nurse, that we haven't
8     already talked about?
9 A   Kim Baer is going to verify the incident
10    involving my racing heart, for which I was
11    placed on administrative leave.
12 Q   All right.  Luwanda Sheer?
13 A   Luwanda Sheer is going to be pretty much
14    similar to Kim Baer.  She's going to have
15    some information as far as dialogue between
16    herself, Kim Baer, Chief Craft, in relation
17    to the administrative leave, as well as the
18    fit for duty.
19 Q   All right.  Sean Terro?
20 A   Sean Terro provided me with the
21    predetermination notice that was allegedly
22    authored by Mr. Domingue.  So he's going to
23    have some type of information on that, as
24    well as --
25 Q   2012-007?

Page 428

1 A   Yes.
2 Q   All right.  Anything else on Sean Terro?
3 A   As far as I know.
4 Q   Cornell Montgomery?
5 A   That's dealing with the administrative leave
6     issue, and the polygraph.
7 Q   Mark Francis?
8 A   Mark Francis, he's going to be a witness to
9     provide information on the retaliation in
10    which the chief had it out for me starting
11    way back from Glen Dartez.  There's audio
12    recordings to corroborate that.
13 Q   Do we have copies of those?
14 A   Yes, sir.
15       As well as him being a witness in which
16    there's an audio recording of Dwayne
17    Arceneaux referencing Mark Francis, telling
18    him that they're going to come after Greg
19    behind the payroll fraud complaint.
20 Q   All right.  David Leblanc?
21 A   David Leblanc.
22 Q   We talked about him.
23 A   No.
24 Q   Right?
25 A   No, sir.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 429

1  Q   I thought we talked about him yesterday.
2  A   No, sir.
3  Q   Okay.  What does he have to do with this?
4  A   David Leblanc was involving the Glen Dartez
5      incident.
6  Q   Is he an officer?
7  A   I take that back.  We did talk to him a
8      little bit in reference to the chain of
9      command, as far as reporting it.
10 Q   Correct.  All right.
11 A   And that's going to be -- there's an audio
12     recording of David Leblanc discussing how the
13     reporting of Glen Dartez, the sequence of
14     events, and how it occurred, and what
15     happened.
16 Q   Do we have that recording?
17 A   Yes.
18 Q   All right.  Lance Leblanc?
19 A   I'm -- it's not David Leblanc.  I'm mistaken.
20     Lance Leblanc is going to be the one you're
21     referring to, as opposed to 17.  17 is going
22     to be what I just mentioned about the
23     recording.
24 Q   Okay.
25 A   You got that?

Page 430

1  Q   Yes.
2  A   All right.  16, David Leblanc.  He was -- he
3      was involved because Glen Dartez allegedly
4      told him he was present at the scene of the
5      homicide.  He had knowledge when I told
6      him.
7  Q   Let me cut you off.
8          What does that have to do with your
9      lawsuit?  He retired.  He was under
10     investigation and retired, correct?  The same
11     thing Gabe Thompson did, right?
12 A   Are you finished?
13 Q   Yes.  I'm asking you a question.  Is that
14     correct?
15 A   Well, I can't answer the question if you
16     continue talking, Mr. Corry.
17 Q   All right.
18 A   Okay.  Are you finished?
19 Q   Yes.
20 A   All right.  What it has to do with my lawsuit
21     is, the retaliation started with Glen Dartez.
22     So regardless if he retired or not, that's
23     when I became -- they put a target on my
24     back, for Glen Dartez.  Because they thought
25     I was responsible for reporting gross

Page 431

1      misconduct by Glen Dartez.
2          And the only reason they went after me
3      was because Chief Craft and Glen Dartez, they
4      were personal friends.  They had been friends
5      almost -- when they first came to the
6      department.  And plus, he was publicly
7      embarrassed, and he thought I was
8      responsible.   So it doesn't matter if Glen
9      Dartez retired.  The issue is, I started
10     being a target behind Glen Dartez.
11 Q   Kelly Gibson?
12 A   Kelly Gibson was the investigator in the Glen
13     Dartez incident.  He conducted an interview
14     with me.  The interview started out inquiring
15     about --
16 Q   Well, we have a copy of your statement in
17     your submission.  We have talked about that,
18     correct?
19 A   Yes.
20 Q   You gave us a copy of your statement.
21 A   Yes.
22 Q   All right.  I don't need you to regurgitate
23     it now.
24 A   I'm not going to regurgitate everything.  We
25     never discussed the statement --

Page 432

1  Q   I don't need to.  I can read it.
2  A   No.  The point I'm trying to make is, they
3      were more concerned about a document, and if
4      the report was released, and if I did it.
5      And that's why he's listed.  And his
6      knowledge of what actually occurred.
7  Q   And you told us, I think more than once, that
8      you did not release anything to the news
9      media regarding the Dartez incident.
10 A   That is correct.
11 Q   Okay.  Or anybody else.  Nothing released to
12     the news media, and nothing released to
13     anybody else, other than official police
14     business, regarding the Dartez incident,
15     correct?
16 A   Is that a question?
17         Yes.  That's correct.  Didn't release
18     it.
19 Q   All right.  Guy Lebreton?
20 A   Guy Lebreton, he's a witness behind the Glen
21     Dartez incident.  He approached me in the
22     parking lot of the police department after
23     patrol discovered that that had occurred.
24     And he mentioned that he was going to report
25     it.  And I don't know if he did or not.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 433

1    But he came to me because he knows --
2  because of my reputation in telling the
3  truth, he knew I was going to tell him if
4  that occurred or not.
5  Q  Okay.  Jason Boudreaux.  I guess that's Board
6  Chairman Jason Boudreaux?
7  A  Yes, sir.
8  Q  What's he going to testify about?
9  A  He's going to testify about the stay order,
10  the AD-2012-007, wherein Chief Craft went in
11  and asked for an extension, in which he's
12  going to verify one of the reasons he had
13  this document was supposedly be authenticated
14  by the secret service, which I know had never
15  happened.
16  Q  All right.  Richard Chappuis?
17  A  Mr. Chappuis, he's going to be a witness
18  because of the conversation that took place
19  outside of civil service, where he said the
20  grievance procedures is useless because the
21  CAO is always going to side with the
22  directors.
23    And he also referenced that Internal
24  Affairs can manipulate the polygraph to get
25  the results that they want.

---

Page 434

1  Q  All right.  Dwayne Arceneaux we've talked
2  about?
3  A  Yes.
4  Q  Okay.  Chuck Huebner we've talked about?
5  A  We talked about him, not in great detail.  We
6  never talked about him as far as why he's
7  listed as a witness.  He's listed as a
8  witness because he's going to verify that I
9  never met him at all, with the exception of
10  one time, and I don't know if he remembered
11  me, is when I came back from Desert Storm,
12  Desert Shield, he interviewed me.
13  Q  Have you talked to him about this lawsuit?
14  A  No, sir.
15  Q  All right.  Reginald Thomas?
16  A  Reginald Thomas.
17  Q  I think we talked about him.
18  A  He's going to verify the conversation that we
19  had at Piccadilly, myself, and Gabe Thompson,
20  in which he discussed how horrible the Mickey
21  Shunick investigation was being conducted by
22  Stephen Bajat.
23    And he's also going to discuss how --
24  Q  Isn't there a guy at Angola that pled to
25  three life sentences for the death of Mickey

---

Page 435

1  Shunick, and some other people?
2  A  He's going to discuss about Bradley Wilson,
3  who was the person that they thought was the
4  target officer.  And that was from an
5  interview he had with the radio station and
6  they brought him in.  He submitted to a
7  polygraph by -- administered by Joey Provost,
8  in which he failed.  And then, he also
9  submitted to a CVSA, in which he failed.  But
10  he was the key suspect in the Mickey Shunick
11  case.
12    And Brandon Scott Lavergne confessed  to
13  committing the murder.
14  Q  That's the guy in Angola?
15  A  I don't know where he's at, Mr. Corry.
16  Q  All right.  Scott Poiencot, anything else you
17  need to add to him?  I'll get an opportunity
18  to depose him here shortly, I hope.
19  A  No.
20  Q  Bradley Wilson?
21  A  He's the guy Reginald Thomas references
22  failed the polygraph and the CVSA, two
23  investigative tools the Lafayette City Police
24  Department utilizes.
25  Q  He was the suspect one time in Mickey

---

Page 436

1  Shunick's death?
2  A  Yes.
3  Q  Have you ever had one suspect and after --
4  during your investigation that changes to
5  another, in your 22 years of police work?
6  A  Yes.
7  Q  You don't always get the right guy the first
8  time, do you?  That's why we have
9  investigations, correct?
10  A  No.  But the -- that's why we have
11  investigations.
12    But the relevance is, they thought he
13  was lying, so they requested that he
14  cooperate in the investigation and take a
15  polygraph test.  He failed that polygraph
16  test.  He failed it miserably, according to
17  Reginald Thomas.  And they still didn't
18  believe him.  So they did a secondary test,
19  which is another investigative tool that the
20  police department utilizes in the criminal,
21  as well as administrative.  And he failed
22  that test, also.
23  Q  All right.
24  A  I failed one, but passed the other.  The same
25  tests.

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 437**

1  Q   Doug McDermott?

2  A   Doug McDermott is going to testify as well as

3      Chuck Huebner, the same thing.

4  Q   Pat Ottinger?

5  A   Pat Ottinger is going to testify, which I

6      don't know -- that Chief Craft consulted with

7      him to release the BR's investigation.

8  Q   So you think you're going to get the city's

9      attorney to waive the attorney-client

10     privilege in advising his clients of matters

11     and testify in court?

12 A   I list him as a witness. Now, that -- that

13     would be up in the air as far as if that's

14     going to happen or not, Mr. Corry.

15 Q   Do you think the federal judge is going to

16     ask that the attorney-client privilege be

17     waived?

18 A   I don't know what the federal judge is going

19     to ask, Mr. Corry. I can't think of a

20     determination that the judge is --

21 Q   So the only reason you've listed Pat Ottinger

22     is for his communications with his clients,

23     to include Chief Craft?

24 A   No.

25 Q   What else, then?

---

**Page 438**

1  A   It's not only his communications. It's to

2      show that Chief Craft testified and said he

3      consulted with Pat -- not with Pat Ottinger,

4      he consulted with Michael Hebert, who was the

5      city attorney at the time, when it was

6      actually Mr. Ottinger.

7  Q   Okay.

8          MR. CORRY:

9          And Steve, he's not the only lawyer

10         noted. I think my name appears in some

11         of them. I think that needs to be

12         discussed and rethought before we take

13         it up with the Court.

14 MR. CORRY:

15 Q   Pat Ottinger -- or excuse me. Mike Hebert is

16     the same thing?

17 A   Yes, sir.

18 Q   That's the city attorney, current City

19     Attorney Mike Hebert?

20 A   Is that a question you're asking me?

21 Q   Yes. That's it.

22 A   Yes.

23 Q   I want to make sure it's the same name, Mike

24     Hebert.

25         Candice Hattan, that's an attorney as

---

**Page 439**

1      well, right?

2  A   Yes.

3  Q   The board's attorney.

4  A   That's correct.

5  Q   And you're trying to get her to waive her

6      attorney-client privilege to her clients? Is

7      that the reason she's listed?

8  A   It's not for her clients. It's for the

9      implementation of that stay order, which was

10     discussed in a public meeting.

11 Q   So what is it that she's going to give you?

12 A   So if that's attorney-client privilege, I

13     don't know why she was discussing it in open

14     forum.

15 Q   All right. Mac Gallien, I think we talked

16     about him yesterday.

17 A   Mac Gallien is going to correlate the Glen

18     Dartez incident, and he's going to be posed

19     questions as far as why it wasn't reported

20     through the chain of command, to the chief,

21     in which general orders compel them to do.

22         And Chief Craft has stated on more than

23     one occasion, he hold his supervisors,

24     particularly people of higher rank, to a

25     higher standard. And that was never done.

---

**Page 440**

1      Nor was he ever disciplined. Nor did Chief

2      Craft ever launch an investigation on that.

3  Q   All right. Brandon Hargrave, this is the

4      third party that's being brought into this

5      lawsuit that really has nothing to do with

6      it?

7  A   Brandon Hargrave is listed because of the JD

8      investigation in which I received retaliation

9      afterwards.

10 Q   All right. Randy Vincent?

11 A   Randy Vincent is going to be a variety of

12     reasons.

13         JD investigation is one and two, as far

14     as what occurred in both of them. The letter

15     of reprimand, the Glen Dartez. Why he didn't

16     report it? He was afforded preferential

17     treatment. And an investigation wasn't

18     conducted on him due to his close

19     relationship.

20 Q   That's not accurate. You've got documents

21     that show that an investigation was

22     conducted.

23 A   On him for failing to report it to Chief

24     Craft. The incident occurred in June.

25 Q   Did you file a complaint with anybody?

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 441

1 A  About what?
2 Q  On Randy Vincent?
3 A  I didn't need to.  The chief is aware of
4    general orders that governs him to do
5    something, and it was brought to his
6    attention by others.
7 Q  So the answer to my question, was no, you did
8    not file a complaint on Randy Vincent?
9 A  No, sir, not at the time, because there's
10   reprisals for filing a complaint, especially
11   for someone who has a close relationship with
12   Chief Craft.
13 Q  Ted Vincent?
14 A  Olita Magee.  The document, the conversation
15   he had with Scott Poiencot, the recordings
16   where they were secretly listening in on
17   people's conversation without their consent,
18   in which he discussed that in a conversation
19   with Scott Poiencot.
20      The way Internal Affairs was being run,
21   as far as how they were conducting
22   investigations on officers, in which officers
23   were purposely lied in an attempt to coerce
24   them to admit to something, even though they
25   never had any compelling evidence.

Page 442

1       He referenced an incident where
2    Lieutenant Prejean was instructing his IA
3    investigators to lie and say they have
4    statement from a complainant, or a video, in
5    order to compel them to confess to an
6    incident even though they didn't have it at
7    the time.  And basically, how he had that
8    information, or where did he get that
9    information that Chief Craft made a deal with
10   Allyson Prejean to -- for her to stop
11   representing officers in order for Dwayne to
12   be placed in Internal Affairs.
13 Q  All right.  That's another third party that
14   we're bringing into this that's not part of
15   this lawsuit.  That's the Allyson Prejean
16   you're talking about, right?
17 A  She interjected herself in the lawsuit.
18 Q  Okay.  I want to make sure I understand who
19   you're referring to.
20 A  I understand.
21 Q  Jim Craft, we talked about him.
22 A  Yes.
23 Q  Stephen Bajat, we've talked about him.
24   That's the Mickey Shunick incident?
25 A  Not only Mickey Shunick.

Page 443

1 Q  Acadiana High, as well?
2 A  Yes.  Also, there's going to be a current one
3    with Andres Landor, in which he was accused
4    the same thing.
5       If I'm not mistaken, there's a lawsuit
6    that's pending right now in which Andres
7    Landor is the -- filed the lawsuit because he
8    felt that they didn't properly investigate an
9    investigation.
10 Q  Luke Walker, is that the Assistant US
11   Attorney Luke Walker?
12 A  Yes.
13 Q  Another attorney?
14 A  Yes.
15 Q  What's he going to add to this?
16 A  He was aware of the incident involving
17   Stephen Bajat.  Luke -- Mr. Walker initially
18   contacted Stephen Bajat.
19 Q  Andres Landor?
20 A  Andres Landor is going to testify to
21   reprisals similar to ours.  He filed a
22   complaint  against --
23 Q  Does it have anything to do with you?
24 A  Yes.
25 Q  What?

Page 444

1 A  I'm about to tell you.
2       It's similar, because he's a black
3    officer.  He reported misconduct and he was
4    retaliated against.
5       At the time he reported it, and because
6    you said it's a matter of public record, I'll
7    just say the initials of the officer.  The
8    officer is SB, who was having inappropriate
9    relationship with a known prostitute.
10 Q  S what?
11 A  SB.  You did say, don't say his name.
12 Q  Well, if they're not -- you know, the federal
13   judge has spoken on that, so I just don't
14   want to get -- (Interrupted)
15 A  Yeah.  But I don't want to blurt it out and
16   it's on the record.
17 Q  Right.
18 A  So that's why I wanted some clarification.
19 Q  All right.
20 A  In which he had -- he reported the incident
21   in 2010, or it was reported in 2010, and
22   brought to Chief Craft's attention, with Ted
23   Vincent and another officer, Kent Uzbie.  And
24   the chief basically told him in his office,
25   that -- don't say anything, and it doesn't

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

Page 445

1  leave this area.
2      The female that he was -- SB was
3  involved in lodged a complaint. And sometime
4  during the summer of last year. And the
5  complaint was white-washed. And then, he was
6  retaliated against. And he's going to
7  testify as far as what happened.
8  Q  All right. Ron Czajkowski, we have talked
9     about, correct?
10  A  Yes. Ron Czajkowski is going to provide
11     information on the JD -- oh, could you --
12  Q  Yes, take that off. Make it JD.
13  A  JD, both investigations. The Bert Bejsovec
14     investigation.
15  Q  All right. Todd Alcorn?
16  A  Mr. Corry, can I ask you a question?
17  Q  Sure.
18  A  I know it might be really -- it might be a
19     crazy question.
20      Why would you say Bert Bejsovec's name
21     instead of just -- okay. All right. I just
22     want to --
23      Todd Alcorn. I listed Todd Alcorn, but
24     I'm afraid now that I listed him there might
25     be some reprisals.

---

Page 446

1      Todd Alcorn is going to -- I wanted him
2  to be a witness because -- because of our
3  friendship, they started some investigations
4  on him, and for allegedly releasing some
5  documents to Busted in Acadiana.
6  Q  Did he release any documents to Busted in
7     Acadiana, that you know of?
8  A  I don't know, Mr. Corry. He was instructed
9     not to discuss that investigation. The
10     investigation was closed. I never inquired
11     as far as the outcome of it. I didn't think
12     it was a matter of importance.
13      I know he was upset because the
14     questions that was posed in Internal Affairs,
15     he told me was geared towards me being -- him
16     being friends with me. And they were trying
17     to find out if he was communicating
18     information to me.
19  Q  Mike Brown?
20  A  Mike Brown is going to testify to despaired
21     treatment in which black officers receive a
22     harsher treatment versus whites.
23      Mike Brown is going to attest that he
24     received a 45-day suspension for failing to
25     properly conduct a search of a building, and

---

Page 447

1  several white officers --
2  Q  Do you know if he appealed that?
3  A  No. I'm not 100 percent sure.
4  Q  Because if he didn't appeal it, it's private.
5  A  It's not private if he's willing to discuss
6     it.
7  Q  It's absolutely his right.
8  A  Yes.
9  Q  But I don't know if we have that information
10     here.
11  A  I have him down here, because I had a
12     discussion with him and he has no qualms of
13     testifying.
14  Q  Okay.
15  A  And several officers did the same thing, and
16     received a one and two-day suspension, but
17     they were white officers.
18  Q  All right. Kenneth Hardy?
19  A  Kenneth Hardy. Kenneth Hardy is going to
20     testify that he received a three-day
21     suspension for allegedly --
22  Q  Did he appeal that?
23  A  Yes, he did.
24  Q  And I think it was dismissed before there was
25     a hearing.

---

Page 448

1  A  Mr. Corry, once you appeal a -- let me. Go
2     ahead.
3      MR. CORRY:
4          Let's go off the record for a
5      second.
6      (DISCUSSION HELD OFF THE RECORD)
7  MR. CORRY:
8  Q  Let's go back on the record.
9      All right. Zeryk Guillory. I know what
10     that's about. That's the -- they tried
11     something in civil service. Is that the sick
12     leave deal?
13  A  Yes.
14  Q  All right.
15  A  There's going to be one more that I
16     omitted.
17  Q  Who is that?
18  A  You.
19  Q  Are you going to list me?
20  A  Yeah.
21  Q  Okay.
22      MR. CORRY:
23          We'll take that up in Court.
24  A  Okay.
25      MR. CORRY:

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

---

**Page 449**

1      Do you have those complaints?
2  MR. SPRING:
3      Can we take five minutes to smoke a
4  cigarette?
5  MR. CORRY:
6      Yes.
7      (SHORT BREAK TAKEN FROM
8      4:06 P.M. TO 4:15 P.M.)
9  MR. CORRY:
10 Q  Do you know anything about the Stanley/Craft
11    organization?
12 A  Yes.
13 Q  What?
14 A  Basically, it's an organization that its
15    almost like Mafia style, that if you go
16    against the machine, there's reprisals that's
17    going to happen.  You can't go against them.
18      If you disagree with them in any form or
19    fashion, verbally, or written, they're going
20    to retaliate against you, by either starting
21    investigations, transferring you, changing
22    your working hours.  And they're going to
23    solicit the help of others in the department
24    to do it where it doesn't directly appear on
25    the surface that it's them actually doing it.

---

**Page 450**

1  Q  Greg, we've talked for two days.  Is there
2     anything that we have not covered that is
3     significant to the claims you've asserted in
4     your lawsuit?  I can't imagine there is,
5     but --
6  A  That's all I can think of right now.
7  MR. CORRY:
8      Okay.  And just for purposes of
9  clarity with the record, Steve, since we
10 have been produced so many different
11 documents.  GC-1 through 139 are the
12 documents we initially received with the
13 original discovery requests of December
14 13th, 2013.
15     140 through 577 is the binder that
16 Mr. Cormier left here at one of the
17 earlier depositions.  There were some
18 documents that he felt were included,
19 that based on the file, or based on the
20 binder that he gave us, they're not
21 there.  But be that as it may, since
22 then, he has produced, or he has
23 compared what we had and given us the
24 documents that were not included.  And
25 those include documents received -- and

---

**Page 451**

1      actually, the ones I referenced earlier,
2  GC-140 to 577, were received on February
3  20th of 2014.
4      And then, today, we received 578
5  through 682, which is the documents,
6  after comparing the exhibit book
7  yesterday to Mr. Cormier's binder over
8  the night, he realized that these were
9  not in there, produced them to us.
10     And then, yesterday, at the start
11 of his deposition, GC-683 through 693
12 were given to us.  And I think actually
13 they -- most, if not all of them, are
14 included in 578 through 682.
15     But we have them all now.  I think
16 we can agree on that.
17 MR. SPRING:
18     Yes.
19 MR. CORRY:
20     Greg, is that fair?
21 THE WITNESS:
22     Yes.
23 MR. CORRY:
24     Okay.  I don't know that I need to
25 attach all of this.  I'm just going to

---

**Page 452**

1  keep it in a folder, it'll be 1 through
2  693.  And you should have a copy of it.
3  If you don't, we can --
4  MR. SPRING:
5      Let me ask you something.  When
6  they do the Bates stamp thing like that,
7  is there a way to cut and paste?  Like
8  is there a PDF to cut and paste it?
9  Like, can you put it on a CD or
10 something?
11 MS. COREIL:
12     We can probably -- you want a copy
13 just like exactly we have it with the
14 Bates numbers in the Bates sorter?  We
15 can get you a copy just like that.
16 MR. CORRY:
17     I can send you a complete copy.
18 MR. SPRING:
19     That will be great, if you could.
20 MR. CORRY:
21     All right.  And then, I'm not going
22 to attach them.  I'm just going to
23 attach what we have there.
24     And I'm going to make sure that the
25 binder, all the copies are put in there.

---

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Greg Cormier
March 31, 2014

Page 453

1          It's simple, because it's 1 through --
2     MS. COREIL:
3          693.
4     MR. CORRY:
5          Pardon?
6     MS. COREIL:
7          693.
8     MR. CORRY:
9          -- 693.
10         And you are going to reserve your
11    right to read and sign?
12    MR. SPRING:
13         Yes.
14    MR. CORRY:
15         Okay.  That's it.  Thank you.
16    (DEPOSITION CONCLUDED AT 4:21 P.M.)
17
18
19
20
21
22
23
24
25

Page 454

1                    CERTIFICATE
2
3          This certification is valid only for a
transcript accompanied by my original signature
4    and original required seal on this page.
5
6          I, Debbie G. Chaney, Certified Court
Reporter, in and for the State of Louisiana, as
the officer before whom this testimony was taken,
7    do hereby certify that GREGORY CORMIER, after
having been duly sworn by me upon authority of
8    R.S. 37:2554, did testify as hereinbefore set
forth in the foregoing four hundred fifty-three
9    (453) pages; that this testimony was reported by
me in the stenotype reporting method, was prepared
10   and transcribed by me or under my personal
supervision, and is a true and correct transcript
11   to the best of my ability and understanding; that
the transcript has been prepared in compliance
12   with transcript format guidelines required by
statute or by rules of the board, as described on
13   the website of the board; that I have acted in
compliance with the prohibition on contractual
14   relationships, as defined by Louisiana Code of
Civil Procedure Article 1434 and in rules and
15   advisory opinions of the board; that I am not
related to counsel or the parties herein, nor am I
16   otherwise interested in the outcome of this
matter.
17
18   This the 17th day of April, 2014, at LAFAYETTE,
19   LOUISIANA.
20
21
22   _____
          DEBBIE GIDDINGS CHANEY, CCR
          LOUISIANA CERTIFICATION NO. 90023
23
24
25

LAFAYETTE POLICE DEPARTMENT
INTEROFFICE COMMUNICATION
SL NOTICE/INSTRUCTIONS

| TO: | DIVISION: | Patrol |
|---|---|---|
| FROM: Sgt. Keith J. Gremillion | OFFICE: Internal Affairs | |
| SUBJECT: | DATE: | |

Major,

Chief of Police James Craft has ordered a shift-level administrative investigation relevant to a complaint filed by _____. The investigative tracking number that has been assigned to this shift-level administrative investigation shall be SL-_____. Below is general instructions/information for you to follow:

This investigation and disciplinary action if any must be completed within sixty days. If you foresee a delay you must either get a 30-day extension from the employee(s) under investigation or notify the Chief's office to petition the Lafayette Fire and Police Civil Service Board for an extension. The starting date for this investigation is _____.

Any related case documents generated during this shift-level administrative investigation should reflect the above case number.

At the conclusion of the investigation, please forward the original completed product to the office of Internal Affairs.

The investigation packet will be presented to Chief James Craft for review. He will determine the disposition and respond to the reporting party through his or designee's office.

In the event the Chief of Police convenes the Department's Pre-Disciplinary Review Board to review this investigation his office will assume this task

If you should need anything else please do not hesitate to contact me or any of the Internal Affairs personnel.

Thanks,

Sgt. Keith J. Gremillion #673

EXHIBIT
D1

Exhibit "A"

PENGAD 800-631-6989





POLICE DEPARTMENT

TEL: (337) 291-8600
900 E. UNIVERSITY AVE.
P. O. BOX 4308
LAFAYETTE, LOUISIANA 70502

September 12, 2012

Lieutenant Gregory J. Cormier (3120-8564)
Lafayette Police Department
900 E. University Ave
Lafayette, LA 70503

Lieutenant Cormier:

An Internal Affairs investigation (AD2012–007) was completed regarding an allegation of employee misconduct in reference to official, confidential, interoffice communication originating in the Internal Affairs Unit being copied and/or removed from the Lafayette Police Department (LPD) and given to a local attorney without appropriate permission or authorization. Additionally, during the course of this investigation, confidential information contained in Shift-Level investigation (SL 2011-028) was published in a federal lawsuit signed and verified by you. Furthermore, a public website created for and/or on behalf of you was launched on the Internet.

A pre-disciplinary hearing was held on September 7, 2012 wherein you provided a verbal statement. In reference to all allegations cited, you stated "I did not do it."

The Internal Affairs investigation report and your verbal statement as provided at the pre-disciplinary hearing was carefully reviewed and considered. It was noted that your verbal statement provided at the pre-disciplinary hearing was inconsistent with your statement provided to Internal Affairs. During the Internal Affairs investigation, you admitted that you copied Internal Affairs documents related to administrative or shift level investigations. You could not recall the number of times you had copied confidential documents. You also admitted to Internal Affairs that you had released internal documents to an unauthorized person on one occasion. You released the subject document to Corporal Scott Poiencot without any authorization. The subject document which had been obliterated was taken from a Shift Level investigation (SL2011-028) of which you were the investigating officer. All identifying information contained in said document had been redacted except for the LPD Internal Affairs Sergeant's signature. The altered document or a copy thereof was provided to a local attorney who represented a LPD officer in a Municipal Fire and Police Civil Service appeal hearing. Subsequently, the attorney used the document as an exhibit in a legal brief which was presented before the Municipal Fire and Police Civil Service Board.

Although you asserted that you gave Corporal Poiencot the document because you believed it contradicted the policies and procedures followed in the past, at no time did you attempt to discuss your concerns about the subject document with your superior officers, nor did you file a formal grievance or request a discussion on the matter before the Municipal Fire and Police Civil Service Board. Instead, you chose to take matters into your own hands and released the document without authorization.

I have sustained the complaint of employee misconduct. Your recent actions were deemed to constitute violation of the following:



Lt. Gregory J. Cormier                                                     page 2          9-12-2012

## LAFAYETTE CONSOLIDATED GOVERNMENT POLICY AND PROCEDURES

### PPM: 2161-2:  Conditions of Employment

**2.        Prohibitions**

2.7        "Unauthorized removal or use of any official correspondence, record, computer file, e-mail or report from any LCG building, office or file."

2.28       "Conduct deemed unbecoming of an employee of the LCG in dealing with fellow employees, supervisors, and superiors, and/or members of the public."

## LAFAYETTE POLICE DEPARTMENT GENERAL ORDERS:

### G.O. 201.2 PROFESSIONAL CONDUCT AND RESPONSIBILITIES

**Professional Conduct**

J.         "Employees shall not perform any actions which disrupt the performance of official duties or which tend to interfere with reasonable supervision and discipline."

**Responsibilities**

C.         "Employees shall abide by all Federal, State, and Local Ordinances, as well as, LCG PPM's, Department Written Directives, General Orders, Standard Operating Procedures, and rules of the Civil Service Board."

**Attention to Duty**

C.         "Employees, whether on or off duty, shall follow the ordinary and reasonable rules of good conduct and behavior. They shall not commit any act in an official or private capacity that would bring reproach, discredit, or embarrassment to their profession, the Department, or which could constitute conduct unbecoming by an employee. Employees shall follow established procedures in carrying out their duties, and shall at all times use sound judgment."

**Reporting to Supervisor**

A.         "Every employee shall seek to protect the integrity of the Department."

### G. O. 204.5 DEPARTMENTAL DISCIPLINE

**Category 3 Offenses**

**3:5       Unauthorized Public Statements**

"Except as specified in General Order 305.1, no employee shall be authorized to release information to the news media, except as authorized by the Chief of Police."

**3:8       Confidentiality**

"All departmental business is to be considered confidential and no employee shall release any information to any non-law enforcement entity without proper authorization.  No employee shall make known to anyone a proposed action of the Department or the details of any police action/operation."

Lt. Gregory J. Cormier                                                    page 3              9-12-2012

### G. O. 301.9 INTERNAL INVESTIGATION, RESPONSIBILITY OF DEPARTMENT PERSONNEL TO COOPERATE

**Confidentiality Policy**

A.    "The Internal Affairs Section shall be responsible for recording, registering, supervising, and controlling all records, reports, documents, information and items that are part of an Internal Affairs investigation. Information or copies of internal investigations shall not be furnished to anyone without permission from the Chief of Police.  Internal investigations will be kept in the secure confines of the Internal Affairs Section with only employees of the Section having access to the files unless otherwise directed by the Chief of Police. (CALEA – 52.1.2)"

I also reference the **Louisiana Municipal Fire and Police Civil Service Rules: LA. R. S. 33:2500: Corrective and Disciplinary Action for Maintaining Standards of Service:**

A.    "The tenure of persons who have been regularly and permanently inducted into positions of the classified service shall be during good behavior. However, the appointing authority may remove any employee from the service, or take such disciplinary action as the circumstances warrant in the manner provided below for any one of the following reasons"

3. "The commission or omission of any act to the prejudice of the departmental service or contrary to public interest or policy."

As an employee of the Lafayette Police Department, your actions reflect upon the reputation and image of the organization and our community, at all times whether on or off duty. You must understand that as public servants we are hired to provide and/or perform services in an efficient and professional manner for the citizens, which we serve. As a Lieutenant, it is crucial that your actions demonstrate sound judgment and portray good decision-making. Your recent actions have demonstrated dishonesty and untruthfulness and tainted your trustworthiness which has caused embarrassment and projected a negative image upon the reputation and integrity of the Lafayette Police Department and our Officers. This level of performance is unacceptable, as it is counterproductive to the mission of the Lafayette Police Department which is an integral part of the Lafayette Consolidated Government.

I would be remiss in my duties, as the Police Chief, to uphold the accountability and integrity of the Lafayette Police Department and our Officers, if I did not administer disciplinary action. Due to the seriousness of your recent actions, I find it in the best interest of the Lafayette Police Department and the Lafayette Consolidated Government to terminate your employment. This letter is your *official notification* that **your employment with the Lafayette Police Department is terminated effective September 12, 2012.** As you are aware, the Municipal Fire and Police Civil Service Rules provide you a right to appeal this action. If you wish to appeal, you must submit a written request to the Fire and Police Civil Service office within fifteen (15) days.



**Jim Craft**
**Police Chief**

C: City-Parish President, L. J. Durel, Jr.
    Chief Administrative Officer, Dee Stanley
    Chairman, Municipal Fire and Police Civil Service Board
    State Examiner, Municipal Fire and Police Civil Service Board
    Secretary, Municipal Fire and Police Civil Service Board
    Human Resources

Personnel Office Review
as to form and procedure
_____   09/12/12
Initials                      Date

### ACKNOWLEDGMENT RECEIPT OF DISCIPLINARY ACTION

I acknowledge receipt of a letter of termination which includes details of the infraction(s) which resulted in this action. I also acknowledge I am aware the Fire-Police Civil Service requirements stipulate a request for an Appeal of this disciplinary action must be filed with the Fire-Police Civil Service Office within fifteen (15) days.


*Senyoo Attorney*   9/12/12

Employee Signature          Date
Print Name:


Supervisor:


*signature*   9/12/2012

Signature                        Date
Print Name:  George J. Alfred