

RECEIVED
MAY 3 0 REC'D 2012

# Internal Memorandum

**Chief Administrative Officer (CAO)**
CAO–Administration (1210)

**TO:** Jason Boudreaux, Chair
Police & Fire Civil Service Board

**DATE:** May 29, 2012

**FROM:** Dee Stanley

**SUBJECT:** Lt. Gregory Cormier Complaint

---

As you know, in your absence the Fire and Police Civil Service Board voted 4-0 on April 11, 2012 not to Investigate Lt. Gregory Cormier's complaint of "Public Payroll Fraud" against a Lieutenant in the Lafayette Police Department. Rather, the Board allowed the LCG Administration to investigate these allegations as reflected in my April 9, 2012 memorandum to Human Resources Manager Ray Domingue, of which you received a copy.

This is to advise you that this investigation has been completed by Human Resources (HR) and there is absolutely no basis for the allegation. The complaint filed against this officer is **unfounded.**

According to the findings by HR, Lt. Cormier based his complaint on the following rationale:

A meeting was held which included the Lieutenant who is the subject of Lt. Cormier's complaint (Lt. B), and their supervisor, a police Captain. At that meeting the Captain assigned tasks to each Lieutenant in an effort to equalize the tasks assigned to each individual. The Downtown Detail was listed as one of the duties that were assigned to Lt. B. Lt. Cormier took that to mean that the Detail was part of the scope of the regular police duties assigned to Lt. B. Lt. B is filing time sheets with overtime slips for four (4) hours of "Administrative Duties" for each pay period.

Lt. B is not indicating when this work is done nor that it is outside of his normal scope of duties. Lt. B is emailing the Detail work schedule during work hours and using the Police Department "police officer distribution list" to distribute it. Police officers requesting changes to the schedule are emailing requests during normal working hours.

Lt. B's position on this matter when interviewed by HR is as follows:

The former supervisor of the Downtown Detail approached Lt. B and informed him that Chief Jim Craft had authorized the Downtown Detail to be transferred to him. Lt. B met with Chief Craft to discuss this assignment. It was understood by the chain of command that Lt. B reported directly to Chief Craft on all matters associated with this Detail.

Lt. B indicates that he works on most of the scheduling for the Downtown Detail from his home office. He indicates that the time associated with the initial schedule and most supplemental changes made to the Detail schedule are done outside of his normal scope of work hours. He works two/three days a week as the evening Lieutenant between the hours of noon to eight PM. The other days he works an eight-hour shift during the day. He does acknowledge that he does email the assignment list during work hours. Lt.



EXHIBIT F

Lt. Greg Cormier Complaint
May 29, 2012

B also stated that when he works the Downtown Detail he will arrive at least one hour before the Detail is scheduled to begin and does not record any of those hours as overtime for the Detail. Lt. B indicates that he is working more than four (4) hours overtime per pay cycle on his duties with the Downtown Detail that are outside of the scope of his normal duty hours.

An interview was conducted with Major Randal Vincent:

Major Vincent stated that he had approved the time entry for Lt. B as submitted, which included the four (4) hours of overtime for "Administrative Duties." He was aware that Lt. B was assigned the Downtown Detail. He is of the opinion that this was an additional detail and not considered a regular duty assigned to a Lieutenant on a day-to-day basis. He is aware that Lt. B does spend time at home working on this Detail and he believes the overtime slips are accurate and justified.

An interview was conducted with Captain Ronald Czajkowski:

Capt. Czajkowski is the immediate supervisor for both Lt. B and Lt. Cormier. He recalls the meeting mentioned by Lt. Cormier where the duties were enumerated for each of the Lieutenants in the Patrol Support Section. He did mention the Downtown Detail as a responsibility for Lt. B, but did not mean that it was a duty that was entirely within the scope of his everyday work. Capt. Czajkowski states that he was aware that Lt. B was performing scheduling of the Downtown Detail at home and not during his regularly scheduled work hours. He was also aware that Lt. B received many requests to make modifications to the schedule as the result of officers requesting to make changes to the schedule for a variety of reasons. He was aware that Lt. B received some emails during the normal work cycle but also that he received calls and emails that were not within his regular work time. The adjustments to the schedule are numerous and take a great deal of time and some are done outside of the normal scope of Lt. B's normal work schedule. Capt. Czajkowski did review the time sheets and overtime slips submitted by Lt. B and had no reservations about signing the documents. He believes that Lt. B contributes more than four (4) hours per pay cycle of work outside of his normal scope of work and that the time submitted by Lt. B for "Administrative Duties" is probably less than the time he actually spends on the project outside of his normal work hours.

An interview was held with Chief Jim Craft:

Chief Craft acknowledges that he assigned the Downtown Detail to Lt. B. He recalls meeting with Lt. B on several occasions to discuss the Detail. He is aware of several instances when he and Lt. B were required to attend meetings dealing with the Detail that were outside the normal scope of his work cycle. Chief Craft is aware that overtime is being charged for "Administrative Duties" and believes that Lt. B is spending more than four (4) hours per pay cycle doing work for the Downtown Detail.

HR also conducted a review of the following documents:

The PPM cited by Lt. Cormier, PPM 2161-2 Conditions of Employment Section 2.14 "Deliberate Falsification of any form or report."

If Lt. B were deliberately reporting inaccurate overtime for "Administrative Duties" associated with the Downtown Detail for time worked during his normal work hours then this PPM would be applicable.

LPD General Orders cited would also be applicable if the allegation is sustained.

The time records submitted by Lt. B do include four (4) hour time slips for overtime for "Administrative Duties for Downtown Detail". There is no detail as to when the hours are worked on the time slip; however, it clear from the investigation that Lt. B works these hours while off duty at various times during the payroll period.

**Overtime Authorization Reports from the former supervisor for the Downtown Detail, Captain A.**

Captain A's overtime sheets consistently show four (4) hours of overtime for "scheduling" of the Downtown Detail.

Conclusion:
Lt. Cormier did acknowledge in his interview that he was not aware of when or where Lt. B was actually completing the work schedule for the Downtown Detail but that he was "led to believe" that this was an

Lt. Greg Cormier Complaint
May 29, 2012

integral part of Lt. B's normal duties and was being done during his normal work cycle. Lt. Cormier's complaint states "Lt. B is submitting the schedule for the Detail during the day. Public perception is he is scheduling the Detail during his normal work hours."

Lt. B indicates that he is preparing the schedule for the Downtown Detail at his residence outside of the normal scope of his everyday duties. He has not listed a particular time or date for the overtime allocated because it is an on-going process throughout the entire pay cycle. Captain A also completed overtime authorization reports and did show a date worked, but also did not show a start and stop time for scheduling the Downtown Detail for the same reasons already stated.

There is no requirement listed in either the LCG PPM's or LPD General Orders that stipulate time and date are required on overtime slips.

It is clear from this investigation that Lt. B not only worked the overtime hours in question, but that he likely exceeded the number of hours worked. This information is verified by his immediate supervisor, Captain Czajkowski, Major Vincent, and Chief Craft. The practice is also consistent with the activities of the supervisor (Capt. A) who immediately preceded Lt. B.

I must also respond to the final paragraph of Lt. Cormier's complaint, which states: "I am also requesting that the board be discreet in not alerting the Chief of this request. This would peril the investigation, as well as the Chief seeking vengeance against anyone associated with cooperating with this investigation."

For the record, it was Chief Craft himself who brought this complaint to my attention asking that it be immediately investigated by Human Resources. An investigation was ordered that very day. For the Board or the administration to "discreetly" investigate a police officer would be a violation of Board policy, as well as the Police Officers Bill of Rights.

*Dee E. Stanley*

Dee E. Stanley
Chief Administrative Officer

C: Joey Durel
Mike Hebert
Ray Domingue
Jim Craft