# In The Matter Of:

*Kane Marceaux, et al vs.*

*Lafayette City-Parish Consolidated Government, et al*

---

*Gabe Thompson*

*February 19, 2014*

---



LORI HEAPHY
&ASSOCIATES LLC
CERTIFIED COURT REPORTERS



EXHIBIT
G

Min-U-Script® with Word Index

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

---

Page 1

```
1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF LOUISIANA

3                   LAFAYETTE DIVISION

4    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
     KANE MARCEAUX, GREG
5    CORMIER, SCOTT POIENCOT,
     NORBERT MYERS, GABE THOMPSON,      CIVIL ACTION NO:
6    NOVEY SPELLY, ULETOM P. HEWITT,     6:12-CV-01532
     REGINA BRISCOE AND ALEETA
7    M. HARDING                         JUDGE HAIK, SR.
                VERSUS               MAG. JUDGE HANNA
8    LAFAYETTE CITY-PARISH CONSOLIDATED
     GOVERNMENT; LAFAYETTE POLICE
9    DEPARTMENT THROUGH THE LAFAYETTE
     CITY-PARISH CONSOLIDATED GOVERNMENT;
10   LESTER JOSEPH "JOEY" DUREL, JR.
     IN HIS CAPACITY AS PRESIDENT OF
11   THE LAFAYETTE CITY-PARISH
     CONSOLIDATED GOVERNMENT; DEE
12   EDWARD STANLEY, INDIVIDUALLY AND
     IN HIS CAPACITY AS CHIEF ADMINISTRATIVE
13   OFFICER OF THE LAFAYETTE CITY-PARISH
     CONSOLIDATED GOVERNMENT; JAMES P.
14   "JIM" Craft, INDIVIDUALLY AND IN
     HIS CAPACITY AS CHIEF OF THE
15   LAFAYETTE POLICE DEPARTMENT, AND
     GEORGE "JACKIE" ALFRED, INDIVIDUALLY
16   AND IN HIS CAPACITY AS PATROL DIVISION
     COMMANDER OF THE LAFAYETTE
17   POLICE DEPARTMENT
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
18

19        The deposition of GABE THOMPSON was taken in

20   the above-entitled cause, pursuant to the following

21   stipulations, before Debbie G. Chaney, Certified

22   Court Reporter, at The Law Offices of Briney, Foret

23   & Corry, 413 Travis Street, Suite 200, Lafayette,

24   Louisiana, on the 19th day of February, 2014,

25   beginning at 10:07 a.m.
```

---

Page 2

```
1                 A P P E A R A N C E S

2

3    MR. MICHAEL P. CORRY, ATTORNEY AT LAW
     MS. HALLIE P. COREIL, ATTORNEY AT LAW
4    BRINEY, FORET & CORRY
     413 Travis Street
5    Lafayette, Louisiana  70505
          REPRESENTING LAFAYETTE CITY-PARISH
6         CONSOLIDATED GOVERNMENT, DEE EDWARD STANLEY,
          INDIVIDUALLY, JAMES P. "JIM" Craft,
7         INDIVIDUALLY, AND GEORGE "JACKIE" ALFRED,
          INDIVIDUALLY

8

9    MR. S. STEPHEN SPRING, ATTORNEY AT LAW
     SPRING & SPRING, LLC
10   733 East Airport Avenue, Suite 104
     Baton Rouge, Louisiana  70806
11        REPRESENTING PLAINTIFFS

12

13   MR. J. CHRISTOPHER ALEXANDER, SR., ATTORNEY AT LAW
     J. CHRISTOPHER ALEXANDER, SR., ESQ. LLC
13   3751 Government Street, Suite A
14   Baton Rouge, Louisiana  70806
          REPRESENTING PLAINTIFFS

15

16   ALSO PRESENT:
17        Mr. Uletom Hewitt
          Mr. Greg Cormier

18

19

20

21

22

23

24

25
```

---

Page 3

```
1           S T I P U L A T I O N S

2

3    It is stipulated and agreed by and between

4    counsel for the parties that the deposition of GABE

5    THOMPSON, is hereby taken for discovery purposes

6    and all other purposes allowable under the Federal

7    Rules of Civil Procedure.

8

9    That the witness reserves the right to read and

10   sign the deposition;

11

12   That all formalities of sealing, certifying

13   and filing are waived.

14

15   That all objections, except those as to the

16   form of the question and the responsiveness of

17   the answer, are reserved until such time as this

18   deposition or any part thereof may be used or

19   sought to be used in evidence;

20

21   That, Debbie G. Chaney, Certified Court

22   Reporter officiated in administering the oath to

23   the above-mentioned witness.

24

25
```

---

Page 4

```
1                      INDEX

2
                                                    Page
3
     Examination By Mr. Corry                         5
4
     Examination By Mr. Spring                      250
5
     Re-Examination By Mr. Corry                    292
6
                       EXHIBITS
7
          Description
8
     1    Driver's license                            9
9
     2    Resume                                      31
10
     3    Internal memorandum (3/4/11)               240
11
     4    Discovery requests                         83
12
     5    Internal memorandum (5/22/12)              246
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 5

1      GABE THOMPSON,
2  after being first duly sworn, was examined and
3  testified as follows:
4      THE WITNESS:
5      Yes, ma'am, I do.
6      EXAMINATION
7  BY MR. CORRY:
8  Q  Mr. Thompson, would you state your full name
9     and address for the record, please?
10 A  Gabriel Sterling Thompson.  And I live at 108
11    Fountain View Drive, it's two words,
12    Youngsville, Louisiana.
13 Q  Have you ever given a deposition before?
14 A  Yes.
15 Q  In connection with your police work?
16 A  That is correct, sir.
17 Q  Have you ever given one outside of police
18    work?
19 A  No, sir.
20 Q  All right.  I'm Michael Corry, you know that.
21    I represent the city, and the chief, and Major
22    Alfred and Dee Stanley in a lawsuit that's
23    been filed in federal court.  I'm here to take
24    your deposition.
25        If you don't understand something, don't

Page 6

1  remember something, don't understand my
2  question, just tell me and we'll rephrase it.
3  All right?
4  A  Yes, sir.
5  Q  And respond out loud.  Good.
6      MR. SPRING:
7      Michael, before you go, we will want
8  to read and sign.
9      MR. CORRY:
10     Okay.
11     MR. SPRING:
12     And I don't know if we said anything
13 on Kane --
14     MR. CORRY:
15     Kane?
16     MR. SPRING:
17     -- if they want to do the same
18 thing.  I don't know if Chris did.
19     MR. CORRY:
20     He did.
21     MR. SPRING:
22     Okay.  Great.
23     MR. CORRY:
24     Didn't he?
25     MS. COREIL:

Page 7

1      Yes.
2      MR. CORRY:
3      Okay.
4  MR. CORRY:
5  Q  So just tell me, and we can -- if I need to
6     clarify the question, I will.
7  A  Absolutely.  Yes, sir.
8  Q  Okay.  All right.  If at any time you need to
9     take a break, tell me and we can take a break.
10       If, as we go through the deposition,
11    something comes back to you that we talked
12    about earlier that you remembered, and you
13    want to go back and go through that, that's
14    fine.
15 A  Okay.
16 Q  Just let me know.  I'd rather get all the
17    information than not enough.
18       How long have you lived at the address at
19    Fountain View?
20 A  2005.  December of 2005, until present.
21 Q  And who lives there with you?
22 A  Me, my wife and my kids.
23 Q  Okay.  And what is your wife's name?
24 A  Alexia Thompson.
25 Q  And is she employed?

Page 8

1  A  No, sir.  She's currently unemployed.
2  Q  Okay.  And how many children do you have?
3  A  Two.
4  Q  And what are their names and ages?
5  A  Marlena Gabriella Thompson, and she is 19.
6     And Marcus Gabriel Thompson, eight.
7  Q  Eight?
8  A  Yes.
9  Q  Have you only been married to this one lady?
10 A  Yes.
11 Q  And are these the only children that you have?
12 A  Yes.
13 Q  Where did you live before Fountain View?
14 A  Before Fountain View, I lived at 117 Socrates
15    Place, Lafayette.
16 Q  How long were you there?
17 A  If I can refer to my notes, I can give you an
18    exact date.  I just want to make sure.
19 Q  Sure.
20 A  I want to give you the right one.
21     Socrates, I was there from 1993 to 2005.
22 Q  Okay.  Are you from Lafayette?
23 A  No, sir.
24 Q  Where are you from?
25 A  Originally from Port Barre.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

---

Page 9

1  Q   And how long have you been in Lafayette?
2  A   From 1987 to the present.
3  Q   Okay.  Where did live before the Socrates
4      address?
5  A   Socrates, I lived at 201 High Meadows
6      Boulevard, Apartment 201, in Lafayette.
7  Q   Okay.  And how long were you there?
8  A   I was there from 1990 to 1993.
9  Q   Okay.  What is your date of birth, Gabe?
10 A   October 8, 1967.
11 Q   How old does that make you?
12 A   46.
13 Q   Okay.  And your Social?  And we'll just put
14     the last four on the record.
15 A   6187.
16 Q   And do you have your driver's license with
17     you?
18 A   Yes, I do.
19 Q   Okay.  I'll make a copy of that.
20         What is the number on it?
21 A   Driver's license number, 2714573.
22 Q   Has the license ever been suspended or revoked
23     for any reason?
24 A   No, sir.
25 Q   What's your height and weight?

---

Page 10

1  A   Right now, I'm 5'8", and I guess I'm about
2      maybe 245, 250, right now.
3  Q   Okay.  Are you on any medications?
4  A   No, sir.
5  Q   Do you have any health conditions?
6  A   No, sir.
7  Q   I assume you've never been arrested --
8  A   No, sir.
9  Q   -- or convicted of any crimes.
10 A   No, sir.
11 Q   Never been treated for alcohol or drug
12     abuse?
13 A   No, sir.
14 Q   Never been treated for psychological or
15     psychiatric conditions?
16 A   No, sir.
17 Q   Ever served in the military?
18 A   No, sir.
19 Q   Who's your family doctor?
20 A   Dr. Calvin White.
21 Q   How many times do you think you've been
22     deposed?
23 A   If I remember correctly, twice.
24 Q   Before today?
25 A   Yes, sir.

---

Page 11

1  Q   Tell me, what was the nature of those?
2  A   Both were as a police officer.  Vehicle
3      crashes that I investigated as a police
4      officer.
5  Q   Okay.
6  A   In civil cases.
7  Q   All right.  Have you ever been named as a
8      defendant in a case while you were working for
9      the Lafayette Police Department?
10 A   Yes.
11 Q   Tell me about that.
12 A   I was sued in reference to an on-the-duty
13     vehicle crash.
14 Q   When?
15 A   That would have been in either 1990 -- late
16     1990, mid '91.
17 Q   You ran into somebody in your car?
18 A   Yes, sir.
19 Q   Did the city pay out on that?
20 A   They settled out of court, yes.
21 Q   Okay.  And you were deposed in that case?
22 A   No, sir.
23 Q   All right.  What other times have you been
24     sued as a defendant?
25 A   That's it.

---

Page 12

1  Q   That's the only time?
2  A   That's it.
3  Q   Have you ever filed a lawsuit other than the
4      TRO and the federal suit that we're here
5      about?
6  A   No, sir.
7  Q   Were you party to the -- any of the mandamus
8      proceedings that Mr. Marceaux brought --
9  A   No, sir.
10 Q   -- in state court?
11 A   No, sir.
12 Q   Have you ever filed for unemployment?
13 A   No, sir.
14 Q   Bankruptcy?
15 A   No, sir.
16 Q   Have you ever had any proceedings instituted
17     against you for any type of garnishment?
18 A   There was one that the city made an error, but
19     I can't remember what it was for.  But somehow
20     they had received some kind of paperwork for a
21     garnishment.  And when it came to my
22     attention, I immediately went to human
23     resources and they said it was an error on
24     their part and they corrected that.  So I
25     couldn't tell you beyond that.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 201

---

**Page 13**

1  Q   When was that?
2  A   Oh, God.  I couldn't tell you.  I really
3      couldn't tell you.
4  Q   Was it within the past five years?
5  A   No.  Probably longer than that.
6  Q   Okay.  Has there ever been garnishment
7      proceedings instituted against you for failure
8      to pay taxes?
9  A   Oh, no, sir.
10 Q   Do you have a recording device today?
11 A   No, sir.
12     MR. CORRY:
13         Does anybody else?
14     MR. SPRING:
15         Uh-uh (no).
16 MR. CORRY:
17 Q   Have you been party to any lawsuit on behalf
18     of either your wife or your children?
19 A   No.
20 Q   Tell me about your education, Gabe.
21         Do you mind if I call you Gabe?
22 A   No, that's fine.
23 Q   Okay.  Call me Michael.
24 A   Okay.  I graduated from Port Barre High, 1985.
25     Attended USL in the summer of '85, and went up

---

**Page 14**

1      until 1989.  Got 104 college credit hours.
2  Q   Why didn't you finish?
3  A   I know.  I actually started working for the
4      police department.  And I'm very close.  I'm a
5      senior.
6  Q   Any other education?
7  A   No, sir.
8  Q   What were you studying at UL?
9  A   Criminal justice.
10 Q   What's the first job you held?
11 A   The first job was as a university police
12     officer.
13 Q   At UL?
14 A   Yes, sir.
15 Q   What years was that?
16 A   1987 to '89.
17 Q   They let students work as police officers?
18 A   Yes, sir.  And that's what's called the
19     student officer program while you're attending
20     school.  It's pretty much like any other job
21     that you have on campus.  But that's what it
22     was, university police officer student
23     officer.  You had full-time people who worked,
24     and also, you had people that attended the
25     university who also worked as police

---

**Page 15**

1      officers.
2  Q   You did like school work type of stuff, or --
3      I mean, office type stuff?
4  A   No.  No, you were a uniformed police officer.
5      Actually, that's where I got my POST
6      certification.  They sent me to the police
7      academy.  Full fledged commissioned police
8      officer.
9  Q   And you did that for two years?
10 A   Yes, sir.
11 Q   Did you ever have any incidents with the
12     university police where you were disciplined,
13     demoted, written up, anything like that?
14 A   No, sir.
15 Q   And then, where did you go?  Where did you
16     attend the police academy?
17 A   At ALETA, Acadiana Law Enforcement Training
18     Academy.
19 Q   And where did you go from there?
20 A   From there, I went to the Lafayette Police
21     Department.
22 Q   When did you apply to the police department?
23 A   I would have applied in, I guess mid-1989,
24     sometime.  I couldn't give you the exact date.
25     But I was hired on January 8th, 1990.

---

**Page 16**

1  Q   Who was the chief then?
2  A   Gary Copes.
3  Q   Did they send you for training at that time?
4  A   No, sir.  Like I said, I was already POST
5      certified, so I went straight into the field
6      training program.
7  Q   And how long did that last?
8  A   They had actually just became certified, or
9      went to an actual accredited certification
10     course.  And they had just started that
11     program.  But it was a three-month program.
12 Q   Okay.  Then, where were you transferred?
13 A   To patrol division.
14 Q   And what division, patrol division?
15 A   As a patrol officer assigned to initially,
16     Shift A.
17 Q   What is Shift A?
18 A   Shift 1 is just a patrol shift.  Some people
19     say Shift A, some say Shift 1.  It's just a
20     normal patrol shift.
21 Q   Was that days or nights?
22 A   Actually, you had rotating shifts back then,
23     you worked days and nights.  And I remained on
24     Shift A for a day and a half, then I was
25     transferred to Shift 4, or Shift D.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 17

1  Q  And what is that?
2  A  The same thing, patrol shift, just opposite
3     rotation.
4  Q  Okay.  And how long were you on that?
5  A  From January -- well, not January of '90.  But
6     April of 1990, up until January of '91.  No.
7     I'm sorry.  '92.
8  Q  Okay.  And then, where were you transferred?
9  A  Patrol support, ATAC section.
10 Q  That's the -- (Interrupted)
11 A  Alcohol Traffic Accident Campaign.
12 Q  And how long -- that was in January of '92?
13 A  Yes, sir.
14 Q  What shift were you on?
15 A  It's not a shift.  It's a unit that's attached
16    to patrol support, and all you do is OWI
17    enforcement.
18 Q  So you work your same shift?
19 A  No, sir.  It's not a shift.
20    I worked a shift rotation, but we're not
21    assigned to patrol.  You're actually assigned
22    to -- that's a different section.  That's in
23    patrol support.
24 Q  Okay.  How long were you in there?
25 A  One year.  Exactly a year, from January to

Page 18

1     December.
2  Q  Okay.
3        MS. COREIL:
4           What were your hours during that?
5        How does that work?
6  A  It's 12-hour shifts.
7        MR. SPRING:
8           I'm going to object.  Under Federal
9        Rules, only one person can ask questions.
10       MR. CORRY:
11          She probably asks better questions
12       than me.  All right.  I'm sorry.
13       MS. COREIL:
14          Michael, would you ask him the
15       question?
16       MR. SPRING:
17          No, no.
18       MR. CORRY:
19          I think he answered.
20 A  It's 12-hour shifts.
21       MS. COREIL:
22          Okay.
23 A  And I worked 3:00 p.m. to 3:00 a.m.
24 MR. CORRY:
25 Q  And then, what about the two shifts before

Page 19

1     Shift A for one day, and Shift D for two
2     years?
3  A  Again, 12-hour shifts.  And if you're on day
4     shift, you worked 6:00 a.m. to 6:00 p.m.  If
5     it was a night rotation, 6:00 p.m. to 6:00
6     a.m.
7  Q  At some point they changed the rotating --
8  A  Yes.
9  Q  -- and you were either days or you were
10    nights?
11 A  Yes.
12 Q  When was that, do you remember?
13 A  I don't know.  By that time, I had made rank
14    and I was in the daytime position.
15 Q  Okay.  All right.  So you stayed in ATAC for a
16    year?
17 A  Yes, sir.
18 Q  And then, where did you go?
19 A  I went to Internal Affairs.
20 Q  As a detective?
21 A  Yes, sir.
22 Q  So you would have held the same position like
23    Terro and Adam --
24 A  That's right.
25 Q  -- and those guys?

Page 20

1  A  That's correct.
2  Q  How long were you in IA?
3  A  From '93 up until -- I know it was 11 years,
4     but I'll give you the exact date.  (Witness
5     examines his documents.)
6        January '93 to April 2004.
7  Q  Who was the -- I guess over that period of
8     time, the IA lieutenant, sergeant changed?
9  A  Absolutely.
10 Q  Can you kind of give me a rundown of what you
11    recall, kind of starting with the beginning to
12    the end?
13 A  When I first went in, let's see, Bob Johnson,
14    I want to say, was the lieutenant.  Casey
15    Fowler and Mike Lavergne were the sergeants.
16    And I was the investigator.
17       From that, then they reduced the unit,
18    and it went to Casey Fowler became the
19    lieutenant, Mike Lavergne was still a
20    sergeant, I was the investigator.
21       And I remember we got Randy Simon came in
22    for a short spell as the lieutenant.  And I
23    want to say that maybe Mark Comeaux became the
24    sergeant.  And I was still the investigator.
25       And from there, went to -- I think Randy

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 21

1   remained.  Mark Comeaux left.  Then, Ted
2   Vincent came in as a sergeant.  I think that
3   was all on Jefferson Street.
4       Then, when we moved to the building on
5   900 East University, at some point, Glen
6   Dartez came in as the lieutenant, and John
7   Bergeron was the sergeant, and I was the
8   investigator still.  They both left at the
9   same time, and I forgot who came.
10      And I want to say maybe Casey Fowler came
11  back again as the lieutenant.  And then, Ted
12  Vincent came back in again as the sergeant.
13  Then, again, at some point it went from Ted
14  and Mike Lavergne came back as a sergeant.
15  And at some point again, Mark Comeaux came
16  back as a sergeant.
17      Then, at one point, Mike Lavergne made
18  lieutenant, stayed as the lieutenant.  And
19  that's when they added the addition
20  investigators.  And it was myself, Debra
21  Abdogoni, and Joey Prevost, I think, were the
22  three investigators.  And Mike was the
23  lieutenant.  And I want to say maybe Ted was
24  still the sergeant.
25      Then, it came back --

Page 22

1  Q   What chiefs were you working for during
2      that '93 to '94; do you remember?
3  A   Yes, let's see.  I started with Chief Copes.
4      From Chief Copes, we went to, I think it was
5      Charles Crenshaw.  Charles Crenshaw to Randy
6      Hundley.  Randy Hundley to Jim Craft.
7  Q   Okay.
8  A   I'm sorry.  I missed Randy Boudreaux somewhere
9      in there.  He was a chief for a short while.
10     So I pretty much worked for all of those.
11 Q   In April of '04, where did you go?
12 A   I was promoted to the rank of sergeant, and
13     transferred back to the patrol division and
14     patrol support, and went to a power squad.
15 Q   What is that?
16 A   A power squad is just a patrol shift when you
17     go supplement the patrol shifts during peak
18     hours.  Again, our work hours then were from
19     3:00 p.m. to 3:00 a.m.
20 Q   So you made sergeant, you worked the night
21     shift?
22 A   Yes, sir.
23 Q   In IA, what were your hours?
24 A   We worked Monday through Friday, 8:00 to 5:00.
25 Q   How long were you in patrol support with the

Page 23

1   power squad?
2  A   I stayed there six months.
3  Q   So basically, 2005?
4  A   Yes.
5  Q   Where did you go then?
6  A   Then, I was transferred to narcotics.
7  Q   As a sergeant?
8  A   Yes, sir.
9  Q   How long were you in narcotics?
10 A   Six years.
11 Q   That's a different division, that's CID?
12 A   CID.  Yes, sir.
13 Q   Who did you work for there?
14 A   Here we go again.
15     Let's see.  When I first went in --
16 Q   Let me cut you off.
17     '05 to '11?
18 A   Yes, sir.
19     First got in, Mark Lambert was the police
20     department captain.  John Babin was the
21     sheriff's office captain.
22     When Mark Lambert retired, Jackie Phelps
23     came in as the police department captain.
24     When Jackie left, I think that's when we got
25     Angelo Iorio came in as the captain.

Page 24

1       After Angelo, I think that's when Ted
2   came.  I'm not sure.  No.  I'm sorry.  Ned
3   Fowler.  We had Ned Fowler.  And then, from
4   Ned Fowler, Ted Vincent.
5  Q   Did you remain a sergeant the entire time you
6      worked in CID?
7  A   Yes, sir.
8  Q   Did you work on the Lafayette Metro Narcotics
9      Task Force?
10 A   Yes, sir, I did.
11 Q   How does that fit in with the DEA Task Force?
12 A   It doesn't.  Two separate entities.
13 Q   What was your job?
14 A   I was a supervisor.  I supervised the day
15     squad, the narcotics agents who worked the day
16     squad.
17 Q   What were your hours?
18 A   On paper, we were supposed to work 8:00 to --
19     we worked ten-hour shifts.  It was 8:00 to
20     6:00.  But actually, most times, we were there
21     about 6:00 a.m., and stayed until 8:00 or 9:00
22     at night.  It just depends.
23 Q   Why?
24 A   Wherever the case takes you.  It depends on
25     what you're working that day and whatever

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 25

1   comes up.  You stay on the case until the job
2   gets done.
3 Q   Was the DEA Task Force alive and well at that
4   time?
5 A   Yes, sir.
6 Q   Was there anybody in your unit on it?
7 A   Yes, sir.
8 Q   Who's that?
9 A   When I first went in, Chad Langley was
10   assigned to the DEA Task Force.  And when Chad
11   Langley left, Kane Marceaux went.
12 Q   Okay.  And did you, as the sergeant, did
13   Langley report to you?
14 A   No, sir.
15 Q   Who did he report to?
16 A   Whoever was the DEA supervisor at the post
17   office area.
18 Q   Who did he report to at LPD?
19 A   At LPD, for paperwork purposes, payroll and
20   stuff, he came to me.
21 Q   Okay.  The same when Marceaux went in?
22 A   Yes.
23 Q   When did you switch out of CID?
24 A   I was promoted to lieutenant in -- March of
25   2010, I was promoted to lieutenant.

Page 26

1 Q   Okay.  So you stayed in CID from '05 to '10?
2 A   Yes, sir.
3 Q   And when you were promoted to lieutenant --
4   (Interrupted)
5 A   Actually, it was November of 2004 to April of
6   2010, when I was in narcotics.
7 Q   Okay.
8 A   And then --
9 Q   Did you always stay on that same shift, 8:00
10   a.m. to 6:00 p.m.?
11 A   Yes, sir.
12 Q   Then, in '10, you were promoted to lieutenant?
13 A   That is correct.
14 Q   Okay.  Where?
15 A   When I was promoted to lieutenant, I was
16   transferred back to the patrol division
17   precinct.  And at that time, they had
18   formulated precincts.  I was assigned to
19   Precinct 2.
20 Q   Where is that?
21 A   Johnson Street boundaries.  The middle portion
22   of Johnson Street.  And I think they have
23   redesigned them.  But then, I want to say
24   anything Johnson Street north, up to the city
25   limits heading north.  As far as west as the

Page 27

1   city went, I think it was to East Broussard
2   Road.  And then, east boundaries, I think was
3   South College, or North College.
4 Q   So to the north, as far as the city went out?
5 A   Yes, sir.
6 Q   Whatever that line is?
7 A   Whatever the line, yes, because it changed
8   frequently.
9 Q   Okay.  And was that considered north side?
10 A   No, sir, at that particular time, it was south
11   side.
12 Q   Okay.  But even though you went to the north
13   side of the city?
14 A   Right.
15 Q   All the way to Carencro?
16 A   Well, it didn't go that far.  But the city
17   actually went up to -- I want to say maybe
18   Interstate 10 was actually was the ending
19   point.
20 Q   Okay.  And which shift were you on?
21 A   I was not assigned a shift.  I'm sorry.  I was
22   assigned a shift.  I was on Precinct 2, I
23   think it was Shift B.  I was the watch
24   commander.
25 Q   What does that mean, what were your working

Page 28

1   hours?
2 A   I worked 5:00 p.m. to 5:00 a.m.
3 Q   You've worked a lot of nights.
4 A   Yeah.  It's obvious they didn't like me.
5 Q   What?
6 A   It's obvious they didn't like me.
7 Q   Well, I mean, half the officers have to work
8   nights, and half have to work days, right?
9 A   Yes.  That's the way it fell, I guess.
10 Q   I mean, is that an accurate statement?
11 A   Yes.
12 Q   Everybody can't work during the day?
13 A   That is correct.
14 Q   And not everybody can work at night.
15 A   That's true.
16 Q   And I'm sure there are people that work at
17   night that want to work days, and there are
18   people that work days that want to work
19   nights.
20 A   Yes.  But the way this happens is wherever
21   the spot comes available.  It's just by the
22   luck of the draw pretty much.  Whoever
23   retires, and wherever the spot is available,
24   that's where you go.
25 Q   Okay.  How long did you stay in Precinct 2,

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

1   Shift B -- when you say watch commander, that
2   was your full-time job?
3   A   Yes, sir.  And --
4   Q   That's at University?
5   A   Yes, sir.
6   Q   And how long were you in that position?
7   A   Don't quote me.  Let me see.  I don't know if
8   I have it.  I may have it.  (Witness examines
9   his documents.)
10      March to June, 2010.
11  Q   All right.  And since you're relying on that,
12  you're looking at it --
13  A   Yes, sir.
14  Q   -- I need to know exactly what that is.  Maybe
15  now's the time to do that.
16  A   Oh, that's just --
17  Q   Is that a document you've generated?
18  A   Yes.
19  Q   Okay.
20  A   And it's actually just my employment resume.
21  Q   Okay.  It's a summary of your employment that
22  you're referring to?
23  A   That is correct.
24      MR. SPRING:
25      Do you want a copy?

1       MR. CORRY:
2       Yes, I think we will.
3   MR. CORRY:
4   Q   What else is in there (indicating)?
5   A   The interrogatories I had to answer for you
6   and --
7   Q   Okay.
8   A   -- copies of my evaluations --
9   Q   All right.
10  A   -- and a couple of internal memos.  And that's
11  pretty much it.
12  Q   Okay.  Is it all information that's been
13  provided in discovery responses, or it's not
14  all of it?
15  A   Yes, it is.
16  Q   Okay.  All of it?
17  A   All of it except for the evaluations.  I mean,
18  I don't know if you're going need those or
19  not.
20  Q   Right.
21  A   I just have them in here.
22  Q   Okay.
23      MR. SPRING:
24      Do you want to copy them now just so
25      you'll --

1       MR. CORRY:
2       No, I'll get to it.
3       MR. SPRING:
4       All right.
5   MR. CORRY:
6   Q   What does that say?
7   A   That's just complaints for the
8   interrogatories.
9   Q   Okay.
10  A   Uh-huh (yes).
11  Q   And show me the resume thing you were --
12  (Interrupted)
13  A   Okay.
14  Q   Let me see it.
15  A   (Witness complies.)
16  Q   Okay.  This is just something you've kept?
17  A   Yes.  It's just my resume.  That's it.
18  Q   Okay.
19      MR. CORRY:
20      Yes, I'd like to get a copy of that
21      and attach that as Number 2.
22  MR. CORRY:
23  Q   All right, Gabe.  June of '10, by my
24  calculations, it looks like you made your
25  seventh move.

1   A   Yes.
2   Q   Where did you go?
3   A   June 2010, I was transferred to Precinct 3.
4   Q   Where is that?
5   A   Precinct 3 would just be the opposite of
6   Precinct 2.  Everything south of Johnston
7   Street to the city limits, as far as they
8   reach out almost to the broader of Broussard.
9   The western boundaries would have been, again,
10  East Broussard Road.  And the eastern
11  boundaries would have been South College.
12  Q   And you were a lieutenant?
13  A   That is correct.
14  Q   Who was your captain and major when you were
15  with Precinct 2, and then with Precinct 3?
16  A   The major would have been Jackie Alfred.  When
17  I was in Precinct 2, my captain was William
18  Picard.
19  Q   How long did you work for -- under Major
20  Alfred?
21  A   I couldn't tell you an exact time.  But from
22  the time he was patrol division commander,
23  until he left.
24  Q   More than a year?
25  A   Oh, yes.  More than a year.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 33

1  Q   Because I'm looking at -- when you were in
2      CID, were you working under him?
3  A   No, sir.  It was Glen Dartez.
4  Q   So when you started back in patrol in March of
5      '10 --
6          Tell me the years you've worked under
7      him.  I guess that may be the easiest way.
8  A   I couldn't tell you.  Because we moved so much
9      at the police department and I don't know when
10     he made major.
11 Q   Okay.
12 A   So I couldn't tell you.
13 Q   But in '10, you definitely did?
14 A   In '10, yeah.  I think he was patrol division
15     commander then.
16 Q   Okay.  Did you ever have any problems with
17     him?
18 A   No, sir.
19 Q   Good major?
20 A   That's a trick question.  I would say no.
21 Q   Did he treat you fair?
22 A   As far as I know.
23 Q   All right.  Let's go back to where we were.
24     June of '10 to what, were you in Precinct
25     3?

Page 34

1  A   Up until May of 2012.
2  Q   And were you the watch commander on that
3      shift?
4  A   No, sir.  I was the administrative
5      assistant.
6  Q   What does that mean?
7  A   Captain Norbert Myers was the precinct
8      commander, and I was in his assistant.
9  Q   Okay.  So you handled -- (Interrupted)
10 A   Administrative duties.  Anytime --
11 Q   What is that?  Payroll, shift scheduling, that
12     kind of thing?
13 A   That's correct.
14 Q   What shift were you on?
15 A   Not a shift.  It was a daytime job.  You
16     worked Monday through Friday, 8:00 to 5:00.
17     Actually, my work schedule was 7:00 to 4:00.
18 Q   Why did you initially say 8:00 to 5:00, and
19     then, 7:00 to 4:00?  Who determines that?
20 A   The precinct commander.
21 Q   And that's the captain?
22 A   Yes, sir.
23 Q   Okay.  The captain can tell officers when they
24     can work?
25 A   If you're assigned to his precinct.  That's

Page 35

1      what they say on paper until they get upset
2      with you, then they tell the precinct
3      commander, no, you can't do it, do what I tell
4      you.
5  Q   Is there a policy or a general order on
6      working hours?
7  A   Yes and no.  If that makes sense.  There's
8      something in writing.  But then, again, like I
9      said, there's verbiage that is delivered by
10     the chief and the majors at the time.  Like a
11     precinct commander can designate when his
12     personnel will work, because you know when you
13     need your personnel in your precinct.  And so,
14     you put them to work when you need -- when you
15     see fit.
16 Q   All right.  Where was your office located
17     starting in March of '10?  University?
18 A   March?  Yes, sir.
19 Q   And then, what about in June of '10, Precinct
20     3?
21 A   University.
22 Q   Okay.  Is there a particular floor that you
23     worked on?
24 A   When I was in Precinct 2 -- third floor, to
25     answer the question -- I shared an office with

Page 36

1      the lieutenant on the opposite rotation.  I
2      want to say at the time was Lieutenant Donald
3      Caesar.  We shared an office because we worked
4      opposite.  So when he was not there,
5      naturally, I was there.  And pretty much that
6      was just if you needed to go into a room to do
7      evaluation on employees, things of that
8      nature.
9          So actually had an office, but you didn't
10     utilize it because you were down in the watch
11     commander's office.
12 Q   And where is that?
13 A   On the first floor.
14 Q   Is that right behind the receptionist?
15 A   No, sir.  It's in -- if you come through the
16     door where the receptionist are, come back
17     into the main building, and -- do you know
18     where the patrol briefing room is?
19 Q   I don't know if I do or not.
20 A   Well, when you go through that door, you pass
21     up the first hallway, the middle hallway.
22 Q   Okay.
23 A   Make a left, the first office on the right.
24 Q   What's going on right there behind the
25     receptionist?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 37

1  A   That is the --
2  Q   Dispatcher?
3  A   -- desk sergeant.
4        No.  Desk sergeant and the personnel
5  clerk, and the assistant to the chief, and the
6  chief's office is back there.
7  Q   Okay.  When you moved in June of '10, up
8  through May of '12, you were on the third
9  floor?
10 A   That is correct.
11 Q   Now, at that time, you weren't the watch
12 commander, so you actually had your office?
13 A   Yes, sir.  I had a personal office, yes.
14 Q   And did you share it with someone?
15 A   No, sir.
16 Q   Who else was on the third floor with you?  How
17 many people were on the third floor?
18 A   A bunch.
19 Q   Hundreds?
20 A   I couldn't give you an exact number, but there
21 are several.
22 Q   Is it broken down into precincts?
23 A   Yes.
24 Q   Tell me about it.
25 A   You had your precinct commanders and their

Page 38

1  assistants on the third floor.  The patrol
2  division commander, the traffic unit, the
3  assistant to the patrol division commander.
4  And that's just in the patrol wing.  Because
5  on the opposite side, you have Internal
6  Affairs and training in that whole separate
7  wing.  You have the exercise room.  But I
8  think in the patrol wing, I think that was
9  it.
10 Q   Okay.  Who worked under you?
11 A   On paper, pretty much everybody assigned to
12 Precinct 3.  Again, there was the precinct
13 commander, then me.  And we took care of
14 everybody else that's on the shift.
15        In addition to that, when the department
16 created the precinct investigators, those
17 investigators answered directly to me.
18 Q   Who were they?
19 A   At the time, I had two.  I had Scott Poiencot
20 and Todd Alcorn.
21 Q   They were called precinct --
22 A   Investigators.
23 Q   -- investigators?
24        What was their role?
25 A   Detectives assigned to the precinct.  They

Page 39

1  were patrol officers.  They were not actually
2  assigned to CID, but were assigned to the
3  precinct and conducted investigations.
4  Q   And when did that start?  When did Poiencot
5  and Alcorn work under you?
6  A   Actually, Scott was already there prior to my
7  arrival and doing that job.  So I don't know
8  his lieutenant was prior to me.
9        And then, when they decided to assign
10 investigators from CID to the precincts,
11 that's when I got Todd.  And I may have had
12 Todd Alcorn, maybe six months, if that long.
13 I'm not sure.
14 Q   You told them what to do on a day-to-day
15 basis?
16 A   That is correct.  I assigned their cases.
17 Q   And what kind of cases were you assigned?
18 A   Anything that pretty much needed to be
19 investigated that was not going to be
20 investigated by CID.  So it could have been a
21 car burglary, it could be a theft, it could be
22 a multitude of things.
23 Q   And how many investigations did they do on a
24 monthly basis?
25 A   On average, they would each probably get

Page 40

1  assigned 30 cases.
2  Q   Per month?
3  A   Yes, sir.
4  Q   And how many would Poiencot handle?
5  A   30.  I said 30 each.
6  Q   Did he handle more or less than Alcorn?
7  A   No.  They handled -- he probably handled more,
8  actually.
9  Q   How many would he handle on a yearly basis?
10 A   I couldn't give you an exact number, Mr.
11 Corry.  However, the police department does
12 have all that information.  They do have a
13 total, because we have to keep a log.  There
14 was a log that was kept on the computer.
15 Q   And is there some designation as to when a
16 case is concluded?
17 A   Well, once the investigator felt that there
18 were no more leads, or if an arrest was made,
19 that's when it was concluded.
20 Q   And is there some stat or something that's
21 kept on that?
22 A   That is correct.
23 Q   What do you call that?
24 A   Either cleared by arrest, cleared by
25 exception, or suspended, or --

Kane Marceaux, et al vs.                                      Gabe Thompson
Lafayette City-Parish Consolidated Government, et al        February 19, 2014

Page 41

1  Q  So he's assigned 30 a month.
2  A  Yes.
3  Q  I guess he can't finish all 30 every month.
4  A  No, sir, he can't.
5  Q  So you constantly have a backlog of cases.
6  A  That's correct.
7  Q  And so, there has to be some designation that
8     the ones from May, and we're here in July,
9     I've cleared out, you know, 18 of the 30.
10    That's what you're referring to?
11 A  That's correct.
12 Q  Okay.  On average, what would they clear out a
13    year?
14 A  I would say more than 60 percent of their
15    cases, they would clear them out.
16 Q  Both of them?
17 A  Yes.
18 Q  Did one do more than the other, or both about
19    the same?
20 A  No.  They were about the same.
21 Q  Okay.  And you said you went up through May of
22    '12?
23 A  That is correct.
24 Q  Where did you go from there?
25 A  I was transferred to Precinct 4.

Page 42

1  Q  Where is that?
2  A  That would be on the north side of Lafayette.
3     And Precinct 4, Evangeline Thruway was the
4     dividing line.  The northeast side, everything
5     from the Northeast Evangeline Thruway up until
6     wherever the city limit ended heading east.
7     Northbound was up to Gloria Switch, and
8     southbound was up to Surrey.
9  Q  And what was your shift?
10 A  Again, I was the administrative assistant.
11 Q  So basically, the same role, just a different
12    precinct?
13 A  Same job, I just transferred to the north
14    side.
15 Q  Still 8:00 to 5:00?
16 A  In Precinct 4, Captain Myers accommodated me
17    to allow me to work 7:00 to 4:00, because that
18    worked better for me.  However, when I was
19    transferred to Precinct 4, Major Alfred said I
20    could no longer work those hours, and made me
21    work 8:00 to 5:00.
22 Q  Why did you need 7:00 to 4:00?
23 A  Because currently, I'm married, but my wife
24    has been hospitalized for a very long time
25    battling Leukemia.  And I'm -- so pretty much

Page 43

1     I'm a dad taking care of the kids.  And just
2     able to get my kids to school and pick them up
3     on time, the 7:00 to 4:00 was better.
4  Q  I think you told me you had a 19-year-old,
5     right?
6  A  Yes.
7  Q  You weren't taking him to school, were you?
8  A  Yes, I was.
9  Q  He was where?
10 A  She.  At the time -- well, when this all first
11    started, it was still at Academy of the Sacred
12    Heart.  And now she's at UL.  And I was
13    dropping her off at school until we got her a
14    vehicle to use.
15 Q  Okay.  And when was that?
16 A  She actually started using her mom's car two
17    years ago, maybe.
18 Q  '12?
19 A  Yes.
20 Q  Before or after you left?
21 A  Right before I left.
22 Q  Is there any policy or procedure with either
23    the city or the police department that allows
24    officers to adjust their hours to get their
25    kids to and from school?  I'm not trying to be

Page 44

1     smart aleck.
2  A  Oh, no, sir.
3        Not that I'm aware of.  But again,
4     precinct commanders were allowed to adjust
5     their employees work hours.  And it was clear
6     through Major Alfred at the time, he knew, and
7     as well as the chief of police knew.
8  Q  And they have a right to change that if they
9     see fit?
10 A  Yes, they do.  However, I know it was changed
11    after the lawsuit was filed.  And that's why I
12    was transferred and that's why my work hours
13    were changed by Major Alfred.
14 Q  Okay.  Other than having to work now 8:00 a.m.
15    to 5:00 p.m., did anything else change with
16    your job?
17 A  No, sir.  I was doing the same job.
18 Q  I mean, there needs to be an administrative
19    assistant in Precinct 4, right?
20 A  That's correct.
21 Q  Who did you transfer in for, do you know?
22 A  No, sir.  I don't remember who was there.
23 Q  Do you know why?
24 A  Why --
25 Q  Yes.

Kane Marceaux, et al vs.                                                                    Gabe Thompson
Lafayette City-Parish Consolidated Government, et al                              February 19, 2014

Page 45

1  A   -- I was transferred?
2  Q   Yes.
3  A   Because I filed a lawsuit.
4  Q   Okay.  Other than your perception that it was
5      the lawsuit -- (Interrupted)
6  A   No, that's it.  And I know that's what was the
7      reason.
8  Q   How do you know that?
9  A   Because Ms. Shirley said she overheard a
10     conversation between Major Alfred and Dwayne
11     Prejean, and a third person that she could not
12     recall, saying that he was going to transfer
13     me.
14        In addition --
15 Q   Hold on right there.  I didn't hear what you
16     said.  Shirley who?
17 A   Ms. Shirley Duhon.
18 Q   Duhon?
19 A   Yes, sir.
20 Q   D-u-h-o-n?
21 A   That's correct.
22 Q   What was her position?
23 A   She's a custodian on the third floor.
24 Q   Okay.  And what did she tell you?
25 A   She was -- one of her storage facilities at

Page 46

1      the police department on the third floor was
2      right outside the door by Internal Affairs.
3      She was inside of her closet, and they didn't
4      know she was in there.  And she overheard the
5      conversation between Alfred Prejean and a
6      third party that she could not recall.  Them
7      specifically saying that they were going to
8      transfer -- well, to quote her exactly, she
9      said she didn't know they were referring to
10     me.  She actually thought they were referring
11     to Greg Cormier.
12        She came to me and said Jackie and Dwayne
13     are talking about transferring Greg, because
14     -- and Jackie made the comment that he didn't
15     care that his wife was in the hospital, he was
16     going to transfer him anyway.  And it was then
17     I told Ms. Shirley, well, they're not
18     referring to Greg, they were talking about me.
19 Q   But they didn't say your name?
20 A   No.
21 Q   Do you have any other evidence that's why they
22     transferred you?
23 A   No, sir, not at this time.
24 Q   Okay.  And we'll get to it.  I know there's a
25     document that shows the transfer.  I think, in

Page 47

1      fact, that's something you supplemented --
2  A   Yes.
3  Q   -- with your discovery.  Just so we stay on
4      track, we'll come back to that.
5  A   Okay.
6  Q   And that was a document you supplemented,
7      right?
8  A   That is correct.
9  Q   Okay.  You worked there from May of '12, until
10     when?
11 A   Until I retired.
12 Q   Okay.  And when did you retire, Gabe?
13 A   November, 2012.
14 Q   November of '12?
15 A   Yes, sir.
16 Q   I thought it was September.
17 A   No.  November 11th, 2012.
18 Q   Do you have some document that shows that?
19 A   Not with me.  I have some at home.
20 Q   What is it?
21 A   A retirement paperwork.
22        I'm sorry.  What did I tell you,
23     November?
24 Q   Yes.
25 A   I'm sorry.  It is September.

Page 48

1  Q   I was like, damn.
2  A   Yeah.  September 11th.
3  Q   You're getting me off my script, man.
4  A   I apologize.
5         I'm just checking you to make sure you're
6      paying attention.  September 11th, 2012.
7  Q   All right.  And in order to retire, what do
8      you have to do?
9  A   I went to human resources and advised them
10     that I was going to plan on retiring.  And I
11     met with Sandra Jolivette, and we prepared the
12     paperwork.  It was done.
13 Q   Since the recordings seem to be the theme of
14     the day, did Ms. Shirley Duhon have a
15     recording of that conversation --
16 A   No, sir.
17 Q   -- she overheard?
18 A   Not that I'm aware.  She didn't tell me if she
19     did or didn't.
20 Q   Has anybody come to you and said they had a
21     recording?
22 A   No, sir.
23 Q   Ms. Sandra Jolivette is who you meet with at
24     HR?
25 A   That is correct.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 49

1 Q  Okay.  You can probably look on your notes
2    there, Gabe.
3       But how many times is that since you
4    started in 1990 --
5 A  '90.
6 Q  -- January 8th of '90, how many times were you
7    transferred?
8 A  Nine.  Eight total.
9 Q  I'm sorry?
10 A  Eight.
11 Q  I heard you say nine.
12 A  Well, nine is when I actually started in the
13    police department.
14 Q  Okay.  So eight total?
15 A  Eight total transfers.
16 Q  That's close to my count as well.
17       Were the seven before the transfer in May
18    of '12, related to any lawsuit --
19 A  No, sir.
20 Q  -- that you claim?
21 A  No, sir.  They were results of being
22    promoted --
23 Q  Okay.
24 A  -- or transferring into a different unit.
25 Q  Okay.  You're not transferred every time

Page 50

1    you're promoted, are you?
2 A  Yes, sir.  Pretty much you are.
3 Q  Okay.  And the only time you can be
4    transferred is not just when you're promoted,
5    correct?
6 A  That is correct.
7 Q  I mean, there are lateral transfers?
8 A  That is correct.
9 Q  Would you agree that a DEA agent that works
10    for the police department, when he's brought
11    back into Lafayette Metro Narcotics Task Force
12    is a lateral?
13 A  I disagree with that.
14 Q  Why?
15 A  Because the position at the DEA, again, is two
16    separate entities.  You're working for a
17    federal agency, and then coming back to a
18    local agency task force, it is a demotion, and
19    --
20 Q  Is it a demotion just in perception, or is it
21    an actual demotion?
22 A  Probably in perception, because you're still
23    having your same rank and you're coming back
24    to where you started.  But there is a demotion
25    from that.  And the transfer, again, would be

Page 51

1    -- when I was there, and as long as I had been
2    there, the guy that was assigned there prior,
3    Chad Langley, stayed there as long as he
4    wanted.  Actually passed up rank several times
5    so he could stay there.
6 Q  Where did he go?
7 A  Eventually, when he decided to take the rank
8    of sergeant, he left DEA and went to patrol.
9 Q  You were here for Kane's entire depo, weren't
10    you?
11 A  That is correct.
12 Q  Did you hear anything else about any of his
13    testimony as it related to that unit, that --
14    because when you were sitting back there the
15    first day, you would nod and you would nod.
16    And y'all generally kind of followed sync.
17       Did you hear anything else that he said
18    that caught you as, that's not the way it
19    worked, or that's not the way it was, or --
20 A  No, sir.
21 Q  -- I don't think he remembers it that way?
22 A  No.  He was pretty much on point.
23 Q  Okay.
24 A  But one of the nods that you did, I know that
25    you maybe referring to is when you asked the

Page 52

1    question about 340.  And I can clarify that
2    for you now that I'm on the record.
3       340 is just simply a number that is
4    designated to CID.  It's just another way of
5    referring to CID.  You start with 310 is the
6    administration; 320 is patrol; 330 is
7    services; 340 is CID.  And that's just a way
8    of -- where you know equipment and personnel
9    are assigned.  That's it.
10 Q  So that's just another designation of a
11    division?
12 A  Of a division, that's all it is.
13 Q  310 is administration?
14 A  Yes, sir.
15 Q  320 is?
16 A  Patrol.  And 330 is services.
17 Q  Well, how come you knew that and Kane didn't?
18    MR. CORMIER:
19       Administration.
20 A  Administration.  He wouldn't have to worry
21    himself about that kind of stuff.
22 MR. CORRY:
23 Q  I just like messing with him.
24 A  Oh, yeah.
25 Q  All right.  When you started out with the

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 53

1 police department, what were you earning, if
2 you remember?
3 A I really don't remember.
4 Q Did your increases in your salary up to the
5 point that you terminated -- the point that
6 you retired, were they consistent? Did you
7 get a raise every time everybody else got a
8 raise?
9 A Yes, sir.
10 Q And how do raises go down in the police
11 department?
12 A It's pretty much up to the city council, if
13 they decide to give us a raise or not that
14 year.
15 Q Okay. It's not based on the chain of command?
16 A No, sir.
17 Q Craft can't come in and say, or Hundley, or
18 Copes, or whoever, or Boudreaux, can't come in
19 and say, Gabe, man, you're doing a good job,
20 I'm going to kick your salary up?
21 A No, sir.
22 Q Or decrease it?
23 A No, sir.
24 Q Okay.
25 A Well, you can decrease it if you discipline me

Page 54

1 in any fashion. Yes, you can take money from
2 me, but can't give you more.
3 Q Okay. Did anybody ever take money from you?
4 A Yes, sir. When I was forced to resign --
5 retire.
6 Q We'll get to that. Prior to that.
7 A No, sir.
8 There was one other incident where I did
9 have to obtain an attorney to deal with Chief
10 Craft. It was during the point when he was
11 the -- I'm looking for the right word --
12 interim chief. Everyone was pretty much
13 working out of class at that time, because of
14 the people who had been indited and had to
15 leave the department.
16 So Chief Craft had actually went to city
17 hall and spoke with whomever he had to speak
18 with, and they decided what they were going to
19 do for every person who worked out of class
20 and did a job that they were not assigned to
21 do, would be paid for working out of class.
22 So you had sergeants who were doing
23 lieutenant's work, lieutenants doing captain's
24 work, captains doing major's work.
25 Q That wasn't a creation by Craft, though, was

Page 55

1 it?
2 A Oh, yeah. He pushed for it because he got
3 paid for doing the chief's job. Because at
4 the time when he was interim chief, he was
5 only a captain, but he was receiving the
6 chief's pay.
7 So in order to rectify the situation, as
8 he put it, he went to city hall and asked for
9 payment for everybody that worked out of
10 class. I happened to be one of those persons.
11 When I was the sergeant in narcotics, I
12 actually was doing the job of the captain,
13 because the captain was actually doing the
14 work of the major.
15 Q This is when Hundley and Lavergne and --
16 (Interrupted)
17 A Yes, when they all had their episodes.
18 When it came down to it, Chief Craft saw
19 fit to pay everybody for the exception of me
20 and Darryl Fontenot, I think it was, who were
21 working out of class.
22 Q Fontenot was an IA, wasn't he?
23 A At that time, yes, he was. He was the IA
24 sergeant at the time. He -- "he" being
25 Darryl -- sent the letter to Chief Craft

Page 56

1 explaining that in Mike Lavergne's absence, he
2 was also doing the job of a lieutenant in
3 Internal Affairs. So Chief Craft decided,
4 okay, he's going to pay Darryl, which left
5 me.
6 Q You're in IA at this time?
7 A No, sir. I was assigned to narcotics.
8 Once that was done, I, again, asked Chief
9 Craft, why are you leaving me out? Why are
10 you not going to pay me? I was doing my
11 captain's job.
12 Q Who was the captain that was out?
13 A At the time, it was Jackie Phelps.
14 Q He wasn't one of the ones that was indited,
15 was he?
16 A No. No.
17 Q Why were you doing his job?
18 A Because he had to leave and go do the major's
19 job. He went and did Casey's job, when Casey
20 had to leave.
21 So while I was doing his job, Chief Craft
22 pretty much came down to, he says, I'm not
23 going to pay a sergeant to do a captain's job.
24 So at that point --
25 Q Because that's two ranks?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 57

1  A   Exactly.
2  Q   Did he pay you as a lieutenant?
3  A   Yes, he did.
4  Q   Okay.  So you were sergeant, but he paid you
5      the -- (Interrupted)
6  A   Well, after --
7  Q   Wait.  Let me just finish, then you can
8      explain it.
9  A   Okay.
10 Q   He wasn't going to pay you two ranks above,
11     but he did pay you the rank of a lieutenant
12     above?
13 A   That is correct.
14 Q   Do you know of anybody else in the police
15     department that was paid for two ranks above
16     during that time frame, for that episode where
17     you describe it as, those guys that got
18     indited?
19 A   I don't -- I don't remember, because you had
20     several people that were working out of class.
21     And so I don't remember what ranks and
22     whatnot.
23 Q   Okay.
24 A   I would be telling you something I don't know.
25 Q   And that was back when, like '05, '06, or

Page 58

1      something?
2  A   Yeah.  When he first became interim chief
3      in '06, '07, something like that.
4  Q   Okay.
5  A   After I spoke to him, I actually got with Ted
6      Vincent, and several people, like, well, it's
7      just not fair what he's doing to you.  So it's
8      like okay.
9          Ted actually drafted a letter.  No, I'm
10     sorry.  It wasn't Ted.  It was -- no, it was
11     Ted.  Somehow Ted became involved and drafted
12     a letter on my behalf.  I'm sorry.  Ted had
13     prepared a letter for Darryl Fontenot.  So Ted
14     gave me the letter he prepared for Darryl
15     Fontenot, and said, Gabe, this got Darryl his
16     payment, so here you go, submit that to him.
17 Q   Was Darryl going up two ranks?
18 A   No.
19 Q   Okay.
20 A   So when I submitted the exact same letter to
21     Chief Craft, and that still was not
22     sufficient.  The response I got back to him
23     was that I needed to prove that I actually did
24     the work of the captain.
25         So at that point, I went back to the

Page 59

1      narcotic's office, and at the time, captains
2      were in charge of doing all the seizure
3      paperwork, and stuff of that nature, taking
4      care of administrative duties at narcotics.  I
5      went and had all the documentation where my
6      signature was on the paperwork that I did, and
7      submitted everything that he requested.  That
8      still was not sufficient.
9          So it was at that point that I obtained
10     an attorney, and I actually -- I'm just going
11     to sue you for the money that you owe me.
12     Because to me, it was just not fair to me that
13     you're going to pay everybody else except
14     me.
15 Q   But he was paying you for lieutenant?
16 A   No, not at first.
17 Q   Okay.
18 A   That was an agreement that was made --
19 Q   All right.
20 A   -- and I actually -- or I should say a
21     settlement that I agreed to.
22 Q   Okay.
23 A   So --
24 Q   Who did you hire?
25 A   I can't remember his name.  I think his last

Page 60

1      name is Flynn.  I can't remember his name.
2      It'll come to me.
3  Q   Flynn?
4  A   I'll let you know.
5  Q   Frank Flynn?
6  A   Frank.  There you go, Frank Flynn.
7          I got Frank.  Gave Frank the paperwork,
8      and then, Frank sent the chief correspondence.
9      They were going back and forth.  Finally,
10     there was a meeting that was set up between
11     myself, Frank, Chief Craft, Ray Domingue.  And
12     I don't know if anyone else was present.  We
13     met in the chief's office.
14         And again, the whole issue was that he
15     was having a difficult time paying a sergeant
16     a captain's salary, for I think it was four or
17     five months that everybody worked out of
18     class.  And so, when --
19 Q   So he wasn't singling you out, it was just the
20     fact of the rank, right?
21 A   Yeah.  But what was the issue, I did the job.
22 Q   Okay.
23 A   So pay me for the job I did.
24 Q   But it wasn't a Gabe Thompson issue, it was
25     the fact that it was was a sergeant --

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 61

1    (Interrupted)
2  A  Well, he made it that issue.  To me, it's
3     just, pay me the money that you owe me.  I did
4     the job.  You know I supplied you with
5     everything that I did do the job.
6  Q  Was it resolved?
7  A  Yes.  Like I said, we came to a settlement,
8     and I agreed for him to go ahead and pay the
9     lieutenant's pay.
10 Q  Okay.  Is there documentation of that?
11 A  Yes.
12 Q  And that was long before the TRO and federal
13    lawsuit?
14 A  That's correct.
15 Q  All right.  What was your rate of pay when you
16    retired?
17 A  I was actually on salary.  But I forgot what
18    the hourly amount that they would put on the
19    checks.
20 Q  What was your salary?
21 A  Roughly, $70,000 a year.
22 Q  Plus benefits?
23 A  That's including benefits.
24 Q  And what did the benefits include?
25 A  Health insurance.  That's pretty much it.

Page 62

1  Q  For you?
2  A  Family.  I was on the family plan.
3  Q  Did you have to pay for that?
4  A  Yes.
5  Q  And you also got sick leave?
6  A  That's correct.
7  Q  And family medical leave?
8  A  Yes.
9  Q  And vacation?
10 A  Yes.
11 Q  Are those three separate things?
12 A  Yes.
13 Q  And you get to accrue those from year to year?
14 A  That is correct.
15 Q  How long were you with the PD total?
16 A  22 years, nine months.
17 Q  22?
18 A  Yes, sir.
19 Q  How does that work with your sick leave?
20 A  If you don't utilize your sick leave, whatever
21    balance you have left over, the city pays you
22    whatever --
23 Q  When you retire?
24 A  Yes, sir.  Whatever your hourly rate is when
25    you retire.

Page 63

1  Q  And it's by hours, days, what?
2  A  Hours.
3  Q  And how is it accrued from year to year?
4  A  I forgot the exact number, how many hours you
5     accrue per year.  But just for practical
6     purposes, say, if you accrue 50 hours a year
7     of sick leave.  Like I said, I'm just throwing
8     that out there.  If you only use ten hours of
9     sick leave, then it'll roll over.
10 Q  And it keeps rolling?
11 A  Yes, sir.
12 Q  All the way until you retire?
13 A  Yes.
14 Q  And if you're fired, you don't get that,
15    right?
16 A  That's correct.
17 Q  Okay.  How many hours did you have when you
18    retired on September 11th of -- (Interrupted)
19 A  It was well over 1,000.  Because I can tell
20    you in my entire time at the Lafayette Police
21    Department, I did not take one day of sick
22    leave.
23 Q  And then, what about your vacation, the same
24    thing?
25 A  Annual leave?  I would take vacation.  I would

Page 64

1     take two -- three weeks every year.  But I
2     still was --
3  Q  So annual leave is vacation?
4  A  Yes.
5  Q  That's what that means?
6  A  Yes.
7  Q  And it's the same thing, you get a certain
8     number of hours --
9  A  That is correct.
10 Q  -- per pay period?
11 A  I think it was -- you earn like 96 hours per
12    year, I think, in annual leave.
13 Q  And it carries over?
14 A  Yes.
15 Q  How much annual leave did you have when you
16    retired?
17 A  I don't recall the exact number.
18 Q  Are you paid for that?
19 A  I was paid some, yes.
20 Q  What does that mean?
21 A  No, I'm saying, I don't remember how many
22    hours I had.  But yes.
23 Q  And that may be a bad question.
24    Is the same policy in place for annual
25    leave as sick leave?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 201

Page 65

1  A  Yes.  Whatever unused annual leave that you
2     have on the books, you are paid for.
3  Q  Okay.  So you used three weeks a year, but you
4     had been there so many years, it was probably
5     -- and I'm sure you accrued more than three
6     weeks a year, correct?
7  A  That is correct.
8  Q  So you had a balance?
9  A  Yes.
10 Q  You just don't remember how many hours?
11 A  That is correct.
12 Q  Was it over 1,000?
13 A  No.
14 Q  500?
15 A  I don't think it was that much.
16 Q  200?
17 A  Yeah, maybe.
18 Q  Okay.  And then, what about family medical
19     leave?
20 A  Well, that is something totally different.
21     You don't earn that.
22 Q  Okay.  So that doesn't carry over, and you
23     don't get paid that --
24 A  No, they don't give it to you.
25 Q  -- when you retire?

Page 66

1  A  Family medical leave, you get that in case of
2     a family emergency.  That's something through
3     HR that they work out.  So you don't earn
4     hours for that.
5  Q  So the only two components of the hours that
6     you earn are sick leave and vacation?
7  A  That's correct.
8  Q  And if you retire, you're paid your vacation?
9  A  That is correct.
10 Q  It's accrued.  And if you're fired, you do
11     not?
12 A  That is correct.
13 Q  What did you receive total on September 11,
14     2012, when you retired, in sick leave and
15     vacation?  I guess it was one payment.
16 A  Yes, sir.  One check.  And it was -- if I
17     remember correctly, $65,000, $66,000.
18 Q  They gave it to you in a check?
19 A  In a check.
20 Q  And I assume you negotiated the check?
21 A  Yes, sir.
22 Q  And have used the money as you see fit for
23     your life?
24 A  That is correct.
25 Q  Okay.  Did your -- when you were transferred

Page 67

1     into Precinct 4 in May of '12, I guess you
2     worked May of '12 to September 11th of '12 --
3  A  That is correct.
4  Q  -- in that same precinct.
5     Who was your captain and major?
6  A  Cornell Montgomery was the captain, Jackie
7     Alfred was the major.
8  Q  Other than the one hour start time, and one
9     hour end time difference, did anything else
10     change, as far as your job duties?
11 A  No, sir.  But there was definitely -- in
12     Precinct 3, I guess, and maybe it's just the
13     captains, I don't know.  But I had more
14     responsibilities in Precinct 3.  Captain Myers
15     was more open and included me in more things.
16     When I was assigned with Captain
17     Montgomery, for certain, he and Major Alfred
18     were close friends.  So pretty much, I was
19     left out of loops on a lot of things.  And,
20     you know, just I guess he chose to run his
21     precinct that way.  And that's all I can say
22     about that.
23 Q  More responsibilities in 3 than 4 --
24 A  Yes.
25 Q  -- is what you're telling me?

Page 68

1  A  Yes.  More inclusive in decision-making
2     process, and things of that nature.
3     For whatever reason, the only thing
4     pretty much for Captain Montgomery I did was
5     payroll.  And --
6  Q  Is Captain Montgomery African American?
7  A  Yes, he is.
8  Q  And Major Alfred is an African American?
9  A  Yes, he is.
10 Q  And then, the captain in 3, who was that?
11 A  Norbert Myers.
12 Q  Is he -- he's a white guy, right?
13 A  Yes, he is.
14 Q  Is he still at the police department?
15 A  No, sir.  He retired.
16 Q  He was a party of this lawsuit at some point,
17     right?
18 A  Yes, he was.
19 Q  And the judge dismissed him?
20 A  Yes.  As far as I know, yes, sir.
21 Q  He retired, or was he fired?
22 A  He retired.
23 Q  When?
24 A  I don't recall.
25 Q  Before or after you?

Kane Marceaux, et al vs.                                                    Gabe Thompson
Lafayette City-Parish Consolidated Government, et al            February 19, 2014

Page 69

1 A   Before.
2 Q   Did you have to work harder in 3 than 4?
3 A   I'm not going to say harder.  Like I said, I
4     was just more inclusive in the decision-making
5     process.  And as the administrative assistant,
6     you want to be well rounded and know what's
7     going on in the precinct because if the
8     captain is out, you're responsible for that
9     precinct.
10        And like I said, for whatever reason,
11    Captain Montgomery opted not to keep me
12    informed, and he did most of his communicating
13    with Major Alfred.
14 Q   Did you ever have to sub in for the captain?
15 A   Yes.
16 Q   In 4?
17 A   In 4?  No, sir.
18 Q   In 3, you did?
19 A   Yes, sir, I did.
20 Q   How often would that be?
21 A   Whenever he would take vacation, I was in
22    charge of the precinct.  Toward the end,
23    Captain Myers was under a lot of stress that
24    was placed on him by the department, so he
25    started seeking medical attention.  And when

Page 70

1     he took those days to go to the doctor, I
2     filled in.
3 Q    So it's basically from 7:00 to 4:00, or 8:00
4     to 5:00, if the captain's not there, you
5     assume his role?
6 A    That is correct.
7 Q    Are you paid for his -- his salary --
8 A    No, sir.
9 Q    -- his salary level?
10 A    No, sir.
11 Q    How is that different than what you had the
12    disagreement with the administration back in
13    -- (Interrupted)
14 A    Because, again, back then, Chief Craft made
15    provisions to get people paid for working out
16    of class.  When I accepted the position as the
17    administrative assistant in both Precincts 3
18    and 4, I knew what the job description
19    entailed.  And that was part of the duties,
20    when the captain's out, you step in.  So I
21    knew that going in.
22 Q    Okay.  And that was a civil service issue, I
23    guess, back in '06 or '07?
24 A    I couldn't tell you.
25 Q    Well, working out of class is a civil service

Page 71

1     issue?
2 A    Yeah.
3 Q    Tell me -- you kind of touched on it, but tell
4     me specifically what you did on day-to-day
5     basis.  And I guess the most significant is
6     when you were in 3, starting in June of '10,
7     up through September 12th.  Or I guess up
8     through May of '12, when you switched over.
9        What does a lieutenant -- (Interrupted)
10 A    Administrative assistant does?
11 Q    Yes.  What are you doing on a daily basis?
12 A    Daily basis, normal routine, you would come
13    into the office.  Any phone calls that you
14    received from citizens, you return those phone
15    calls.  Any assignments that the captain had
16    for you that day to go take care of, you
17    address those.  Any shift level investigations
18    that came in that were not investigated by
19    Internal Affairs, I was responsible for those.
20        I did payroll for the entire precinct.  I
21    say do payroll -- the actual shift lieutenants
22    or watch commanders would do their payroll,
23    but then it was sent to me to verify, to make
24    sure that it was input into the computer
25    properly.

Page 72

1 Q    Were you the one that put it in, or you just
2     checked theirs?
3 A    No, I checked theirs.
4        However, I did mine, and for me and
5     Scott, you know, the guys that I supervised.
6        We attended any type of neighborhood
7     meetings that needed to -- that we needed to
8     attend, as far as if a neighborhood had a
9     complaint about something going on in the
10    neighborhood, I attended those type of
11    functions.
12        So pretty much anything that had to deal
13    with Precinct 3, I was involved in it.
14        And from day one, like I said, Captain
15    Myers was very open, and included me in
16    everything that was going on in that precinct.
17 Q    All right.  And then, when you went to 4, did
18    your duties change, other than as you
19    perceived it, not being included as much?
20    Were you doing the same type of things?
21 A    Yeah.  While I was there, like I said, the
22    only thing I did was, whatever a shift
23    lieutenant or sergeant had paperwork to place
24    in one of their employee's files, I was given
25    that duty.  Punch the holes and go put it in,

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

---

Page 73

1     their file.
2        The payroll, didn't do that.
3 Q  I thought you told me earlier that's about all
4     you did was payroll?
5 A  Payroll.  I'm talking about just mine and the
6     one person that I had to supervise while I was
7     there.
8 Q  Who was that?
9 A  Dana Broussard.
10 Q  Okay.
11 A  She was the -- I forgot what they call them
12     now -- the resource officers.
13 Q  Is that what Scott and Alcorn were?
14 A  No.
15 Q  That's different?
16 A  Something totally different.  Yes.
17        And that was pretty much it.  So I was
18     just confined to my office.  And if he had
19     something for me to do, like I said, he --
20 Q  There weren't things that you had to take the
21     initiative and do on your own?
22 A  No.  Because pretty much, I actually subjected
23     myself when he -- for compstats.  Prepare your
24     compstat report, all the information would
25     come in on Fridays, I would normally get to

Page 74

1     the office before him, so I would printout all
2     of his paperwork so it'd be ready for him to
3     do, you know.  And I took the initiative on
4     things that I could do.
5        I actually -- I assisted Captain Richard
6     more than I did him.  And she was in Precinct
7     1.  She would actually --
8 Q  What office were you in, the physical
9     building?
10 A  On the Willow Street.  They moved to the
11     Clifton Chenier building.
12 Q  Where?
13 A  The Clifton Chenier building.
14 Q  Okay.
15 A  That's where that office is located.
16 Q  Okay.
17 A  As far as attending neighborhood meetings with
18     him, or things of that nature, he never wanted
19     me to attend those.  Don't know why.  But
20     that's the choices he made.  Instead, he took
21     a corporal with him, a resource officer.
22 Q  He took Dana Broussard?
23 A  Yes.
24 Q  How did you supervise her?  What did you have
25     to do to -- (Interrupted)

Page 75

1 A  I was responsible for her payroll, and pretty
2     much that was it.
3 Q  Did you tell her what to do on a daily basis?
4 A  No, because she reported to Captain
5     Montgomery.
6 Q  Why is that?
7 A  That's the way he had it.
8 Q  And he's got the right to do that?
9 A  Yes, sir.
10 Q  Is there a PPM or general order that gives him
11     that right, or is that just running the police
12     department?
13 A  Pretty much of his running, yes.
14 Q  I mean, the police department runs on a daily
15     basis and there's not necessarily a PPM or
16     general order that says, you know, you have to
17     turn the light switch on this morning.
18 A  Right.
19 Q  Right?
20 A  Unwritten rules, correct.
21 Q  I mean, there's things that go on to run the
22     department, right?
23 A  That is correct.
24 Q  Have you ever filed any kind of workers'
25     compensation claim?

Page 76

1 A  No, sir.
2 Q  Were you ever injured on the job?
3 A  No, sir.
4 Q  And these two are the only two lawsuits that
5     you have filed?
6 A  That is correct.
7 Q  What about, were you ever disciplined within
8     the police department at any time during your
9     career?
10 A  Yes, sir.
11 Q  When?
12 A  I can give you the exact date, if I can refer
13     to my notes.
14 Q  Yes.  Yes.  I don't have a problem with you
15     referring to them.  I just need to get a copy
16     of whatever it is you're referring to, that's
17     all.
18 A  Let's see.  I had it.  (Witness examines his
19     documents.)
20        On May 14th, 2009, I received a
21     counseling form from Major Glen Dartez.
22 Q  Is a counseling form discipline?
23 A  Yes, sir.
24 Q  Can you appeal it to the civil service board?
25 A  Yes, you can.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 125

1  Greg, if it was later that afternoon. I
2  advised him that I did have that recording on
3  Scott's pen, but I did give the pen back to
4  Scott. So again, I didn't have possession of
5  the recording after that.
6 Q  You don't know, has it been downloaded?
7 A  I have no idea.
8 Q  Has it been produced in anything that's --
9  (Interrupted)
10 A  I have no idea.
11 Q  Did you have anything to do with the Bert
12  Bejsovec incident or investigation, or --
13  (Interrupted)
14 A  I was aware. I'm friends with Greg, that's no
15  secret. So I knew that he had filed a
16  complaint against Bert. I knew some of the
17  allegations that were being made. And once
18  his complaint was filed, as you know, at the
19  police department, it spreads like wild fire.
20  We have rumors all around, and people were
21  talking about it, to include Major Alfred.
22  Like I said, so --
23 Q  Worse than a sorority house.
24 A  Exactly. So, yeah, it had spread around the
25  the department, so pretty much everybody knew.

Page 126

1  And people were actually upset the fact that
2  Greg had filed a complaint, a formal complaint
3  against Bert Bejsovec. And for all the
4  reasons, the biggest thing that the
5  administration kept focusing, oh, he's the
6  SWAT commander. Who cares? If he violated
7  the law, he violated the law.
8 Q  Wasn't that investigated? That was some kind
9  of payroll deal --
10 A  Yes.
11 Q  -- overtime deal, or planning Mardi Gras, or
12  -- what did it involve?
13 A  I don't know the specifics. But again, I know
14  it was an allegation of payroll fraud. But to
15  what level, I couldn't go into specifics.
16 Q  And was it investigated; do you know?
17 A  Not to my -- I know that the city did look
18  into it, and it was investigated by Ray
19  Domingue, from what I was told.
20  But then, again, the way I was told that
21  he did not conduct a proper investigation.
22  And again, that's, I guess, to be left open to
23  interpretation.
24 Q  Okay. And I can ask Greg about all of that.
25 A  That's correct.

Page 127

1 Q  I just want to make sure you don't have any
2  other knowledge about it.
3 A  No. That's it.
4 Q  Nothing else?
5 A  That's it.
6 Q  Not the basis of your lawsuit?
7 A  No.
8 Q  Okay. And then, the one with Major Alfred.
9 A  Yes, sir.
10 Q  And refresh my memory. That was April 19th,
11  or May 19th?
12 A  I think it's April 19th.
13 Q  And how did that come about?
14 A  That came about on April 18th, while at home,
15  I was watching the news. They did a news
16  story saying that there was a possibility that
17  -- I think he was a sergeant at the time,
18  Sergeant Ricky Rees, had went before some
19  subcommittee in Baton Rouge, and presented
20  information regarding Red Flex, and that he
21  possibly had perjured himself.
22  Again, being a mid-level manager, I didn't
23  know if the next day if Major Alfred had saw
24  the news that night. So again, having dealt
25  with the man, I felt that it was incumbent on

Page 128

1  me just to go make sure that he knew about the
2  news article.
3 Q  Was Rees in y'all's chain?
4 A  He was not in my direct chain. He was
5  assigned to patrol support. He actually
6  worked for Greg at the time. He was the
7  traffic sergeant.
8  I went to go and talk to Alfred just,
9  again, to make him aware, to see if he knew
10  about the news article. And when I went, I
11  decided to record that conversation, simply
12  because Dwayne Arceneaux's last day on the
13  job, he and I met on the first floor of the
14  Lafayette Police Department, in the lobby area
15  right near the watch commander's office. He
16  had a luncheon that day on that last day. In
17  fact --
18 Q  When was his last day?
19 A  I don't recall.
20 Q  When was it in relation to April 19th of '12?
21 A  Well, he told me on that day, his last day of
22  work, he said, Gabe, whatever you do, do not
23  trust Jackie Alfred. He said, I am tired of
24  telling Jackie to do -- all the dirty work for
25  Jim Craft. He needs to allow Craft to do his

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 129

1    dirt himself.
2        So he said, just watch yourself.
3    Whatever you do, watch yourself around Jackie
4    Alfred.
5  Q   Did he give you any examples, or any evidence
6    of dirty work?
7  A   No.  No.  He didn't give me any specific
8    details at that time.  But those guys were
9    together every day of the week.
10 Q   Is Dwayne a white guy or black guy?
11 A   A black guy.
12 Q   Okay.
13 A   Yeah.  He was -- matter of fact, he was
14   Jackie's assistant.  He was Jackie's assistant
15   in patrol.  When Jackie was patrol division
16   commander.  And when Jackie left patrol and
17   went to the criminal investigations division,
18   he took Dwayne with him to be his captain in
19   CID.  And when Jackie came back, I want to say
20   that Dwayne came back with him to the patrol
21   division.  So they were together daily.
22       So I took a lot of credence in what he
23   told me.  I mean, if he was going to be with
24   this man every day, you know what you're
25   talking about.  And he made that comment,

Page 130

1    said, do not trust Jackie Alfred for any
2    reason.
3  Q   Did Poiencot tell you to bring the recorder in
4    there?
5  A   No, he did not.
6        Actually, because like I said during my
7    testimony, I did not own a digital recorder.
8    I had one assigned to me by the Lafayette
9    Police Department, but because this was for my
10   own personal, I asked Scott to borrow his
11   recorder.
12 Q   All right.
13 A   And I went into Major Alfred's office.
14 Q   Where was that?
15 A   His office was -- I don't know if you would
16   know the layout of the police department, but
17   his office was --
18 Q   What floor?
19 A   Third floor.  We're all on the third floor.
20   Patrol is on the third floor.
21 Q   Okay.
22 A   But he was around the corner from me.
23 Q   Was anybody in there when you went in with
24   him?
25 A   No.

Page 131

1  Q   Did you tell him you were recording him?
2  A   No, I did not.
3  Q   You didn't think you needed to?
4  A   No, sir.
5  Q   Did you read him his bill of rights before you
6    recorded him?
7  A   No, sir, because I was not conducting an
8    investigation.
9  Q   Okay.
10 A   I simply was recording my conversation that I
11   was having with him for my own protection, my
12   own personal protection.
13 Q   Had you been threatened by Major Alfred before
14   that day?
15 A   No.  But again, based on what I was told by
16   Dwayne Arceneaux, who was a very close ally of
17   Jackie Alfred, I felt the need.
18       And since you say that, I personally was
19   not threatened by Jackie Alfred.  However,
20   being an administrative assistant as I
21   mentioned to earlier, I participated in a lot
22   of predisciplinary hearings.  One in
23   particular, again, goes back to Kenneth Hardy.
24 Q   When was that?
25 A   I don't remember the exact date, but it would

Page 132

1    have been maybe in 2010 or '11.
2        I conducted an investigation on Kenneth
3    Hardy.  A female had filed a complaint saying
4    that he was -- he had initially had a traffic
5    stop on her.  And why communicating with her,
6    he had chewing tobacco in his mouth.  And this
7    was like at 2:00 or 3:00 in the morning.
8    I conducted the investigation, was not able to
9    substantiate that.  Again, being in my chain
10   of command and I was conducting the
11   investigation, my investigation when I was
12   done, went to my captain, Captain Norbert
13   Myers at the time, then it went to Jackie
14   Alfred as the patrol division commander for
15   his review and approval, before it went down
16   to the chief.
17       Upon Jackie reviewing that investigation,
18   he was in agreement, saying, yeah, man, we
19   can't prove this.  This guy didn't do anything
20   wrong, the whole nine.      And then, after
21   he reviewed the investigation, he and I sat
22   and spoke about it.
23       I recall another incident where it was
24   me, Alfred and Arceneaux sitting down talking
25   about the investigation.  And it was like,

Page 133

1  general consensus, you know, pretty much this
2  was a bogus complaint that was being filed
3  against this guy.
4  Q  Was it sustained?
5  A  I want to say yes, it was.  I want to say he
6  was disciplined.  He was --
7  Q  Do you know?
8  A  Yes.  I think he received some days suspension
9  behind that.  And I was --
10 Q  Did he appeal it?
11 A  I have no idea.
12 Q  Okay.  So it's a private, personal matter?
13 A  Right.  I disagreed with the outcome.  And
14 Alfred at -- during the meetings with me and
15 him alone, and with me, him and Arceneaux, he
16 was like, no, the chief is going to be wrong
17 on this.  He said, I'm going to let the chief
18 know.
19    When I was at that predisciplinary
20 hearing, and that's going to be in the record
21 with the Lafayette Police Department -- I
22 don't know if you participated in any of the
23 predisciplinary hearings.  But it goes around
24 to each person in that room.  The chief makes
25 his -- goes to the patrol division commander,

Page 134

1  what's your vote on this, or your opinion on
2  what we shall do?  Then, he goes to the people
3  from HR.  Normally, it's Janice and Rick Zeno
4  that sit in.  Then, he went to Captain Myers
5  and he came to me.
6     Well, when he asked Alfred, Alfred --
7  well, I'm going to sustain, I'm not going to
8  put a vote.  I'm like, okay, this is amazing.
9  All before you was like, the chief is wrong,
10 you know, I'm going to let him know.
11 Q  What does this have to do with the lawsuit,
12 Greg?
13 A  Well, it goes back to --
14 Q  Gabe?
15 A  -- why I didn't trust Alfred.  Because you're
16 showing me now that you're not going to go
17 against Chief Craft.  Even right or wrong
18 you're not going to go against this man.  That
19 was the whole deal.  And that was the reason
20 why -- one of the reasons why I decided to
21 record that conversation to protect myself,
22 because I saw how this man went from, I'm
23 going to tell the chief, I'm going to let him
24 know this is wrong.  And then, when it came
25 down to, let's make the decision on what we're

Page 135

1  going to do to this officer, oh, I'm going to
2  abstain.
3     And then, we discussed it after.  And it
4  was like, why did you do that?  Oh, well, I
5  didn't want to go against the chief.  So
6  you're telling me you don't have the fortitude
7  to stand up and do what's right, so I have no
8  use for you.
9  Q  You told him that?
10 A  Yeah.
11 Q  All right.  So when you went in on April 19 --
12 when was that conversation, that hearing and
13 whatnot, in relation to April 19th of '12?
14 A  I don't remember.  It was before that date,
15 but I don't remember the exact date.
16 Q  It could have been a year before?
17 A  No, not that long.
18 Q  Okay.
19 A  It would have been within maybe two or three
20 months.
21 Q  All right.  So you go in on the 19th to record
22 him, don't tell him you're recording him,
23 don't read him his bill of rights.
24 A  And again, I'm going to say, I don't have to
25 advise him of his bill of rights because I was

Page 136

1  not conducting an investigation on Major
2  Alfred, I was merely recording a conversation
3  with Major Alfred for my own personal
4  protection, which was not a violation of
5  departmental policy, not a violation of state
6  law or federal law.
7  Q  Okay.  What was the nature of the
8  conversation?
9  A  Again, I was going in to inquire if he had saw
10 the news article regarding Richard Rees,
11 because Richard was assigned to the patrol
12 division.  And I didn't -- like I told him, I
13 didn't want him to get blindsided with
14 information that he didn't know.
15    And his response to me was, he said, oh,
16 I already knew about it.  He said, the media
17 actually called yesterday afternoon.  And at
18 that point, I was done with the conversation,
19 I was turning out of his office to leave
20 because he was already aware of it.
21    And he kept me in his office and
22 continued the conversation.  And that's when
23 he went on to the -- tell me about what had
24 occurred at a civil service meeting between he
25 and Kane.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 137

1  Q   Okay.  What else did he say?
2  A   Pretty much, that was it.  He went on to
3      pretty much say that, you know, he was
4      appalled by the fact that Kane had went into
5      an open meeting and made comments about him in
6      that nature, and that he was going to -- he
7      would -- he would -- he and Craft were going
8      to do whatever they needed to do to make sure
9      that that never happened again, and that he
10     was going to file a complaint on Kane.  Kane
11     was going to have to prove the things that he
12     said.  And again, I had no knowledge of what
13     happened at the civil service meeting because
14     I wasn't there, so --
15 Q   Okay.  What did you do with the -- how long
16     did that conversation last?
17 A   The entire conversation, from the time I
18     walked into his office until the time I left,
19     18 to 20 minutes, I think, total.
20 Q   Okay.  And what did you do with that?
21 A   Once I left his office, I went back to my
22     office and gave Scott his pen back.
23 Q   Did you tell him what occurred?
24 A   I don't think so.  I think the only thing I
25     told him was that there was actually nothing

Page 138

1      of importance on it, so -- and that pretty
2      much was it from me.
3  Q   You didn't feel threatened in the meeting with
4      Major Alfred, did you?
5  A   Personally, me, no, I did not.
6  Q   Okay.  Did you discuss what Major Alfred said
7      with anybody else?
8  A   No.
9  Q   How did it come that this recording was given
10     to the news media, and then, a TRO was filed
11     and that was the basis of the TRO, that
12     recording?
13 A   Through the testimony in federal court, I
14     learned that it was Kane that submitted it to
15     the media.  But it wasn't me.
16 Q   Okay.  And how did Kane even come to find out
17     about it?  Why was he involved with it?
18 A   That's something you would have to ask Kane,
19     sir.  I have no idea.
20 Q   Did Scott give it to him?
21 A   I have no idea.
22 Q   You were there when it was played for the
23     judge?
24 A   Yes, sir.
25 Q   You heard his comment after it was played?

Page 139

1  A   I remember him making a comment.  I don't
2      remember specifically what he said, but yes.
3  Q   Something like, is that all you got?
4  A   Yes, something to that effect.
5  Q   Then, he denied the TRO?
6  A   Yes, sir.
7  Q   Any other recordings you've made?
8  A   No, sir.
9  Q   When did you decide to file the federal
10     lawsuit?
11 A   Once I was -- they're going to say
12     differently.  When I felt that I was forced to
13     retire before I wanted to retire, because
14     again, doing what was best -- what I thought
15     was best for my family.
16         And the fact that I had been railroaded,
17     and falsely accused in the first investigation
18     of 007.  And then, Alfred came back after he
19     obtained information that pretty much you
20     supplied him during the federal court -- I
21     mean, district court.  Which is an issue that
22     I guess we'll need to discuss.
23         Because at that point, I don't know where
24     you, as the attorney was representing the
25     city, or as the fact that you became an agent

Page 140

1      of the Lafayette Police Department.  I
2      understand your right to question me on the
3      stand, but the information that you questioned
4      me about regarding that recording was
5      information that was used to generate the
6      complaint that was filed against me and Scott
7      by Alfred.
8          And I was not advised of my bill of
9      rights by you or anybody else from the city of
10     that time.
11 Q   We were in state court.
12 A   Yes.  But again, you bring up about Alfred, if
13     I had advised him of his rights when you
14     questioned me.  But I was not advised of my
15     rights.
16         And those -- that information that you
17     obtained was given to the city, which they
18     used to launch an investigation on me, in
19     which at that point, that's what they were
20     going to terminate me on.
21 Q   Has anybody given you a termination letter?
22 A   No.  Because I retired.
23 Q   Do you know the outcome of the 007
24     investigation?
25 A   No, sir.  Again, I have not received my

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 141

1  disposition letter.  And my belief is I was
2  not given that information simply because they
3  know, at the moment that documentation hits my
4  hand, I will be filing criminal charges
5  against Dee Stanley, Jim Craft, Jackie Alfred,
6  Dwayne Arceneaux.
7  Q  So I don't know that you answered the question
8  as to when you decided to file the federal
9  lawsuit, date-wise.
10  A  Date-wise?  I don't know the exact date.  But
11  once we realized that we were not going to get
12  any relief from district court, the 15th
13  Judicial District, it was decided that, I
14  guess we need to move into the federal
15  venue.
16  Q  Why did you think you weren't going to get
17  relief in the district court, in the 15th
18  JDC?
19  A  For the most part -- and again, this is only
20  my opinion.  The 15th JDC is a joke.
21  Q  Why do you say that?
22  A  They do not prosecute things.  And definitely,
23  they will not go against the city.  I don't
24  care which judge you go before, which
25  prosecutors are attending it, they will not do

Page 142

1  anything against the City of Lafayette.
2  Q  This wasn't a criminal matter, though,
3  correct?
4  A  Correct.
5  Q  I mean, it was a civil matter?
6  A  Right.
7  Q  The TRO was filed in civil court.
8  A  Civil court, yes.
9  Q  Okay. So prosecuting really was not an issue,
10  was it?
11     MR. SPRING:
12        I'm going to object.  That is asking
13     him to call for a legal conclusion
14     whether it's a prosecution, or however
15     you want to call it.
16  MR. CORRY:
17  Q  I think you can answer it.
18  A  Okay.  It was civil in nature.  But again,
19  just my years with the Lafayette Police
20  Department, and having to deal with the 15th
21  Judicial District, that's just the way things
22  are done.  They really lack in doing
23  successful prosecutions, in my opinion.
24  Q  And you're talking about the criminal context
25  or the civil context?

Page 143

1  A  Criminal context.
2  Q  Okay.
3  A  It's a reason and, you know, just as point of
4  reference.  Louisiana State Police, if you pay
5  attention, because I know you made a comment
6  yesterday that you do watch the news.  And we
7  said that bad guys don't watch the news.  But
8  Louisiana State Police, look at it where they
9  make all their traffic stops; Jeff Davis
10  Parish, St. Martin Parish.  There's a reason
11  that nobody is stopped in the 15th Judicial
12  District by the Louisiana State Police.  They
13  will not come out and say it, but we do have
14  friends and families that work for the state
15  police.  And they just don't do it, because
16  the 15th JDC don't prosecute.
17  Q  And that's in a criminal context?
18  A  That's correct.
19  Q  But I'm focusing on the TRO in civil court
20  before Judge Earles.  And the federal suit
21  that you have filed is also in the civil
22  context.
23  A  Right.
24  Q  And you told me that the decision was filed in
25  federal court because you didn't think you

Page 144

1  would get any relief in the 15th JDC, correct?
2  A  Right.
3  Q  But you're talking about criminal.  And I just
4  want to make sure we're comparing apples to
5  apples?
6  A  Apples to apples and oranges to oranges.  I
7  got you.
8     And if I'm not getting -- from what I've
9  seen in my experience with dealing with the
10  15th JDC regarding criminal matters, I don't
11  seeing civil being any different.
12  Q  Did you -- as a police officer, did you have
13  anything civilly before the 15th JDC?
14  A  No, sir.
15  Q  I assume not, right?
16  A  No, sir.
17  Q  But your feelings civilly are the same as
18  criminal?
19  A  As criminal, absolutely.
20  Q  Did you have any particular issues with Judge
21  Earles?
22  A  No, sir.  I know the man personally.
23  Q  If you thought you needed to protect yourself
24  with Jackie Alfred based on what Dwayne
25  Arceneaux had told you, why did you just

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 145

1   record him that one time and never again?
2  A  Because there was pretty much my contact with
3     him -- that was pretty much one of my first
4     contacts with him after I had the conversation
5     with Dwayne Arceneaux.
6  Q  Were you still working -- strike that.
7        That was the only other conversation that
8     you had with Major Alfred after that
9     conversation with Dwayne Arceneaux, up until
10    the time you retired?
11 A  Yeah.  The man stopped speaking to me.
12 Q  Did you ever have to interact with him through
13    the office?
14 A  He would not deal with me.
15 Q  Okay.  Were you still working when general
16    order 201.2 was implemented, the clandestine?
17 A  Yes, sir.
18 Q  Did you record after that occurred?
19 A  No, sir.
20 Q  Do you know if anybody else did?
21 A  I have no idea of that.
22 Q  Did you publish any of the recordings, I guess
23    the only two that you made?
24 A  No, sir, I did not.
25 Q  And when I say "published", either to the

Page 146

1   newspaper, the Internet, or the TV stations?
2  A  No, sir, I did not.
3  Q  Do you know how that recording you made got on
4     TV?
5  A  No, sir, I do not.
6  Q  Let's flip.  Why don't you look in your book?
7     Let's talk about the transfers.
8        What documents do you have that support
9     your -- the issue on the transfers?
10 A  The actual letter of transfer.
11 Q  Okay.  And I think that was submitted in the
12    supplemental?
13 A  Well, it was sent in the first time, but that
14    was one of the ones that we discussed
15    yesterday, like one or two of the pages were
16    there, but the page that included my name was
17    missing.
18 Q  Let's find it in the first set, if you can
19    flip to it.  29, GT-29.
20 A  (Witness examines documents.)
21       29 on this one is actually just the third
22    page.
23 Q  Okay.  That's what I'm -- (Interrupted)
24 A  Okay.
25 Q  But that's the original responses?

Page 147

1  A  Right.
2  Q  Do you know why we only got the third page?
3  A  No, sir, I don't.
4  Q  Okay.  And then, the supplemental responses
5     that we received last night, there was a -- I
6     think it's GT-68.
7  A  Yes, sir, it is.
8  Q  Okay.  So 29 is the same as 70?
9  A  That is correct.
10 Q  I guess we'll just look at 68.  Tell me what
11    this is.
12 A  (Witness examines document.)
13       I would say internal memorandum for the
14    Lafayette Police Department detailing
15    personnel transfers that were going to take
16    place on June 10th, 2012.
17 Q  Okay.  And the date of the memo is what?
18 A  May 22nd, 2012.
19 Q  In your prior seven transfers, is this the
20    type of memo you would receive when being
21    transferred?
22 A  Yes and no.  Sometimes transfers came out on
23    -- in memo form.  Sometimes they did them by
24    e-mail.  And sometimes they didn't do them at
25    all, you were just transferred.

Page 148

1  Q  Any policy or procedure that you know about
2     with regards to -- (Interrupted)
3  A  The policy is that everything is supposed to
4     be done in writing, but that's it.  There were
5     times that some people were transferred,
6     nothing came out.  There were times where it
7     was done by e-mail.  And there were times
8     where they actually sent out internal
9     memorandum.
10 Q  All right.  And this is a three-page document?
11 A  That is correct.
12 Q  And it looks like there's one, two, three,
13    four -- 11 lieutenants that were transferred.
14 A  Yes, sir.
15 Q  And eight sergeants.
16 A  Yes, sir.
17 Q  And other than yourself, were any of these
18    other individuals, any of the other ten
19    lieutenants, part of this federal lawsuit?
20 A  Lieutenant Novey Stelly and Lieutenant Greg
21    Cormier.
22 Q  Anybody else?
23 A  I don't think so.
24 Q  Okay.  And then, the eight sergeants, were any
25    of them part of the lawsuit, the federal

Kane Marceaux, et al vs.                                                                 Gabe Thompson
Lafayette City-Parish Consolidated Government, et al                              February 19, 2014

Page 149

1   lawsuit?
2  A   No, sir.
3  Q   Okay.  Why is this included in your discovery
4      responses, GT-68 through 70?
5  A   Because in one of your interrogatories, I
6      would have to actually go back and read the
7      specific wording, but it said my supposed
8      transfer.  And that is included, because to
9      show that it wasn't a supposed transfer, I was
10     actually transferred.
11 Q   Let's look at that.  Did you assist your
12     attorney in responding to this discovery?
13 A   Yes, sir, I did.
14 Q   The original set and the supplemental set?
15 A   That is correct.
16 Q   Did you find which request it specifically
17     addresses?
18 A   (Witness examines document.)
19         Interrogatory Number 7.
20 Q   Okay.  It's actually referring to paragraph
21     231 through 235 of the original complaint.
22         MR. CORRY:
23             Do we have a copy of that?
24 MR. CORRY:
25 Q   Did you verify this complaint when it was

Page 150

1   filed?
2  A   Can you elaborate a little bit more?  I
3      mean --
4  Q   Did you execute a verification affidavit?
5  A   Yes.
6  Q   I think it's 231 through --
7  A   235.
8  Q   -- 235.  If you want to look at that to
9      refresh your memory.
10 A   (Witness examines document.)
11         Yes, sir.
12 Q   Are you with me?
13 A   Yes, sir.
14 Q   You reviewed it?
15 A   Yes, sir.
16 Q   And just for the record, you reviewed the
17     original allegations in the complaint of 231
18     to 235.  And then, the response to
19     Interrogatory Number 7 is GT-68 through 70.
20     Is that accurate?
21 A   That's correct.
22 Q   Okay.  Is there anything else that's
23     responsive to that interrogatory, other than
24     GT-68 through 70?
25 A   It would go into the details when the class

Page 151

1   was put on at the police department, and he
2      altered --
3  Q   We're going to get to that.
4  A   Okay.
5  Q   Where you thought you weren't included?
6  A   Yes.
7  Q   Okay.  I'm talking about -- (Interrupted)
8  A   But I was required to switch my schedule for
9      that week as well --
10 Q   Okay.
11 A   -- to work nights.  Because I was actually a
12     daytime supervisor in that position.
13 Q   Okay.  Let's talk about this --
14 A   Okay.
15 Q   -- and then we'll talk -- I'll make a note to
16     talk about the class.
17 A   Okay.
18 Q   You were transferred with a number of
19     officers, I think 19 total; 11 and 8, 19?
20 A   Yes.
21 Q   Okay.  And it says, relieved of duty patrol
22     division, Precinct 3, administrative assistant
23     under the supervision of Captain Norbert
24     Myers.  Transferred to patrol division,
25     Precinct 4, administrative assistant under the

Page 152

1   supervision of Cornell Montgomery.  The same
2      lateral transfer?
3  A   Yes, sir.
4  Q   The same position?
5  A   Yes, sir.
6  Q   The only difference in your working hours, I
7      think you told me was instead of 7:00 to 4:00,
8      it was 8:00 to 5:00.
9  A   That is correct.
10 Q   Daytime.
11 A   Yes, sir.
12 Q   And you've already described the difference in
13     the -- you felt of less responsibilities with
14     the transfer.
15 A   Right.
16 Q   Or less interaction with the captain.
17         Anything else that was different?
18 A   No, sir.
19 Q   Anything about your pay that was different?
20 A   No, sir.
21 Q   Did you talk to any of these other lieutenants
22     about why they were being transferred, or did
23     it have any bearing on anything that you've
24     alleged in the lawsuit?
25 A   There was no reason to speak to them, because

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 153

1    I already knew why I was being transferred.
2    And --
3  Q   Did you -- (Interrupted)
4  A   -- in order for me to be transferred, you have
5    to move other people.  So you can't move me
6    from 3 and not put somebody in my place.  So
7    as a chain reaction, whenever somebody is
8    moved from one place, it will affect other
9    people.
10  Q   Okay.  Transfers occur, right?
11  A   Yes, they do.
12  Q   Lieutenants are transferred in the same
13    position from one precinct to another?
14  A   Yes, sir, it can happen.
15  Q   Okay.  This wasn't the first time the
16    transfers such as the one that you made in
17    GT-68 through 70 occurred in the Lafayette
18    Police Department, is it?
19  A   No.  There have been other people who were
20    transferred because they spoke out, too.
21  Q   Other than this memo, did anybody specifically
22    tell you, hey, you're being transferred,
23    here's where you're being transferred, and why
24    you're being transferred?
25  A   No.

Page 154

1  Q   How did you get this memo?
2  A   It is sent to the department, the entire
3    department.  Everybody in the Lafayette Police
4    Department got this.
5  Q   Okay.  So you have an e-mail account, I guess?
6  A   Yes.
7  Q   It comes through your e-mail?
8  A   It comes through the e-mail.
9  Q   And you're required to check that
10    periodically?
11  A   Daily.
12  Q   And you check it for updates and --
13    (Interrupted)
14  A   That is correct.
15  Q   Okay.  All right.  Then, you were talking
16    about a class.  I think you referenced that.
17    That was in your supplemental responses.
18    You're talking about the seminar deal?
19  A   Yes, sir.
20  Q   Is that GT-51?
21  A   (Witness examines his documents.)
22     Yes.  It actually starts at GT-50, the
23    last -- the second to last paragraph.
24  Q   Where it says note?
25  A   During.  During the week of August 13th

Page 155

1    through the 17th.
2  Q   And where does it go through?
3  A   (Witness examines his documents.)
4     It goes through that -- it goes through
5    GT-52.  And where it stops is where it says
6    Friday, the 25th.
7  Q   Okay.  That's where it ends?
8  A   Yes.
9  Q   All right.  And it's in the record.  We've
10    attached it.
11  A   Okay.
12  Q   But tell me -- just briefly tell me what that
13    was about, how that affects Interrogatory
14    Number 7, and the allegations of 231 through
15    235 of the original claim.
16  A   This supervisory class was being hosted by the
17    Lafayette Police Department.  When the class
18    came about, Alfred actually had sent out an
19    e-mail noting that they were going to be
20    sending all lieutenants, and maybe one or two
21    sergeants, people who were up for lieutenant,
22    that were close, the next couple of guys to
23    make lieutenant, to this class.  I want to say
24    that they also had sent some of the captains.
25  Q   What kind of class was it?

Page 156

1  A   A supervisory class.
2     Once the e-mail was sent by Alfred, I
3    noted that my name was not on it.  And at the
4    time, I had been a lieutenant for well over a
5    year.  And my name was not on it.  And I also
6    noticed that Greg name was not on it as well.
7    When I saw Reginald Thomas, who was the
8    training director at the time, I questioned
9    him about it.  I said, why my name was left
10    off the list, why I'm not going to this class?
11    The man just kind of lowered his head and
12    wouldn't say anything.  So I said, well,
13    pretty much your body language tells me
14    everything.  He said pretty much it came down
15    to, the decision was made by Jackie Alfred not
16    to send me to that class.
17  Q   Did someone tell you that?
18  A   Reginald Thomas.  He was the training
19    director.  And he said Jackie Alfred put the
20    list together, and he decided who was going to
21    attend this class.  And he told Reginald I was
22    not going to this class.
23  Q   Is that within the directive of the major to
24    decide who goes to classes?
25  A   I would say yes.  But if you send out an

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 157

1   e-mail, department wide, saying all
2   lieutenants would be going to this class, I
3   feel that I'm a lieutenant, I should have
4   attended this class.
5  Q   Okay.  Do all lieutenants attend all classes
6      that are offered in the police department?
7  A   Absolutely not.
8  Q   Okay.  They can select a particular lieutenant
9      or lieutenants, plural, depending on the type
10     of class?
11 A   Correct.
12 Q   Okay.
13 A   However, every lieutenant in that department
14     for the exception of me, Greg and Andy
15     Fontenot.  And I think the reason why Andy
16     Fontenot was not elected to go, Andy decided
17     that he would fill in and make the overtime,
18     filling in for the other lieutenants as watch
19     commanders.  So he saw an opportunity to make
20     additional monies.  And he had already
21     announced his retirement, that he would be
22     leaving within the next couple of months.  So
23     it would have been pointless to send him to
24     this class, because the class was, from what I
25     was told, $600 per officer.

Page 158

1  Q   Do you have any evidence of that, or it's just
2      your speculation?
3  A   Evidence regarding what?
4  Q   Andy.
5  A   Andy?  I don't have the evidence in hand, but
6      I'm more than certain you can call Andy, and
7      he'll tell you this.  Because I spoke to --
8      Andy and I were real good friends, and Andy
9      told me this.
10 Q   Is he a white guy or a black guy?
11 A   He's a white guy.
12 Q   And was he part of the lawsuit?
13 A   No, he was not.
14 Q   Any other evidence in response to that
15     Interrogatory Number 8 -- excuse me, number 7,
16     and as it relates to 231 to 235?
17 A   Other than just to get on the record that
18     during that week, again, my work schedule
19     changed.  At first, they were going to have
20     both Greg and I fill in for all the other
21     lieutenants.  But however, on that Friday,
22     before the class, is when they actually placed
23     Greg on administrative leave and sent him
24     home.  And then, that left only Andy and I to
25     fill in on the desk as watch commanders.  It

Page 159

1   was either -- I think it was the Saturday
2   night, maybe around 11:00 or 11:30 at night, I
3   received a call from Cornell Montgomery.  He
4   told me he was out of state, and said because
5   they had sent Greg home, he would not be able
6   to work to fill in for the lieutenants who
7   were going to the class the Sunday, and they
8   needed me to go in and take that shift.  And I
9   told him absolutely not, because it was too
10  much of a last minute notice, that the police
11  department made a mistake.  They made the
12  error because they knew about this well in
13  advance, and they're the ones that decided to
14  send Greg home for whatever reason.
15     And I couldn't do it, because, again, I
16  didn't have a babysitter lined up at the time,
17  and all of this good stuff.  And they wanted
18  me to go in that Sunday night.  I wasn't going
19  to do it.  So he could have wrote me up, and
20  do whatever he needed to do.
21 Q   So is that -- you denied -- you refused a
22     direct order?
23 A   It wasn't a direct order.  It was a request.
24 Q   Okay.
25 A   He asked me if I could do it, and that's when

Page 160

1   he said he understood.  And he said, well, I'm
2   out of town, but he said, I think I can make
3   it back in time and I will go in and sit on
4   the desk.  So I don't know if he did, or I
5   don't know who actually worked that shift the
6   Sunday night.
7      But then, I had to report for duty the
8   Monday night, the Monday and Tuesday.
9  Q   And we're talking the week of August 13th
10     through the 17th of 2012?
11 A   Yes, sir.
12 Q   That's a Monday through Friday?
13 A   Yes, sir.
14 Q   The seminar went on every day?
15 A   Yes, sir.
16 Q   All day?
17 A   All day.
18 Q   And so, you covered for however you --
19     (Interrupted)
20 A   Right.
21 Q   I mean, that wasn't the first time you had
22     covered for somebody that was in a seminar, or
23     off on vacation, or sick leave, or whatever,
24     is it?
25 A   Not the first time, but not under these

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 161

1  circumstances.
2      Like I said, there had been times where a
3  lieutenant may have been on vacation, and
4  while that lieutenant, his partner was on --
5  while he was on vacation, another lieutenant
6  may have gotten sick.  And then, well, now
7  you're in a jam.  And that's one of the duties
8  as the administrative assistant, if it's your
9  shift that's working, you will go fill in for
10  that lieutenant who called in sick.
11 Q  Is that what you did here?
12 A  Absolutely not.  Like I said, this -- this was
13  then giving a directive that I was going.  I
14  was not going to the class, and that I was
15  going to going to work those shifts by order
16  of Major Alfred.
17 Q  Somebody's got to work the desk, right?
18 A  Absolutely.  And it was Lieutenant Randy
19  Miller was highly upset.  He said he did not
20  want to go to this class, he was being forced
21  to go to this class, he didn't want to go.
22  Reginald Thomas had already attended this
23  class, and there was no reason to send him
24  again, because he had just got back from the
25  FBI National Academy.  But Alfred opted to

Page 162

1  send him again.
2      So again, you're wasting taxpayer dollars
3  to give this man the same training, when you
4  could have sent either myself or Greg to this
5  training.
6 Q  Were you paid for your duties that week?
7 A  Yes, I received my normal salary.
8 Q  Anything else --
9 A  No, sir.
10 Q  -- on the transfer or the class?
11 A  No.
12 Q  That covers it?
13 A  Pretty much.
14 Q  Okay.  Well, it either does or it doesn't.
15 A  Well, again, I just wanted to go back, you
16  know, just, I guess we touched on it.  But the
17  fact that Reginald Thomas specifically told me
18  that it was Jackie Alfred that made that
19  decision not to send me to this class.  And I
20  even told him, I said, well, if someone should
21  back out from this class, it sounds like a
22  very good class, I would like to attend.
23 Q  And did anybody back out?
24 A  No.  But again, like I said, I spoke to Randy
25  Miller.  He did not want to go.  So you force

Page 163

1  people who didn't want to go to go to this
2  class.  And somebody who wanted to attend,
3  you would not send him.
4 Q  Did Reggie Thomas tell you why Major Alfred
5  did not want to send you?
6 A  Yes.
7 Q  Why?
8 A  He said he was upset with me because I had
9  filed -- recorded a conversation with him.
10 Q  Okay.  Any other reason?
11 A  No.  That was it.
12 Q  All right.  Let's look through your
13  interrogatories, Gabe.  If you'll turn to
14  GT-43, the supplemental responses.
15 A  (Witness complies.)
16      Okay.
17 Q  It says -- it's actually a response to the
18  request for administration.  The request for
19  admission says, please admit that you have no
20  evidence other than recordings identified in
21  any pleading or proceeding involving any
22  plaintiff or any defendant in this lawsuit,
23  which otherwise support your claims against
24  the defendants.
25 A  Uh-huh (yes).

Page 164

1 Q  And you deny that.  And then, number 1, asks,
2  in response to request for admission number 1
3  -- if response for request for admission
4  number 1 is denied, please state in detail
5  each and every item of evidence, physical,
6  documented or otherwise, which supports each
7  and every claim against defendants.  And
8  you've listed that.
9 A  Yes, sir.
10 Q  Okay.  Is there anything else, other than what
11  you've listed?
12 A  No, sir.
13 Q  Okay.  And the Internal Affairs case number
14  2012, 007, that's the Mac Gallian document?
15 A  That is correct.
16 Q  Okay.  The polygraph of Woody Overton, the
17  same 007, that's the polygraph you took?
18 A  Yes, sir.
19 Q  What was the result of that polygraph?
20 A  I passed.
21 Q  Is that what a polygraph tells you?
22 A  Yes.
23 Q  It says pass, fail?
24 A  Yes.
25 Q  Okay.  The video of Woody Overton, what is

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 165

1  that?
2  A  The polygraph room is wired for audio and
3  video, and so everything was recorded.
4  Q  Was your attorney present with you during
5  that?
6  A  No, sir.  Didn't need one.  Didn't need him
7  for that.
8  Q  And then, 010, the next one, AD-2012-010, what
9  is that?
10  A  That's the complaint that Alfred filed on me
11  for conducting an unauthorized investigation.
12  Q  For the recording?
13  A  When I recorded our conversation.
14  Q  Cornell Montgomery, I think we've talked about
15  him.  Is there anything else that you need to
16  add?
17  A  He was -- he received a phone call from Alfred
18  the day that I was served with my notice for
19  the predetermination hearing.
20  Q  On?
21  A  For AD-2012-010.  Me, Cornell and Reginald
22  Thomas were at Vital Services at the Clifton
23  Chenier building.  We were having a
24  conversation discussing about joining NOBLE,
25  which is the National Organization for Black

Page 166

1  Law Enforcement Officers.
2  Q  What was the date of this?
3  A  It would be the exact same date I was served
4  with my notice, which was on September 6th.
5  Q  Of?
6  A  2012.
7  Q  Okay.
8  A  We were in Reggie's office talking.  Cornell
9  called Alfred, and wanted to -- to ask him if
10  he was to remain a member of NOBLE once
11  he retired from the Lafayette Police
12  Department.  While during that conversation,
13  Alfred -- well, Cornell had Alfred on
14  speakerphone.  Alfred instructed him --
15  Q  Did Alfred know he was on speakerphone?
16  A  Yes.  Because shortly thereafter, he
17  instructed Montgomery to take him off of
18  speaker and pick up the receiver.
19  Q  Did he know that anybody else was present
20  other than -- (Interrupted)
21  A  Yes.  Because Montgomery told him.  He said,
22  Me, Gabe and Reg are standing here talking.
23      And after he asked about NOBLE, he told
24  him to pick up the receiver.  It was then
25  Alfred instructed Montgomery to tell me that I

Page 167

1  needed to report to city hall to go pick up my
2  letter regarding the predetermination hearing.
3  Q  On 010?
4  A  Yes.
5  Q  On 2012-010?
6  A  Yes, sir.
7  Q  Did you do that?
8  A  Yes, sir.  As soon as he told me.  And matter
9  of fact, the specific instructions was I
10  needed to leave and leave now, because Ray
11  Domingue would be leaving real soon to go home
12  for the day.
13  Q  I think you explained that --
14  A  Yeah.
15  Q  -- scenario in your supplemental answers.
16  A  Right.  And one of the things that concerned
17  me was that, again, having participated in
18  this process, I didn't understand why I was
19  being sent to city hall, why I was being
20  issued this form by Ray Domingue, because that
21  is normally done at the police department and
22  is given to you by either the chief or a
23  member of the Internal Affairs section.
24      So for whatever reason, they decided to
25  change the policy that day.  But I followed

Page 168

1  the order and I went to city hall, went to
2  human resources.
3  Q  You mentioned policy.  Is there a general
4  order, or PPM, or anything else that dictates
5  how you get a predetermination hearing
6  letter?
7  A  No.  But again, it's just protocol, that's
8  always been -- was done in-house.
9  Q  Okay.  Anything else with Cornell at that
10  time?
11  A  No, sir.  That's pretty much.
12  Q  Anything else he's got to offer in support of
13  your allegations that we haven't talked about?
14  A  No.  But I'm more than certain -- Cornell
15  never came out and personally told me this.
16  But again, he and Alfred were real close
17  friends.  I'm more than certain that Alfred
18  told him everything that was going on
19  regarding me.
20  Q  You don't know that?
21  A  I don't know that.
22  Q  It's speculation?
23  A  Yes, it's speculation.
24  Q  Okay.
25  A  Speculation.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 169

1  Q   All right.  And then, anything else?
2  A   That's it.
3  Q   Captain Luranie Richard?
4  A   Captain Richard is the one that was on the
5      telephone with Alfred, had him on speaker,
6      when he told her that me, Greg and Scott were
7      going to be terminated.  And this, I heard
8      because our offices were less than ten feet
9      away from each other, and she had her phone on
10     speaker.  And just about before he called her,
11     she asked me to come to her office to assist
12     her with setting up a Power Point, because she
13     couldn't do it.
14         And so, I was going into her office to
15     assist her with that.  When I got to her
16     office, I could hear Alfred -- while I was
17     walking down the hall to go to her office, I
18     could hear the conversation with Alfred
19     telling her this.  When I got close to the
20     office, she picked the phone up off the
21     receiver, finished her conversation with
22     Alfred, hung up.
23         I assisted her with the Power Point.  And
24     then, when we were done, that's when she made
25     the comment to me, I'm sorry what these people

Page 170

1      are about to do to y'all.  I'm sorry to say
2      that they're going to fire y'all.
3  Q   When was that?
4  A   I would have to actually go back to my notes
5      to give you the exact date.
6  Q   Okay.  And what is it you're referring to?  Is
7      it something in here?
8  A   It would be in here, yeah.  It would have been
9      easier for me to find it in mine, but I can
10     find it.
11 Q   That's fine.
12         I guess it would be starting on page 48,
13     GT-48 and going back?
14 A   (Witness examines documents.)
15         I think it's right after this one.  Okay.
16     It's going to be on GT-56, and the fourth line
17     from the bottom.  It starts with, Captain
18     Luranie Richard called me to her office to
19     assist in preparing the Power Point
20     presentation for compstat.
21 Q   And that's what you were telling me.  Do you
22     have a date reference on that?
23 A   I thought I had.  Because I think it would
24     have been on the -- let me check.  It may have
25     been cut off.

Page 171

1          It's on that same date I talked to
2      Reginald, so that would have been September
3      10th, 2012.
4  Q   Is that different than what's in here?
5  A   No, it's in the same.  It's all in the same
6      one.
7  Q   Okay.  Show me where.
8  A   All right.
9  Q   Where you are getting the September 10th?
10 A   September 10th would be actually on GT-55, at
11     the top of the page.
12 Q   Okay.  And it just goes through --
13     (Interrupted)
14 A   It goes through, because that all happened on
15     the same day.
16 Q   Okay.  All right.  Anything else that Luranie
17     Richard can add?
18 A   No, sir.
19 Q   Reggie Thomas, I think we've talked about him,
20     right?
21 A   Reggie, again, would be on GT- --
22 Q   The deal with the class?
23 A   No.  Reginald came to me to let me know that
24     he had went spoke to both Alfred and Craft on
25     my behalf, because he knew I was being

Page 172

1      railroaded.  And he specifically said that in
2      speaking with Alfred, he was very upset with
3      me, and he specifically said that, the man has
4      black in his heart.  He doesn't want to have
5      anything to do with you.
6          He said that he went speak with Craft,
7      and he said normally -- and Reg is one of
8      those type of people that could actually walk
9      into Chief Craft's office at any given moment
10     in time with that open door policy and discuss
11     pretty much anything with Chief Craft.
12 Q   He was the former civil service rep?
13 A   Yes.  And he said even on that particular day
14     when he went to speak to Craft on my behalf,
15     that Craft was treating him funny.  Because
16     there was some documents related to the
17     lawsuit on Craft's desk.  And he said that
18     Craft actually picked the paperwork up,
19     maintaining eye contact with him, and flipped
20     it over so he could not read what it was.
21 Q   That's his prerogative, isn't it?
22 A   Oh, yeah.  But I'm just telling you what he
23     told me during the conversation.
24 Q   Okay.
25 A   And he recommended that I type up a letter, he

Page 173

1   said, because he was more than certain that
2   Craft nor Alfred would want to meet with me
3   personally.  So he recommended that I type up
4   a letter to Chief Craft stating that if -- I
5   would accept any discipline that was handed
6   down to me by Chief Craft regarding recording
7   Major Alfred, and not take it to civil service
8   in appeal, whatever discipline that was
9   rendered to me, that that may work and keep my
10  job.
11  Q   Did you do that?
12  A   No, sir, I did not.
13  Q   And that was on September 10th of '12?
14  A   Yes, sir.
15  Q   And you retired the next day?
16  A   Yes, sir.  Because I told Reginald, I'm not
17  going to admit to something I did not do.  I
18  didn't violate any policy, or rules or
19  regulations.  So once he told me this, again,
20  Reg is a confidant of Chief Craft.
21  Q   Was he a friend of yours?
22  A   Yes.  Yes.
23  Q   And for the record, Reggie is a black guy,
24  right?
25  A   Yes, he is.

Page 174

1       And after -- and I know he had spoke with
2   Chief Craft because he told me he had.  And
3   then, he said he was going to go back and
4   speak to him again on my behalf.  And he said
5   he didn't know exactly how far it would go, or
6   what he could actually do.
7       If he honestly and truly did this, I have
8   no idea.  I'm just going on what he told me.
9   Q   Did you ever apologize to anybody for
10  recording Major Alfred?
11  A   No.
12  Q   Did you ever deny recording Major Alfred to
13  anybody?
14  A   No, I did not.  And I know --
15  Q   Nobody ever asked you if you had recorded
16  them, and you said no?
17  A   No.
18      And I think I know where you're going
19  with this.  It was Thursday morning, right
20  before a compstat meeting.  My office was
21  directly across from the compstat office.  I
22  was still in my office.
23  Q   What time frame are we talking about?
24  A   Compstat starts at 8:00, so --
25  Q   No, no.  Date-wise.

Page 175

1   A   It was -- it would have been sometime after
2   the hearing in state court.
3   Q   The TRO?
4   A   The TRO hearing.  It would have been after
5   that.
6   Q   Before the federal lawsuit was filed?
7   A   Before the federal lawsuit, but after the
8   state hearing.
9       I was in my office, getting ready --
10  gathering the last few things I needed to go
11  into the compstat meeting.  Craft is normally
12  the last person to enter.  And either Mark
13  Francis or Jackie Alfred will make the
14  announcement, all rise, or stand up, the chief
15  is coming in, whatever the protocol is that
16  they did for him to enter the room.
17  Well, while I was in my office, Alfred was
18  already standing in the hallway, Craft walked
19  up.  They were having a conversation.  I
20  couldn't tell you what they were really
21  talking about.
22      Shortly thereafter, Mark Francis walked
23  up, and Craft made a comment to Mark Francis,
24  saying, oh, I heard you almost got your ass
25  whipped yesterday by Greg Cormier.  And to

Page 176

1   this date, I still didn't know what happened.
2   And I don't even think Greg -- I hadn't even
3   mentioned this to Greg.  Because I overhead
4   this conversation that Craft said, I heard you
5   almost got your ass whipped by Greg Cormier
6   yesterday.  And it's obvious that they had
7   some form of disagreement regarding what was
8   going on at the Lafayette Police Department.
9   Q   Who is "they"?
10  A   Huh?
11  Q   Who is "they"?
12  A   Referring to they being Greg and Mark.
13  Q   Okay.
14  A   Evidently had some form of disagreement.
15      So right about that time, when that
16  statement was made, I walked out my office,
17  and they all kind of jumped, oh, shit, he was
18  still in his office.
19  Q   And for the record, Greg Cormier is an African
20  American and so is Mark Francis?
21  A   Yes, he is.
22  Q   Okay.
23  A   Well, yes, they are.
24      I walked out of my office, and they were
25  discussing the case and about the recordings.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 177

1   And so, after some of the recordings were
2   played on television, and I have a distinct
3   laughter, people know me.  I'm a jolly guy.  I
4   laugh a lot.
5 Q   I think it was 22 times, right?
6 A   Yes.  I'm a jolly guy.  That should be another
7   reason why you should not be recording me
8   anyway, or conduct an investigation because I
9   was laughing during the entire process.  I
10   thought he was funny, actually.
11       I told Mark Francis, I said, I know what
12   it appears to be, it looks like I was the one
13   recording everybody because it was being
14   played on the television.  But I specifically
15   told Mark Francis, I did not record you.
16   Because he thought that I was one of the ones
17   -- that I recorded him.  And I specifically
18   told Mark Francis, I did not record you.
19       And that's when -- but all three of them
20   were standing there.  And that's when -- I
21   remember in district court you had asked me
22   about that.  And -- because they were trying
23   to make it that I lied to Alfred and said I
24   didn't record him.  Well, I was not speaking
25   to Alfred, and I was not speaking to Craft.  I

Page 178

1   never recorded Craft anyway.  But I was not
2   speaking to Alfred.  I was speaking to Mark
3   Francis.
4 Q   Okay.  Anything else on Reggie?
5 A   No.
6 Q   And you talked about Francis.
7 A   Yes.
8 Q   Anything else on him?
9 A   Mark Francis, and how it goes in and ties in
10   with all of this.  At one point, even before
11   all of this stuff got started.  It was shortly
12   after Scott Poiencot was elected to the civil
13   service board.
14 Q   In violation of the statute, the state
15   statute?
16 A   That's what you said.
17       MR. SPRING:
18           That's calling for a legal
19       conclusion on his part.
20       MR. CORRY:
21           We have a judgment on that, Steve,
22       you know that.
23 A   Okay.  But I'm aware of any of that.
24   MR. CORRY:
25 Q   Okay.

Page 179

1 A   You keep throwing that out there, but that's
2   no concern of mine.
3 Q   Okay.
4 A   That's no business of mine what happened with
5   that.
6       But Mark Francis came to me and told me
7   to tell Scott that he needed to be careful and
8   watch himself when he's having conversations
9   with people in the POV lot is what we call it,
10   but it's the big parking lot across from the
11   police department.  You know, the POV, private
12   owned vehicle lot.  Because those boys on the
13   third floor, referring to the guys in Internal
14   Affairs, were watching him.  And, in fact,
15   that they were putting a case together on him
16   and it had already been delivered to city
17   hall.
18       And so, I confirmed, I said, do you
19   really want me to tell him this?  Yes.
20       So naturally, I passed this information
21   on to Scott.  And in addition to going back to
22   the --
23 Q   What did Scott say?
24 A   He said, they can watch what they want.  If an
25   officer is going to come to me, I'm going to

Page 180

1   talk to him.  It's my job as their civil
2   service rep to assist them in any manner I
3   can.
4       And my thing, if he was doing something
5   illegal, he wouldn't be doing it in a wide
6   open parking lot where everybody in God's
7   creation can see.
8       So -- but that was the information that
9   he asked me to pass on to Scott.
10 Q   Don't people generally talk -- and I'm not a
11   police officer.  I think y'all know that.
12   Don't people generally talk like out in a
13   parking lot out away from everything --
14 A   No.
15 Q   -- to make sure nobody can hear, or record, or
16   anything like that?
17 A   No.  And part of the problem, they didn't
18   realize Scott -- because Scott worked for me,
19   I knew it.
20       Scott, even though we had assigned police
21   vehicles that we could take home every day,
22   Scott Poiencot did not take his vehicle home,
23   even though he lived in the city.  He lives --
24   Scott lives maybe four or five miles from the
25   Lafayette Police Department, if that long --

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 181

1    that far, I mean.  But he always drove his
2    personal vehicle to work and parked in that
3    lot.
4         So most times they saw Scott in that lot,
5    he was going to his vehicle, or going to his
6    police unit.
7  Q  That's the lot on the corner of Pinhook and
8    University?
9  A  That is correct.
10  Q  That big lot?
11  A  Yes.
12  Q  I think there's the ATAC vans out there?
13  A  Yes.
14  Q  Okay.  What is the lot behind the police
15    department that's fenced it?
16  A  We just call that the back lot of the secured
17    lot because they have the gate up, and the
18    fence around it.
19  Q  You can park in either one?
20  A  Yes.  Police officers can park in either one.
21  Q  Okay.
22  A  And Scott never parked in the back.  He always
23    parked in the POV lot.  And a lot of officers
24    do that, and that -- I guess that's why they
25    would run across Scott in that lot, and

Page 182

1    decided to talk to him then.  But people were
2    speculating, I would assume.
3  Q  How long did Scott work for you while he was
4    on the civil service board?
5  A  The entire time he was on the civil service
6    board.
7  Q  What time frame is that?
8  A  I don't remember, Mr. Corry.
9  Q  Do you remember when -- he was working for you
10    when he got elected?
11  A  Yes.
12  Q  And he was working for you when he was
13    terminated?
14  A  Yes, sir.
15  Q  Okay.  Do you ever recall any occasion where
16    Scott went and talked to anyone about matters
17    coming before the board before they came to
18    the board?
19  A  No.
20  Q  Do you ever recall any information of him
21    meeting with attorneys on matters before the
22    board, before it came to the board?
23  A  No, sir.  His dealings with the civil service
24    board had nothing do with the Lafayette Police
25    Department, so I had no jurisdiction over

Page 183

1    Scott --
2  Q  I'm not asking about jurisdiction.
3  A  No, I'm just saying.
4  Q  I'm asking just personal knowledge.
5  A  Oh, no.  No.  Because all of that information
6    would be classified, or you know --
7  Q  You never saw any?  I'm asking that, too.
8         Did you ever see him meet with any
9    attorneys, or individuals going before the
10    board --
11  A  No.
12  Q  -- or have any matters before the board before
13    they were heard?
14  A  No, sir.  No, sir.
15  Q  Do you ever recall him meeting with other
16    board members at any time, or overhearing any
17    conversations, or see any documentation or
18    e-mails of any kind, with any board members --
19  A  No, sir.
20  Q  -- about civil service business before it was
21    heard?
22  A  No, sir.
23  Q  Did you ever hear any -- have you heard of any
24    of Scott's recordings?
25  A  I heard one.  And it was the one where he

Page 184

1    filed the complaint against Chief Craft when
2    Chief Craft said that a friend of his had gone
3    -- that Scott had gone to handle a complaint
4    at his friend's house.  And it was after a
5    staff meeting, Chief Craft called myself and
6    Captain Myers into his office, and said that
7    we pretty much needed to deal with Scott
8    Poiencot, because his friend -- I think his
9    last name was Balfour.
10  Q  Dwayne Balfour or something?
11  A  Something, yeah.  That's him.
12         Said that the chief specifically said
13    that Scott had went there and knocked Mr. --
14    sorry ladies -- knocked Mr. Balfour's dick in
15    the dirt.
16  Q  You listened to that recording?
17  A  So what had happened was -- I didn't listen to
18    -- I listened to when Scott actually had went
19    and handle the complaint that he was sent to
20    handle by the chief.  Scott recording his
21    conversations and dealing with Mr. Balfour.
22    And so --
23  Q  That's what you listened to?
24  A  Yes.  I listened to the conversation between
25    he and Balfour.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

---

Page 185

1  Q   Why?
2  A   Because, again, he had his lieutenant and his
3      captain calling him in saying that the chief
4      said you screwed up, and you went out there
5      and you were rude to this guy, and you were
6      unprofessional.  And so, he told us, can y'all
7      wait one moment?  And wherever he went, to
8      either his personal vehicle, his unit, his
9      office, I cant tell you where he went.  Came
10     back with his recording.  Y'all listen to
11     this.
12 Q   What did you hear?
13 A   He was very professional.  Everything that the
14     chief said that Scott allegedly did while
15     dealing with Balfour, totally to the contrary.
16 Q   Was Balfour polite?
17 A   Yes.  They were very cordial with each other.
18     And he said, now, go ahead and do what y'all
19     have to do and we'll let the chips fall where
20     they may.
21 Q   Okay.  Any other recordings of Scott's?
22 A   No.
23 Q   What about Kane's?
24 A   Kane's?  No.
25 Q   Anything else on Mark Francis?

---

Page 186

1  A   I was privy to the conversation when Mark
2      Francis came up and made all the comments
3      regarding Glen Dartez.
4  Q   Okay.
5  A   Like I said, I didn't --
6  Q   That didn't affect you, though.  I mean, that
7      had nothing to do with you, did it?
8  A   No.  I was present for the recording, like I
9      said.
10 Q   The recording?
11 A   Yes.  When he was -- that conversation.  I was
12     present for that conversation.
13         I didn't -- like I said, I didn't record
14     him.  But yes, I was present for the
15     conversation.
16 Q   Okay.  Somebody recorded it?
17 A   Yes.
18 Q   Who?
19 A   Couldn't tell you specifically, because it was
20     me, Greg, Scott and Mark Francis.
21 Q   Okay.  This is the incident with Dartez,
22     dealing with what?
23 A   When Dartez was on the scene when a female was
24     murdered, and he left the scene.
25 Q   Okay.  All right.

---

Page 187

1  A   And --
2  Q   Were you working for Dartez at the time?
3  A   No, sir.
4  Q   Okay.  Did that incident have any affect on
5      you in this lawsuit?
6  A   No, but in a sense it does.  Not related to
7      Dartez, but the fact that in that same
8      conversation, Mark Francis went on to state
9      that he did not believe -- well, he -- that he
10     personally told Chief Craft that he did not
11     believe him either, when he said he had no
12     knowledge of the incident and what Dartez did
13     on the scene.
14         He supposedly said that he told Craft
15     that he was a liar, and that he could not go
16     to the media and sell that bullshit because he
17     didn't believe it.
18 Q   And was Francis the public information officer
19     at the time?
20 A   Yes, sir.
21 Q   What time frame was this?
22 A   It may be in here.
23 Q   I don't recall seeing that in there.
24 A   Yes, it's in there.
25 Q   Is it?

---

Page 188

1  A   Uh-huh (yes).  (Witness examines his
2      documents.)
3  Q   It's in the lawsuit, Gabe.
4  A   It's in the lawsuit?  I recall reading it
5      somewhere.
6  Q   Yes, it's in the lawsuit.
7  A   Okay.
8  Q   In fact, if you want to look at it, it'll be
9      the next Interrogatory Number 2, dealing with
10     paragraphs 131 through 136.  We'll be able to
11     knock that out right now as well.
12 A   Okay.
13         MR. SPRING:
14             Yes.  Can we take five minutes?
15         (SHORT BREAK TAKEN
16     FROM 2:04 P.M. TO 2:13 P.M.)
17 MR. CORRY:
18 Q   Okay.  Gabe, I think I asked you to look at
19     131 to 136.  Is that what you were referring
20     to?
21 A   Yes, sir.
22 Q   So it was February 16th of '12, that you had
23     that conversation in the parking lot --
24 A   Yes.
25 Q   -- involving Dartez --

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 189

1  A  Yes.
2  Q  -- the incident with Dartez?
3  A  Yes, sir.
4  Q  Okay.  Anything else with Francis in response
5     to Interrogatory Number 1?
6  A  No, sir.
7  Q  And then, Todd Alcorn, I think we talked
8     about, right?
9  A  Todd Alcorn, no, we had not.  But he, too, had
10    came -- let's see, I know he's in here.
11    (Witness examines his documents.)
12        On GT-55, and it'll start with, on Monday
13    September 10th, 2012, on the very first
14    line.
15 Q  Okay.  What was that about?  Give me that.
16 A  Okay.  It was the day of the hearing, my
17    predetermination hearing.  When we were done,
18    we were walking out of the building.  I was in
19    the -- I had parked in the POV lot as well.
20    Officer Alcorn was out in that lot.  And when
21    he saw me, he said that he had had a
22    conversation with Mark Francis, who was his
23    immediate supervisor at the time.
24 Q  Is Alcorn a white guy or African American?
25 A  Black.

Page 190

1  Q  A black guy?
2  A  Uh-huh (yes).
3        And he said that Mark Francis had told
4     him that Craft had every intention of
5     terminating me, Greg and Scott, within the
6     next two days.
7  Q  Okay.  Hearsay from Alcorn --
8  A  Yes.
9  Q  -- that he got from Francis --
10 A  Right.
11 Q  -- that Francis allegedly got from Craft?
12 A  That is correct.
13 Q  Anything else with him?
14 A  No, sir.
15 Q  Shirley Duhon, she's the lady, the custodian.
16 A  The custodian, yes, sir.
17 Q  So he talked about her.
18 A  Yes, sir.
19 Q  Nothing else on her?
20 A  No, sir.
21 Q  Interrogatory Number 2 regarding paragraphs
22    131 through 136.  Anything else to add on
23    that, that's the Dartez incident?
24 A  No, sir.
25 Q  Okay.  And you covered that in your

Page 191

1     explanation, did you not, on answer to
2     Interrogatory Number 10?
3  A  Yes.  (Witness examines documents.)
4        Mine is better.  I put the question and
5     the answer.  They just did it -- put the
6     answers.  I know exactly.
7  Q  That's the way it's supposed to be done.
8  A  All those years in Internal Affairs, I learned
9     a lot.  I worked with a lot of city attorneys.
10       The response to Number 10, that's when I
11    actually talk about when Alfred says that I
12    had violated a direct order from him.
13 Q  Well, that was the -- 10 goes on for pages.
14    Answer Interrogatory Number 10 goes on, and
15    you covered --
16 A  Yes.
17 Q  -- several different topics.
18 A  Several incidents, yes.
19 Q  It goes from 48, all the way to --
20 A  Yes, and I kind of touched on --
21 Q  -- all the way to 58.
22 A  Yes.
23 Q  So let's go back.  Look at Interrogatory
24    Number 2, look in your book on 2, involving
25    the Dartez incident.  And it says, please

Page 192

1     identify and describe in detail, any evidence,
2     physical, documentary or otherwise, related to
3     paragraphs 131 through 136 of the --
4     (Interrupted)
5  A  Yes.  And --
6  Q  And you say, my testimony since I witnessed
7     the conversation -- (Interrupted)
8  A  Yeah.
9  Q  And you've already told me what that was?
10 A  Right.
11 Q  And the same thing with 122 through 146.  Do
12    you want to look back here?
13 A  I've got mine.  Like I said, mine is easier.
14    Yes.  (Witness examines documents.)
15       The same -- same.
16 Q  That's the Dartez incident?
17 A  I don't have any personal evidence regarding
18    that incident, however I was present for the
19    conversation --
20 Q  Okay.
21 A  -- when Mark Francis spoke to me, Scott and
22    Greg.
23 Q  So basically, to put it in a nutshell, the
24    testimony from paragraphs 131 through 136 of
25    the original complaint, and 122 to 146 of the

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 193

1  original complaint is just a conversation you
2  had that you were -- (Interrupted)
3  A  I was present for the conversation.
4  Q  Information was related to you.  You have no
5  firsthand knowledge of it any of it?
6  A  That's correct.
7  Q  And no physical evidence of any of it?
8  A  That's correct.
9  Q  Okay.  211 to 219, let me show you that.
10     I think that's -- 211 to 219, I think, is
11  the recording of April 19th, 2012.  Go ahead
12  and read the original complaint, those
13  paragraphs.
14  A  (Witness examines documents.)
15     Yes.
16  Q  That is the April 19th --
17  A  Yes, sir.
18  Q  -- conversation that we've already talked
19  about?
20  A  That's correct.
21  Q  Anything to add there?
22  A  No, sir.
23  Q  And I think in your answers, you reference the
24  recording --
25  A  Yes.

Page 194

1  Q  -- that's answer to Interrogatory Number 5.
2     6 is 221 through 223 of the -- 221 to
3  223, I think we talked about.  But go ahead
4  and look at that.  I think that -- that's the
5  007 complaint, I think.
6  A  (Witness examines document.)
7     Yes, sir, it is.
8  Q  Okay.  And you have talked about that?
9  A  Yes, sir, I did.
10  Q  Okay.  And you actually outlined it in your
11  answer to Interrogatory Number 6, which is
12  that GT-45 and the top of GT-46.  Just look
13  through that, and make sure that we've covered
14  everything you have there.  I think we have.
15  A  (Witness examines documents.)
16  Q  And I'm going to take you through the
17  documents after we finish with this.
18  A  Okay.
19  Q  So I know you referenced some documents.
20     We'll get to that
21  A  (Witness examines documents.)
22     Yes.
23  Q  We covered all of that?
24  A  Yes.
25  Q  Okay.  7 is 231 to 235 of the original

Page 195

1  complaint.  That's the transfer.  And I think
2  we've already talked about that?
3  A  The transfer, yes, sir.  And what happened
4  with the class, and also, having to work the
5  night shift.
6  Q  We talked about that.  Anything else?
7  A  No, sir.
8  Q  And then, the amended complaint, Interrogatory
9  Number 8, which is that GT-46.  Look at 85 of
10  the amended complaint, paragraphs 85 through
11  91.  I think that's all that applies to you in
12  the amended complaint.
13  A  (Witness examines documents.)
14     Yes, sir.  The only thing we didn't touch
15  on, I think I had mentioned somewhere in one
16  of the documents, they conducted the
17  investigation regarding the Ed Mac Gallian
18  incident.  And when I was served with the
19  notice of investigation, actually with two, on
20  the first one, said that naturally, we had to
21  fully cooperate and participate in the
22  investigation, and that we may be subject to a
23  polygraph.  The second one that was sent out
24  by Prejean, which actually was in bold, saying
25  that all persons who are suspects in this

Page 196

1  investigation would be polygraphed.  There was
2  no more option on the table.  And that was
3  before -- he hadn't taken one statement.
4  Q  Is there any -- I mean, you were in IA a long
5  time.  Did y'all polygraph people?
6  A  No.
7  Q  Never?
8  A  We did, but it wasn't for this.
9     In all honesty, when I was in Internal
10  Affairs, the supervisors I worked for and just
11  the attitude I had, treating everybody fairly,
12  we wouldn't have done an investigation of that
13  nature anyway.  This was basically a witch
14  hunt.  He had no knowledge of who actually
15  took the paperwork, if anybody actually took
16  the paperwork.   And so, to come out and say
17  that --
18  Q  Well, the paperwork ended up with Olita Magee
19  in Ed Mac Gallian's civil service hearing.
20  A  Okay.  So and again, I wasn't there, so --
21  Q  I mean --
22  A  -- based on what you're telling me --
23  Q  -- it ended up there.
24  A  So it ended up there, but who's to say that
25  somebody from Internal Affairs didn't get it?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 197

1 Q   Well, how do you know the 15 didn't involve
2     Internal Affairs people?
3 A   They didn't.  He gave me the list.
4 Q   How do you know?
5 A   Because he gave me the list.
6 Q   But you told me earlier you didn't know who
7     the 15 were.
8 A   I don't know all 15.  But while I'm going to
9     say he didn't give me the list of all 15, but
10    he gave me the list of people who were going
11    to be polygraphed, and then that -- it wasn't
12    all 15, which is an issue that I assume we
13    will get when we do discovery.
14        Because, again, he told me when we were
15    served, that all 15 people would be
16    polygraphed because they had solicited the
17    assistance from Louisiana State Police,
18    Lafayette Parish Sheriff's Office, and the
19    Lafayette Police Department polygraphist that
20    was going to conduct all these polygraphs on
21    everybody who were involved or who was listed
22    as suspects.
23        I don't know all 15.  But I know
24    specifically that Nancy Hebert was listed as a
25    suspect.  She was the secretary to the patrol

Page 198

1     division commander, and she was not
2     polygraphed.  I spoke to Forest Blanton, who
3     was also a suspect in this case and he was not
4     polygraphed.
5         But for some reason they felt the need to
6     polygraph me.  And I don't know why, even
7     after I -- I don't know what these people told
8     him differently than what I explained to him,
9     that I had no knowledge of it and was not
10    involved in it.
11 Q   Again, it's not a crime if there's a document
12    that's been taken out of a private personnel
13    file, amended, whited out, doctored, however
14    you want to describe it, and used in another
15    civil service matter unrelated to that
16    document in an attempt to persuade somebody
17    about something.  I mean, that's -- that's not
18    illegal to start an investigation on a
19    document like that, is it?
20 A   No, it's not.
21 Q   Okay.  So it's not criminal that somebody
22    says, hey, this document has been taken out of
23    a private personnel file and now has been
24    altered, and used, and we think perhaps 15
25    people may have something to do with it, or

Page 199

1     may not.  But these are the 15 that we think
2     might.  And --
3 A   And --
4 Q   -- the process goes through, right?
5 A   Right, if it's done fairly.
6         And that's where it goes back to there's
7     despaired treatment within the Lafayette
8     Police Department.  Because I am telling you
9     right now, I don't know all 15 suspects but I
10    gave you two names of people I know who were
11    not polygraphed.  So what made them different
12    from me, or Greg, or Scott, or Norbert?
13 Q   Were you involved in the investigation?
14 A   On what level?  I was listed as a suspect.
15    That's how I was involved.
16 Q   No.  But I mean as far as the investigation
17    itself?
18 A   On what level?  That's what I'm saying, I was
19    a suspect.  Are you talking about --
20 Q   Conducting the investigation.
21 A   No, absolutely not.
22 Q   So you don't -- I mean, you don't have
23    knowledge of what went on, and what facts were
24    developed, or what information was developed
25    to decide who was going to be polygraphed and

Page 200

1     who wasn't, do you?
2 A   Okay.  And --
3 Q   You have to answer yes or no, then you can
4     explain.
5 A   No, I do not.
6 Q   Okay.  Now, do you want to explain?
7 A   Yes.  But I'm basing on what the lieutenant
8     who was in charge of Internal Affairs told me,
9     that everybody was polygraphed.  And it's
10    painfully obvious they did not do a thorough
11    investigation because based on information I
12    have received, the person who actually took
13    the form is still employed at the Lafayette
14    Police Department, has not been investigated
15    any further.  And as far as I know, the
16    investigation has concluded simply because I
17    was forced to retire, and Greg and Scott were
18    terminated.
19 Q   Who took it?
20 A   I learned from Scott Poiencot.
21 Q   Who did he tell you took it?
22 A   He told me that Todd Green.
23 Q   Who is Todd Green?
24 A   Todd Green is an investigator in juveniles.
25        So how are you just going to stop if you

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 201

1 didn't come out and actually find out who did
2 it?
3 Q  Did Poiencot tell anybody in IA that Todd
4    Green took that document?
5 A  I don't know when he found out.  He told me,
6    matter of fact, I think it was on the day of
7    my predetermination hearing.  Yeah, our
8    hearings were on the same day.  His was
9    concluding, and I was heading into the
10   building.  And we met in the parking lot and
11   he stopped me on that date, which was, I think
12   we established was September 10th, I think, or
13   somewhere around that.  Yes, September 10th.
14   That he had learned that it was Todd Green.
15 Q  Where did he learn it?
16 A  I have no idea.  And that --
17 Q  So it's hearsay?
18 A  It's hearsay, but --
19 Q  Okay.  Did you chase hearsay when you were an
20   IA detective?
21 A  Sometimes you had to.
22 Q  Okay.
23 A  Absolutely.
24 Q  All right.  All right.  And we were talking
25   about 8, correct?

Page 202

1 A  Yes.
2 Q  Anything else other than the documents?  And
3    we're going to go through those.
4 A  Well, that's just on a personnel level.
5    You know, looking at my response, the mere
6    fact that, again, I was put through this, my
7    family was put through this.  And when I took
8    my polygraph exam -- and like I said, I'm
9    pretty sure you're going to have access to
10   that -- we walked in, it took all of 20
11   minutes.  Because normally when you take a
12   polygraph exam, and having worked in Internal
13   Affairs, you will go over the questions with
14   the person you will be testing so there are no
15   surprises.
16      When I walked in, I had never met Trooper
17   Woody Overton before.  I told him, we don't
18   have to go over anything, hook me up to the
19   machine, let's go, you can ask me any
20   questions you want concerning my career here
21   at the Lafayette Police Department.  That's
22   exactly what we did.  And I passed.
23      So again, I was kind of bitter behind
24   that.  But the fact that I'm going to is the
25   fact that Dwayne Prejean, for whatever reason

Page 203

1 he concocted this and came up with his list of
2 suspects, to include myself.  And then, when
3 this was all done, and Woody went in and told
4 them that I passed with flying colors, to be
5 specific, this man had the audacity to come
6 into the conference room when I was getting my
7 leather gear so I can go back to work, and
8 asked me about my wife.  And that really,
9 really, really, got under my skin.  But that's
10 just on a personal note.
11 Q  Who asked you about your wife?
12 A  Dwayne Prejean.
13 Q  Okay.
14 A  You weren't concerned about her before when he
15   came at me with his bogus investigation, so do
16   not.
17 Q  I understand.
18      But you were never advised or given any
19   documentation about the outcome of 007?
20 A  No.
21 Q  Or 010?
22 A  No.
23 Q  You decided to retire before?
24 A  Well, no.  Not for 007.  007, I was still at
25   work.  And we went for -- when they went to

Page 204

1 ask for that extension, and Jason Boudreaux
2 with the civil service board told him,
3 conclude that investigation and send whatever
4 notices you need to send to the guys you're
5 done with, and if you're only still dealing
6 with Greg Cormier, then you're dealing with
7 Greg Cormier.
8      And from the date of that hearing until
9 the time I retired, I never received any
10 documentation.
11      Now, on 10, yeah.  The day before I had
12 my hearing -- I had my hearing, I retired the
13 next day.  So that one I'm not going to fumble
14 that, either way it goes, but they still knew
15 my address, so why --
16 Q  So you had predetermination hearings on
17   both?
18 A  No.  No.
19 Q  What did you have predetermination hearings
20   on?
21 A  Just on 10.
22 Q  Okay.
23 A  7, I didn't need one because I was cleared.
24 Q  Okay.
25 A  So I was exonerated.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 205

1     And that's why I said as soon as they
2  produce that document -- I'm certain that's
3  why they have not given me or Mr. Spring that
4  document, because as soon as I get that
5  document in my hands, you can let Chief Craft
6  and Dee Stanley know, I will be filing
7  criminal charges on them.
8  Q   Okay.  All right.  Anything else on answer to
9     Interrogatory Number 8 as it results to
10    allegations 87 and 88 of your amended
11    complaint?
12 A  No, sir.
13 Q  9, I think we just talked about.  Is answer to
14    Interrogatory Number 9, which is paragraph 89
15    of the amended complaint, that's Todd Green?
16 A  Right.
17 Q  And then, 10 is just kind of your summary of
18    your position in this matter?
19 A  Right.  And I think we covered a majority of
20    it.
21 Q  Yes.
22    So on the Mac Gallian document, you took
23    the polygraph and you're telling me you passed
24    it?
25 A  Yes.

Page 206

1  Q  And you didn't take anything out of any other
2     officer's file?
3  A  Absolutely not.
4  Q  And give it to Olita Magee?
5  A  Absolutely not.
6  Q  And you don't have any firsthand knowledge of
7     who did?
8  A  That is correct.
9  Q  And you were told by Poiencot that Todd Green
10    Scott did it?
11 A  That is correct.
12 Q  Sometime around September of 2012?
13 A  That is correct.
14 Q  When did you first learn of the Mac Gallian
15    investigation, or the leaked document
16    investigation?
17 A  When I was served with the Notice of
18    Investigation.
19 Q  Okay.
20    Which would have been May 11th.
21 Q  Let's go back to the front.  This way with the
22    documents, where your documents start.  It's
23    going to be right here (indicating).  Keep
24    going a couple of pages.
25 A  (Witness complies)

Page 207

1     All right.
2  Q  That's when you were notified?
3  A  Yes, sir.
4  Q  GT-16?
5  A  Yes, sir.
6  Q  And that involves AD-2012-007?
7  A  That is correct.
8  Q  That is the Mac Gallian leaked document?
9  A  Yes, sir.
10 Q  All right.  And then, GT-17 is the one where
11    you're talking about polygraph?
12 A  Yes, sir.
13 Q  Where the polygraph became mandatory?
14 A  Became mandatory.
15 Q  Okay.  You received that?
16 A  Yes, sir, I did.
17 Q  GT-19 is what?
18 A  It's just an e-mail.  It actually goes in
19    conjunction with GT-20.  It's just a
20    carryover.
21 Q  Okay.  The same with 20?
22 A  That is correct.
23 Q  You told them you were exercising your 30
24    days?
25 A  Yes, sir.

Page 208

1     Actually, I sent that to Dwayne Prejean
2  because he actually had quoted the wrong law.
3  He was the Internal Affairs lieutenant, and he
4  was incompetent and recorded the actual wrong
5  statute.
6  Q  Okay.  Did you give statements in both of
7     those investigations --
8  A  Yes, sir.
9  Q  -- 7 and 10?
10 A  Yes, sir, I did.
11 Q  Did you have an attorney present for both?
12 A  For 7, I don't recall if you were there or not
13    (indicating).
14    But for 10, Mr. Spring had sent another
15    representative from his office to sit in with
16    me.
17 Q  Who was that?
18 A  It was -- I don't recall his name, but it was
19    your private investigator.
20    MR. SPRING:
21       Oh, Steve Fontenot.
22    MR. CORRY:
23       Steve Fontenot?
24    MR. SPRING:
25       Yes.

Kane Marceaux, et al vs.                                                          Gabe Thompson
Lafayette City-Parish Consolidated Government, et al                       February 19, 2014

Page 209

1  A  I don't recall his name.  I just know it was a
2     private investigator.
3  MR. CORRY:
4  Q  Okay.  21 is --
5  A  That's when --
6  Q  -- when he's making the correction?
7  A  Yeah.
8  Q  What is the -- what was the typo?  He said 32,
9     and it should have been -- (Interrupted)
10 A  31.  2531.
11 Q  Okay.  And then, what is G-22 and 23?
12 A  Those, I didn't submit.  But it's pretty much
13    my complaints that were just handwritten.  I
14    think somehow those just got mixed in, Because
15    it's the same information that we already had.
16    It's was just saying on the date what happened
17    when Prejean served me, on the day I was
18    served.
19 Q  Okay.  All right.  That was just your
20    handwritten notes?
21 A  Yes.  That was my handwritten notes
22    documenting the dates and the times.
23 Q  24 is what?
24 A  24 is the first e-mail that I received from
25    Dwayne Prejean, saying that my polygraph was

Page 210

1     scheduled on Thursday, July 12th at 10:00 a.m.
2  Q  Okay.  And it looks like maybe Randy Vincent
3     was given a polygraph, Lieutenant Greg
4     Cormier, Captain Ron Czajkowski, Lieutenant
5     Gabe Thompson and Corporal Scott Poiencot.
6  A  Yes.
7  Q  Did y'all work all in the same area?
8  A  Yes.
9  Q  Okay.  Did that have something to do with the
10    suspects, the area of the building?
11 A  That, you'd have to ask Prejean.  Because I
12    don't know how he established his suspect
13    list.
14 Q  But Randy Vincent, Cormier, Czajkowski,
15    Thompson and Poiencot all worked --
16    (Interrupted)
17 A  Yeah.  Randy Vincent, at the time, was the
18    patrol division commander.  Greg Cormier was
19    the patrol support lieutenant over pretty much
20    of the entire section.  But on paper, for
21    traffic and mounted patrol.
22       Ron Czajkowski was the captain who
23    assisted Major Randy Vincent.  I -- at the
24    time, I was assigned to Precinct 3 as Captain
25    Norbert Myers' assistant.  And Corporal Scott

Page 211

1     Poiencot was our immediate supervisor.
2  Q  Where was y'all's offices in relation to each
3     other, all on the third floor?
4  A  Yes, sir.  In the patrol wing.
5  Q  The document that was taken out and doctored,
6     do you know where it came from?
7  A  Absolutely not.
8  Q  Do you know where those files are kept?
9  A  No.  The thing is, I didn't even see it.
10    Matter of fact, when you go back and review
11    the tape of the polygraph, he tried to give it
12    to me to touch it.  I didn't even want it.  I
13    didn't care -- to me, it didn't matter.
14       To this date, I can't tell you exactly
15    what document was taken because I never looked
16    at it, didn't care about it.
17 Q  All right.  25, what is that for?
18 A  (Witness examines document.)
19 Q  Just a revised schedule?
20 A  It was sent on July 9th.  Yes, saying --
21    that's when my date was changed from Thursday,
22    the 12th, to Wednesday, July 11th.
23 Q  Why?
24 A  Again, that's something you'd have to ask
25    Prejean.  I have no idea.

Page 212

1  Q  26?
2  A  Again, another e-mail that was sent from
3     Alfred.  Alfred just forwarded Prejean,
4     showing that the dates had changed.
5  Q  All right.  And then, 27 is dated May 11th,
6     2012.  What is that?  Have we talked about
7     this?
8  A  No, sir.  This is when Alfred -- I think this
9     is the one.  Is when Alfred said that I had
10    violated a direct order from him, regarding
11    Scott Poiencot and his work hours.
12 Q  And what was that?
13 A  It started out, actually, with a phone call
14    from Cornell Montgomery.  Cornell Montgomery
15    called me.  At the time, I was still assigned
16    to Precinct 3.  Cornell was the captain in
17    Precinct 4.
18       Cornell Montgomery called my office and
19    asked if Scott was at work.  It was a Friday.
20    He asked if Scott was at work.  Captain
21    calling a lieutenant.  I said, no, he's not.
22       And on that particular day, Scott
23    actually had taken annual leave to attend a
24    doctor's appointment with his wife.
25       But at that time, that was none of

Page 213

1  Cornell Montgomery's business.  Scott worked
2  for me.  So I didn't tell him that.  I just
3  told him that Scott was not at work.
4 Q  You don't have to tell a captain what's going
5  on?
6 A  No.  I didn't work for him.
7 Q  I'm --
8 A  Yes.  And it was --
9 Q  -- not used to the chain of command deal.
10 A  Right.
11     I worked for Captain Norbert Myers at the
12  time, so it was actually none of Cornell
13  Montgomery's business where Scott Poiencot was
14  on that day.
15 Q  If he had been like a friend, would you have
16  told him?
17 A  I considered Cornell a friend, yeah.  But
18  again, it was no concern of his because Scott
19  was not assigned to Precinct 4, he was
20  assigned to Precinct 3.  He worked for me.  I
21  knew where he was, so --
22 Q  Didn't matter?
23 A  -- it didn't matter.
24 Q  All right.
25 A  Because unless you need him for some official

Page 214

1  business that you're withholding from me, he's
2  just out on annual leave today.  That's all
3  you need to know.
4     Shortly after -- and that's the only
5  question he asked.  He terminated the
6  conversation.
7     Shortly thereafter, Alfred called me in
8  my office and asked me the same question, if
9  Scott was at work.  And I advised him no,
10  Scott was off.  And he said, well, I'll talk
11  to you when I get back from lunch.
12     Well, he returned back to the office from
13  lunch, called me to his office.  I went into
14  his office, and that's when he said that --
15  well, actually before, he sent an e-mail to
16  Chief Craft, Captain Myers, and he cc'd myself
17  and Scott.
18     And in that e-mail, he said that I had --
19  and I don't know why it's not attached in
20  here, but it may be in there.  But he said that
21  I had disobeyed his direct order, and that he
22  had told me to change Scott's work hours.  And
23  that was not accurate.
24     And this is my response.  I don't know
25  why his isn't --

Page 215

1 Q  And it may be further back.  I think we'll get
2  --
3 A  Okay.
4 Q  I think it is, and we'll get to it.
5 A  And that was my response, that he was
6  mistaken, that he did not tell me to change
7  Scott's hours, that we had not had that
8  conversation before.  And --
9 Q  Had he ever made an inquiry --
10 A  No.
11 Q  -- as to Scott's hours?
12 A  He had not spoken to me.
13 Q  Had he sent you an e-mail?
14 A  No.
15 Q  Had anybody told you anything about Scott's
16  hours?
17 A  No.  And my thing is, like I said, Scott was
18  already assigned to Precinct 3 when I arrived
19  there.  And his work hours were established
20  with Captain Norbert Myers, who was the
21  precinct commander.  So me as a lieutenant, I
22  cannot come in, unless there is an issue that
23  I can bring to Captain Myers and say, well,
24  no, Scott should be on eight hours or
25  whatever.  But that was the arrangement they

Page 216

1  had made.  So it was business as usual.
2     And for Alfred to make that outlandish
3  accusation that, you know, I had disobeyed his
4  direct order was ludicrous.  And then, send it
5  to Craft, and -- who was the chief, and my
6  captain, and to say that I did it.  This was
7  my response, that he was mistaken.
8     And that he called me -- when he got back
9  from lunch, he called me to his office.  And
10  he said, well, I could have sworn I told you
11  about this, and that was a switched out thing.
12  So if you want me to do that, if you're
13  telling me -- if you're giving me an order
14  right now to go and change Scott Poiencot's
15  work hours, I will go do that.
16     But the issue I told him that I had was
17  that those work hours were established between
18  Scott and Captain Myers prior to my arrival in
19  Precinct 3, so he needed to discuss whatever
20  it was with Captain Myers.   At the time,
21  Captain Myers was in his office.  So all of
22  these calls to me -- again, they want to talk
23  about violating the chain of command, he
24  should have went directly to Captain Myers
25  from the get-to.

Kane Marceaux, et al vs.                                                                Gabe Thompson
Lafayette City-Parish Consolidated Government, et al                       February 19, 2014

Page 217

1  Q  Well, a major can come to anybody he wants,
2      can't he?
3  A  No.  Well, that's how it goes.  That's what
4      they wanted -- chain of command works both
5      ways.
6  Q  The chain only goes up?
7  A  No, it doesn't.  It goes both ways.
8  Q  Well, you don't have to jump me.
9  A  No, I'm not jumping you.  It goes both ways.
10 Q  I'm not in the military, and I've never been a
11     police officer, that's why I'm asking you.
12 A  Yes.  No.  The chain of command works both
13     ways, up and down.
14 Q  Okay.
15 A  So he should have went --
16 Q  It just seems to me if I'm a major, and I want
17     to talk to somebody below me, I'm going to
18     talk to them.  You can't do that?
19 A  Yes, you can.  Yes, you can.  And nobody would
20     do it, but --
21 Q  I mean, is there any general order, or PPM
22     that says he can't?
23 A  No.  And that's how the chain of command goes,
24     too.  But they only utilize the chain of
25     command if they want to discipline somebody

Page 218

1      for violating the chain of command.
2  Q  Okay.  Let me ask you this, Gabe:  This
3      conversation and this scenario on GT-27,
4      regarding this e-mail of May 11th of '12,
5      involving Scott's work hours --
6  A  Yes.
7  Q  -- is supposed to be five days a week, four
8      days a week.  Was that before or after Major
9      Alfred found out you recorded him?
10 A  I don't remember.  It was all around the same
11     time.  It would have been close.  It was
12     either right before or right after.  I'm not
13     sure.  And I don't want to give you a wrong
14     date and go on the record and saying --
15 Q  You don't know?
16 A  -- exactly when it was.  I don't know.
17 Q  Okay.  Because the TRO hearing was on the 29th
18     of May.
19 Q  Okay.  So maybe he already knew then.
20 A  Well, this was May 11th.  I don't know.
21 A  May 11th.
22 Q  I don't know.
23     I'm asking you if you know, or do you
24     have any evidence to know?
25 A  No, I don't.

Page 219

1  Q  Okay.
2  A  I don't.
3  Q  So Scott worked under you?
4  A  Yes.
5  Q  Where did Greg work in relation to you and
6      Scott?
7  A  Greg was in patrol support.
8  Q  In the same -- (Interrupted)
9  A  Same building, same wing of the building but
10     in patrol, but he was in patrol support.
11     Greg was the lieutenant in charge of the
12     traffic unit and mounted patrol.
13 Q  How far was his office from yours?
14 A  Three doors downs.
15 Q  And where was Scott's?
16 A  Actually, Scott's was right across the hall
17     from Greg's.  Scott --
18 Q  So y'all -- (Interrupted)
19 A  -- he was actually closer to Greg than he was
20     to me.
21 Q  So y'all were within 30 feet of each other?
22 A  Yeah.
23 Q  Who else was in that little area?
24 A  My captain, Captain Myers.  Our offices were
25     right next to each other.

Page 220

1  Q  He retired?
2  A  Yes.
3  Q  Is he the kind of tall guy with the big belly
4      that comes to the civil service hearings?
5  A  I don't know, because I don't go to civil
6      service hearings.  But he is a tall guy.  A
7      burly guy, yes.
8  Q  Is he around a lot?  I mean, I've seen him --
9      I think I've seen him around with y'all.
10 A  Yeah.  If you've seen him with us, it's
11     probably the same guy.  We're probably talking
12     about the same guy.
13 Q  Is that the same guy?
14 A  We're probably talking about the same guy.
15 Q  Six feet or so?
16 A  Yes.
17 Q  Okay.  Who else was in that area?
18 A  Let's see.  I'll have to go down the hall.
19     Let me do this in my head.
20     Captain Myers, me, Forest Blanton,
21     storage closet, hallway, Greg's office.  I
22     forgot who was next to Greg.  Then, it was Ned
23     Fowler, and Phil Fontenot, then Bert Bejsovec.
24     Then it was lieutenants who were assigned to
25     the shifts, their offices.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 221

1  Q   Each -- every -- all of y'all had your own
2      office?
3  A   Yes.
4  Q   You didn't switch out at night with somebody
5      else?
6  A   If you were assigned to a -- if you were a
7      watch commander, yes.  But the people that I
8      just named, we all had our own individual
9      offices.
10 Q   Would y'all lock them at night?
11 A   Yes.
12 Q   All right.  PT -- excuse me, GT-28.  The same
13     thing about the polygraph?
14 A   Yes.  It appears to just be a duplicate.
15 Q   All right.  And then, 29 is just the transfer
16     sheet, but we didn't get the whole page?
17 A   That is correct.
18 Q   30 is a duplicate?
19 A   Yes.
20 Q   31?
21 A   Predisciplinary hearing for case 10.
22 Q   All right.  Do you know what these PPM's that
23     are referenced in the general orders that are
24     referenced, do you know what those involve?
25 A   No.  I've been gone from there for two years

Page 222

1      now.  I used to know them all.  But definitely
2      the conditions of employment, both exactly
3      what 1.20 and 2.17 and 2.19 and 2.28 says, I
4      couldn't tell you right off without looking at
5      them.
6  Q   Okay.
7  A   However, 1200-2, public statement releases,
8      that's pretty much just saying that only the
9      public information officer can release
10     information to the media or a chief's
11     designee.
12 Q   Would you be in violation of that 1200.2 if
13     the recording you made of Jackie Alfred ended
14     up on a website or on the news?
15 A   No, sir.
16 Q   Why not?
17 A   Because it was not a police document or a
18     police investigation.  That was my own
19     personal recording.  So I could do with it
20     what I feel.
21 Q   Okay.  Were you in violation of any of these
22     cited?
23 A   Absolutely not.
24 Q   I guess if you don't know what all of them are
25     -- (Interrupted)

Page 223

1  A   But I can tell you, I was not in violation.
2      Because the things they were accusing me of,
3      well, look, professional conduct, like I said,
4      specifically A, E and J, I don't know what
5      they are right off without looking at them,
6      and the attention of duties, those are all in
7      the Lafayette Police Department general
8      orders.  However, all these things that they
9      were accusing me of, I did not do.
10 Q   All right.  And you received that.  It looks
11     like you signed for it on September 6th.
12 A   September 6th.
13 Q   That's on GT-34?
14 A   That's correct.
15 Q   I guess GT-35 is another copy of what we've
16     already seen?
17 A   Yes.
18 Q   GT-36, the same thing?
19 A   Yes.  Yes, it looks like it's just --
20 Q   We have two copies of it?
21 A   Two copies of it, yes.
22 Q   Steve is wasting paper.
23 A   Yes, that's all.
24 Q   All right.  Let's look at what you submitted
25     today, or last night.

Page 224

1  A   It's pretty much going to be the same thing.
2  Q   Okay.  Anything different?  Why don't you flip
3      through GT-61 through GT-75?  Anything
4      different than what we've talked about?
5  A   (Witness examines documents.)
6          The only thing that's different in the
7      attachments, 65 is the e-mail from Alfred to
8      me.
9  Q   Okay.  I thought I'd seen it.
10 A   Yes.  And I responded about the work hours,
11     Scott's work hours.
12 Q   Okay.  So the GT-65 is the e-mail that
13     prompted the --
14 A   My response.
15 Q   -- response by you of May 11th, 2012, on
16     GT-64?
17 A   That is correct.
18         And if we can go back there while we're
19     still touching on that because I didn't finish
20     that.
21         When he met with me and I told him that I
22     would go and let Captain Myers know he told me
23     to -- not to bring the matter to Captain
24     Myers' attention, that he would do it himself.
25     Days went by --

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 225

1  Q   What did you think about that?
2  A   It didn't matter.  To me that was protocol, go
3  to -- go to Captain Myers with it.
4       Days went by, nothing happened.  And
5  then, whatever sparked it up again, it came
6  back up.  He called Captain Myers and I to his
7  office.  And again, he accused me of
8  disobeying his direct order.  Again, I denied
9  that because that was not the case.
10       And at that point, he and Captain Myers
11  got into a heated exchange.  And that's when
12  it went to the level of Captain Myers telling
13  him, well, y'all tell precinct commanders that
14  we can work our personnel the way we see fit,
15  but yet, you are giving me an order to change
16  my guy's work hours?  And so, they went back
17  and forth.
18       And he's saying, well, yeah, as a
19  precinct commander, you can work with your
20  guys.  And then, ultimately, Alfred just said,
21  well, okay, I'm telling you this is an order,
22  you will change Scott's works hours.
23       You know, because Alfred's thing was, he
24  says, well, four, ten-hours shifts only
25  benefit the employees and does not benefit the

Page 226

1  department, so I want them working eight
2  hours.  So --
3  Q   Do you see any faulty logic in that?
4  A   Well, it depends on where you're working, you
5  know, what type of work they're doing.  So
6  yes, it would be.  For him to just come out
7  and say that eight-hours are better than
8  working ten-hour shifts, I would disagree with
9  that.
10  Q   Well, you're there more days, right?  Five
11  days as opposed to four.
12  A   To four.
13  Q   Right?
14  A   But you're still working the same amount of
15  hours, so you're still getting the same amount
16  of work in.
17  Q   Right.  But you're there more days?
18  A   Right.
19  Q   So if something happens on a Friday that you
20  need to address, you can do it, as opposed to
21  being off every Friday, Saturday and Sunday.
22  You're only off two days, you're there for
23  five days.
24  A   Yes.  And that's one of the things that Alfred
25  had misconstrued because he was not off every

Page 227

1  Friday.  He was off every other Friday.  We
2  rotated that shift.  So he was off every other
3  Friday.
4  Q   Okay.  Well, even every other Friday.
5  A   And --
6  Q   So you don't see any faulty logic in that, do
7  you?
8  A   No, on either side.
9  Q   Okay.
10  A   It depends on what you like.
11  Q   All right.
12  A   And even in the conversation, Alfred said
13  that, well, I know that Chief Craft --
14  Q   How does that affect you in this lawsuit?
15  A   Because he made a false allegation against me
16  saying that I disobeyed a direct order that he
17  gave me that he never gave me.
18  Q   Okay.  But it was taken care of, correct?
19  A   Yeah.
20  Q   And you weren't disciplined in any way, right?
21  A   No, I was not.
22  Q   And there was no investigation ordered because
23  of it?
24  A   No.
25  Q   I mean, do you have things that happen from

Page 228

1  time to time in the police department where
2  somebody tells you something, you misconstrue
3  it, and they actually make it an order, or --
4  (Interrupted)
5  A   No.  Orders are very clear.  And if a
6  supervisor doesn't give a clear order, well,
7  then, you've got a problem with your
8  supervisor.
9  Q   Okay.  What do you do with that?
10  A   Well, then, you correct that supervisor, send
11  him back to supervisor training.
12  Q   What does a subordinate do?
13  A   The subordinate, your only course of action is
14  then to document the incident, saying exactly
15  the order you were given.
16       And as a subordinate, you do have the
17  right, if you know that an order is not
18  lawful, you do have the right to disobey that
19  order.
20  Q   Okay.  Criminally, you're talking about?
21  A   No.  Civilly, administrative, it doesn't
22  matter.  If a supervisor gives you an order
23  that you know is not lawful, you do not have
24  to follow the order.
25  Q   You're using lawful in the general sense?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 229

1  A   Right.
2  Q   Not in the criminal sense?
3  A   Right.
4  Q   Okay.  Did you do anything with what Major
5      Alfred told you in the e-mail and the response
6      that you gave on May 11th of 2011?
7  A   No, I did not.  And I would say that he
8      probably knew about the lawsuit by then.  And
9      the reason why I'm going back, and it's
10     popping in my mind now is because this entire
11     meeting that we had when he called Captain
12     Myers and I to his office was recorded by
13     Captain Myers.  And I know that for a fact.
14  Q  Where is that recording?
15  A   Captain Myers.  He was dismissed from this
16     lawsuit, so I'm assuming he still has it.  But
17     he did record that entire conversation.
18  Q   Okay.  May 11th, to my knowledge, there was no
19     lawsuit filed.
20  A   Okay.
21  Q   I mean, we can check -- (Interrupted)
22  A   And I know that.  I don't know --
23  Q   We can check the clerk's records, but I think
24     the TRO was filed after that.
25  A   Okay.  But it was within that time frame

Page 230

1      somewhere.  It was near -- real close.
2  Q   And I don't want to mislead you, but I think
3      that's accurate.
4  A   And you may be accurate.  That's what I'm
5      saying, you may be accurate.
6         MS. COREIL:
7            It was filed the 24th.
8  A   Okay.  That's what I say, because I don't --
9  MR. CORRY:
10  Q   Okay.  May 24th.
11         MS. COREIL:
12            May 24th.
13  A   I don't recall.
14  MR. CORRY:
15  Q   She should know.
16         Okay.  So if, in fact, the lawsuit was
17     filed on May 24th, the meeting on May 11th
18     happened before?
19  A   Right.
20  Q   In relation to when the TRO was filed on May
21     24th, when was the decision made to file it?
22     Were you involved in that decision?
23  A   No, sir.
24  Q   But your name was used?
25  A   Yes.

Page 231

1  Q   Did you give permission to use your name?
2  A   Yes, I did.
3  Q   But you don't know when the decision was made
4      to -- (Interrupted)
5  A   No, sir, I don't.
6  Q   I find that odd.  I've got to tell you.
7  A   Okay.
8         MR. SPRING:
9            That's your question?
10         MR. CORRY:
11            Yes.
12         MR. SPRING:
13            I'm going to object to it.
14  A   Well --
15  MR. CORRY:
16  Q   A lawsuit is filed on your behalf and you're
17     not involved in the conversation of why we're
18     filing it, or when we're filing it?
19  A   Yeah.
20  Q   Okay.
21  A   I trust the people that I was dealing with.
22  Q   All right.  So on the Mac Gallian document,
23     you didn't remove it, you didn't alter it?
24  A   None of that.  No involvement whatsoever.
25  Q   Didn't give it to anybody?

Page 232

1  A   That is correct.
2  Q   There it is, May 24th.
3         Is there anything else that we need to
4      discuss as it relates to the federal lawsuit?
5  A   Not that I'm aware of unless, Mr. Spring, do
6      you have any questions for me?
7  Q   Well, he may.
8         But I'm talking about as far as your
9      discovery responses, the allegations in the
10     lawsuit, and the things we've discussed today,
11     have we covered everything that you have a
12     contention with?
13  A   Except for one other issue, and that's just a
14     personal thing for me.  It's not a part of the
15     lawsuit, but if we can just put it on record.
16         The fact that I did retire from the
17     Lafayette Police Department, I was not
18     terminated.  And granted, my retirement was
19     forced.  Like I said, I had to do what I
20     thought was best for my family, but I still
21     did retire.
22         They conducted these investigations on
23     me, and I know I was cleared on both of them
24     even though they won't give me the
25     documentation to prove that at this time.  But

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 233

1  we will get those eventually.
2      The fact that I retired, I gave 22 years,
3  nine months of dedication to the Lafayette
4  Police Department and service to the citizens
5  of Lafayette. And Jim Craft made a decision
6  not to supply me with a retired commission
7  card, or retirement badge, or a plaque like he
8  had done for everybody else at the Lafayette
9  Police Department. But he's come up with this
10  unwritten rule again, that he makes the
11  decision, even though he does not pay.
12 Q  Back up. Retired commission card?
13 A  A plaque and badge.
14      So if I were to drop dead today, oh, God,
15  don't do it, but there's nothing that my
16  family would have to say that I actually
17  worked at the Lafayette Police Department, you
18  know.
19      And it's decision -- again, it goes back,
20  he likes to make the comments that, well, I
21  can't pay for these plaques and these badges
22  because, you know, that's taxpayers monies
23  that paid for this stuff. So a fund has been
24  established by the union, FOP, and the
25  Magnolia State Police Officers Association,

Page 234

1  which are three organizations in the
2  department, and they pay for these items to
3  give to officers who retire.
4 Q  Did they give one to you?
5 A  No. Because Jim Craft made the decision that
6  I left the department under, I guess, unsavory
7  conditions, so he made a decision that I was
8  not allowed to receive any of those.
9      In fact, when Captain Myers retired, and
10  at the time was part of this lawsuit, he did
11  the same thing to Captain Myers. However, he
12  was able to obtain his, because Major Terry
13  Head, who I found has since retired, actually
14  went to Craft and said, listen, you're
15  accusing the man of stuff and he hasn't done
16  anything. Because by that time, Captain Myers
17  had also taken his polygraph and had passed.
18  And he wasn't going to give it to him either,
19  based on, again, he felt that, you know, he
20  was not worthy of receiving those things.
21 Q  Okay. It doesn't have anything to do with the
22  lawsuit?
23 A  No.
24 Q  I understand.
25 A  No. Like I said, it's just personal.

Page 235

1 Q  But you're upset about that?
2 A  Yes.
3 Q  All right. I understand that.
4      You did receive roughly $77,000 in your
5  accrued leave?
6 A  Yes.
7 Q  Okay. And you -- (Interrupted)
8 A  Monies that I earned.
9 Q  But you did receive it?
10 A  Yes, I did.
11 Q  And you've also received your retirement.
12  When did you start drawing, right when you
13  retired?
14 A  It actually took about a month for it to
15  actually kick in.
16 Q  Okay. I think I asked you this, but I want to
17  make sure.
18      You gave statements in both of those
19  investigations?
20 A  Yes, sir, I did.
21 Q  Is there anything that was covered in those
22  that we haven't talked about?
23 A  No, sir.
24      Toward the end, in investigation 10, one
25  of the questions Pat Pattum asked was, the

Page 236

1  reason I joined the lawsuit was because I did
2  not obtain the position of Internal Affairs.
3  When the position came open in Internal
4  Affairs for the lieutenant spot, three people
5  put in for that position. I did, Phil
6  Fontenot and Dwayne Prejean.
7 Q  Is that part of this lawsuit?
8 A  I guess in a sense it will eventually come
9  out. I think it will.
10      An e-mail was sent out by Dwayne
11  Arceneaux announcing the position opening in
12  patrol support. At the time, Dwayne Prejean
13  was the patrol support lieutenant. And it had
14  been stated that he had received the position
15  in Internal Affairs.
16      Policy is that you're supposed to
17  interview people and, you know, first announce
18  that you have an opening, and that you're
19  going to accept applications from people who
20  are interested in the position. That was not
21  done.
22 Q  Did you receive an interview?
23 A  Ultimately, I did.
24      But what happened was there was a
25  conflict between Arceneaux and Craft, because

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 237

1   when Arceneaux announced that there was an
2   opening in patrol support, everybody knew
3   that, okay, well, Dwayne Prejean received a
4   spot in Internal Affairs. So there was
5   conflict between Craft and Arceneaux regarding
6   that.
7       Because when it came out, I said, well, I
8   was not afforded the opportunity to apply for
9   this position, and neither was Phil Fontenot.
10  Phil Fontenot was upset as well.
11  Q  Is Phil Fontenot African American, or white?
12  A  No. He's white.
13  Q  Did y'all both apply?
14  A  Yes.
15  Q  Did y'all both interview?
16  A  Yes, we did.
17  Q  Okay.
18  A  Ultimately, that happened because they came
19  back and rescinded that Prejean had gotten the
20  position. So now, they had to come back and
21  pretty much cover their tracks.
22  Q  You have evidence to that --
23  A  I did.
24  Q  -- or that's just water cooler talk?
25  A  No, no. I did. But unfortunately, I was

Page 238

1   maintaining a file on my department issued
2   laptop and it crashed, and I lost the
3   information, so --
4   Q  Are you suggesting that anyone within LPD made
5   it crash?
6   A  That's a possibility. I'm not going to point
7   a finger. I'm not going to do like them and
8   stoop to their level and say, well, y'all 15
9   people did it. But the information was lost.
10      So they came back, Arceneaux actually
11  sent me e-mails between he and Craft. And I
12  know eventually when we do discovery, those
13  documents will come back up and they will
14  resurface. But there was conflict between
15  them two. They were having an e-mail war.
16  And Arceneaux sent them to me. So I knew
17  exactly what had happened.
18      So they came back and Chief --
19  Q  I don't remember seeing that as part of the
20  lawsuit.
21  A  No. I guess not.
22  Q  But you got an interview?
23  A  Yes.
24  Q  And Dwayne got picked?
25  A  Dwayne got the job. And ultimately, it became

Page 239

1   -- I became disgruntled, and that's how it
2   relates to the lawsuit. I became disgruntled,
3   a disgruntled employee because I did not
4   obtain the position in Internal Affairs as the
5   IA Lieutenant.
6   Q  Why did you become disgruntled?
7   A  That's what they said. I did not become
8   disgruntled.
9   Q  Okay. I thought you said that.
10  A  No.
11  Q  I thought you said, I became disgruntled.
12  A  No, no. That was the reason that they started
13  saying I become disgruntled. "They" being
14  Chief Craft and whoever else that follows him.
15  That is the reason -- or one of the reasons
16  why I became disgruntled is because I did not
17  get the position in Internal Affairs.
18      And matter of fact, at one point, Dwayne
19  Prejean came to me, met me in my office and
20  said, man, I understand that you're upset that
21  you didn't get the position, and you know,
22  you're upset. Dwayne -- it had been maybe
23  three or four months. Dwayne, no, I'm not.
24  Q  What time frame was that?
25  A  I don't know. Whenever he got the position.

Page 240

1   I can tell you this much, I can tell you when
2   they offered it open.
3   Q  And what are you looking at?
4   A  The e-mail that was sent out. There you go
5   (indicating).
6   Q  March 4th of 2011?
7   A  Oh, you just want the date? I was going to
8   let him read it because he doesn't have it.
9   Q  Yes.
10      Who was in there, Kelly Gibson?
11  A  I think so, at the time.
12  Q  He made captain --
13  A  Yeah.
14  Q  -- when Babin retired?
15  A  Exactly.
16  Q  Are there two Babin's, one in P.D. and one in
17  the sheriff?
18  A  Right. The Babin at the P.D. has since
19  retired. He was a captain at the P.D. And
20  his brother, John Babin, you've heard named
21  several times is in charge of narcotics.
22  Q  The one that Kane had the issues with that we
23  talked a lot about yesterday, that was John
24  Babin.
25  A  John Babin.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 241

1  Q   Not Karl Babin?
2  A   Not Karl Babin.  They're brothers.
3  Q   All right.
4  A   But that's the reason they're saying I became
5      disgruntled, because I didn't get the
6      position.  They asked me that question -- not
7      "they".  Pat Pattum asked me that question
8      during my interview, in reference to --
9  Q   10?
10 A   -- 10.
11         MR. SPRING:
12             Can we attach a copy of that?
13         MR. CORRY:
14             Sure.
15 A   And I was like, absolutely not, that was not
16     the reason why, you know.  Because number one,
17     I'm not disgruntled in no way, shape or form,
18     because I continued to do my job and report
19     for duty as required.
20         MR. CORRY:
21             Okay.  I'm not going to -- you can
22         attach it.  The only objection is, I
23         don't think it has any relevance to the
24         allegations made in the lawsuit.  But if
25         you want to attach it.

Page 242

1         MR. SPRING:
2             Yes.
3  MR. CORRY:
4  Q   I guess -- and some of this we may have been
5      over.  I just want to make sure I've covered
6      it.
7          As it relates to the document, releasing
8      personnel -- private personnel documents,
9      there's general orders and PPM's against
10     that?
11 A   That's correct.
12 Q   You can't go take something out of a IA file
13     and go release it?
14 A   That is correct.
15 Q   You're aware of that?
16 A   Yes, sir, I am.
17 Q   Did you think that you needed to get Major
18     Alfred's permission for that recording on
19     April 19th of '12, to be used in the TRO,
20     either put on the website or given to the news
21     media?
22 A   No, sir, I did not.
23 Q   That was not a violation of any general order
24     or PPM?
25 A   Absolutely not.

Page 243

1  Q   Or any other policy, or procedure or law?
2  A   That is correct.
3  Q   Alcorn has retired?
4  A   No.  Since I have retired, I know he has
5      obtained the rank of sergeant, but I cannot
6      tell you where he is assigned.
7  Q   Do you keep in touch with anybody at the
8      police department?
9  A   No, sir.
10         Once all of this is done, I will.  But I
11     don't want to bring any unjust harm to
12     anybody, because believe it or not, if Chief
13     Craft knows anybody at the Lafayette Police
14     Department has any communication with anybody
15     associated with this lawsuit they will be
16     become victims.  They're next victims.
17         MR. CORRY:
18             Do you want to take a quick smoke
19         break?
20         MR. SPRING:
21             Yes.
22         (SHORT BREAK TAKEN FROM
23         3:07 P.M. TO 3:24 P.M.)
24 MR. CORRY:
25 Q   Were you ever offered the sergeant's job in

Page 244

1      IA?
2  A   Yes.
3  Q   Did you accept it?
4  A   No, I did not.
5  Q   Why not?
6  A   I had just transferred into narcotics, and I
7      had served 11 years in IA.  And like I said,
8      then when I made sergeant, I went do the six
9      months in patrol.
10         So part of the reason was like, okay,
11     well, I just left that unit.  I'll just give
12     myself a break from it.
13         In addition, one of the biggest thing was
14     the fact that I had worked with Chief Craft
15     before on a negotiations team, and I kind of
16     knew our personalities would not coincide.
17     And I would have to work too closely with him
18     in that respect.
19 Q   So when you were offered the IA sergeant's
20     job, it was when Chief Craft was the chief?
21 A   He was -- I don't know if he was still the
22     interim chief, or had been appointed as the
23     chief at that time.
24 Q   It was after Hundley?
25 A   Yes, it was definitely after Hundley.

Kane Marceaux, et al vs.                                    Gabe Thompson
Lafayette City-Parish Consolidated Government, et al        February 19, 2014

Page 245

1  Q   And he offered it to you?
2  A   Yes.  He didn't come to me directly.  He
3      actually went through --
4  Q   The chain?
5  A   He went -- I don't know if it went through the
6      entire chain.  But he went through -- my
7      captain at the time was Jackie Phelps.
8          Matter of fact, we were in Shreveport,
9      Louisiana, at a narcotics conference.  And
10     Captain Phelps came and asked, he said, well,
11     do you want to go to Internal Affairs?  The
12     chief is inquiring.  And, you know, I told him
13     no, at the time, because I've just gotten
14     here, I'm learning this job, I really think
15     I'm going to enjoy it, so I want to stay here.
16     And I went on to tell him, again, I don't
17     think our personalities would actually gel.
18     Like I said, just having the limited contact I
19     had dealing with him as a negotiator.
20  Q  Well, then, how did that change when you
21     wanted the IA job, the lieutenants job.
22  A   Well, I figured I had matured some and
23     probably can -- I got to where I try my best
24     to work with as many people as I can and get
25     along with everybody.

Page 246

1  Q   Okay.  All right.  Anything else we haven't
2      covered?
3  A   No, sir.
4  Q   Anything else in your blue folder?  Do you
5      mind if I look through it?
6  A   No.  Absolutely.
7          (DISCUSSION HELD OFF THE RECORD)
8      MS. COREIL:
9          I think that was going to be 5.
10     COURT REPORTER:
11         Yes.
12     MR. CORRY:
13         With the objection that I made.
14  MR. CORRY:
15  Q   In the conversation with Major Alfred on April
16     19th, when you recorded him with Scott's pen
17     --
18  A   Yes, sir.
19  Q   -- was there any discussion about transfers at
20     that time?
21  A   I don't recall.  I don't think so.
22  Q   Okay.  When did y'all do the supplemental
23     responses, last night?
24  A   Yes.
25  Q   Did you have any recordings with anyone else?

Page 247

1  A   No.
2  Q   I know we talked about Kane and Scott, I
3      think.  Anybody else?  Greg, did you have any
4      recordings with him?  Did you give him any
5      recordings, or do any recordings for him?
6  A   No.  The only pen -- person's pen I used was
7      Scott's.
8  Q   Is that blue folder LCG property?
9  A   Absolutely not.
10  Q   It looks familiar.
11  A   Oh, yeah.  But they sell them everywhere.
12  Q   I'm just messing with you.
13  A   I know.  But we're on record.
14  Q   This first section is the discovery?
15  A   Yes, sir.  That's the stuff that I think that
16     we did last night.
17  Q   And the responses?
18  A   Yes.  And those are the ones that I typed up
19     myself.
20  Q   Okay.  And that's what we supplemented last
21     night?
22  A   Yes.  Pretty much the same information, just
23     different format.
24  Q   Yes.  Okay.
25  A   Those are all the attached documents that we

Page 248

1      have.
2  Q   I mean, you know, if there's more to give me,
3      give it to me.  I just don't want you to come
4      to court and say --
5  A   No.
6  Q   -- I got these.
7  A   I don't know.
8  Q   I don't see -- (Interrupted)
9  A   I don't know if you want to introduce my
10     evaluations.  Because like I said, for 22
11     years, three months, I was an outstanding
12     employee.
13  Q   I have access to those.  I don't need those.
14  A   Yeah.
15         I was an outstanding employee.  But the
16     last six months of my career, I was public
17     enemy number -- I'm going to say three.
18     Because I think Greg and Scott were one and
19     two.  Were public enemies one and two.
20  Q   Is an IA sergeant -- is that something that's
21     advertised and interviewed for?
22  A   Yes.
23  Q   Did that happen when they approached you about
24     taking it?
25  A   No, they did not.  And again, that was under

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 249

1  Chief Craft, and that was one of those
2  unwritten rules that he actually violated his
3  own policy, is because -- I can tell you
4  exactly how that went down.
5      When he called Captain Phelps and asked
6  me to -- if interested in the position, I said
7  no. And the next thing was, they told me that
8  being that I was turning down the position, I
9  needed to find somebody to go into Internal
10 Affairs. And the first person I threw under
11 the bus was Greg Cormier. That was the first
12 name I gave them. I said, Greg Cormier.
13     And for whatever reason, they said no to
14 Greg. And then, I said, okay, if not Greg
15 Cormier, Greg Randall. Because I'm pretty
16 sure we've got pretty much the same
17 personalities. Greg Randall. They said no to
18 Greg Randall. And then, that's when I
19 recommended Keith Gremillion.
20     And at first they said no to Keith
21 Gremillion, then, ultimately, they went with
22 the decision to accept him, and that's when he
23 went in.
24 Q  Okay. And Keith was someone you thought would
25 be good?

Page 250

1  A  Yeah. I hadn't worked with the guy, but I
2  thought he'd be fair. And that's what you
3  need, somebody in there who's going to be fair
4  and objective.
5      MR. CORRY:
6          Okay. You have questions, Steve?
7      MR. SPRING:
8          Yes, I've got a few.
9              EXAMINATION
10 BY MR. SPRING:
11 Q  Let me start with this: You talked about
12 Chief Craft with unwritten rules.
13 A  Yes, sir.
14 Q  Okay. As a police officer in the Lafayette
15 Police Department, as an employee, are you
16 under civil service?
17 A  Yes, sir.
18 Q  Is there any significance to being a civil
19 service employee?
20 A  Significance would be that you do have some
21 protection in relations to being protected by
22 civil service, compared to if you worked, say,
23 for the sheriff's office, where you're an
24 at-will employee that on any given day, if the
25 sheriff decides he no longer wants you to work

Page 251

1  at his place, he can walk in and terminate you
2  and there's nothing that you can do about it.
3      However, with the civil service
4  protection, pretty much there are rules and
5  regulations that should be followed, and there
6  is a due process in place.
7  Q  Okay. And that would apply to advancement?
8  A  Yes, sir.
9  Q  Is that why a test is required?
10 A  Yes, sir. Well, actually, that's part of the
11 state law for civil service.
12 Q  What about seniority?
13 A  Seniority, again, is established the date that
14 you're hired. And you're put on that list and
15 you wait your turn.
16 Q  Okay. And that falls within the ambient of
17 civil service?
18 A  Yes, sir.
19 Q  Now, Mr. Corry had asked you some questions
20 about the Lafayette Consolidated Government
21 PPM's, I guess policy and procedure --
22 A  Manual.
23 Q  -- manual.
24 A  Yes, sir.
25 Q  And also, general orders for the police

Page 252

1  department.
2  A  Yes, sir.
3  Q  Okay. To your knowledge, do the PPM's apply
4  to all employees of the city government?
5  A  That's correct, sir.
6  Q  And are they to be applied equally?
7  A  Yes, sir.
8  Q  What about the general orders for the
9  department?
10 A  They apply to all employees of the Lafayette
11 Police Department, yes.
12 Q  Okay. Now, there was a question about -- I
13 believe it was -- I think you had testified in
14 reference, let's see, an open door policy of
15 Chief Craft.
16 A  Yes, sir.
17 Q  Okay. With respect to the chain of command,
18 it's my understanding that there's a specific
19 rule in the general orders, and I think it's
20 1.9, perhaps, that says there is a chain of
21 command except in an emergency situation or
22 unless the chief makes some exception.
23 A  That is correct.
24 Q  Okay. And you're familiar with that?
25 A  Yes, sir, I am.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 253

1  Q   And would this open door policy fall within
2      that exception?
3  A   Yes, sir.
4          MR. CORRY:
5              And I'm just going to enter an
6      objection.  It's -- I'm not sure how it
7      relates to the allegations Gabe has made,
8      but --
9  MR. SPRING:
10 Q   Okay.  Well, let's go back then to this
11     unwritten rule.
12         Okay.  You said Chief Craft has unwritten
13     rules.  Can you tell me about that?  Is that a
14     policy?
15 A   Not a written policy, of course.  But the
16     unwritten rules -- because, again, having
17     obtained the rank of lieutenant, I was privy
18     to a lot.  And just everybody -- there is
19     despaired treatment between people when it
20     comes to certain discipline that's issued out,
21     or the way people are transferred to different
22     sections.
23         It's just if you're friends with the man,
24     you're going to be taken care of.  If you're
25     not, shame on you.

Page 254

1  Q   Okay.  And how does that work?  How does that
2      policy work, based on your experience?
3  A   My experience, as far as how it would work, if
4      -- as they walk around the police department,
5      they refer themselves as team Craft.  If
6      you're on team Craft, if there's any position
7      that you want to go to, or transfer to another
8      section because you're tired of working where
9      you're working, maybe they'll may put a letter
10     out, maybe they won't, and you'll just
11     transfer into that section.
12         If you're not a member of team Craft,
13     well, then, naturally, you have to follow the
14     rules that is designated by the general orders
15     of the Lafayette Police Department, and the
16     PPM's of the Lafayette Consolidated
17     Government.
18 Q   So if I understand your testimony correctly,
19     the PPM's and -- the unwritten policy is that
20     the PPM's and the general orders depending on
21     who you are--
22         MR. CORRY:
23             I'm going to object.
24 MR. SPRING:
25 Q   -- can either be used favorably if you're part

Page 255

1      of team Craft, or not so favorably if you're
2      not?
3          MR. CORRY:
4              And I'm going to object to the
5      form.
6  MR. SPRING:
7  Q   Objection, and answer the question.
8  A   Yes.
9  Q   Now, I think you said you were with the police
10     department 22 years and nine months.
11 A   That is correct.
12 Q   And from your inception, you were under four
13     or five chiefs before Chief Craft?
14 A   Yes, sir.
15 Q   And prior to Chief Craft, did you have any
16     kind of disciplinary problems at all?
17 A   No, sir.
18 Q   And all of your transfers associated with
19     promotions prior to Chief Craft --
20     (Interrupted)
21 A   It's standard procedure.
22 Q   Okay.  And earlier in your testimony, you
23     characterized the bogus charges and
24     investigations that were filed against you.
25 A   Yes, sir.

Page 256

1  Q   Is that part of the -- is that part of the,
2      let's call it, Chief Craft policy or rule?
3  A   Yes, sir.
4  Q   Besides yourself, do you have any evidence
5      that's known throughout the department?
6  A   I'm more than certain that you can go and
7      speak to any officer at the Lafayette Police
8      Department who would feel comfortable speaking
9      to you openly, and freely and truthfully, they
10     will tell you that it does exists.
11 Q   Okay.
12 A   The unwritten rule.
13 Q   Now, earlier in your testimony in response to
14     questions, you said that you have a right to,
15     I believe it is, not obey an order from a
16     superior that you believe to be unlawful, I
17     think was your word.
18 A   That's correct.
19 Q   Is that right?
20 A   Yes, sir.
21 Q   As part of this unwritten policy, what happens
22     if you, as an officer, take that position of a
23     superior officer and you're not part of team
24     Craft?
25         MR. CORRY:

Page 257

1      I'm going to object.  It calls for
2    speculation.
3  MR. SPRING:
4  Q   Based on your experience, have you seen any
5    examples of what has happened?
6  A   Yes, sir.
7  Q   Can you tell me those examples?
8  A   The example that comes to mind would be --
9    well, Sergeant Greg Randall at the time.
10    Sergeant Randall, I forgot how many days
11    suspension he received based on a complaint
12    that had been filed against him by Major
13    Dartez, because Major Dartez felt that he did
14    not properly conduct an investigation while he
15    was in charge of the juvenile section.  "He"
16    being Sergeant Randall.
17      I don't know how long the entire
18    process went.  But ultimately, Greg ended up,
19    I think, when he appealed it to civil service,
20    he ended up winning his appeal, because it was
21    shown that the police department did not
22    follow their own protocols and procedures
23    regarding that incident.
24  Q   And that would have been under Chief Craft's
25    direction?

Page 258

1  A   Yes, sir.
2  Q   And knowledge?
3  A   Yes, sir.  He was the chief.  He's the only
4    one who can order an investigation.
5  Q   Okay.  And you just said the Chief Craft is
6    the only one that can order an investigation?
7  A   Yes, sir.
8  Q   Well, I thought you testified earlier that
9    with respect to one of the investigations
10    ordered against you, Dee Stanley ordered that.
11  A   That's what I was told by Lieutenant Prejean.
12    However, the general orders clearly state that
13    the only person who can authorize an Internal
14    Affairs investigation of the Lafayette Police
15    Department is the chief of police.
16  Q   And what relationship, based on your
17    knowledge, does Dee Stanley have with Chief
18    Craft under the chain of command?
19      MR. CORRY:
20        I'm going to object.  Speculation.
21  MR. SPRING:
22  Q   Subject to the objection.
23  A   Okay.  Dee Stanley is Jim Craft's supervisor.
24  Q   And does Chief Craft report to Dee Stanley?
25  A   Yes, sir.

Page 259

1  Q   And is Chief Craft charged with disclosing to
2    Dee Stanley what he's doing, as far as
3    administering policies, and things of that
4    nature, for the police department?
5  A   I would say yes.
6  Q   Okay.  One of the allegations that was made in
7    the complaint and amended complaint is that
8    there is a code of silence resulting in a
9    hostile work environment in the police
10    department, which has led to adverse
11    employment actions, including wrongful
12    terminations.  Are you familiar with that?
13  A   Yes, sir.
14  Q   With respect to the charges that were brought
15    against you that, as you described it, forced
16    you to take retirement rather than
17    termination, is it your position that it was
18    based upon this code of silence?
19      MR. CORRY:
20        I'm going to object, Steve.  You're
21      leading him and he's your witness, you
22      can't do that.
23      MR. SPRING:
24        All right.
25  MR. SPRING:

Page 260

1  Q   You can answer.
2  A   Well, did you finish?  You didn't finish.
3  Q   Okay.  Why -- what is it that you did, to your
4    knowledge, that was -- or was there anything
5    that you did that triggered all of this?
6  A   Yes.
7  Q   And what was that?
8  A   I recorded a conversation, a personal
9    conversation with Jackie Alfred.
10  Q   Okay.  And you went and testified in the
11    temporary restraining order; is that right?
12  A   Yes, sir, I did.
13  Q   And why did you do that?
14  A   I received a subpoena as part of a witness, or
15    I guess a witness and a plaintiff.
16  Q   Okay.  And why did you participate in that?
17  A   Because definitely I wanted the truth to come
18    out and let the record reflect that I really
19    didn't do anything wrong, and just to pretty
20    much clear my name.
21  Q   Okay.  And there was some questions about you
22    laughing about the conversation with Jackie
23    Alfred.  Do you remember that?
24  A   Yes, sir.
25  Q   What was your feelings when you heard what he

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 261

1    had to say?
2  A  Actually, I thought it was kind of comical.
3     You know, he was upset.  And I had been around
4     Jackie Alfred for a while.  And like I said,
5     we really had no real issues to talk about,
6     per se.  But again, after receiving
7     information from Dwayne Arceneaux, and knowing
8     that Arceneaux was leaving, I felt that I
9     needed -- and the fact that I was actually
10    going talk to Alfred about someone who is very
11    close to Chief Craft, which was Ricky Rees, I
12    felt the need to go ahead and record that
13    conversation.
14 Q  Right.
15       But when you heard what he had to say,
16    what was your reaction?
17 A  And my reaction, it was actually kind of
18    comical.  Because, again, like I said, knowing
19    him for as long as I had, some of the things
20    he was saying, I just thought it was
21    ludicrous, you know.  Like, why would you get
22    upset because of what was said at a civil
23    service hearing, you know, if it's the truth?
24 Q  Now, if memory serves me, in that
25    conversation, there was a statement that

Page 262

1     Jackie Alfred made to the effect that he
2     didn't care -- he had checked with Chief Craft
3     and he didn't care if it was retaliation or
4     what they wanted to call it.
5        MR. CORRY:
6           I'm going to object.  I think the
7        recording speaks for itself.
8     MR. SPRING:
9  Q  Okay.  Assuming that statement is on there,
10    do you remember that?
11 A  Yes, sir, I do.
12 Q  What was your reaction to that?
13 A  I thought that was not appropriate for a major
14    to make that type of a statement about any
15    employee, whether it's a PO, corporal,
16    sergeant, lieutenant, captain, another major
17    or the chief.
18 Q  And based on the knowledge you have about the
19    PPM's and the general orders, is there any
20    policy or general order that prohibits police
21    officers from telling the truth and speaking
22    out to issues that they believe are adverse to
23    the department?
24 A  No, sir.  Contrary.  That general action
25    states that you should always tell the truth

Page 263

1     and be forthcoming.
2  Q  Is there an unwritten policy, to your
3     knowledge?
4  A  An unwritten policy regarding that?
5  Q  Yes.
6  A  Yes, sir.
7  Q  And what is that unwritten policy?
8  A  Unwritten policy, again, depends on which team
9     you're on, and --
10 Q  Well, assuming you're not on team Craft,
11    what's the policy?
12 A  The policy would be that if you don't tell the
13    truth when you're supposed to, we're going to
14    hammer you.  Or if you say something adverse
15    against the department, we're going to hammer
16    you.
17 Q  One of the allegations in the complaint that
18    was filed is that there's racial
19    discrimination.  Are you familiar with that?
20 A  Yes, sir.
21 Q  Do you maintain there is or is not?
22 A  I would say there is.
23 Q  Okay.  And can you tell me about that?  How
24    does it work?
25       MR. CORRY:

Page 264

1        Steve, I'm going to object.
2     Discrimination claims were stricken from
3     the lawsuit, you know that.
4        MR. SPRING:
5           Well, I just went into it because
6        you were asking Kane about it the other
7        day.
8        MR. CORRY:
9           Well, that's the allegations he said
10       he made.
11    MR. SPRING:
12 Q  Let's go back to the IA investigation.  You
13    had testified that you were to go to see Ray
14    Domingue?
15 A  Yes, sir.
16 Q  Okay.  And how long did you work in IA?
17 A  11 years.
18 Q  In the 11 years you worked there, do you know
19    of any instance when a person who was to
20    receive a notice of an internal investigation
21    was directed to receive it from Ray Domingue
22    at city hall, rather than through the police
23    department in IA?
24 A  No, sir.
25 Q  Besides yourself, do you know if anyone else

Kane Marceaux, et al vs.                                                    Gabe Thompson
Lafayette City-Parish Consolidated Government, et al                  February 19, 2014

---

Page 265

1    was directed to receive this special
2    treatment?
3  A   No, sir, I do not know.
4  Q   Were you given any reason -- let me ask you
5    that. Is that a policy of the police
6    department in Internal Affairs that any
7    notices are given at the police department, or
8    through IA?
9  A   Like I said, I don't think there is any
10   written rule about it. But standard protocol,
11   as long as I've been at the Lafayette Police
12   Department, spent my time in Internal Affairs,
13   and being a lieutenant conducting
14   investigations, it has always done in-house.
15  Q   So do you know why you were given special
16   treatment?
17  A   No, sir.
18  Q   Now, you also talked about the Internal
19   Affairs that you, and I think -- was it Phil
20   Fontenot?
21  A   Yes, sir.
22  Q   Is there a policy -- if I understood you
23   correctly, whatever the policy is on how that
24   position was supposed to have been protocol is
25   not how it was done; is that right?

---

Page 266

1  A   Initially, that's correct.
2  Q   Okay. And is that while Chief Craft was the
3    chief?
4  A   That is correct.
5  Q   And is there any other instances that you have
6    any personal knowledge of where the same --
7    the same type of mechanism was used for other
8    people?
9  A   I'd have to think back on that one, sir. None
10   is coming to mind right now, but I'm certain
11   there have been. But to personally, come out
12   and say right now, a specific incident, I
13   can't recall one at this time.
14  Q   Okay. Let me direct you to this transfer on
15   May 22nd of 2012. And I'm not sure what your
16   GT number is on that. It's attached.
17      MR. CORRY:
18          It's your responses. Let's see.
19      MR. SPRING:
20          Right.
21  MR. SPRING:
22  Q   It's dated May 22nd?
23  A   GT-68.
24  Q   It has 19 people being transferred.
25  A   Yes, sir.

---

Page 267

1  Q   Okay. Do you know if there's ever been any
2    transfer of that many people at the same time
3    prior to this?
4      MR. CORRY:
5          I'm going to object. That calls for
6      speculation.
7      MR. SPRING:
8          Well, I'm asking --
9      MR. CORRY:
10          There's no foundation.
11      MR. SPRING:
12          -- if he has personal knowledge.
13  A   I'm going to say yes, I recall other transfers
14   where there were multiple transferred. The
15   reason behind it, I couldn't tell you because
16   I was not affected by those transfers. But,
17   yes, there have been.
18  MR. SPRING:
19  Q   What was the stated reason for this particular
20   transfer reflected by the document you have
21   produced dated May 22nd of 2012?
22  A   No information was given. Just, you're being
23   transferred.
24  Q   You're not aware that it was to make everyone
25   well rounded?

---

Page 268

1  A   I heard that. That would be third party
2    information, but --
3  Q   All right. Okay. Are you aware out of the 19
4    people, the only three people who actually got
5    transferred were you, Lieutenant Stelly and
6    Greg Cormier?
7  A   No, sir, I was not aware.
8  Q   Okay. You also testified in respect -- with
9    respect to a complaint that Greg Cormier had
10   filed against Burt -- is it Bejsovec?
11  A   Bejsovec.
12  Q   Okay. I'm going to Bert B.
13  A   Okay.
14  Q   -- against Bert B.
15      Now, you worked with Internal Affairs,
16   you said for how many years?
17  A   11 years.
18  Q   All right. Was there ever a time when you had
19   an allegation of payroll fraud that was
20   handled by human resources rather than IA?
21  A   Not that I can recall. Every payroll fraud
22   allegation that came before while I was in
23   that unit, Internal Affairs handled it.
24  Q   Do you know of any reason why this one was
25   given special treatment?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 269

1 A  No, I do not.
2      MR. CORRY:
3          I'm going to object to the
4      classification of special treatment.
5      MR. SPRING:
6          I thought you would.
7      MR. CORRY:
8          He doesn't know the inner workings
9      of the decisions that were made.
10 MR. SPRING:
11 Q  Oh, and also with respect to this transfer.
12      MR. CORRY:
13          68.
14 MR. SPRING:
15 Q  68. Is there is a -- is there a way to get
16      exempted under hardship from a transfer?
17 A  Yes. If you would actually make contact with
18      your supervisors, and they would go through
19      the chain of command up to the chief, and you
20      explain what the hardship is. And the chief,
21      at that time, can either decide to recall your
22      transfer, or let it go through.
23 Q  Okay. And is that a policy as well?
24 A  Yes, sir.
25 Q  Okay. And did you ask for a hardship release?

Page 270

1 A  No, sir, I did not. Actually, after I found
2      out that they had denied Novey Stelly, because
3      he had made a hardship request, I figured it
4      would have been a waste of my time. When I
5      found out I was being transferred to Captain
6      Montgomery, I did go to him and explain to him
7      my situation, and that it would be more
8      beneficial for me to work 7:00 to 4:00,
9      instead of 8:00 to 5:00. He initially said,
10      okay, that won't be a problem. Then maybe
11      about an hour later, he advised me that he was
12      going to go get with Major Alfred to make sure
13      it was okay.
14          And at that point, I told him, I said,
15      man, look, don't worry about it. If you have
16      to go and ask him, I already know what the
17      answer's going to be, don't waste your time.
18      He told me, no, I'm still going to do it.
19          Ultimately, he did go talk to Major
20      Alfred, and Major Alfred advised that, no, I
21      would 8:00 to 5:00, instead of 7:00 to 4:00.
22 Q  On the 22nd of May, do you know if there was a
23      news publication about the TRO the same day?
24 A  I'm not aware.
25 Q  In talking about the change from 7:00 to 8:00,

Page 271

1      and 4:00 to 5:00, making that change for one
2      hour, is that significant or not significant,
3      as it relates to you and your family situation
4      then?
5 A  It was very significant to me. Mainly because
6      if I reported for 7:00 a.m., I could actually
7      get my son to his bus stop in time to catch
8      the bus. And then, I would also be off in
9      time to pick him up when he got off.
10 Q  Okay. So what was the impact of 8:00 to 5:00,
11      rather than 7:00 to 4:00, to you?
12 A  I had to hire a babysitter to care for my son,
13      and that cost me additional funds.
14 Q  So it depleted resources you had available?
15 A  Yes, sir.
16 Q  Also, when you were in Internal Affairs, were
17      there ever any times when people were alleged
18      to have done something who didn't do it and
19      actually got disciplined?
20 A  No.
21 Q  Do you know of any examples, or did you
22      witness any examples after Chief Craft came in
23      where that happened?
24 A  Yes. I had referred to it earlier. I
25      remember the particular case that was involved

Page 272

1      with Kenneth Hardy. Like I said, they
2      actually went out and, you know, disciplined
3      this young man even after the investigation
4      had not been substantiated.
5 Q  Was he a member of team Craft?
6 A  No, he was not.
7 Q  So as I understand your testimony, the
8      Internal Affairs investigation and allegations
9      that were initiated by Dee Stanley, that would
10      be contrary to any of the PPM's, or general
11      orders, to your knowledge; is that right?
12      MR. CORRY:
13          I'm going to object to that.
14      Improper foundation. Calls for
15      speculation.
16      MR. SPRING:
17          Subject to that.
18      MR. CORRY:
19          Outside of his knowledge.
20 MR. SPRING:
21 Q  Subject to the objection, can you answer that,
22      please?
23 A  Again, that would not be protocol, because it
24      is written in Lafayette Police Department
25      general orders that the only person authorized

Page 273

1  to authorize an investigation by Internal
2  Affairs would be Chief Jim Craft.
3  The only way that Mr. Stanley would be
4  required to order an investigation is if
5  Internal Affairs section actually received a
6  complaint on Chief Jim Craft.  Then,
7  naturally, you cannot go to the chief of
8  police and say, will, will you order an
9  investigation on yourself?  So at that point,
10  you would have to go to Mr. Stanley, and he
11  would then say, okay, you can conduct the
12  investigation on the chief or not.
13  Q   Okay.  Do you know of any other instances
14  where an IA investigation was ordered by
15  Stanley for someone receiving special
16  treatment?
17  A   No, sir.
18  Q   And you testified earlier that you had put an
19  application in for the attorney general's
20  office.
21  A   That is correct.
22  Q   And the report made to whoever Mr. Wright was,
23  that you were a troublemaker?
24  A   I do recall his first name now, too, Mr.
25  Corry.  It's Earl Wright.

Page 274

1  Q   And he works with -- he was doing a background
2  check?
3  A   Yes, sir.  He was employed at the State of
4  Louisiana Attorney General's Office.  It has
5  been brought to my attention, though, over the
6  last -- I would say maybe the last three to
7  four weeks he has been since terminated from
8  that place.  It was learned that he was
9  actually not POST certified.
10  Q   Okay.
11       MR. CORRY:
12            You're going to add him to your
13       witness list?
14       MR. SPRING:
15            I've got enough on my plate right
16       now.
17  MR. SPRING:
18  Q   And this Dwayne with the police department, do
19  you know who that was?
20  A   No.  The only -- again, assumption that I made
21  that he was referring to Dwayne Prejean,
22  because he said he didn't recall who he had
23  spoken to.  And he just said that he was told
24  he would have to speak with someone named
25  Dwayne.  He could not recall the last name.

Page 275

1  Q   Also, earlier, you testified about the
2  counseling forms, that the policy is it's
3  supposed to be maintained for one year, and
4  then excised from the file.  Is that right?
5  A   That is correct.
6  Q   Okay.  Prior to Chief Craft and the other
7  administrations, were they excised from the
8  personnel files?
9       MR. CORRY:
10            I'm going to object.  I'm not sure
11       that he has access to personnel files.
12       It's outside of his scope and knowledge.
13  MR. SPRING:
14  Q   If you know.
15            Were they excised from personnel files
16       prior to Chief Craft's administration?
17       MR. CORRY:
18            Same objection.
19  MR. SPRING:
20  Q   If you know.
21       MR. CORRY:
22            No way he could know.
23       MR. SPRING:
24            Oh, I would like him to answer it.
25       So subject to the objection.

Page 276

1  A   The way I will answer this question is, when I
2  was assigned to the Internal Affairs section,
3  the files that were maintained in Internal
4  Affairs, we purged them annually.  And
5  anything that needed to come out, the
6  supervisors were very good about that.  The
7  way the filing system was set up, you knew
8  which year needed to be purged, so those
9  documents were removed accordingly.
10  MR. SPRING:
11  Q   And after Chief Craft?
12  A   I was no longer assigned to that unit, so I
13  can't tell you specifically how it was
14  handled.
15  Q   All right.  But you did testify that if you
16  got one, even though it was supposed to be
17  excised for one year --
18  A   Yes, sir.
19  Q   -- it would come home to roost against you; is
20  that right?
21  A   Yes.
22       MR. CORRY:
23            I'm going to object.  It's outside
24       the scope of his knowledge.
25  A   And I -- and I responded that way earlier

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 277

1   because there were cases where I sat in
2   predisciplinary hearings where outdated
3   counseling forms were made part of the
4   record.
5 MR. SPRING:
6 Q   And it was not supposed to be, pursuant to the
7     general orders, PPM's of the police report --
8 A   That is correct.
9 Q   -- is that correct?
10 A   That's correct.
11 Q   Do you remember who was present in any of
12     those?  Was Chief Craft present in any of
13     those?
14 A   Yes, sir.
15 Q   Anyone else that you can recall?
16 A   It depends on where you were assigned at the
17     time.  Again, it would have been, if you're in
18     patrol, it would have been Major Alfred.
19 Q   Okay.  Is that one of the unwritten policies
20     of Chief Craft?
21 A   I don't know if it was an unwritten policy,
22     but that was a practice of his.
23 Q   Okay.
24 A   And again, you would have members of the human
25     resources section that would sit in.  And

Page 278

1   pretty much what would happen is they would go
2   through -- they would obtain your entire
3   personnel file.  And if this information was
4   supposed to have been removed and wasn't,
5   they still would look at that and use that as
6   part of the information they used to formalize
7   if you were going to be disciplined or not,
8   and how much discipline you were going to
9   receive.
10 Q   On those instances where you sat in
11     predisciplinary hearings --
12     MR. CORRY:
13         What time frame are we talking
14     about?
15 MR. SPRING:
16 Q   Well, why don't you just testify and give us a
17     time frame?
18     MR. CORRY:
19         Yes.  What time frame are you
20     talking about?
21 A   Pretty much from the time I went to Internal
22     Affairs and then left that unit, up until the
23     time that I made lieutenant and became part of
24     that administrative portion again, you know.
25     MR. CORRY:

Page 279

1         So what years was that?
2 A   2010 to 2012.
3 MR. SPRING:
4 Q   And on those instances, were those folks part
5     of team Craft?
6 A   Not recalling any specifically, sir, I
7     couldn't answer for certain.  But if they were
8     used against you, you were not.
9 Q   Okay.  This transfer to Captain Montgomery,
10     was that punitive, or did you take it as
11     punitive?
12 A   Absolutely, I did.  Yes.
13 Q   Can you tell me why?
14 A   Again, as you may have heard the verbiage used
15     before that they were making this transfer to
16     make officers well rounded.  But how are you
17     making me well rounded when you're just
18     transferred me from the precinct where I've
19     been working for the past couple of years and
20     move me to another precinct to do the exact
21     same job?  It would have been different if
22     they was taking me out of patrol and sending
23     me somewheres else.  However, you move me from
24     one precinct to another to do the exact same
25     job.

Page 280

1 Q   And that's after the recording of April 19th,
2     with Jackie Alfred?
3 A   That is correct.
4 Q   How did your work environment change after
5     that?
6     MR. CORRY:
7         Asked and answered.  I'm going to
8     object.
9 MR. SPRING:
10 Q   Well, subject to the objection.
11 A   Okay.  It changed.  Again, less inclusive.
12     When it came to dealing with things that were
13     going on in the precinct, you know, I pretty
14     much felt worthless because I actually felt
15     bad, because I pretty much was going to work
16     and earning the salary that I was not actually
17     earning.  So pretty much I went into my
18     office, and that was pretty much it.
19 Q   Life in exile?
20 A   Yes, sir.
21 Q   Okay.  Do you know of any other instances
22     while you were with the department under Chief
23     Craft, when the same thing was done to
24     others?
25 A   Can you be more specific?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 281

1  Q   Well, do you know of any other transfers that
2      were done like that, where you were -- any
3      other officer who was obviously not part of
4      team Craft would have been transferred to life
5      in exile?
6  A   Oh, absolutely.
7      MR. CORRY:
8          And Steve, I'm going to object.  If
9      it doesn't affect his allegations in the
10     lawsuit and the constitutional claims
11     that remain as they relate to Gabe
12     Thompson, it's irrelevant and doesn't
13     matter.
14     MR. SPRING:
15         Well, I don't think it's irrelevant
16     because if there is a policy, you're
17     going to have to prove the existence,
18     frequency, and that type of thing.  So I
19     think it's relevant.
20 MR. SPRING:
21 Q   But subject to the objection, would you answer
22     the question?
23 A   Yes, sir.  Absolutely.  Greg Cormier and Scott
24     Poiencot were both transferred as a result of
25     the TRO that was filed.  And they, too, were

Page 282

1      actually transferred to the exact same
2      precinct I was, Precinct 4.
3  Q   In the beginning of the deposition, you
4      testified to the extent that you had no
5      problems with Alfred, but you also responded
6      he was not a good major.
7  A   That's correct.
8  Q   Is that correct?
9  A   Yes, sir.
10 Q   Can you explain that further for me, please?
11 A   In short, I would classify the man as a
12     hypocrite.  Because he was one of these that
13     would walk around the police department, and
14     if an officer walked past him and he did not
15     acknowledge him, he became upset, wanted to
16     write people up, or get them demoted, whatever
17     the case might be, whatever he can have done
18     to them.
19         And on the flip side of that, he was
20     doing the exact same things.  Both he and
21     Chief Craft, they would not acknowledge
22     people.  Even after sitting through a staff
23     meeting when all of this started, and Chief
24     Craft said that everybody would remain
25     professional and we would still respect one

Page 283

1      another.  And that was not the case.  Both he
2      and Alfred, if anything, made the place a very
3      hostile place to be in because both of them
4      would not speak to me.  I can't speak on
5      behalf of anyone else involved this this
6      lawsuit.  But they would not speak to me.
7          In addition -- it was just bad for -- for
8      this guy, you know, because it was -- at one
9      point, I remember a specific incident when I
10     was going into the watch commander's office to
11     relieve the watch commander, because I was
12     going to work that night shift for somebody.
13     And the chief walked into the room, and I just
14     acknowledged him.  You know, how are you
15     Chief?  And there were another lieutenant in
16     the room, a sergeant and a -- I want to say
17     either a corporal or P.O.  And he did not
18     address me.  He just looked at me, and then
19     just turned around and walked out the office.
20     And what was this disheartening about it is
21     that you actually had a rookie police officer
22     in this room that witnessed this.  And all
23     this guy said was, wow.  That was his
24     explanation.  I don't recall who the officer
25     was, but all he said was, wow, I can't believe

Page 284

1      that just happened.
2  Q   Okay.  Mr. Corry asked you a question about
3      policy on working hours.  And I think you gave
4      a response of yes and no.
5          Writing, yes; actual, no.  Do you recall
6      that?
7  A   Uh-huh (yes).
8  Q   Okay.  Is there other instances in the
9      department under Chief Craft's administration
10     where the policy is written saying yes, but in
11     actuality, it's something quite different?
12 A   And again, it would be on a case-by-case
13     basis --
14 Q   Yes.
15 A   -- and would determine what the circumstances
16     are.
17         And it goes back to, if you're a member
18     of team Craft, it depends on what it is, you
19     may or may not be disciplined as a result of
20     what the allegation is that's being made
21     against you.  And if you're not, again, you
22     will be dealt with accordingly.
23 Q   And you also testified about this polygraph
24     that was supposed to be ordered to everyone.
25 A   Yes.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 285

1  Q   Normally, is a polygraph -- are suspects told
2      they're going to have to take a polygraph
3      upfront, or is that done normally after an
4      initial interview?
5  A   You would wait after the initial interview.
6      To come out and just order a polygraph in the
7      beginning before you even interview anybody,
8      what's the basis behind it?
9  Q   Is there a written protocol, maybe in the IA
10     directives, or general orders?
11 A   Unless it's been put in since I've left, no,
12     sir.
13 Q   Okay.
14 A   And that's just basic investigators 101.  How
15     would you offer a polygraph examination
16     without even talking to me first?  You don't
17     know what I have to say.
18 Q   So that would be special treatment then; is
19     that right?
20 A   Absolutely.
21         MR. CORRY:
22             Good thing you called.
23         THE WITNESS:
24             Yes.
25 MR. SPRING:

Page 286

1  Q   The day that you encountered Woody --
2  A   Overton.
3  Q   -- Overton, do you know if he was there in the
4      capacity of state trooper, or in a private
5      capacity?
6  A   He advised me he was in his official capacity
7      as a Louisiana State Police Officer.
8  Q   Okay.  There was some questions on this Olita
9      Magee, missing document.  The third floor of
10     the police department, can any police officer
11     or civilian employee ride the elevator to the
12     third floor?
13 A   Yes, sir.
14 Q   Was that a secure floor, off limits to anyone?
15 A   No, sir, it was not.  It's open.
16 Q   Do you have any awareness of the installation
17     of covert smoke detectors which were installed
18     near your office, Scott and Greg's office, by
19     a company called WOW, W-O-W, Technologies?
20 A   Yes, sir.  I learned that there was a
21     possibility that a listening device, audio
22     devices had been placed, and possibly a video
23     as well, devices had -- covert devices had
24     been placed in the ceilings throughout the
25     police department, first and second floor.

Page 287

1          MR. CORRY:
2              I thought you worked on the third
3      floor?
4  A   Yes.  But access to all floors in the police
5      department.  So first, second and third
6      floors.
7          Actually, there was one also placed in
8      the watch commander's office on the first
9      floor.  Some of the ones that they had
10     questions about, I can tell you, went to Alton
11     Trahan and asked if those were legitimate fire
12     detectors.  And he looked at them.  He is a
13     fire investigator for the Lafayette Fire
14     Department.  He said, absolutely not.  Those
15     are not real detectors.  He said, I don't know
16     what they are, but they're not detectors.
17         Don't know what the reason for it, behind
18     it, but that was under Chief Craft's
19     administration.
20 MR. SPRING:
21 Q   Can you give me a date?
22 A   I don't have a specific date, sir.
23 Q   Year, month?
24 A   It would have been in 2012.  He -- after
25     receiving this information from Alton, I know

Page 288

1      that Dwayne Arceneaux had found out.  And I
2      want to say that maybe Dwayne must have
3      informed Alfred about it.  And eventually,
4      Chief Craft learned of it.  And then, Chief
5      Craft said -- and I forgot if it was after a
6      compstat meeting, or during the general staff,
7      that there were people going around saying
8      there were audio listening devices -- audio,
9      video devices that had been installed.  And he
10     said, no, that was not the case.  That was --
11     they were legitimate instruments that had been
12     installed, and that it was a rumor that was
13     going around.
14 Q   Were they ever removed?
15 A   To my knowledge, sir, no, they were not.
16 Q   When you were sergeant in narcotics, could you
17     or your agents enforce federal statutes?
18 A   No, sir.
19 Q   Members of CID, did they work drug cases?
20 A   No, sir.
21         And when you say "members of CID", you're
22     talking adult detectives, juvenile detectives?
23 Q   Yes.
24 A   No, sir.
25 Q   Would you consider being assigned to the DEA

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

---

Page 289

1    Task Force a prestige position?
2  A   Absolutely.  Yes.
3  Q   And how would you view a transfer from DEA
4    back to Metro?
5        MR. CORRY:
6          And Steve --
7        MR. SPRING:
8          Well, that's all right.  It's asked
9    and answered.
10        MR. CORRY:
11          I object.  And it doesn't affect him
12    at all.
13        MR. SPRING:
14          That's fine.
15  MR. SPRING:
16  Q   While you were with narcotics, did you ever
17    have a federal commission?
18  A   No, sir, I did not.
19  Q   Would you consider Metro, or CID and DEA the
20    same?
21  A   No, sir, they're not.
22  Q   Do you know of any officers underneath Chief
23    Craft's administration that were accommodated
24    when they were injured to work and receive
25    full employment?

---

Page 290

1  A   Yes, sir.
2  Q   Can you tell me who?
3  A   Specifically, yeah.  I know it was testified
4    to in here yesterday, but I do have knowledge
5    because I saw it myself.  Monte Potier, when
6    he reported to duty in a wheelchair.  I mean,
7    that was common knowledge around the police
8    department.  Everybody saw it.  You can't hide
9    men coming to work in a wheelchair every
10    day.
11  Q   And --
12  A   And Captain Ted Vincent.  Like I said, I
13    worked -- I'm sorry, I think he's made major
14    since.  He made no secrets about it that he
15    had very bad hips and that he had hip
16    replacement surgeries on both hips.  And he
17    was accommodated.  Matter of fact, he was
18    allowed to work from home preparing -- I think
19    they were revising some of the general orders
20    at the time.  And he was allowed to work from
21    home to do that.
22  Q   And by doing that, he wouldn't have to use up
23    any sick leave?
24  A   Any sick leave, that is correct.
25  Q   And so, he would be paid at whatever high rate

---

Page 291

1    he was when he retired, right?
2  A   That is correct.
3  Q   You mentioned that with respect to the Olita
4    Magee incident, the name of the detective,
5    Todd Green.
6  A   Yes, sir.
7  Q   Do you know whether he was one of the ones
8    included in the 15 or so notices?
9        MR. CORRY:
10          I'm going to object.  He doesn't
11          know who the 15 were.  He already asked
12          and answered.
13  MR. SPRING:
14  Q   Subject to that objection, do you know if he
15    was included?
16  A   To my knowledge, no, sir.
17  Q   Okay.  In the transfer from May 22nd, did you
18    consider that to be unwarranted discipline?
19        MR. CORRY:
20          Objection.  Speculation.  Asked and
21          answered.
22  MR. SPRING:
23  Q   Okay.  Did you?
24  A   Yes.
25        MR. SPRING:

---

Page 292

1        I have no other questions.
2        RE-EXAMINATION
3  BY MR. CORRY:
4  Q   Do you have any direct firsthand knowledge of
5    -- is it Captain Monte Potier?
6  A   No.  At the time, he probably would have been
7    sergeant.
8  Q   And what time frame is this?
9  A   I couldn't give you a specific date, sir.  I
10    would be lying if I did.
11  Q   Okay.  Do you have any specific knowledge of
12    his sick leave, annual leave balance?
13  A   No, sir.
14  Q   Do you have any direct evidence of his pay?
15  A   No, sir.
16  Q   Is he still employed?
17  A   As far as I know, yes.
18  Q   Same question for Captain Ted Vincent, do you
19    have any direct firsthand knowledge of his
20    balance of sick and/or annual leave?
21  A   No, sir.
22  Q   Or his pay?
23  A   No, sir.
24  Q   Do you know when it was that you claim he was
25    working at home because of his hips?

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 293

1  A  Again, I couldn't give you a specific date,
2     but he makes no qualms about it.  He tells
3     you.  He personally told this to me that he
4     was allowed to do this, so this is firsthand
5     knowledge.
6  Q  All right.  Can the public come up and view IA
7     files?
8  A  No, sir.
9  Q  Okay.  So for a document to be taken out of an
10    IA file, it's got to be done by someone on the
11    inside, right?
12 A  Internal Affairs, yes.
13 Q  Or someone within the police department?
14 A  No.  And I say no, because --
15 Q  Did Todd Green work in Internal Affairs?
16 A  No, he didn't.
17 Q  This speculation about these smoke detectors,
18    or whatever they were, did anybody examine
19    them to see if they were smoke detectors, or
20    what did you say, some kind of bugging device?
21 A  Audio listening device, audio, video listening
22    device.
23 Q  Do you have any direct evidence that that's
24    what that is?
25 A  No, sir.

Page 294

1  Q  Okay.
2  A  The only other person, like I said, I spoke to
3     Fire Investigator Trahan, and he said it was
4     not.  And now --
5  Q  Did he examine them?
6  A  I don't know if he went back and -- he
7     actually stood up and looked at them when he
8     and I were speaking at the time, and he said,
9     no, it was not.
10 Q  Did you voice any complaints to anybody about
11    it?
12 A  No.
13 Q  And Chief Craft addressed it at some meeting?
14 A  Yeah.
15    And the only other person that I had made
16    a comment to those detectors about was -- I
17    can't recall his last name, but he is the head
18    maintenance guy at the police department,
19    Doug.  I don't remember his last name.  But
20    one day, I said, hey, Doug, what are those?
21    Because he was with the contracting company
22    that came out and installed this.  And he
23    would not answer.  He just laughed and walked
24    off.
25 Q  What direct evidence do you have that Gabe --

Page 295

1     excuse me, Greg Cormier and Scott Poiencot
2     were transferred because of the TRO?
3  A  Because they both are friends of mine and we
4     were all transferred at the same time, the
5     very next day.  I think almost the next day,
6     we learned that we were going to we
7     transferred.
8  Q  What direct evidence do you have that it was
9     because of the TRO?  Nothing?
10 A  Oh, simply because again, Ms. Shirley had
11    overheard the conversation.
12 Q  If she didn't overhear it -- you never
13    mentioned anything about Greg Cormier or Scott
14    Poiencot, did you?
15 A  No, sir.
16 Q  Are you at any time -- regarding the testimony
17    about counseling forms being used, are you
18    ever -- or have you ever been part of letters
19    of discipline, composing them, putting them
20    together?
21 A  No, sir.
22 Q  Okay.  Who determines the ultimate discipline
23    that's given, the chief?
24 A  The chief.
25 Q  The appointed authority?

Page 296

1  A  That is correct.
2  Q  So you have no idea or do you have -- scratch
3     that.
4     Do you have any direct evidence that he
5     actually uses a counseling form that should
6     have been taken out within a year in
7     discipline?
8  A  Again --
9  Q  Any direct evidence.
10 A  No, sir.
11 Q  Okay.  Did you ever voice any objection at any
12    time you were in any predisciplinary
13    hearings, or predetermination hearings that,
14    hey, I think this counseling form's outdated,
15    it shouldn't be used?
16 A  Yes.
17 Q  You did?
18 A  On multiple occasions.  Good friends, and I
19    still am to this day, with Janice Hollier.  We
20    had a good working relationship.
21    Rick Zeno, on the other hand, he more
22    tend to side with -- in my opinion, human
23    resources was supposed to be looking out for
24    both the employee and the wellbeing of the
25    city.  But for whatever reason, again, my

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 297

1 opinion that Rick Zeno leaned more toward the
2 city.
3 Q  Go back to my question, though.
4 A  Uh-huh (yes).
5 Q  Do you have any -- you voiced objection?
6 A  Yes.
7 Q  To who?
8 A  In those meetings.
9 Q  To who?
10 A  Okay.  Whoever was present.  Whether it be the
11 chief, Major Alfred, whether it be Rick Zeno,
12 Janice Hollier, or if Mr. Domingue was present
13 himself.
14    At the time, it would have been my
15 captain, Captain Myers, and myself.
16 Q  Okay.  But you don't know if that was actually
17 part of the progressive discipline that was
18 administered by this chief, because you
19 weren't part of that, correct?
20 A  Ultimately, if an officer is assigned, like I
21 said, example, I'm assigned to Precinct 3 as
22 the administrative lieutenant.  Once that
23 officer is disciplined, I receive a copy of
24 the -- whatever discipline letter that is
25 sent.

Page 298

1 Q  Right.  But you're not part of composing the
2 letter, or determining how much discipline
3 that officer gets, correct?
4 A  My opinion is asked in that meeting.
5 Q  I'm sorry?
6 A  My opinion is asked.
7 Q  Right.
8    But the ultimate discipline is the
9 decision of the appointing authority, and only
10 the appointing authority.
11 A  Right.
12 Q  Okay.  So whether the outdated counseling
13 form, if that, in fact, ever occurred, you
14 don't know if the pointing authority used that
15 or not?  You don't have any direct evidence
16 whether it was used or not, do you?
17 A  I don't have any direct evidence, no.
18 Q  Okay.  Do you have any direct evidence of the
19 Kenneth Hardy matter, or is it just
20 speculation, water cooler talk?
21 A  No.  Again, the Lafayette Police Department
22 would have access to all of those things.
23 Q  So it's just speculation that you -- hearsay
24 that you've heard?
25 A  No.  It's not hearsay, because those were

Page 299

1 actual investigations that I conducted.  So I
2 know those files do exist.
3 Q  Okay.  And if an officer thinks that he's been
4 -- received discipline that's not warranted,
5 his avenue is to go appeal it to the civil
6 service board?
7 A  Yes, sir.
8 Q  Okay.  When you were working in Metro
9 Narcotics, I think you said your hours were
10 like 8:00 to 5:00, but you generally worked
11 6:00 a.m. to 9:00 p.m.
12 A  8:00 to 6:00, yes, sir.
13 Q  What did you do with your children?  Did you
14 have to hire a babysitter?
15 A  Yes, sir, I did.
16 Q  Okay.  Did you complain to anybody that that
17 was a hardship?
18 A  Yes, sir.  And my supervisors knew.  But
19 again, we were working four ten's, and they
20 were more accommodating.  And when I needed to
21 leave, if I needed to leave, because those
22 occasions where I did have to work late --
23 Q  You were paid overtime?
24 A  -- they made accommodations.
25 Q  And you were paid overtime?

Page 300

1 A  Paid overtime, yes, sir.  Or like I said, most
2 times I did not turn in overtime and I had
3 enough advance notice to where I could make
4 the necessary arrangements, too.  And it
5 wasn't every day that this was happening.
6 Q  Do you have any direct evidence of this code
7 of silence that's been thrown in this lawsuit?
8 Direct evidence.
9 A  No, sir.
10 Q  Do you have any direct evidence of this
11 Stanley-Craft organization, other than just
12 speculation and talk around the police force?
13 A  Well, it exists.  I mean, it's --
14 Q  Direct evidence.
15 A  No.
16    MS. COREIL:
17       Team Craft I think is what it is.
18 A  That's the word I used.
19 MR. CORRY:
20 Q  And that's coming next.
21    Any direct evidence of team Craft?  Is
22 there a list, who's on it and who's not?
23 A  No.  But we know who they are.
24 Q  Y'all speculate who's on it?
25 A  Oh, no, no.  They make it known.

Kane Marceaux, et al vs.
Lafayette City-Parish Consolidated Government, et al

Gabe Thompson
February 19, 2014

Page 301

1  Q  Who does?
2  A  I can tell you the members of team Craft.
3     Ready to run down?  We've got Bert Bejsovec,
4     Blair Dore, you have Paul Mouton, you have
5     Mark Francis.  At the time you had Jackie
6     Alfred, you had Dwayne Arceneaux, you had
7     Monte Potier, you had Ricky Rees, you had --
8  Q  Those are --
9  A  You had --
10  Q  -- white officers and African American
11     officers?
12  A  Yes.  Yes.
13  Q  Okay.
14  A  There are several.
15         MR. SPRING:
16             Do you want to complete your answer?
17  MR. CORRY:
18  Q  Yes.  I don't want to cut you off.
19  A  Oh.  Cornell Montgomery, you had -- some of
20     the younger guys I really just didn't know,
21     but they were members.
22         Pretty much any member of the Lafayette
23     Police Department SWAT team.  If you were on
24     the SWAT team, you had free reigns.
25  Q  Free reigns?

Page 302

1  A  Yes.
2  Q  To do whatever you wanted?
3  A  Pretty much.  And I can tell you, that, I can
4     verify it for you because there was a pursuit
5     that was conducted by members of the Lafayette
6     Police Department SWAT team.
7  Q  Did it affect you directly?
8  A  No.
9  Q  Okay.  Do you have any actual evidence that an
10     unlawful direct order was made to you that you
11     had to follow, or voice an objection not to
12     follow?
13  A  No, sir.
14  Q  Were you ever denied seniority?
15  A  No.
16  Q  Were you ever denied any advancement?
17  A  No.  Passed the test and put my time in.
18  Q  Were you ever disciplined for violation of
19     going through the chain of command on this
20     open door policy?
21  A  No, sir.
22         MR. CORRY:
23             I can't read my handwriting.
24         MR. SPRING:
25             I have that problem.

Page 303

1         MR. CORRY:
2             Probably the best question, too.
3  MR. CORRY:
4  Q  Hell's Kitchen, have you ever heard of that
5     before this lawsuit?
6  A  That's a TV show, right?
7  Q  Okay.  Well, that answers that.
8         MR. CORRY:
9             You better get out of here.
10         MR. SPRING:
11             We're done.
12         MR. CORRY:
13             You have the right to read and
14     sign.
15         MR. SPRING:
16             Yes, we're going to read and sign.
17         THE WITNESS:
18             Oh, yeah.
19         (DEPOSITION CONCLUDED AT 4:23 P.M.)
20
21
22
23
24
25

Page 304

1                    CERTIFICATE
2
3         This certification is valid only for a
    transcript accompanied by my original signature and
    original required seal on this page.
4
5         I, Debbie G. Chaney, Certified Court Reporter,
    in and for the State of Louisiana, as the officer
6     before whom this testimony was taken, do hereby
    certify that GABE THOMPSON, after having been duly
7     sworn by me upon authority of R.S. 37:2554, did
    testify as hereinbefore set forth in the foregoing
8     three hundred seven (307) pages; that this
    testimony was reported by me in the stenotype
9     reporting method, was prepared and transcribed by
    me or under my personal supervision, and is a true
10     and correct transcript to the best of my ability
    and understanding; that the transcript has been
11     prepared in compliance with transcript format
    guidelines required by statute or by rules of the
12     board, as described on the website of the board;
    that I have acted in compliance with the
13     prohibition on contractual relationships, as
    defined by Louisiana Code of Civil Procedure
14     Article 1434 and in rules and advisory opinions of
    the board; that I am not related to counsel or the
15     parties herein, nor am I otherwise interested in
    the outcome of this matter.
16
17     This the 7th day of March, 2014, at LAFAYETTE,
18     LOUISIANA.
19
20
21         _____
           DEBBIE GIDDINGS CHANEY, CCR
           LOUISIANA CERTIFICATION NO. 90023
22
23
24
25